FILED

MAY 22 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            *cu*            DEPUTY

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11
12

WHITEWATER WEST INDUSTRIES, LTD., a Canadian corporation,

Case No.:  3:17-cv-01118-BEN-BLM

Plaintiff,

13

**ORDER ON MOTIONS IN LIMINE AND DAUBERT MOTION**

v.

14
15

PACIFIC SURF DESIGNS, INC., a Delaware corporation, and FLOW SERVICES, INC., a California corporation,

**[Doc. Nos. 193, 194, 195, 196, 208.]**

16
17

Defendants.

18
19
20

Plaintiff brings this action against Defendant Pacific Surf Designs, Inc. ("PSD")

21

and Flow Services, Inc.'s ("FSI") (collectively "Defendants") for direct infringement of

22

Plaintiff's U.S. Patent No. 6,491,589 (the "'589 Patent") issued on December 10, 2002.

23

Pursuant to 35 U.S.C. § 282, the '589 Patent is presumed to be valid.  (Doc. No. 1 ¶ 11.)

24

The '589 Patent is entitled "Mobile Water Ride Having Sluice Slide-Over Cover" and

25

relates "to a simulated wave water ride attraction having one or more flexible

26

nozzle/sluice covers for ensuring the safety of riders and lowering the risk of injury or

27

interference with ride operation. *Id.* ¶ 12.

28

1    On January 31, 2014, Surf Park and FlowRider Surf Ltd. ("FlowRider") entered
2    into an Intellectual Property License Agreement conveying to FlowRider all substantial
3    rights to the '589 Patent, including the right to bring actions for infringement of the '589
4    Patent. All of FlowRider's rights to the '589 Patent were transferred to Whitewater
5    pursuant to January 31, 2014, Intellectual Property Sublicense Agreement and a February
6    1, 2016 amalgamation, in which FlowRider and Whitewater amalgamated as one
7    company in the name of Whitewater. By operation of Canadian law, on the date of the
8    amalgamation, all of FlowRider's assets became the property of Whitewater.
9    Accordingly, Plaintiff Whitewater has independent standing to sue for infringement of
10   the '589 Patent. *Id.* ¶ 14.

11   Plaintiff alleges the '589 Patent includes 57 total claims, of which at least claims 1,
12   3, 13, 15-17, 24-27, 29-38, 41-43, 50, and 54-55 (the "Asserted Claims") are infringed by
13   Defendants. Despite such awareness, Defendants willfully, deliberately, and
14   intentionally continued to engage in their infringing activities of the Asserted Claims.

15   In preparation for trial, the parties filed several motions in limine to exclude
16   evidence. The motions are fully briefed. The Court addresses each in turn.

17                                    **LEGAL STANDARD**

18   Rulings on motions in limine fall entirely within this Court's discretion. *United*
19   *States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing *Luce v. United States*,
20   469 U.S. 38, 41-42 (1984)). Evidence is excluded on a motion in limine only if the
21   evidence is clearly inadmissible for any purpose. *Fresenius Med. Care Holdings, Inc., v.*
22   *Baxter Int'l, Inc.*, No. C 03-1431 SBA (EDL), 2006 WL 1646113, at *3 (N.D. Cal. June
23   12, 2006). If evidence is not clearly inadmissible, evidentiary rulings should be deferred
24   until trial to allow questions of foundation, relevancy, and prejudice to be resolved in
25   context. *See Bensimon*, 172 F.3d at 1127 (when ruling on a motion in limine, a trial court
26   lacks access to all the facts from trial testimony). Denial of a motion in limine does not
27   mean that the evidence contemplated by the motion will be admitted at trial. *Id.* Instead,
28   denial means that the court cannot, or should not, determine whether the evidence in

1  question should be excluded before trial. *Id.*; *see also McSherry v. City of Long Beach*,

2  423 F.3d 1015, 1022 (9th Cir. 2005) (rulings on motions in limine are subject to change

3  when trial unfolds).

**DISCUSSION**

**I.    Plaintiff's Motions in Limine**

A.    Motion No. 1–Bifurcate Inequitable Conduct from Jury Trial–Doc. No. 193.

In its Motion, the Plaintiff seeks to bifurcate the upcoming trial into two separate

parts: a jury trial on the issues of invalidity and infringement followed by a bench trial on

the issue of inequitable conduct. (Doc. No. 193 at 1.)

"Inequitable conduct is an equitable defense to patent infringement that, if proved,

bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d

1276, 1285 (Fed. Cir. 2011) (*en banc*.) "To prove inequitable conduct, the challenger

must show by clear and convincing evidence that the patent applicant (1) misrepresented

or omitted information material to patentability, and (2) did so with specific intent to

mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig. v. Aurobindo

Pharma Ltd.*, 703 F.3d 511, 519 (Fed. Cir. 2012). Materiality and intent are separate and

independent requirements. *See Therasense*, 649 F.3d at 1290 ("A district court should

not use a 'sliding scale,' where a weak showing of intent may be found sufficient based

on a strong showing of materiality, and vice versa.").

The specific intent to deceive prong requires the accused infringer to prove "by

clear and convincing evidence that [1] the applicant knew of the reference, [2] knew it

was material, and [3] made a deliberate decision to withhold it." *Therasense*, 649 F.3d at

1290. "[t]he materiality required to establish inequitable conduct is but-for materiality."

