FILED

SEP 16 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER WEST INDUSTRIES, LTD., a Canadian corporation,<br><br>                                            Plaintiff,<br><br>v.<br><br>PACIFIC SURF DESIGNS, INC., a Delaware corporation, and FLOW SERVICES, INC., a Delaware corporation,<br><br>                                            Defendants. | Case No.:  3:17-cv-01118-BEN-BLM<br><br>**ORDER:**<br>**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE OR EXCLUDE THE REPORT AND TESTIMONY OF JAMES T. CARMICHAEL;**<br>**(2) DENYING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT;**<br>**(3) DENYING PLAINTIFF'S FIRST MOTION FOR SUMMARY JUDGMENT.**<br><br>**[Doc. No. 197, 191, 200.]** |

Before the Court is Plaintiff's Motion to Strike or Exclude the Report and Testimony of James T. Carmichael filed by Plaintiff Whitewater West Industries, Ltd. ("Plaintiff" or "Whitewater"), Defendants' Second Motion for Summary Judgment, and Plaintiff's First Motion for Summary Judgment. The Motions are fully briefed. The Court finds the motions suitable for determination on the papers without oral argument, pursuant to Civil Local Rule 7.1.d.1.

///

1

# BACKGROUND

Plaintiff brings this action against Defendant Pacific Surf Designs, Inc. ("PSD") and Flow Services, Inc. ("FSI") (collectively "Defendants") for direct infringement of Plaintiff's U.S. Patent No. 6,491,589 (the "'589 Patent") issued on December 10, 2002. Pursuant to 35 U.S.C. § 282, the '589 Patent is presumed to be valid. (Doc. No. 1 ¶ 11.) The '589 Patent is entitled "Mobile Water Ride Having Sluice Slide-Over Cover" and relates "to a simulated wave water ride attraction having one or more flexible nozzle/sluice covers for ensuring the safety of riders and lowering the risk of injury or interference with ride operation. *Id.* ¶ 12.

On January 31, 2014, Surf Park and FlowRider Surf Ltd. ("FlowRider") entered into an Intellectual Property License Agreement conveying to FlowRider all substantial rights to the '589 Patent, including the right to bring actions for infringement of the '589 Patent. All of FlowRider's rights to the '589 Patent were transferred to Whitewater pursuant to a January 31, 2014, Intellectual Property Sublicense Agreement, and a February 1, 2016 amalgamation, in which FlowRider and Whitewater amalgamated as one company in the name of Whitewater. By operation of Canadian law, on the date of the amalgamation, all of FlowRider's assets became the property of Whitewater. Accordingly, Plaintiff Whitewater has independent standing to sue for infringement of the '589 Patent. *Id.* ¶ 14.

Plaintiff alleges the '589 Patent includes 57 total claims, of which at least claims 1, 3, 13, 15-17, 24-27, 29-38, 41-43, 50, and 54-55 (the "Asserted Claims") are infringed by Defendants. Despite such awareness, Defendants willfully, deliberately, and intentionally continued to engage in their infringing activities of the Asserted Claims.

# DISCUSSION

## I. Plaintiffs' Motion to Strike or Exclude James T. Carmichael's Expert Report and Testimony.

Plaintiffs move to strike or exclude the expert report and deposition testimony of James T. Carmichael ("Carmichael") as improperly providing legal opinions on ultimate issues of law. (Doc. No. 197 at 4.)

In ruling on a motion to strike, the Court "must view the pleading under attack in the light most favorable to the pleader." *Id.* Importantly, a court should not grant a motion to strike "unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). Accordingly, if there is any doubt as to whether the allegations may raise an issue of fact or law, the motion should be denied. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure specialized evidence is "not only relevant but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993) ("*Daubert I*"). The Court's obligation "to scrutinize carefully the reasoning and methodology underlying [expert] affidavits" applies even on summary judgment. *Houle v. Jubilee Fisheries, Inc.*, No. C04-2346JLR, 2006 WL 27204, at *5 (W.D. Wash. Jan. 5, 2006) (quoting *Daubert I*, 509 U.S. at 501). An expert witness may testify

> If (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has reliably applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007).

The Court has broad discretion in exercising its gatekeeping function, *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000), which applies to both scientific and non-scientific testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying *Daubert* to all expert testimony, not just scientific testimony); *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Under Rule 702, the Court must assure itself of two things: that "any and all scientific

3

testimony or evidence admitted is not only relevant but reliable." *Daubert I*, 509 U.S. at 589.

Where, as here, experts are retained to offer non-scientific testimony, the reliability inquiry will "depend[ ] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting *Hankey*, 203 F.3d at 1169). It is generally said that "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, at 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

The second prong, relevance, focuses on whether the expert testimony "fits" the facts of the trial. That is, the testimony must be "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). At the bottom, the dispositive question for the relevance prong is whether the proposed testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert I*, 509 U.S. at 591; *Elsayed Mukhtar v. Cal. State. Univ., Hayward*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702.")

To the extent that an expert purports to offer a legal opinion on an ultimate issue, such testimony must be excluded because "offering legal conclusion testimony invades the province of the trial judge." *Nationwide v. Kass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008); *Mukhtar*, 299 F.3d at 1066 n.10 ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law."). In breach of contract cases, the expert may not be allowed to opine on the meaning and import of disputed terms. *See PMI Mortg. Ins. Co. v. Am. Int'l Speciality Lines Ins. Co.*,

4

291 F. App'x 40, 41 (9th Cir. 2008) (unpublished) ("The expert testimony proffered by AISLIC went to the interpretation of the underlying settlement agreement, a contract, an ultimate question of law upon which the opinion of an expert may not be given."). To permit any such testimony would be to commit error, as it is well-known that matters of law are generally "inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).

As a corollary of this principle, expert conclusions which do not inform the jury about the facts but which "merely function like jury instructions," are impermissible.[1] *Lee v. First Nat'l Ins. Co.*, No. CV09060264MMMCWX, 2010 WL 11549637, at *10 n.80 (C.D. Cal. Dec. 22, 2010) (quoting Charles A. Wright et al., FED. PRAC. & PROC. EVID. § 6265.2 (2d ed.)); *accord Nationwide*, 523 F.3d at 1060.

In this case, Defendants seek to elicit testimony from Dr. James T. Carmichael ("Carmichael"), their expert in PTO practice and procedure, on (1) *the duty of candor owed to the PTO and the Office's expectation of how patent applicants and petitioners comply with that duty*; (2) *the kind of information that the PTO considers material when deciding either whether an invention is patentable or whether a petition should be granted*; and (3) *the PTO's expectations against the inventor's, Plaintiff's and Plaintiff's counsel's action in this case. Id.*[2] According to Defendants, Carmichael is well-qualified as an expert in PTO practice and procedure, having served for nearly a decade

---

[1]    On one level, they are improper because they invade the province of the court to instruct the jury as to the law. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) ("Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." (internal quotation marks omitted)). And on another, they do not "help" the jury within the meaning of Rule 702, as they "do nothing more for the jury than tell it what verdict to reach." *Lee*, 2010 WL 11549637, at *10.

[2]    Mr. Carmichael is an attorney who currently specializes in patent development and prosecution. (Doc. No. 215 at 1.) Formerly, he served as a Patent and Trademark Office Administrative Patent Judge for nearly a decade supervising PTO enforcement proceedings and then as Examiner-In-Chief. *Id.*

supervising PTO enforcement proceedings and then as Examiner-In-Chief, to explain "whether misrepresentations made to, or omissions withheld from the Patent Office are material and whether particular facts are indicative of an intent to deceive the Patent Office is admissible." (Doc. No. 215 at 1.)

Plaintiff does not question or challenge Carmichael's qualifications as an expert.[3] (Doc. No. 242 at 2.) It does however set forth three primary reasons why Carmichael's report and testimony are inadmissible and should be stricken entirely.[4] First, Plaintiff argues that Carmichael's report and testimony are designated for no other purpose than to provide improper legal conclusions. (*See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks and citations omitted)) (Doc. No. 197 at 2.) Second, Plaintiff contends that Carmichael improperly speculates what the PTO would have done if it had been in possession of the additional information alleged in this suit. *See Id.* And third, Carmichael improperly opines on the credibility and intent of Whitewater, its counsel, and third-party Thomas Lochtefeld. (Doc. No. 197 at 2.)

## A. **Improper Legal Conclusions**

Plaintiff contends Defendants assert the '589 Patent is unenforceable due to inequitable conduct before the PTO. Specifically, Defendants allege Plaintiff failed to disclose prior art to the PTO, as well as conduct engaged in by Whitewater's attorney, Erikson Squier, and Mr. Lochtefeld, as to activities related to the expiration and reinstatement of the '589 Patent. Defendants intend to illustrate this through Carmichael's expert report and deposition testimony. *Id.* Plaintiff argues that a number of Mr.

---

[3] The Court will presume for purposes of this Motion that Mr. Carmichael's specialized knowledge qualifies him to give expert opinions concerning the PTO.

[4] Such motions, however, "are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice. *Gottesman v. Santana*, 263 F. Supp. 3d 1034, 1307 (S.D. Cal. 2017).

