1  JOSEPH E. THOMAS (State Bar No. 101443)
   WILLIAM J. KOLEGRAFF (State Bar No. 183861)
2  **THOMAS, WHITELAW & KOLEGRAFF LLP**
   18101 Von Karman Avenue, Suite 230
3  Irvine, California 92612-7132
   Telephone:   (949) 679-6400
4  Facsimile:   (949) 679-6405

5  Attorneys for Defendants

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

11 | WHITEWATER WEST INDUSTRIES, LTD., | CASE NO. 3:17-cv-01118-BEN-BLM
   | a Canadian corporation,
12 |                                    | **DEFENDANT'S TRIAL BRIEF**
   |         Plaintiff,
13 |                                    |
   |    vs.                             | The Hon. Roger T. Benitez
14 |                                    |
   | PACIFIC SURF DESIGNS, INC., a Delaware | Trial Date:   December 3, 2019
15 | corporation, and FLOW SERVICES, INC., a
   | California corporation,
16 |
   |         Defendants.
17

Pursuant to Local Rule 16.1(9)(a), Defendants Pacific Surf Designs, Inc. and Flow Services, Inc. hereby submit the following trial brief. Defendant's hereby incorporates its Memorandum of Fact and Law [Dkt. 254] filed on January 14, 2019.

## I. INTRODUCTION

Plaintiff will try to establish at trial that Defendants willfully infringe on their U.S. Patent No. 6,491,589 ("'589") patent under claims 1, 3, 13, 15, 17, 24-27, 29, 30, 37, and 42-43. Defendants deny that any of their activities have infringed any claim of the '589 patent and deny that any infringement has been willful. Defendants contend that the '589 is invalid because the alleged invention was already known or obvious to those of ordinary skill in the field. Furthermore, Defendants contend that the '589 patent is entirely unenforceable, because the inventor and Whitewater's attorneys intentionally made misrepresentations to the Patent Office, including making a false statement to the Patent Office when Whitewater's Counsel reinstated the '589 patent.

Plaintiff allowed the '589 patent to expire from December 10, 2014 to August 25, 2015. As a result, regardless of the circumstances surrounding that expiration, PSD held intervening rights to make, offer to sell and sell even infringing products during that period, so its sales of accused rides in that period cannot constitute infringement. Moreover, in reviving the expired patent, Plaintiff's counsel falsely declared to the Patent Office that he had investigated the cause of the delay in payment of the maintenance fee for the '589 patent and concluded that the entire delay in paying the patent maintenance fee was "unintentional." Mr. Squier, the Whitewater counsel making that declaration, did so without doing any investigation, and having no basis to declare under perjury that the entire delay in making the payment was unintentional.  This act is inequitable conduct and renders the '589 patent unenforceable in its entirety.

To the extent Plaintiff can properly assert that Defendants' actions infringe their inequitably revived U.S. patent, its infringement case hinges on its unnatural, litigation-driven interpretations of what it means for the patented nozzle cover to include a "flexible tongue" that is "biased downward." Plaintiff now seeks, through its expert to apply a very different and overbroad interpretation of the claims so that it can argue PSD's accused rides meet that limitation. For example, Plaintiff argues that the nozzle cover in PSD's rides includes a "flexible tongue" because its steel plate is attached with a hinge. But in reality, Plaintiff asserts that any material, no matter how rigid, is "flexible," as its expert admitted when he opined that the same steel plate would be a

"flexible tongue" within the meaning of the patent claims even if the hinge was removed or welded shut. Thus, if plaintiff's latest interpretation is adopted, "flexible" does not limit the claims in any way—a result that violates well-accepted principles of claim construction.  However, if the claims were construed as broadly as Plaintiff suggests in arguing infringement, then the asserted claims of the '589 patent are invalid as either anticipated or obvious. Well before Mr. Lochtefeld applied for the '589 patent was filed, Wave Loch installed sheet wave rides (what it now calls "RetroRiders") at Hyland Hills and other locations that have all of the actual limitations of the asserted claims, either alone or in combination with the Frenzl patent. But to attempt to sidestep this prior art, Plaintiff impermissibly argues that limitations from the specification of the '589 patent should be read into the claims. In particular, Plaintiff argues that the claims should be read to effectively require that the nozzle cover be configured so that a rider can traverse from the ride surface over the nozzle cover onto a deck or landing on the other side of the cover.

