**BUCHALTER**
A Professional Corporation
J. Rick Taché (SBN: 195100)
Roger L. Scott (SBN: 247165)
Erikson C. Squier (SBN: 275274)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: 949.760.1121
Facsimile:  949.720.0182
Email:    rtache@buchalter.com
          rscott@buchalter.com
          ecsquier@buchalter.com

**SNELL & WILMER LLP**
William S. O'Hare (SBN: 82562)
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626
Telephone:  714.427.7000
Facsimile:   714.427.7799
Email:     wohare@swlaw.com

Attorneys for Plaintiff
Whitewater West Industries, Ltd.

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER WEST INDUSTRIES, LTD., a Canadian corporation;<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC SURF DESIGNS, INC., a Delaware corporation, and FLOW SERVICES, INC., a California corporation;<br><br>Defendants. | CASE NO.  3:17-cv-01118-BEN-BLM<br><br>**PLAINTIFF WHITEWATER WEST INDUSTRIES, LTD.'S TRIAL BRIEF**<br><br>Hon. Roger T. Benitez<br><br>Trial Date:  December 3, 2019 |

Just two weeks after forming Pacific Surf Designs, Inc., ("PSD"), its co-founder, Richard Alleshouse, expressed PSD's unequivocal intent to infringe on Plaintiff Whitewater West Industries, Ltd.'s ("Whitewater") patents, identifying its primary product line as "Flowrider knock offs." That PSD and its subsidiary Flow Services, Inc. ("Flow Services") followed through on their plan to copy the Flowrider products, including the technology claimed in U.S. Pat. No. 6,491,589 (the "'589 Patent"), is confirmed by Defendants' expert who admits that PSD's accused products embody all but a portion of one claim element of Claim 1 of the '589 Patent.[1] Even then, Defendants' expert admitted the existence of structural components embodying that last remaining claim element when describing the operation of the accused products. Specifically, the nozzle flap used in each of Defendants' accused products contains a "flexible tongue" as that term is construed according to its plain and ordinary meaning within the context of the '589 Patent. Accordingly, Defendants' accused products should be found to infringe each of independent claims 1, 17, 24, 37, and 42 of the '589 Patent ("Asserted Independent Claims").[2]

Defendants will attempt to avoid liability by establishing that the '589 Patent is invalid and unenforceable. Both of these allegations are contradicted by the undisputed evidence. First, the '589 Patent is not invalid (*i.e.*, anticipated or rendered obvious) based upon the patents or rides relied upon by Defendants and the '589 Patent fully complies with 35 U.S.C. § 112. The prior patents have previously been evaluated and rejected by the U.S. Patent and Trademark Office ("PTO") as neither anticipating nor rendering obvious the '589 Patent. Similarly, the prior rides use an alternative design that this Court has already held contains "stark differences" between the claimed nozzle

---

[1] Claim 1 is a representative claim for each of independent claims 17, 24, 37, and 42 asserted in the '589 Patent due to the similarity in structure and operation recited by each claim. Additional support for the remaining asserted claims of the '589 Patent is located in Whitewater's Infringement Contentions.

[2] A finding of infringement of Claim 1 by PSD's accused products necessarily implicates Flow Services services as it relates to Claim 17 of the '589 Patent.

assembly in the '589 Patent and these earlier generation rides.  Second, Defendants will not be able to establish by clear and convincing evidence that the inventor of the '589 Patent, Whitewater, or its counsel engaged in any inequitable conduct before the PTO so as to render the '589 Patent unenforceable.

## I.    STATEMENT OF FACTS

### A.    The '589 Patent

The '589 Patent entitled, "Mobile Water Ride Having Sluice Slide-Over Cover," issued on December 10, 2002.  Whitewater asserts Claims 1, 3, 13, 15,17, 24-27, 29, 30, 37, 42, and 43 against PSD's accused products and Claim 17 against Flow Services' refurbishment and repair services.  Sheet wave rides practicing the '589 Patent include a nozzle cover with a flexible tongue allowing riders to safely ride over the nozzles and exit at the front of the ride.  The '589 Patent pioneered a new generation of sheet wave rides, eliminating the transition surface and padded vertical wall found in older generation rides, like the RetroRider product installed at Hyland Hills.

