1                    United States District Court

2              for the Southern District of California

3

4                                    )
5    WHITEWATER WEST INDUSTRIES,      )
     LTD., a Canadian Corporation,    )   No. 17cv1118-BEN
6                                     )
              Plaintiff,              )   December 4, 2019
7                                     )
                  v.                  )   San Diego, California
8                                     )
     PACIFIC SURF DESIGNS, INC., a    )
9    Delaware Corporation, and FLOW   )
     SERVICES, INC., a California     )
10   Corporation,

11        Defendants.

12
                         VOLUME 2B
13               TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE ROGER T. BENITEZ
14               United States District Judge

15   APPEARANCES:

16   For the Plaintiff:      SNELL & WILLMER LLP
                                  WILLIAM S. O'HARE
17
                             BUCHALTER
18                                ROGER L. SCOTT

19   For the Defendants:     THOMAS WHITELAW & KOLEGRAFF LLP
                                  JOSEPH E. THOMAS
20                                WILLIAM J. KOLEGRAFF

21

22
     Court Reporter:         Dana Peabody, RDR, CRR
23                           District Court Clerk's Office
                             333 West Broadway, Suite 420
24                           San Diego, California 92101
                             DanaPeabodyCSR@gmail.com
25

298

```
1   Case:  WhiteWater West Industries, Ltd., v.
        Pacific Surf  Designs, Inc.
2   Date:  December 4, 2019

3

4                    INDEX OF WITNESSES

5   FOR THE PLAINTIFF:

                             E X A M I N A T I O N
6                            DIRECT  CROSS REDIRECT RECROSS

7   Glen Stevick
    Mr. Taché                  299            323
8   Mr. Kolegraff                     310            328

9   Marshall Myrman
    Mr. Scott                  331            393
10  Mr. Thomas                        377            398

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | San Diego, California, December 4, 2019 |
| 2 | * * * |
| 3 | (Proceedings held outside the presence of the jury panel.) |
| 4 | THE COURT:  All right.  Glenn, go get the jury, |
| 01:05  5 | please. |
| 6 | (Proceedings held in the presence of the jury panel.) |
| 7 | THE COURT:  All right.  Welcome back. |
| 8 | MR. TACHÉ:  May I proceed, Your Honor? |
| 9 | THE COURT:  Yes. |
| 01:07  10 | GLEN STEVICK, |
| 11 | PLAINTIFF'S WITNESS, SWORN |
| 12 | DIRECT EXAMINATION (Resumed) |
| 13 | BY MR. TACHÉ: |
| 14 | Q.  Good afternoon, Dr. Stevick. |
| 01:07  15 | A.  Good afternoon. |
| 16 | Q.  Let me show you the video that we've seen a few times |
| 17 | today.  I just want to clarify for the record, is this a video |
| 18 | that you took at PSD's ride in Whale's Tail Adventure? |
| 19 | A.  It is. |
| 01:07  20 | Q.  Thank you. |
| 21 | MR. TACHÉ:  That's, for the record, Exhibit 377. |
| 22 | BY MR. TACHÉ: |
| 23 | Q.  Thank you.  Let's turn to Claim 24.  The first claim |
| 24 | elements, "A water ride attraction, comprising," we've seen |
| 01:08  25 | that a few times today, Dr. Stevick.  Is it your opinion that |

1    PSD's accused rides are water ride attractions?

2    A.   Yes.

3    Q.   And we've also seen the second claim limitation that

4    the -- their rides have a ride surface.  Is that correct?

01:08    5    A.   Correct.

6    Q.   And I believe that the Court construed "contoured" to mean

7    made -- I'm sorry -- shaped or made.

8    A.   Shaped or made, yes.

9    Q.   Correct.  And so is it your opinion, Dr. Stevick, that

01:08    10   PSD's accused products have a contoured ride surface?

11   A.   Yes.

12   Q.   So let's turn to the next claim element.  And I'm going to

13   try to pronounce this properly.  "A sluice sized and configured

14   to inject a flow of water onto said ride surface."  Did the

01:09    15   Court -- let's start with the first part, the word "sluice."

16   Did the Court construe the term "sluice" in connection with

17   this case?

18   A.   Yes.

19   Q.   And what was the construction that the Court gave the word

01:09    20   "sluice"?

21   A.   Well, it gave the construction for sluice and sluice gate

22   to be a component for injecting water.

23   Q.   Thank you.  And thank you for the clarification as well.

24        And did you apply the Court's construction when you

01:09    25   reviewed PSD's accused products?

1    A.   Yes.

2    Q.   So let's move to the next part of that limitation.  "Sized

3    and configured to inject a flow of water onto said ride

4    surface."  Do PSD's products have a sluice gate that has an

01:09    5    outlet for injecting the flow of water onto the ride surface?

6    A.   Yes.

7            MR. TACHÉ:  And if we could bring up the demo, please.

8    BY MR. TACHÉ:

9    Q.   Let's go to the next claim element, "A cover which covers

01:10    10   and extends over the top surface of said sluice

11   substantial" -- I'm sorry.  Is the claim element, "A cover

12   which covers and extends over the top surface of said sluice"

13   substantially the same language as we saw in connection with

14   Claim 1?

01:10    15           MR. TACHÉ:  And if we could bring up that comparison.

16           THE WITNESS:  Yes.

17   BY MR. TACHÉ:

18   Q.   And looking at the two claims, Claim 1 and Claim 24, do you

19   see any differences between those two claim limitations?

01:10    20   A.   Well, there's different words, but they really mean the

21   same thing in light of the specification.

22   Q.   And the difference in the words is the addition of "top

23   surface" in Claim 24.  Is that correct?

24   A.   Yes.

01:10    25   Q.   And does that in any way change your opinion as to the

1    meaning of that claim charge?

2    A.   No.   The surface, that will be against the cover anyway,

3    even in Claim 1.

4    Q.   Thank you.

01:11    5         MR. TACHÉ:   And if we could please bring up the demo

6    of the products.

7    BY MR. TACHÉ:

8    Q.   Do each of PSD's accused products have a cover of

9    which -- which covers and extends over the top surface of said

01:11   10   sluice?

11   A.   Yes.

12        MR. TACHÉ:   If we could please go to the next claim

13   element.

14   BY MR. TACHÉ:

01:11   15   Q.   "To prevent riders from possibly colliding with or riding

16   over said sluice and interfering with ride operation."  Does

17   the specification in any way describe or show this claim term?

18   A.   Yes, this is preventing the problem identified in the

19   "Background" section, which is, "preventing riders from

01:11   20   possibly colliding with or riding over the sluice gate and/or

21   interfering with the ride operation."  And what they're talking

22   about there is that the buffer section or transition section is

23   so long that it's needed to prevent this collision.  So we're

24   meeting that goal and eliminating the transition section.

01:12   25   Q.   And just for the record, you're referring to what's marked

1    as Exhibit 1 -- I'm sorry -- 1-16 and Exhibit 1?

2    A.   Yes.

3    Q.   And so how does this relate to the claim's nozzle cover?

4    A.   Well, it relates in that you're accomplishing the same

01:12   5    goal, but you're optimizing the ride area and putting it --

6    making it extend all the way to the deck.

7    Q.   Thank you.

8         And in your opinion, Dr. Stevic, do all of PSD's accused

9    products have this claim element?

01:12   10   A.   Yes.

11   Q.   And based on your analysis of Claim 24 in the context of

12   the '589 patent, what is your opinion as to the purpose of the

13   cover claimed?

14   A.   The purpose is all the things we've talked about:

01:13   15   increasing visibility, allow you to ride safely over the nozzle

16   area, and to optimize the rideable area, and prevent injuries.

17   Q.   And we've discussed this in this context of other

18   independent claims.  Is the purpose achieved in connection with

19   Claim 24 in the same manner as it was in the context of the

01:13   20   other independent claims we've spoken about?

21   A.   Yes, it is.

22   Q.   And do PSD's products operate the same way?

23   A.   Yes.

24   Q.   For the same purpose?

01:13   25   A.   For the same purpose, accomplishing the same goals, yes,

1    sir.

2    Q.   Thank you.

3         MR. TACHÉ:   If we could please turn to claims -- I'm

4    sorry.   If we can go back to Claim 24.

01:13   5    BY MR. TACHÉ:

6    Q.   So in your mind, just to summarize, Dr. Stevic -- in your

7    opinion, do each of the accused PSD ProFlow and Supertube

8    products meet each and every claim limitation as set forth in

9    Claim 24 of the '589 patent?

01:14   10    A.   Yes.

11    Q.   Thank you.

12         MR. TACHÉ:   If we could please turn to Claims 25

13    through 27, 29, and 30.

14    BY MR. TACHÉ:

01:14   15    Q.   Dr. Stevick, are all these claims dependent on Claim 24?

16    A.   Yes, they all incorporate Claim 24.

17    Q.   And in an effort to make this as -- a little quicker for

18    everybody involved, do the -- in your opinion -- is it your

19    opinion that the dependent Claims 25 through 27, 29, and 30 --

01:14   20    are they the same language as appears in claims we've talked

21    about this morning?

22    A.   Yes.

23    Q.   And is it your opinion that PSD's accused products meet

24    each and every one of the limitations contained in Claims 25,

01:15   25    26, 27, 29, and 30?

1    A.   Yes.   The added elements are actually part of the other

2    claims from circulation pump to decking to slope ride surface.

3    Q.   Thank you.

4         MR. TACHÉ:   Let's turn to independent Claim 17,

01:15   5    please.

6    BY MR. TACHÉ:

7    Q.   The first claim element is a cover -- claim limitation --

8    pardon me -- is a cover for a water ride sluice gate from which

9    a flow of water jets out.   The claim element cover for a water

01:15   10   ride, in your opinion, does it mean the same thing as the

11   nozzle cover that we discussed in connection with Claim 1?

12   A.   Yes.

13   Q.   And let's move to the next part of the claim.   Contoured

14   flexible pad.   Is this the same claim element as the contoured

01:15   15   flexible pad from Claim, I believe, 24 -- or 42?   Pardon me.

16   A.   42, yes.

17   Q.   And let's focus on the next part of that claim.   "Connecter

18   configured to removably affix the cover to said sluice gate."

19   Is this the same language as "removably affix to said nozzle"

01:16   20   language from Claim 42?

21   A.   It's equivalent, yes, it's the same.

22   Q.   Thank you.

23        The next claim limitation is, "A flexible tongue at a

24   downstream end of the cover."   Is this the same claim language

01:16   25   that we found in Claim 42 earlier today?

1    A.   Yes.

2    Q.   And let's go back to Claim 24.  "A tongue configured to

3    extend over the water that jets from said sluice gate."  Is

4    this the same language that is found in Claim 42, "extending

01:16    5    over the water that flows from said outlet"?

6    A.   Yes, it is.

7    Q.   Finally, "Tongue being urged downward against the flow of

8    water jetting from said sluice gate."  Is this also language we

9    saw in Claim 43 earlier today?

01:17    10    A.   Yes.

11    Q.   So in summary, Dr. Stevick, is it your opinion that the

12    accused PSD ProFlow and Supertube products each meet each and

13    every claim limitation set forth in Claim 17?

14    A.   Yes.

01:17    15    Q.   Thank you.

16         And based on your analysis of Claim 17, what is the purpose

17    of the cover set forth therein?

18    A.   Again, it's all the goals that we've talked about:

19    visibility, safe riding over the nozzle area onto the decking

01:18    20    area, optimizing the area so you have an increased rideable

21    area for the footprint of the entire ride, those things.

22    Q.   And is this achieved in the same manner that you previously

23    described in connection with the other claims we've discussed

24    this morning?

01:18    25    A.   Yes.

1   Q.   And is it also your opinion that PSD's products operate in

2   the same way?

3   A.   Yes.

4   Q.   And for the same purpose?

01:18   5   A.   Yes.

6   Q.   Let's look at the final independent claim that's being

7   asserted in this case, Claim 37.  It has an awful lot of words

8   in here, but is it your opinion that independent Claim 37

9   contains the same claim limitations as those found in the

01:18   10  various combinations of other claims being asserted against

11  PSD, these products that we've discussed earlier today?

12  A.   Yes.

13  Q.   And is it your -- is your opinion the same as the other

14  claims we've discussed with respect to whether or not PSD's

01:19   15  accused products have each and every one of these claim

16  limitations?

17  A.   They do.

18  Q.   And is your opinion also true with respect to the doctrine

19  of equivalents as it relates to PSD's claims for Claim 37?

01:19   20  A.   Yes.

21  Q.   At the beginning of your testimony today, we discussed

22  portions of the patent, and we talked about the "Background"

23  section and the "Summary" section and the detailed description

24  and figures, everything coming before the claims, and that's

01:19   25  generally referred to as the specification, is it not?

1    A.   Yes.

2    Q.   And the last part of the patent is referred to as the

3    claims?

4    A.   Yes.

01:19    5    Q.   So what's the difference between the specification and the

6    claims?

7    A.   Well, the claims actually lay out what you're stating is

8    your invention.  Your unique idea.  The specification supports

9    the claims, but is never as broad as the claims themselves.

01:19   10    The claims usually extend significantly further.  The

11    specification, the figures, the words are to give you examples,

12    to show you how this can be accomplished.

13    Q.   Thank you.

14         Is it the intended purpose as it's described and claimed in

01:20   15    the '589 patent for the nozzle cover to actually act as a valve

16    or some other way turn off the water that's coming out of the

17    nozzles?

18    A.   No.  If it turned off the water, the ride simply wouldn't

19    work.  It's -- in fact, you want maximum flow.  You don't want

01:20   20    to chew up energy impeding the flow.

21    Q.   Thank you.

22         We discussed Claim 17 just a moment ago --

23    A.   Sure.

24    Q.   -- in the context of PSD's products.

01:20   25         Flow Services, a company owned by PSD, is also accused of

1   infringing Claim 17 for their refurbishment and replacement

2   services.  Based on your analysis of Flow Services' services,

3   do they meet each and every claim limitation as set forth in

4   Claim 17?

01:21   5   A.   Yes.

6   Q.   Thank you.

7        Just a moment ago we were talking about the doctrine of

8   equivalents.  Can you briefly describe what that is for the

9   jury?

01:21   10   A.   Well, the doctrine of equivalents means that something does

11  something exactly the same way and comes up with the same

12  function or a similar way.  It's equivalent and, therefore,

13  still covered by the patent.

14  Q.   And so is that an alternative way of finding infringement

01:21   15  with respect to the product?

16  A.   Yes.

17  Q.   Thank you.

18           MR. TACHÉ:   Thank you, Dr. Stevick.

19           THE COURT:   Thank you.

01:21   20       All right.  Cross.

21

22

23

24

25

1      MR. KOLEGRAFF:  Our paralegal just left the room for a

2  moment.  She's operating the machine.  I can get started

3  without the video.

4                        CROSS-EXAMINATION

01:21    5  BY MR. KOLEGRAFF:

6  Q.   So good afternoon.

7  A.   Good afternoon, Counsel.

8  Q.   So if you can remember back into the patent, the '589

9  patent, there was a Figure 3A, and in there we had a cover 150

01:22   10  that had a tongue 160.  That was shown to be made out of a foam

11  plastic.  Is that correct?

12  A.   Well, I'm not sure it gives an exact definition of what the

13  materials are.  In fact, in Column 11 it states that -- let me

14  read it.  Okay.  "The pad, 150 or pad material, can be

01:23   15  reinforced internally or externally," which means that it

16  probably can have steel or fiberglass inside of it or on one

17  side of it.  And preferred embodiments, alternate materials may

18  be used as required, given how you're trying to implement the

19  design.

01:23   20  Q.   Does that phrase "internally or externally stiffened" I

21  think was the word -- "reinforced."  Is that anyplace in the

22  claims?  In the 57 claims that are attached at the end of this

23  patent, anyplace is the term "reinforced" used?

24  A.   Well, it's not limiting it to that, so there's no reason to

01:23   25  add it.

1   Q.   So the answer is no, no place in the 57 claims did they

2   claim a reinforced, flexible tongue, correct?

3   A.   There is no limitation, you're correct, so it means it can

4   have either.

01:23   5   Q.   And in all 57 claims, not once did they refer to the

6   flexible tongue as having a hinge.  Is that correct?

7   A.   It's not mentioned, which means it's not limiting, so it

8   can have a hinge or not have a hinge.  It's not --

9   Q.   My question is very simple.  I'm not trying to argue with

01:24   10   you.

11   A.   Sure.

12   Q.   I'm just trying to clarify so the jury understands what's

13   in those claims because they've not seen all 57 claims, and

14   they're not at issue here, so I just want to make sure that

01:24   15   everyone understands.

16        In addition in those 57 claims, the word "hinge" or

17   "hinged" or "rotate" is not in any of those 57 claims?

18   A.   That limitation is not in any of the claims, meaning that

19   it's acceptable, it's part of it.

01:24   20   Q.   So in order to determine, using plain and ordinary meaning,

21   that a flexible tongue includes a metal hinged plate, you have

22   to go to that column 11 citation that you just read from.  Is

23   that correct?

24   A.   No, and I'd love to explain why.  As an engineer, you know

01:25   25   that flexible can be obtained in numerous ways.  A hinge is one

1    way.  And there's lots of different types of hinges.  Flexing

2    is a hinge.

3    Q.  So --

4    A.  So --

01:25   5    Q.  I'm sorry.  I didn't mean to cut you off.

6    A.  As an engineer, there's many ways -- as someone skilled in

7    the art, you know there's many ways to make something flex

8    downward, so then you're looking at limitations in the claims,

9    and there is no limitation of hinge or no hinge.  It just has

01:25   10   to be flexible so it urges against the water.

11   Q.  But several times today when we get into defining what a

12   flexible tongue is -- because flexible tongue has not been

13   shown to be hinged or a metal plate or as a reinforcing member.

14   None of that is in the claims.  We've consistently gone back to

01:25   15   that Column 11, and that's what we've used to say but look,

16   that's what we meant to say when we were over here in these

17   claims.  So we've used that at least two or three times,

18   correct?

19   A.  I disagree with you completely.

01:26   20   Q.  So where in that Column 11 does it say "hinge" or "metal

21   plate"?

22   A.  It doesn't.

23   Q.  It does not?

24   A.  But you would see from the claims themselves.  This is just

01:26   25   explaining how a POSITA would understand that a little bit

313

1    because if you put a rigid plate into the tongue, you have to

2    add flexibility in some other manner.  It's fairly

3    straightforward.

4              THE COURT:  Ladies and gentlemen of the jury, raise

01:26    5    your hand if you know what a POSITA is.

6              PANEL MEMBER:  A what?

7              THE COURT:  Don't one of you think that maybe the jury

8    ought to know what a POSITA is?

9              THE WITNESS:  You're absolutely right, Your Honor.

01:26   10              THE COURT:  Would somebody like to tell the jury what

11    a POSITA is?

12              THE WITNESS:  Sure.

13              THE COURT:  Okay.

14              THE WITNESS:  A person of ordinary skill in the

01:26   15    particular art that you're talking about in the patent.

16              THE COURT:  Thank you.

17              THE WITNESS:  It doesn't necessarily have to be an

18    engineer.

19              MR. KOLEGRAFF:  Thank you.

01:27   20              THE COURT:  All right.

21    BY MR. KOLEGRAFF:

22    Q.   So when I look at the -- you've seen our demonstratives

23    over here?

24    A.   Yes.

01:27   25    Q.   And the far one over there is the one that represents the

1    foam pad cover.  Okay?  That's the one that is shown generally

2    in Figure 3A.  Would you agree?

3    A.   It's one embodiment of it, sure.

4    Q.   Thank you.

01:27    5       So when water comes out underneath that jet and urges or

6    pushes the foam up, it doesn't do it -- I'll use the word

7    "consistently."  So you'll have the left edge that could be

8    vibrating a little bit differently than the right edge.  It

9    could be vibrating a little bit different than the middle.

01:27   10   Would that be a fair assessment?

11   A.   The flow coming out of the nozzle is never perfectly

12   uniform, but gravity is urging that tongue downward just like

13   the one on the far left.

14   Q.   But the left end will be operating slightly differently

01:27   15   than the right end because it's flexible and it deforms,

16   correct?

17   A.   Well, they both do that.  Right?

18   Q.   That front edge, when I pull up the right edge, the left

19   edge is acting exactly as the right edge does.  It lifts up.

01:28   20   There's no deformation across that leading downstream edge.

21   A.   There's some.  It's not as much as the right one, that's

22   true.

23   Q.   It gets back to your definition of "flat."  You're saying

24   this looks flat, but when you look at it at a granular enough

01:28   25   level, nothing is really flat.  So -- but there's no meaningful

1   deformation across the front of this device, hinged device,

2   correct?

3   A.   Correct.  But the claims don't require it.  There's no

4   limitation of any sort like that.

01:28   5   Q.   And are you aware that one of the major reasons why they

6   went -- why WhiteWater went from -- or excuse me -- Wave Loch

7   went from the version that we see at the far end to this hinge

8   was because they were having delamination issues with that far

9   version?

01:29   10   A.   I really don't know.

11   Q.   This morning we heard testimony from Mr. Lochtefeld that

12   that far left was suffering from delamination.  When they moved

13   to this hinged version, they were getting better reliability

14   without lamination.

01:29   15   A.   My right and the jury's right.  Is that the one you mean?

16   Q.   Yes.  So --

17   A.   Okay.

18   Q.   -- the one that has delamination issues, the one that

19   solved the delamination issues with the metal hinge.  So the

01:29   20   result that you get in using these two devices is different.

21   That's why WhiteWater or Wave Loch moved to this device?

22   A.   Well, the performance in terms of the goals of the patent

23   are actually identical.  Better visibility, better optimization

24   of ride area, and the ability to ride up and over without

01:30   25   injury.  Now, obviously if they're having delamination problems

1    and you solve it, you have better performance, but it's the

2    same goal.

3    Q.   But wouldn't it be a goal of the patent to provide a

4    reliable device?

01:30    5    A.   Well, laminations can be solved many ways, and it's outside

6    the scope of the patent.

7    Q.   But the end result of using this device is a device that

8    has higher reliability for the lamination.

9    A.   That could be.

01:30    10    Q.   Thank you.

11    A.   I don't have the data to say one way or another.  You can

12    certainly solve the lamination problems many ways.  Better

13    glues, to start with.

14    Q.   So you mentioned earlier that you had been in a prior

01:30    15    engagement with WhiteWater?

16    A.   Yes.

17    Q.   How long did that engagement last?

18    A.   It was over a year, I'm sure.

19    Q.   About how much did you get paid in that engagement?

01:30    20    A.   I don't recall.  It was many years ago.

21    Q.   Can you just give a rough order of magnitude?

22    A.   I really have no idea.

23    Q.   How much are you being paid here for your testimony and

24    your depositions and your consulting work?

01:31    25    A.   I'm not paid directly.  My company is being paid 375 an

317