*Therasense*, 649 F.3d at 1291; *see also 1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367,

1374 (Fed. Cir. 2012) ("Moreover, [a] finding that the misrepresentation or omission

amounts to gross negligence or negligence under a 'should have known' standard does

not satisfy this intent requirement.") (internal quotation marks omitted) (alteration in

original). A non-disclosed reference is material "if the PTO would not have allowed a

1  claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291. A
2  non-disclosed reference that is cumulative of prior art properly before the patent
3  examiner is not material. *See id.* at 1294; *Fujitsu Ltd. v. Tellabs Operations, Inc.*, 2012
4  WL 31333548, *2 (N.D. Ill. 2012).

5       The Federal Circuit has approved of the use of an advisory jury verdict on the issue
6  of inequitable conduct at the trial court's discretion. *See, e.g., Am. Calcar, Inc. v. Am.*
7  *Honda Motor Co.*, 651 F.3d 1318, 1332-36 (Fed. Cir. 2011) (discussing jury's advisory
8  verdict on inequitable conduct); *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098,
9  1110 (Fed. Cir. 2003) ("Inequitable conduct is equitable in nature and the trial court has
10 the obligation to resolve the underlying facts of materiality and intent. A trial court has
11 some discretion in choosing whether to submit special interrogatories to the jury
12 regarding the underlying facts.") (internal citation omitted); *Hebert v. Lisle Corp.*, 99
13 F.3d 1109, 1114 (Fed. Cir. 1996) ("There are a variety of ways in which the district court
14 may choose to handle the issue of inequitable conduct during a jury trial, as the Federal
15 Circuit has recognized. Some courts have reserved the entire issue of inequitable conduct
16 unto themselves; some have submitted special interrogatories to the jury on the facts of
17 materiality and intent; and some have instructed the jury to find and weigh the facts of
18 materiality and intent and decide the ultimate question of inequitable conduct, as in the
19 case at bar."); *see also Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 818 F. Supp. 2d
20 1193, 1228 (E.D. Cal. 2011) (allowing the jury to return an advisory verdict on
21 materiality and intent). Here, the Court will seek an advisory verdict as to both the intent
22 to deceive and materiality prongs of the inequitable conduct analysis.

23      In arguing for bifurcation, Plaintiff asserts that putting inequitable conduct to the
24 jury is prejudicial and would "distract and confuse the jury with salacious allegations of
25 alleged misconduct rather than decide the straightforward infringement and invalidity
26 issues before them." (Doc. No. 193-1 at 1.) The Court disagrees.

27      In deciding whether to bifurcate a trial, the court considers judicial resources
28 required for such bifurcation, including a coherent presentation of the facts to the jury

1  and duplication of evidence. *See Fresenius Medical Care Holdings, Inc. v. Baxter Inter.*

2  *Inc.*, 2006 WL 1646108, *3 (N.D. Cal. 2006) ("[T]he Court does not find that bifurcating

3  the trial would conserve judicial resources, as it would require the parties to present the

4  same evidence and many of the same witnesses to the bench at the conclusion of the

5  trial."); *Transclean Corp. v. Bridgewood Services, Inc.*, 101 F. Supp. 2d 788, 792 (D.

6  Minn. 2000) ("Moreover, we have a considerable concern that a bifurcation of the

7  inequitable conduct issue will artificially balkanize the evidence in such a way as to

8  impede a coherent presentation of the facts to the Jury, and result in a considerable

9  amount of duplicate testimony. The Jury will be introduced, by one or both parties, to the

10  patent application process, and we think it to be an inadvisable use of judicial resources

11  to segregate certain factual issues, which may require the recalling of witnesses, for a

12  separate evidentiary Hearing to the Court."); *see also Calmar, Inc. v. Emson Research*,

13  850 F. Supp. 861, 865 (C.D. Cal. 1994) ("Pursuant to Fed. R. Civ. P. 42(b), the court in

14  furtherance of convenience or to avoid prejudice or when separate trials will be

15  conducive to expedition and economy may order a separate trial of any separate issue.

16  The decision as to whether to bifurcate a trial rests with the sound discretion of the trial

17  court. Motions to bifurcate are to be granted on a case by case basis only when the

18  separation will result in judicial economy and will not unduly prejudice any party.

19  Factors to be considered when ruling on a Fed. R. Civ. P. 42(b) motion include the

20  complexity of issues, factual proof, risk of jury confusion, the difference between the

21  separated issues, the chance that separation will lead to economy in discovery and, the

22  possibility that the first trial may be dispositive of the case.") (internal quotation marks

23  and citations omitted).

24        Under Rule 42 of the Federal Rules of Civil Procedure, the court may bifurcate a

25  trial for the convenience of the court and the parties, to avoid prejudice, and to expedite

26  and economize the trial process. Fed. R. Civ. P. 42(b). Under Rule 42(b), a district court

27  has broad discretion to bifurcate as part of its trial management. *Gardco Mfg., Inc. v.*

28  *Herst Lighting*, 820 F.2d 1209, 1212 (Fed. Cir. 1987).

1    Here, Defendants have shown that there is a substantial overlap of evidence as to

2 Plaintiff's claim of infringement and Defendants' asserted defenses. (Doc. No. 216 at 4.)

3 Notably, "the expiration and revival of the '589 patent affects not only Defendants'

4 inequitable conduct defense but also the issue of damages and Defendants' other

5 equitable defenses." *Id.* at 6. Moreover, "the inequitable conduct evidence .... will

6 overlap with Plaintiff's assertion that Defendants' infringement was willful." *Id.* at 7.

7    Under the circumstances, the Court is not persuaded that bifurcating the trial would

8 conserve judicial resources, as it would require the parties to present duplicative evidence

9 to the bench at the conclusion of the jury trial. *See Fresenius*, 2006 WL 1646108, *2-3

10 (declining to bifurcate inequitable conduct defense where jury already determining

11 validity of patents at issue).