Carmichael's opinions asserted in his Expert Report are impermissible legal conclusions.[5] Since "an expert witness cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law," Plaintiff argues that Defendants should be prohibited from using Carmichael's report to do so now. *U.S. v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (excluding expert testimony offering a legal conclusion.) *Id.* at 4.

Defendants do not dispute that an expert witness cannot give an opinion as to his legal conclusion. However, "expert testimony concerning whether misrepresentations made to or omissions withheld from, the Patent Office are material and whether particular facts are indicative of an intent to deceive the Patent Office are admissible. (Doc. No. 215 at 1.) Specifically, Defendants argue that Carmichael's report and testimony will undoubtedly aid the Court and jury with evaluating whether Plaintiff's actions were

---

[5]      Mr. Carmichael explains that he had "been asked by counsel for Defendant to [o]pine on whether or not the '589 Patent was obtained or revived through misconduct or failure to disclose material information. (Carmichael Report ¶ 34.) Next, Carmichael asserted that "[i]t is my opinion that at the PTO [the '589 Patent] was subject to egregious misconduct and failure to disclose material information." *Id.* ¶ 1. Moreover, "[i]n my opinion Mr. Squier and Mr. Lochtefeld breached their duties of good faith and candor concerning the '589 Patent by committing gross and egregious misconduct including submission of one or more unmistakably false statements to the PTO and by failing to disclose material information." *Id.* ¶ 219. Mr. Carmichael was of the opinion that had the PTO been aware of all the facts, "the patent would not have issued." *Id.* ¶¶ 207. Furthermore, "such selective disclosure of information regarding these prior art rides constitutes a failure to disclose known material information that violated the duty of candor and good faith." *Id.* ¶ 209. Carmichael further opined that Mr. Lochtefeld's March 27, 2015, certified statement (*that Light Wave Ltd. was the assignee of the entire right, title, and interest of the '589 patent*) "to the PTO was 'unmistakably false'" because Mr. Lochtefeld himself had signed away all of Light Wave's rights in favor of Surf Park in May 2011. *Id.* ¶ 210. Carmichael further opined that had the PTO been aware that there was "no inquiry reasonable under the circumstances" made by Mr. Squier because he instead relied on his discussion with Mr. Tache, "the PTO would not have revived the patent" as it did, in this case, believing Mr. Squier had been truthful in the Petition statement that the delay in the maintenance fee to this patent was unintentional. *Id.* ¶ 211.

reasonable and benign or intended to deceive the PTO and effectively did so.  *Id.*
Moreover, Defendants assert that Carmichael steered clear of offering 'legal' and
'individuals' state of minds opinions, and instead focused on accepted areas such as the
PTO's standard for materiality and the duty of candor it imposes on practitioners,
applicants, and petitioners.  *Id.* at 4.

The Court concludes that most of Plaintiff's criticisms go to the weight that a jury
should give Carmichael's opinions, rather than their admissibility.  As such, these
arguments are improper bases to exclude Mr. Carmichael's expert opinion.  Furthermore,
this Court will not exclude testimony that is relevant to issues that will be put before the
jury, even if the testimony is also relevant to issues that will be decided solely by the Court.
Unless the testimony has no relevance to the jury, it should be permitted.

Having reviewed Carmichael's expert report and deposition testimony, the Court
concludes that his opinions pass muster under the reliability and relevance requirements of
*Daubert* and Rule 702.  Furthermore, the Court notes that Plaintiff offers an expert of its
own, Nicholas Godici, to opine on the same issues.  Therefore, Plaintiff's request to
exclude Carmichael's report and testimony entirely is **DENIED**.  Plaintiff may challenge
Carmichael's expert opinions regarding inequitable opinion on cross-examination.

**B. Improper Speculation on what PTO's Actions would have been**

Next, Plaintiff argues that Carmichael's report and deposition testimony should be
stricken or excluded because Mr. Carmichael "improperly opines on what he believes a
PTO examiner *would have done* in a specific situation had he or she had additional
information Carmichael had been provided" at the time of review and decision.  (Doc.
No. 197 at 7.)

Plaintiff contends that Carmichael's report and testimony constitute "retroactive
mind-reading of the thoughts of patent examiners."  *Barry v. Medtronic, Inc.*, No. 1:14-
cv-104, 2016 U.S. Dist. LEXIS 104118, *6-7 (E.D. Tex. July 19, 2016).  For example,
"the '589 Patent would not have issued as it did if the PTO had been aware of those prior
installations and systems", and "if Mr. Squier had disclosed [information he allegedly

withheld] the PTO would not have revived the patent and would have viewed the certification as unmistakably false".[6] *Id.* at 7-8. Furthermore, Plaintiff asserts that "Carmichael has twice had" his expert report or testimony "excluded for attempting to offer exactly this sort of improper testimony." *Id.*

Defendants contend that Plaintiff is blatantly mischaracterizing Carmichael's opinions and that he most assuredly does *not* attempt to read the minds of any patent examiners as part of his expert services or opinions. (Doc. No. 215 at 7.) Rather, Carmichael's report and testimony will assist the Court and the trier of fact in determining whether "from the perspective of a reasonable PTO examiner – the omitted information rises to the level of but-for materiality." *Id.* Moreover, "Carmichael's opinion is not speculative but based upon his deep understanding of, and long experience with, PTO practice and procedure." *Id.* at 7-8.

The Court agrees with Plaintiff. While district courts have consistently recognized that experts may opine on the materiality of a patent applicant's misrepresentations, omissions, and intent before the PTO, that does not entitle them to speculate about the outcome "if the examiner had different information." Doing so is nothing more than "irrelevant speculation." *See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,* No. C 92-20643 RMW, 1995 U.S. Dist. LEXIS 22335, at *8 (N.D. Cal. Apr. 25, 1995). In a similar circumstance, a district court in the Northern District excluded the testimony of a patent attorney-expert who was also "a former supervising patent examiner and former member of the Patent Office  Board of Patent Appeals and Interferences" from providing his expert opinion "as to what the prior art teaches," "the 'materiality' of prior art," or what "the [PTO] examiner would have done if [the expert] had been the examiner, or if the examiner had different information." 1995 WL 261407, at *2 (N.D. Cal. Apr. 25, 1995). In doing so, the court noted that the defendant's expert

---

[6]     Carmichael also "discusses the limited time patent examiners have to spend examing a patent." (Doc. No. 197 at 8.)

1  was not a technical expert, and lacked skill in the pertinent art. *See id.* at *2–3. The court
2  found that testimony as to what the examiner "would have done" under different
3  circumstances was "irrelevant speculation" that would impermissibly "advise [the] jury as
4  to applicable principles of law." *See id.* at *3; *accord Icon-IP Pty Ltd. v. Specialized*
5  *Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 947 (N.D. Cal. 2015) (prohibiting the
6  defendant's expert, who had spent over thirty-four years working at the PTO, from
7  speculating "about what the PTO would have done had specific prior art references been
8  brought to the examiner's attention").

9    Here, Plaintiff argues Carmichael's report and testimony is not helpful to the Court
10  or trier of fact to determine what a patent examiner would have done had it been provided
11  with additional information Carmichael was exposed to because Carmichael states what
12  he believes the PTO examiner would have done based off his experience as a former
13  patent examiner. (*See* Doc. No. 242 at 3-5.) In essence, Carmichael is placing the
14  proverbial cart before the horse by describing for the fact-finder how they should find in
15  this circumstance rather than allowing them to make the determination based on the facts.
16  In this case, despite Carmichael's prior experience, his testimony oversteps his bounds of
17  authority. Though Carmichael could theoretically opine on PTO policy and procedure,
18  Defendants do not seek to present testimony on that issue. *See, e.g., Sundance*, 550 F.3d
19  at 1361 n.2 & n.5 (allowing the defendant's patent attorney-expert "testify as to patent
20  office procedure generally") (citing *Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.*, 79
21  F. Supp. 2d 252, 254–55 (W.D.N.Y. 2000)). Similarly, Carmichael's testimony as to
22  "reasonable practice" by patent examiners would not help the jury to assess a fact in
23  issue: instead, it would require him to give impermissible legal opinions. *See Argus*
24  *Chem. Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 13 (Fed. Cir. 1985) ("The
25  question of the appropriate standard for determining inequitable conduct in procuring a
26  patent is one of law.) Therefore, the Court **GRANTS** Plaintiff's motion and excludes
27  Carmichael's report and testimony regarding the hypothetical behavior of the PTO.
28  ///

## C. **Opinions Regarding Intent or Credibility**

Finally, Plaintiff argues that Carmichael's report and testimony regarding intent or credibility should be struck/excluded because it is inadmissible. Plaintiff alleges that throughout Carmichael's report and testimony, he refers to specific, *purposeful* "facts for the sole purpose of attacking the credibility of, or to attempt to imply what the intent, of Whitewater, its counsel, or Lochtefeld was."[7] (Doc. No. 197 at 9.) Certain other comments by Carmichael are mere speculative inferences regarding the knowledge, intent, or practices of Whitewater's counsel in a given situation.[8] *Id.* at 10. "Such statements are impermissible as they go directly to the province of the fact-finder." *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1567 (Fed. Cir. 1998) ("Intent is a factual determination particularly within the province of the trier of fact."). *Id.*

In response, Defendants argue that Carmichael's expert report and testimony provide a helpful context which will help the Court and trier of fact to analyze the facts of this case. Specifically, Carmichael will describe the PTO's procedures for reinstating a patent that has expired due to unintentional delay/lapse of maintenance fees. Additionally, he will describe the procedures for withdrawing and/or correcting incorrect submissions to the PTO. (Doc. No. 215 at 8.) Finally, Defendants contend Carmichael will identify specific facts in the record which are suggestive of intent. *Id.* Comparing Plaintiff's actions with the suggestions identified by Carmichael will likely help the jury determine whether Plaintiff intended to deceive the PTO during the reinstatement application process. *Id.*

Patent regulations impose a duty of candor to the PTO on _each_ named *inventor*, *attorney* and/or *agent* who prepares/prosecutes a patent application, as well as *every person* who is substantively involved in the preparation and/or prosecution of the application and

---

[7]    Plaintiff contends that "many of these statements relate to matters that do not relate to conduct before the PTO. (Doc. No. 197 at 10.)