### A. THE '589 PATENT

The '589 patent issued on December 10, 2002, with 57 claims. The '589 patent claims priority to an application filed August 2, 1999. Thomas Lochtefeld, the founder and owner of Wave Loch, is the only named inventor. The patent generally relates to a nozzle cover for a sheet wave water attraction. The '589 patent has several independent claims, all relating to a water ride with a nozzle assembly or sluice and a "cover" or "pad" for preventing injury to riders that might otherwise hit the nozzle if there were no cover.  Mr. Bruce McFarland performed contract work for Wave Loch, and in particular, was hired as a designer for the structures and methods set out in the '589.  Mr. McFarland also worked on the Hyland Hills FlowRiders, and was instrumental in the nozzle and flexible tongue design for the '589.

## II. INEQUITABLE CONDUCT

Despite numerous warnings regarding the need to pay maintenance fees, no one paid the maintenance fee due 11 ½ years after the '589 issued.  Accordingly, the '589 Patent expired for failure to timely pay maintenance fees on December 10, 2014, after Plaintiff's predecessor (Flowrider Surf Ltd.) had already sued Defendant Pacific Surf Designs for infringement and voluntarily dismissed that complaint. Plaintiff, through its patent counsel, Mr. Squier, committed multiple acts of inequitable conduct in getting the '589 patent reinstated. Mr. Squier, (1) misrepresented the party on whose behalf he was acting, and (2) certified that he knew that the delay in paying the maintenance fee was unintentional while having conducted no investigation on

which to base that certification and when in fact, the delay was deliberate. Because these misrepresentations were both material to patentability and made with the specific intent to mislead or deceive the PTO, Plaintiff's conduct renders the '589 patent unenforceable.

According to Mr. Erikson Squier, for reasons withheld under an assertion of attorney-client privilege, allegedly independently discovered the expiration of the '589 patent when he was coincidentally instructed by Mr. Taché on February 4, 2015 to review the '589's file history on the Patent Office website. In actuality, Mr. Taché received a copy of the Patent Office's Notice of Expiration from the patent owner's law firm, Knobbe Martens, on January 22, 2015. But only after Mr. Squier's alleged "discovery" of the expiration and his reporting it to Mr. Taché—two weeks after the Knobbe Martens email—did Mr. Taché inform Plaintiff Whitewater.

Mr. Squier affirmatively misrepresented to the PTO - twice—that he had personal knowledge that the "entire delay" in payment of the maintenance fee was "unintentional." Mr. Squier conducted no investigation about the cause of the delay in payment, instead relied soley on the instruction from Mr. Taché to file a petition to revive on behalf of his client, 15 days later. At no time was the client Whitewater asked whether the delay in payment was intentional, nor was it explained that the '589 could only be revived if the entire delay was "unintentional." When asked in deposition if the client was ever informed of this so-called "unintentional" delay in payment, Mr. Squier repeatedly asserted attorney-client privilege. Had the client been informed, and had the client told Mr. Taché that the entire delay was unintentional, that factual data would not be privileged.

Around this same time, in mid-February 2015 while the '589 patent remained expired, Whitewater received an inquiry from a customer regarding the differences between FlowRider products and PSD products. Whitewater responded and said, "it was currently investigating possible patent infringement…" One can only conclude that Whitewater was delaying paying the maintenance fee while conducting its investigation to sue for infringement under the '589 patent.

Further, Mr. Squier's original and renewed petitions to revive the '589 patent were improperly filed naming Mr. Lochtefeld as the party seeking revival, when in fact it was Whitewater seeking revival. It should be noted here that Mr. Squier never even communicated with Mr. Lochtefeld prior to filing the revival. This misrepresentation was to shield the involvement of Whitewater, which had not been identified to the Patent Office as having any rights in the '589 patent, and avoiding the patent owner Surf Park.