During prosecution of the '589 Patent, the Patent Examiner analyzed prior art patents, including those same patents Defendants will likely rely upon in their effort to invalidate the '589 Patent.  Additionally, on August 24, 2016, PSD filed a petition to institute *inter partes* review of the asserted claims of the '589 Patent.  On February 22, 2017, the United States Patent Trial and Appeal Board ("PTAB") denied PSD's petition, rejecting PSD's argument of anticipation and obviousness, which were based on the same patents Defendants will likely rely upon in this action.  Further, this Court denied Defendants' motion for summary judgment, holding that there were "stark differences" between the claims of the '589 Patent and the Hyland Hills ride.  ECF No. 181 at 4:20.

## II.    INFRINGEMENT

### 1.    Infringement Of The '589 Patent Against All Defendants Under 35 U.S.C. § 271(a)

To prevail on its infringement claim against Defendants, Whitewater must prove all of the following:

2

1    that it is more likely than not, that Defendants made, used, sold, offered for

2    sale within, or imported into the United States a product that meets all of

3    the requirements of a claim and did so without the permission of

4    Whitewater during the time the '589 patent was in force.

5  See Federal Circuit Bar Association Model Patent Jury Instruction 3.1a.

6    Under the doctrine of equivalents, a product infringes a claim if the accused

7    product contains elements or performs steps corresponding to each and

8    every requirement of the claim that is equivalent to, even though not literally

9    met by, the accused product. … [A]n element or step is equivalent to a

10   requirement of a claim that is not met literally if a person having ordinary

11   skill in the field of technology of the patent would have considered the

12   differences between them to be "insubstantial" or would have found that the

13   structure or action: (1) performs substantially the same function and (2)

14   works in substantially the same way (3) to achieve substantially the same

15   result as the requirement of the claim.

16  See Federal Circuit Bar Association Model Patent Jury Instruction 3.1c.

17    Determination that an accused device directly infringes a patent claim is a two-step

18  process. *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.

19  Cir. 1999).  First, the meaning and scope of the claim must be construed as a matter of

20  law.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995),

21  *aff'd*, 517 U.S. 370 (1996).  Second, the construed claim language must be compared to

22  the accused device to see whether the device contains every limitation of the claimed

23  invention. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1247-48 (Fed.

24  Cir. 1998).

25    A patentee bears the burden of proving by a preponderance of the evidence that

26  each and every limitation of at least one of the asserted claims of the '589 Patent is

27  present in an accused device either literally or equivalently.  *Conroy v. Reebok Intern.,*

28  *Ltd.*, 14 F.3d 1570, 1573 (Fed. Cir. 1994).  An accused product literally infringes a patent

3

claim when the product includes all elements of the claim. *TechSearch L.C.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). An accused product also may infringe under the doctrine of equivalents "if each limitation of the claim is met in the accused device either literally or equivalently." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1459 (Fed. Cir. 1998) (*en banc*). "Under the doctrine of equivalents, infringement may be found . . . if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (en banc) (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950)). Equivalency may also be determined if the differences between an element of an accused device and a claim limitation are "insubstantial" to one of ordinary skill in the art. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40 (1997).

### a. Defendants' Accused Products and Services Infringe The '589 Patent

Defendants' accused products and services, as applicable, literally infringe every one of the six distinct elements of Claim 1 of the '589 Patent. Defendants ***admit*** that the accused products contain all but a portion of one element of Claim 1, but that remaining element is not truly in dispute. The only element of Claim 1 that Defendants do not admit exists is that the tongue in the accused products is "***flexible***." But, there can be no reasonable dispute that the tongue in Defendants' accused products is "flexible." Defendants acknowledge that their nozzle cover utilizes a hinge. Alleshouse Depo at 379:12-380:4 (nozzle flap "would, by the forces of gravity . . . rest against the ride surface as it's on a hinge."). And, the American Heritage Dictionary—relied on by Defendants' expert—defines "hinge" as "a jointed or ***flexible*** device that allows the turning or pivoting of a part, such as a door, on a stationary frame." American Heritage

Dictionary, 3rd Ed., p. 643 (Defn. for "hinge").[3]  Thus, the nozzle cover in the accused products has a "flexible tongue."

As a result, PSD's accused products meet all six distinct elements of Claim 1 of the '589 Patent.  Based on information produced in this case, PSD's accused products were either installed in the United States or were offered for sale and/or sold in the United States, but delivered to locations offshore.  Accordingly, all of PSD's accused products, whether ultimately installed in the US or in foreign jurisdictions literally infringe Claim 1 of the '589 Patent.