```
 1  hour.
 2  Q.   So your company.  Are you the sole owner of that company?
 3  A.   Almost.  Not completely.  But we've got three electron
 4  microscopes, an explosion laboratory, interns every summer.  It
01:31  5  doesn't all go in my pocket.
 6  Q.   Okay.  Can you estimate about how many hours you've charged
 7  375 an hour?
 8  A.   Hundreds of hours.  I couldn't tell you the exact number.
 9  Q.   Can you just give a rough order?  Are we looking 300, 900?
01:31  10  A.   Oh, I'm sure it's 1- to 200.
 11  Q.   1- to 200.  Thank you.
 12        MR. KOLEGRAFF:  Can you pull up Exhibit KZ?
 13  BY MR. KOLEGRAFF:
 14  Q.   Exhibit KZ.  And we'll look at the first page of that KZ-1.
01:32  15  Claim 24 requires, "A cover which covers and extends over the
 16  top surface of said sluice."  Is that correct?  I'm just
 17  quoting the language from Claim 24.
 18  A.   In light of the specification, yes.
 19  Q.   In your report, you identified this piece right there as
01:33  20  meeting that claim limitation.  Is that correct?
 21  A.   That's part of the cover, yes, and including the tongue
 22  area.
 23  Q.   And that does not cover --
 24  A.   It should be this area here.
01:33  25  Q.   But there are nozzles.  The nozzles actually sit all the
```

1    way back here, correct?

2    A.   No, only portions do.   This has to be looked at from the

3    perspective of the rider, protecting him from basically that

4    front edge, the openings of the nozzle.   As I discussed

01:33  5    earlier, you don't have to cover the entire nozzle.   There's

6    decking, other stuff that covers the back end of it, those huge

7    nozzle pieces.   We're looking at the outlet, the part that's

8    potentially an injury risk to the rider.

9    Q.   Do you know how wide that little board is?

01:34  10   A.   I mean, I'm guessing four or five inches, something like

11   that.

12        MR. KOLEGRAFF:   Can we go back to Exhibit 1 and

13   page 5, so Exhibit 1-5?

14   BY MR. KOLEGRAFF:

01:34  15   Q.   So in the specification for the '589, they talk about

16   needing to cover the beak, which is this portion right here, of

17   the nozzle that extends and shoots the water out.   The first

18   four inches is not going to cover that beak.   Is that correct?

19   A.   Well, it doesn't need to.   There's a deck that abuts it.

01:34  20   It's really just what we talked about before.   "Substantial

21   cover" means enough that you can safely ride over it.

22   Q.   But the only thing --

23   A.   There's no exact dimension.

24   Q.   The only thing you're saying is that cover is that little

01:35  25   four- to five-inch board?

1   A.   No, it's the whole thing, the board plus the tongue.

2   That's all of the cover.

3          MR. KOLEGRAFF:   Let's take a look at Exhibit LF.

4   BY MR. KOLEGRAFF:

01:35   5   Q.   So this is a picture of a PSD design during manufacture

6   while it's being built.

7   A.   Okay.

8   Q.   So you see we have a metal plate, we have a piano hinge,

9   and then we have the nozzle structure there.  Do we agree with

01:35   10  those pieces?

11  A.   Well, we can't see all of the nozzle structure.  The amount

12  that's exposed is there, clearly.

13  Q.   So when the pump is turned on, that water forces the metal

14  plate to rotate about the hinge, so it actually just rotates

01:36   15  around the hinge.  Is that correct?

16  A.   That's what flexing is in the context of the patent.  It

17  rotates, it flexes upward, but it's being urged down by the

18  weight of that reinforcing, which is the steel plate.

19  Q.   Do we agree that this metal plate there is rigid?

01:36   20  A.   Well, relatively.  That's why we, if you read Column 11 --

21  Q.   So what makes this, in your opinion, a flexible tongue is

22  adding a hinge to a solid piece of metal?

23  A.   That's actually a very common way in engineering to make

24  something flex.

01:36   25         A recent design we've come up with at my lab is what's

1    called a pig that goes down a pipeline to ultrasound and

2    measure the thickness as it goes.

3        We have several different ways to make it flex.  One is

4    almost a hinged gimbal joint.  Another is just a flexible piece

01:36   5    of rubber that bends between the modules.  It's -- engineers go

6    back and forth between those two types of hinges all the time.

7    Q.  So a door that is a solid wood door that hinges to a frame,

8    you consider that to be a flexible door?

9    A.  In terms -- the inventor of a patent is his own -- he

01:37   10   provides his own definition of what the meaning is.  And in the

11   meaning of this patent, "flexing" is movement down into and

12   urging into the water.  It doesn't mean just flexing in terms

13   of bending, and what a hinge does is it just localizes all the

14   bending at one spot.  That's just one of the options that

01:37   15   POSITAs and engineers have at our disposal.  It's part of the

16   bag of tricks.

17   Q.  You've mentioned that a patent drafter can be their own

18   lexiconer.  They can set their own definitions within the

19   specifications, but the starting point of reading any claim is

01:38   20   the plain and ordinary meaning, which is what you're supposed

21   to be doing here, is applying the plain and ordinary meaning of

22   those terms.  So you look at that term "flexible tongue," and I

23   look at a door, and I go, is that door flexible?  My plain and

24   ordinary meaning would say no.  So where are you getting this

01:38   25   definition that just merely adding a hinge to a solid piece

1    makes it flexible?

2    A.   Well, maybe you haven't seen many robot arms, but they add

3    flex in lots of different ways.  One is to actually flex

4    plastic.  The other is to have a series of hinged --

01:38    5    mechanically jointed hinges.  These are both hinges.  And I

6    think maybe the limitation is, where the problem we're having

7    between the two of us is, I look at it as an engineer or a

8    POSITA, and there's not another good word besides "flex," so

9    we're going to use that, even if it's a hinge.

01:39   10    Q.   So we talk about -- you mentioned these operating the same

11    way, but clearly the flexible tongue that we see at the far end

12    of the display here versus the hinge here, this is a pure

13    rotation about a single axis on a hinge point, correct?

14    A.   Most of the flexing occurs at one point, yes.

01:39   15    Q.   And this has flexing distributed across -- longitudinal

16    length, along this length.  The flexing is along that entire

17    length?

18    A.   It will have more distributed flexing, yes.

19    Q.   So they flex in a different way --

01:39   20    A.   No, they flex --

21    Q.   -- to give a different result?

22           THE COURT:  Wait.  Counsel.

23           MR. KOLEGRAFF:  Oh, I'm sorry.

24           THE COURT:  Let him speak, and would you do me a favor

01:39   25    and let him speak.

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  Okay.  Great.  Thank you.

3        Go ahead.

4    BY MR. KOLEGRAFF:

01:39   5    Q.   So they operate in a different way.  This flexible device

6    that we have here of the foam padding distributes its rotation

7    across or its flexing across this whole form of deformation.

8    This -- the entire flexing is at the hinge, correct?

9    A.   Yes, but the claims make no difference as to how localized

01:40  10    the flex is.  It doesn't require all the flex at one spot or

11    distributed.  There's no limitation; therefore, it applies to

12    both.

13    Q.   And they get a different result.  This one results in a

14    product that easily delaminates -- and I'm looking at the

01:40  15    foam-padded one -- and the one that has the hinge has a much

16    better life expectancy to its pad because it is hinged, so it

17    has a different result, correct?

18    A.   I disagree.  If you use the right glues on the right one,

19    you wouldn't have delamination.

01:40  20    Q.   So looking at the PSD device, this component, the metal

21    plate, is a separate piece from the hinge.  Is that correct?

22    A.   No, I think it all acts together as you have a cover, that

23    back piece, hinge, and tongue.  It's all one -- you have

24    different components.

01:41  25    Q.   But just a little while ago you said that was removable,

1    the hinge was removable.

2    A.   The back side of the hinge is.

3    Q.   So we have a metal plate, and when we attach this hinge to

4    it, doesn't that make the metal plate even stiffer?

01:41    5    A.   I'm sorry?

6    Q.   When I have a metal plate and then I bolt a hinge to it,

7    doesn't that make the metal plate even stiffer?

8    A.   Not much.  Usually the hinge -- the idea of the hinge is so

9    it flexes, so it doesn't add much stiffness to the plate.

01:42    10        MR. KOLEGRAFF:  Thank you.

11        THE COURT:  Redirect.

12        MR. TACHÉ:  Could we bring up Claim 1?  And that's

13    Exhibit 1.

14                        REDIRECT EXAMINATION

01:42    15    BY MR. TACHÉ:

16    Q.   You were asked a question just a moment ago, Dr. Stevick,

17    about some requirement to cover a beak.  Do you recall that

18    question?

19    A.   Yes.

01:43    20    Q.   In Claim 1, do you see the word "beak" anywhere?

21    A.   No.

22    Q.   So what is it that the cover is supposed to cover?

23    A.   It's supposed to substantially cover the nozzle such that a

24    rider can go over without being injured.  And if you look at

01:43    25    the drawings, that doesn't come anywhere near covering the

1    entire beak area of the nozzle.

2            MR. TACHÉ:  Can we please bring up Exhibit LF?

3    BY MR. TACHÉ:

4    Q.  Let's pretend there's a drawing that looks like --

01:44  5            MR. KOLEGRAFF:  We're almost there.

6            MR. TACHÉ:  Thank you.  Do I need to do something

7    here?

8            MR. KOLEGRAFF:  No.

9    BY MR. TACHÉ:

01:44  10   Q.  Let me ask you another question while they're bringing that

11   up.  Here we go.  Is this the finished nozzle flap that PSD

12   makes?

13   A.  No.

14   Q.  And so I believe you testified a moment ago there were

01:44  15   actually three parts to the claimed cover that's the nozzle

16   cover in the claims being asserted?

17   A.  Yes.

18   Q.  And can you explain for the jury what those three

19   components are?

01:44  20   A.  You mean in the patent or in the PSD product?

21   Q.  The nozzle cover that's disclosed and claimed in the '589

22   patent.

23   A.  Which claim?

24   Q.  Claim 1, for example.  I'm looking for --

01:44  25   A.  All right.  Let's go to Claim 1.

1   Q.  I may have confused you, Dr. Stevick.  All I'm looking for

2   is the components that would make up the claimed nozzle cover.

3   A.  Well, it's a padded material substantially covering said

4   nozzle.  It includes a flexible tongue which is bias downward.

01:45   5   Q.  And I believe you testified earlier today with respect to

6   something upstream.  Do you recall saying something about a

7   generally flat portion?

8   A.  Let's see.  Do we have a flat portion in Claim 1?

9   Q.  I believe it's in Claim 17 or Claim 24.

01:45   10   A.  I think you're right, yes.

11   Q.  Would those be the three components of the nozzle cover?

12   A.  Sure.

13   Q.  How wide, based on having gone to one of WhiteWater's rides

14   and one of PSD's accused rides -- how wide are the nozzles

01:46   15   approximately?

16   A.  You mean left to right?

17   Q.  Exactly.

18   A.  40, 50 feet.

19   Q.  So when we talk about flexing, we're distending based on

01:46   20   water pressure.  It's distributed over quite a wider area than

21   it's represented here?

22   A.  Much wider.

23   Q.  You've referred to claim limitations in connection with

24   your discussion with counsel for the defense.  What do you mean

01:46   25   by "claim limitation"?

1    A.   The elements of a claim are actually limitations.   Those

2    things have to be in an accused product to violate the patent.

3    If they're not there, then it violates the patent.   So if you

4    add more things, it makes it easier to go around the patent.

01:46  5    So there are no -- in this particular case, there are no

6    limitations or elements that say what kind of hinge you use or

7    how that flex occurs.   You can do it any way you want.   So it's

8    not an issue in terms of the patent.   The question is, does it

9    flex downward toward the water, not how do you accomplish the

01:47  10   flex.

11   Q.   Thank you, Dr. Stevick.

12        So is it a fair statement, is it a conclusion to say, that

13   claims are broader than the specification?

14   A.   Always.

01:47  15   Q.   So the fact that someone didn't specifically articulate

16   each and every conceivable method or -- method or embodiment in

17   the specification, would that negatively impact the scope of

18   the claims?

19   A.   No, the patent would be incredibly long if you came up with

01:47  20   every single way you can accomplish what's in the claims, so

21   they don't do that.

22        MR. TACHÉ:   Can we please bring up Exhibit 1?   I

23   believe it's page 16, which should be Column 11.  23.  Yes,

24   thank you.   Here we go.   I'll get it right eventually.  21.  If

01:48  25   we could highlight that paragraph.

BY MR. TACHÉ:

Q.   Counsel just asked you a question and said that Mr. Lochtefeld meant to say that the invention claimed in the '589 patent covered an embodiment that had a rigid nozzle flap and a hinge.  He didn't mean to say that, did he, Dr. Stevick? He actually said it, didn't he?

A.   Well, it's said by the fact that it has no limitation that excludes it.  So it's in.  And when you have a rigid, reinforced tongue, there's really not many alternatives.  You will put a hinge in of some type.

Q.   And you testified earlier you're an inventor on at least five patents?

A.   Yes.

Q.   Did you include each and every possible embodiment in those applications?

A.   No.

Q.   And why not?

A.   Well, because it would be voluminously long.

Q.   And so as long as the specification is written in such a manner so it supports broad claims, is that what a prudent inventor would do?

A.   Yes, your claims cover the invention, and the specifications tell you the goals so you can interpret those claims.

Q.   And do you believe that's what Mr. Lochtefeld did in the

1    '589 patent?

2    A.   Yes.

3    Q.   You were asked a question about delamination just a moment

4    ago.   If I could call your attention to the Exhibit 1,

01:50  5    page 21 --

6         MR. TACHÉ:   Still just a little higher up in

7    that -- it's the beginning of the first full paragraph.   Thank

8    you.

9    BY MR. TACHÉ:

01:50  10   Q.   You were asked the question whether or not delamination was

11   a concern.   Can you please take a look at the first full

12   sentence of that paragraph and read that to the jury?

13   A.   Sure.   It says, "The sluice cover or pad 130 is" -- I think

14   that should be 150 -- "is preferably made out of any suitable

01:50  15   soft, flexible material that will avoid injury upon impact, yet

16   rigid enough to hold its shape under prolonged use."

17   Q.   And so, "rigid enough to hold its shape under prolonged

18   use," would that cover the concerns that were raised by defense

19   counsel as to delamination?

01:51  20   A.   Yes.

21        MR. TACHÉ:   Thank you, Dr. Stevick.

22        THE COURT:   Recross.

23                  RECROSS-EXAMINATION

24   BY MR. KOLEGRAFF:

01:51  25   Q.   So I just heard -- and I want to paraphrase, so please

1    correct me if I get the paraphrase incorrect -- that you said

2    the claims are generally broader than what's in the

3    specification.  Please correct that if that's not what you

4    said.

01:51  5    A.   No, that's what I said.

6    Q.   Okay.  But you're aware that patents have to comply with

7    35 USC 112, and there's three requirements in there:  that the

8    claims just can't hang out there by themselves, the claims have

9    to comply with a written description and enablement standard,

01:51  10   and a best vote standard.  So the inventor has to describe the

11   invention in a way that would tell somebody that he understood

12   there was a hinge, teach them how to build that hinge and

13   plate, and should have described the best mode of the

14   invention.  So was that ever done here?

01:52  15   A.   I think it was, actually.  I think the modifications you're

16   suggesting are normal tricks in the tool bag of any POSITA.

17   The invention was to get rid of that extended energy-absorbing

18   section where you've got to have a long length of flow to stop

19   the riders.  Now, you've got the flap that lets them make that

01:52  20   part of the ride itself.  And that's enough for any POSITA to

21   use a variety of hinges and methods for flexing.

22   Q.   This morning Mr. Lochtefeld said that he went from the one

23   down here that had the fully flexible tongue to this hinged

24   version, again for lamination purposes, and that this was a

01:52  25   better design, and this is the design that he stuck with from

| | | |
|---|---|---|
| | 1 | 2005 until 2012 when he sold his company.  So this was a better |
| | 2 | design than what is had here.  Under Section USC 112, he was |
| | 3 | supposed to disclose the better mode, the best mode of |
| | 4 | operating the invention.  So was it ever disclosed in the |
| 01:53 | 5 | patent to do that, to put a metal hinge? |
| | 6 | A.   Yes.  Mr. Lochtefeld has 50 patents.  He's very conscious |
| | 7 | of his patents, and he, without doubt, believed that this was |
| | 8 | already covered by the subject patent, the '589.  I would have |
| | 9 | assumed the same. |
| 01:53 | 10 | MR. KOLEGRAFF:  Thank you. |
| | 11 | THE COURT:  All right, sir.  You may step down. |
| | 12 | Please call your next witness. |
| | 13 | MR. SCOTT:  At this time we're going to play -- I |
| | 14 | apologize. |
| 01:53 | 15 | MS. TRINH:  Your Honor, at this time we would like to |
| | 16 | play the video testimony of Richard Alleshouse and Yong Yeh. |
| | 17 | It will be about 15 minutes. |
| | 18 | THE COURT:  Okay. |
| | 19 | (A video was played and not reported.) |
| 02:11 | 20 | THE COURT:  Is that it? |
| | 21 | All right.  Call your next witness. |
| | 22 | MR. SCOTT:  We'd like to call Marshall Myrman, please. |
| | 23 | MARSHALL MYRMAN, |
| | 24 | PLAINTIFF'S WITNESS, SWORN |
| 02:11 | 25 | THE CLERK:  Would you state and spell your full name |

1    for the record.

2          THE WITNESS:   Marshall Corey Myrman, M-A-R-S-H-A-L-L,

3    M-Y-R-M-A-N.

4                           DIRECT EXAMINATION

02:12    5    BY MR. SCOTT:

6    Q.   Good afternoon, Mr. Myrman.   Where are you from?

7    A.   San Diego.

8    Q.   Do you surf?

9    A.   Yes.

02:12   10    Q.   How long have you surfed?

11    A.   Pretty much since, I don't know, I've been going to the

12    beach.   Maybe since I was, like, eight years old.

13    Q.   How long have you lived in San Diego?

14    A.   I was born in Coronado in the Naval Air Station and grew up

02:12   15    locally in Navy housing, so my whole life I've lived in the

16    county.

17    Q.   Where are you currently employed?

18    A.   For FlowRider, Inc.

19    Q.   Where is FlowRider, Inc., located?

02:13   20    A.   Right down the street here in Pacific Highway.

21    Q.   Is FlowRider, Inc., related to WhiteWater West Industries?

22    A.   Yes, we're owned by WhiteWater West Industries.

23    Q.   If I looked at FlowRider's website, what would it say your

24    title is?

02:13   25    A.   Fearless leader.

1    Q.   Why does it say "fearless leader"?

2    A.   Kind of title-averse.  You know, I haven't had a title on

3    my business card in 20 years.  I think they're overrated, and

4    so it was just something that popped up and into the website.

02:13  5    Q.   Is WhiteWater, your parent company, a little more formal

6    than you are?

7    A.   Substantially more formal.

8    Q.   If I looked at WhiteWater's website, what would it say your

9    title is?

02:13  10   A.   President of FlowRider, Inc.

11   Q.   What does your job as president of FlowRider, Inc., entail?

12   A.   Pretty much it encompasses running the business of sheet

13   waves for WhiteWater West Industries.  That would include

14   supervising design, engineering, manufacturing, project

02:14  15   services, sales, marketing.

16   Q.   Before you worked in the sheet wave industry, what other

17   industries did you work in?

18   A.   I grew up in the computer head and disk industry and

19   morphed into running an injection molding company that made

02:14  20   underwater flashlights and accessories for the dive equipment

21   market.  Spent quite a bit of time in the golf industry.

22   Worked in hand tool industry and also outdoor kitchens,

23   high-end, super high-end grills and accessories, outdoor

24   refrigerators and stuff.

02:14  25   Q.   Not to go through all that, but just, you mentioned the

1    golf industry.  Where did you work in the golf industry?

2    A.   I worked for Links Golf and I worked for Callaway Golf.

3    Q.   What was your role at Callaway?

4    A.   I was an officer and VP of manufacturing and logistics,

02:15  5    responsible for the global manufacturing and distribution,

6    warehousing, et cetera, of the product.

7    Q.   Do you have any formal engineering training?

8    A.   None.

9    Q.   During your career, have you worked with engineers?

02:15  10   A.   Constantly.

11   Q.   How long have you held roles that involve working with

12   engineers?

13   A.   For at least 20 years.

14   Q.   Was working at WhiteWater or FlowRider, Inc., your first

02:15  15   job in the sheet wave industry?

16   A.   No.

17   Q.   What was your first job in the sheet wave industry?

18   A.   I was hired by Tom Lochtefeld at Wave Loch.

19   Q.   When did you start working at Wave Loch?

02:15  20   A.   About February of 2008.

21   Q.   What was your title there?

22   A.   COO.

23   Q.   Chief Operating Officer?

24   A.   Correct.

02:15  25   Q.   When you worked at Wave Loch as the Chief Operating

1    Officer, what did you do?

2    A.   Substantially the same things that I do today.

3    Q.   When you joined the Wave Loch company in 2008, what product

4    lines did it sell?

02:16    5    A.   It was selling FlowRiders and FlowRiders in their own box

6    called a Wave in a Box and FlowBarrels.

7             MR. SCOTT:  So put up 387 quickly just to make sure

8    we're on the same page.

9    BY MR. SCOTT:

02:16    10   Q.   I think we all know by now.  Is this FlowRider?

11   A.   That's a FlowRider Single, yes.

12   Q.   All right.

13            MR. SCOTT:  Can you put up 385, please?

14   BY MR. SCOTT:

02:16    15   Q.   Is that a FlowBarrel?

16   A.   That would be a FlowBarrel Ten.

17   Q.   Who did Wave Loch target as its customers for these

18   FlowRider products?

19   A.   Early on, it was the water park industry, as a water park

02:16    20   attraction, and then kind of naturally morphed into the

21   municipal market where municipal pools were dying, so they were

22   being replaced, and then hotels and resorts, the cruise ship

23   business, and in the stand-alone piece where it would just be a

24   FlowRider with food and beverage.

02:17    25   Q.   When you joined Wave Loch, what was its position in the

1  sheet wave industry?

2  A.   It was the leader in the marketplace.

3  Q.   During your time working at Wave Loch, did you develop any

4  new product lines?

02:17  5  A.   We developed some new products.

6  Q.   Like what?

7  A.   When I first came on board, we were working on a new mobile

8  wave that was -- it was on its own truck and chassis,

9  basically.  It was actually a very unique product.  We

02:17  10  developed a 180-degree wave.  We started the development of

11  that.  It didn't get installed until after the transition, but

12  it was called Huevos.

13  Q.   When you say "after the transition," what are you referring

14  to?

02:17  15  A.   The acquisition of the IP and trademarks by WhiteWater.

16  Q.   Okay.  When you worked at Wave Loch, did Wave Loch file for

17  patents to protect its inventions?

18  A.   Yes.

19  Q.   Any patents you remember being filed while you worked at

02:18  20  Wave Loch?

21  A.   Probably a drainage called pillow padding patent was filed

22  and awarded, I believe, while I was there.

23  Q.   Was obtaining patents an important part of Wave Loch's

24  business?

02:18  25  A.   It was an important part of Tom's life.

1   Q.   Based on your experience at Wave Loch, did Wave Loch's

2   employees know that it was important for the company to file

3   for and obtain patents?

4   A.   Yes, I believe so.

02:18   5   Q.   Why do you think that?

6   A.   Well, I mean, we would sit in meetings in Tom's office --

7   and by "we," fairly small company, about eight people.  So half

8   of us would go to Tom, in Tom's office, and have brainstorming

9   sessions, and much of the conversation was well, is there

02:18   10   something here that we can wrap some IP around?

11   Q.   Other than the '589 patent, did Wave Loch have any patents

12   that covered aspects of the FlowRider products?

13   A.   Yes.

14   Q.   Like what?

02:18   15   A.   Well, I believe there was a containerless ride patent early

16   on, and he also received a patent on a tension fabric ride

17   surface, which is like a trampoline ride surface, so when you

18   ride on it, your head doesn't just thud into the ride surface;

19   it bounces.  It's a little less forgiving.

02:19   20   Q.   Did you supervise employees at Wave Loch?

21   A.   Yes.

22   Q.   During your time at Wave Loch, how many employees did you

23   supervise?

24   A.   When I came on board, I think there was about seven

02:19   25   employees and kind of flattened the organization, so most of

1   them reported to me.

2   Q.   Did you supervise Mr. Alleshouse?

3   A.   Yes.

4   Q.   Were you there when Mr. Alleshouse was hired?

02:19   5   A.   No.

6   Q.   He was already there?

7   A.   He was already there.

8   Q.   What did you do in your first few months on the job at Wave

9   Loch?

02:19   10   A.   I spent my life going into certain businesses and kind of

11   getting under the hood, so to speak, like a mechanic.   And so

12   the first thing to do is try and figure out if the right people

13   are in the right places.   Tom had mentioned do what you want,

14   but the people you have are who you have.   So it was kind of --

02:20   15   you know, he was very loyal to the people working for him, so

16   finding kind of the right roles for the right people.

17   Q.   Okay.   Did you assign Mr. Alleshouse to any specific role?

18   A.   Yeah.   When I first came on board, both Richard and

19   Ori Vicente, I believe they were working directly for another

02:20   20   engineer named Steve Hovey and after a couple months changed

21   that relationship so that Richard and Ori and Steve, the three

22   of them, reported to me.

23   Q.   Did you give Mr. Alleshouse any specific job duties when

24   you changed that reporting structure?

02:20   25   A.   Yes, specifically I made him responsible for the FlowRider

1   product line.

2   Q.   When you looked under the hood at Wave Loch, did you find

3   any problems?

4   A.   Well, yeah.  I mean, we were -- I believe we had just

02:20   5   gotten into a dispute with a supplier because they provided

6   steel that wasn't to spec, but we never provided them 2D

7   drawings; they were interpreting a 3D model.  I mean, it was a

8   bit of a mess.  So --

9   Q.   Among other things, there was a lack of 2D drawings?

02:21   10   A.   Amongst other things, yes.

11   Q.   Okay.  When you say you put Mr. Alleshouse in charge of the

12   FlowRider, what do you mean?

13   A.   The product, soup to nuts.  You know, I wanted the products

14   completely documented so that we would never have that

02:21   15   stainless issue again.  It's hard enough, but when you give a

16   supplier incorrect data to have them provide hundreds of

17   thousands of dollars of product, it becomes a problem.  So he

18   was responsible for documenting the products from start to

19   finish.  And really, I wanted him to be like the product

02:21   20   manager for that product line.

21   Q.   Did you think that Mr. Alleshouse was capable of being the

22   product manager for the FlowRider product line?

23   A.   Yeah, I think so.  I mean, I realized he had -- he had

24   processing aptitude, like I understood that he worked at

02:22   25   Hunter, and Hunter is a company that makes irrigation stuff,

339

1    you know, and injection molding facilities, so there was kind

2    of a common thread and a common manufacturing, engineering-type

3    aptitude that we really needed in the business.

4    Q.  Mr. Alleshouse as a supervisor, do you believe he was aware

02:22    5    of the Wave Loch patents covering the FlowRider products?

6    A.  I believe so, yes.

7    Q.  What makes you think that?

8    A.  We -- when I got there, we weren't putting the markings,

9    the patent markings, on our tractions.  And when I became aware

02:22    10    of it, we found a way to get those patents listed on our

11    product, and Richard was responsible for that.

12    Q.  What does "marking the product" mean?

13    A.  I believe if you have a product, you want to protect it.

14    You need to put the patent numbers on it.

02:23    15    Q.  Okay.  How did Wave Loch ultimately mark its Rider patent

16    numbers?

17    A.  I'm sorry?  Can you say that again, please?

18    Q.  I understood you to say that you talked with

19    Mr. Alleshouse, and you figured out a way to mark the patents

02:23    20    on the product?

21    A.  Yes.

22    Q.  How did you ultimately do that?

23    A.  Ultimately, we put them on the ride surface.

24            MR. SCOTT:  Can I see Exhibit 475, please?

25

340