12    Finally, Plaintiff has not demonstrated that it would be prejudiced if the trial was

13 not bifurcated. *See, generally*, Doc. No. 231 at 2-8. At first glance, the Plaintiff's Reply

14 appears to refute Defendants' contentions regarding substantial overlapping evidence.

15 However, closer examination reveals the Plaintiff's analysis fails to fully address the

16 Defendants' arguments. Instead, Plaintiff relies on conjecture and blanket assertions of

17 unsurmountable prejudice it will sustain without bifurcation. *Id.* Despite Plaintiff's

18 claims, the Court notes that most any risk of prejudice can be mitigated using a jury

19 instruction or interrogatory which is thereby presented to the jury as part of a special

20 verdict form. *See Transclean*, 101 F. Supp. 2d at 792 (limiting jury's fact-finding by

21 specific interrogatories and jury instructions and concluding that risk that the jury's

22 findings on the merits of plaintiff's adjoining legal claims will be based upon evidence of

23 inequitable conduct seems inappreciable). Such is the case in this matter.

24    Thus, Plaintiff's proposal would not outweigh bifurcation's disruptive effect;

25 instead, bifurcation will result in unnecessary delay and complication. Accordingly, the

26 Court **DECLINES** to bifurcate the trial and **DENIES** Plaintiff's Motion in Limine No. 1.

27 ///

28 ///

B.   <u>Motion No. 2-Exclude Argument, Testimony or Evidence Regarding Prior Lawsuits Involving the '589 Patent</u>-Doc. No. 194.

In its Motion, Plaintiff seeks to exclude any argument, testimony, or evidence relating to the dismissal without prejudice of *Flowrider Surf, Ltd., et al. vs. Pacific Surf Designs, Inc.*, No. 15-01879 (the "Flowrider Action"). (Doc. No. 194 at 1.) Plaintiff argues that evidence relating to the prior '589 Patent litigation is not only settled, but it also is irrelevant to this action and would only serve to confuse the jury and prejudice Plaintiff if allowed to be admitted. *Id.*

Defendants seek to admit evidence arising from four years of '589 Patent litigation to illustrate Plaintiff's numerous misrepresentations and intentional misconduct directed towards interfering with Defendants' business activities. (*See generally* Doc. No. 217.)

Here, Defendants acknowledge evidence of the '589 Patent litigation would likely "put doubt in the minds of the jury as to the merits of the current case." *Id.* at 1. Such would likely have a significant improper influence on the jury's determination of the issues in this case. Moreover, it would only serve to complicate the issues and confuse the jury. Thus, the prejudicial potential of this evidence outweighs the probative value it may have. Accordingly, the Court **GRANTS** Plaintiff's Motion in Limine No. 2.

C.   <u>Motion No. 3-Exclude Argument, Testimony or Evidence Regarding the '016 Patent</u>-Doc. No. 195.

In its Motion, Plaintiff seeks to exclude any argument, testimony, or evidence relating to "U.S. Patent No. 8,088,016 (the "'016 Patent") and any related litigation." (Doc. No. 195 at 1.) Plaintiff contends the '016 Patent has no bearing on the current litigation and its introduction "would be unduly prejudicial and confuse the jury." *Id.*

Defendants contend that the claims regarding the '016 Patent arise from the same "common factual nucleus of operative fact" as the '589 Patent. (*See* Doc. No. 223) As a result, "evidence relating to the '016 Patent is highly probative of and necessarily entangled with, the damages issues in this case" thereby making it admissible and necessary to the presentation of Defendants' case. *Id.* at 2.

1    As of now, the Court has not been provided with enough evidentiary context to

2    evaluate the probative value and relevance. Accordingly, the Court **DENIES** Plaintiff's

3    Motion in Limine No. 3.

4        D.    <u>Motion No. 4-Exclude Argument, Testimony or Evidence Regarding the</u>

5              <u>Arbitration Between Plaintiff and Wave Loch, LLC-Doc. No. 196</u>.

6        In its Motion, the Plaintiff seeks to exclude any argument, testimony, or evidence

7    relating to the Wave Loch Arbitration. Plaintiff contends the evidence is not only

8    irrelevant, Magistrate Judge Barbara Major rejected the Defendants' argument in the

9    related FlowRider Action, "finding that the discovery sought by Defendants related to the

10   Wave Loch Arbitration was not relevant, even under the broad 'relevance' standard that

11   applies for discovery purposes." Moreover, Plaintiff contends its admittance would also

12   complicate the proceedings and confuse the jury. (Doc. No. 196 at 4.)

13       Defendants argue the limited discovery was completed during the FlowRider

14   action and its admittance is appropriate since it is highly relevant to the issues in this

15   case. Specifically, Defendants assert the evidence would show that Plaintiff's counsel

16   engaged in inequitable conduct, that Mr. Lochtefeld's credibility is questionable, and Dr.

17   Vigil's rejection of FlowRider Surf, Ltd.'s 2014 License as Not "Comparable" is subject

18   to dispute. (Doc. No. 220 at 3-6.)

19       Here, given that Magistrate Judge Major previously denied admitting this same

20   evidence and the limited information presented by Defendants to refute Plaintiff's call for

21   its exclusion, the Court finds the evidence should be excluded at this time. However,

22   should the issue arise during trial, the Defendants may request the Court reconsider its

23   holding. Accordingly, the Court **GRANTS** Plaintiff's Motion in Limine No. 4.