[8]    Implies Plaintiff's "counsel lacked knowledge of a 'competent' patent attorney" or "opining as to counsel's knowledge or intent in informing the PTO of scope of inquiry" (Doc. No. 197 at 10.)

whoever is associated with the inventor or assignee. 37 C.F.R. § 1.56. Accordingly, nondisclosure of information to the PTO can support a finding of inequitable conduct which in turn can render an entire patent unenforceable. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287, 1288 (Fed. Cir. 2011) (en banc).

In cases of omission, direct evidence of a deliberate intent to deceive is rare and thus, indirect and circumstantial evidence may be considered. *Id.* Nonetheless, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* (internal quotation marks omitted). The court may not infer intent solely from materiality. And, "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.*

Importantly, "to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.* (internal quotation marks omitted). Thus, "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91.

Here, both materiality and intent are fact-driven, and it is the Defendant's burden to prove the existence of these threshold elements. At this juncture, Defendants have not done so. Carmichael's conclusory report and testimony do not present clear and convincing evidence that the withheld information or alleged misstatements were material to the prosecution of the '589 Patent, nor that the applicants intentionally omitted reference to it. In addition, given the conflicting evidence between Carmichael's and Defendants' expert contentions, the Court cannot conclude there are no triable issues of material fact regarding Plaintiff's failure to disclose the prior art or pay the renewal fees for the '589 Patent.

Next, Carmichael's report suggests the Plaintiff and/or one of its agents could reasonably have considered the prior art to be immaterial and therefore deemed disclosing it inconsequential to the patent reapplication process. Furthermore, despite stating in his expert report the Plaintiff likely overlooked paying the maintenance fees on the '589

Patent, Carmichael now contends that the evidence is clear that Plaintiff could not have overlooked the maintenance fee renewal considering that Mr. Squier "disclosed that ~~Carmichael was not in a position to not know that the renewal was due, coupled by the fact~~ that no reasonable investigation had been conducted to support his claim of an unintentional delay in paying the patents maintenance fees by Plaintiff." (Doc. No. 242 at 4.) This is especially important considering that under current PTO procedure, the reviewing agent would likely not have revived the patent and would have viewed the certification as unmistakably false. *Id.*

Finally, Defendants' evidence reflecting prior disclosure of the '589 Patent information elsewhere in regards to other patents held by Plaintiff, cuts both ways. The other disclosures appear to indicate the applicants were aware of the undisclosed prior art, and the applicants chose not to disclose. Thus, on the one hand, it is reasonable to assume the applicants chose not to disclose the prior art because they deemed it unnecessary and were unaware of the need to pay the renewal fees for the '589 Patent. On the other hand, the applicants' misrepresentations to the PTO could demonstrate that they chose not to disclose the prior art or pay the renewal fees because they wanted to investigate first the validity of Defendants' claims before expending the funds necessary to renew the '589 Patent. Thus, there is conflicting evidence regarding what the examiner actually considered. Therefore, the Court **GRANTS** Plaintiff's motion to exclude Carmichael's report and testimony as to intent and credibility.

## II.  <u>Summary Judgement Motions</u>

Both parties have now filed summary judgment motions. Defendant's motion raises four issues (1) *Inequitable Conduct*; (2) *Intervening Rights for sales made while '589 Patent was expired*; (3) *Infringement Under 35 U.S.C. § 271*; and (4) *Permanent Injunction.* (*See* Doc. No. 191.) Plaintiff's motion raises three issues (1) *Infringement of the '589 Patent*; (2) *Validity of the '589 Patent*; and (3) *Inequitable Conduct.* (*See* Doc. No. 200.)

This Court's September 27, 2018 Order denying Defendants First Motion for

Summary Judgment provides an overview of the '589 Patent and the other allegedly infringing products, so the Court does not repeat it here.

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As an initial matter, the Defendants filed an *ex parte* motion on November 1, 2018, seeking leave of court to file a Second Motion for Summary Judgment. (Doc. No. 192.) Plaintiff opposed the *ex parte* motion (see Doc. No. 209), but elected not to respond to the second summary judgment motion until after this Court ruled on Defendants *ex parte* motion. The Court **GRANTS** the Defendants' *ex parte* Motion and Orders the submitted

14

1 | copy of the Second Motion for Summary Judgment docketed on November 1, 2018 (Doc.

2 | No. 191) filed for purposes of this motion. Furthermore, the Court finds Plaintiff's lack of

3 | opposition to the Defendants' Second Summary Judgment Motion as a non-issue since the

4 | Defendants' Second Summary Judgment Motion is hereby Ordered **DENIED**.

5 | **A. Defendants' Second Motion for Summary Judgment**

6 | (1) *Summary Judgment as to Inequitable Conduct.*

7 | Inequitable conduct is an equitable defense to patent infringement that bars

8 | enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276,

9 | 1285 (Fed. Cir. 2011). "To hold a patent unenforceable for inequitable conduct, a

10 | district court must find by clear and convincing evidence that a patent applicant breached

11 | its duty of candor and good faith to the United States Patent and Trademark Office... by

12 | failing to disclose material information, or submitting false material information, with an

13 | intent to deceive the PTO." *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229,

14 | 1233-34 (Fed. Cir. 2008); *see Therasense, Inc.*, 649 F.3d at 1287.

15 | A claim of inequitable conduct has two elements: materiality and intent. *See*

16 | *Therasense, Inc.*, 649 F.3d at 1287-88. "[T]he remedy for inequitable conduct is the

17 | 'atomic bomb' of patent law." *Id.* at 1288. Moreover, "mistake, negligence, even gross

18 | negligence, does not support a ruling of inequitable conduct." *Aspex Eyewear Inc. v.*

19 | *Clariti Eyewear, Inc.*, 605 F.3d 1305, 1316 (Fed. Cir. 2010). Inequitable conduct renders

20 | the entire patent claim unenforceable. *Id.*

21 | "Although it is not impermissible to grant summary judgment of inequitable

22 | conduct, [the Federal Circuit] urges caution in making an inequitable conduct

23 | determination at the summary judgment stage." *M. Eagles Tool Warehouse, Inc. v.*

24 | *Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006) (quotation omitted); *see*

25 | *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1317 (Fed. Cir. 2006)

26 | ("[A] grant of summary judgment on the issue of inequitable conduct is permissible but

27 | uncommon."). The element of intent in particular "requires the fact finder to evaluate all

28 | the facts and circumstances in each case" and "[s]uch an evaluation is *rarely* enabled in

summary proceedings." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993) (citation omitted).

Here, Defendants'[9] motion seeks summary judgment concerning inequitable conduct. However, given the fact-intensive nature of the inquiry, the Court readily concludes that Defendants have not carried their burden of showing that this is one of those rare cases requiring summary judgment on this issue. Among other things, Defendants' motion reflects "multiple reasonable inferences that may be drawn" from the facts, and Defendants' argument falls short of demonstrating Plaintiff's actions during the pendency of the application reinstatement process was intended to deceive the PTO. *Therasense*, 649 F.3d at 1290-91. Furthermore, the Court finds that Defendants' Motion, at the very least, presents a genuine dispute of fact regarding inequitable conduct, requiring the Motion to be denied as to this issue. *See Polara Eng'g, Inc. v. Campbell Co.*, No. 13-00007-CJC, 2015 WL 12914378, at *1 (C.D. Cal. Apr. 27, 2015) (denying accused infringer's motion for summary judgment of inequitable conduct where "facts of materiality or intent are reasonably disputed"); *Latentier, LLC*, 725 F. Supp. 2d at 802 (denying accused infringer's cross-motion for summary judgment of inequitable conduct concluding that material issue of fact existed as to intent despite named inventor "associate[ing]" prior art publication and prior public use "with the [patented] invention"). Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as it pertains to inequitable conduct.

///
///
///
///

---

[9]     Defendants' Motion alleges the '589 Patent is unenforceable due to Mr. Squier's inequitable conduct in making multiple misrepresentations and omissions to mislead the PTO into reinstating the lapsed '589 Patent. (Doc. No. 191 at 10-17.)

(2) *Because the '589 Patent was Expired and Subsequently Reinstated, Defendants Contend They Hold Intervening Rights for Sales Made During the Expiration.*

Defendants next move for Summary Judgment of non-infringement of the '589 patent based on the defense of intervening rights.