This misrepresentation was confirmed when the Patent Office rejected the original petition

to revive, stating reasons, "not apparent whether the statement of unintentional delay was signed by a person who would have been in a position of knowing that the entire delay was… unintentional."

In response, Mr. Squier filed the renewed petition falsley identifying Mr. Lochtefeld as the filer of the petition. The renewed petition came after Mr. Squier filed a Power of Attorney from Mr. Lochtefeld's Light Wave Ltd. entity, which was still listed as the assignee of record at the Patent Office even though it no longer retained rights in the '589 Patent.

Mr. Squier submitted each petition to reinstate on behalf of Plaintiff Whitewater, a third-party licensee whose connection to the patent was unknown to the Patent Office. The renewed petition, again signed by Mr. Squier, identified Mr. Lochtefeld as the "Registrant" and represented that "[o]n February 20, 2015, Registrant petitioned for revival" of the '589 patent. Mr. Squier admitted the statement was false—Mr. Lochtefeld had not petitioned for revival, was not familiar with the expiration and reinstatement, and was not represented by Mr. Squier for purposes of submitting the petitions to reinstate. On August 25, 2015, the PTO mailed a decision granting the petition to accept the delayed fee payment and reinstating the patent as of the decision mail date.

Mr. Squier made multiple material misrepresentations to the PTO with the specific intent to deceive the PTO in order to reinstate the '589 patent after Plaintiff delayed paying maintenance fees (while it investigated whether to sue PSD for infringement). Mr. Squier materially misrepresented that the petitions were submitted by the patent owner. Mr. Squier's undisputed misrepresentation of the identity of the petitioning party was material and in and of itself supports a finding of inequitable conduct. In signing both petitions on February 20, 2015 and again on August 11, 2015, Mr. Squier certified that the delayed maintenance fee payment was unintentional. However, neither Mr. Squier nor Mr. Taché conducted any investigation to determine the truth of that statement—neither as to Mr. Squier's client, Plaintiff Whitewater, much less patent owner Surf Park. Accordingly, Mr. Squier's petitions affirmatively stating that the delay in payment was unintentional were unmistakably false.

Circumstantial evidence makes clear that Mr. Squier's multiple misrepresentations were made with the specific intent to deceive the Patent Office in order to obtain revival of the '589 patent.

III.    **NON-INFRINGEMENT**

First, invalid claims cannot be infringed. Ill. Tool Works, Inc. v. MOC Prods. Co., 856 F.

Supp. 2d 1156, 1166 (S.D. Cal. Mar. 6, 2012) ("an invalid claim cannot give rise to liability for infringement") (quoting Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1583 (Fed. Cir. 1983)) (internal quotations omitted). As Defendants have shown all Asserted Claims of the '589 patent are invalid, and therefore, they cannot be infringed.

Second, Courts analyze patent infringement in two steps. First, the court determines the meaning and scope of the patent claims asserted to be infringed as a matter of law. Next, the court compares the properly construed claims to the device or method accused of infringing. General Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 981 (Fed.Cir.1997).

IV.     **Literal Infringement**

To establish literal infringement, every limitation set forth in a claim must be found in an accused product or process. The absence of even a single claim limitation from the accused products precludes a finding of infringement of that claim. A patent claim is literally infringed only if Defendant's product includes each and every element recited in that patent claim. If Defendant's product does not contain one or more elements recited in a claim, Defendant's product does not literally infringe that claim.

   1.     **"Flexible Tongue" and "Flexible" Limitations**

In its infringement contentions and expert report on infringement, Plaintiff has proffered constructions of claim terms not construed by the Court and which are inconsistent with the plain and ordinary meaning of those terms. For example, Plaintiff's technical expert, Dr. Stevick, argued that: "a nozzle cover that comprises a padded material substantially covering said nozzle is a cover for a nozzle that is manufactured using any soft, flexible material for avoiding injury upon impact, either alone or in combination with other materials, that covers at least a portion of the nozzle for ensuring rider safety for a rider that rides over the top of the nozzle via the nozzle cover."