Whitewater additionally asserts independent claims 17, 24, 37, and 42 and dependent claims 3, 13, 15, 25-27, 29, 30, and 43, which ultimately depend upon certain of the asserted independent claims, of the '589 Patent.  Although Claim 1 is used above as a representative example of the features recited in the various asserted claims of the '589 Patent, Defendants' accused products also literally infringe the asserted independent claims and the asserted dependent claims because each element recited in the asserted claims of the '589 Patent is found in Defendants' accused products.

> **b.  The Accused Products Also Infringe the '589 Patent Under the Doctrine of Equivalents**

To the extent that Defendants' accused products are found not to literally infringe the asserted claims of the '589 Patent, they should still be found to infringe under the doctrine of equivalents.  Application of the doctrine of equivalents is proper "when the alleged infringer seeks to appropriate the invention with minor modification to avoid the literal language of the claims."  *Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 942 (Fed. Cir. 1983).  Defendants will likely attempt to establish that their accused products do not

---

[3] Defendants cannot argue that the hinge is somehow separate from the tongue or nozzle cover.  This Court has already rejected such a construction as inconsistent with the language of the '589 Patent.  *Flowrider Surf Ltd. v. Pacific Surf Designs, Inc.*, No. 15-1879, ECF No. 88 at 9:7-8, 17-18 ("Here, the language of the claims demonstrates that the tongue is a part of the cover. . . Defendant's proposed construction of tongue as a separate part is inconsistent with the intrinsic evidence").

infringe the '589 Patent based on the minor change of adding a hinge to the nozzle cover. Accordingly, if Defendants' hinged tongue performs the same function, in the same way, to achieve the same result as the nozzle cover of the '589 Patent, Defendants' nozzle cover is an infringing equivalent structure to the claimed nozzle cover.

The purpose of the flexible tongue is set forth in the specification of the '589 Patent:  "A flexible tongue is provided which is urged downward squeezing against the flow of water and sealing the nozzle area off from possible injurious contact from a rider."  '589 Patent at Abstract.  Defendants admit that "[t]he purpose of the hinge is to allow the flap to move up and down against—or with—the flow of water . . . so that the nozzle openings are covered when the ride is shut down."  E. Pribonic Dep. 66:20-24. Thus, Defendants' hinged tongue is an equivalent structure to a tongue that is flexible as a result of using a flexible material.  As such, Defendants' accused products also infringe the asserted claims of the '589 Patent under the Doctrine of Equivalents.

## 2.     Patent Infringement of the '589 Patent under 35 U.S.C. § 271(b)—Active Inducement

To prevail on its infringement claim for active inducement against Defendants, Whitewater must prove the following:

1.     that the acts are actually carried out by Defendants' customers and directly infringe that claim;

2.     that Defendants took action during the time the '589 patent was in force intending to cause the infringing acts by its customers; and

3.     that Defendants were aware of the '589 patent and knew that the acts, if taken, would constitute infringement of that patent, or that Defendants believed there was a high probability that the acts by Defendants' customers infringed the '589 patent and took deliberate steps to avoid learning of that infringement.

See Federal Circuit Bar Association Model Patent Jury Instruction 3.2.

Defendants knew of the '589 Patent at least as early as October 1, 2012 and was aware of allegations of infringement of the '589 Patent at least as early as May 1, 2014 due to a Complaint filed against PSD ("2014 Complaint").  In the 2014 Complaint, PSD was provided a copy of the '589 Patent and informed that its sheet wave attractions or services, as applicable, being offered for sale infringed upon at least one of the asserted claims of the '589 Patent.  Despite this knowledge, Defendants intentionally continued to use, manufacture, offer for sale, sell, import, install, and instruct customers on operation of its infringing sheet wave attractions and/or infringing nozzle covers.  Each of Defendants' customers' acts of using such sheet wave attractions and/or nozzle covers directly infringes at least one of the asserted claims of the '589 Patent.

### 3.      Patent Infringement of the '589 Patent under 35 U.S.C. § 271(f)(1) —Supplying Components Out of United States

To prevail on its infringement claim under Section 271(f)(1) against Defendants, Whitewater must prove all of the following:

1.   Defendants supply or causes to be supplied components from the United States to a place outside the United States, which make up all or a substantial portion of the invention of any one of the claims of the '589 patent;

2.   Defendants take action intentionally to cause another to act by customers outside of the United States to assemble the components;

3.   Defendants know of the '589 patent, and knows that the encouraged acts constitute infringement of that patent; and

4.   the encouraged acts would constitute direct infringement of the claim if they had been carried out in the United States.