```
         1  BY MR. SCOTT:
         2  Q.   Do you recognize this document?
         3  A.   Yeah, it says, "Plan view of logo placement."  This was a
         4  ride surface drawing.
02:23    5  Q.   Okay.  Does this ride surface drawing show where the patent
         6  markings would go?
         7  A.   Yeah, they would be down there, that little white block in
         8  the left-hand corner of the ride surface.
         9  Q.   You can draw on the screen with your finger, if you want.
02:23   10  A.   Oh, sorry.  It's right there.  I forgot about that.
        11        MR. SCOTT:  I'd like to show Exhibit 472.  Is this
        12  what -- if I could have blown up the last exhibit.
        13  BY MR. SCOTT:
        14  Q.   And look in that corner.  Is that what's shown there?
02:24   15  A.   Correct.
        16  Q.   Is '589 on this list of Exhibit 472?
        17  A.   Yeah, it's right here.  Not very good at drawing, so . . .
        18  Q.   Why didn't Wave Loch mark its products before you got
        19  there?
02:24   20  A.   Why didn't Wave Loch mark its products?
        21  Q.   Do you know?
        22  A.   No.
        23  Q.   You just got there and realized they didn't do --
        24  A.   Yeah, it was one of the things that wasn't happening.
02:24   25  Q.   Okay.  Changing tracks a little bit, have you ever invented
```

1    something and obtained a patent?

2    A.   Yes.

3    Q.   What did you invent?

4    A.   When I was in the hand tool industry, I had come out of the

02:24    5    golf industry, and I realized that -- if you've ever swung a

6    framing hammer, they weigh between, generally, about 20, 36

7    ounces, pretty heavy.  And for a framer pounding nails all day,

8    you know, you'll see carpenters that have tennis elbow and

9    whatnot, so I thought what a great thing it would be to

02:25    10    create -- you know, in golf, it's all about club head speed, so

11    why not take the clubhead speed analogy and give it to a

12    hammer?

13        So I went to the supply chain that I basically knew in golf

14    and asked them if we could build a hammer handle out of carbon

02:25    15    fiber just like a golf shaft, and then we would use 17-4

16    stainless for the head, just like a golf head, like a 5 iron,

17    and then we used titanium to protect it.  By "protect it," I

18    mean like on the shaft, put an overstrike plate, so when you

19    miss, swing and miss, it wouldn't shatter the very expensive

02:26    20    handle that we were building.  And so it was just kind of

21    taking a combination of elements that I learned from the past

22    to create a hammer that weighed 15 ounces, and, you know, you

23    could really drive a nail with that thing.

24    Q.   You ultimately got a patent on this hammer?

02:26    25    A.   Yes.

342

1  Q.  If I put your hammer patent in front of you, could you tell

2  me what the claims meant?

3  A.  Oh, probably not.

4  Q.  Would you understand generally what the patent covered?

02:26   5  A.  Maybe.

6  Q.  You would know it covered your hammer with the titanium

7  head and the carbon fiber shaft?

8  A.  Yeah, I developed it with an engineer on staff, and he --

9  you know, it's my idea, but he did a substantial amount of the

02:26   10  dirty work.

11  Q.  When you obtained the patent on your hammer, what did you

12  understand having a patent meant?

13  A.  That it was mine and that nobody could use it unless they

14  wanted to pay me.

02:27   15  Q.  Are you familiar with the '589 patent?

16  A.  Yes.

17  Q.  Have you seen it?

18  A.  Yes.

19  Q.  Just like your hammer patent, do you understand what the

02:27   20  claims mean?

21  A.  Barely.

22  Q.  Okay.  But do you have an understanding of what the patent

23  covers?

24  A.  Yes.

02:27   25  Q.  What is your understanding of what the '589 patent covers?

343