24   **II.**    **Defendants' Daubert Motion and Motion in Limine**

25       A.    <u>Daubert Motion and Motion in Limine, Exclude Expert Opinions</u>-Doc.

26             No. 208.

27       Defendants seek to exclude Plaintiff's expert witnesses oral or written testimony

28   and expert reports for the following reasons: (a) *Plaintiff's failure to present proper*

*evidence of a causal nexus to support their claim for injunctive relief;* (b) *Plaintiff's experts' belated and undisclosed opinions on PSD's ability to design around the '589 Patent;* (c) *Plaintiff's technical expert's failure to properly analyze or disclose the basis for his opinions regarding infringement under Section 271(f);* (d) *Plaintiff's technical expert's failure to properly disclose or apply the claim constructions upon which his infringement and validity opinions are based;* (e) *Plaintiff's damages expert's parroting of the opinions of others and arrival at a form of royalty (lump sum) that is unsupported by any evidence;* and (f) *Plaintiff's inequitable conduct expert's speculation about the content of communications that have been withheld as privileged.* (Doc. No. 208 at 1.)

Plaintiff argues that it's experts' testimony is reliable and rebuts Defendants grounds for excluding their testimony. (Doc. No. 212 at 1-2.) The Court addresses each of the arguments below.

(a) *Plaintiff's failure to present proper evidence of a causal nexus to support their claim for injunctive relief.*

Defendants seek an order excluding the testimony of Plaintiff's experts from offering evidence of a causal nexus because neither of its experts demonstrates a link between PSD's allegedly infringing ride sales and incorporation of the supposedly patented nozzle cover feature. (Doc. No. 208 at 3.) Thus, Plaintiff has provided no reliable, admissible evidence that PSD's customers purchased the allegedly infringing rides because of the allegedly patented nozzle flaps, and its experts' opinions on those issues should be excluded. *Id.* at 6.

Plaintiff contends that its experts are permitted to opine on the "*causal nexus*" between Defendants' infringing products and product sales. (Doc. No. 212 at 1.) The law is clear that direct evidence of customer desire is not required to demonstrate a causal nexus. *Id.*

In situations such as this where the trial judge is called upon to determine the validity of a party's expert testimony, the Court applies Federal Rule of Evidence 702 to ensure that specialized and technical evidence is "not only relevant but reliable."

1 | *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993); *accord Kumho*
2 | *Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposes a special
3 | "gatekeeping obligation" on trial judge.)

4 | Thus, a witness who is "qualified as an expert by knowledge, skill, experience,
5 | training, or education" may testify "in the form of an opinion" where:

6 | (a) the expert's scientific, technical, or other specialized knowledge will help the
7 | trier of fact to understand the evidence or to determine a fact in issue;

8 | (b) the testimony is based on sufficient facts or data;

9 | (c) the testimony is the product of reliable principles and methods; and

10 | (d) the expert has reliably applied the principles and methods to the facts of the
11 | case.

12 | Fed. R. Evid. 702.

13 | Expert testimony is admissible under Rule 702 if it is both relevant and reliable.
14 | *See Daubert*, 509 U.S. at 589; see also *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.
15 | 2010) ("The requirement that the opinion testimony assists the trier of fact goes primarily
16 | to relevance.") (internal quotation marks omitted).

17 | Under the reliability requirement, the expert testimony must "ha[ve] a reliable
18 | basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at
19 | 565. To ensure reliability, the court must "assess the [expert's] reasoning or
20 | methodology, using as appropriate such criteria as testability, publication in peer-
21 | reviewed literature, and general acceptance." *Id.* at 564. These factors are "helpful, not
22 | definitive," and a court has the discretion to decide how to test reliability "based on the
23 | particular circumstances of the particular case." *Id.* (internal quotation marks and
24 | footnotes omitted). "When evaluating specialized or technical expert opinion testimony,
25 | the relevant reliability concerns may focus upon personal knowledge or experience."
26 | *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

27 | The inquiry into the admissibility of expert testimony is "a flexible one" where
28 | "[s]haky but admissible evidence is to be attacked by cross-examination, contrary

1   evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at

2   564. "When the methodology is sound, and the evidence relied upon sufficiently related

3   to the case at hand, disputes about the degree of relevance or accuracy (above this

4   minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd.*

5   *P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden is on the

6   proponent of the expert testimony to show, by a preponderance of the evidence, that the

7   admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow*

8   *Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory

9   committee's notes.

10                              (i) <u>Dr. Stevick</u>

11         First, Defendants argue Dr. Stevick's testimony is not relevant to determining

12   whether "the nozzle cover in PSD's rides drives customer demand" because Dr. Stevick

13   did not include the reasons why PSD's customers purchased their water rides in his

14   report.[1] (Doc. No 208 at 3.) Dr. Stevick's analysis does, however, include responses

15   covering the purported advantages of the '589 Patent. (Doc. No. 208 at 4.) Thus,

16   Defendants proclaim Dr. Stevick's analysis has no bearing on whether there is a causal

17   nexus between PSD's allegedly infringing ride sales and incorporation of the supposedly

18   patented nozzle cover feature. (Doc. No. 208 at 3.)

19         Next, Defendants contend that the consumer statements utilized by Dr. Stevick to

20   conduct his analysis are irrelevant and self-serving since they do not directly address why

21   the respondents purchased their rides. *Id.* E.g., the fact a consumer may have been less

22   likely to purchase a ride lacking the improvements of '589 Patent is relevant to

23   establishing what are motivating factors for some purchasers of PSD rides.[2]

24

25

26   [1]    Dr. Stevick did not analyze the reasons why PSD's customers purchased their rides
     believing the topic lay "outside the scope" of his report. (Doc. No 208 at 3.)

27   [2]    "During his deposition, Dr. Stevick speculated that, based on his opinion that
     PSD's rides infringe, the allegedly infringing features in those rides must impact

28   customer purchasing decisions." (Doc. No. 208 at 3-4.)