The Patent Act provides that, when a patent is reinstated after a lapse, parties who, during the lapse period, "made, purchased, or used" goods that would infringe the reinstated patent are entitled to "continue the use of, or to sell to others" those goods "so made, purchased, or used." 35 U.S.C. § 41(c)(2). The rights conferred by this provision are known as "absolute intervening rights." The provision is designed to protect the rights of those who, in reliance on the lapse, first took steps to begin making, selling, or using the product during the lapse period, i.e., after the end of the six-month grace period but prior to reinstatement. *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1554 (Fed. Cir.1997), *cert. denied*, 522 U.S. 908 (1997). The legislative history states that the intervening rights provisions in § 41(c)(2) are like those in 35 U.S.C. § 252, concerning reissued patents. *Id.* (quoting H. Rep. No. 97–542, at 8 (reprinted in 1982 U.S.C.C.A.N. 772)). Absolute intervening rights extend only to goods already made at the time the reissue patent is granted. *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1221 (Fed. Cir.1993) (interpreting § 252).

The second sentence of 35 U.S.C. § 41(c)(2) grants courts discretion to "provide for the continued manufacture, use, offer for sale, or sale of the [good] ... to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced" during the lapse period. This section allows the court to grant a party potentially broad rights to continue manufacturing and selling goods that would otherwise infringe a reinstated patent to protect investments made during the lapse period. *BIC Leisure Prods., Inc.*, 1 F.3d at 1221 (construing § 252). Although potentially much broader than the absolute right to sell goods already made, the rights granted by this second provision are not absolute; rather, they are known as "equitable

17

1 | intervening rights." *Id.* "'The purpose of [this portion of] the statute is to protect
2 | investments which have been made in good faith reliance on some perceived infirmity in
3 | the original patent.'" ~~*Thayer v. Nydigger*, No. CIV 95-2004-AS, 1999 WL 372552 at~~
4 | *12 (D. Or. 1999) (quoting *Halliburton Co. v. Western Co. of North Am.*, 10 U.S.P.Q. 2d
5 | 1973, 1983 (W.D. Okla. 1988), *aff'd*, 935 F.2d 281 (Fed. Cir.1991)).

6 |     If the Court concludes that reinstatement of the '589 patent was warranted, then
7 | Defendants argue that they are entitled to the absolute intervening right to sell the goods
8 | produced during the lapse period. They also argue that equitable considerations warrant
9 | the grant of equitable intervening rights. Bearing in mind the Defendants' argument, the
10 | Court notes that intervening rights are only granted to parties acting in "good faith" who
11 | "innocently" develop and manufacture the infringing good. *Henkel Corp. v. Coral, Inc.*,
12 | 754 F. Supp. 1280, 1320 (N.D. Ill. 1990) (citing *Seattle Box Co. v. Industrial Crating and*
13 | *Packing*, 756 F.2d 1574, 1579 (Fed. Cir. 1985)).

14 |     In this case, considering the Defendants' Motion with the often contentious, fluid
15 | facts proffered, and the ongoing hostile litigation permeating this and the former related
16 | case, genuine issues of material facts remain as to whether Defendants acted in "good
17 | faith" and "innocently" as to its foreign sales of water rides and ride components to
18 | customers in Trinidad, Tobago, and France.[10] (*See* Doc. No. 191.) While that issue
19 | ultimately will be determined at trial, such a determination cannot be made at this time.
20 | On the other side, Defendants argue that Plaintiff committed fraud on the PTO through
21 | comments and/or omissions to gain reinstatement of the '589 Patent. *Id.* For example, a
22 | fraudulent claim of small entity status will be treated as a fraud on the PTO, *see DH*
23 | *Technology, Inc. v. Synergystex, Int'l, Inc.*, 154 F.3d 1333, 1342-43 (Fed. Cir. 1998), and

24 |
25 |
26 | [10]   The first sale to install a ProFlow Double in Trinidad and Tobago for Fouraime Enterprises Ltd. took place on February 27, 2015. Ex. T, Vigil Report at 20, 118; Ex. U,
27 | Yeh Tr. 316:10-21. The second sale to install a Supertube in France for Les Parcs du Sud
28 | SAS (France) took place on April 14, 2015. Ex. T, Vigil Report at 20, 112. (Doc. No. 191 at 18.)

a fraudulent effort to correct an earlier honest error could also be viewed as fraud on the PTO. *DH Technology* shows that the issue of fraud in such matters is one of subject intent. *Id.* at 1343 (noting that district court had not decided intent and remanding for determination of that issue). Defendants have come forward with evidence from which a reasonable jury might find fraudulent intent by clear and convincing evidence, but that is not enough for summary judgment. The law recognizes that people can make honest mistakes. A jury could also find that Plaintiff's errors were simply mistakes that should not be penalized as a fraud.

Finally, even if the doctrine of intervening rights was found to be controlling, the Defendants have not demonstrated to this Court, through specific evidence, that no genuine issue of material fact exists showing that they detrimentally relied on the lapse of the '589 patent, instead of merely lying in wait for the opportunity to pounce on a competitor's market share. Section 41(c)(2) "was intended to protect the rights of those who, *in reliance upon the lapse,* first began using the claimed invention or who first took steps to begin using it during the lapse period." *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1554 (Fed. Cir. 1997)) (emphasis added). Too many genuine issues of material fact exist to enable summary judgment. Therefore, Defendants' Motion for summary judgment on the issue of intervening rights is **DENIED**.

(3) *Plaintiff Cannot Prove Infringement Under 35 U.S.C. § 271(f).*

Defendants next move for Summary Judgment of non-infringement regarding the '589 patent under 35 U.S.C. § 271(f). In the Complaint, Plaintiff alleges Defendants' sale of sheet wave water-attraction rides to overseas customers in Trinidad, Tobago, and France, infringed the '589 patent under 35 U.S.C. §§ 271(f)(1) and (2). (Doc. No. 191 at 19.)

Under the Patent Act, a company can be liable for patent infringement if it ships components of a patented invention overseas to be assembled there. *See* 35 U.S.C. § 271(f)(2). Section § 271 outlines several types of infringement. The general infringement provision, § 271(a), covers most infringements that occur "within the

United States."  The subsection at issue in this case, § 271(f), "expands the definition of infringement to include supplying from the United States a patented invention's components."  *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 444-445 (2007).  It contains two provisions that "work in tandem" by addressing "different scenarios."  *Life Technologies Corp. v. Promega Corp.*, 580 U.S. ____, 137 S. Ct. 734, 742 (2017).

Section 271(f)(1) addresses the act of exporting a substantial portion of an invention's components:  Under 35 U.S.C. § 271(f)(1), liability exists for one who "supplies or causes to be supplied in or from the United States" one or more components of a patented invention "where such components are uncombined in whole or in part, in such a manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."[11] 35 U.S.C. § 271(f)(1).

Section 271(f)(2) addresses the act of exporting components that are specially adapted for an invention:  Section 271(f)(2) provides for liability as against persons who supply or cause to be supplied "in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial non-infringing use ... knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States." 35 U.S.C. § 271(f)(2).  Patent owners who prove infringement under § 271 are entitled to relief under § 284, which

---

[11]     The term "components" in Section 271(f) "applies only to 'such components' as are combined to form the 'patented invention' at issue," *i.e.*, "a usable, combinable part." *Microsoft Corp. v. AT&T*, 550 U.S. 437, 449, 450-52 (2007) (holding that Windows "software, uncoupled from a medium" was not a "combinable component" and that "a copy of Windows, not Windows in the abstract, qualifies as a 'component' under § 271(f).").  (Doc. No. 191 at 20.)

authorizes "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

The Court notes that Sections §§ 271(f)(1) and (f)(2) are modeled after Sections 271(b) and (c) in some respects. For example, the Federal Circuit has recognized that "[t]he language of section § 271(f) itself mimics the language of the indirect infringement provisions of Sections 271(b) and (c)." *Zoltek Corp. v. United States*, 672 F.3d 1309, 1334 (Fed. Cir. 2012). However, while there may be similarities between § 271(f) and §§ 271(b) and (c), they are not the same.[12] In determining the applicable mental state, the requirements of Section § 271(f) are not presumptively identical to those of Sections 271(b) and (c). The Court concludes that Section § 271(f)(1) requires that an alleged infringer (1) actively induce the combination of the components in question; and (2) that the combination of those components would infringe the patent if such combination occurred within the United States.