Plaintiff's proffered construction appears to add a number of restrictions that do not arise from the plain meaning of the claim term "padded", nor is there any intrinsic evidence in the record cited to by Plaintiff. For example, Plaintiff has failed to point to anything that ties the flexibility of the nozzle cover to "avoiding injury upon impact, either alone or in combination with other materials."

Plaintiff's technical expert also stated that 'flexible' describes the ability of the tongue to 'flex' or move relative to the water being emitted onto the ride surface," and that "the flexibility of the tongue is a separate limitation, and thus adds an additional requirement to Claim 1, beyond

mere presence of padded material, for example, by orienting or configuring the tongue in such a manner so as to support the required flexing or movement of the tongue relative to the water." This proffered construction, however, is inconsistent with Plaintiff's representations to the Court that the same term in Claim 17, are characterized as "being squeezable, bendable, extendable and movable about an axis." Indeed, Plaintiff's technical expert, Dr. Stevick, confirmed that the exact same adjective ("flexible") used in Claim 17 means something different—"as specific to the pad or padded material, flexible describes the softness and impact-absorbing nature of the material…"

Black letter patent law requires that claim terms be interpreted consistently in the same patent and that they also be interpreted according to their plain and ordinary meaning provided that meaning is consistent with the patent specification and prosecution history. As used in this field and in the context of this invention, the plain and ordinary meaning in this field is "capable of being bent." This definition is consistent with the specification, which shows in Figs. 3A-3D a "flexible and removable tongue-like pad" (item 160) that is shown as bent due to the force of the water ejected from the nozzle.

### 2.     A Hinged metal plate is not a flexible tongue

The alleged "flexible tongue" of the Accused Products is a rigid steel plate, which PSD has shown a person of ordinary skill would understand is not flexible. Plaintiff now contends that the presence of a hinge of the Accused Products causes the tongue to be flexible. However, the hinge of the Accused Products is clearly not part of the tongue. Rather, as Plaintiff has confirmed with respect to Claim 3, the hinge of the Accused Products is merely part of the assembly that connects the alleged cover to the alleged decking. It does not, and cannot, impart flexibility to the steel. Conspicuously, Plaintiff has failed to address this defect in any of its pleadings throughout this case, its contentions or its experts. In fact, Plaintiff directly asked Mr. Pribonic whether the purported nozzle cover of the Accused Products included "flexibility" or a "flexible tongue" as a result of a hinge:

```
Q. And your reference to a flap, is that the nozzle flap?
A. Nozzle flap.
Q. In the accused products?
A. Yes.
Q. Do you see the item marked "hinge"?
A. Yes.
Q. In both the isometric and section view?
A. Yes.
Q. And would you agree that that would [provide] flexibility to the flap?
A: No, I would not.
Q. Why would you not?
```

> A  The hinge adds the ability for movement of the flap; the flap still remains rigid and inflexible.  In fact, the hinge reinforces one edge of the flap, making it more rigid.
> Q.  Would you agree that the hinge that's connected to the nozzle flap permits the nozzle flap to bend -- get the hinge point?
> A:  No, I don't.  The flap itself does not bend.  The flap rotates around the hinge pin, and nowhere does it bend.
> (objections omitted) Pribonic Tr. 63:10–64:11.

Under a proper construction, Plaintiff cannot prove by a preponderance of the evidence that the Accused Products meet the "flexible tongue" limitations from Claims 1, 17, 37–38, 42, and related dependent claims.