See Federal Circuit Bar Association Model Patent Jury Instruction 3.4.

Defendants admit that the accused products infringe the '589 Patent under Section 271(f)(1).  Claim 17 of the '589 Patent discloses "A cover for a water ride sluice gate from which a flow of water jets out, comprising a contoured flexible pad, a connector

7

configured to removably affix the cover to said sluice gate, a flexible tongue at a downstream end of the cover, the tongue configured to extend over the water that jets from said sluice gate, and a generally flat portion at an upstream end of the cover, said tongue being urged down ward against the flow of water jetting from said sluice gate." The sluice gate cover is commonly referred to as a "nozzle flap."  Defendants' nozzle flaps are comprised of three components, metal, foam, and a vinyl cover.  Alleshouse Tr. 224 at 11-14. ("our nozzle flaps "metal, and they're cut on-site to make them fit.  And then they . . . have foam applied to them on-site, and then they are wrapped in a vinyl membrane.").  Defendants admit that they shipped all, or substantially all, of the components for the nozzle flaps in their foreign installations from the United States.

For example, Defendants admit that *all* of the components for the nozzle flap in their Trinidad installation were shipped from the United States.  Yeh Tr. 323:4-11 (all components except vinyl were *manufactured* in U.S.); 326:15-20 (steel and "ride surface materials" including foam, vinyl, and glue were shipped from the U.S.); Yeh Tr., Ex. 27 (listing foam, vinyl, glue, and fabricated steel as shipped from the U.S.).  Thus, based on information obtained in this case, for the above and other foreign installations, Defendants supplied "**all or a substantial portion of the components** where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."

### 4. Defendants' Patent Infringement of '589 Patent Constitutes Willful Infringement

To prevail on its willful infringement claim against Defendants, Whitewater must prove by a preponderance of the evidence the following:

1. Defendants knew of the Plaintiff's patent; and

2. intentionally infringed at least one asserted claim of the patent.

See AIPLA Model Patent Jury Instructions 11.0.

8

Defendants knew of the '589 Patent at least as early as October 1, 2012 and were aware of allegations of infringement of the '589 Patent due to Defendants' sheet wave attractions or services incorporating a slide-over cover at least as early as the 2014 Complaint. The novel covers described in the '589 Patent were recited in each of the independent claims of the '589 Patent and disclosed as a principal object and advantage of the invention in overcoming limitations of conventional sheet wave attractions. Despite this knowledge, Defendants used, offered for sale, sold, supplied, refurbished, or maintained nozzle covers for use on sheet wave attractions since at least as early as 2012 and have continued such actions throughout the pendency of this lawsuit.

## III.   VALIDITY

"Issued patents enjoy a presumption of validity, and therefore the evidence showing invalidity must be clear and convincing." *Gen-Probe Inc. v. Becton Dickinson & Co.*, No. 09-02319-BEN (NLS), 899 F. Supp. 2d 971, 982 (S.D. Cal. 2012) (citing *Schumer v. Lab. Computer Sys.,* 308 F.3d 1304, 1315–16 (Fed. Cir. 2002)).

To anticipate a claim under 35 U.S.C. § 102 "requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334-35 (Fed. Cir. 2008)(quoting *Connell v. Sears, Roebuch & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)). Deciding whether a claim is anticipated is a two-step analysis: the first step requires construing the claim and the second step in the analysis requires a comparison of the properly construed claim to the prior art. *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995). Anticipation is a question of fact which must be proven by clear and convincing evidence. *See Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994).

"In a challenge based on obviousness under 35 U.S.C. § 103, the person alleging invalidity must show prior art references which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention." *Al-Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1323 (Fed. Cir. 1999). The

9

ultimate determination of whether an invention would have been obvious is a legal conclusion based on the totality of the evidence, including underlying factual inquiries such as: (i) the scope and content of the prior art; (ii) the level of ordinary skill in the prior art; (iii) the differences between the claimed invention and the prior art; and (iv) objective evidence of nonobviousness. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000) (citations omitted).

Defendants will likely rely upon alleged (1) prior patents and (2) prior rides to contend the '589 Patent is invalid as anticipated or as obvious. However, neither the prior patents nor rides disclose all of the claim elements recited by at least Claim 1 (and the other asserted claims) of the '589 Patent; namely, they lack, at least, a nozzle cover having a flexible tongue biased downward against the flow of water to prevent injury to riders riding over the nozzle. Accordingly, none of Defendants' alleged prior art can invalidate the '589 Patent alone or in any possible combination.