```
       1   A.   Well, my understanding is that it's a -- it's a patent that
       2   provides -- it's kind of a key embodiment in terms of allowing
       3   somebody to ride up and over the nozzle cover to provide
       4   protection so that people don't get hurt during that.
02:27  5   Q.   Before we get too far off the hammer, was your hammer a
       6   commercial success?
       7   A.   No, no.
       8   Q.   Why not?
       9   A.   Well, I think you could probably buy a nail gun for about
02:27 10   the same price as our hammer.  So it was a beautiful hammer,
      11   though, I can tell you.  It was awesome looking.
      12   Q.   A little expensive to build a titanium hammer?
      13   A.   I mean, we sold a couple thousand, but, you know, it wasn't
      14   a commercial success.
02:28 15   Q.   Okay.  Based on your experience working at Wave Loch and
      16   now WhiteWater, do you believe the '589 patent is important?
      17   A.   Yeah, absolutely.
      18   Q.   Why?
      19   A.   Well, I mean, if you -- you've seen the -- like the Hyland
02:28 20   Hills venues and stuff like that.  I mean, it was the patent
      21   that allowed Tom to shrink the unit down and to make it, from a
      22   square footage standpoint -- I mean, right now FlowRider Double
      23   is like 2,000 square feet.  It's a fairly small unit.  And
      24   before it was substantially larger, with a lot larger civil
02:28 25   works costs for the client.  So we're saving the client money,
```

1    we reduced the cost of goods, which saves us money, allowed Tom

2    probably to sell it for less, provide better sight lines, which

3    is really key because that's really where the money is:   in

4    serving food and beverage while you're watching your little

02:29    5    grandchildren now ride.  It was really a key piece.

6    Q.   Your grandchildren ride FlowRiders now?

7    A.   My eldest one has.

8    Q.   How does WhiteWater advertise its FlowRider products?

9    A.   We don't advertise that much.  I mean, a lot of our

02:29    10   advertising is via our best clients, like Royal Caribbean, but

11   we do -- we do send a lot of information out through the Web.

12   We also have campaigns that we direct over social media:

13   LinkedIn, Facebook, Instagram, Twitter.  We have the very

14   standard brochures, which we kind of abhor brochures.  And then

02:30    15   we have a pretty comprehensive series of websites, actually.

16   Q.   Historically, did WhiteWater advertise the '589 patent with

17   a nozzle flap as a feature of its ride?

18   A.   No.

19   Q.   Why not?

02:30    20   A.   I think it was more that we were looking at what we were

21   doing now versus what we did then.

22   Q.   Okay.  I want to back all the way up to when you started

23   working at Wave Loch.  How were nozzle flaps made when you

24   started working at Wave Loch?

02:30    25   A.   They were made in the field.  They're made with -- using

1   some kind of substrate, either fiber plate or steel or I think

2   we've even used some PVC at one time, with foam bonded on top,

3   wrapped in our blue vinyl, and bolted together from there.

4   Q.   I think we've heard some of this, but briefly, how does the

02:31   5   nozzle flap work, to your understanding?

6   A.   Well, it rests basically on the ride surface, and, you

7   know, it has that downward bias, and when the ride starts up,

8   it lifts the -- it lifts the nozzle flap out of the way so the

9   stream of water is coming out and then allows the water to move

02:31   10   up and over the top of the ride surface.

11   Q.   I'm going to give you a copy of Exhibit 384.  I'm giving it

12   to you because it's a bunch of pages.  Could you take a second

13   and flip through here and make sure you understand what the

14   document is.

02:31   15   A.   Okay.

16   Q.   Can you tell me what this document is?

17   A.   Well, it's a Wave Loch drawing for a nozzle flap left

18   assembly there at the top.  And the subsequent drawings

19   are -- they look like raw material fabrication drawings.

02:32   20   Q.   As far as you can tell, does this accurately depict how the

21   nozzle flap was constructed in 2009 at Wave Loch?

22   A.   Probably.  I never built one myself, but, you know, it

23   looks like the materials that are used.

24   Q.   Is it basically the same as the nozzle flap that WhiteWater

02:32   25   uses today?

346

1  A.   Basically.  I mean, I'm sure we've made a few minor tweaks,

2  but it's probably pretty close.

3          MR. SCOTT:  I want to blow up the bottom right-hand

4  corner.  All the way down, please.

02:32   5  BY MR. SCOTT:

6  Q.   What's the date on this document?

7  A.   March 20, 2009.

8  Q.   To the left of that, do you see something that says "drawn

9  by"?

02:33   10  A.   "RRA."

11  Q.   Do you know whose initials RRA is?

12  A.   It's -- it must be Richard Alleshouse.  I don't know his

13  middle name, though.

14  Q.   Okay.  I was going to ask you, did you have any employees

02:33   15  that you supervised during your time at Wave Loch with those

16  initials besides Mr. Alleshouse?

17  A.   Not that I know of.

18  Q.   You believe he drew these?

19  A.   I'm pretty certain he did.

02:33   20  Q.   You see the box at the bottom that says "confidential

21  information"?

22  A.   Yes.

23  Q.   What's the purpose of that?

24  A.   It's to let anybody know that has access to the drawing

02:33   25  that it's confidential and states the ownership.

```
 1   Q.   Do you see there's a list of patents there?

 2   A.   Yes.

 3   Q.   I want to point out that the '589 patent is not listed

 4   here.  Do you have any idea why that would be?

 5   A.   Just part of the overall cleanup of the organization.

 6   Q.   Same thing?

 7   A.   Much like the patents -- much like the patents missing from

 8   the attraction.  It doesn't surprise me that a patent number

 9   would be missing from this.

10   Q.   Okay.  I'm going to show you Exhibit 383.  So take a second

11   and flip through it.

12        MR. SCOTT:  And, Gary, if you can take a second and

13   flip through the pages so that the jury can see it.

14   BY MR. SCOTT:

15   Q.   FlowRider, do you recognize this document?

16   A.   Yes.

17   Q.   What was this?

18   A.   It's a very nicely done set of installation instructions

19   and construction instructions for nozzle flap.

20   Q.   How is this different than the document we just looked at?

21   I think it was 384.

22   A.   The document we just looked at was like -- had these pieces

23   in it, I believe.  And if you go through, you'd see the steel

24   elements of the prior document in it.  But this is -- this is

25   why Richard was in the role he was in.  You know, he had great
```

1    attention to detail, and this is -- I just got goosebumps

2    thinking about it, Richard.  It's a nice set.

3    Q.  Looking here, you said the other one, 384, was just the

4    steel.  This includes all the parts:  the vinyl, the foam,

02:35    5    everything?

6    A.  I'm sorry, can you repeat that?

7    Q.  It's not just the steel:  It's the vinyl, the foam,

8    everything?

9    A.  Yes, it's a full-blown instruction.  I mean, you could --

02:35    10    Q.  If you flip to the second page at the top, it says, "Step 1

11    and then Step 2"?

12    A.  Correct.

13    Q.  This whole thing, really just a step-by-step instruction on

14    exactly how Wave Loch built and how to assemble a hinged nozzle

02:36    15    flap?

16    A.  Yeah, the purpose of this document is if you got run over

17    by a bus, somebody could do it.

18    Q.  Okay.  Blowing up the bottom right-hand corner again, what

19    are the initials under "drawn by"?

02:36    20    A.  "RRA."

21    Q.  You believe that to be Richard Alleshouse?

22    A.  Yes.

23    Q.  Have you ridden a FlowRider?

24    A.  Yes.

02:36    25    Q.  Do you watch other people ride FlowRiders?

349

```
        1    A.   Quite a bit, yes.

        2    Q.   Have you seen other people ride over the nozzle cover?

        3    A.   I have, yes.

        4    Q.   Have you ridden over the nozzle cover?

02:36   5    A.   Yeah, but I'm a poor example of doing a nozzle grind.

        6    Q.   Do you do it to exit or to try to do a trick?

        7    A.   You could call my tricks less than spectacular, but I've

        8    tried to do it.

        9    Q.   I'd like to put up -- what happens when somebody rides over

02:37  10    the nozzle flap?

       11    A.   The nozzle depresses and does what it's supposed to do.

       12         THE COURT:   What kind of tricks do you do?  Like sit?

       13    Lie down?  Roll over?

       14         THE WITNESS:   I can ride switch stance and maybe do a

02:37  15    360.  That's about it.  At my age, I try not to get air.

       16         MR. SCOTT:   Thank you, Your Honor.  I appreciate that.

       17    I'd like to look at Exhibit 250, please.

       18    BY MR. SCOTT:

       19    Q.   What's happening in this picture?

02:37  20    A.   This young gentleman is -- looks like he's having some

       21    excitement.  He's riding over the nozzle, and as you can see

       22    there, the nozzle is depressing, and it's doing what it's

       23    intended to do.