1    Here, Defendants raise valid criticisms of Dr. Stevick's analysis, however,

2 challenges to survey methodology generally go to the weight afforded, not admissibility.

3 (*See Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). In this case, Plaintiff

4 provides reasonable justifications to refute the criticisms raised by Defendants.

5 Specifically, Plaintiff argues "direct evidence of customer decisions" is not required or

6 necessary to establish a causal nexus. *See Polara Eng'g, Inc. v. Campbell Co.*, 237 F.

7 Supp. 3d 956, 988 (C.D. Cal. 2017) *reversed on other grounds*, 894 F.3d 1339 (Fed. Cir.

8 2018) (granting injunction without direct evidence of customer preference where parties

9 were direct competitors and defendant developed its infringing product to compete with

10 the plaintiff's product). Moreover, Defendants' critiques can be effectively addressed

11 through cross-examination. *See also Freeland v. Iridium World Commc'ns., Ltd.*, 545 F.

12 Supp. 2d 59, 88 (D.D.C. 2008) ("Motorola may cross-examine Saunders about the factual

13 basis of his opinions, but its disagreements with that factual basis does not affect the

14 testimony's admissibility.") Thus, in this case, Dr. Stevick's opinions need not be based

15 on direct customer information to be admissible.

16    Finally, Defendants argue that Dr. Stevick's opinion is unreliable and should be

17 excluded because it is based on speculation.[3] (Doc. No. 208 at 4.) Nonetheless, Dr.

18 Stevick, utilizing fundamental engineering principles, opined that the '589 Patent offers

19 benefits that consumers of water ride attractions prefer over those "that did not use the

20 '589 nozzle covers." (Doc. No. 212 at 5.) Thus, Dr. Stevick's conclusion supports a

21 finding of a causal nexus between PSD's sales and the patented nozzle cover feature of

22 the '589 Patent.

23

24

25

---

26 [3]   The fact that Dr. Stevick conducted no independent analysis regarding whether the

27 patented invention led to the advantages claimed or whether those advantages were

28 demanded by PSD's customers would appear to confirm Defendants contentions. *Id.* at
3.

1   Accordingly, because the Court finds that Dr. Stevick's analysis is based on

2   sufficiently reliable methodology and that he bears the necessary qualifications to offer

3   his intended testimony, Defendants Motion as to Dr. Stevick is **DENIED**.

4   (ii) Dr. Vigil

5   Likewise, Defendants argue the opinion and expert report of Dr. Vigil, Plaintiff's

6   damages expert should be excluded. First, Defendants contend that Dr. Vigil's failed to

7   properly disclose his causal nexis opinion in his expert report. (Doc. No. 208 at 4.)

8   Despite the procedural defect, Dr. Vigil's opinion is still not relevant to this case because

9   he relied exclusively on the opinions in Dr. Stevick's report which merely adopted,

10   without analysis, the self-serving statements in the '589 Patent about the purported

11   advantages of the patented invention in developing his opinion.[4] *Id.* The Court

12   disagrees.

13   Contrary to Defendants' assertion, Dr. Vigil, developed his opinion by applying his

14   understanding of economic principles to the evidence derived from testimony and

15   communications of Whitewater representatives and Dr. Stevick's report for issues

16   requiring a technical background to analyze. (Doc. No. 212 at 6.) Since an expert cannot

17   be an expert in all fields, it is common for experts, such as Dr. Vigil to rely on the report

18   of other experts for background information outside their field of expertise. In this case,

19   Dr. Stevick provides Dr. Vigil with technical background information relevant to the

20   development of Dr. Vigil's opinion of the benefits enabled by the '589 Patent. Thus, Dr.

21   Vigil opinion and report are relevant.

22   Dr. Vigil's report is also reliable because it was well-founded, relevant and limited

23   to analysis in Dr. Vigil's specific field of expertise. *Id.* Thus, it is also reliable.

---

[4]   Defendants contend that his expert report does not even mention causal nexus once in 180 pages. *Id.*

1    Accordingly, because the Court finds Dr. Vigil's analysis is based on sufficiently

2  reliable methodology and he bears the necessary qualifications to offer his intended

3  testimony, Defendants Motion as to Dr. Vigil is **DENIED**.

4    (b) *Plaintiff's belated and undisclosed opinions on PSD's ability to design around the*
5    *'589 Patent.*

6    Defendant contends that Plaintiff's experts should be precluded from offering

7  opinions of PSD's ability to design around the '589 Patent. (Doc. No. 208 at 6.)

8  Specifically, Defendants contend that they timely disclosed the expert opinion of Richard

9  Alleshouse which indicated that if PSD's current version of its nozzle flap was found to

10  infringe the '589 Patent, PSD could design around the patent by either: (1) retrofitting the

11  existing nozzle flap design "by welding the existing hinge [to which the nozzle flap is

12  connected] so that it does not move" or (2) "replacing the hinge with a fixed connection

13  such as a curved or angled fixed plate." *Id.* However, neither Plaintiff's technical expert,

14  Dr. Stevick, nor its damages expert, Dr. Vigil, addressed Mr. Alleshouse's design-around

15  opinions in their reports. *Id.*

16    Plaintiff argues that Defendants' efforts to exclude opinions and testimony

17  regarding Defendants' failed efforts to design around the '589 Patent are based on

18  flagrant mischaracterizations of the opinions and testimony of Dr's Stevick and Vigil.