Section § 271(f)(2) requires that the accused infringer intend that the supplied component(s) be combined. 35 U.S.C. § 271(f)(2) ("Whoever without authority supplies or causes to be supplied ... any component of a patented invention ... *intending that such component will be combined* ...." (emphasis added)). However, Section § 271(f)(2) also imposes an additional constraint absent from Section § 271(f)(1), requiring that the accused infringer supply such component "knowing that such component is ... especially made or especially adapted for use in the invention." *Id.* This language parallels the knowledge requirement in 35 U.S.C. § 271(c), which provides that the accused infringer

---

[12]    Even the Federal Circuit has acknowledged that Section 271(f) is not identical to Sections §§ 271(b) and (c). In *Waymark Corp. v. Porta Sys. Corp.*, the Federal Circuit placed Section § 271(f)(2) on its own footing, distinguishing it from Section 271(c) by holding that, under Section § 271(f)(2), there need not be any proof of a completed assembly abroad. *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1367-68 (2001).

must "know[ ] the [component] to be especially made or especially adapted for use in an infringement of such patent." 35 U.S.C. § 271(c).[13]

Because the mental state required for infringement under Section § 271(f)(2) is equivalent to that required under Section § 271(c), the Court looks to the Supreme Court's analysis Section 271(c) for guidance. In *Aro Manufacturing Co. v. Convertible Top Replacement Co., Inc.*, 377 U.S. 476, 488 (1964), a majority of the Supreme Court held that Section § 271(c) "require[s] a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." The Court, therefore, concludes that Section § 271(f)(2) requires a plaintiff to prove that the defendant (1) intended the combination of components; (2) knew that the combination he intended was patented and (3) knew that the combination he intended would be infringing if it occurred in the United States.

Applying Section § 271(f)'s two-part framework requires a brief examination of the history and background of this case. Here, the Court notes that Plaintiff's Claim 17 of the '589 Patent describes its covers for a water ride slice gate from which a flow of water jets out as being comprised of "a contoured flexible pad, a connector configured to removably affix the cover to said sluice gate, a flexible tongue at a downstream end of the cover, the tongue configured to extend over the water that jets from said sluice gate, a flexible tongue at a downstream end of the cover, the tongue configured to extend over the water that jets from said sluice gate, and a generally flat portion at an upstream end of the cover, said tongue being urged downward against the flow of water jetting from said sluice gate." (Doc. No. 1 ¶ 25.) Furthermore, Plaintiff's sluice gate covers are commonly referred to as "nozzle flap." *Id.* ¶ 12.

---

[13] Although the plain language of Section § 271(f)(2) makes the consideration of legislative history unnecessary, the legislative history of Section 271(f)(2) only confirms what is clear from the plain language of the statute. S. Rep. 98-663 at 7 ("Paragraph [ ](2), like existing subsection 271(c) requires the infringer to have knowledge that the component is especially made or adapted.").

Defendants' claim their nozzle flaps are comprised of three components, metal, foam, and a vinyl cover. Alleshouse Tr. 224 at 11-14. ("our nozzle flaps 'metal, and they're cut on-site to make them fit. And then they . . . have foam applied to them on-site, and then they are wrapped in a vinyl membrane.'")

Additionally, there is no dispute that the Defendants sold two rides in 2015. (Doc. No. 191 at 18.) The first sale which took place on February 27, 2015, called for Defendants to install a ProFlow Double ride at locations in Trinidad and Tobago for Fouraime Enterprises Ltd. *Id.* The second sale, occurring on April 14, 2015, called for Defendants to install a Supertube ride for Les Parcs du Sud SAS in France. *Id.*

Here, there is little question that Plaintiffs could demonstrate the first requirement of Section 271(f)(1)—that Defendants actively induced the combination of the materials and/or components at issue here. This intent to induce combination is shown throughout the record. First, Defendants admit that they shipped all, or substantially all, of the components for the nozzle flaps to their foreign installations from the United States. More specifically, Mr. Yeh admitted that for the Supertube installation in France, Defendants combined the foam and vinyl "in the United States using Defendants' 'trade secret' process and then shipped" everything to France for installation. Yeh Tr. 295:5-8 (PSD installed product in France); 295:18-296:7 (foam and vinyl combined in U.S.); 313:22 (foam sourced in U.S.). To put this in perspective, two out of the three elements required to make the claimed nozzle flaps were pre-combined in the United States and shipped to France for use, in part, to make the infringing nozzle flaps. As for the ProFlow Double ride installed in Trinidad, Mr. Yeh also admitted that *all* the components for the nozzle flaps for that installation were also from the United States.[14]

---

[14] Yeh Tr. 323: 4-11 (*all* components except vinyl were *manufactured* in U.S.); 326:15-20 (steel and "ride surface materials" including foam, vinyl, and glue were shipped from the U.S.); Yeh Tr., Ex. 27 (listing foam, vinyl, glue, and fabricated steel as shipped from the U.S.).

1    The remaining requirement is that the components be combined in a manner that
2    would infringe the patent if such combination occurred within the United States. The
3    Defendants already indirectly admitted that the accused products infringed the '589
4    Patent under Section § 721(f)(1). In this case, the foreign sales of rides to foreign
5    customers in Trinidad and France necessitated Defendants to source building supplies
6    from United States ("U.S.") manufacturers for fabricating before shipping all the
7    materials to the foreign destination worksite where all the materials would be combined,
8    for final assembly. On the worksite, Defendants' employees would then combine the
9    fabricated steel, pre-cut/formed foam and ride surface materials to assemble the allegedly
10   infringing slide over nozzle flaps. These nozzle flaps were then used in the water ride
11   constructed by Defendants' employees in Trinidad and France. Considering the steps
12   taken by Defendants to prep/fabricate the steel, ship the materials overseas, and construct
13   the nozzle flaps on a foreign shore, this Court has no doubt that Plaintiff will be able to
14   show that all of the Section § 271(f)(1) requirements were met.

15       Under Section § 271(f)(2), there is little question that Plaintiff could not
16   demonstrate that the Defendants intended the combination of the items it shipped (*from*
17   *the United States*) to its foreign customer(s), would later be combined in a manner that
18   would infringe the patent if such combination occurred within the United States. First, as
19   reflected in the Complaint, the Defendants were aware of the '589 Patent at least as early
20   as October 1, 2012. (*See* Doc. No. 1.) Moreover, Defendants had knowledge of the '589
21   Patent infringement allegations arising from Defendants' integration of infringing slide-
22   over nozzle covers which it utilized in producing its own sheet wave water-attractions
23   and for refurbishment projects of similar water-attractions as early as the filing of
24   Plaintiff's 2014 Complaint. *Id.* The nozzle cover defined in the '589 Patent were recited
25   in each of the independent claims of the '589 Patent as well as described as the principal
26   object and advantage of the invention in overcoming limitations of conventional sheet
27   wave water-attractions. *Id.*

28

1    Despite this knowledge, Defendants continued to supply its foreign customers with

2  *fabricated nozzle covers* or caused '*materials*' such as *fabricated steel, unfinished foam,*

3  *and ride surface materials* utilized in the production of said nozzle covers to be shipped

4  from the United States to *France, Trinidad,* and *Tobago,* to fulfill Defendants' foreign

5  customer orders for sheet wave water-attraction rides.  These '*materials*' (*interestingly,*

6  *the same materials utilized in the '589 Patent nozzle cover*) were then combined onsite by

7  the Defendants to produce an infringing slide over nozzle cover which Defendants

8  installed in the foreign customers' newly purchased sheet wave water-attraction or

9  refurbishment project. *Id.*  Each of these foreign country sheet wave attractions utilized

10  the specially fabricated nozzle covers and therefore infringed upon at least one of the

11  asserted claims of the '589 Patent.  Defendants attempt in the Motion to minimize or

12  explain away its likely infringing conduct is unavailing.[15]  Thus, Plaintiffs would likely

13  be able to satisfy all of Section § 271(f)(2)'s requirements.

14      Consequently, the Court finds Plaintiff's allegation that Defendants' sale of rides

15  in France, Trinidad, and Tobago infringed the '589 Patent under 35 U.S.C. § 271(f)

16  presents a genuine dispute of fact regarding infringement under Sections §§ 271(f)(1) and

17  (2).  Therefore, the Court **DENIES** Defendant's Motion for Summary Judgment as it

18  pertains to infringement under 35 U.S.C. 271(f)(1) and (2).

19          (4)    Plaintiff's Request for a Permanent Injunction.

20      A plaintiff seeking a permanent injunction barring patent infringement must

21  demonstrate that four factors are present before the court may grant such relief: (1) it has

22

23  _____

24  [15]    Defendants argued that their rides incorporate a flap that was not "flexible" or
    "biased downward" and thus reasonably believed that their design would not infringe any
25  valid claim of the '589 Patent.  They did not know, nor should they have known, that the
    components were especially made or adapted for use in a product that infringes a claim of
26  the '589 Patent.  Further, Plaintiff alleges without evidence that Defendants supplied
    "specially fabricated nozzle covers" despite the testimony clearly describing shipments of
27  steel, padding, and glue to be cut and combined, and installed on-site.  Steel, padding,
28  and glue have many substantial non-infringing uses.

1 | suffered an irreparable injury[16]; (2) legal remedies, including monetary damages, are

2 | inadequate; (3) the balance of the hardships between the plaintiff and the defendant

3 | weighs in favor of granting an injunction[17]; and (4) the public interest would not be

4 | impacted negatively by an injunction[18]. *eBay Inc. v. MercExchange,* LLC, 547 U.S. 388,

5 | 391 (2006).