### 3. "Urged / Biased Downwards"

There is no dispute that PSD's Accused Products do not include any spring or other "resilient material" that causes its rigid, steel nozzle flaps (the alleged "tongue") to be "biased" or "urged" downward. Rather, Plaintiff, through its expert, Dr. Stevick, now contends that PSD nozzle flap meets these "biased/urged downward" limitations simply because it is mounted using a hinge. In doing so, however, Plaintiff and Dr. Stevick gloss over the differences in the language of these limitations from claim to claim. For example, some claims specify that the tongue is biased downward "against the flow of water" (claims 1, 17, 37, 42) versus "towards the jet of water" (claim 38).  Likewise, unlike the other asserted claims, claim 37 requires that the biasing have the effect of "squeez[ing] said tongue against the flow of water." Plaintiff's have provided no separate proof that each of these variations of the "biased/urged downward" limitations are met.

But even if all of these limitations were taken to mean the same thing, there is no basis in the record to suggest, as Plaintiff and Dr. Stevick do, that the hinge in PSD's Accused Products performs any "biasing" or "urging" function. While the Court's Markman order left open the possibility that "gravity" could be used to bias or urge a tongue downward, that is far different from suggesting that any element acted upon by gravity (i.e., every element) is therefore "biased" or "urged" downward.  Accordingly, Plaintiff cannot prove by a preponderance of the evidence that the Accused Products infringe Claims 1, 3, 13, 15–17, 37, 38, and 42–43.

### 4. INTERVENING RIGHTS

When a patentee allows its patent to lapse for failure to pay the required maintenance fees and then reinstates it, parties who "made, purchased, offered to sell, or used" any infringing product during the lapse period hold "intervening rights" to "continue the use of, to offer for sale, or to sell to others" those products. The lapse period extends from the end of the patentee's six-

month grace period to pay the maintenance fee to the date the patent was reinstated by the USPTO. 35 U.S.C. § 41(c)(2).

Regardless of whether deliberately or unintentionally, there is no dispute that the '589 patent expired for non-payment of maintenance fees (i.e., the six-month payment grace period ended) on December 10, 2014—the beginning date of the lapse period. It is also undisputed that the PTO did not grant Plaintiff's petition to reinstate the '589 patent until August 25, 2015, the end date of the lapse period.

The parties agree that during this lapse period, Defendants sold two rides customized for their respective locations that were to be installed overseas. The first sale to install a ProFlow Double in Trinidad and Tobago for Fouraime Enterprises Ltd. took place on February 27, 2015. The second sale to install a Supertube in France for Les Parcs du Sud SAS (France) took place on April 14, 2015. Unlike competitors that offer off-the-shelf rides, Defendants' rides for each foreign location were unique customizations tailored to the customer's specifications and locations, and Defendants worked extensively with Fouraime and Les Parcs du Sud to ensure that the rides PSD sold appealed to the target demographic.

Plaintiff alleges that by offering to sell these rides and supplying certain materials from the United States, PSD infringed the '589 patent under 35 U.S.C. § 271(f). While Defendants dispute that allegation, to the extent Defendants' sales of these foreign rides infringed, Defendants held intervening rights pursuant to 35 U.S.C. § 41(c)(2) to continue to make and sell these rides and related components, because these sales undisputedly occurred while the '589 patent was expired. It is undisputed that Defendants became aware of the '589 patent's expiration sometime between Christmas 2014 and New Year's 2015 by searching the Patent Office Public PAIR website. PSD relied upon the expiration in concluding that it could sell its rides without fear of further infringement accusations. Based on that understanding, Defendants subsequently entered into these two foreign sales that Plaintiff alleges would otherwise have infringed the '589 patent.

## V.   INVALIDITY

Defendants will demonstrate that each of the asserted patent claims are considered invalid for at least one of the following reasons: the claims are anticipated by the prior art, the claims are obvious in view of the prior art, the '589 Patent specification failed to enable a person of ordinary skill to make and use the full scope of the invention, the claims are indefinite such that a person of ordinary skill would not know what is covered and what is not, or the '589 patent fails to comply

with the written description requirement under 35 U.S.C. §112.

### 1. ANTICIPATION

To determine if a patent claim is anticipated by prior art is a two-step process: the first step requires construing the claim, and the second step requires a comparison of the properly construed claim to the prior art. Such a claim is invalid for anticipation under 35 U.S.C. § 102(b) if the invention was patented or published anywhere, or was in public use, on sale, or offered for sale, in the United States, more than one year prior to the filing date of the United States.