### c. Alleged Prior Patents

Each of the prior patents relied upon by Defendants have been found not to invalidate the '589 Patent by the USPTO whether individually or in combination with each other. First, the prior patents are listed on the cover page of the '589 Patent as "references cited" meaning they were considered by the USPTO during prosecution and deemed not to preclude patentability. *Tokai Corp. v. Easton Enters.,* 632 F.3d 1358, 1367 (Fed. Cir. 2011) ("although the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the [USPTO]"). For example, neither the Frenzi '987 Patent nor the Sauerbier '014 Patent disclose a nozzle cover as claimed in the '589 Patent. *See*, Frenzi '987 Patent, 5:7-30 (describing "a nozzle 3 that controls the flow of water on the apparatus, pivoting between an opened state allowing water to flow and closed state to prevent water from flowing"); *Id.*, Sauerbier '014 Patent 10:56-60 (describing "a "[c]ontainment structure 38a [that] is

constructed of concrete, fiberglass, waterproof plywood, or the like structural materials, to provide an adequate housing for the water and associated pumping equipment").

Second, the remaining prior patents relied upon by Defendants were again examined a second time during PSD's failed effort to initiate an IPR of the '589 Patent. In denying to institute an IPR, the PTAB explicitly described why none of the prior patents could possibly render the '589 Patent unpatentable, including, *inter alia*:

- The Frenzl '402 Patent lacks a nozzle cover: "the portion [of the Frenzl '402 Patent PSD relies on] as disclosing a nozzle ***cannot be both a nozzle and a cover for that same nozzle***." Decision declining to institute IPR at 12.

- The Hill '547 Patent lacks a nozzle cover: "[PSD] relies on the upper support as the claimed cover [but the upper support] ***cannot be both a nozzle and a cover for that nozzle***" *Id*. at 14 (emphasis added).

- The Lochtefeld '547 lacks a nozzle cover: "we conclude that the Petition does not show a reasonable likelihood that [Defendant] would prevail for any claim challenged based on [the Frenzl '402 Patent] alone or in combination with [the Lochtefeld '547 Patent]. [PSD] ***does not assert that [the Lochtefeld '547 Patent] teaches the claimed nozzle cover***." *Id*. at 12 (emphasis added).

- The Lochtefeld '590 Patent lacks a nozzle cover: "***[PSD] has identified no disclosure in [the Lochtefeld '590 Patent] that teaches the claimed nozzle cover***. Accordingly, we conclude that the Petition does not show a reasonable likelihood that [PSD] would prevail for any claim challenged in a ground including [the Lochtefeld '590 Patent]." *Id*. at 20 (emphasis added).

None of these patents disclose the claimed nozzle cover and cannot, either alone or in combination, invalidate the '589 Patent.

### d. Alleged Prior Rides

Defendants will attempt to establish that Wave Loch sheet wave attractions that pre-date the '589 patent somehow anticipate or render obvious its claimed flexible nozzle cover. However, Tom Lochtefeld (who designed and sold these prior attractions),

11

conceived of the '589 Patent technology for the express purpose of addressing drawbacks posed by such early generation designs.  In describing these early generation sheet wave attractions, the '589 Patent specifically disclosed the reverse curve design present in the attraction at Hyland Hills.  *Id*. at 7:7-22.  The '589 Patent explains how the new generation of surfing rides claimed in the '589 Patent use a ***slide-over cover*** for the water emitting components to eliminate the extended transition surface required in early designs like the attraction at Hyland Hills.  '589 Patent at 1:40-51, 2:10-14, 7:54-59.

The Court has already rejected Defendants' argument that the foam "bumper pad" mounted to a vertical wall of these early generation rides comprises a nozzle cover having a flexible tongue biased downward against the flow of water as claimed in the '589 Patent.  ECF No. 181 at 4:20.  (holding that there are "stark differences" between the claims of the '589 Patent and the Hyland Hills ride).  Indeed, the Court held that the Hyland Hill's bumper pad "***does not touch the flow of water***.  It does not ride against the water or squeeze against the flow.  It provides no tension against the jetted water.  ***The jetted water, instead flows untouched, unimpeded, and out of contact, through the space below the RetroRider bumper pad***."  *Id.* at 5:26-6:2.