       24    Q.   How can you see that the nozzle is depressing?

02:38  25    A.   Well, you can see, like, a little change in elevation right
```

1    there, I believe, from one nozzle to the next.

2    Q.   I'm sorry.  We've been saying "nozzle."

3    A.   Nozzle flap, nozzle cover, yes.  So you can see the nozzle

4    is pressing down into the water there.

02:38   5    Q.   Do you believe --

6              THE COURT:  Do you mean the nozzle flap?

7              THE WITNESS:  The nozzle flap.  Sorry about that.

8              MR. SCOTT:  Thank you.

9    BY MR. SCOTT:

02:38   10   Q.   Do you believe the sheet waves are safe products?

11   A.   I believe that inherently they're safe, but it is a board

12   sport activity, and when you're standing up in this area right

13   here and you catch a rail, you're going to fall, and if you

14   snowboard and you catch a rail and you fall, you know, it's

02:38   15   painful, so you catch a rail here and you fall the wrong way,

16   it can be painful.

17   Q.   Have there been injuries on FlowRiders?

18   A.   Yes.

19   Q.   To your knowledge, have any of the injuries on FlowRiders

02:39   20   been due to the nozzle cover?

21   A.   I don't remember a specific claim due to the nozzle flap or

22   cover assembly, no.

23   Q.   When Mr. Alleshouse worked at Wave Loch, did you give him

24   any special treatment of any kind?

02:39   25   A.   I was a champion of Richard.  And so when he said that he

1    needed Friday -- every other Friday off to go through his MBA

2    program, I acknowledged that and gave him every other Friday

3    off.

4    Q.   Was this paid time off or unpaid?

02:39    5    A.   I wasn't asking for a paid-time-off slip from him, so it

6    was -- you know, it was paid time.  I mean, he worked

7    additional hours here and there, but basically it was comped.

8    Q.   Why did you comp him the time off for his MBA?

9    A.   Because like I said, I was a champion of Richard, and, you

02:40    10    know, when you look in your organization, you look for

11    successors, and I thought Richard was mine, so pure and simple.

12    Q.   When did Mr. Alleshouse leave Wave Loch?

13    A.   July 27, 2012.

14    Q.   You sound pretty specific about that.  I put up Exhibit

02:40    15    400.

16    A.   Yes, I'm pretty specific about it because I had surgery the

17    day before, on the 26th, so . . .

18    Q.   Not the FYI at the top, but the second email at the bottom,

19    is this Mr. Alleshouse's resignation email to you?

02:40    20    A.   I don't think he emailed it until he came in with a printed

21    copy and resigned.  In other words, he just didn't email it and

22    walk out the door.  I mean, he walked in with a printed copy of

23    this and then emailed it to me after.

24    Q.   He came and told you and said hey, Marsh, I resign?

02:41    25    A.   Yes, that's correct.

1  Q.  Did he give you any reason for his resignation?

2  A.  Well, nothing more than he wanted some time off to pursue

3  other opportunities.

4  Q.  So basically the same thing that it says in this email, he

5  wanted time off?

6  A.  Pretty much.

7  Q.  Okay.  Was this before or after Mr. Alleshouse got his MBA,

8  to your understanding?

9  A.  I think it was coincided right with it.  I think he was

10  right at the end of his MBA.  In fact, he walked in in slacks

11  and a long-sleeve dress shirt, and that wasn't exactly -- or is

12  exactly our dress code, so --

13  Q.  What's your dress code?

14  A.  Generally shorts and some kind of decent-looking shirt,

15  hopefully.

16  Q.  When do you recall first learning about Pacific Surf

17  Designs?

18  A.  It was probably sometime later in August.  I can't

19  remember -- I'm not certain as to the exact date.  It might

20  have been late August or early September, sometime in there.

21  Q.  Do you know when Mr. Alleshouse started Pacific Surf

22  Designs?

23  A.  I think it was incorporated mid-August.

24  Q.  He didn't really take much time off, did he?

25  A.  I don't think so.

1    Q.   What was your reaction when you found out that

2    Mr. Alleshouse had cofounded Pacific Surf Designs?

3    A.   I was pissed off.

4    Q.   Why?

02:42    5    A.   Because, well, first of all, he said, "I'm taking some time

6    off to pursue other opportunities," and then to go out and

7    start a competing business, you could say it was pretty

8    aggravating.

9    Q.   Okay.  How did you know it was a competing business?

02:42    10    A.   Well, I mean, if it's a sheet wave business and you're

11    building something that looks like a FlowRider, then it's going

12    to be a competing business.

13    Q.   Okay.  Since 2012, what sheet wave products has WhiteWater

14    sold?

02:43    15    A.   Since 2012?

16    Q.   Yeah.

17    A.   We've sold a wide range of FlowRiders including Single,

18    Double, Wave in the Boxes, Mobile FlowRiders, a couple

19    variations of a product we called Huevos.  We have also

02:43    20    recently sold a product that's a curling wave, not a barreling

21    wave.

22    Q.   How many sheet wave products has WhiteWater sold since

23    2012?

24    A.   Probably over a hundred.

02:43    25    Q.   All of those sheet wave products use hinged nozzle flaps?

354

```
      1  A.   Correct.
      2  Q.   In the U.S., who is permitted to sell products using
      3  Whitewater's hinged nozzle flap?
      4  A.   That would be FlowRider, Inc., and Aquatic Development
02:43 5  Group.
      6  Q.   What's Aquatic Development Group?
      7  A.   ADG is our licensee in the USA.
      8  Q.   Okay.  During your time in the sheet wave industry, have
      9  there been other competitors in the marketplace selling similar
02:44 10 products?
     11  A.   Yes.
     12  Q.   Do any of your product competitors, setting aside Pacific
     13  Surf Designs for the moment -- do any of your competitors have
     14  products in the United States that use a nozzle flap?
02:44 15 A.   Not that I'm aware of.
     16  Q.   Are you aware of a company called Murphy's Waves?
     17  A.   Yes.
     18  Q.   Do you know what Murphy's Wave's product is?
     19  A.   Yeah, it's called StingRay.  I think it was shown earlier.
02:44 20 Q.   Have you seen -- have you been in the StingRay?  I know
     21  Mr. Lochtefeld said he had.
     22  A.   I have not seen a StingRay in person.
     23  Q.   Have you seen pictures or videos of the StingRay?
     24  A.   Yes.
02:44 25 Q.   As far as you can tell, is there a rideover nozzle cover
```

1    that the rider actually goes over on a StingRay?

2    A.    No.

3    Q.    Do you know how many StingRays have been sold in the

4    United States?

02:44    5    A.    To the best of my knowledge, one.

6    Q.    Okay.  We talked with Mr. Lochtefeld about American Wave

7    Machines and its SurfStream.  Do you know how many SurfStreams

8    have been sold in the U.S.?

9    A.    I think maybe one or two.

02:45    10    Q.    Have you seen pictures or video of SurfStream?

11    A.    Yes.

12    Q.    Your understanding is SurfStream has a nozzle cover that

13    can be ridden over by the rider?

14    A.    No, it's a different wave.  It's a deep-flow wave with

02:45    15    water about like this, and it's moving slower, but there's no

16    way you could ever get to the nozzle.  The ride area on it is

17    maybe like this much distance by the width.

18    Q.    Okay.

19    A.    You couldn't go past there.  There's too much water going

02:45    20    that way.

21    Q.    What about sheet wave competitors outside the U.S.?  Do you

22    have those?

23    A.    Oh, yes.

24    Q.    Do any of those use nozzle flaps, ones people can ride

02:45    25    over?

1 A. I think there are some people that do.

2 Q. Have you sued any of them?

3 A. No.

4 Q. Why not?

02:45 5 A. Because we don't have protection in the countries that they

6 exist and that they're selling into, for the most part.

7 Q. For example, are you aware of a company called Wavesurfer?

8 A. Yes.

9 Q. Do you know the owner of Wavesurfer?

02:46 10 A. Yes.  His name is Karel Dubois.

11 Q. Do you know where Mr. Dubois sells his products?

12 A. In Europe.

13 Q. To your knowledge, has he ever sold a product in a country

14 where WhiteWater has a nozzle flap patent?

02:46 15 A. I'm not positive of that.

16 Q. So there are other people that use these things, but for

17 some reason, you just can't go after them?

18 A. That's correct.

19 Q. Do you know how any of those competitors outside this

02:46 20 country make their rideover nozzle flap?

21 A. No.

22 Q. So you don't know whether they do this, whether they do

23 this, or they do this?

24 A. I haven't been under the hood of any of their attractions.

02:46 25 Q. Okay.  I want to show you Exhibit CS.

1    A.   Can you blow that up?

2    Q.   I'm going to bring you a copy.

3    A.   That works.   Thank you.

4    Q.   Do you recognize this email?

02:47   5    A.   Yes.

6    Q.   You sent this email?

7    A.   I did.

8    Q.   I'd like to direct you to the second paragraph where you

9    say, "The FlowRider sheet wave is under attack."   Why did you

02:47   10   say that?

11   A.   Well, it might have been a little dramatic, but it's -- I

12   said it because we had an estimator that sent out an estimate

13   for a FlowRider at a price of USD 937, up in the paragraph

14   above, plus USD 27 for installation.   So basically what we're

02:47   15   saying is we had an estimating group who thought we were going

16   to sell FlowRiders for 965,000, and our list price at the time

17   was like 850,000.   So I was a little bit upset that somebody

18   would take liberties with our pricing structure.   And the fact

19   is, if that price went out there, we'd never get a FlowRider

02:48   20   sold at that price.   And so I was trying to implore upon people

21   we're under attack.   We've got a bunch of people coming into

22   the marketplace and nipping at the heels; you can't just go out

23   there and quote a price like this.   It's a joke.

24   Q.   Okay.   The second sentence of that second paragraph says,

02:48   25   "This attack will ultimately lead to the commoditization of the

1   sheet wave industry."  What did you mean by that?  What's

2   "commoditization" mean?

3   A.   It just means that the pricing structure of the product is

4   going to go down.

02:48  5   Q.   I'd like to point out you listed a few specific competitors

6   that were attacking the FlowRider sheet wave:  Murphy's Waves,

7   Wavesurfer, American Wave Machines.

8   A.   Yes.  Pacific Surf Designs.

9   Q.   You referred to Murphy's Waves as "our subsidiary."  What

02:49  10   did you mean by there?

11   A.   That's a wholly -- WhiteWater owns a portion of Murphy's

12   Waves.  It's a very unique situation.

13   Q.   So Murphy's Waves is owned by WhiteWater, but it

14   occasionally sells products that compete with you?

02:49  15   A.   Yes.

16   Q.   Okay.  And we talked about Wavesurfer and American Wave

17   Machines.  You don't like having competitors in the sheet wave

18   marketplace, do you?

19   A.   Well, I mean, I'm a competitor.  You know, I grew up

02:49  20   playing sports.  It's always about squishing the competition.

21   Q.   Okay.  Did you squish the competition with Murphy's by

22   suing them?

23   A.   No.

24   Q.   Does Murphy's Wave use a rideover nozzle cover?

02:49  25   A.   No.

```
 1   Q.   Did you sue Wavesurfer?

 2   A.   No.

 3   Q.   Do they use a nozzle cover?

 4   A.   I'm uncertain.  I haven't seen their wave up close and

 5   personal.

 6   Q.   But it's in Europe someplace, right?

 7   A.   It's in Europe.

 8   Q.   What about American Wave Machines?  You said they didn't

 9   use a nozzle cover?

10   A.   No.

11   Q.   What about Pacific Surf Designs; do they?

12   A.   Yes.

13   Q.   I'd like to show you Exhibit CW.  There's another long

14   email chain, so I'll hand some copies out.

15        MR. SCOTT:  I'd like to start at the last page of this

16   one, please, the last email.  If you can scroll up just a bit.

17   Gary, can you get to the email that's at the top of page 2 of

18   Exhibit CW?

19   BY MR. SCOTT:

20   Q.   Who's Andrew Thatcher?

21   A.   He's our sales guy at FlowRider.

22   Q.   Do you know who Juha is that he's writing to?

23   A.   Yes.

24   Q.   Who is that?

25   A.   He was a customer of ours in a venue where we built a
```

1    FlowRider in Thailand.

2    Q.   Okay.  So what is Andrew saying to Juha here?

3    A.   I think he's just saying we want to continue to work

4    together --

02:51   5    Q.   Okay.

6    A.   -- going forward.

7    Q.   Go up to the next email in this chain that's at the bottom

8    of page 1.  Looking at the chain in front of you, I see that

9    you're not copied here, but this was ultimately forwarded to

02:51   10   you.  Is that right?

11   A.   Right.

12   Q.   Okay.  Is Juha specifically asking questions to Andrew

13   Thatcher about Pacific Surf Designs?

14   A.   Not that I'm aware of.

02:52   15   Q.   If you look at the bottom of the second paragraph of that

16   email from Juha to Andrew Thatcher.

17   A.   Oh, yes.

18   Q.   Okay.

19   A.   Sorry.

02:52   20   Q.   It looks like the next one up is Andrew forwards it to you.

21   He says "FYI."  I'm sorry.  What is the question that Juha is

22   asking?  I should have asked you that before I moved on.

23   A.   He's looking for reasons why we're a better investment than

24   PSD or the Chinese version.  I guess they were entertaining a

02:52   25   Chinese version of our -- of a sheet wave as well.

1    Q.   Looking at the top email, it looks like you're writing

2    Mr. Thatcher and giving him some of the reasons you're better?

3    A.   Yeah.  Well, I think our tension fabric ride surface is a

4    great product, and the recovery system that we built is a very

02:52   5    soft landing when you land in the rear recovery, so I think

6    those two pieces, and the fact that we've -- you know, really

7    building our business around kind of a service mentality is

8    really key to us.

9    Q.   In the third line here you say, "We are going to sue

02:53   10   Richard so he won't even be in business."

11   A.   Yes.

12   Q.   You're referring to Richard Alleshouse?

13   A.   Yes.

14   Q.   Why did you write that?

02:53   15   A.   Because probably the same reason I was upset with Richard

16   over leaving the business, but the fact is, is so that he

17   wouldn't copy our product.

18   Q.   Okay.  I notice that this is dated October 2, 2013.  Did

19   you know whether WhiteWater was going to sue Richard Alleshouse

02:53   20   in October of 2013?

21   A.   The acquisition wasn't even complete, so, I mean, it's hard

22   to say.

23   Q.   Okay.  Did you intend Mr. Thatcher to tell Juha that you

24   were going to sue Richard?

02:53   25   A.   No.