19  (Doc. No. 212 at 1.) The actual opinions and testimony do not support exclusion. *Id.*

20    First, Plaintiff contends that Dr. Stevick opined during his deposition that PSD's

21  existing accused rides meet the "flexible tongue" limitation because the hinge component

22  allows the flap to "flex [] quite a bit." (Doc. No. 208 at 6.) When Dr. Stevick was

23  presented with a nozzle flap utilizing a steel plate that was fixed, opposed to on a hinge

24  (*as described in Mr. Alleshouse's proposed design-around*), Dr. Stevick refused to offer

25  an opinion to Defendants counsel's inquiry of whether the fixed steel plate meet the

26  limitations of the '589 Patent. *Id.* Specifically, Dr. Stevick refused to offer a response

27  because it lay outside the topic he was prepared to talk about. *Id.* Experts cannot testify

28

1    on matters not disclosed in their expert report or deposition. *Siemens Med. Sols. USA,*
2    *Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1286 (Fed. Cir. 2011).

3         Plaintiffs argue that Dr. Stevick clearly and repeatedly rejected the viability of
4    Defendants' proposed design around. (Doc. No. 212 at 7-8.)  When Defendants didn't
5    get the answer they wanted, they took a different approach and presented "Dr. Stevick
6    with a design document that was not produced in discovery or provided as part of Mr.
7    Alleshouse's "expert" disclosure, of a diagram purporting to depict a design around
8    concept for a "rigid" nozzle flap. *Id.* "Dr. Stevick again rejected Defendants' diagram as
9    a valid design around, explaining that, as depicted, 'nothing is that rigid, and it's going to
10   flex.'" *Id.* When Dr. Stevick refused to "speculate" about what flexibility would be
11   permitted to avoid infringement of the '589 Patent, Defendants took his refusal as further
12   evidence of his failure to provide a response.

13        Here, the record is clear Dr. Stevick did not provide any opinion about PSD's
14   proposed design-around until his deposition.  However, at the deposition, he provided
15   enough responses to the questions he was able to answer.  The Court finds that Dr.
16   Stevick did provide opinion and testimony that was within the scope of his expertise as a
17   technical expert at his deposition.  The fact that Dr. Stevick refused to answer questions
18   he felt were improper or outside the scope of his expertise can be discussed on cross-
19   examination as this addresses the weight of his opinion, not its admissibility.

20        Second, as to Dr. Vigil's opinions, Defendant contends that Dr. Vigil
21   acknowledged that he does not have the relevant technical expertise to offer, and
22   therefore is not offering, any technical opinions in this case. (Doc. No. 208 at 7.)  Dr.
23   Vigil is unqualified to offer an opinion on whether PSD's proposed design-around for the
24   '589 patent is feasible or would be an acceptable, non-infringing alternative to the
25   accused products.

26        Plaintiff argues that Dr. Vigil's opinion and testimony was well within the bounds
27   of his expert field of study.  Specifically, he "does not provide, or attempt to provide, any
28   opinion on the technical feasibility of Defendants' proposed design around" and instead

"opines as to the economic aspects of that proposed design around." (Doc. No. 212 at 9.) Moreover, he did not "opine that Defendants' design around was not feasible because it was not implemented", but because "Defendants' failure to implement their proposed design-around is evidence that the design around option may not be as easy, inexpensive, or acceptable as Defendants claim. *Id.*

The Court finds that Dr. Vigil's opinion and testimony was well within the scope of his expertise as a damage's expert. Plaintiff was entitled to rely on Dr. Vigil's expert opinion. *Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device."). Moreover, Defendants' argument that Dr. Vigil is "unqualified to offer an opinion on whether PSD's proposed design-around for the '589 patent is feasible or would be an acceptable, non-infringing alternative to the accused products" can be discussed on cross-examination as this addresses the weight of his opinion, not its admissibility. Thus, Defendants' challenges are premature and inappropriate for Rule 702 gatekeeping purposes.

Accordingly, the Court **DENIES** Defendants' Daubert Motion to exclude the opinion and testimony of Plaintiff's technical expert Dr. Stevick and Damages expert, Dr. Vigil.

(c) *Plaintiff's technical expert's failure to properly analyze or disclose the basis for his opinions regarding infringement under Section 271(f).*

Defendants seek to exclude Dr. Stevick's testimony on the alleged infringement as unreliable. (Doc. No. 208 at 9.) To prove that PSD's foreign ride sales infringed the '589 Patent under 35 U.S.C. § 271(f), Plaintiff must show that PSD "supplie[d] or cause[d] to be supplied in or from the United States" either "*all or a substantial portion of the components of a patented invention*" (under subsection 1) or "any component of a patented invention that is especially made or especially adapted for use in the invention

1   and *not a staple article or commodity of commerce suitable for substantial non-infringing*

2   *use*" (under subsection 2).  35 U.S.C. § 271(f).  *Id.*

3        Plaintiff contends that Dr. Stevick's opinions regarding Defendants' export of

4   components from the U.S. for use in infringing foreign installations are properly based on

5   Dr. Stevick's application of his own extensive engineering experience to Defendants'

6   drawings and other documents depicting Defendants' products.  (Doc. No. 212 at 1.)

7        The Court disagrees with Defendants.  Plaintiff's reliance on Dr. Stevick's opinion

8   to prove that PSD's foreign ride sales infringed the '589 Patent under 35 U.S.C. § 271(f)

9   is permissible.  Here, Dr. Stevick's opinion that ride materials were fabricated for the

10   specific purpose of constructing Defendants' infringing rides is a relevant *fact* that

11   supports Plaintiff's argument that Defendants' products infringe by meeting the standards

12   of Section 271(f).  Any challenge that Defendants may have to Plaintiff's use of Dr.