6 | In the Complaint, Plaintiff requested the Court issue both a preliminary and

7 | permanent injunction prohibiting the Defendants, their respective officers, agents,

8 | servants, employees and/or all persons acting in concert or participation with it, from

9 | engaging in further infringement and/or acts of infringement and inducement of the '589

10 | Patent. (Doc. No. 1 at 16 ¶ F.) Since that initial filing, the Court has twice rejected

11 | Plaintiff's requests for the issuance of a preliminary injunction (*Doc. No. 48 on October*

12 | *13, 2017, and Doc. No. 182 on September 28, 2018*) due to a lack of evidence

13 | demonstrating a causal nexus between Defendants' potential future acts of alleged

14 | infringement and the purported irreparable harm Plaintiff will sustain without injunctive

15 | protections. (Doc. No. 191 at 22.) Twenty-three months have elapsed since the Court

16 | first denied injunctive relief. Despite this, Plaintiff has yet to remedy the causal nexus

17 | evidentiary defect by providing "evidence that the patented feature influences consumer

---

[16] To prove irreparable injury, a patentee must prove that (1) absent an injunction, it will suffer irreparable harm and (2) there is a sufficiently strong "causal nexus" connecting the alleged harm to the alleged infringement. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013).

[17] The balance of the hardships involves the consideration of "the relative effect of granting or denying an injunction on the parties" with regard to the parties' sizes, products, and revenue sources. *I4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).

[18] Finally, the "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i Ltd. Partnership*, 598 F.3d at 863.

1  demand for Defendants' infringing product. . . .  Whitewater had not put forth any
2  evidence that consumers value the [patented nozzle] cover when making their purchasing
3  decisions." *Id.*  Defendant further alleges that this fact is further supported by the fact
4  that Plaintiff's expert, Dr. Stevick, "conceded that the topic of why customers decided to
5  purchase PSD's allegedly infringing rides was 'outside the scope' of his report." *Id.*
6  While Defendants contentions weaken Plaintiff's assertions for the need of a preliminary
7  injunction, it has little effect on whether a permanent injunction should ultimately be
8  imposed in this matter.  Because this case was only recently set for trial, the Court notes
9  that many of the questions that remain unanswered now could likely be resolved at that
10  time.  Accordingly, the Court **DENIES** Defendant's request to dismiss Plaintiff's request
11  for a permanent injunction as premature.  Therefore, Defendant's Motion for Summary
12  Judgment denying Plaintiff's request for a Permanent Injunction is **DENIED without**
13  **prejudice**.

### B. Plaintiff's First Motion for Summary Judgment

(1) *Whether Defendants' Accused Products Infringe the '589 Patent*.

17  To succeed on its claim of patent infringement, Plaintiff must carry its burden of
18  establishing, by a preponderance of the evidence, that the accused products either literally
19  infringe the claims of the '589 Patent or infringe the claims of the '589 Patent under the
20  doctrine of equivalents.

*a. Whether Claim 1 is Literally Infringed*

22  "To establish literal infringement, every limitation set forth in a claim must be
23  found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54
24  F.3d 1570, 1575 (Fed. Cir. 1995).  Thus, "[i]f any claim limitation is absent from the
25  accused device, there is no literal infringement as a matter of law." *Amgen Inc. v. F.*
26  *Hoffman—LA Roche, Ltd.*, 580 F.3d 1340, 1374 (Fed. Cir. 2009).  Plaintiff contends that
27  Defendants' accused products meet all but a portion of one element of Claim one of the

'589 Patent.[19]  Accordingly, Defendants' accused products should be found to infringe each of independent claims 1, 17, 24, 37, 38, and 42 of the '589 Patent ("Asserted Independent Claims").  (Doc. No. 200 at 1.)

Defendants argue that their products not only do not literally infringe the '589 Patent, but Plaintiff's conclusory statement is insufficient to carry its burden as the movant for summary judgment.[20]  (Doc. No. 228 at 4.)  Furthermore, Defendants say that Plaintiff's attempt to abridge its infringement analysis by incorrectly claiming the "Defendants admit that their accused products contain all but a portion of element (d) of Claim 1," is an improper assertion.  Defendants also contend they never made such an admission. *Id.* at 5.  But, even if Defendants had done so, it would matter little because the independent claims are drawn to different aspects of the disclosure and contain different claim limitations that appear nowhere in Claim 1. *Id.*

Plaintiff argues, however, that Defendants' accused products include "a nozzle assembly for a water ride attraction," (Doc. No. 233 at 2) containing a covered outlet aperture and flexible tongue which is designed to jet water onto a riding surface while the water attraction is in operation.[21]  Plaintiff contends that the biased downward flexible

---

[19]    Plaintiff alleges that Defendants' accused products infringe … Claim 1 of the '589 Patent, namely: "[a] a nozzle assembly for a water ride attraction, comprising: [b] a nozzle having an outlet aperture adapted to emit a jet of water onto a ride surface; and [c] a nozzle cover comprising a padded material substantially covering said nozzle and including [d] a flexible tongue [e] which is biased downward against the flow of water [f] to prevent injury to riders riding over said nozzle." (Doc. No. 200 at 8.)

[20]    Defendants note that Plaintiff breaks Claim 1 of the '589 Patent up into six elements: [a] A nozzle assembly for a water ride attraction, comprising; [b] a nozzle having an outlet aperture adapted to emit a jet of water onto a ride surface; and [c] a nozzle cover comprising a padded material substantially covering said nozzle and including; [d] a flexible tongue; [e] which is biased downward against the flow of water; [f] to prevent injury to riders riding over said nozzle. (Doc. No. 228 at 4.)

[21]    Plaintiff alleges that Defendants' accused products include "a nozzle assembly for a water ride attraction" (Doc. No. 200-19), containing "a nozzle having an outlet aperture, adapted to jet water onto a ride surface" (*id.* at 39: 17-40:1), with a cover

tongue on Defendants' nozzle flap is designed accordingly to allow the flap to move up and down against—or with—the flow of water . . . so that the nozzle openings are covered when the ride is not in operation. *Id.* at 3. Thus, Plaintiff claims Defendants' failed to establish a genuine dispute that the hinged tongue on their products meets the claim element of a "flexible" tongue. *Id.*

Setting aside the issues of material fact that remain to be tried regarding the "flexible tongue" limitation, Defendants take issue with Plaintiff's "biased downward" limitation of Claim 1. (Doc. No. 228 at 6.) First, Defendants contend that Mr. Alleshouse never stated that the nozzle flaps in the accused rides are "biased downward against the flow of the water." *Id.* Second, this construction certainly is not the "plain meaning" of "biased downward against the flow of water." *Id.* Further, while Plaintiff takes issue with Defendants' decision not to include "flex" in its definition of "flexible," Defendants likewise disagree with Plaintiff's contention that any person of ordinary skill in the art would consider a door to be "flexible" simply because it is connected to a hinge. *Id.* at 8. This is especially true considering that Plaintiff did not point to any evidence, intrinsic or otherwise, suggesting that the term "flexible" should be understood to encompass a rigid, steel plate connected to a hinge.

Clearly, the parties and their experts vigorously dispute this point. Accordingly, genuine issues remain as to whether there was literal infringement of the '589 Patent. Therefore, Plaintiff's Motion for Summary Judgment as to literal infringement is **DENIED**.

### b. Whether Claim 1 is Infringed by Equivalents

Plaintiff argues that even if the Defendants' accused products are found not to literally infringe the Asserted Independent Claims of the '589 Patent, they should still be

---

comprising of "a padded material substantially covering said nozzle" (*id.* at 41:2-7) to "prevent injury to riders" (*id.* at 75:22-76:2) as they ride or pass over said nozzle. (Doc. No. 233 at 2.)

found to infringe under the doctrine of equivalents. (Doc. No. 200 at 11.) "A device that does not infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed. Cir. 1997).

"An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Wavetronix LLC v. EIS Elec. Integrated Sys.,* 573 F.3d 1343, 1358 (Fed. Cir. 2009) (quoting *Eagle Comtronics, Inc. v. Arrow Commc'n Labs.,* 305 F.3d 1303, 1315 (Fed. Cir. 2002)); see also *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,* 637 F.3d 1269, 1279 (Fed. Cir. 2011) (explaining that under the doctrine of equivalents, a party cannot "avoid [ ] infringement liability by making only insubstantial changes and substitutions ... which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law" (internal citation and quotations omitted)). In determining whether an alleged equivalent includes only "insubstantial changes and substitutions," the Federal Circuit has applied the "function-way-result test ... which asks whether an element of an accused product performs substantially the same function in substantially the same way to obtain substantially the same result as an element of the patented invention." *Siemens,* 637 F.3d at 1279.

"Although equivalence is a factual matter normally reserved for a fact-finder, the trial court should grant summary judgment in any case where no reasonable fact-finder could find equivalence." *Sage Prods.,* 126 F.3d at 1423; see also *Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349, 1356 (Fed. Cir. 2012) ("If no reasonable jury could find equivalence, then the court must grant summary judgment of no infringement under the doctrine of equivalents." (citations omitted)). "[F]or example, courts properly refuse to apply the doctrine of equivalents 'where the accused device contain[s] the antithesis of the claimed structure.'" *Deere & Co.,* 703 F.3d at 1356 (quoting *Planet Bingo, LLC v. GameTech Int'l, Inc.,* 472 F.3d 1338, 1345 (Fed. Cir. 2006)). "In such a case, application of the doctrine of equivalents would 'vitiate' a claim element, [such that] no reasonable

jury could determine two elements to be equivalent." *Id.* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8, (1997)); *see, e.g., Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (affirming summary judgment of non-infringement under the doctrine of equivalents because "it would defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise"); *Sage Prods.*, 126 F.3d at 1424-25 (affirming grant of summary judgment of no infringement under the doctrine of equivalents because patent claimed a slot at the top of the container, and accused product placed slot inside the container).