### 2. OBVIOUSNESS

Pursuant to 35 U.S.C. § 103, a patent is obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "[A] a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," and an important inquiry is "whether the improvement is more than the predictable use of prior art elements according to their established functions." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 401 (2007). Thus, even if all of the requirements of a claim cannot be found in a single prior art reference that would anticipate the claim or constitute a statutory bar to the claim, it is still invalid if it would have been obvious to a person of ordinary skill at the time of alleged invention. See id. at 418 ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

Obviousness can also be found on a single prior art reference so long as any differences between that reference and the claims would have been obvious to a person of ordinary skill in the art at the time of the alleged invention—that is, if the person of ordinary skill could readily adapt the reference to meet the claims of the patent, by applying known concepts to achieve expected results in the adaptation of the reference. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." KSR, 550 U.S. at 419.

### A.     Hyland Hills Flow Rider Anticipates the '589 Patent

#### 1.     Nozzle

The nozzle at Hyland Hills explicitly contains reference to a "nozzle," an integrated "adjustable aperture," "water," and a "ride surface." The inventor, Tom Lochtefeld testified that the water in Hyland Hills is emitted onto the ride surface, and the adjustable aperture controls that flow of water. Hyland Hills also discloses a 6" foam pad labeled in various drawings as 'Bumper pad," "Foam Pad," or a Nozzle Front Pad." The nozzle pad in Hyland Hills is attached to the face of the nozzle and is immediately above the "adjustable aperture" portion of the nozzle. The material utilized in Hyland Hills was the exact same "flexible" "pad material" disclosed in the '589 patent's specification.

Since the exact same material is used in the prior art as in the preferred embodiment, there can be no reasonable debate that it satisfies the claim requirement that the "nozzle cover" comprise a "padded material." In re Crish, 393 F.3d 1253, 1259–1260 (Fed. Cir. 2004) (application anticipated by patentee's own publication, which used same terminology as later patent); Ineos USA LLC v. Berry Plastics Corp., No. 3:13-CV-00017, 2014 WL 1493852, at *3 (S.D. Tex. Apr. 15, 2014) (patent anticipated where the prior art disclosed exactly the same composition claimed by the invention). Accordingly, the nozzle cover is a "padded material" as claimed.

#### 2.     Substantially Covering Said Nozzle:

The nozzle cover at Hyland Hills substantially covers the nozzle in two ways—it covers the entire face of the nozzle, and it also covers (directly above) the adjustable aperture, which is an integrated portion of the nozzle. The specification explicitly states that "the sluice cover can be efficaciously sized and/or dimensioned in alternative manners, as required or desired, giving due consideration to the goals of providing a suitably resilient and strong nozzle cover, and/or achieving one or more of the benefits and advantages as taught or suggested herein."

#### 3.     Flexible Tongue Which Is Biased Downward Against The Flow Of The Water

Hyland Hills also discloses the claimed "flexible tongue." In claim construction, Plaintiff argued that the tongue need not be a separate unit from the nozzle cover, but rather "a portion of th[e] cover that, like a human tongue, extends outward from one end." This is exactly what Hyland

Hills depicts. The nozzle cover "extends outward" (down and to the right) at its lower end. This portion that extends outwards ("tongue") is made out of resilient, "flexible" material—the exact same material specified in the detailed description of the '589 patent—and accordingly falls squarely within the description provided by counsel during the Markman hearing: "nothing more than a resilient rubber or plastic can be biased downward."

Finally, Plaintiff argued in claim construction that the "biased downward" requirement is met by any component acted upon by gravity. It cannot be disputed that gravity acts upon the outward extending portion of the nozzle cover in the Hyland Hills installation.