The other installations Defendants will likely rely upon suffer from the same fatally missing element of at least the claimed flexible tongue and therefore do not anticipate or render obvious the asserted claims of the '589 Patent.

IV.   **ENFORCEABILITY**

1.   **Inequitable Conduct—Failure To Disclose Prior Art**

Inequitable conduct is the "atomic bomb" of patent law.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011).  Unlike invalidity defenses which render individual claims invalid, inequitable conduct makes the entire patent unenforceable and can infect related patents and applications in the same technology family.  *Id.*  Because it is an equitable doctrine, inequitable conduct should only be found in instances where the patentee's misconduct resulted in an unfair benefit from the unwarranted claim.  *Id.* at 1292.  Accordingly, Defendants must prove

1  inequitable conduct "by clear and convincing evidence that the patent applicant (1)
2  misrepresented or omitted information material to patentability, and (2) did so with
3  specific intent to mislead or deceive the PTO." *Ohio Willow Wood Co. v. Alps S., LLC*,
4  735 F.3d 1333, 1344 (Fed.Cir.2013).   Intent and materiality must be ***separately***
5  ***established***. *Therasense,* 649 F.3d at 1290.

6       The party alleging inequitable conduct may prove the materiality prong in one of
7  two ways.   Most commonly, the party attempts to establish "but-for materiality" by
8  providing "proof that the patentee withheld or misrepresented information that, in the
9  absence of the withholding or misrepresentation, would have prevented a patent claim
10 from issuing." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1345 (Fed. Cir.
11 2013).   Alternatively, a court will presume materiality where the party alleging
12 inequitable conduct proves that "the patentee has engaged in affirmative acts of egregious
13 misconduct, such as the filing of an unmistakably false affidavit." *Therasense*, 649 F.3d
14 at 1292.

15      Inequitable conduct requires clear and convincing evidence of a specific intent to
16 mislead or deceive the PTO.   *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1181
17 (Fed.Cir.1995); *Astrazeneca Pharm. LP v. Teva Pharm. USA, Inc.*, 583 F.3d 766, 776
18 (Fed. Cir. 2009).   "Mistake, negligence, ***even gross negligence***, does not support a ruling
19 of inequitable conduct." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305,
20 1316 (Fed. Cir. 2010).   Intent to deceive the PTO can be shown by direct or
21 circumstantial evidence.   *Therasense,* 649 F.3d at 1290.   But where circumstantial
22 evidence is relied upon, the clear and convincing evidence standard requires the party
23 alleging inequitable conduct to show that the specific intent to deceive is "the single most
24 reasonable inference able to be drawn from the evidence." *Id.*   Therefore, "***when there***
25 ***are multiple reasonable inferences that may be drawn, intent to deceive cannot be***
26 ***found***." *Id*. at 1290-91.

27      Defendants are likely to pursue three different theories of inequitable conduct.
28 Defendants will attempt to establish that Mr. Lochtefeld engaged in inequitable conduct

by failing to disclose alleged prior art to the patent office during the prosecution of the '589 Patent, specifically, installations of older-model sheet wave attractions.  Defendant cannot demonstrate either materiality or intent regarding these omissions.

"Because neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality." *Therasense*, 649 F.3d at 1292-93.  Undisclosed prior art is "but-for material if the PTO would not have allowed a claim had it been aware of it." *Id.* Defendants' theory that Mr. Lochtefeld failed to present material prior art is based entirely on the premise that older sheet wave installations disclosed the claimed subject matter of the '589 Patent.  But, the prior rides relied on by Defendants cannot serve to invalidate the '589 Patent.  Thus, Defendants are unlikely to be able to demonstrate by clear and convincing evidence that any alleged prior art that was not disclosed during prosecution was material to the issuance of the '589 Patent.

Further, there is no evidence—either direct or circumstantial—that Mr. Lochtefeld intended to deceive the patent office by not disclosing the older model sheet wave rides as prior art.  At most, Defendants point to the fact that Mr. Lochtefeld knew of the prior installations and did not disclose them.  But the failure to disclose alone cannot satisfy the deceptive intent requirement of inequitable conduct.  *Astrazeneca Pharmaceuticals LP v. Teva Pharmaceuticals USA, Inc.*, 583 F.3d 766, 777 (Fed. Cir. 2009).  As a result, Defendant cannot demonstrate that an intent to deceive the PTO was the single most reasonable inference, a necessary element of their inequitable conduct defense and counterclaim.