```
 1    Q.   Why not?
 2    A.   He would know better.  This is not -- this is
 3    internal -- this is like a bathroom conversation, basically.
 4    Q.   Okay.  To your knowledge, did Mr. Thatcher ever tell Juha
 5    you were planning on suing Mr. Alleshouse?
 6    A.   Did Andrew ever tell Juha that we were?
 7    Q.   If you know.
 8    A.   I don't know.
 9    Q.   Okay.  Do you know what products PSD sells?
10    A.   Yes.
11    Q.   How do you know?
12    A.   From their website.
13              MR. SCOTT:  I'd like to bring up Exhibit 158.
14              THE WITNESS:  And from the sales that they've had as
15    well.
16              MR. SCOTT:  Would you bring up Exhibit 158?
17    BY MR. SCOTT:
18    Q.   I apologize.  This is a very bad version of PSD's website.
19              MR. SCOTT:  Let's go to page 4, please, Gary.
20    BY MR. SCOTT:
21    Q.   Are these the products that Pacific Surf Designs
22    advertises?
23    A.   Yes.
24    Q.   I assume that's you circling stuff?
25    A.   Yeah, sorry, I was preempting the --
```

1    Q.   What are you circling?

2    A.   I'm circling the products that compete -- or that are

3    similar.

4    Q.   Okay.  You circled the ProFlow.  What is the ProFlow

02:55    5    similar to?

6    A.   It's similar to FlowRider Double or the FlowRider Single,

7    Double, Triple product line.

8    Q.   Okay.  What about the Supertube?  What is that similar to?

9    A.   It's very similar to our FlowBarrel Ten.

02:55    10           MR. SCOTT:  Just to compare the two, can you put up

11    Exhibit 24 next to Exhibit 387, please?

12    BY MR. SCOTT:

13    Q.   How similar is the ProFlow to the FlowRider?

14    A.   It's pretty similar except it's -- this has an -- angled

02:55    15    sidewalls.

16    Q.   Are there any other differences you're aware of besides the

17    angled sidewalls?

18    A.   What they use in the front and rear recovery is different

19    material.  And the ride surface is foam over a substrate-like

02:56    20    expanded metal or something rather than --

21    Q.   As opposed to your ride surface?

22    A.   Which is tension.

23    Q.   Okay.  Have you ever seen a PSD product in person?

24    A.   Yes.

02:56    25    Q.   Which one did you see?

1   A.   I believe this one here on the left.  It wasn't in

2   operation when I saw it, but I visited College Station.

3   Q.   I personally don't know whether that's College Station or

4   not, but you went to a PSD product in College Station?

02:56   5   A.   It looks like College Station.

6   Q.   Okay.

7   A.   I mean, that's why I mentioned it because I remember the

8   backdrop.

9   Q.   Did you ride the ride?

02:56   10   A.   No, no, it wasn't in operation.  It was -- the ride had

11   been built, but the nozzle flaps were out, the recovery was

12   out.  Apparently there were some pumps taken out and stuff.

13   Q.   You got to my next question.  You said the nozzle flaps

14   were out.  Did you see the nozzle flaps?

02:57   15   A.   Not installed, but I saw them, like, lying on the nozzle

16   deck.

17   Q.   What did they look like to you?

18   A.   I think they were on the nozzle deck.  I was with Andrew.

19   It looked very similar to our nozzle.

02:57   20   Q.   Okay.

21        THE COURT:  Tell you what.  It's 3:00.  Let's take a

22   brief recess.  I'm sure my court reporter could use some time

23   off, so let's come back at ten minutes after 3:00.  Please

24   remember my admonition.  Thank you.

03:07   25        (Recess.)

1    (Proceedings held outside the presence of the jury panel.)

2        THE COURT:  Counsel, I have a quick question for you.

3    How are we doing on time?

4        MR. SCOTT:  At the moment, we believe we're doing

03:07   5    okay.  I have -- I was discussing with counsel about three more

6    pages left, and this is after knocking out 22 pages, so I think

7    ten minutes, 15 tops left with -- on my direct.

8        THE COURT:  Overall, how are we doing?  How many more

9    witnesses do you have?

03:08  10        MR. O'HARE:  Well, let's see.  On our case, we've got

11    two witnesses by deposition that will be about how long?

12        MS. TRINH:  At most, 45 minutes.

13        MR. O'HARE:  So say under an hour.  We've got

14    Mr. Thatcher, we've got -- help me out, Roger.

03:08  15        MR. SCOTT:  Remaining on our side, we have

16    Andrew Thatcher, live; Geoff Chutter, live; our damages expert,

17    Robert Vigil, live; and we have the two witnesses that are

18    being read in.  They'll take about 45 minutes.

19        MR. O'HARE:  So, I mean, we're going to kind of

03:08  20    reassess tonight based on what happened today, but I think

21    we're on track to get our last witness on the stand probably

22    Friday morning.

23        THE COURT:  Okay.  Great.

24        Glenn, do me a favor.  Go get the jury, please.

03:09  25        MR. SCOTT:  We have a quick housekeeping matter,

1    Your Honor.

2            THE COURT:  What's that?

3            MR. SCOTT:  There were some discussions with the

4    courtroom deputy.  Apparently there were two exhibits that were

03:09   5    erroneously referred to in the direct of Dr. Stevick.

6    Mr. Taché referred to Exhibit 92 that is not on the list.  He

7    intended to refer to Exhibit 22, which is on the list.  He also

8    referred to Exhibit 113, which is not on the list.  He intended

9    to refer to Exhibit 133, which is on the list.  It's the exact

03:09   10   same document.  There were duplicates, and we removed

11   duplicates.

12           THE CLERK:  133 is not on the list.

13           MR. SCOTT:  I got it backwards.

14           THE CLERK:  133 is 113, and 92 is 22.

03:09   15           MR. SCOTT:  Yes.

16           THE COURT:  All right.  Any problems with that?

17           MR. THOMAS:  No problems, Your Honor.

18           THE COURT:  All right.  Great.  Thank you.

19       Go get the jury.

03:10   20       (Proceedings held in the presence of the jury panel.)

21           THE COURT:  Everybody, please be seated.

22       So some of you have been very diligently taking notes, and

23   you may have taken some notes about some exhibit numbers, and

24   just to make sure that there's not a misunderstanding, Counsel,

03:11   25   would you do me a favor and go through what we talked about off

1    the record.

2            MR. SCOTT:  With the Court's indulgence, I want to

3    make sure I say it right this time, Your Honor.

4            THE COURT:  That would be good.

03:11  5      Let me tell you what the problem is.  Sometimes in what's

6    known as discovery, there will be a document that will be given

7    a number, and sometimes witnesses refer to it by that number,

8    but that number may be different than a number that we're using

9    here in trial, and I think that happened with regards to two

03:11  10   documents.

11       So yes, sir?

12            PANEL MEMBER:  My question is on -- I'm Juror

13   Number 16, by the way.  On the videos, there's a three-digit

14   number, like it will say 001 and a -- and 024.  Is that the

03:11  15   exhibit number?

16            THE COURT:  No.

17            PANEL MEMBER:  Okay.

18            MR. SCOTT:  Well, it may be depending on the exhibit,

19   Your Honor.  The documents are numbered slightly differently.

03:12  20            THE COURT:  So never mind.

21       Explain it to us so there's no confusion.

22            MR. SCOTT:  So, for example, let's bring up Exhibit

23   158, which I was planning on using anyways.  So down in the

24   bottom right-hand corner, you see a box that says "Plaintiff's

03:12  25   Exhibit."  Can you blow that up?  So Plaintiff's Exhibit 158.

368

<table>
<tr><td></td><td>1</td><td>And then, Gary, can you unblow it up?  And then at the very</td></tr>
<tr><td></td><td>2</td><td>bottom, you see "158-1."  That's the page reference.  So if</td></tr>
<tr><td></td><td>3</td><td>it's a multipage document, you'll see "158-1," "-2," "-3," and</td></tr>
<tr><td></td><td>4</td><td>the overall confusion that we started with that the judge is</td></tr>
<tr><td>03:12</td><td>5</td><td>asking for explanation is during Dr. Stevick's examination,</td></tr>
<tr><td></td><td>6</td><td>Mr. Taché referred to Exhibit 92, and he intended -- it should</td></tr>
<tr><td></td><td>7</td><td>have been Exhibit 22.</td></tr>
<tr><td></td><td>8</td><td>THE COURT:  Which is the same document.</td></tr>
<tr><td></td><td>9</td><td>MR. SCOTT:  Which is the exact same document.  It just</td></tr>
<tr><td>03:13</td><td>10</td><td>has a different number on it, and there was a reference to</td></tr>
<tr><td></td><td>11</td><td>Exhibit 113, which should have been Exhibit 133.  And I think</td></tr>
<tr><td></td><td>12</td><td>I've done that right this time.</td></tr>
<tr><td></td><td>13</td><td>THE COURT:  Okay.</td></tr>
<tr><td></td><td>14</td><td>PANEL MEMBER:  Okay.</td></tr>
<tr><td>03:13</td><td>15</td><td>THE COURT:  Got it.  Great.  Thank you.  Appreciate</td></tr>
<tr><td></td><td>16</td><td>it.</td></tr>
<tr><td></td><td>17</td><td>All right.  Proceed.</td></tr>
<tr><td></td><td>18</td><td>THE CLERK:  Judge, hold on.  So 133 was said on the</td></tr>
<tr><td></td><td>19</td><td>record.  It should be 113?</td></tr>
<tr><td>03:13</td><td>20</td><td>MR. SCOTT:  Mr. Rivera, you're saying 133 is not on</td></tr>
<tr><td></td><td>21</td><td>the list, and 113 is on the list?</td></tr>
<tr><td></td><td>22</td><td>THE COURT:  So it should have been 113?</td></tr>
<tr><td></td><td>23</td><td>MR. SCOTT:  Yes.</td></tr>
<tr><td></td><td>24</td><td>THE CLERK:  Okay.</td></tr>
<tr><td>03:13</td><td>25</td><td>THE COURT:  Are you confused?  No.  You got it?  Okay.</td></tr>
</table>

1    Good.  Thanks.

2    BY MR. SCOTT:

3    Q.  All right.  I was bringing 158 up anyways, which is why I

4    used it as the example.

03:13  5        MR. SCOTT:  Can you go back to page 4, please, Gary?

6    BY MR. SCOTT:

7    Q.  Mr. Myrman, earlier you circled the ProFlow on the left and

8    the Supertube on the far right.  To your knowledge, has PSD

9    sold a ProFlow Quarterpipe or ProFlow Halfpipe?

03:14 10   A.  Not that I'm aware.

11   Q.  Okay.  Do you know if Pacific Surf Designs sells its

12   products to the same types of customers that WhiteWater sells

13   to?

14   A.  Yeah, I believe so.  I mean, Whale's Tale's a water park,

03:14 15   College Station is kind of a stand-alone, hybrid type of a

16   tank.  I think there's one in -- the one in France is, I

17   believe, part of a water park.  So generally the same

18   clientele.

19   Q.  Okay.  What's your most popular sheet wave ride?

03:14 20   A.  FlowRider Double is the most popular one.

21   Q.  What does WhiteWater sell the FlowRider Double for?

22   A.  Around 850,000 U.S., plus or minus.

23   Q.  Do you know what WhiteWater's margin is on a FlowRider

24   Double if it sells at full price?

03:15 25   A.  It's in the 40 percent-plus range.

1    Q.   Okay.  Now, we talked about Aquatic Design or Aquatic

2    Development Group.  It's your licensee.  Do you know what their

3    price is for a FlowRider Double?

4    A.   They sell it for generally about the same price; 825 to

03:15   5    850, in that range.

6    Q.   Do you know what the royalty is that WhiteWater gets when

7    ADG sells a ProFlow Double [sic]?

8    A.   Yes, there's a 20 percent royalty.

9    Q.   Do you know what PSD sells their similar product, the

03:15   10   ProFlow Double, for?

11   A.   No, I don't know.

12   Q.   Do you know if it's more or less expensive?

13   A.   I think less, but I'm uncertain as to what the list price

14   is.

03:15   15   Q.   Okay.  Does WhiteWater own a lot of patents?

16   A.   Yes, quite a few.

17   Q.   Have you been in discussions where WhiteWater has

18   chosen --

19        Let me back up.  Are you aware that patents, at least in

03:15   20   the United States, you have to pay fees to keep them active?

21   A.   Yes, I'm aware of maintenance fees.

22   Q.   Have you been in discussions at WhiteWater where WhiteWater

23   has chosen not to pay the maintenance fee on a patent?

24   A.   Yes.

03:16   25   Q.   Why would WhiteWater deliberately choose not to pay a

1    maintenance fee?

2    A.   Well, sometimes you come up with something, like in Tom's

3    patent portfolio, we inherited a bunch of patents, and some of

4    them just aren't worth maintaining, so you would let it go.  I

03:16   5    mean, if you find that you're overzealous in protecting patents

6    in a bunch of different countries and you never have

7    a -- you're never going to sell one, let's say, in Turkey, you

8    just let it go, don't pay the maintenance.

9    Q.   Okay.  If WhiteWater was considering whether or not to not

03:16   10   pay to maintain a patent relating to sheet waves, who would be

11   involved in that conversation?

12   A.   It would probably be myself and now it's Luc Benac.

13   Q.   Did you ever have a discussion with anyone at WhiteWater

14   where intentionally not paying a maintenance fee on the '589

03:17   15   patent was discussed?

16   A.   Never.

17   Q.   I'd like to show Exhibit BW.  I'd like to focus your

18   attention on the second email on page 1.  This is from David

19   Osborne to several people.  You start with -- do you know who

03:17   20   David Osborne is?

21   A.   Yes.

22   Q.   Okay.  You're not in the "to" line, but I see that your

23   name is in the "cc" line.

24   A.   Correct.

03:17   25   Q.   You received this email?

1    A.   Yes.

2    Q.   I don't know if I asked the follow-up question.  Who is

3    Mr. Osborne?

4    A.   David Osborne was Tom's, what's called, in-house counsel,

03:18    5    and we all worked down at the amusement park at Belmont Park.

6    Q.   So he's Tom's attorney?

7    A.   Correct.

8    Q.   Mr. Osborne is saying, "Wave Loch has sold the below

9    patents or listed patents to WhiteWater West.  Can you please

03:18   10    transfer the files to their attorney, Rick Taché, of

11    Greenberg."  Do you see that?

12    A.   Yes.

13    Q.   He used to work at Greenberg Traurig?

14    A.   Yes.

03:18   15    Q.   He represents WhiteWater for various things?

16    A.   Correct.

17    Q.   Looking at Patent Number 1, can you tell me what Patent

18    Number 1 that Mr. Osborne listed is?

19    A.   Patent Numbers 6,491,589, the title is, "Mobile water" --

03:18   20    having a misspelled "sluice."

21    Q.   The '589 patent?

22    A.   Yes, it's the '589 patent.

23    Q.   Can you read the second line there?

24    A.   Yeah.  "Maintenance fee due date December 10, 2014,

03:18   25    unextendible.  11.5-year maintenance fee."

1   Q.   So right here Mr. Lochtefeld's lawyer is telling you and

2   Rick Taché that WhiteWater needed to pay a maintenance fee on

3   the '589 on December 10, 2014.  Is that right?

4   A.   Correct.

03:19   5   Q.   Did you think that Rick Taché or his firm,

6   Greenberg Traurig, were going to pay this maintenance fee?

7   A.   I'm sorry?

8   Q.   Did you think Rick Taché or Greenberg Traurig were going to

9   pay this maintenance fee?

03:19   10   A.   No.

11   Q.   Why not?

12   A.   Because Mr. Taché had told me quite some time that

13   Greenberg didn't handle maintenance fees.  I don't know if it

14   was like below their level or pay grade, but they just didn't

03:19   15   handle the maintenance.

16   Q.   Okay.  Is your understanding WhiteWater was going to be

17   responsible for paying this maintenance fee?

18   A.   That's correct.

19   Q.   Was there someone at WhiteWater -- and I'll note the date

03:20   20   is August of 2014.  In August of 2014 was there someone who was

21   responsible for paying the maintenance fees on WhiteWater's

22   patents?

23   A.   It was supposed to be Tim Kwasnicki.

24   Q.   Okay.  What was Mr. Kwasnicki's role at WhiteWater?

03:20   25   A.   Tim was like the contracts administrator and handled a

1    bunch of risk issues in the business in terms of safety.

2    Q.   Does Mr. Kwasnicki work at WhiteWater anymore?

3    A.   No.

4    Q.   Are you aware that WhiteWater did not, in fact, pay that

03:20    5    maintenance fee on December 10, 2014?

6    A.   Was I aware that it wasn't paid on December 10th?

7    Q.   Sitting here now, are you aware?

8    A.   Yes.

9    Q.   I'd like to show you Exhibit 465.

03:21    10          MR. SCOTT:  Gary, can you bring up page 2, please?

11    BY MR. SCOTT:

12    Q.   What's the date on this email, Mr. Myrman?

13    A.   On the top there, February 5th, 2015.

14    Q.   Who is sending this email?

03:21    15    A.   Me.

16    Q.   No, I'm sorry.  Looking at the page 2 of Exhibit 465.

17    A.   Gotcha.  That's from Mr. Taché at Greenberg.

18    Q.   You recognize that as Mr. Taché's old email address?

19    A.   That's correct.

03:22    20    Q.   And it's dated February 5.  So the first line says, "As you

21    know, our firm does not handle maintenance/annuity payments for

22    WhiteWater's patent portfolio."  Do you see that?

23    A.   Yes.

24    Q.   I apologize.  Who is this addressed to?

03:22    25    A.   Tim Kwasnicki.

375

1   Q.   And you're copied?

2   A.   Yes.

3   Q.   Who is Michael Heaven?

4   A.   That's Tim's boss.  He was the COO of WhiteWater.

03:22   5   Q.   So the first line is just confirming what you told me, that

6   you knew Mr. Taché wasn't going to pay the fee?

7   A.   That's correct.

8   Q.   Okay.  I notice a lot of --

9        MR. SCOTT:  Gary, if you could back out of the blowup.

03:22   10  BY MR. SCOTT:

11  Q.   I see there's some things blocked out here.  Did you black

12  this out?

13  A.   No.

14  Q.   Do you know who did black this out?

03:22   15  A.   No.

16  Q.   Is this an email between an attorney, Rick Taché, and a

17  client, WhiteWater?

18  A.   That's correct.

19  Q.   Okay.  Looking at the second paragraph here where there's

03:22   20  just a little bit blacked out, what is Mr. Taché telling you

21  and Mr. Kwasnicki there?

22  A.   He's saying that apparently they came across an issued

23  patent yesterday in your portfolio relating to surfing

24  apparatus that appears to have inadvertently expired last

03:23   25  month, the '589 specifically, on January 2nd.

1    Q.   Is this the first time on February 5th that you learned

2    that the '589 patent maintenance fee had not been paid on the

3    '589 patent?

4    A.   It was.

03:23   5    Q.   Going to page 1 of Exhibit 465, did you send this email to

6    Mr. Kwasnicki?

7    A.   I did.

8    Q.   Can you read what you wrote there?

9    A.   "Are there any other renewals that are slipping?  Did you

03:24  10    have a chance to return David Osborne's call/email on this

11    topic?"

12    Q.   Why did you ask Mr. Kwasnicki if any other renewals were

13    slipping?

14    A.   Because he blew it.

03:24  15    Q.   Blew it on what?

16    A.   On the '589, on the renewal, and I wanted to know what else

17    he was not doing.

18    Q.   Okay.  Let's turn to Exhibit 466.  This is just the next

19    email in that same email chain.  Mr. Kwasnicki writes you back.

03:24  20    "Truthfully, there may be others slipping.  Due to day-to-day

21    demands, I typically don't have time to follow up quickly on

22    all the patent issues.  Sorry, Rick."

23         What did you understand Mr. Kwasnicki to be telling you?

24    A.   That that response was completely unacceptable.

03:24  25    Q.   You thought it was unacceptable, but what was Mr. Kwasnicki

1    telling you?

2    A.   That he wasn't doing his job.

3    Q.   What was your reaction to all of this?

4    A.   I was steamed.

03:25  5    Q.   Why?

6    A.   Because the '589 is a critical piece of the IP portfolio

7    that Whitewater paid millions for.

8    Q.   Did Mr. Kwasnicki ever tell you that he was going to

9    intentionally let the '589 go abandoned?

03:25  10   A.   No.

11   Q.   To your knowledge, did Whitewater intentionally allow the

12   '589 patent to lapse?

13   A.   No way.

14   Q.   Would you have ever agreed to let the '589 patent go

03:25  15   abandoned?

16   A.   Never.

17            MR. SCOTT:   Thank you, Mr. Myrman.

18            THE COURT:   Cross.

19                         CROSS-EXAMINATION

03:25  20   BY MR. THOMAS:

21   Q.   Good afternoon, Mr. Myrman.

22   A.   Hello.

23   Q.   I don't believe we've been formally introduced.   You've

24   seen me?

03:25  25   A.   How do you do?

1    Q.   Joe Thomas on behalf of PSD.

2         You've been sitting in the court throughout the trial as

3    the company's designated representative.

4    A.   That's correct.

03:26   5    Q.   So you sat through all the witness testimony, including

6    Mr. Lochtefeld's testimony today, correct?

7    A.   Correct.

8    Q.   You testified you joined Wave Loch and Mr. Lochtefeld's

9    company in 2008.  Is that right?

03:26   10   A.   That's correct.

11   Q.   And you took it over, and you began to change some things

12   that you thought needed to be improved in the way the company

13   operated?

14   A.   Correct.

03:26   15   Q.   And you recall Mr. Lochtefeld was questioned about how the

16   nozzle flap was assembled and installed between 1999 and 2005?

17   A.   Uh-huh.

18   Q.   You recall his testimony on that?

19   A.   Yes, vaguely.

03:26   20   Q.   And I'm going to walk over to the demonstrative.

21              MR. THOMAS:  What is our number for this?

22              MR. KOLEGRAFF:   NU.

23   BY MR. THOMAS:

24   Q.   And if you'll recall, Mr. Lochtefeld testified following

03:27   25   the issuance of the patent for about five years, Wave Loch

1   consistently made the nozzle flap just like this.  Do you

2   recall that?

3   A.   Yes.

4   Q.   And then after that five-year period, he determined there's

03:27   5   a better way because of the -- because of the force of the

6   water was causing delamination on the ends of this nozzle flap.

7   Do you recall that?

8   A.   Yes.

9   Q.   And he changed what he was doing -- and this was about

03:27   10   2005, according to his testimony -- to a hinged nozzle flap.

11   You recall him saying that?

12   A.   Yes.

13   Q.   Okay.  So when you joined the company, this is what the

14   nozzle flap -- this is how the nozzle flap was being made at

03:27   15   that time?

16   A.   That's correct.  That's the nozzle flap.

17   Q.   And you were not part of the company at the time the patent

18   was issued and for those first five years when it was made like

19   this?

03:27   20   A.   That's correct.

21   Q.   Okay.  And you're not an expert on claims construction on

22   patents?

23   A.   That's correct.

24   Q.   Okay.  And those are things that are beyond your skill and

03:28   25   expertise, correct?

1    A.   I would agree.

2    Q.   All right.  Now, let's just talk about a couple other

3    things.  You mentioned the nozzle flap.  At the time of your

4    deposition -- do you recall having your deposition taken in

03:28  5    this case?

6    A.   Yes, sir.

7    Q.   And at the time of your deposition, you testified, did you

8    not, that as far as you knew, there was no marketing materials

9    presented by WhiteWater that you knew of concerning the nozzle

03:28  10   flap.  Do you recall that testimony?

11   A.   I believe so.

12   Q.   Okay.  And that was accurate, correct?

13   A.   I think so.  You'd have to refresh my memory on the date of

14   the deposition, but I think at that time, yes.

03:28  15   Q.   All right.  So there was nothing on your website, there was

16   nothing in your marketing literature, no formal information

17   provided to the clients in writing, email or website or

18   otherwise, marketing the nozzle flap feature.  Is that correct?

19   A.   That would be correct, I think.

03:29  20   Q.   Okay.  Now, let's turn to, if we could, what you looked at

21   earlier today, which I think was Exhibit 234.

22        MR. THOMAS:  Can we put that up?

23   BY MR. THOMAS:

24   Q.   And if --

03:29  25        MR. SCOTT:  I don't believe this was introduced

1    previously.  I just want to clarify Mr. -- you stated that he

2    was looking at it before, and I don't think he looked at this

3    before.

4            MR. THOMAS:  I did the same mistake that you made.  I

03:29   5    referred to a deposition exhibit number.  The trial exhibit was

6    the one that was used, CS-1, so we've both run afoul.

7            For the record, this should be CS-1.

8            If we could highlight the second paragraph here.

9    BY MR. THOMAS:

03:30  10    Q.  It begins, "The FlowRider sheet wave is under attack."

11            MR. THOMAS:  Highlight the whole thing.

12    BY MR. THOMAS:

13    Q.  And this is an email that you had prepared, correct,

14    Mr. Myrman?

03:30  15    A.  Correct.

16            MR. THOMAS:  We can probably get by without the

17    highlighting.  I feel like I'm on the FlowRider right now.

18    BY MR. THOMAS:

19    Q.  Anyway --

03:30  20    A.  Paragraph 2.

21    Q.  Paragraph 2.  And this is your words:  "The FlowRider sheet

22    wave is under attack."  And you were referring to your own

23    subsidiary, Murphy's Wave, which is a competitor, right?  They

24    take business from --

03:31  25    A.  That's correct.