13   Stevick's opinion here goes to the weight, not the admissibility of Dr. Stevick's

14   testimony.

15        Accordingly, the Court **DENIES** Defendants' Daubert Motion as to Dr. Stevick's

16   opinion and testimony.

17        (d) *Plaintiff's technical expert's failure to properly disclose or apply the claim*

18        *constructions upon which his infringement and validity opinions are based.*

19        Defendants seek to exclude the opinion of Dr. Stevick, Plaintiff's technical expert

20   for infringement and invalidity for his use of undisclosed claim constructions in his

21   analysis (*in the context of the '589 Patent*) which he either was unwilling or unable to

22   explain.[5]  (Doc. No. 208 at 11.)  Defendants allege Dr. Stevick's actions violated

23

24

25   [5]   Defendants contend that "Dr. Stevick's claim construction-based opinions must be
     excluded" because "he refused to disclose the constructions of the terms he applied."
26   (Doc. No. 208 at 11.)  When construing patent claims, a court considers the literal
     language of the claim, the patent specification, and the prosecution history.  *Markman v.*
27   *Westview Instruments, Inc.,* 52 F.3d 967, 977-80 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517
28   U.S. 370 (1996).  Of these sources, "the specification is always 'highly relevant to the

1  fundamental rules of claim construction. *Id.* Thus, Defendants move to exclude Dr.

2  Stevick's opinion, expert report, and deposition testimony in this matter.[6] (See Doc. No.

3  208 at 11-14.)

4      Plaintiff disputes Defendants' position contending that Dr. Stevick applied clearly

5  disclosed and reliable claim construction methodology in his analysis. (Doc. No. 212 at

6  1.) Furthermore, Plaintiff contends that Defendants' arguments are merely based on

7  misrepresentations of Dr. Stevick's opinion and testimony. *Id.*

8      The Court rejects Defendants' arguments finding, instead, that Dr. Stevick applied

9  and disclosed the appropriate construction terms to the opinions contained in his analysis.

10  *See Id.* at 14–18. Moreover, Dr. Stevick's report not only defined the individual terms in

11  accordance with the Courts prior Claim Construction Order, it elaborated on the

12  definition of certain terms like "Flexible tongue," "coverage," and "flexible" to ensure it

13  was clear why the term was construed in the manner it was, and its effect on the '589

14

15

16  claim construction analysis. Usually, it is the single best guide to the meaning of a
disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) *(en banc)*

17  (internal quotation marks omitted). "[T]he words of a claim are generally given their
ordinary and customary meaning. ... [Which is] the meaning that the term would have to

18  a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

19  effective filing date of the patent application." *Id.* at 1312-13 (internal quotation marks
and citations omitted). "[T]he ordinary meaning of a claim term is its meaning to [an]

20  ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks

21  omitted).

22  [6]    Defendants move to exclude Dr. Stevick's opinion, expert report, and deposition
testimony on the following four grounds: (1) refusing to disclose the constructions of the

23  terms he applied to claim construction opinions in his analysis *(See Claar v. Burlington
Norther R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)); (2) applying an inappropriate

24  construction of the term "flexible" to the nozzle cover "including a flexible tongue"

25  thereby effectively rendering the term meaningless; (3) improperly interpreting the claim
terms by looking to the accused products, as evidenced by his construction of the

26  "flexible tongue which is biased downward against the flow of water ..." limitation; and

27  (4) using import limitations based on preferred embodiments from the '598 patent claim
specification for his definition of "mobile," and the requirement of a rideable area beyond

28  the nozzle cover that is not reflected in claim 1. (See Doc. No. 208 at 11-14.)

1   Patent. Finally, "Dr. Stevick's opinions and testimony demonstrated that he did not

2   improperly import claim limitations based on preferred embodiments" thereby refuting

3   Defendants' claims to the contrary. *Id.* at 17. Notably, Defendants' assertions on this

4   point seem to arise from counsel's failure to obtain the desired response from Dr. Stevick

5   at his deposition. *Id.* Thus, while Defendants may have identified inconsistencies or

6   weaknesses with Dr. Stevick's testimony, these inconsistencies go to the weight, rather

7   than to the admissibility. Therefore, these situations may be properly addressed through

8   rigorous cross-examination and through the presentation of competing evidence, rather

9   than exclusion.

10          Accordingly, the Court **DENIES** Defendants' Daubert Motion as to Dr. Stevick's

11   failure to disclose or apply the claim constructions to the infringement.

12          (e) *Plaintiff's damages expert's parroting of the opinions of others and arrival at a form*

13              *of royalty (lump sum) that is unsupported by any evidence.*

14          Defendants seek to exclude the opinions of Plaintiff's damages expert Dr. Vigil as

15   unreliable regarding his opinion that the parties would have negotiated a "license in

16   which PSD supposedly would have agreed to pay Plaintiff a lump sum royalty of at least

17   $2.0 million" which is contrary to the comparable licenses he analyzed. (Doc. No. 208 at

18   14.) Moreover, Defendants contend that Dr. Vigil does not disclose the "actual opinions

19   of the third parties he relies upon, nor did he apportion value to only the patent-in-suit."

20   *Id.*

21          Plaintiff contends that Dr. Vigil is expressly permitted to rely on facts obtained

22   from third parties in support of his reasonable royalty analysis. (Doc. No. 212 at 1.)

23   Further, that analysis is based on a clear explanation of how Dr. Vigil determined

24   comparable license agreements and how he apportioned value to the '589 Patent. *Id.*

25          "Upon finding for the claimant the court shall award the claimant damages

26   adequate to compensate for the infringement, but in no event less than a reasonable

27   royalty for the use made of the invention by the infringer, together with interest and costs

28   as fixed by the court." 35 U.S.C. 284. Two typical categories of compensation for

1  infringement are the patentee's lost profits and the "reasonable royalty he would have

2  received through the patentee's lost profits.