Here, Plaintiff argues that it provides a "limitation by limitation" analysis of how Defendants' products infringe under the doctrine of equivalents. *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996.). (Doc. No. 233 at 3.). Specifically, Plaintiff contends that while Defendants apparently believe that their accused products do not infringe the '589 Patent based on the minor change of adding a hinge to the nozzle cover; if that hinged tongue performs the same function, in the same way, to achieve the same result as the nozzle cover of the '589 Patent, Defendants' nozzle cover is an infringing equivalent structure to the claimed nozzle cover.[22] (*See* Doc. No. 200 at 11-12.)

Defendants dispute Plaintiff's contention arguing that the only evidence offered by Plaintiff to support its contention is a conclusory opinion provided by Dr. Stevick, in which he merely repeats the doctrine's legal standard and fails to explain how or why the nozzle assemblies or water ride attractions perform the same function in the same way

---

[22] The purpose of the flexible tongue is set forth in the specification of the '589 Patent: "A flexible tongue is provided which is urged downward squeezing against the flow of water and sealing the nozzle area off from possible injurious contact from a rider." Scott Decl., Ex. 3, '589 Patent at Abstract. (Doc. No. 200 at 12.)

with the same results as the alleged invention.[23]  Since conclusory and generalized testimony will not meet the patentee's burden, Dr. Stevick's opinion is insufficient to support a finding of summary judgment under the doctrine of equivalents.

In this case, beyond relying on prior art as evidence of "known interchangeability," as discussed *supra*, Plaintiff has not provided particularized evidence to explain on a limitation-to-limitation basis how the accused product is equivalent to plaintiff's patent-in-suit as required under established precedent to defeat a motion for summary judgment. *See, e.g., Eastcott v. Hasselblad USA, Inc.*, 564 Fed. Appx. 590, 594-95 (Fed. Cir. 2014) (affirming the grant of summary judgment of non-infringement where plaintiff failed to provide the particularized testimony on a limitation-by-limitation basis to establish the existence of a genuine issue of fact regarding infringement under the doctrine of equivalents.)

Indeed, Plaintiff has not proffered much as far as expert testimony on infringement, which is "typically" required to prove infringement under the doctrine of equivalents. *Aquatex Indus.*, 479 F.3d at 1329.  For the most part, the Plaintiff in a conclusory and generalized fashion asserts legal arguments in support of its argument that Defendants' accused products infringe Plaintiff's '589 Patent under the doctrine of equivalents.  In any event, Plaintiff has not set forth sufficient evidence to create a genuine issue of infringement of the '589 Patent under the doctrine of equivalents.  "The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for

---

[23]     Dr. Stevick's report summarily discusses the doctrine of equivalents as follows: In addition, based upon the above understanding and analysis, I am unable to conclude how any differences that could exist between any argued construction of any limitation of the claim and any relevant modification of the ProFlow Line of Products or Supertube would be anything other than an insubstantial difference that performs the same function, in the same way, to achieve the same result, thus infringing under the Doctrine of Equivalents. (Doc. No. 228 at 10.)

which is the responsibility of the proponent." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1210 (Fed. Cir. 2001). Accordingly, Plaintiff has not carried its burden of proof of infringement under the doctrine of equivalents. Therefore, Plaintiff's Motion for Summary Judgment as to the doctrine of equivalents is **DENIED**.

### (2)   *The '589 Patent is Valid.*

Next, Plaintiff moves for summary judgment, regarding the validity of the '589 Patent. Specifically, Plaintiff argues the Defendants cannot demonstrate the invalidity of the '589 Patent through the use of either prior patents or prior rides. (Doc. No. 233 at 6.)

Patents are presumed valid. 35 U.S.C. § 282(a). A party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). "Both anticipation under § 102 and obviousness under § 103 are two-step inquiries." *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). The first step is claim construction. *Id.* The second step requires a comparison of the properly construed claims to the prior art. *Id.*

For a claim to be anticipated under § 102, and thus invalid, "each claim element must be disclosed, either expressly or inherently, in a single prior art reference, and the claimed arrangement or combination of those elements must also be disclosed, either expressly or inherently, in that same prior art reference." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332-33 (Fed. Cir. 2010). "Inherent anticipation requires that the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top–U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (internal quotation marks omitted). Whether prior art anticipates the accused device is a question of fact.[24] *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir.

---

[24]     Although anticipation is a question of fact, where there are no "genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005, cert. denied, 547 U.S. 1218, S. Ct. 2887 (2006).

1 | 2010).

2     "Anticipation is typically established by one skilled in the art who must 'identify

3 each claim element, state the witness['] interpretation of the claim element, and explain in

4 detail how each claim element is disclosed in the prior art reference.'" *Lucent*

5 *Technologies, Inc. v. Microsoft Corp.*, 544 F. Supp. 2d 1080, 1091 (S.D. Cal. 2008)

6 (quoting *Schumer*, 308 F.3d at 1315). "The testimony is insufficient if it is merely

7 conclusory." *Schumer*, 308 F.3d at 1315-16. Moreover, it must be clear. It is not "the task

8 of the district court, to attempt to interpret confusing or general testimony to determine

9 whether a case of invalidity has been made out, particularly at the summary judgment

10 stage." *Id.* at 1316.

11     Under 35 U.S.C. § 103, a patent claim is invalid as obvious "if the differences

12 between the claimed invention and the prior art are such that the claimed invention as a

13 whole would have been obvious before the effective filing date of the claimed invention to

14 a person having ordinary skill in the art to which the claimed invention pertains." To

15 determine whether this test is met, the Court examines four factors: (1) the scope and

16 content of the prior art; (2) the differences between the prior art and the claims at issue; (3)

17 the level of ordinary skill in the pertinent art; and (4) any relevant secondary considerations

18 (i.e., objective indicia of non-obviousness). *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398,

19 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

20 Importantly, "a patent composed of several elements is not proved obvious merely by

21 demonstrating that each of its elements was, independently, known in the prior art." *KSR*,

22 550 U.S. at 418 (2007). On the other hand, "when a patent simply arranges old elements

23 with each performing the same function it had been known to perform and yields no more

24 than one would expect from such an arrangement, the combination is obvious." *Id.* at 417

25 (2007) (internal quotation marks omitted).

26     The Federal Circuit has emphasized the "[o]bjective indicia of non-obviousness

27 must be considered in every case where present." *Apple Inc. v. Samsung Elecs. Co.*, 839

28 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc). Also relevant is the factual question "whether

the relevant skilled artisan had a motivation to combine pieces of prior art in the way eventually claimed in the patent at issue." *Intercontinental Great Brands,* 869 F.3d at 1343 (citing *Apple,* 839 F.3d at 1047-48, 1051). This question is distinct from "the ultimate legal determination of whether the claimed combination would have been obvious to the ordinary artisan – meaning that it is possible that a reason or motivation may exist, but nonetheless the ordinary artisan would not have found the combination obvious." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.,* 876 F.3d 1350, 1359 (Fed. Cir. 2017).

### a. *Alleged Prior Patents*

#### (*i*) Anticipation of Claim 1 of the '589 Patent

Plaintiff argues that it is entitled to summary judgment on its anticipation claim because each of the prior patents relied upon by Defendants has been found not to invalidate the '589 Patent. In particular, some of the prior patents relied upon by the Defendants are listed on the cover page of the '589 Patent as "references cited."[25] (Doc. No. 200 at 14.) The remaining prior patents relied upon by Defendants were examined a second time during Defendants' unsuccessful attempt to initiate an *inter partes* review ("IPR") of the '589 Patent before the United States Patent and Trademark Office ("USPTO") board of appeal ("PTAB").[26] *Id.* at 15. Furthermore, the Defendants do not even mention any prior patents or contest the USPTO's express findings that prior patents do not invalidate the '589 Patent, thereby conceding that they do not anticipate the '589 Patent. (Doc. No. 233 at 6.)

Defendants dispute Plaintiff's anticipation argument asserting that the challenge cannot even occur because the claim construction definitions used to perform the analysis

---

[25] Prior patent are listed on the cover page of the '589 Patent as "references cited" meaning they were examined/considered by the PTO during prosecution and deemed not to preclude patentability. For example: (1) Frenzi '987 Patent; (2) Sauerbier '014 Patent; (3) Frenzi '987 Patent. (Doc. No. 200 at 14.)

[26] Remaining prior patents examined by the PTAB. (1) Frenzi '402 Patent; (2) Hill '547 Patent; (3) Lochtefeld '547 Patent; (4) Lochtefeld '590 Patent.