### 4. The Combination of Hyland Hills and Frenzl Renders the '589 Patent Obvious

The combination of the Hyland Hills installation with U.S. Patent No. 3,598,402 ("Frenzl") renders obvious Claims 1, 3, 13, 16–17, 24–27, 29, 37–38, and 42–43 of the '589 patent. On Claim 1, "A Nozzle Assembly For A Water Ride Attraction," Frenzl discloses a nozzle assembly for a water ride attraction, an apparatus for practicing nautical sports, including surfing, a nozzle assembly for use with the apparatus, and a "nozzle adapted to discharge water onto the surface of said bottom " of the ride surface.

Frenzl further shows that a flexible tongue is attached to the downstream (or lower) end of the cover, and it is biased downward against the flow of water, thereby preventing injuries to riders riding over the nozzle. Frenzl teaches that the tongue is "biased downward" by a valve system. Regarding "flexible," FIG. 7 shows a slight curvature in tongue when it is positioned to release water and that it is straight when it is positioned to stop the flow of water, thereby showing that tongue is flexible.

It would have been obvious to modify Frenzl's cover to have a padded material. For example, a person of ordinary skill would have understood that a rider could contact the nozzle cover, so padding it would have been an obvious means to render it safer.  There would be no detriment to doing so because the portion that the rider would contact is outside of the water, and thus, there are no serious materials considerations that must be made as with a submerged portion of the cover.  In addition, although FIG. 1 of Frenzl is directed to another embodiment, it shows a cover (described as sidewall) overlying the nozzle area and states that it is "preferably inflatable," thereby disclosing the "padded" limitation and showing that the modification to FIG. 7 would have been obvious.

### 5. The Combination of Hyland Hills and the Guam Installations Renders the '589 Patent Obvious

The Hyland Hills installation combined with the Guam installation renders obvious Claims 1, 3, 13, 15–17, 24–27, 29–35, 37–38, and 41–43 of the '589 patent. In the case that not all the limitations can be found in the Hyland Hills installation, any missing limitation can be found in the Guam installation. As these installations are both Flowrider machines that pre-date the critical date, there is a motivation to combine. Bruce McFarland, lead engineer at the Guam installation, confirmed at his deposition that the Hyland Hills Flow Rider, as installed in 1996, was the basis for the Flow Rider installation at Guam.

## VI. Damages

Plaintiff is not entitled to damages in this case because the '589 patent is unenforceable, not infringed, and invalid. In the event that any damages would be deemed appropriate, Plaintiff's damages demand is entirely unreasonable in light of the ready availability of a low- to no-cost non-infringing alternative. Although PSD is confident that a "hinged metal plate" is not a "flexible tongue", Mr. Alleshouse made a simple design change to replace the piano hinge with a solid bracket. In this way, the metal plate of the flap is rigidly positioned, and does not move, rotate or flex. This alternative design is less costly than the piano hinge, and results in less wear and tear to the flap covering, and therefore requires less maintenance. This alternative design is currently being offered for sale, sold, installed, and used. Further, any of the existing installations could be upgraded to this ridged design by simply welding the hinge into place, at a cost of about $500 per installation.

Whitewater's damage request is also unreasonable in light of the minimal sales at issue in this case and the limited nature of the patented invention (nozzle covers) relative to the overall Accused Products (sheet wave water attractions). Plaintiff's damages calculation is based on a hypothetical negotiation of a reasonable royalty. Plaintiff's expert (Dr. Robert Vigil) concludes—contrary to all of the evidence here—that the parties would have agreed to a lump-sum payment for a license "from the date of first infringement through the date of trial." In doing so, Dr. Vigil fails on multiple levels to limit his damages calculation to the value of the invention particularly claimed in the '589 patent and an objective assessment of the license terms to which both parties would have agreed.

DATED: November 26, 2019         THOMAS, WHITELAW & KOLEGRAFF LLP


                                 By:    /s/ Joseph E. Thomas
                                     JOSEPH E. THOMAS
                                     WILLIAM J. KOLEGRAFF
                                     Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on November 26, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

Dated November 26, 2019          By:     /s/ Joseph E. Thomas
                                         Joseph E. Thomas
                                         Attorney for Defendant