## 2.    Inequitable Conduct—Improper Reinstatement

The "clear and convincing" standard for inequitable conduct applies equally to Defendants' inequitable conduct claim regarding alleged improper reinstatement based on the alleged conduct of Mr. Lochtefeld and Mr. Squier.

14

1
2

**a.**      **Mr. Lochtefeld Did Not Intend To Deceive The USPTO By Stating That Light Wave Owned The '589 Patent**

3        Defendants will attempt to establish that Mr. Lochtefeld's March 27, 2015
4    statement to the USPTO, in the context of submitting a power of attorney, that Light
5    Wave was the owner of the '589 Patent constitutes inequitable conduct.  Whitewater does
6    not concede that Mr. Lochtefeld's statements to the USPTO were material.  Indeed, the
7    USPTO did not even consider the Light Wave Power of Attorney when making its
8    decision to reinstate the '589 Patent.

9        Even where a statement is *per se* material, "the accused infringer must still prove
10   intent to deceive the USPTO by clear and convincing evidence to invoke the inequitable
11   conduct doctrine."  *Caron v. QuicKutz, Inc.*, No. CV-09-02600-PHX-NVW, 2012 U.S.
12   Dist. LEXIS 162737, at *10-11 (D. Ariz. Nov. 13, 2012) (citing *Outside the Box*
13   *Innovations, LLC v. Travel Caddy, Inc.,* 695 F.3d 1285 (Fed. Cir. Sept. 21, 2012).  Here,
14   there is no evidence that Mr. Lochtefeld intended to deceive the USPTO.  Mr. Lochtefeld
15   was sent the power of attorney because, in March 2015, Light Wave was listed as the
16   owner of the '589 Patent with the USPTO.  '589 Assignment Record.  Mr. Lochtefeld
17   executed the power of attorney without recognizing that it was then owned by Surf Park
18   PTE, Ltd.  When signing the power of attorney form, Mr. Lochtefeld did not have any
19   intent to deceive the USPTO.  At worst, such an error amounts to negligence.  But,
20   negligence is insufficient to rise to the level of intent to support an inequitable conduct
21   claim.  *Aspex Eyewear Inc.*, 605 F.3d at 1316 ("Mistake, negligence, even gross
22   negligence, does not support a ruling of inequitable conduct.").

23        Mr. Lochtefeld's explanation that his statement that Light Wave owned the '589
24   Patent was simply an inadvertent or careless error creates a reasonable inference that he
25   did not intend to deceive the patent office, preventing Defendants from demonstrating
26   that deceptive intent is the single most reasonable inference to be drawn.  *Therasense*,
27   649 F.3d at 1290-1291 ("when there are multiple reasonable inferences that may be
28   drawn, intent to deceive cannot be found").

15

### b.   Mr. Squier Did Not Intend To Deceive The USPTO

Defendants will attempt to establish that Mr. Squier committed inequitable conduct by stating that the entire period of delay in the payment of maintenance fees for the '589 Patent was unintentional.  Defendants base their claim on Mr. Squier's alleged failure to conduct a reasonable investigation into the failure to timely pay maintenance fees for the '589 Patent.  The evidence will clearly establish that Mr. Squier's statement to the USPTO that the entire period of delay in the payment of maintenance fees was unintentional was accurate and that his investigation into the unintentionality of the delay in the timely payment of maintenance fees for the '589 Patent was reasonable.

Mr. Squier had no intent to deceive the USPTO when he stated that the entire period of delay was unintentional.  As explained above, absent an intent to deceive, Mr. Squier is not required to provide a good faith explanation for his actions.  *Star Sci., Inc., supra*, 537 F.3d at 1368.   Nevertheless, Mr. Squier's good faith explanation is straightforward: when stating that the entire period of delay was unintentional, Mr. Squier understood, and still understands, that to be true.