```
 1   Q.   -- you?
 2        You consider them a competitor, do you not?
 3   A.   That's correct.
 4   Q.   American Wave you consider a competitor, correct?
 5   A.   Yes.
 6   Q.   And the same with Pacific Surf Designs; you consider them a
 7   competitor?
 8   A.   That's correct.
 9   Q.   This phrase, "The commoditization of the sheet wave
10   industry," that's a reference to commodity pricing; that
11   they're all basically the same, and whoever gets the lowest
12   price usually gets the sell?
13   A.   A lot of the sales in this industry are price-based.
14   Q.   And would you agree that pricing is the predominant factor
15   that customers are using today in deciding which product to
16   use?
17   A.   I don't agree that it's the predominant factor, but it is a
18   big factor, yes.
19   Q.   Okay.  Well, your statement here seems to suggest, if I'm
20   not misreading it, that this pricing attack from the
21   competitors that you've identified in paragraph 2 is changing
22   the landscape of how you're going to have to do business in
23   terms of pricing your own product, correct?
24   A.   Not exactly, no.
25   Q.   Well, wasn't that your concern in writing this?
```

03:31 (line 5)
03:31 (line 10)
03:31 (line 15)
03:31 (line 20)
03:32 (line 25)

1    A.   My concern is that -- my main concern is that we overpriced

2    it by over 100 grand over our -- you know, what we call our

3    MAPP price, and if we continue to make mistakes like that, it

4    would not be good for us.   That was my -- the number one reason

03:32    5    for this was to implore upon our people to make correct

6    decisions when sending quotes out.

7    Q.   Okay.   And the last sentence of this paragraph 2, you

8    wrote, "It sends a very bad message to the marketplace when

9    there is 'price-checking' going on."   You see that?   You see

03:33   10    that reference?   And that's a reference to the customers

11    checking on pricing from your competitors, correct?

12    A.   Correct.

13    Q.   So what they're doing as of the date -- what is the date on

14    this email?   It's April 8, 2015.   You're aware that the

03:33   15    industry landscape has changed, and the customers are now

16    focusing on price checking before they buy, correct?

17    A.   To a certain degree.

18    Q.   Now, let's turn, if we might, to Exhibit -- I'll make sure

19    I get this one right -- CW-1, and this is an exhibit that was

03:33   20    shown to you by Mr. Scott, your counsel, on direct examination.

21    Do you recall this?

22    A.   Correct.

23    Q.   Okay.   And at the very top, for now, I'm going to focus on

24    the email that you wrote to Mr. Thatcher dated October 2, 2013.

03:34   25    Do you see that?

1   A.   Uh-huh.

2   Q.   Okay.  There's a reference here that you wrote, "We're

3   going to sue Richard so he won't even be in business."  You're

4   telling Mr. Thatcher that on October 2, 2013, correct?

03:34   5   A.   Correct.

6   Q.   And at that time, PSD had not sold a single competitive

7   product in the marketplace.  Isn't that correct?

8   A.   I don't know when they sold the first wave.

9   Q.   How did you know you were going to sue them if they hadn't

03:34   10   sold anything?

11   A.   Because they were copying our product, and it was covered

12   by a patent that we were soon to be amalgamated into.

13   Q.   Okay.  And you reference that you joined Wave Loch in 2008?

14   A.   2008.

03:35   15   Q.   And you left Wave Loch, did you not, in 2014?

16   A.   No.

17   Q.   I understood you resigned from Wave Loch and went to work

18   for WhiteWater in or about 2014?

19   A.   2013.

03:35   20   Q.   I'm sorry, 2013.  So --

21   A.   I resigned.

22   Q.   You resigned?

23   A.   And --

24   Q.   And --

03:35   25   A.   -- to be specific, in April of 2013, I resigned.