3    The Court has considered the parties' arguments and determined that Defendants'

4  Motion to exclude opinions and testimony of Plaintiff's damages expert Dr. Vigil must be

5  denied on the arguments presented. Defendants' challenges to the admissibility of Dr.

6  Vigil's testimony are not properly based on his qualifications or analysis, though they

7  purport to be; rather, Defendants' challenges are more appropriately viewed as attacks on

8  the expert's conclusions themselves as opposed to the conclusions of its own expert.

9  These issues go to the weight due to Dr. Vigil's testimony and, as such are properly

10  resolved by the jury. *See, e.g., Balt. & Ohio R.R. Co. v. Deneen*, 167 F.2d 799, 801 (4th

11  Cir. 1948) (The "power to resolve any conflicts ... between the [parties'] evidence ... [is]

12  peculiarly in the province of the jury.").

13    Accordingly, the Court **DENIES** Defendant's Daubert Motion as to the exclusion

14  of opinions and testimony of Plaintiff's damages expert Dr. Vigil.

15     (f) *Plaintiff's inequitable conduct expert's speculation about the content of*

16  *communications that have been withheld as privileged*.

17    Defendants object to the testimony of Mr. Godici on the issue of "inequitable

18  conduct" claiming it is irrelevant and unreliable. In this case, Defendants contend that

19  Mr. Godici's opinions regarding the investigation into the intentionality of the delay of

20  the maintenance fee payment lack any factual basis and must be excluded. (Doc. No. 208

21  at 23.) Specifically, since the Plaintiff did not disclose this essential information in

22  discovery, Mr. Godici's opinion is untestable and should be excluded from the trial in this

23  case. *Cf., Fox v. California Sierra Financial Services*, 120 F.R.D. 520, 530 (N.D. Cal.

24  1988) ("If the holder intends to consent to waiver of the attorney-client privilege at trial,

25  such intention must be disclosed during the discovery stage and any information as to

26  which the privilege will be waived must be made available to the opposing party through

27  discovery so as not to afford the one party an unfair advantage at trial."). *Id.* at 24.

28

1  Plaintiff contends that Nicholas Godici's rebuttal opinion that the evidence does

2  not support inequitable conduct is properly based on the sworn statements of Erikson

3  Squier and J. Rick Tache. (Doc. No. 212 at 2.) Any challenge to Mr. Godici's opinions

4  is the proper subject of examination at trial, not exclusion. *Id.*

5  Here, despite the Plaintiff's attempt to paint it as such, this is not testimony about

6  merely rebutting the Defense expert's conclusion as to whether Plaintiff and its counsel

7  engaged in inequitable conduct before the PTO. Rather, Defendants are correct that the

8  majority of Mr. Godici's opinion constitutes "an improper attempt to offer an opinion

9  from a legal expert about inequitable conduct, intent, and what the examiner would have

10  done had circumstances been different. (*See* Doc. No. 208 at 22-24.) Indeed, during his

11  deposition, Mr. Godici testified that he does not know the substance of the "details and

12  instruction" of Mr. Tache's and Mr. Squier's privileged communications. (Doc. No. 208

13  at 23.) Moreover, he concludes that he is "not aware of anything in the record indicating

14  that Mr. Squier [i.e., the attorney who committed the inequitable conduct] failed to

15  conduct a reasonable inquiry under proper PTO procedures or that his execution of the

16  certified statement of unintentional delay in the reinstatement petition was in any way

17  inaccurate or improper." *Id.* at 22. This testimony is infused, to too great a degree, with

18  what sounds like legal opinion, or with speculation as to what may have been in another's

19  mind. Such evidence is either unhelpful to the fact-finder or is that which the expert is

20  not qualified to give. In line with the consistent practice of this Court, the Court will not

21  permit Mr. Godici to offer such testimony here.

22  Accordingly, the Court **GRANTS** Defendants' Daubert Motion regarding

23  inequitable conduct.

### CONCLUSION

25  In summary, the Court rules as follows:

26  1. The Court **DENIES** Plaintiff's Motion in Limine No. 1 (Doc. No. 193);

27  2. The Court **GRANTS** Plaintiff's Motion in Limine No. 2 (Doc. No. 194);

28  3. The Court **DENIES** Plaintiff's Motion in Limine No. 3 (Doc. No. 195);

4. The Court **GRANTS** Plaintiff's Motion in Limine No. 4 (Doc. No. 196); and

5. Defendants' Daubert Motion/Motion in Limine (Doc. No. 208) is:

(a) **DENIED** as to Plaintiff's failure to present proper evidence of a causal nexus to support their claim for injunctive relief;

(b) **DENIED** as to Plaintiff's experts' belated and undisclosed opinions on PSD's ability to design around the '589 Patent;

(c) **DENIED** as to Plaintiff's technical expert's failure to properly analyze or disclose the basis for his opinions regarding infringement under Section 271(f);

(d) **DENIED** as to Plaintiff's technical expert's failure to properly disclose or apply the claim constructions upon which his infringement and validity opinions are based;

(e) **DENIED** as to Plaintiff's expert's parroting of the opinions of others and arrival at a form of royalty (lump sum) that is unsupported by any evidence, and;

(f) **GRANTED** as to Plaintiff's inequitable conduct expert's speculation about the content of communications that have been withheld as privileged.

**IT IS SO ORDERED.**

DATED: May 22, 2019

_____
**HON. ROGER T. BENITEZ**
United States District Judge