1    are flawed. (Doc. No. 228 at 13-15.) Specifically, Defendants contend that Plaintiff's

2    expert, Dr. Stevick, provided invalidity opinions that were based on undisclosed and/or

3    incorrect claim constructions. *Id.* For example, Defendants allege that Dr. Stevick was

4    unwilling or unable to explain what particular claim terms mean in the context of the

5    '589 Patent.[27] *Id.*

6         Construing this conflicting expert testimony in the light most favorable to

7    Defendants, the Court finds that there is a genuine dispute of material fact that precludes

8    summary judgment of anticipation. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916,

9    922 (9th Cir. 2004) (on summary judgment, the Court must view the evidence in the light

10   most favorable to the non-moving party); *Garter-Bare Co. v. Munsingwear, Inc.*, 650

11   F.2d 975, 979-82 (9th Cir. 1980) (reversing a district court's grant of summary judgment

12   where the parties provided conflicting expert testimony, but the district court granted

13   summary judgment by relying solely on the moving party's expert testimony). As a

14   result of Dr. Stevick providing conflicting testimony, Defendants are unable from

15   determining if all the necessary elements have been disclosed in the patents or its

16   accuracy for comparative analysis. Therefore, the Court **DENIES** Plaintiff's Motion for

17   Summary Judgment on the validity of the '589 Patent as anticipated.

18                    *(ii)* Obviousness of the '589 Patent

19         Plaintiff's Motion contends that Defendants cannot demonstrate the invalidity of

20   the '589 Patent based upon the prior patents relied upon by Defendants. (Doc. No. 200 at

21   2.) Plaintiff notes that the PTAB rejected Defendants' argument of obviousness based on

22   the Frenzl '402 Patent, noting the absence of any nozzle cover and that "[e]ach claim of

23   the '589 patent recites a nozzle cover in one form or another." *Id.* at 4. The PTAB

24   similarly rejected Defendant's argument of obviousness based on Hill '547 Patent,

25

26

27   ─────────────────────

28   [27]    See Doc. No. 228, Exh. B, Stevick Tr. at 104:20-105:3, 106:17-107:2, 113:15-25,
         117:6-17, 175:8-19, 175:21-176:23, 177-18, 177:20-178:22.

3:17-cv-01118-BEN-BLM

1   holding that there was not any disclosure of a nozzle cover or any downward biasing of a

2   tongue. *Id.* at 4.

3       Defendants assert that Plaintiff's arguments are insufficient to meet its burden to

4   show that it is entitled to summary judgment as to obviousness. To begin with, Dr.

5   Stevick, Plaintiff's expert allegedly provided improper validity analysis based off of

6   undisclosed and/or incorrect claim constructions. (Doc. No. 228 at 13.) To complicate

7   matters, he repeatedly refused to explain how differences in the wording of two similar

8   limitations in two different claims should affect how those limitations are interpreted for

9   purposes of his infringement or validity analysis. *Id.* Without properly construed claim

10   construction language, Defendants cannot meet the required heavy burden of

11   demonstrating by clear and convincing evidence that the scope and content of the prior

12   art (*element 1*) is understood, and prevents a person of ordinary skill in the art from

13   conducting an accurate side by side comparative analysis of the prior art with the claims

14   at issue (*element 2*). *See Id.*

15       Construing the conflicting testimony in the light most favorable to Defendant, the

16   Court finds that there is a genuine dispute of material fact that precludes summary

17   judgment. Therefore, the Court **DENIES** Plaintiff's Motion for Summary Judgment on

18   the validity of the '589 Patent based on obviousness.

19                *b. <u>Alleged Prior Rides</u>*

20           (*i*) Anticipation of Claim 1 of the '589 Patent

21       Plaintiff argues that it is entitled to summary judgment on its anticipation claim

22   because Wave Loch sheet wave attractions like Hyland Hills and similar (*pre-'589*

23   *Patent*) installations relied upon by Defendants have been found not to invalidate the

24   '589 Patent. For instance, the new generation of surfing rides incorporating '589 Patent

25   technology utilize a slide-over cover for the water emitting components to eliminate the

26

27

28

extended transition surface required in early designs such as Hyland Hills.[28] (Doc. No. 200 at 16.) As a result, the reverse curve design and extended transition surfaces required by the earlier generation sheet wave attractions such as Hyland Hills have given way to installations using "a nozzle cover comprising a padded material substantially covering said nozzle and including a flexible tongue which is biased downward against the flow of water to prevent injury to the riders riding over said nozzle as described in the '589 Patent. *Id.*

Defendants contend their invalidity case is grounded in construction of the language of the asserted claims and a comparison that indicates on a limitation-by-limitation basis how the elements of those claims are present in the prior art ride. (Doc. No. 228 at 16.) Without proper claim construction language to work from, it is impossible to conduct a limitation-by-limitation comparison of the prior rides (*pre-'589 Patent*) with newer installations utilizing the '589 Patent technology to determine the potential materiality of the prior rides. *Id.* at 16-17.

Here, Defendants contend that Dr. Stevick has provided conflicting testimony regarding claim construction definitions and refused to cooperate in resolving the discrepancies. As a result, Defendants are unable from determining if all the necessary elements have been disclosed in the patents or its accuracy for comparative analysis. Construing this conflicting testimony in the light most favorable to Defendants, the Court concludes that there is a genuine dispute of material fact that precludes summary judgment of anticipation. Therefore, the Court **DENIES** Plaintiff's Motion for Summary Judgment on the validity of the '589 Patent based on anticipation.

///

---

[28] Claim 1 of the '589 Patent recites "a nozzle cover comprising a padded material substantially covering said nozzle and including a flexible tongue which is biased downward against the flow of water to prevent injury to the riders riding over said nozzle. (Doc. No. 200 at 16.)

| | |
|---|---|
| 1 | <div align="center">(*ii*) Obviousness of the '589 Patent</div> |
| 2 | Plaintiff's Motion argues that Defendants cannot demonstrate the invalidity of the |
| 3 | '589 Patent through the use of prior rides. (Doc. No. 233 at 6-7.) For example, the |
| 4 | Defendants' response alleges that the Wave Loch sheet wave attractions that pre-date the |
| 5 | '589 Patent render obvious the claimed flexible nozzle cover used in such rides as Hyland |
| 6 | Hills. (Doc. No. 200 at 16.) However, as Plaintiff notes, the Court has already rejected |
| 7 | Defendants' argument that the foam "bumper pad" mounted to the vertical wall of early |
| 8 | (*pre-589 Patent*) generation rides comprises a nozzle cover having a flexible tongue |
| 9 | biased downward against the flow of water as claimed in the '589 Patent.[29] *Id*. at 17. |
| 10 | As with Defendants' prior obviousness argument, Defendants contend that their |
| 11 | invalidity case is grounded in construction of the language of the asserted claims, and a |
| 12 | comparison that indicates on a limitation-by-limitation basis how the elements of those |
| 13 | claims are present in the prior art ride. Without appropriate claim construction language, |
| 14 | Defendants cannot accurately adduce whether the prior rides are obvious in light of each |
| 15 | other or in combination. |
| 16 | Construing this conflicting testimony in the light most favorable to Defendants, the |
| 17 | Court finds that there is a genuine dispute of material fact that precludes summary |
| 18 | judgment. Therefore, the Court **DENIES** Plaintiff's Motion for Summary Judgment on |
| 19 | the validity of the '589 Patent based on obviousness. |
| 20 | <div align="center">(3)    *Summary Judgment as to Inequitable Conduct*.</div> |
| 21 | Here, Plaintiff[30] seeks summary judgment concerning inequitable conduct (*defined* |
| 22 | *supra*). As with Defendants' motion, given the fact-intensive nature of the party's |
| 23 | |
| 24 | |
| 25 | [29]    The rejecting court held that there was "stark differences" between the claims of the '589 Patent and the Hyland Hills ride. (Doc. No. 200 at 17.) |
| 26 | [30]    Plaintiff's Motion alleges that Mr. Lochtefeld and Mr. Squier did not engage in |
| 27 | inequitable conduct by intentionally misleading or omitting material prior art in its |
| 28 | application and presentation to the PTO to have the lapsed '589 Patent reinstated. (Doc. No. 200 at 17-25.) |

inquiries, the Court readily concludes that Plaintiff has not carried its burden of showing that this is one of those rare cases requiring summary judgment on this issue. Among other things, Plaintiff's motion reflects "multiple reasonable inferences that may be drawn" from the facts, and Plaintiff's argument falls short of conclusively demonstrating it did not intend to deceive the PTO with its actions. *Therasense*, 649 F.3d at 1290-91. The Court finds that Plaintiff's Motion, at the very least, presents a genuine dispute of fact regarding inequitable conduct requiring Plaintiff's Motion to be denied on this issue. *See Polara Eng'g, Inc. v. Campbell Co.*, No. 13-00007-CJC, 2015 WL 12914378, at *1 (C.D. Cal. Apr. 27, 2015) (denying accused infringer's motion for summary judgment for inequitable conduct where "facts of materiality or intent are reasonably disputed"); *Latentier, LLC*, 725 F. Supp. 2d at 802 (denying accused infringer's cross-motion for summary judgment of inequitable conduct concluding that material issue of fact existed as to intent despite named inventor "associate[ing]" prior art publication and prior public use "with the [patented] invention"). Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as it pertains to inequitable conduct.

<div align="center">

**CONCLUSION**

</div>

Accordingly, the Court **GRANTS in part, and DENIES in part** Plaintiff's Motion to Strike or Exclude, **DENIES** Defendants' Second Motion for Summary Judgement and **DENIES** Plaintiff's First Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: September /3 , 2019

Hon. Roger T. Benitez
United States District Judge