Mr. Squier first learned that the '589 Patent had expired on February 4, 2015 and had no knowledge of any prior email the law firm of Knobbe Martens sent to Mr. Taché regarding expiration of the '589 Patent.  See *Barry v. Medtronic, Inc.*, 245 F. Supp. 3d 793, 818 (E.D. Tex. 2017) ("Because Mr. Henry was not aware of the references, he was not under a duty to disclose them to the PTO, and his omission cannot be the basis for Medtronic's inequitable conduct defense." (citations omitted)).  Mr. Squier believed that he was entitled to rely on Mr. Taché's communications with Whitewater as the basis for a reasonable investigation.  See *Asghari-Kamrani v. United Servs. Auto. Ass'n*, 252 F. Supp. 3d 562, 581 (E.D. Va. 2017) (finding that there was no inequitable conduct when patent counsel certified the entire delay in correcting the priority claim was unintentional based on representations of former counsel, even when patent counsel did not further contact or question the other counsel); MPEP § 410 ("When a practitioner is submitting information (e.g., a statement of fact) from the applicant or a third party, or relying upon

1  information from the applicant or a third party in his/her arguments, the office will

2  consider a practitioner's 'inquiry reasonable under the circumstances' duty under 37 CFR

3  11.18 met so long as the practitioner has no knowledge of information that is contrary to

4  the information provided by the applicant or third party."). Mr. Squier believed that

5  Whitewater—as the party responsible for the payment of maintenance fees for the '589

6  Patent—was the only party that needed to be consulted to establish that the delay in

7  timely payment of the maintenance fees was unintentional. To the extent it is alleged that

8  Mr. Squier was incorrect in his belief that relying on a third party (Mr. Taché), or

9  information obtained from Whitewater, constituted a reasonable investigation, such a

10  legal error does not give rise to an intent to deceive. *Dexcowin Glob., Inc. v. Aribex, Inc.*,

11  No. CV 16-143-GW(AGRx), 2017 U.S. Dist. LEXIS 181529, at *35 (C.D. Cal. June 7,

12  2017) ("A mistake on the law, however, does not equate to a specific intent to deceive").

13  Mr. Squier's explanation that he believed his statement to the USPTO that the

14  entire period of delay was unintentional was accurate and supported by what he

15  understood to be a reasonable investigation creates the reasonable inference that he did

16  not intend to deceive the USPTO. Such a reasonable inference prevents Defendants from

17  establishing that deceptive intent is the single most reasonable inference to be drawn.

18  *Therasense*, 649 F.3d at 1290-1291. As a result, Defendants will not be able to

19  demonstrate that an intent to deceive the PTO was the single most reasonable inference.

20  **V.   DAMAGES**

21  Whitewater is entitled to a reasonable royalty calculated based on the hypothetical

22  negotiation framework provided by Whitewater's expert, Dr. Vigil, because there are no

23  acceptable, non-infringing alternatives in the market. *Presidio Components, Inc. v. Am.*

24  *Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012) ("[P]roducts lacking the

25  advantages of the patented invention can hardly be termed a substitute acceptable to the

26  customer who wants those advantages.").[4]

27

28  [4]

17

Further, Dr. Vigil's reasonable royalty is a proper basis for damages.  The Federal Circuit holds that "requir[ing] all damages models to begin with the smallest saleable patent-practicing unit—is untenable" and "conflicts with [its] prior approvals of a methodology that values the asserted patent based on comparable licenses." *Commonwealth Sci. & Indus. Res. Organisation v. Cisco Sys.*, 809 F.3d 1295 (Fed. Cir. 2015).  The Federal Circuit and this Court have expressly held that running-royalty agreements are relevant to lump-sum agreements as long as some basis for comparison exists in the evidence presented to the jury.  *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *accord Lucent Techs., Inc. v. Microsoft Corp.*, No. 07-CV-2000 H CAB, 2011 WL 2728317, at *3 (S.D. Cal. July 13, 2011) ("Running-royalty agreements can be relevant to lump-sum damages, but 'some basis for comparison must exist in the evidence presented to the jury.'").  Dr. Vigil makes this comparison through the use of the minimum royalty requirements specified in the running royalty agreements.  Moreover, Dr. Vigil conducts a thorough analysis of the *Georgia-Pacific* factors.  Thus, Whitewater properly apportions its damages.

DATED:  November 26, 2019

BUCHALTER
A Professional Corporation


By:  */s/  Roger L. Scott*
                                     

BUCHALTER
A Professional Corporation
J. Rick Taché
Roger L. Scott
Erikson C. Squier

SNELL & WILMER, LLP
William S. O'Hare

Attorneys for Plaintiff
Whitewater West Industries, Ltd.

18

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on November 26, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

*/s/ Roger L. Scott*
Roger L. Scott

PLAINTIFF'S TRIAL BRIEF
CASE NO. 3:17-cv-01118-BEN-BLM
BN 35415822v8