```
 1   Q.   Okay.  I appreciate that.
 2        But not only you resigned, three other people that left
 3   with you on the same -- at the same time.  Isn't that correct?
 4   A.   That's not quite how it went down.
 5   Q.   Well, were there other --
 6   A.   It was close.
 7   Q.   Were there other employees who came either with you or
 8   following your resignation?
 9   A.   Yes.
10   Q.   And those were people who had reported to you in this
11   flat-line organization that you described on direct
12   examination?
13   A.   That's correct.
14   Q.   And what were the names of those people?
15   A.   That would have been Ori Vicente, Andrew Thatcher, and I
16   believe Till Paris.
17   Q.   Okay.  Were you the first one of the group to resign?
18   A.   Yes.
19   Q.   And when you resigned, all of the people that reported to
20   you who had been working for Mr. Lochtefeld at Wave Loch also
21   resigned?
22   A.   It was a matter of a few days.
23   Q.   Okay.  And they joined you over at WhiteWater, correct?
24   A.   Yes.
25   Q.   And you were hired by WhiteWater in 2013 to start a
```

03:35 (line 5), 03:35 (line 10), 03:35 (line 15), 03:36 (line 20), 03:36 (line 25)

1   competitive business to Mr. Lochtefeld's company, Wave Loch,

2   were you not?

3   A.   No, that's not correct.

4   Q.   That's what you ended up doing?

03:36   5   A.   That's not correct at all.

6   Q.   Aren't you responsible for the revenue stream for this

7   FlowRider as the fearless leader?

8   A.   That's correct.

9   Q.   Wouldn't that business be a direct competitor had

03:36   10   Mr. Lochtefeld not chosen later to sell his interest to

11   WhiteWater?

12   A.   Everything I did after I joined WhiteWater inured to Tom's

13   benefit.

14   Q.   At the time?

03:36   15   A.   Everything, all the --

16   Q.   Tom didn't join you when you resigned, did he?

17   A.   No, Tom was the owner of Wave Loch.

18   Q.   And was Tom -- Tom was upset with you and your team when

19   they resigned, was he not?

03:37   20   A.   Probably.

21   Q.   And he felt betrayed by you and your team, did he not?

22   A.   He might have.

23   Q.   And he told you so in so many words, did he not?

24   A.   I don't remember him saying that.

03:37   25   Q.   So in essence, you covered Mr. Alleshouse, what he did, you

1    did the same thing to Mr. Lochtefeld in 2013.  Isn't that

2    correct?

3    A.   That's incorrect.

4    Q.   And did you have a noncompete?

03:37   5    A.   I would imagine I had an employment agreement.

6    Q.   Did you?

7    A.   I don't know what it says.  You'd have to show it to me.

8    Q.   Okay.  Well, I'm just asking whether you signed an

9    employment agreement.

03:37   10   A.   I had an employment agreement, yes.

11   Q.   You resigned under that employment agreement.  Did that

12   employment agreement have some statements about confidential

13   information that you weren't supposed to be using when you

14   left?

03:37   15   A.   Sure, yes.

16   Q.   And you nonetheless went to work for WhiteWater over

17   Mr. Lochtefeld's displeasure or objection, correct?

18   A.   Actually, I continued to work in Tom's offices for the next

19   six months, so I'm not sure where you're heading.

03:38   20   Q.   What led up to this mass resignation -- I say "mass"

21   because the company, in terms of number of employees, was not

22   that large at that time, so it was a massive change to

23   Mr. Lochtefeld's company at Wave Loch when all of you left.

24   Your resignation -- the reason you resigned as a group was

03:38   25   because Mr. Lochtefeld was not making a deal with WhiteWater,

1    correct?

2    A.   No, that's incorrect.

3    Q.   And when you guys left en masse, Mr. Lochtefeld then had no

4    choice but to sign some kind of agreement with WhiteWater;

03:38    5    otherwise he couldn't perform his business since all his key

6    employees had left?

7    A.   That's also very incorrect.

8    Q.   Okay.  Well, what employees were left after your whole

9    group resigned?

03:38   10    A.   Steve Hovey was left, Rob Chifonte, the whole retail

11   business, but we all worked in the same offices within feet of

12   each other.

13   Q.   But was there an engineer on staff after you left?

14   A.   Steve Hovey, yes.

03:39   15   Q.   But you were the fearless leader; you were in charge of the

16   whole operation, were you not?

17   A.   I was responsible for Wave Loch before the acquisition.

18   Q.   And the acquisition didn't happen until after you resigned

19   and joined WhiteWater?

03:39   20   A.   The effectivity date was 12-1-2012.

21   Q.   I understand, but the documentation wasn't signed until

22   after you resigned and left to join WhiteWater?

23   A.   That's correct.

24   Q.   In fact, it was done a year after that?

03:39   25   A.   Nine months.

1    Q.   Nine months.  So you'd been there -- it took nine months,

2    and then when everybody got together, they made a transaction,

3    they went back and said let's pretend this really happened in

4    2012?

03:39   5    A.   I don't think that's how it worked.  There was a memorandum

6    of understanding that was signed where the dates were down

7    there and all the overhead was agreed to, so I think that's

8    misstated.

9    Q.   All right.  Now, let me -- I'll turn to Exhibit NC, if I

03:40   10   might.

11       Okay.  Have you seen this document before?

12   A.   I may have.  I can't remember.

13   Q.   Are you familiar with the Surf House Phuket and the Surf

14   House Patong Beach?

03:40   15   A.   Yes, very much so.

16   Q.   Are you familiar -- you're familiar with the signator on

17   this, Mr. Aalto?

18   A.   Juha.  I never met him.  I know the name.

19   Q.   You know the name.  You know who he is?

03:41   20   A.   Yes.

21   Q.   In fact, he's somebody you corresponded with over potential

22   sales.  Isn't that correct?

23   A.   I've had some correspondence with him, but not many.

24   Q.   Okay.  And in the second paragraph of this correspondence,

03:41   25   he says, "I've known Yong and Richard for a number of years and

1  feel their company, Pacific Surf Designs, is the most

2  innovative company in the industry."

3      Do you see that?

4  A.  Yes.

03:41  5  Q.  Do you agree that they were an innovative company?

6  A.  I would agree that they are a company.

7  Q.  Okay.  They say, "They have improved and taken the industry

8  forward more than any operator in the last 20 years with their

9  designs and ideas.  And they are able to implement these

03:41  10  concepts as they have the best technological and engineering

11  know-how between them."  Do you see that?

12  A.  Yes.

13  Q.  Were you aware that there were customers in the marketplace

14  that had expressed those sentiments about Pacific Surf Designs

03:41  15  and Mr. Alleshouse and Mr. Yeh?

16  A.  I hadn't seen them in writing.

17  Q.  It goes on to say, "I have a FlowRider in each of my

18  venues, and their concepts are the next generation of products

19  replacing the FlowRider."

03:42  20      Do you see that?

21  A.  Yes.

22  Q.  And then finally, it goes on to state, "The only reason we

23  did not purchase a product from them was due to WhiteWater

24  West's investment in our company giving us no choice."

03:42  25      Do you see that?

1    A.   Yes.

2    Q.   Okay.   And are you aware that WhiteWater had invested in

3    the -- this company that owned Surf House Phuket and Surf House

4    Patong Beach?

03:42   5    A.   Yes.

6    Q.   Now, are you familiar with the fact that -- well, we

7    looked -- I don't want to go back and cover old territory, but

8    the previous emails we looked at, there was reference

9    that -- to the pricing of product at marketplace, and my

03:43   10   general question to you, Mr. Myrman, is you're aware that,

11   number one, PSD is a competitor; and number two, they're

12   offering their products at a lower price than WhiteWater is?

13   A.   I don't know what their pricing is.   I think that's what I

14   testified to.

03:43   15   Q.   Okay.   So you've never investigated their pricing?

16   A.   I've never seen a published price list.

17   Q.   Okay.   But you never talked to customers or get word of

18   mouth in the industry?

19   A.   Word of mouth is that they price lower.   I don't know how

03:43   20   much or where or when.

21   Q.   But you're aware generally that they are pricing their

22   product?

23   A.   Generally, yes.

24   Q.   Are you aware generally that their cost of operation or

03:43   25   OpEx, as they say in the business, is lower on their sheet

1    wave?

2    A.   Are you talking about their cost of goods sold?

3    Q.   No.   Once it's installed, to run a sheet wave machine,

4    whether it's WhiteWater's or PSD's or someone else's, there's

03:44   5    power required?

6    A.   Okay.   Their operating costs.

7    Q.   Yes, OpEx, right.   Are you aware that the OpEx for the PSD

8    machines is lower because they consume less electricity;

9    they're more efficient?

03:44   10   A.   Yes.

11   Q.   Okay.   So there's two aspects of the competition.   There's

12   the aspect of what the customer wants, which is a lower price

13   to start with, cheaper commodity purchased; and then secondly,

14   because these things tend to last a number of years, they want

03:44   15   to make sure their operating costs are lower after the fact,

16   correct?

17   A.   Okay.

18   Q.   And you would agree that you are competing also not only on

19   the initial price, but also you have to demonstrate the value

03:44   20   and the operating cost proposition to the customer as well for

21   your product?

22   A.   Yes, sometimes.

23   Q.   Okay.   And at times, customers will make decisions to

24   select one product over another if they feel that one is more

03:45   25   safe, more efficient, and less costly to operate over the life

393

```
 1   of the use of the product, correct?
 2   A.   Sometimes.
 3   Q.   We talked about the competitors, and I don't want to go
 4   through all of them again, but you mentioned previously
 5   Murphy's Wave, which is a subsidiary of the parent corporation
 6   WhiteWater, correct?
 7   A.   Correct.
 8   Q.   And you agreed that Murphy's Wave is a competitor to you,
 9   correct?
10   A.   That's correct.
11   Q.   Okay.  So if Murphy's Waves gets a sale that you were
12   competing for, you lose that sale, correct?
13   A.   That's correct.
14          MR. THOMAS:  All right.  I have no further questions,
15   Your Honor.
16          THE COURT:  All right.  Redirect.
17                    REDIRECT EXAMINATION
18   BY MR. SCOTT:
19   Q.   I'd like to bring up Exhibit NC, Mr. Myrman.  It was blown
20   up, and I want to show you the whole page.
21          MR. SCOTT:  Don't blow it up, actually, Gary.
22   BY MR. SCOTT:
23   Q.   Is this document addressed to anyone in particular?
24   A.   No.
25   Q.   Do you have any idea whether Juha sent this to anyone other
```

1    than, apparently, Pacific Surf Designs?

2    A.   I don't know who it was sent to.  There's no "to."

3    Q.   It could have been sent to anyone at all or no one?

4    A.   That's correct.

03:46   5    Q.   Okay.  Juha, we looked at an email with him earlier.  He

6    was a partner in a group in Thailand?

7    A.   He was a partner and part of a group called Sick-X.

8    Q.   A group called Sick-X?

9    A.   Joint venture.

03:47   10   Q.   I'd like to look at Exhibit 169, please.  This is an email

11   chain between Andrew Thatcher and Janne.  I'm not even going to

12   try that last name.  I understand that both Janne and Juha are

13   Finnish?

14   A.   That's right.

03:47   15   Q.   He's got a long last name that I'm not going to try.

16        The first line says, "Hi, Janne.  If it comes down to it, I

17   would like to meet with Juha along with Marshall."  Did

18   Andrew Thatcher ever ask you to meet with Janne and Juha?

19   A.   Did he ever ask me to meet with them?

03:47   20   Q.   Correct.

21   A.   He might have mentioned that it was a good idea, but

22   logistically, it never worked out.

23   Q.   Are you aware around the time of this email, in April of

24   2016, WhiteWater and Pacific Surf Designs were competing in

03:48   25   selling their products to Sick-X?

1    A.   Yes.

2    Q.   I'd like to look at page 2 of this exhibit.

3          MR. SCOTT:   Can you blow up the email in -- the bottom

4    email there?

5    BY MR. SCOTT:

6    Q.   So this is Janne writing to Andrew.  "Number one, I have

7    promised Juha to take a meeting with Yong Yeh and Richard, and

8    we will mainly discuss technical things on the ride.  They have

9    offered us cheaper pricing and better financing plan, but I

10   base my choice to WhiteWater for two main things:  reliability

11   of the product and the company behind it; safety in terms of

12   customer accidents, et cetera."  He goes on to ask for a

13   comparison to Richard's model.

14       Is it your understanding that Yong Yeh and

15   Richard Alleshouse were trying to sell a product to Janne and

16   Juha?

17   A.   Yeah, we had sold Janne an attraction in Kata Beach in

18   Thailand, and Richard and Yong were trying to come in and get

19   the next deal from them.

20   Q.   And at least here Janne is saying that they, Richard and

21   Yong, have offered a cheaper price and better financing, right?

22   A.   Correct.

23   Q.   So what did WhiteWater do to get the deal?

24   A.   We dropped our price and gave them better financing.

25   Q.   Did you also invest in their company?

1    A.   We did.

2    Q.   Okay.  So there was a direct competition going on;

3    Whitewater competed to get the deal?

4    A.   We matched the deal.

03:49    5    Q.   Mr. Thomas also asked you about your transition between the

6    Wave Loch and Whitewater.  Do you recall that questioning?

7    A.   That's correct.

8         MR. SCOTT:  Can you bring up Exhibit BM, please?

9    BY MR. SCOTT:

03:49    10   Q.   When you were testifying, you referred to a memorandum of

11   understanding.  Have you seen Exhibit BM before?

12   A.   That's correct.

13   Q.   That's the memorandum of understanding you were referring

14   to when you talked to Mr. Thomas?

03:49    15   A.   Yes, sir.

16        MR. SCOTT:  Can we see a date at the bottom of this,

17   please?  Sorry.  The very bottom of the document.

18   BY MR. SCOTT:

19   Q.   This appears to be executed on November 29, 2012.  Is that

03:50    20   consistent with your recollection?

21   A.   That's consistent with my recollection, yes.

22   Q.   So if Whitewater had an agreement with Wave Loch as of

23   November 29, 2012, with respect to trying to come to an

24   understanding to take over Wave Loch's business --

03:50    25   A.   They weren't going to take over Wave Loch's business.  They

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | were going to assume the IP and the trademarks of the FlowRider              |
|       | 2  | brand and product lines.                                                     |
|       | 3  | Q.  So when you left in April of 2013, you said --                           |
|       | 4  | A.  April of 2013, yes.                                                      |
| 03:50 | 5  | Q.  Okay.  That was a few months after this memorandum of                    |
|       | 6  | understanding had been signed, right?                                        |
|       | 7  | A.  Yes.                                                                     |
|       | 8  | Q.  But a few months before the final deal was signed?                       |
|       | 9  | A.  Many months before the final deal was signed.                           |
| 03:51 | 10 | Q.  So were you leaving Wave Loch to go directly compete with               |
|       | 11 | Wave Loch and WhiteWater?                                                    |
|       | 12 | A.  No, I had resigned from Wave Loch to accept a job with Lynx             |
|       | 13 | Professional Grills, the company that I had come from.                       |
|       | 14 | Q.  Okay.  But you went to WhiteWater in 2013 while this                    |
| 03:51 | 15 | transaction was still being negotiated, right?                               |
|       | 16 | A.  That's right.                                                            |
|       | 17 | Q.  After 2013, when you worked at WhiteWater, where did you               |
|       | 18 | physically sit?                                                              |
|       | 19 | A.  I physically sat in the exact same office that I sat when I             |
| 03:51 | 20 | worked for Tom, as did Andrew Thatcher and Till and Ori.  We                |
|       | 21 | all sat in the exact same spot.                                              |
|       | 22 | Q.  So if Tom was upset, he wasn't upset enough to throw you               |
|       | 23 | out, even though you were working for WhiteWater?                            |
|       | 24 | A.  That's correct, he did not throw us out.                                 |
| 03:51 | 25 | Q.  Okay.  Why not?                                                          |

```
        1   A.   Because everything we did inured to his benefit.

        2             MR. SCOTT:  Thank you.  No further questions.

        3             THE COURT:  Recross.

        4                        RECROSS-EXAMINATION

03:52   5   BY MR. THOMAS:

        6   Q.   Exhibit BM, the same exhibit we were just looking at

        7   quickly, and if you look at the last page -- I have it up on

        8   the screen -- you'll see under Wave Loch, that's

        9   Mr. Lochtefeld's signature, correct?

03:52  10   A.   On the bottom right there?

       11   Q.   Yes.

       12   A.   Yes, sir.

       13   Q.   You didn't sign this agreement, did you?

       14   A.   No, I don't believe so.

03:52  15   Q.   And were you aware of it?

       16   A.   Yes.

       17   Q.   Okay.  And having -- so you received a copy of it, reviewed

       18   a copy of it back in -- or in or about November of 2012?

       19   A.   I don't know if I have a copy of it, but I was involved in

03:53  20   it.

       21   Q.   What was your involvement in it?

       22   A.   I was kind of like the cheese in between the sandwich

       23   between Tom and Geoff; in other words, I was kind of like

       24   somewhat stuck in the middle between the two during the

03:53  25   negotiation period.
```

```
 1   Q.   They weren't getting along, were they?
 2   A.   They're like oil and water.
 3   Q.   So the answer is they were not getting along?
 4   A.   I didn't say that.  I just said they're like oil and water.
 5   Q.   Okay.
 6   A.   They don't mix well.
 7   Q.   Understood.  We all know what that means.
 8        And if you look on this page here, you'll see in this
 9   document -- well, first off, this document was never amended;
10   it was replaced later by the consolidation agreement, correct?
11   A.   I'm uncertain if it was ever amended.  I don't know.
12   Q.   You're not aware of any amendment?
13   A.   I don't know.
14   Q.   And the bullet point at the top says, "For a period of 30
15   days, neither party shall pursue any other acquisition or enter
16   into any discussions with any third party."  So this had a kind
17   of a binding effect in terms of exclusivity over these
18   negotiations for a period of about 30 days, so, roughly, to the
19   end of 2012, December 30, 2012.  Do you agree?
20   A.   I would agree that's what it says.
21   Q.   And the last bullet point says, "This MOU is nonbinding,
22   and the parties shall have no liability hereunder prior to the
23   entry of a definitive agreement except for the breach of the
24   confidentiality provision contained herein."
25        So you understood that this document was not binding?
```

1  A.   That's what it says.

2  Q.   So when you resigned, you knew that this agreement was not

3  binding on either party?

4  A.   Okay.

03:55   5  Q.   And Mr. -- who was the individual at WhiteWater that

6  extended your job offer in 2013?

7  A.   That would be Geoff Chutter, the CEO and owner of

8  WhiteWater.

9  Q.   And Mr. Chutter, who is oil and water with Mr. Lochtefeld,

03:55  10  at the time saw you as the piece of cheese, to use your words?

11  A.   He saw me as part of the acquisition.

12  Q.   So he's having a difficult time dealing with

13  Mr. Lochtefeld.  You were trying to buffer between them, and

14  then finally you resigned and joined up with Mr. Chutter?

03:55  15  A.   I don't think Geoff needs me to do a deal.  The guy's done

16  dozens of license agreements and acquisitions.

17  Q.   Wouldn't you agree that the three people that joined

18  WhiteWater in or about the time you resigned in August -- I'm

19  sorry, in 2013 -- had a crippling effect on Mr. Lochtefeld's

03:55  20  ability to continue to do business?

21  A.   No, that's not correct.

22       MR. THOMAS:  Okay.  I have no further questions,

23  Your Honor.

24       THE COURT:  All right.  Well, we're going to break for

03:56  25  the evening just in time.

401

1          THE WITNESS:  Wow, good job, Your Honor.  I apologize.

2          THE COURT:  I've never had a witness say that to me.

3     See you all tomorrow morning.  9:00 a.m.  Have a great

4     evening.  Thank you.

5                         ---oOo---

6

7                    C-E-R-T-I-F-I-C-A-T-I-O-N

8

9       I certify that the foregoing is a correct transcript from

10    the record of proceedings in the above-entitled matter.

11

12       Dated December 4, 2019, at San Diego, California.

13

14

15                    /s/ Dana Peabody_____
                      Dana Peabody,
                      Registered Diplomate Reporter
16                    Certified Realtime Reporter

17

18

19

20

21

22

23

24

25