1                  United States District Court

2               for the Southern District of California

3

4                                        )
5   WHITEWATER WEST INDUSTRIES,          )
    LTD., a Canadian Corporation,        )   No. 17cv1118-BEN
6                                        )
            Plaintiff,                   )   December 5, 2019
7                                        )
                v.                       )   San Diego, California
8                                        )
    PACIFIC SURF DESIGNS, INC., a        )
9   Delaware Corporation, and FLOW       )
    SERVICES, INC., a California         )
10  Corporation,

11      Defendants.

12
                         VOLUME 3A
13               TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE ROGER T. BENITEZ
14               United States District Judge

15  APPEARANCES:

16  For the Plaintiff:      SNELL & WILLMER LLP
                                WILLIAM S. O'HARE
17
                            BUCHALTER
18                              ROGER L. SCOTT

19  For the Defendants:     THOMAS WHITELAW & KOLEGRAFF LLP
                                JOSEPH E. THOMAS
20                              WILLIAM J. KOLEGRAFF

21

22
    Court Reporter:         Dana Peabody, RDR, CRR
23                          District Court Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California 92101
                            DanaPeabodyCSR@gmail.com
25

403

Case:   WhiteWater v. Pacific Surf Designs, Inc.
Date:   December 5, 2019


                        INDEX OF WITNESSES

FOR THE PLAINTIFF:
                                    E X A M I N A T I O N
                              DIRECT   CROSS  REDIRECT  RECROSS

Andrew Thatcher
Mr. Scott                     404                467
Mr. Thomas                            437                    472

Geoffrey Chutter
Mr. Taché                     475

|   |   |
|---|---|
|  | 1  San Diego, California, December 5, 2019 |
|  | 2  * * * |
|  | 3  (Proceedings held outside the presence of the jury panel.) |
|  | 4  THE COURT:  Good morning.  Anything that we need to |
| 09:02 | 5  take up before I bring the jury in?  If not, Glenn, go get |
|  | 6  them. |
|  | 7  THE CLERK:  Yes, Your Honor. |
|  | 8  THE COURT:  Thank you. |
|  | 9  (Proceedings held in the presence of the jury panel.) |
| 09:06 | 10  THE COURT:  Well, good morning, and welcome back. |
|  | 11  All right.  Please call your next witness. |
|  | 12  MR. SCOTT:  The plaintiffs would like to call Andrew |
|  | 13  Thatcher. |
|  | 14  ANDREW THATCHER, |
| 09:07 | 15  PLAINTIFF'S WITNESS, SWORN |
|  | 16  THE CLERK:  Would you state and spell your full name |
|  | 17  for the record. |
|  | 18  THE WITNESS:  Andrew Thatcher, A-N-D-R-E-W, |
|  | 19  T-H-A-T-C-H-E-R. |
| 09:07 | 20  DIRECT EXAMINATION |
|  | 21  BY MR. SCOTT: |
|  | 22  Q.  Good morning. |
|  | 23  A.  Good morning. |
|  | 24  Q.  Are you currently employed? |
| 09:07 | 25  A.  Yes, I am. |

1  Q.   Where?

2  A.   I work for FlowRider, Inc., a division of WhiteWater West

3  Industries.

4  Q.   What's your position at FlowRider, Inc.?

09:08   5  A.   I'm vice president of business development.

6  Q.   What do you do as the vice president of business

7  development?

8  A.   Well, I sell, so I sell directly to clients, and I -- we

9  also have a sales force that I work with, that I provide

09:08   10  guidance to on the surf portion of our company, and I'm also

11  involved with, you know, engineering, human resources because

12  I'm one of the kind of senior team members.

13  Q.   Where are you originally from?

14  A.   South Africa.

09:08   15  Q.   When did you move to the United States?

16  A.   March 8, 2000.

17  Q.   What was your first job when you got to the United States?

18  A.   I started working for Tom Lochtefeld at Wave House at

19  Belmont Park.

09:08   20  Q.   What's Wave House?

21  A.   Wave House is kind of like the venue that Tom was an owner

22  of and that has the surfing machines and then bar and

23  restaurant and that kind of thing.

24  Q.   At some point, did you work for Wave Loch?

09:09   25  A.   Yes, after roughly about a year, I moved from Wave House to

1    Wave Loch.

2    Q.  Did you have a title at Wave Loch?

3    A.  Well, so when I was at Wave House, I was kind of like the

4    gofer, the guy that did all the manual labor, worked on the

09:09    5    rides and that kind of thing.  And when I went to Wave Loch, I

6    was a draftsman for two years.

7    Q.  Did you have any education in engineering or drafting when

8    you started being a draftsman?

9    A.  So I went to a technical high school where we did drawing,

09:09    10    technical drawings, and then when I was here, I did some

11    AutoCAD courses to kind of, like, learn drafting, and then Tom

12    actually paid for me to do an Inventor course, which is the

13    program that we use to design our rides.

14    Q.  How many employees were there at Wave Loch when you -- in,

09:10    15    say, 2001 when you became a draftsman?

16    A.  There were, I think, about ten, somewhere around there.

17    Q.  Did you sit in any particular group of employees within

18    Wave Loch?

19    A.  Yes, I sat with the engineers in the engineering office.

09:10    20    Q.  Were you involved in engineering discussions?

21    A.  Yes.

22    Q.  Like what?

23    A.  Well, we were -- you know, we would discuss different

24    topics or we would have certain challenges or, you know, we'd

09:10    25    have a meeting, and there would be a certain amount of design

1   criteria that would be put upon us, and we would try to

2   brainstorm to try to come up with solutions.  So I wasn't the

3   final decision-maker, obviously, but, you know, I had input.

4   Q.   What did you do for Wave Loch after drafting?

09:11   5   A.   So in 2003, I actually started doing sales.

6   Q.   How long did you do sales for Wave Loch?

7   A.   Well, I actually continue to do it, so it's been, gosh, 17

8   years, but there were kind of different steps along the way.

9   You know, started off as a sales manager and then became

09:11   10   director of sales and marketing, and then when our company was

11   acquired, I was made the VP of business development for the

12   surfing part of our company.

13   Q.   While you were doing sales, did you still involve yourself

14   in engineering discussions?

09:11   15   A.   Yes, you know, sometimes to the chagrin of our engineers,

16   but it's something that I've always been interested in.  I've

17   always been kind of passionate about the technical side of our

18   business.

19   Q.   Does having an engineering knowledge of the products help

09:11   20   you sell the products?

21   A.   It does.  So, you know, we're selling a piece of equipment

22   that costs a million dollars, right, and so it really is

23   helpful if you -- if you can articulate to your clients that,

24   you know, why you use a certain thickness of stainless steel or

09:12   25   why you use a certain bolt size.  They typically are quite

1   impressed that you have a real solid understanding of the

2   product.  So it helps me through my whole sales process to be

3   an expert on the product.  So it's something that I pride

4   myself on, and it has been effective.

09:12   5   Q.   When you were working at Wave Loch, did you have an

6   understanding of how the products worked, the FlowRider

7   products?

8   A.   Yes.  So, you know, bear in mind when I first started, I

9   was like the guy on the ride working, right, so manual labor,

09:12   10   in the dirt, with my hands, fixing things, building stuff, and

11   then went on to design and so on.

12   Q.   Did you know that Wave Loch had patents protecting aspects

13   of their products?

14   A.   Yes.

09:13   15   Q.   Do you know what those patents covered?

16   A.   Well, I know that there was -- you know, every time we send

17   out a contract or a proposal, we'd have a number of patents at

18   the bottom of the proposal, so I always knew there were a lot

19   of patents that protected us.  But there were kind of three

09:13   20   main patents:  The first one of which was for a kind of

21   containerless sheet flow, essentially simplified for us, but

22   it's a sheet of water flowing uphill.  That was our original

23   patent, which has since expired.  And then there was the ride

24   surface patent and the nozzle flap patent.

09:13   25   Q.   Do you have an understanding of what a patent is?

1   A.   My understanding of a patent is that if you come up with an

2   idea or create something, create an invention, it's -- you can

3   get this idea patented, and it protects you from other people

4   coming in and copying your stuff.

09:14   5   Q.   Are you familiar with the '589 patent?

6   A.   Yes.

7   Q.   What's your understanding -- have you read the '589 patent?

8   A.   No.

9   Q.   What's your understanding of what the '589 patent does?

09:14   10   A.   It's basically a patent that protects part of our ride

11   called a nozzle flap.

12   Q.   How long have you been working with the FlowRider product

13   now?

14   A.   For nearly 20 years.

09:14   15   Q.   In that time, do you have a belief that the nozzle flap is

16   important to the FlowRider rides?

17   A.   Yes.

18   Q.   Why?

19   A.   Well, prior to that point, our rides are very long, so the

09:14   20   water would come out of a nozzle, travel downhill, run

21   horizontal, and then go up a hill again, and the nozzle flap

22   allowed us to shorten the ride.  So not only did it make the

23   ride shorter, but it did so in a safe manner so that it allowed

24   us to shorten the ride which made -- and then also made the

09:15   25   ride a lot safer.

1  Q.   How does the nozzle flap work?

2  A.   So it's basically a device, you know, so the nozzle is a

3  chunk of stainless steel angle iron and bolts, and then this is

4  a padded flap that sits over the nozzle, and it's flexible, and

09:15  5  it needs to be strong, so it's reinforced.  And then it

6  will -- when you turn on the ride, it will open, and then the

7  water will flow out, and then you turn the ride off, it should

8  close.

9  Q.   When did you first see a nozzle flap in person?

09:15  10  A.   I saw it on the FlowBarrel Bruticus Maximus back in the

11  summer of 2000.

12  Q.   I understood from Mr. Lochtefeld's testimony yesterday the

13  Bruticus Maximus started the tour in 1999.  Was part of that

14  tour coming to San Diego in 2000?

09:15  15  A.   Yes.

16  Q.   Did you just see the ride in operation, like, as a

17  spectator?

18  A.   I mean, we lived and breathed that product, so bear in

19  mind, at that point, I was the guy that was wrenching on the

09:16  20  rides, so I -- me and other people were carrying the nozzle

21  flaps, we were doing different things on the ride, we were

22  coating the ride, we were doing a number of different tasks to

23  get the ride set up because we did the -- a huge event at

24  Belmont Park around -- I think it was August of 2000, so we had

09:16  25  to get ready for this big event.

|       |    |                                                               |
|-------|----|---------------------------------------------------------------|
|       | 1  | THE COURT:  Did you say coating or coding?                     |
|       | 2  | THE WITNESS:  C-O-A-T-I-N-G, coating.                         |
|       | 3  | THE COURT:  Okay.  Great.                                     |
|       | 4  | THE WITNESS:  Sorry.                                          |
| 09:16 | 5  | THE COURT:  That's okay.                                      |

BY MR. SCOTT:

Q.  Can you describe the nozzle flap that you saw on the Bruticus Maximus in the summer of 2000?

A.  Yes, it was a flap that was roughly two inches thick at its base.  It tapered down to a point, kind of like a blunt nose. It was quite thick at the start, and it was extremely heavy because we had to lift it multiple times, and it was quite rigid, but at the same time flexible.

Q.  When you say it was kind of rigid, was there something that made it a little bit rigid?

A.  Yes, so back when we originally built that ride, it was -- the ride itself and the nozzle flaps were coated with polyurethane coating, which was performed by a company called MBGS in Texas.  And the coatings that MBGS used to use was very, very thick, so the coating on the nozzle flap was roughly a quarter inch to three-eighths of an inch thick.  So this coating encapsulated the nozzle flap, which gave it its rigidity, but also made it still flexible at the same time.

Q.  This morning did you have an opportunity to inspect Defendant's demonstrative Exhibit NU?

412

```
 1  A.  I did.
 2  Q.  Specifically, did you inspect this flap on your right and
 3  the jury's right?
 4  A.  I did.
 5  Q.  Is this representative of the nozzle flap that you saw on
 6  the Bruticus Maximus in the summer of 2000?
 7  A.  That is not representative of the original nozzle flap that
 8  was on the barrel.
 9  Q.  Why not?
10  A.  Because that's kind of a little bit more floppy, like a
11  noodle.  The original nozzle flap was a lot more kind of rigid
12  and firm.
13  Q.  Was the original nozzle flap that you recall thicker or
14  thinner than Exhibit NU on the right?
15  A.  It was thicker.  It was roughly two inches thick or more,
16  two and a half inches thick, at its base.
17  Q.  Do you believe upon your inspection that Exhibit NU, the
18  right-hand one, was reinforced in any way?
19  A.  I mean, it has coating on it, but it's not the same level
20  of coating that the other nozzle flap had, which gave it a lot
21  more, you know, rigidity and firmness.
22  Q.  Did you consider the nozzle flap on the Bruticus Maximus in
23  the summer of 2000 to be reinforced in any way?
24  A.  It was basically reinforced by the coating that was wrapped
25  around the entire thing.
```

413

1   Q.   Okay.  So with the nozzle flap on the Bruticus Maximus,

2   would I have been able to do this?

3   A.   No.

4          MR. SCOTT:  I should describe this.  I flexed it from

09:19   5   side to side.

6   BY MR. SCOTT:

7   Q.   Would the Bruticus Maximus 2000 nozzle flap have done that?

8   A.   No.

9   Q.   Just while I'm on the subject of this demonstrative,

09:19   10   looking at these three examples of nozzle flaps, I understand

11   they're just, you know, demonstratives, but how long or how

12   wide was the original Bruticus nozzle flap?

13   A.   It was -- gosh, I believe it was eight feet wide.

14   Q.   Okay.  And how many nozzle flaps were on the Bruticus

09:20   15   Maximus?

16   A.   Four.

17   Q.   Looking at this left--hand-side one here, how wide is the

18   nozzle flap on the current FlowRider product?

19   A.   I believe it's a little over eight feet, so kind of

09:20   20   similar, similar in size.

21   Q.   Okay.  And so if it's a FlowRider Double, it has two

22   eight-foot flaps?

23   A.   Right.

24   Q.   Okay.

09:20   25   A.   Roughly.  I don't know the exact dimension to the detail.

1    Q.  We talked about the urethane coating that was on the -- on

2    the nozzle flap you saw on Bruticus Maximus in 2000.  Was that

3    on the exterior of the nozzle flap?

4    A.  That is correct.

09:20    5    Q.  Okay.  So you consider that to be externally reinforced?

6    A.  Yes.

7           MR. SCOTT:  Can you put up Exhibit 121-11?

8           THE CLERK:  What exhibit?

9           MR. SCOTT:  Exhibit 121.

09:21    10        Can you highlight the pad 130?

11   BY MR. SCOTT:

12   Q.  During your time, nearly 20 years now, working at Wave Loch

13   and WhiteWater on the FlowRider products, has every nozzle flap

14   you've encountered been reinforced either externally or

09:21    15   internally?

16   A.  Yes.

17   Q.  At some point, did FlowRider start using a hinged nozzle

18   flap with a steel plate in it?

19   A.  Yes.  So the company that we were originally using, MBGS,

09:21    20   actually went out of business, so the we used fiberglass and

21   other methods to reinforced the nozzle flap.

22          MR. SCOTT:  I'd like to look at 468, please.

23   BY MR. SCOTT:

24   Q.  Do you recognize what this is?

09:22    25   A.  Yes.

1   Q.   Can you tell me what this is, please?

2   A.   This is Bruticus Maximus after it had been installed at

3   Belmont Park for a number of years.

4   Q.   Is this the same nozzle flap that you saw in Bruticus

09:22   5   Maximus in the 2000?

6   A.   No.

7   Q.   Do you know why it's different?

8   A.   You know, over time, these things wear.  It's kind of like

9   painting your house and how you would paint a house, and over

09:22   10   time, the paint would kind of wear and look bad.  So we would

11   frequently recoat the barrel to make it look fresh and new.

12   And then at some point, that nozzle flap was replaced and this

13   was put on.

14   Q.   Over time, about how many nozzle flaps do you think you've

09:22   15   seen?

16   A.   Gosh, it's probably around a hundred, maybe close to a

17   hundred, or it could be a little bit more because each ride has

18   multiple, so I've seen a lot of nozzle flaps in my time.

19   Q.   You've seen a lot of rides, a lot of nozzle flaps?

09:23   20   A.   Yes.

21   Q.   Aside from this one that you say was a reinstallation at

22   Belmont Park, have you ever seen a nozzle flap on a FlowRider

23   product that flexed like 468?

24   A.   No.

09:23   25   Q.   During your time at Wave Loch and now WhiteWater, what has

1  been the function of every nozzle flap that you've seen?

2  A.  So there's -- there are kind of three key things that a

3  nozzle flap does.  And it may seem so simple, but you have a

4  person that can come careening and collide with the metal

09:23  5  nozzle that's got bolts and angle iron on it, and the primary

6  function of a nozzle flap is to protect the rider.

7      So it does three basic things:  Number one, it prevents the

8  rider from colliding with the metal object.  It allows the

9  rider to kind of come up and over the nozzle itself.  It also

09:24  10  should be flexible so that it can close when the ride is turned

11  off.  So it basically will shut down when the ride's turned

12  off.  And it, you know, should -- people can kind of rub up

13  against it and collide with it.  The primary purpose is to

14  prevent people and boards and things getting sucked into the

09:24  15  nozzle.  So while it's a really simple part, it plays a really

16  important role.

17  Q.  Do all of the nozzle flaps you've seen accomplish those

18  functions in the same way?

19  A.  More or less, yes.

09:24  20  Q.  How does it do that?

21  A.  So you would -- the nozzle flap assembly is basically

22  bolted to the nozzle, and it sits skimming on the flow, and

23  then when the ride is turned off, it kind of drops down and

24  closes the nozzle flap or the nozzle.

09:25  25  Q.  Could a FlowRider ever shut off while a rider is on it?

A.   Yeah, there are kind of five -- four or five different
scenarios of where a ride can be shut off while the person is
riding.  Bear in mind that there's an operator who's standing
about five or six feet away from the rider, so if the rider
asks -- says, "Shut the ride down, help," or something, you
know, then they could shut the ride down then.  If the person
falls, you know, has some kind of a -- you know, hurts himself
or something like that -- you know, it's a body-active sport,
so it happens from time to time.  That could cause the ride to
be shut down.  Or if -- you know, if there's horseplay, you
know, some guy's monkeying around and causing trouble, they
could shut it down then.  You know, they shut it down at the
end of business, but there's also another scenario, what we
call flow decay, where if the power of the water is
insufficient to push the person over the hump, then you'll get
a mass of white water that will build up behind the person, and
there would be not enough power to essentially push that mass
of white water off the back of the ride at which point they'd
shut the ride down, and the person, along with the water, will
kind of come sliding down and careening towards the nozzle flap
itself.

Q.   How common is flow decay?

A.   Well, it kind of -- you know, it sounds bad, but it's not
as bad as it sounds.  It's pretty common.  It will probably
happen two or three times a day.  You kind of want it to happen

```
 1  because we -- we're using a ride where there could be kids who
 2  are 30 pounds or some dude is 300 pounds, and, you know, to
 3  have enough power to push a huge person up over the ride
 4  sometimes can be a little bit too much power for a smaller kid.
 5  So you kind of want to be right on that edge.  So oftentimes,
 6  if you do have a big person, you will get a flow decay.
 7  Q.  I'd like to show you Exhibit 492.
 8  A.  I've seen this one before.  So this is flow decay happening
 9  right there, exactly what I was describing.
10  Q.  Okay.  I was just going to ask you, is this an example of
11  flow decay?
12  A.  This is absolutely an example of flow decay.
13  Q.  So he fell, and he wasn't pushed off the back, and the ride
14  operator shut down the ride?
15  A.  Correct.
16  Q.  Is that a FlowRider ride?
17  A.  Yes.
18  Q.  So the --
19          THE COURT:  Can you go back to that?
20          MR. SCOTT:  Sure, 492.
21          THE COURT:  I have a question for you:  What is this
22  thing that -- in this picture that is now almost touching what
23  appears to be a board?
24          MR. SCOTT:  This here, Your Honor?
25          THE COURT:  Yes.  What is that?
```

| | | |
|---|---|---|
| | 1 | THE WITNESS:  That looks to be part of the nozzle flap |
| | 2 | assembly, kind of like the top pad, which we call the burrito. |
| | 3 | THE COURT:  The what? |
| | 4 | THE WITNESS:  We call it a burrito, but it's just part |
| 09:28 | 5 | of the nozzle flap.  It's the top that makes the connection |
| | 6 | between the nozzle flap and the top grading. |
| | 7 | THE COURT:  And what's this other thing down, like, |
| | 8 | where he has -- he appears to have his elbow on it? |
| | 9 | MR. SCOTT:  This here, Your Honor? |
| 09:28 | 10 | THE COURT:  No. |
| | 11 | THE WITNESS:  The rider? |
| | 12 | THE COURT:  I don't think I can draw on it.  But see |
| | 13 | where the rider is? |
| | 14 | THE WITNESS:  Yes. |
| 09:28 | 15 | THE COURT:  And he appears to have his left elbow |
| | 16 | on -- |
| | 17 | MR. SCOTT:  Here? |
| | 18 | THE WITNESS:  Yes, his elbow is on the nozzle flap |
| | 19 | itself, on the -- the leading edge of the flap. |
| 09:29 | 20 | THE COURT:  Got it.  All right.  Thank you. |
| | 21 | BY MR. SCOTT: |
| | 22 | Q.  So using this again, this is a hinged nozzle flap? |
| | 23 | A.  Yes. |
| | 24 | Q.  Is this the burrito piece? |
| 09:29 | 25 | A.  Yes, but it's normally kind of connected.  This one appears |

1   to be, you know, broken or torn or something.

2   Q.   And when the judge was asking you, you said that the

3   rider's elbow appeared to be on the nozzle flap?

4   A.   That is correct, yes.

09:29   5   Q.   What could happen if the nozzle flap was not closed when

6   this gentleman slid down?

7   A.   Well, for one, the board that you see next to the other

8   gentleman could get sucked down into the nozzle, the rider

9   himself could collide with the gaping hole of the nozzle itself

09:29   10   and hit bolts and steel, so there's a -- he's got a big smile

11   on his face right there.  He wouldn't have that if the nozzle

12   flap wasn't there.

13   Q.   You do sales, correct?

14   A.   Correct.

09:30   15   Q.   Historically, do you sell the nozzle flap?

16   A.   Not really.  I mean, I would sell the -- what the nozzle

17   flap did because prior to that point, our rides kind of came

18   along, went down, and then was horizontal and then went up

19   again.  So the nozzle flap allowed us to shorten the ride, so

09:30   20   in a lot of the marketing materials I talk about things like,

21   you know, visibility and that kind of thing.  So I would more

22   focus on what the nozzle flap did than the actual nozzle flap

23   itself.  And -- but in recent times, I've kind of ramped up a

24   little bit more of the promotion on the nozzle flap itself.

09:30   25   Q.   I'd like to show you a marketing brochure, Exhibit 60.  Do

1    you recognize this document?

2    A.   Yes.

3    Q.   What is this?

4    A.   It's a piece that just describes the FlowRider benefits

09:31   5    that I would send to a client, potential client.

6             MR. SCOTT:  Can you scroll down?  There we go.

7    BY MR. SCOTT:

8    Q.   So looking here, this is page 3 of Exhibit 60.  It says,

9    "Dear Matt."  Says some things.  And says, "Sincerely, Andrew

09:31   10   Thatcher."  That's you?

11   A.   That is me.

12   Q.   Is this a common package that you would send to potential

13   customers?

14   A.   Yes.

09:31   15   Q.   And this one's dated 2012?

16   A.   Yes.

17   Q.   Scrolling down to page 8, there's a list of patents.  By

18   the way, I notice that this list of patents is kind of floating

19   in the middle of the page.  Is that how you would normally send

09:31   20   it to a client?

21   A.   No, the formatting got screwy on this one.

22   Q.   Okay.  Do you see the '589 patent in this list?

23   A.   I do.

24   Q.   Can you point it out?  By the way, I don't know if you

09:31   25   noticed, but you can actually draw on that screen with your

1    finger.

2    A.   Right there.

3    Q.   Exactly.

4         Look at page 6.  At the top it says, "Dimensions and

09:32  5  specifications" --

6    A.   Yes.

7    Q.   -- "attraction footprint."

8    A.   Right.

9    Q.   Why do you put the attraction footprint in here?

09:32  10  A.   Because it's important.  A lot of our clients are trying to

11   plan to add a ride, and so they need to know what the size of

12   the ride is, particularly indoors when they're trying to put it

13   inside a building or something like that.

14   Q.   Did you ever work on a ride that didn't use a nozzle flap?

09:32  15  A.   No.

16   Q.   You didn't work on a ride in Montana?

17   A.   Oh, yeah, I mean, we did a -- that was -- our older

18   technology that was sold in the late '90s, but when I first

19   started, I was kind of involved on some parts of the install,

09:32  20  so . . .

21   Q.   Did you go to Montana?

22   A.   I think three or four times.

23   Q.   Was that ride bigger or smaller than the footprint of a

24   FlowRider?

09:33  25  A.   It was a lot bigger.  Also different.

1            MR. SCOTT:  I'd like to look at page 13, please.

2   Could you scroll up just a little bit to 12?  And we've got a

3   formatting issue.

4   BY MR. SCOTT:

09:33   5   Q.  So right here at the bottom of 12 it says, "Attachment 9,

6   features and strong points."  Do you see that?

7   A.  Yes.

8   Q.  And the features and strong points are what's on this list

9   on the next page?

09:33   10  A.  That is correct.

11  Q.  So looking at page 13, Item 1 is "Safety"?

12  A.  Yes.

13  Q.  You advertise the safety of your products?

14  A.  Yes.

09:33   15  Q.  Anywhere in here do you talk about the nozzle flap?

16  A.  I don't think so.

17  Q.  Why not?

18  A.  Well, you know, our biggest focus was always on the ride

19  surface.  That was kind of the sexy part whereas a nozzle flap

09:33   20  is -- it's kind of like car manufacturers don't really talk

21  about their steering wheels, but you can't really drive a car

22  without a steering wheel, so we didn't really talk about it.

23  We more talked about the things that the nozzle flap did or

24  what it allowed us to do.

09:34   25  Q.  Okay.

1          MR. SCOTT:  Can you back out of that, Gary?

2    BY MR. SCOTT:

3    Q.   Looking at the other items on this page, is there anything

4    else here that is promoting the features of a nozzle flap

09:34    5    without mentioning the nozzle flap?

6    A.   Sure.  I mean, you know, you showed the video a few minutes

7    ago of the guy wiping out.  That video went absolutely viral.

8    There were millions of people that saw that video, and I was

9    constantly pinged on Facebook, so it's a classic example of the

09:34   10    nozzle flap at work because the person who took the video is

11    able to get up close and personal with the person who's riding.

12    So even, "Number 5, Rise of social media," it's absolutely

13    true.  You see this guy.  He's riding.  The person taking the

14    video is very close to the rider.  And as a result, you know,

09:34   15    you get this -- these incredible social media shots.  And then

16    also talking about food and beverage as well.  You know, it's

17    really critical, especially an indoor venue, to get as many

18    tables and chairs up around the ride as possible.  So, you

19    know, from a spectator standpoint, the nozzle flap allowed us

09:35   20    to make the ride smaller, which has given us all these added

21    benefits.

22    Q.   Do you know Richard Alleshouse?

23    A.   Yes, I do.

24    Q.   When did you first meet Richard Alleshouse?

09:35   25    A.   When he joined Wave Loch.

1    Q.   Do you recall when that was?

2    A.   I think it was around 2005.

3    Q.   Do you recall Mr. Alleshouse leave and then come back

4    again?

09:35    5    A.   That's right, yeah.  He first started working on the

6    Bruticus Maximus, the wave itself, I believe, and then

7    afterwards, he joined us as a product engineer for FlowRider.

8    Q.   Do you recall when he joined as a product engineer for

9    FlowRider?

09:35   10    A.   I think it was 2005, but I don't recall exactly.

11    Q.   That's fine.  Whenever it was, when he came back as a

12    project manager, what did you understand Mr. Alleshouse's job

13    duties to be?

14    A.   He wasn't a product manager.  He was the product engineer.

09:36   15    Q.   Sorry.

16    A.   So he was --

17    Q.   Thank you.

18    A.   -- focused on the FlowRider, you know, Single, Double,

19    Compact, different FlowRider products.  That was his baby.

09:36   20    Q.   Did Mr. Alleshouse know how to build a nozzle flap?

21    A.   Yes.

22    Q.   Do you believe Mr. Alleshouse knew about the '589 patent?

23    A.   Yes.

24    Q.   Why do you think that?

09:36   25    A.   Well, for one, the patents were always kind of front and

09:36

1  center.  They were on every single proposal, they were on our
2  brochures, and also he was given the task of actually marking
3  our rides with the patent numbers itself.  So he got the patent
4  numbers, gave them to some of our suppliers, who would then
5  actually stencil the patent numbers on the rides itself.
6  Q.   Were you surprised when Mr. Alleshouse left Wave Loch?
7  A.   I was.
8  Q.   Why?
9  A.   You know, we were buddies, we would get coffee every
10  morning, we went on fishing trips, on surfing trips, and, you
11  know, he introduced me to spearfishing.  We were good friends
12  and never once mentioned that he was going to leave, and so I
13  was pretty disappointed when I heard the news.
14  Q.   Do you recall when he left?
15  A.   I believe it was 2012?  No.  I don't recall the exact date.
16  Q.   I was going to ask you when in 2012 he left.
17       But did you have a trip with Mr. Alleshouse planned around
18  the time that Mr. Alleshouse left?
19  A.   We did.  So we were planning a trip down to Gonzaga Bay on
20  the Sea of Cortez to go fishing and spearfishing.
21  Q.   Was that trip before or after he left?
22  A.   It was three weeks after his final day.
23  Q.   Did you still go?
24  A.   Yes.
25  Q.   At any point during that trip, did Mr. Alleshouse tell you

09:37 (lines 10-15)
09:37 (line 20)
09:37 (line 25)

1  he was going to start a competing business?

2  A.   No.  I asked what he was planning, and he at no point

3  mentioned that he was going to do that.

4  Q.   When did you first learn that Mr. Alleshouse had started a

09:38  5  new company?

6  A.   It was a few weeks after our trip down to Gonzaga Bay.

7  Q.   How did you learn about that?

8  A.   I saw a post on Facebook.

9  Q.   Do you recall what the post said?

09:38  10  A.   I believe it was that they were going to be exhibiting at

11  IAAPA.

12  Q.   Can you tell me what that is?

13  A.   IAAPA is the International Association of Amusement Parks

14  and Attractions.  So basically if you want to sell a roller

09:38  15  coaster or water park or anything like that, that's the big

16  convention in Orlando that happens every year around November,

17  like the week before Thanksgiving.

18  Q.   Did you go to IAAPA in November of 2012?

19  A.   I did.

09:38  20  Q.   Was Mr. Alleshouse there?

21  A.   Yes.

22  Q.   Did he have a display or something?

23  A.   Yes, he did.

24  Q.   Did you go by?

09:38  25  A.   I walked past it.

1   Q.   What did you see?

2   A.   I saw basically copies of the FlowRider in their booth.

3   Q.   What was your reaction?

4   A.   As models, as scale models.

09:39   5   Q.   What was your reaction?

6   A.   I mean, I was disappointed, angry.  You know, it was

7   frustrating.

8             MR. SCOTT:  I'd like to put up Exhibit CQ, please.

9   BY MR. SCOTT:

09:39   10  Q.   I want to go to page 3 of this first.  Page 2 maybe.

11       So looking at the email, in the middle there, and then

12  there's something in a foreign language below that, I want to

13  point out, you're not on this immediate email, are you?

14  A.   I don't believe so.

09:39   15  Q.   Do you recall whether this email string was ultimately

16  forwarded to you?

17  A.   I think so, yeah.

18  Q.   Looking here, can you tell what's going on in this email?

19  A.   It's, I believe, the -- it's one of our salespeople, Val,

09:40   20  emailing Sean, asking questions about a competitor --

21  Q.   Who's Sean?

22  A.   -- in Barcelona.

23  Q.   I'm sorry.  I didn't mean to cut you off.

24       Who's Sean Hinton?

09:40   25  A.   Sean Hinton, I believe at this time, was the regional vice

429

|  |  |  |
|--|--|--|
| | 1 | president for Europe. |
| | 2 | Q.   Okay.  So backing out of that -- |
| | 3 | A.   Sales in Europe. |
| | 4 | MR. SCOTT:  And scroll up, and if you can, Gary, blow |
| 09:40 | 5 | up this email that's between the two pages from Geoff Chutter. |
| | 6 | BY MR. SCOTT: |
| | 7 | Q.   Again, you're not on this? |
| | 8 | A.   Right. |
| | 9 | Q.   Do you recall it being forwarded to you? |
| 09:40 | 10 | A.   Yes. |
| | 11 | Q.   Okay.  Who's Geoff Chutter? |
| | 12 | A.   He is the CEO of Whitewater. |
| | 13 | Q.   What is Mr. Chutter saying here? |
| | 14 | A.   He's basically saying that we should look into our |
| 09:41 | 15 | competitors. |
| | 16 | Q.   For what purpose? |
| | 17 | A.   To see if there are opportunities to see, you know, what |
| | 18 | they're doing, you know, what we can learn from our |
| | 19 | competitors. |
| 09:41 | 20 | Q.   He says, "In spite of the fact that we're being knocked |
| | 21 | off, we can't miss the opportunity here," right? |
| | 22 | A.   Yes. |
| | 23 | Q.   What's the opportunity? |
| | 24 | A.   It's to learn what our competitors are doing. |
| 09:41 | 25 | Q.   Okay.  Let's go to the next email in the chain. |

430

1  A.   This is an internal document, obviously.

2  Q.   So the next one up looks like you are on this one.  This is

3  from Mr. Myrman, who we met yesterday.

4  A.   Yes.

09:41  5  Q.   He includes you on this.  What is Mr. Myrman talking about

6  here?

7  A.   He's talking about a competitor of ours named Wavesurfer or

8  AFP.  They've competed against us in Europe, and so he was

9  talking about those guys.

09:41  10  Q.   Let's go to the top where you actually write something.

11  Can you read your email, please?  This is an email from you,

12  right?

13  A.   Yeah, I mean, it's a bit embarrassing.  This is an internal

14  document, but I said, "Richard is also a big threat from a

09:42  15  product standpoint.  He has no cash, so he is struggling.  Now

16  is the time to squash him.  He was the main engineer for the

17  FlowRider for five years, and he has made improvements.  He has

18  no sales force, but his product is good.  If we do nothing,

19  then this will be a problem."

09:42  20  Q.   And at the bottom you talk about Karel and a padded nozzle

21  flap, and you said you believe the padded nozzle is still a

22  very valid patent?

23  A.   Correct.

24  Q.   Do you know whether WhiteWater holds a patent for a padded

09:42  25  nozzle in Barcelona where that product is being sold?

1    A.   I don't know.

2    Q.   Okay.  Focusing on the first paragraph, did you mean

3    everything you said there about Richard and Pacific Surf

4    Designs?

09:42    5    A.   I mean, I was angry, you know, and frustrated, but yeah, it

6    was --

7    Q.   Okay.  Did you think he was a big threat from a product

8    standpoint?

9    A.   Yes, and I was right because or else we wouldn't be here.

09:43   10    Q.   Do you think he's made im -- did you think he made

11   improvements to the ride?

12   A.   Yeah, at the time, I did.

13   Q.   What sort of improvements did he make?

14   A.   You know, based on our standard FlowRider, he had reduced

09:43   15   the water volume, which had some good consequences.  He had

16   made the pump more accessible for oil changes.  You know, there

17   were a few things like that.

18   Q.   Were you also being honest when you said you wanted to

19   squash him?

09:43   20   A.   Yes.

21   Q.   Were you angry at Mr. Alleshouse?

22   A.   I was.

23   Q.   Who does WhiteWater sell products to?

24   A.   So our clients can be anyone from a sheik in Dubai, water

09:43   25   parks, resorts, municipalities, cruise ships, and private

1   individuals, that kind of thing.

2   Q.   Have you sold to a sheik in Dubai?

3   A.   A couple.

4   Q.   What did you sell?

09:44   5   A.   We have a product called a FlowBarrel Ten Double, which is

6   massive and very expensive, and this guy put it at his house.

7   Q.   Is it the most expensive product you sell?

8   A.   It is.  Crazy.

9   Q.   He put it in his backyard?

09:44   10   A.   Yes.

11   Q.   As part of your job, do you monitor what your competitors

12   are doing?

13   A.   Yes.

14   Q.   Have you run into situations where you're bidding on the

09:44   15   same projects as Pacific Surf Designs?

16   A.   All the time.

17   Q.   How many?

18   A.   Gosh, I mean, there are different kinds of scenarios,

19   right?  There are tenders when we are officially bidding, and

09:44   20   then there are other times where we're just talking to clients.

21   We get a lot of tire-kickers, so we get a lot of people that

22   come and just ask us questions, and then they'll -- they have a

23   plan to do something, but sometimes that plan happens,

24   sometimes it doesn't, so come across them a lot.

09:45   25   Q.   Okay.  In any situations where you were bidding against

433

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
|          | 1  | Pacific Surf Designs, did Pacific Surf Designs get the project?               |
|          | 2  | A.  Yes, I believe so.                                                        |
|          | 3  | Q.  Do you remember any examples?                                             |
|          | 4  | A.  One was Moon Palace down in Mexico.                                       |
| 09:45    | 5  | Q.  Any others?                                                               |
|          | 6  | A.  I believe there was a project in Texas as well that we                    |
|          | 7  | lost.                                                                         |
|          | 8  | Q.  Okay.  In some situations where you've been bidding against               |
|          | 9  | each other, has WhiteWater won the bid?                                       |
| 09:45    | 10 | A.  Yes.                                                                      |
|          | 11 | Q.  Has WhiteWater ever had to lower its prices in order to get               |
|          | 12 | a bid when it was competing against Pacific Surf Designs?                     |
|          | 13 | A.  Yes.                                                                      |
|          | 14 |         MR. SCOTT:  I want to bring up Exhibit 169, please.                   |
| 09:45    | 15 | Scroll down to the next email in the chain.  Here we go.                      |
|          | 16 | BY MR. SCOTT:                                                                 |
|          | 17 | Q.  First question.  How do you pronounce Janne's last name?                  |
|          | 18 | A.  Miikkulainen.                                                             |
|          | 19 | Q.  Janne Miikkulainen.  Thank you.  I couldn't do that                       |
| 09:46    | 20 | yesterday.                                                                    |
|          | 21 |     This is an email from Janne to you?                                       |
|          | 22 | A.  Yes.                                                                      |
|          | 23 | Q.  Do you remember this email?                                               |
|          | 24 | A.  I do.                                                                     |
| 09:46    | 25 | Q.  Sometime in 2016?                                                         |

1    A.   Right.

2    Q.   What was Janne telling you here?

3    A.   He said that he's promised to take a meeting with Yong

4    and Richard, and they're going to be discussing a number of topics.

09:46   5    So he was asking me to basically help him be prepared for that

6    meeting.

7    Q.   Okay.  He wasn't just taking a meeting.  He said, "I

8    promised Juha to take a meeting with Yong Yeh and Richard."

9    A.   Right.

09:46   10   Q.   Do you know who Juha was?

11   A.   Juha was Janne's partner, a minor partner, in their company

12   called Sick-X.

13   Q.   Okay.  I'd like to look at the second line here.  It says,

14   "They have offered us cheaper price and better financing plan,"

09:47   15   right?

16   A.   Right.

17   Q.   So what do you understand Janne was telling you here?

18   A.   If you want this business, you lower your price and give us

19   better financing.

09:47   20   Q.   Okay.  Did he expressly tell you that?

21   A.   Yes.

22   Q.   Not in this email; in a phone call?

23   A.   Right.

24   Q.   Even if he had not said that separately, would you have

09:47   25   understood this language to mean you need to lower your price?

```
 1   A.   Yes.
 2   Q.   Why?
 3   A.   Because he's -- you know, he's basically saying if you
 4   don't lower your price and give us better financing, then we're
 5   going to buy from PSD.
 6   Q.   Okay.  Scrolling up to the first email --
 7   A.   And that's what we had to do.
 8           MR. SCOTT:  Can you get all the way till about here?
 9   I'm sorry, from the top down there.  Just don't need that
10   bottom paragraph.
11   BY MR. SCOTT:
12   Q.   So this is your email to Janne?
13   A.   Yep.
14   Q.   Do you believe that everything you said here is true?
15   A.   Yes.
16   Q.   Did you ultimately get the project from this company?
17   A.   Yes, we did.
18   Q.   I didn't ask you, do you know what this company is called
19   that Janne and Juha worked for?
20   A.   Sick-X.
21   Q.   How many rides was Sick-X trying to sell?
22   A.   Trying to buy?
23   Q.   Thank you.  Trying to buy.
24   A.   They had and continue to have plans to roll out ten venues,
25   and they've rolled out three so far.
```

1    Q.   Okay.  So in 2016 when you were working with Janne on this,

2    did you understand you were bidding on a single ride, or were

3    you bidding on ten rides?

4    A.   We were bidding on multiple rides.

09:49   5    Q.   Okay.  Did you ultimately have to cut your price in order

6    to get that?

7    A.   Yes.

8    Q.   Do you know what price you sold for?

9    A.   We had to go down to 675,000.

09:49   10   Q.   What's your list price for FlowRider Double?

11   A.   It's around 850-.

12   Q.   And the 675- is also for a FlowRider Double?

13   A.   Yes.

14   Q.   Is your understanding that that price is locked in for all

09:49   15   ten of these rides?

16   A.   Right.

17   Q.   Did WhiteWater have to do anything else besides lowering

18   its price in order to get this project?

19   A.   Yeah, we also had to invest in their company 200,000 Euros.

09:49   20   Q.   Why did you have to do that?

21   A.   Because we were told that that's what Yong had offered to

22   Juha, was basically to invest in Sick-X to try and kind of get

23   their business.  So we had to match that in order to -- in

24   order to continue to sell to them.

09:49   25          MR. SCOTT:  I'd like to bring up Exhibit 67, please.

BY MR. SCOTT:

Q.   On the second email here -- this is an email from you to Marshall Myrman.  Cutting to the chase, I want to focus on this paragraph that begins, "Pacific Surf Designs."  Looking here it says, "Pacific Surf Designs is probably our biggest competitor and the one that I am constantly battling."

A.   Yep.

Q.   And you go on to talk about pricing and the way they market their products.  You say, "They try to one-up us whenever they can."  You talk about them being cheaper, better warranty, things like that.  Are all of those things true?

A.   That was my understanding, yes.

Q.   Do you believe that PSD is your biggest competitor?

A.   I mean, they certainly are one of our biggest competitors, yes.

Q.   Do you believe that PSD is competing against you fairly?

A.   No.

Q.   Why not?

A.   Because they're using our intellectual property.

        MR. SCOTT:  Thank you.

        THE COURT:  All right.  Mr. Thomas.

                    CROSS-EXAMINATION

BY MR. THOMAS:

Q.   Good morning, Mr. Thatcher.

A.   Good morning.  We haven't been formally introduced, so I

```
 1   thought I'd take the opportunity to do that.  My name is
 2   Joe Thomas.  I'm counsel for PSD.
 3        Let me pick up on a couple of things that you covered with
 4   your counsel on direct examination.
 5        You talked about marketing materials, if you recall.  I'd
 6   like to show you Exhibit 60, which you covered with -- directly
 7   with your counsel.  Just give us a minute.  We're going to
 8   switch over the technology here.
 9   A.   No problem.
10   Q.   While we're getting to that, you were open and candid,
11   saying you never really put any marketing materials directly
12   about the nozzle flap in your marketing information, correct?
13   A.   Certainly not in -- you know, originally, no.
14   Q.   And you've only done that more recently in 2018 after this
15   litigation was filed.  Isn't that correct?
16   A.   I think it was actually long before that, but . . .
17   Q.   You recall giving your deposition in this case?
18   A.   Yes.
19   Q.   And you were under oath at that time?
20   A.   Yes.
21   Q.   Okay.  And do you recall indicating that at the time of
22   your deposition, there was no marketing materials directly
23   marketing the nozzle flap?
24   A.   Okay.  Yeah.
25   Q.   And that was true, correct?
```

09:51
09:52
09:52
09:53
09:53

```
 1   A.   Yeah.
 2   Q.   What year was your deposition taken?
 3   A.   I beg your pardon?
 4   Q.   What year was your deposition taken?
 5   A.   2016.
 6   Q.   2016.  So as of 2016, there were no marketing materials
 7   that were prepared by WhiteWater marketing specifically the
 8   nozzle flap, correct?
 9   A.   I haven't gone back and studied every single little bit of
10   marketing material, but if that's what I said, we'll go with
11   it.
12   Q.   Okay.  Let's look at Exhibit 60, if we could, and I -- look
13   at my notes here.  I want to get the right page number where
14   you showed the various patents in this information.  I think
15   it's page 8, I'm being told.  We'll quickly go there.
16        Okay.  This is page 8 of Exhibit 60, which was the page you
17   talked about earlier.  Now, if you look at the bottom -- well,
18   first off, this was -- this document was prepared when?  Do you
19   recall?
20   A.   2012.
21   Q.   2012.  Now, if you look at the bottom, there's a series of
22   referenced patents.
23   A.   Right.
24   Q.   And you're including this because you want to tell the
25   customers we have these patents, correct?
```

1  A.   Right.

2  Q.   Well, isn't it a fact, as of the date of this marketing

3  material, a number of these patents had already been expired?

4  A.   So I'm not the responsible person for knowing what patents

09:54  5  are there or exist.  I -- at the time, I'm the sales guy.  I

6  reach out to either Tom or our kind of in-house legal counsel

7  and say hey, can you give me a list of patents that we can put

8  on this brochure?  But I didn't go in and check every single

9  patent and how it applied and what it did and where it was.

09:55  10  Q.   But you were in charge of preparing the marketing materials

11  to go to the customers, are you not?

12  A.   I did, yes.

13  Q.   Okay.  In that respect, you're responsible for making sure

14  that the statements in those marketing materials are true and

09:55  15  correct and accurate?

16  A.   I'm responsible for sending out the marketing materials.

17  Q.   Okay.  But you did no investigation to ascertain whether

18  any of these patents had been expired that you're including in

19  this marketing materials?

09:55  20  A.   No, I was trusting the people that were giving me the

21  information.

22  Q.   Okay.  And would it surprise you to know that -- I'll just

23  list off the patents for the record:  The '547 patent that's

24  referenced here, the '280 patent, the '692 patent, the '190

09:56  25  patent, the '260 patent, the '907 patent, the '019 patent, and

1   the '101 patent have all expired at the time this document was

2   prepared?

3   A.   Okay.

4   Q.   Okay.  And have you --

09:56   5   A.   I think the intent here was more to just show our clients

6   that we are focused on coming up with our own technology and

7   building great products and we patent our ideas as we go along,

8   so it wasn't really a big technical exercise on getting exact

9   details of what each patent did and how it did it.

09:56   10   Q.   Okay.  So your testimony is, you didn't do any verification

11   of the materials as it relates to whether the patents were

12   expired at the time you sent out this?

13   A.   That was my job.  I reached out to our legal counsel, our

14   lawyer, and said can you send me a list of our patents?

09:57   15   Q.   Okay.

16   A.   They gave me the list, put it on this marketing materials.

17   Q.   Okay.

18   A.   It's as simple as that.

19   Q.   And -- all right.  Well, we talked about your role in the

09:57   20   company.  You were involved -- you're involved in sales, and

21   there are competitors to your company, besides PSD?

22   A.   Correct.

23   Q.   How many would you say there are in the United States?

24   A.   I'd say six or seven.  Different types of competitors too,

09:57   25   you know.  Anyone that's taking a sale away from us is a

442

1  competitor.

2  Q.  So six or seven competitors besides PSD?

3  A.  Probably around there.

4  Q.  Okay.  And your business, the principal buying criteria to

09:57  5  your customers that you're marketing to is price, is it not?

6  A.  No, no, it's not.

7  Q.  Well, don't you have to respond to -- we'll look at some

8  emails in a minute, but you, in fact, are aware of what your

9  competitors are doing, and sometimes your customers even tell

09:58  10  you the competitors are offering a better price?

11  A.  Yes.

12  Q.  And it's not just PSD.  There are other competitors that

13  come in and underprice you?

14  A.  That does happen.

09:58  15  Q.  And if you want to secure that business, you have to be

16  prudent and lower your price to make your product competitive

17  in the marketplace?

18  A.  It depends on the situation.

19  Q.  You've lowered your price for other competitors, not just

09:58  20  PSD?

21  A.  That is correct.

22  Q.  This is a common experience when you're out and you're

23  trying to negotiate.  These are expensive pieces of equipment.

24  You said about a million dollars, correct?

09:58  25  A.  Right.

1    Q.   And you understand the customers all have some degree of

2    price sensitivity associated with these decisions, correct?

3    A.   Right, but --

4    Q.   So --

09:58    5    A.   -- I mean, there are different situations.  You know, there

6    are some situations where you have more quote/unquote leverage

7    or there are -- you know, it's negotiation.

8             THE COURT:  I'm sorry.  You have what?

9             THE WITNESS:  There are some situations where you have

09:59   10    a little bit more leverage than other situations, like if I'm

11    selling in China, for example, you know, I don't -- certain

12    things are not as important as in other countries.

13    BY MR. THOMAS:

14    Q.   But in fact, price is the most common reason that you don't

09:59   15    get projects.  Isn't that correct?

16    A.   I would say that price is one of the biggest ones, yeah.

17    Q.   And you recall testifying to that in your deposition that

18    you provided in this case, correct?

19    A.   I believe I'm -- I must have said that.

09:59   20    Q.   And that's a true statement, is it not?

21    A.   Yes.

22    Q.   So you lower your price not just for PSD; you have to lower

23    your price for other competitors as well, correct?

24    A.   Correct.

09:59   25    Q.   All right.  Now, let's look at Exhibit 67 -- I'm sorry --

1    Exhibit 169 quickly.  This is the email string that your

2    counsel showed you on direct examination, and you identified

3    the company associated with this email -- because the company

4    name's not on it -- as, I think, Sick-X.  Is that correct?

10:00    5    A.   That is correct.

6    Q.   And this customer did what a lot of customers do when

7    they're thinking about a big decision to buy a million-dollar

8    project; they came to you and said we have somebody else that's

9    offering us better terms, and you reacted to that, correct?

10:01    10    A.   Correct.

11    Q.   And you made an investment in this company?

12    A.   Correct.

13    Q.   200,000 Euros?

14    A.   Not me personally, but our company did, yes.

10:01    15    Q.   I understand.  I wasn't suggesting you did.

16         But that -- who made the decision to invest in Sick-X?

17    A.   That was a decision made by our senior management.

18    Q.   And they evaluated carefully the wisdom of that decision?

19    A.   Yes.

10:01    20    Q.   So in effect, your company has a minority ownership

21    interest in Sick-X, correct?

22    A.   Yes, we do, now.

23    Q.   So by reducing the price that you have reduced to secure

24    the sales, you've made three, I think, of ten --

10:01    25    A.   Two further of ten.

1   Q.   Okay.  Two of ten, but the expectation will be eventually

2   ten, correct?

3   A.   Yes.

4   Q.   So you get the benefit up front of selling your equipment,

10:01   5   and you get the benefit on the back end of your ownership

6   interest in the company's success when they acquire and operate

7   that, correct?

8   A.   We do, but it's different.  You know, I personally would

9   much rather just sell them the product at the -- at our full

10:02   10   price.  I mean, I personally am driven by commission, right, so

11   commission puts food on my table, it's how I feed my family; it

12   is with commissions.  So I mean, I don't get a piece of the

13   action for, you know, investing in a company, so did we do it?

14   Yes.  Is it what we wanted to do?  What I wanted to do?

10:02   15   Absolutely not.

16   Q.   Yes, you're a commission salesperson, so your only focus is

17   on getting the sales and the highest price possible because

18   that maximizes your commission, correct?

19   A.   My focus as a salesperson is to create a relationship with

10:02   20   my client and to have a great relationship so that I can

21   continue to sell to them in the future.

22   Q.   Understood.

23   A.   It's not to gouge them on price or anything like that.

24   Q.   My apologies.  I'm not suggesting that, Mr. Thatcher.

10:03   25       What I'm getting at is, your interest through your

1    employment status is securing commission income, correct?

2    A.   It is.

3    Q.   And you weren't involved in this decision to invest; that

4    was a decision made by higher-up people than you, correct?

10:03    5    A.   I'd like to say that I saw the big picture, and so I kind

6    of made certain recommendations, but I wasn't the

7    decision-maker.

8    Q.   So somebody else evaluated that and made that decision at

9    the company?

10:03    10    A.   Right.

11    Q.   That would have been Mr. Chutter?

12    A.   I believe it would have been between Mr. Myrman and

13    Mr. Chutter.

14    Q.   And neither Mr. Myrman or Mr. Chutter are commission

10:03    15    salespeople, are they?

16    A.   I don't know their package deal.

17    Q.   Okay.  And you did make a recommendation to go forward with

18    the investment, did you not?

19    A.   Well, when choosing between zero and something, I would

10:03    20    normally choose something.

21    Q.   Okay.  All right.  And what is your commission that you

22    make off the sale?

23    A.   Well, it's typically 2.5 percent if I sell at full price;

24    however, my commission percentage drops as the price of the

10:04    25    sale drops as well.  So if I make a full sale price, I make

1    sometimes double or triple than if I'm having to lower the

2    price substantially.  So I'm incentivized to not lower the

3    price.

4    Q.   Now, you mentioned you were friends at one point, and maybe

10:04    5    you are today, I don't know, with Mr. Alleshouse, and you were

6    angry with him, and you realize he was a competitor; you

7    realize now you're going to face some risk that your

8    compensation could be affected by his competition, correct?

9    A.   That's right.

10:04    10    MR. THOMAS:  Okay.  All right.  Now, let me have you,

11    if I could, bring up on the screen Exhibit CO-1.

12    BY MR. THOMAS:

13    Q.   This is an email that you prepared to David Keim?

14    A.   Yes.

10:05    15    Q.   Who is Mr. Keim?

16    A.   He is a -- he was a sales director at our licensee, Aquatic

17    Development Group.

18    Q.   Okay.  So we heard from Mr. Myrman yesterday, and

19    Mr. Myrman stated that this Aquatic Development Group is

10:05    20    actually a competitor of your company.  Do you agree with that?

21    A.   No.

22    Q.   You don't.  Okay.

23    A.   Aquatic Development Group is our North American licensee.

24    Q.   When they take a sale, they'll take a sale from you?

10:05    25    A.   I think you must be mistaken.  I don't believe he would

1   have said that at all.

2   Q.   You don't?

3   A.   No.   You're maybe talking about Murphy's and not Aquatic

4   Development Group.   The topic is Murphy's.

10:06   5   Q.   Well, let's turn back to this email.

6        You're looking at this.   You were doing an analysis of this

7   FlowRider versus StingRay?

8   A.   Yes.

9   Q.   Okay.   And explain for us why you were doing that.

10:06   10   A.   It's part of my job.

11   Q.   And if we could look at the page 3 of this attachment to

12   the email.   This is a document you prepared, is it not?

13   A.   Yes.

14   Q.   And it says, "FlowRider versus StingRay."   Do you see that?

10:06   15   A.   Right.

16   Q.   Okay.   And when you -- let's move through the next page, if

17   we could, page 4.

18        This is a simple description of what you think are the

19   benefits of the FlowRider as in comparison to the StingRay.   Is

10:07   20   that correct?

21   A.   That's what I put there.

22   Q.   Okay.   And when you looked at the StingRay -- you've seen

23   the StingRay before, have you not?

24   A.   Not in person.

10:07   25   Q.   You've seen photographs or video of the StingRay?

1  A.   Yes.

2  Q.   And that's what you used to prepare this comparative?

3  A.   Yes.

4  Q.   Okay.  And does the StingRay have a nozzle flap?

10:07  5  A.   I don't think so.

6  Q.   Okay.  And have you lost sales at any time to StingRay?

7  A.   I believe so, yes.

8  Q.   So some customers are buying these machines -- they're made

9  by StingRay -- without nozzle flaps, correct?

10:08  10  A.   That is correct.

11  Q.   And do you know how many sales you've lost to StingRay?

12  A.   It's probably two or three.

13  Q.   Okay.  And are there other competitors that have equipment

14  without nozzle flaps besides StingRay?

10:08  15  A.   There are, but again, this ride is quite different, so it

16  may not even need a nozzle flap.  I'm just preparing an example

17  of how the FlowRider compares to the StingRay.

18  Q.   I'm not asking you about your comparison; I'm just asking

19  you for information.

10:08  20  A.   Okay.

21  Q.   Are there other competitors that sell products without

22  nozzle flaps?

23  A.   Yes.

24  Q.   And how many?

10:08  25  A.   We used to sell products without nozzle flaps.

Q.   And how many would you say in the marketplace are there?

A.   How many competitors without nozzle flaps?

Q.   Yes.

A.   I'm not sure off the top of my head, but bear in mind, it also depends on how you define a "competitor."  For example, American Wave Machines, they -- their design is so completely different that they would never need to have a nozzle flap, so . . .

Q.   But they're offering a sheet wave machine, correct?

A.   No, they have a deep water wave.

Q.   But they're offering a ride attraction?

A.   Yes.

Q.   In that sense, they're a competitor?

A.   Yes.

Q.   And so there are offerings by other competitors of water ride attractions that don't sell or offer nozzle flaps, correct?

A.   Yeah, and I mean, I have no problem with companies like American Wave Machines because, you know, they've come up with something that is completely different to a FlowRider.  They don't need a nozzle flap.  So I mean we go head-to head, but it's, you know --

Q.   And your company, WhiteWater, you also provide replacement parts for existing rides that are in the marketplace?

A.   Yes.

1    Q.    And you actually offer the service of either refurbishing,

2    selling, or replacing nozzle flaps?

3    A.    Yes.

4    Q.    And how much does WhiteWater charge to sell a nozzle flap?

10:10    5    A.    I don't know.  I don't handle it.

6    Q.    You have no -- would you say it's about $2,000?

7    A.    I couldn't speculate at this point.  I don't handle

8    after-sales.

9    Q.    Okay.  Have you ever -- as part of your understanding of

10:10    10    this equipment that you are responsible for selling, did you

11    ever try to identify what is the value or price of that nozzle

12    flap in relation to the roughly million-dollar sale that you're

13    making?

14    A.    Yeah, I don't know what the selling price is of a nozzle

10:11    15    flap.

16    Q.    You've --

17    A.    But I mean, the moral of the story, though, is that it's

18    more about what the nozzle flap did for our product than the

19    actual cost of a particular one part.

10:11    20    Q.    Okay.  Well, we'll let that decision be made by the jury.

21    A.    Okay.

22    Q.    But we're going to come back to the questions I have for

23    you.

24          You've studied PSD, your friendship with Mr. Alleshouse,

10:11    25    and your knowledge of them being a competitor.  You're aware

1  that they also sell, at times, nozzle flaps?

2  A.  I've heard that.

3  Q.  And are you aware that their nozzle flap sells for less

4  than $3,000?

10:11  5  A.  Okay.

6  Q.  And that would probably be competitive with the price that

7  your company would sell a nozzle flap?

8  A.  I don't think so.  I think we would be a lot more.

9  Q.  Okay.  But you don't really know?

10:11  10  A.  I don't really know.

11  Q.  You never did any investigation in this?

12  A.  I have not.

13  Q.  Okay.  And then let's turn now, if we could, to Defendant's

14  Exhibit CQ.  And if we could scroll to the bottom of page 1 of

10:12  15  CQ, this was an email string shown to you earlier today by your

16  counsel, and I'm going to focus now on this email that

17  Mr. Chutter -- scroll up just a little bit.  This was an email

18  prepared by Mr. Chutter.  It doesn't show you on this part of

19  it, but you are copied later, as we saw earlier.  When we get

10:12  20  to the top of the email, you get all this information, correct?

21  And just explain for the jury who Mr. Chutter is.

22  A.  He is the CEO of our company.

23  Q.  Okay.  And you report to him?

24  A.  No.

10:12  25  Q.  Who do you report to?

1    A.   Marshall Myrman.

2    Q.   And Mr. Myrman reports to Mr. Chutter?

3    A.   Yes.

4    Q.   Even though your direct reporting is to Mr. Myrman, at

10:13  5    times you have interaction with Mr. Chutter.  You take

6    direction from Mr. Chutter, do you not?

7    A.   Yes, sometimes.

8    Q.   Now, let's look at this email.  And I know we covered this.

9    I don't want to dwell too much on it because we've seen it, but

10:13  10    it begins with, "In spite of the fact that we're being knocked

11    off, we can't miss the opportunity here."  Now, this phrase

12    "knocked off," this is bandied about, and we'll see other

13    emails.  Virtually every time you or Mr. Myrman or Mr. Chutter

14    identifies a competitor, they throw this term of "knocking off"

10:13  15    out, correct?

16    A.   I guess it depends on who the competitor is that we're

17    talking about.

18    Q.   Okay.  And let's go down.  It says, "Our opportunity is to

19    study each of them and to try and learn what we can do to

10:14  20    FlowRider to improve it."  Do you see that?

21    A.   Yep.

22    Q.   So Mr. Chutter is giving general direction to your boss,

23    Mr. Myrman, directly saying let's go out and look at what our

24    competitors are doing, and let's knock them off, let's take

10:14  25    improvements and incorporate them into our design, correct?

1    A.   No.

2    Q.   Okay.

3    A.   He didn't say that.

4    Q.   Let's -- we'll come to it.  Let's scroll down.  It says,

10:14    5    "But if there are improvements we can learn, it serves us well

6    to incorporate these."  And in fact, you did do that, did you

7    not?

8    A.   I will say that, you know, we had on our FlowRider

9    Double -- we used to have a deep tank, which was around five

10:14    10   feet deep, but we had another product called the Wave-In-A-Box,

11   which had a shallow tank with much less water.  So we knew that

12   we could make the ride with a shallower tank, and so we then

13   incorporated the shallower tank on our standard FlowRider

14   Double, but based on the fact that we knew what we were doing

10:15    15   because of our Wave-In-A-Box model, but the lower water volume

16   that PSD was offering may have helped spur us to copy ourselves

17   because we were already doing it on the other model.  We just

18   incorporated it on the standard FlowRider Double.

19   Q.   Well, let's look at Defendant's Exhibit NK, page 1.  You're

10:15    20   familiar with this?

21   A.   Yes.

22   Q.   And lo and behold, following Mr. Chutter's direction to

23   study the competitors and incorporate new things, you come

24   out -- or the company rather comes out with FlowRider new and

10:15    25   improved 2.0, correct?

1    A.   That is correct.

2    Q.   And specifically, if you look at those three bullet points

3    in the middle of this -- let me back up.  Did you prepare this

4    as part of your sales and marketing expertise?

10:16   5    A.   I prepared something similar, but I don't recognize this

6    exact format.

7    Q.   So you can't tell us whether this was something you were

8    responsible for or not.  Is that your testimony?

9    A.   I prepared a FlowRider 2.0 presentation, but this one looks

10:16   10   like a different format, so I'm not sure if I did this exact

11   one, but certainly I was part of coming up with content.

12   Q.   Okay.  And who named it FlowRider 2.0?

13   A.   I'm not sure.  It could have been me.

14   Q.   Okay.  And when did that -- when was this done?  When was

10:16   15   FlowRider 2.0 marketed to the customers of WhiteWater?

16   A.   It was a couple years ago.

17   Q.   Okay.  So '17?

18   A.   That's what it says on this document, so we'll go with

19   that.

10:17   20   Q.   Let's look at these bullet points here.  It says, "Less

21   water."  This is the item that you were aware that PSD was

22   operating using -- their system was using less water, correct?

23   A.   Well, yes, but again, we have two products.  One is called

24   the Wave-In-A-Box, and then the other one is just our standard

10:17   25   FlowRider Double.  Okay?  Our Wave-In-A-Box and our cruise ship

1    Wave-In-A-Box uses less water than PSD's standard model.  So

2    using less water is not, like, a new thing that is a miracle of

3    nature.  We were doing it on other models.  We just

4    incorporated it on the -- on our standard offering.

10:17  5    Q.   And what spurred you to do it was your recognition that PSD

6    was doing it, correct?

7    A.   You know, it -- I can't say yes or no, but it

8    certainly -- the timing is around -- is right, but we were

9    doing that on our Wave-In-A-Box, so it makes sense for us to do

10:18  10   it on our other products too.

11   Q.   And then the second bullet point says, "Less concrete."

12   That's also a feature that was being done by Mr. Alleshouse at

13   his company, PSD, correct?

14   A.   I have not analyzed the amount of concrete that they use.

10:18  15   All we did -- their tank design is different too.  So all we

16   did was made our tank shallower.  And by virtue of the fact of

17   making our tank shallower, we were using less concrete and,

18   therefore, less excavation too.

19   Q.   And the benefit to the customer is it was reducing

10:18  20   construction costs when you did that, correct?

21   A.   Correct.

22   Q.   And you are aware generally from the marketplace that PSD's

23   construction costs were lower because of their design than

24   your -- yours were for the FlowRider?

10:18  25   A.   I have not analyzed their cost for their concrete.

1    Q.   Okay.

2    A.   Plus their tank is more complicated, so it may even be more

3    cost for their concrete, but I haven't done the analysis.

4    Q.   Okay.  And then the third bullet point, "Less excavation,"

10:19   5    that was also a feature that was being offered by PSD at the

6    time you moved to this 2.0 FlowRider, correct?

7    A.   That is incorrect.

8    Q.   Okay.  And --

9    A.   Their tank is deeper than ours.  It's just shaped

10:19   10    differently.

11    Q.   Let's go to the next page.  Page 2 at the top.  You'll see

12    at the very first line, "With constant focus on safety, we also

13    increased the length of the recovery area."  Do you see that?

14    A.   Yes.

10:19   15    Q.   That was a feature being offered by PSD prior to you coming

16    up with FlowRider 2.0, correct?

17    A.   I didn't analyze the length of their rear recovery.  We had

18    a rear recovery that was 14 feet in length, and we introduced a

19    new product that we called pillow padding, and it was a little

10:20   20    bit more slick, and so because of the pillow padding, we

21    increased the length of our rear recovery.  That was not in

22    response to PSD.

23    Q.   Okay.

24    A.   We did it because we needed to.

10:20   25    Q.   Okay.  And then looking at the next paragraph, I'm going to

1  focus on the last portion of that sentence.  "Changing the pump

2  configuration which allows for servicing in the horizontal

3  position."  Do you see that?

4  A.  Yep.

10:20  5  Q.  That was also done in response to the designs that

6  Mr. Alleshouse came up for PSD, correct?

7  A.  Well, that was something that our pump supplier did, so --

8  Q.  That change was made as -- to adopt the same feature that

9  PSD was offering its customers, correct?

10:20  10  A.  Well, PSD was using a different pump supplier, so our pump

11  supplier allowed us to -- they changed it so that they could

12  service their pump in the horizontal position, so we told our

13  customers what our pump supplier was doing.

14  Q.  And the impetus for all these changes was what was going on

10:21  15  with PSD in the marketplace?

16  A.  No, that's not correct.

17  Q.  All right.  Now, let's talk about another exhibit.  Let me

18  show you quickly Defendant's CP-1.  Okay.  This is an email

19  from you to Mr. Myrman dated December 11, 2014.  Do you recall

10:21  20  this email?

21  A.  Yes.

22  Q.  Okay.  And there's a reference here about Ocean Park HK was

23  burned once before on a patent case.  Do you see that?

24  A.  Yes.

10:22  25  Q.  What does that reference to?

1    A.   We were competing against American Wave Machines on a

2    project with Ocean Park Hong Kong, and because we were in a

3    lawsuit with them, they ended up not buying any attraction.

4    Q.   Okay.   "They" being Ocean Park Hong Kong?

10:22    5    A.   Yep.

6    Q.   Okay.   And are you aware -- you know about the outcome of

7    that lawsuit, that Wave Loch lost that lawsuit?

8    A.   Okay.

9    Q.   Well, Mr. Lochtefeld was here and testified about this the

10:22   10   other day.   And he testified that he filed a patent case, and

11   he thought he had a case of patent infringement, and it

12   proved -- he lost that.   He didn't have one.

13   A.   Okay.

14   Q.   And is that the reference here about being burned --

10:23   15   A.   Yes.

16   Q.   -- on a patent case?

17   A.   Yes.

18   Q.   Because they're expensive?

19   A.   I don't know why they -- they just didn't buy from either

10:23   20   party because of this -- of a dispute.

21   Q.   Okay.   Okay.   Let's move on to another exhibit, AV-1.   And

22   I'm going to scroll to the bottom of this.   There's -- this is

23   an email to a Chuck Newman.   Who is Mr. Chuck Newman?

24   A.   He is -- he runs a design firm.

10:23   25   Q.   And what kind of design firm does he run?

1    A.   They design water parks and municipalities, that kind of

2    thing.

3    Q.   Okay.  And why were you emailing with Mr. Newman about the

4    benefits of the FlowRider?

10:24    5    A.   Because he had asked me to.

6    Q.   And why was he asking you to do that?

7    A.   He called me and said can you tell me about -- you know,

8    send me an email with your features and benefits and

9    particularly how they compare to PSD.

10:24   10    Q.   Okay.  And you prepared this on February 13, 2015, correct?

11    A.   I don't recall the date, but it's --

12    Q.   We can scroll up.  I'll show you the date.

13          MR. THOMAS:  A little higher.

14          THE WITNESS:  Yeah, there.

10:24   15    BY MR. THOMAS:

16    Q.   Okay.  Now, let's turn to the next page, page 2.  And

17    you'll see under paragraph 3 you're talking about your features

18    and benefits:  pillow padding, padding system, divider, and

19    that continues on to the next page at the top.

10:25   20    A.   Can I point something out?

21    Q.   Yes.

22    A.   You previously had said that we never did any marketing of

23    the nozzle flaps prior to 2018 or something, and here I'm

24    specifically pointing out the nozzle flap in this document

10:25   25    that's 2015.

Q.   You are, and this was after the deposition was filed.   This wasn't my statement.   That was your statement.   And if that statement was wrong, that's what you said.

A.   Well, that was certainly marketing materials, but it was an important feature that we would point out.

Q.   And the first time that you specifically brought up this nozzle flap as a marketing material was after this litigation was filed.   Isn't that correct?

A.   I don't recall.

Q.   Okay.   And then if we could scroll down to paragraph 5. And there it says, "FlowRider is currently investigating a possible patent infringement.   One possible claim is over the use of a nozzle flap which may be covered under this '589 patent."   Do you see that?

A.   Yes.

Q.   Why did you think it was important to talk about a possible patent infringement claim with this third party, Mr. Newman?

A.   Because I thought that they were copying our stuff, and I believed that it was wrong.

Q.   Well, you don't say they're copying, you're saying there's a possibility.

A.   Well, I'm being polite.

Q.   Well, you were.

     And do you believe this statement's inaccurate in any way?

A.   Inaccurate?

1    Q.   Yeah.

2    A.   No.

3    Q.   All right.  Now, let's turn to another exhibit, CU, page 1.

4    And we looked at this previously.  Or you looked at this

5    previously with counsel.

6         So I think we've covered a lot of what's in here, but

7    this -- this is a document that you were sending -- I'm afraid

8    to try to pronounce his name because I may get it wrong.  Could

9    you say it for me?

10   A.   Janne Miikkulainen.

11   Q.   Mr. Miikkulainen.  And at the bottom here of this email it

12   says, "Let's focus on what makes the FlowRider better."  Do you

13   see that?

14   A.   Correct.

15   Q.   Okay.  And those items that are bullet-pointed are the

16   items that you typically market to your customers, are they

17   not?

18   A.   It's some of them.

19   Q.   And there was no effort by you to market your nozzle flaps

20   in this email, was there?

21   A.   You know, like I said earlier, it's kind of like you won't

22   see a car manufacturer marketing their steering wheel.  Is it

23   important to the function of the car?  Absolutely.  But they

24   don't market that.  I was marketing the things that were a

25   little bit more sexy.  And also I was just replying to his

|  |  |
|---|---|
| | email, responding to his question. |
| 2 | Q.   Okay.  We covered all of the investment in SpaceX [sic]. |
| 3 | We don't need to do that again. |
| 4 | Now, let's turn now to Defendant's Exhibit CT, page 1. |
| 5 | This is an email from you to David Bogdonov? |

1   email, responding to his question.

2   Q.   Okay.  We covered all of the investment in SpaceX [sic].

3   We don't need to do that again.

4        Now, let's turn now to Defendant's Exhibit CT, page 1.

10:29   5   This is an email from you to David Bogdonov?

6   A.   David Bogdonov.

7   Q.   Who is David Bogdonov?

8   A.   He's a friend of one of the salespeople.

9   Q.   One of the salespeople that reports to you?

10:29   10   A.   No, he doesn't report to me.

11   Q.   Is he in the company?

12   A.   We collaborate.

13   Q.   Is he a WhiteWater employee?

14   A.   Yes.

10:29   15   Q.   Okay.  And when you say you collaborate, he has a certain

16   area of sales that he's responsible for, and you have a certain

17   area of sales that you're responsible for?

18   A.   Yes, China.

19   Q.   His is China?

10:29   20   A.   Yes, was.

21   Q.   Okay.  And then we have a note here.  "Do you have WhatsApp

22   or WeChat?"  Do you see that?

23   A.   Yes.

24   Q.   Why were you asking about WhatsApp or WeChat?

10:29   25   A.   It's a convenient way to communicate, and we often

464

```
 1   communicate and collaborate on projects.
 2   Q.  And also keeps those communications from being
 3   discoverable, doesn't it, when you use those sources?
 4   A.  Well, I mean, to be honest, if I wanted to keep it from
 5   being discoverable, I would have just picked up the phone and
 6   called him.  So I don't know why I asked him why he had
 7   WhatsApp or WeChat, but we do communicate on WhatsApp or
 8   WeChat.
 9   Q.  And you also communicate by email, like this email?
10   A.  Yeah.
11   Q.  So you could have just emailed him and said what you wanted
12   to in email, but you chose to go a different route?
13   A.  Well, typically if I'm going to have a long conversation
14   with someone, I like to pick up the phone and talk to them.
15   Q.  Okay.  And this reference is, "Notification that WhiteWater
16   has filed suit against Pacific Surf Designs."  So that was the
17   purpose of your anticipated conversation?
18   A.  I don't recall.
19   Q.  You don't recall anything about this conversation?
20   A.  It was three years ago.  I don't recall what we were
21   talking about.
22   Q.  All right.  Now, let's move on to Exhibit DY.
23   A.  By the way, we would talk, like, two or three times a week,
24   so it's common practice to talk to David.
25   Q.  Okay.  And you also email quite frequently with him as
```

10:30 (line 5)
10:30 (line 10)
10:30 (line 15)
10:30 (line 20)
10:31 (line 25)

1   well, do you not?

2   A.   Yeah.

3   Q.   All right.  Let's move on to DY.  Have you seen this

4   before?

10:31   5   A.   Yes, I believe so.

6   Q.   Who is Joanne Saunders?

7   A.   She's my colleague.

8   Q.   She's an employee at WhiteWater?

9   A.   Yes.

10:31   10   Q.   And does she work in sales?

11   A.   Yes.

12   Q.   Okay.  And she's talking about an exhibitor list at IAAPA?

13   A.   Yes.

14   Q.   Were you at that exhibitor event that she's referencing?

10:32   15   A.   Yes.

16   Q.   And do you know what she's talking about here where it

17   says, "Does not include Fly Wave or Atlantis"?

18   A.   Okay.

19   Q.   I'm just asking you what is she referring to since you were

10:32   20   at this exhibition as well.

21   A.   She is describing to Francine that the exhibiter list

22   doesn't include -- we have a company that copies our product to

23   the T in China called Fly Wave, and then there's another

24   company in Turkey called Atlantis.  So she was just saying that

10:32   25   those two companies were not on the exhibiter list.

1    Q.   Okay.  So you keep pretty close tabs on your competitors on

2    what they're doing, both at exhibitions like the IAAPA as well

3    as their marketing materials?

4    A.   It's our job.

10:33    5    Q.   You want to stay current with what they're doing, know

6    about their new designs?

7    A.   Yep.

8    Q.   And based on your communications with Mr. Chutter, you're

9    constantly evaluating your own design to see how you can

10:33    10    improve it and integrate something that one or more of your

11    competitors may have already included?

12    A.   That's not accurate.  We are constantly looking at

13    ourselves.  We're constantly looking at our own product to see

14    how we can improve.  It's a bit bold to say that we were always

10:33    15    looking at our competitors to see what we can glean from them

16    to make our product better.  We are out there in the field, and

17    we have -- we're always trying to make our product better.

18    Marshall's a chairman of ASTM for the stationary wave

19    committee, so he is constantly focused and on our case about

10:34    20    making our product better.

21    Q.   And part of that making your product better is looking at

22    your competitors, as Mr. Chutter stated in his email, and

23    incorporating changes that they may have that are good?

24    A.   It may be one aspect, but it's a bit over the top to think

10:34    25    that that's all we do.  That's not what we do.

1       MR. THOMAS:  Okay.  I have no further questions,

2   Your Honor.

3       THE COURT:  Well, maybe now is a good time for us to

4   take a short recess.  So let's plan to be back at quarter till

10:34   5   11:00.  Okay?  Please remember my admonition.  Thank you.

6       You may step down, sir.

7       THE WITNESS:  Thank you.

8       (Recess.)

9       (Proceedings held outside the presence of the jury panel.)

10:46   10      THE COURT:  All right, Glenn, go get the jury.

11      (Proceedings held in the presence of the jury panel.)

12      THE COURT:  All right.  Go ahead.

13                      REDIRECT EXAMINATION

14   BY MR. SCOTT:

10:48   15   Q.  Welcome back, Mr. Thatcher.  Can we pull up Exhibit AV,

16   please?

17      MR. SCOTT:  Gary, can you blow up the email, "Dear

18   Chuck," that starts on the bottom of this page and continues on

19   the next one?  There you go.  Just the top bit.  The 1 through

10:49   20   5.  Keep going down.  No, I'm sorry.  All right.

21   BY MR. SCOTT:

22   Q.  Do you recall when Mr. Thomas asked you why you were

23   telling Chuck about a potential patent infringement issue with

24   Pacific Surf Designs?

10:49   25   A.  Sorry.  Can you repeat that?

1   Q.   Do you recall when Mr. Thomas asked you why you were

2   telling Chuck about a potential patent infringement issue with

3   Pacific Surf Designs?

4   A.   Yes.

10:49   5   Q.   It says, "Dear Chuck.  Thank you for the call yesterday.

6   We truly appreciate you reaching out to us.  As per our

7   discussion, you were looking for information on the following:"

8   Can you read Number 5, please?

9   A.   "Any patent infringement issues with Pacific Surf Designs."

10:50   10   Q.   So Chuck specifically asked you to tell him about patent

11   infringement issues with Pacific Surf Designs?

12   A.   Yes, he did.

13   Q.   Okay.  Mr. Thomas asked you some questions about ADG.

14   A.   Yes.

10:50   15   Q.   Who is ADG?

16   A.   Aquatic Development Group is our North American licensee.

17   Q.   What does that mean?

18   A.   It basically means that they sell our product and pay us a

19   royalty.

10:50   20   Q.   Where are they allowed to sell your product?

21   A.   In the United States.

22   Q.   To your knowledge, are you allowed to sell a product in the

23   area that ADG is licensed in?

24   A.   We have certain carveouts, so there are certain situations

10:50   25   where we can sell the product directly and then other

1    situations where we cannot.

2    Q.   Okay.  How many times do you directly compete with ADG?

3    A.   We don't really -- the system is not set up for us to

4    compete with ADG, so we don't really compete with ADG.

10:51   5    Q.   The idea is that ADG sells in the U.S. and you don't,

6    right?

7    A.   Well, the idea is that ADG sells in the U.S. to certain

8    markets, and then we sell in the U.S. to different markets.

9    Q.   Okay.  I'd like to look at Exhibit NK.  Do you recall

10:51  10    Mr. Thomas questioning you about this document?

11    A.   Yes.

12         MR. SCOTT:  Can you just blow up the bottom of the

13    first page here?

14    BY MR. SCOTT:

10:51  15    Q.   This was put out because FlowRider changed the depth of its

16    tank on its FlowRider product.  Is that correct?

17    A.   Well, there were a number of things.

18    Q.   One of the primary --

19    A.   One of the primary things, yes.

10:52  20    Q.   Okay.  Did FlowRider already have a product with a shallow

21    tank?

22    A.   Yes, it was the Wave-In-A-Box, and you'll notice that I

23    mention in this document that we've changed the old side

24    closures.  The side closures on the Wave-In-A-Box were also

10:52  25    different, so we incorporated a number of features from the

1    Wave-In-A-Box on to our new FlowRider.

2    Q.   Who had a shallow tank first, FlowRider or Pacific Surf

3    Designs?

4    A.   FlowRider.

10:52   5    Q.   Did Mr. Alleshouse work on the Wave-In-A-Box when he worked

6    at Wave Loch?

7    A.   Yes.

8    Q.   So he knew that the Wave-In-A-Box had a shallow tank when

9    he started Pacific Surf Designs?

10:52   10    A.   Yes.

11             MR. SCOTT:  Bring up Exhibit 67, please.  Can you blow

12    up Number 1 and all the bullet points, which actually continues

13    on to page 2?  Sorry.  It continues on to page 2.

14    BY MR. SCOTT:

10:53   15    Q.   There's a list of competitors here.

16    A.   Yes.

17    Q.   How many rides has American Wave Machines sold in the U.S.,

18    to your knowledge?

19    A.   Three, I believe.

10:53   20    Q.   Okay.  And is it true that they sell only maybe one ride a

21    year?

22    A.   I don't really keep track of everything, but I believe that

23    it's roughly around there.

24    Q.   Okay.  What about Murphy's Waves?  When they launched the

10:53   25    StingRay -- we talked about the StingRay product a little bit.

How many have they sold in the U.S.?

A.   One.

Q.   Wavesurfer focuses on Europe.  You believe they had six

waves at the time you sent this email?

10:53   A.   Yes.

Q.   City Wave, China?

A.   Yes.

Q.   "Pacific Surf Designs, probably our biggest competitor, and

the one that I am constantly battling."  Is that true?

10:54   A.   Yes.

Q.   I'd like to show you Exhibit 68 and go to page 9 of this

document.

     Mr. Thatcher, you haven't seen this document before.  This

is a document that was actually prepared by Pacific Surf

10:54   Designs in 2013.  I just want to ask you if some of the things

that are stated here are true.  Looking at all these listed

competitors here, you've got AFP, which is Wavesurfer, correct?

A.   Correct.

Q.   And is it true that maybe in 2013, Wavesurfer had only one

10:54   or two installs?

A.   Correct.

Q.   True that American Wave Machines in 2013 probably only had

four, maybe six installs?

A.   Yes.

10:54   Q.   StingRay worldwide had maybe six?

1    A.   Yes.

2    Q.   Okay.  And it's true that Wave Loch at the time had about

3    120?

4    A.   That seems about right.

10:55  5    Q.   All right.  I want to look at the top here where Pacific

6    Surf Designs has written Pacific Surf Designs, Wave Loch,

7    listed all of the companies.  The only two that are listed as

8    direct competitors are Pacific Surf Designs and Wave Loch.  Do

9    you believe that's an accurate statement, that Pacific Surf

10:55  10    Designs is your only direct competitor?

11    A.   Yes.

12          MR. SCOTT:  All right.  Thank you.  No further

13    questions.

14          THE COURT:  All right.  Recross.

10:55  15                    RECROSS-EXAMINATION

16    BY MR. THOMAS:

17    Q.   Mr. Thatcher, you joined Wave Loch in 2005.  Is that right?

18    A.   I think it was more like 2001.

19    Q.   When did you become part of the sales team?

10:55  20    A.   2003.

21    Q.   And you've been part of the sales team consistently with

22    Whitewater after the acquisition?

23    A.   Yes.

24    Q.   So you've always had that role.  And when you were --

10:56  25    A.   Not always.  From 2000 to 2003, I --

Q.   Understood.  I meant always from that point in time where you joined the sales force.

A.   Correct.

Q.   You've never left.  And when you started with the sales group in 2003, how many other salespeople were at Wave Loch?

A.   There was just me.

Q.   And how long was it just you?

A.   I don't recall.  Maybe a year or two, something like that.

Q.   So as long as two years or over one year, in any case, you were the only salesperson in the company?

A.   That sounds about right.

Q.   And you're aware that Wave Loch was also refurbishing and selling nozzle flaps at that time, correct?

A.   Yeah, possibly.

Q.   And those sales of nozzle flaps would have been part of your sales responsibilities, correct?

A.   No.  I mean, so, first of all, you know, the very -- when I started selling in 2003, we only had maybe one or two rides that incorporated a nozzle flap.  In fact, in 2004, we did the licensee with -- with Aquatic Development Group, and that was, like, our first sale in the U.S. in a while, to Kalahari.  So I wasn't involved in selling nozzle flaps in those days or after-sales for that matter.

Q.   I'm sorry?

A.   I was not involved in after-sales.

Q.   In all of your years you've been at the company, you've
never learned of the pricing for a nozzle flap that is sold by
your company, being Wave Loch or WhiteWater.  Is that your
testimony?

10:57  A.   I don't know what the price of a nozzle flap is, no.

Q.   You've never discovered that.  You've never learned that.
Is that your testimony?

A.   I've been doing this for 20 years.  I don't recall.  Maybe
at some point 15 years ago some guy sent me an email with a
10:58  price of a nozzle flap, but I don't recall.

Q.   Okay.  And have any of your customers that you've had a
deal with -- have they ever asked you what the cost is for a
nozzle flap?

A.   That doesn't flow through me.  I don't handle after-sales.

10:58        MR. THOMAS:  I have no further questions.

        THE COURT:  Thank you, sir.  You may step down.

    Please call your next witness.

        MR. TACHÉ:  At this point, WhiteWater calls
Mr. Chutter, the CEO of WhiteWater.

10:59        THE COURT:  Please come forward, sir, and be sworn.

                    GEOFFREY CHUTTER,

              PLAINTIFF'S WITNESS, SWORN

        THE CLERK:  Would you state and spell your full name
for the record.

10:59        THE WITNESS:  Geoffrey Paul Chutter, G-E-O-F-F-R-E-Y,

```
 1   C-H-U-T-T-E-R.

 2                    DIRECT EXAMINATION

 3   BY MR. TACHÉ:

 4   Q.   Good morning, Mr. Chutter.

 5   A.   Good morning.

 6   Q.   Where are you currently employed?

 7   A.   WhiteWater West Industries.

 8   Q.   And where is that located?

 9   A.   Vancouver, BC.

10   Q.   Do you have a facility locally named FlowRider, Inc.?

11   A.   Yes.

12   Q.   Where are they located?

13   A.   A little bit louder.

14   Q.   Sorry.  Where are they located?

15   A.   San Diego.

16   Q.   And what is your position at WhiteWater?

17   A.   President and CEO.

18   Q.   And are you also the founder of the company?

19   A.   Yes.

20   Q.   And when was the company founded?

21   A.   December 15, 1980.

22   Q.   You seem to have that very distinctly in your memory.  Why

23   is that?

24   A.   I do.  It was the day on which we closed on acquiring 18

25   acres of land in the interior of British Columbia to build a
```

|   | |
|---|---|
| 1 | water park. |
| 2 | Q.   And we'll explore that a little bit later.  Thank you. |
| 3 |      What is the current business of WhiteWater? |
| 4 | A.   We design water parks globally, and we're the largest |
| 5 | manufacturer of water park products globally. |
| 6 | Q.   Are you an engineer by training? |
| 7 | A.   No. |
| 8 | Q.   Did you attend university? |
| 9 | A.   Yes. |
| 10 | Q.   Where did you go to school? |
| 11 | A.   University of Toronto. |
| 12 | Q.   And what degree -- I'm sorry.  Did you graduate with a |
| 13 | degree? |
| 14 | A.   Yes. |
| 15 | Q.   What was the degree in? |
| 16 | A.   Master of commerce. |
| 17 | Q.   What did you do after you graduated? |
| 18 | A.   I joined KPMG in Toronto where I received my CPA. |
| 19 | Q.   And as a CPA at KPMG, what did you do? |
| 20 | A.   It was mostly in the audit function, reviewing the |
| 21 | financials and certifying financial statements of other |
| 22 | companies. |
| 23 | Q.   How long did you stay at KPMG? |
| 24 | A.   I was in Toronto for four years and then transferred to the |
| 25 | Vancouver office with KPMG for another year and a bit. |

Timestamps in left margin:
11:00 (line 5)
11:00 (line 10)
11:01 (line 15)
11:01 (line 20)
11:01 (line 25)

1    Q.   And you mentioned a year and a bit.  It sounds like you

2    left KPMG?

3    A.   Sorry.  Say it again.

4    Q.   What did you do after you left KPMG?

11:01    5    A.   I endeavored to build a waterslide park.

6    Q.   And is this the piece of land that you purchased?

7    A.   Yes.

8    Q.   And how successful was your endeavor to build a water park?

9    A.   It was the first one I'd ever done, but it was successful.

11:02    10    It was a huge amount of fun.

11    Q.   Do you still own that water park?

12    A.   No.  No, during the course of -- the industry didn't exist

13    back then, so we had to come up with our own molds to build the

14    water slides, and during that first summer in '81, there were

11:02    15    four gentlemen that came through independently and said how can

16    I do that in my hometown?  Could you help me?  Which I did, and

17    we ended up signing engineering contracts and supply contracts

18    with them.  And as they say, the rest is history.  I preferred

19    the development, the creative side, to the operations, and sold

11:02    20    the water park in '83.

21    Q.   And is that when sort of the current iteration of

22    WhiteWater began?

23    A.   Yes.

24    Q.   As part of forming WhiteWater, do you have any guiding

11:03    25    principles that you operate your business under?

1   A.   We do.  We've -- in the course of growth, you inevitably

2   have a number of consultants that come in and coach and guide

3   you, and we've done that numerous times, certainly every couple

4   of years, and in the course of that, you determine your mission

11:03   5   statement and a series of guiding principles, so yes, we do.

6   Q.   Can you share one of those guiding principles with us?

7   A.   Say it again?

8   Q.   I'm sorry.  I'm having a hard time speaking up.  Is that

9   better?

11:03   10   A.   Yeah, it doesn't seem to be coming from --

11   Q.   I'll speak louder and stand closer.

12       Can you share one of those guiding principles with us,

13   please?

14   A.   Oh, most of them are people-focused, but the overall idea

11:03   15   is doing what you should do even if nobody's looking.  Doing

16   the right thing even if nobody's looking.

17   Q.   And have those guiding principles impacted your business at

18   all?

19   A.   They have.  I remember coming back from one of these

11:04   20   courses and going directly to HR and saying I'd like to change

21   how we recruit.  I don't want to recruit anymore with the first

22   barrier being skill set.  I would like to recruit with it being

23   mind-set; in other words, hiring people that were positive,

24   can-do, glass-half-full attitude, the belief being that we can

11:04   25   teach skill, but if somebody doesn't have the right mind-set,

1   my calling in life is not to be Gandhi or Mother Teresa.

2   Q.   Have these governing principles impacted the success of

3   WhiteWater?

4   A.   Absolutely.

11:04   5   Q.   And can you give us some examples of how WhiteWater has

6   been successful as a result?

7   A.   Well, I think our growth stands on its own.  We're a

8   company of 600 people today, certainly the largest in the water

9   park sector and, I would say, among the largest of the largest

11:05   10   in the entire IAAPA amusement park sector.  And I attribute

11   that -- the majority of that would be attributed to the people

12   that are on the team.

13   Q.   You just mentioned an acronym, IAAPA.  What is that?

14   A.   It's the International Association of Amusement Parks and

11:05   15   Attractions.  It's an international body that guides and holds

16   conventions for membership.  They have a convention in Asia,

17   one in Europe, and the big one is in Orlando every November

18   attended by about -- this year, 45,000 industry people.  It's

19   not open to the public.

11:05   20   Q.   Thank you.

21        As part of your success, has WhiteWater won any awards?

22   A.   Yes, in excess of a hundred awards over the course of the

23   years.

24   Q.   And what's shown on the screen, is this an image taken from

11:06   25   your website?

1   A.   Yes.

2   Q.   And is this a list of some of the awards that WhiteWater

3   has won?

4   A.   It is, over the last few years.

11:06   5   Q.   Has WhiteWater won any awards directly from IAAPA?

6   A.   Yes, those are listed on the left there.  This year, you

7   mean, or just generally?

8   Q.   No, in general.

9   A.   Yes, absolutely.

11:06   10   Q.   The image that's on the screen sort of stops at 2018.  Has

11   WhiteWater won any awards from IAAPA this year?

12   A.   Yeah, just a few weeks ago -- and this is unprecedented --

13   we were awarded three Brass Ring Awards.  The Brass Ring Award

14   is an award given for best new product.

11:06   15   Q.   Has WhiteWater -- in addition to winning awards for its

16   technology, has WhiteWater won any leadership awards as a

17   company?

18   A.   Corporately, yes.  We've -- in Canada, there's an award,

19   and from our standpoint, it's the highest corporate award one

11:07   20   can win, is the best -- Canada's Best-Managed Company Award,

21   and last year we were the recipients of that.

22   Q.   How many times has WhiteWater won that award?

23   A.   Five times.

24   Q.   And how is that award determined?

11:07   25   A.   Well, there's a panel of judges.  It's sponsored by big

international banks and CPA officials and leaders across the

country.  But they, of course, look at financial results, they

look at internal processes of the company, how it's governed,

involvement in the community, all aspects, and it's quite

11:08   grueling.  There's pages of questions and interviews, and

obviously they come out and see the company and visit

factories, et cetera.

Q.   How many companies are being typically considered for this

award?

11:08   A.   Well, there's -- in any one year, there will be several

thousand companies considered, and it's whittled down, and

ultimately, there's approximately 50 that are selected as the

best in the country.

Q.   Has WhiteWater ever won any awards in China?

11:08   A.   Yes.  It's an interesting country.  I was asked to fly to

China.  In fact, they said we'll pay business class and all

accommodations, et cetera, two months ago and was presented

with what they call the Golden Tiger Award, which is won for

outstanding service.  It was presented in the city of

11:09   Kwangchow.

Q.   Is that an award that's typically given to -- awarded to

companies outside of China?

A.   If you happen to be a supplier, a contractor to a number of

projects in China, it can be awarded outside the country, yes.

11:09   Q.   Are you aware of how that award was determined?

1    A.   No.

2    Q.   In addition to company awards, has -- have you personally

3    recently received any awards?

4    A.   Yes.

11:09    5    Q.   And can you give me an example of one of the awards you've

6    recently won?

7    A.   About six weeks ago, there was -- internationally

8    there's -- Ernst & Young have an Entrepreneur of the Year Award

9    for 60-odd countries in the world, and we were put forward in

11:10    10    the Pacific region, which is effectively British Columbia, for

11    that award in what they call a business-to-business category,

12    and we were -- I was awarded that six weeks ago.  And then at

13    the end of the evening, they totaled all the categories, and

14    they selected a specific region Entrepreneur of the Year, and

11:10    15    to certainly my shock and WhiteWater folks' at the table, I was

16    a recipient of that.  And this is over 1200 people, all in

17    tuxedos and long dresses, the men in tuxedos, the women in long

18    dresses, and that was quite an honor.  And that meant that you

19    went to the Canadian Entrepreneur of the Year gala in Toronto,

11:11    20    and that was last Thursday, and -- is this water?

21              THE COURT:  Yes.

22              THE WITNESS:  I was a recipient of that last Thursday.

23    BY MR. TACHÉ:

24    Q.   Just so we're clear, who is EY?

11:11    25    A.   Ernst & Young.  They're a huge CPA firm, global.

1    Q.   Is there an international component?

2    A.   There is.  As a result of winning that, I'm to go to

3    Monte Carlo in June for the world's.  There's 60 companies I'll

4    be competing against the Entreprenuer of the Year from the

5    United States and France, Great Britain, et cetera.

6    Q.   You mentioned you're a member of IAAPA.  Have you won any

7    awards recently on a personal level through IAAPA?  If so,

8    could you tell the jury?

9    A.   Yes, this last IAAPA I was given the Outstanding Service

10   Award.  There's one of those given a year.  And that's for

11   leadership and outstanding achievement and spreading goodwill

12   within the industry globally.

13   Q.   Do you know whether or not PSD is a member of IAAPA?

14   A.   They are.

15   Q.   Given that WhiteWater's won so many awards, can you please

16   tell the jury whether or not technology is an important part of

17   WhiteWater as a business?

18   A.   Technology's hugely important.  In fact, WhiteWater has won

19   three technology awards at IAAPA, Brass Ring Awards, over the

20   course, and no one else from our sector, the water park sector,

21   has ever won a technology award before.

22   Q.   Does WhiteWater own any patents or patent applications?

23   A.   Yes.

24   Q.   Do you have an approximate number of how many you own?

25   A.   Patents, 120.  Applications, ongoing, perhaps 15.

1    Q.   Why is intellectual property important to WhiteWater?

2    A.   It's sort of invent or die.  Henry Ford came up with the

3    Model T Ford, but if he'd stuck with that, he would have been

4    long gone.  It's hugely important for growth within the

11:14   5    industry.  It also clearly adds to the value of the company.

6    Patents are assets that can be sold, so in terms of the value

7    of the company, it certainly improves that.  It also gives us

8    an opportunity to be incredibly competitive in the marketplace.

9    If we're approaching a new greenfield project, a new water

11:14  10    park, and we have a brand-new ride that nobody's put in before,

11    there's a lot of pizzazz to that, and it helps us win jobs.

12    Q.   When you say it helped you win jobs, can you please tell

13    the jury what you mean by that?

14    A.   Simply that often owners -- let me back up.  Our main

11:14  15    mandate with an owner of a water park is to drive his gate; in

16    other words, improve his bottom line.  If his revenue goes up

17    every year, we will be heroes in his eyes, so when he

18    wants -- he or she wants to expand in the future, they

19    would -- we hope that they would come back to us.  So coming up

11:15  20    with ideas that will help drive their gate, increase their

21    attendance, is very positive thing.

22    Q.   Does owning intellectual property help you compete better

23    in the marketplace relative to other companies?

24    A.   Absolutely.

11:15  25    Q.   And in what way?

A.   It allows us to go -- to be very global, it allows us to differentiate.  We've had a different model than many of the rest of the business.  Most of the -- most of the companies in the water park industry are single-product companies.  You can pretty well tell by their name.  WhiteWater has been a company that has focused on the entire water park sector, so we would be the largest, for example, manufacturer/supplier of waterslides; certainly in terms of interactive play structures, we would be the top one or two of the world; wave equipment, we probably have 75 to 80 percent of the world market on wave equipment; and certainly we're number one on sheet flow technology through the FlowRider.

Q.   In addition to owning patents and filing for patent applications on an ongoing basis, can you please tell the jury whether or not WhiteWater licenses technology from others?

A.   Yes, we've done that numerous times.

Q.   And why would WhiteWater do so?

A.   It's a big industry.  As I say, in IAAPA, there are 45,000 people in attendance, and clearly, we don't have a corner on new ideas or new products, so if we see an idea that we think is incredibly interesting, we would approach the inventor of that idea and see if it's possible to get a license from them, and they're encouraged to do that.  In a number of cases, they're small companies that perhaps they only sell in the UK or central Europe, and they would like some global reach.  We

1  can provide that because we're a very global company.

2  Q.   Thank you.

3       How does WhiteWater decide which companies to license

4  technology from?

11:17  5  A.   It's a little bit gut-feel at the end of the day, but if

6  there's a technology out there that we think will complement

7  our offering and make us more desirable to enter into a

8  contract with a company that's going to build a new water park,

9  then we would try and get a license to be able to add that to

11:18  10  our portfolio.

11  Q.   Are there any other considerations that you factor into a

12  decision to license from a company?

13  A.   I mean, generally when we're looking at products and the

14  ability to put together an agreement, obviously you like to try

11:18  15  and put it together in a win-win situation.  Certainly, my

16  findings in over 40 years in this industry is if you don't put

17  a win-win situation together, over time there will be mistrust

18  and frustration, and agreements will not continue, so we try

19  and work with people who we've got a cultural match with as

11:18  20  much as possible.

21  Q.   Thank you, Mr. Chutter.

22       When did WhiteWater first enter the sheet wave business?

23  A.   My recollection, it was the late '90s, early 2000s.

24  Q.   And why did WhiteWater decide to enter into the sheet wave

11:19  25  business?

11:19   1   A.   We do a lot of -- we're the first company, supply company,

2   to do master planning of parks; in other words, somebody would

3   come to us, and they would like to build a water park in their

4   hometown.  So we would get the architectural department, they

11:19   5   would design it all out, locating change rooms and waterslide

6   complexes and wave pools, and our observation was that

7   Wave Loch, a San Diego company, had developed the FlowRider,

8   and those were being put here and there into water parks, so we

9   thought that that sector was one that we were massively

11:19   10   familiar with and that we could get better penetration into

11   that market because of who we were if we got a license from

12   Wave Loch, and then when we did master planning, we could

13   design in a FlowRider.  They're a particularly exciting ride,

14   and we love the ride and thought it would be a good

11:20   15   opportunity.

16   Q.   How did WhiteWater first enter into this marketplace?  And

17   by "this marketplace," I'm referring to the sheet wave

18   industry.

19   A.   How?

11:20   20   Q.   Yes.

21   A.   We entered into a license with Wave Loch to manufacture

22   products and sell them to the water park sector.

23   Q.   Why did you select WhiteWater -- I'm sorry, why did you

24   select Wave Loch?

11:20   25   A.   I love WhiteWater.

11:20

1    I knew the principal of Wave Loch for a number of years in

2  the industry.  He's -- he is the father of sheet flow

3  technology.  He invented the concept of sheet flow technology,

4  which effectively is like a garden hose except the garden hose

5  is about three inches high and about 30 feet wide up over a

6  little crest, and you surf down it.

7    He had done his first one in -- Schlitterbahn Waterpark in

8  New Braunfels, Texas, concrete with a foam coating on it and

9  then developed it since then.

10    We thought we could help him on the technology side of it

11  and take it to a new level.

12    But Tom was the pioneer.  He was the only one that had that

13  technology.

14  Q.   Thank you.

15         MR. TACHÉ:  If we could please bring up Exhibit 108.

16  BY MR. TACHÉ:

17  Q.   You mentioned a moment ago that you entered into a license

18  agreement in the early 2000s with Wave Loch.  Is this the

19  license agreement that you were referring to?

20  A.   Yes.

21  Q.   And by "this," I'm referring to Exhibit 108.

22  A.   Yes.

23  Q.   Do you recall what rights you would have received under

24  this license agreement?

25         MR. TACHÉ:  If we could please bring up page 12 of

1    108.

2              THE WITNESS:  It was for a product that was referred

3    to as a Beach Break FlowRider, and there were geographic

4    restrictions on it.

11:22    5    BY MR. TACHÉ:

6    Q.  Let me help you out.  I'm actually pointing at the correct

7    page.  It's page 4.  Was that your signature, just for the

8    record?

9    A.  That's my signature.

11:22   10    Q.  Thank you.

11              MR. TACHÉ:  It's Section 2.1, if we could highlight

12    that.

13    BY MR. TACHÉ:

14    Q.  Let me ask the question again, Mr. Chutter.  Do you recall

11:22   15    what rights you received under the license agreement in 2003

16    with Wave Loch?

17    A.  Yes.

18    Q.  And what were those rights?

19    A.  To manufacture and sell products that he referred to as the

11:22   20    FlowRider, which at that point, it was known as a Beach Break

21    FlowRider and Wave-In-A-Box.

22              MR. TACHÉ:  If we could please turn to page 6 of that

23    exhibit, Section 3.11 -- 3.1.1 and highlight that.

24    BY MR. TACHÉ:

11:23   25    Q.  If you could please tell the jury, Mr. Chutter, what was

1   the royalty payment that you agreed to under this license

2   agreement in 2003?

3   A.   10 percent on the gross proceeds of the contract.

4   Q.   And when you say "gross proceeds," what do you mean by

11:23   5   that?

6   A.   Effectively, the contract value.  It was -- from my

7   experience, it was easier to be able to enter into a contract

8   with somebody buying a FlowRider and then just go to the

9   contract value and pay a royalty based on that contract value.

11:23   10   Q.   And, Mr. Chutter, if you could please tell the jury whether

11   or not the royalty that you paid to Wave Loch at the time in

12   2003 is consistent with other agreements that you had done at

13   the time for licenses?

14   A.   Yes, we'd -- as I said earlier, we've entered into a dozen

11:24   15   license agreements.  They're all very similar in format.

16   Similar in objective.  All aquatic licenses similar to this

17   one.

18   Q.   Do you recall whether or not this 2003 license agreement

19   contained a minimum royalty or minimum guarantee provision?

11:24   20   A.   One thing with Tom, you're assured there'd be a minimum,

21   and absolutely.

22   Q.   And the "Tom" that you're referring to is Mr. Lochtefeld?

23   A.   Yes.

24   Q.   And do you recall what that guaranteed minimum was,

11:24   25   Mr. Chutter?

1    A.   I think it was 120,000 per year.

2    Q.   Let me help you with this.

3         MR. TACHÉ:   If we could please highlight Section 2.1M

4    on page 6 of the agreement.

11:24    5         THE WITNESS:   Sorry.   On this one, minimum of five

6    site installations.

7    BY MR. TACHÉ:

8    Q.   Mr. Chutter, if you could please tell the jury what is

9    meant by a "site installation."

11:25   10    A.   That would be a FlowRider.

11    Q.   Installed at some site?

12    A.   Yes, five sites.

13    Q.   Did WhiteWater make any sales under this 2003 agreement?

14    A.   Yes, absolutely.

11:25   15    Q.   And as a result, was this agreement mutually beneficial to

16    Wave Loch and WhiteWater?

17    A.   Both sides, yes.

18    Q.   As a result of this agreement, did WhiteWater enter into

19    any subsequent agreements with Wave Loch for license

11:25   20    technology?

21    A.   We did.

22    Q.   And do you recall when that would have been?

23    A.   2009.

24         MR. TACHÉ:   If we could please bring up Exhibit 33.

11:25   25    BY MR. TACHÉ:

```
       1  Q.   Is this the agreement that you were referring to?

       2  A.   Yes.

       3  Q.   And why did you end up in a second license agreement with

       4  Wave Loch?

11:26  5  A.   The first one just expired.

       6         MR. TACHÉ:  If we could please turn to page 2, Section

       7  1.7 of this agreement.  I'm sorry.  Page 7, Section 3.1.1.

       8  BY MR. TACHÉ:

       9  Q.   Do you recall what the royalty was under the agreement with

11:26 10  Wave Loch in 2009?

      11  A.   20 percent royalty.

      12  Q.   And was that royalty reduced over time?

      13  A.   Yes.

      14  Q.   Do you recall why that royalty would have been 20 percent?

11:26 15  A.   Yeah, I believe it's when one -- one of the patents

      16  expired, it reduced to 10 percent.

      17  Q.   And that 10 percent number is something that is typical in

      18  terms of the royalties that you pay under license agreements?

      19  A.   Yeah, virtually all the license agreements that we've

11:27 20  entered into, these other, as you say, ten to 12, have been at

      21  the 10 percent mark.

      22         MR. TACHÉ:  If we could turn to page 6, Section

      23  2.2.14.  Highlight that.  Thank you.

      24  BY MR. TACHÉ:

11:27 25  Q.   I believe this is the amount you were referring to a moment
```

1  ago.  Was there a guaranteed minimum payment obligation under

2  this agreement?

3  A.  Yes, in this one, 120,000.

4  Q.  And if you could please explain to the jury what is meant

11:27   5  by an annual minimum guarantee royalty.

6  A.  If we were not successful in selling any FlowRiders, we'd

7  still be obliged to pay them $120,000.

8       MR. TACHÉ:  If we could please turn to page 2 of the

9  agreement, Section 1.11.

11:27   10  BY MR. TACHÉ:

11  Q.  There's something that's defined in this section as

12  licensed territory.  Do you see that, Mr. Chutter?

13  A.  Yes.

14  Q.  Were these the restrictions or areas that you were allowed

11:28   15  to sell a product in under this 2009 agreement?

16  A.  Yes.  Under this agreement, we were able to sell globally,

17  with the exception of Canada and the United States.

18  Q.  And do you know whether or not there were any other

19  companies selling these products at that time in Canada or the

11:28   20  United States?

21  A.  Yeah, I believe at this time Wave Loch had an agreement

22  with a company called ADG, Aquatic Development Group, to look

23  after those countries.

24  Q.  And so were you allowed to sell in Canada or the

11:28   25  United States at the time?

A.  No.

Q.  So the license that you got was obviously not exclusive because there was another company that was selling.  Why would WhiteWater agree to pay an annual guaranteed minimum royalty under an agreement without having an exclusive provision?

A.  It was exclusive in the territories that we had rights for, which were -- and we were only selling into those territories, and nobody else could sell into those territories.

Q.  Was this also consistent with the comment that you made earlier with respect to something that Mr. Lochtefeld expected in his agreement?

A.  Yes, absolutely.

Q.  And what do you mean by that?

A.  There are key components of a license agreement, and we've touched on -- you touched on a number of them.  Territory is one.  Royalty is one.  Minimums is one.  Jurisdiction is one.  Tom was a lawyer himself, and as a result, the detail and minutia in which he went into these agreements was quite detailed, comma, painful.

Q.  Do you have a good relationship with Mr. Lochtefeld?

A.  I do, I do.

Q.  So the comment was meant in jest?

A.  Oh, absolutely.  No, we -- when we're in the same city, we'll dine together.  There's a very respectful and long relationship going back to the very early days in the industry.

1    As they say, he's one of the pioneers.  He's a father of the

2    industry, one of the fathers of the industry.

3    Q.   Thank you.

4        In 2011, did you enter into a license agreement with

11:30   5    Surf Park?

6    A.   He's also a World Water Park Hall-of-Famer, which we have

7    that in common as well.

8    Q.   I didn't mean to interrupt.

9    A.   Sorry.

11:30   10   Q.   Didn't want to miss.  Thank you.

11       In 2011, did WhiteWater enter into a license agreement with

12   Surf Park?

13   A.   Yes.

14   Q.   And who is Surf Park?

11:31   15   A.   Surf Park was a Singaporean company.

16   Q.   You used the term "was."  Are they still in existence, as

17   far as you know?

18   A.   I don't know, actually.

19   Q.   Okay.  Thank you.

11:31   20       MR. TACHÉ:  If we could please bring up Exhibit 35.

21   BY MR. TACHÉ:

22   Q.   Is what's shown on the screen as Exhibit 35 a license

23   agreement that you entered into with Surf Park in 2011?

24   A.   Yes.

11:31   25   Q.   Why did you enter into an agreement with Surf Park for

1    this -- the technology?

2    A.   Tom Lochtefeld had sold the intellectual property

3    to -- relating to the FlowRider to Surf Park.

4    Q.   So then why would you enter -- so you entered into this

5    agreement in order to continue to be selling the product?

6    A.   The previous agreement was with Wave Loch, but then

7    Wave Loch sold the intellectual property to Surf Park, so in

8    order to maintain our rights, we were obliged to enter into an

9    agreement with Surf Park.

10           MR. TACHÉ:   If we could bring up the demonstrative of

11   the agreements.

12   BY MR. TACHÉ:

13   Q.   This is a representation of some of the agreements we'll be

14   talking about this morning, Mr. Chutter.

15       The 2011 license agreement that you entered into Wave Loch,

16   is that represented by the yellow line on the right-hand side

17   that says "Surf Park PTE to Whitewater West Industries"?

18   A.   Yes.

19   Q.   And you referenced just a moment ago, it's your

20   understanding you entered into this agreement because Wave Loch

21   had assigned or sold its rights in the same technology to

22   Surf Park at or about the same time?

23   A.   Correct.

24   Q.   And is that represented by the yellow -- I hope it's

25   yellow -- the top right-hand corner?

11:31  (line 5)
11:32  (line 10)
11:32  (line 12/15)
11:32  (line 20)
11:33  (line 25)

```
 1    A.   Yes.

 2              MR. TACHÉ:   If we could please bring back Exhibit 35,

 3    page 4, Section 2.1.1.

 4    BY MR. TACHÉ:

11:33  5    Q.   What rights did you receive from Surf Park in 2011,

 6    Mr. Chutter?

 7    A.   Exclusive rights to the FlowRider product line within the

 8    territory, and the territory exempted the United States and

 9    Eastern Canada.

11:33 10    Q.   We'll discuss that portion in just a moment.

11         Do you recall whether or not this agreement with Surf Park

12    contained a minimum guarantee?

13              MR. TACHÉ:   And if we could please bring up page 8 of

14    this Section 3.2.

11:34 15              THE WITNESS:   Yes, it did.

16    BY MR. TACHÉ:

17    Q.   And do you recall what that minimum guarantee was?

18    A.   125,000.

19    Q.   And that's the number represented on the top paragraph?

11:34 20    A.   Yes.

21    Q.   You stated just a moment ago that this agreement had some

22    carveouts for Eastern Canada and the United States.  Is that a

23    fair representation of what you said?

24    A.   Yes.

11:34 25    Q.   And do you recall why you had those carveouts?
```

A.   Wave Loch had -- as we touched on earlier, Wave Loch had an

agreement with a company called ADG, Aquatic Development Group,

covering U.S. and parts of Canada.

Q.   The agreement that we just looked at --

      MR. TACHÉ:  And if we could please bring up Section

2.1.1 again.  Thank you.  2.1.1, I believe.  It's on

page -- it's on page 4.  Thank you.

BY MR. TACHÉ:

Q.   That agreement says that it's an exclusive license, does it

not, Mr. Chutter?

A.   It does.

Q.   So was this agreement contemplating any relationship that

you might have with ADG?

A.   Part of the understanding on this is that we would honor

the agreement that Wave Loch had with ADG and enter into a

sublicense between WhiteWater and ADG covering the territories

that they historically had so that we would end up having the

master agreement for the world, and we would sublicense ADG for

the United States and Eastern Canada.

      MR. TACHÉ:  If we could please bring up Exhibit 34.

BY MR. TACHÉ:

Q.   And if you could please tell the jury, Mr. Chutter, whether

or not you entered into an agreement with ADG consistent with

the terms and conditions you just spoke about?

A.   Yes.

1  Q.   And is this the agreement that you entered into with them?

2  A.   It is.

3  Q.   And the "them" is ADG.

4       Do you recall whether or not the sublicense agreement

11:36  5  entered into with ADG included the '589 patent?

6  A.   Yes, it did.

7            MR. TACHÉ:   And if we could please turn to page 7 of

8  this exhibit, Section 3.2.

9  BY MR. TACHÉ:

11:36  10  Q.   Did this subagreement -- pardon me.   Did this sublicense

11  agreement with ADG include a minimum royalty provision?

12  A.   It did.

13  Q.   And how much was that agreement?

14  A.   600,000.

11:37  15  Q.   And so is my understanding correct that in the event that

16  ADG did not sell a single product in a particular year, they

17  were still obligated to pay you $600,000?

18  A.   That's correct.

19  Q.   Was this 2011 agreement, sublicense agreement, with ADG

11:37  20  ever amended?

21  A.   Yes, it was.

22  Q.   And was it ever amended to remove this minimum annual

23  royalty obligation?

24  A.   Yes, it was.

11:37  25  Q.   And why would you agree to do something like that?

500

A.   ADG was another company that goes back to the early days of the industry; father, then son.  I've known them for 39 years that I've been involved in the amusement water park industry. I knew the father well, Herb Ellis, and son, Ken.  They were a long-established company, honorable company, out of Cohoes, New York.  They had always exceeded in terms of royalties -- exceeded 600,000 per year.  As a result, I felt it not a huge risk, given their activity, to waive the minimum.

Q.   Thank you, Mr. Chutter.

     You testified earlier that it's one of sort of your business philosophies when entering into license agreements not to create competitive situations.  Can you please tell the jury whether or not the agreement that you entered into with ADG in the sublicense agreement -- did it set up a situation where you would be competing directly with ADG?

A.   Generally not.  Generally, geographically, we had the world, and we subbed to them United States and Eastern Canada, east of the Manitoba-Ontario border.  They had exclusivity, for example, in the municipal market.  There were a few carveouts that were remnants of the agreement that Tom had with them, but by and large, it was exclusive.

Q.   Thank you.

          MR. TACHÉ:  If we could please bring up Exhibit 46.

BY MR. TACHÉ:

Q.   Mr. Chutter, do you recognize this agreement --

1    A.   Yes.

2    Q.   -- and the agreement that -- this is referring to what's

3    shown in Exhibit 46.

4    A.   Yes, I recognize it.

11:39    5    Q.   Who are the parties to this agreement, Mr. Chutter?

6    A.   FlowRider Surf and Wave Loch, Tom Lochtefeld's company.

7            MR. TACHÉ:   If we could please bring up the

8    demonstrative of the agreements.

9    BY MR. TACHÉ:

11:39   10    Q.   So is this the agreement that you're referring to, the

11   contribution agreement?   Is this the agreement that is between

12   Wave Loch and FlowRider Surf represented on the left-hand side

13   with the black arrow?

14   A.   It is.

11:40   15    Q.   Who is FlowRider Surf?

16   A.   FlowRider Surf is a Canadian company set up -- British

17   Columbia company set up to facilitate the acquisition of

18   intellectual property from Wave Loch and Surf Park.   It did not

19   go directly into WhiteWater because Tom Lochtefeld wanted to

11:40   20   have an eye on the company to ensure that royalties would be

21   recorded properly, et cetera.   So we established this company

22   where Tom had a 10 percent interest and WhiteWater had a

23   90 percent interest.

24   Q.   A moment ago you referred to an acquisition.   Can you

11:41   25   please explain -- could you please explain to the jury what the

502

1    contribution agreement is and what it represented?

2    A.   Well, for us it represented acquiring the Wave Loch

3    FlowRider division outright, buying the intellectual property

4    and assets of FlowRider as it related to -- Wave Loch as it

11:41   5    related to the FlowRider product line.

6    Q.   And why would WhiteWater want to buy Wave Loch's sheet wave

7    business?

8    A.   It made good business sense to us.  We had a -- we had at

9    this time, 2012, 2014 -- we'd had a ten-year experience,

11:41  10    ten-plus-year experience with the product, we knew the product,

11    we manufactured the product, and Tom's passion in life was not

12    FlowRider or Wave Loch.  Tom's passion in life was to get

13    surfing into the Olympics and develop technology on a bigger

14    scale.  I mean, he's a good old San Diego boy.  He remains an

11:42  15    active surfer.  FlowRider was a means to allow him to do that.

16    And as an aside, next summer in Tokyo will be the first summer

17    that surfing is in the summer Olympics.

18    Q.   Thank you, Mr. Chutter.

19         MR. TACHÉ:  If we could please turn back to Exhibit

11:42  20    46, page 5.  If you could highlight the date on the agreement.

21    Sorry.  If you could please highlight the first and second line

22    of the agreement.  That's okay.  Don't worry about it.  If you

23    could just blow it up a little.

24    BY MR. TACHÉ:

11:42  25    Q.   Do you recall when the contribution agreement was signed

1  between FlowRider Surf, Ltd., and --

2  A.   Last day of January 2014.

3  Q.   Do you remember what the effective date of the agreement

4  was?

11:43  5  A.   December 1, 2012.

6  Q.   And so why would there be almost a two-year difference

7  between when WhiteWater and Wave Loch -- I'm sorry, when

8  FlowRider Surf, Ltd., and Wave Loch signed the agreement and

9  its effective date to almost two years earlier?

11:43  10  A.   As you have observed, there's been a number of agreements,

11  and also, I knew Tom very well.  He's a unique combination of

12  being a Californian, a surfer, and a lawyer.  And I also knew

13  that doing an agreement, that combination was pretty toxic, and

14  I hope there's nobody in this room that falls into that

11:43  15  category, but I knew it always took an awfully long time to

16  conclude an agreement with Tom.  So right at the very

17  beginning, I said, "Tom, if we're going to negotiate this,

18  let's do it.  We'll do it in good faith.  But let's make

19  everything effective December 1, 2012," which meant that in

11:44  20  between that time, if he sold FlowRiders, that the gain on

21  those FlowRiders would attribute back to WhiteWater, and we

22  would, of course, have to pay royalty, and as it worked out, we

23  obviously came to an agreement, and as a result, the effective

24  date was backdated to December 1, 2012.

11:44  25  Q.   Thank you.

1    And as part of the acquisition of Wave Loch sheet wave

2  business, did you acquire any intellectual property rights?

3  A.  Yes, all the intellectual property.

4  Q.  And by "all," do you mean things like patents, trademarks,

11:44   5  that kind of thing?

6  A.  Yes.

7  Q.  In connection with the contribution agreement, did

8  WhiteWater acquire any intellectual property rights from anyone

9  else?

11:45  10  A.  Yes.

11  Q.  And what was the other company from whom WhiteWater

12  acquired rights?

13  A.  Surf Park.  As mentioned earlier, Tom had transferred some

14  of his -- sold some of his intellectual property to Surf Park.

11:45  15  Q.  Thank you.

16        MR. TACHÉ:  If we could please bring up the

17  agreements.

18  BY MR. TACHÉ:

19  Q.  So is -- we talked earlier about the assignment from

11:45  20  Wave Loch to Surf Park in 2011.  The effective date, you can

21  see from the footnote, it says "2013 assignment," and it

22  references in the bottom left-hand corner "effective 2011."

23  And then we also talked about the agreement from Surf Park to

24  WhiteWater in 2011.  Do you see that?

11:45  25  A.  Correct.

1    Q.   There's now a reference to a license agreement from -- that

2    we talked about from -- and is this the agreement we're talking

3    about from Surf Park to FlowRider?

4    A.   Yes.

11:46    5    Q.   And why was that?

6    A.   The owner of Surf Park -- a gentleman referred to as XT --

7    for taxation reasons needed to have the IP in Singapore for no

8    less than seven years.  And he hadn't, obviously, by the dates

9    that you see there.  That had not occurred yet.  So we agreed

11:46   10    to leave the intellectual property in Singapore in Surf Park

11    until that seven years expired, and then we had the option to

12    purchase that intellectual property at the expiration of that

13    date.

14    Q.   And did WhiteWater ever exercise that option to purchase

11:47   15    the assets?

16    A.   We did.

17    Q.   And is that represented by the 2017 assignment agreement

18    right here?

19    A.   Yes.

11:47   20         MR. TACHÉ:   If we could please bring up Exhibit 47.

21    BY MR. TACHÉ:

22    Q.   Is this the 2014 intellectual property agreement we were

23    just discussing with respect to Surf Park and FlowRider Surf,

24    Ltd.?

11:47   25    A.   Yes.

1  Q.   And did this have the same effective date of December 1,

2  2012, as the contribution agreement?

3  A.   Yes.

4  Q.   And to your recollection, Mr. Chutter, was the '589 patent

11:47  5  included as one of the assets that were subject to this license

6  agreement?

7  A.   It was.

8  Q.   And at the time you signed the contribution agreement with

9  Mr. Lochtefeld and took the license agreement with Surf Park,

11:48  10  were you aware that the '589 patent was included in those

11  assets?

12  A.   Yes.

13  Q.   And why were you aware of that fact?

14  A.   From our perspective, there are two patents in his

11:48  15  portfolio that were particularly interesting and differentiated

16  FlowRider from -- in the marketplace.  One was really the

17  tension fabric riding surface, which is similar to a

18  trampoline, and the other is the nozzle flap.

19  Q.   Why do you consider those to be the two more important

11:48  20  patents from the portfolio?

21  A.   Well, on the first one, as I mentioned earlier, Tom

22  invented this concrete foam and then a riding surface.  We,

23  with our fiberglass background, took this idea and thought gee,

24  we could make a mold and spray in the riding surface, spray in

11:49  25  foam, spray in fiberglass, let it harden, pop it out, and then

1   bolt all of these together and make a FlowRider, and that we

2   did for a number of years.

3        And then Tom, working with a group in South Africa, came up

4   with this idea of a tension fabric, which, as I say, is very

11:49  5   similar in principle to a trampoline, in which the water would

6   go over it.  We liked that technology.

7        Our number one principle at WhiteWater is safety.  And

8   surfing can be a hazardous sport.  And the tension fabric, in

9   our view, allowed the equipment to be much safer, so we're very

11:50  10  interested in that, a lot easier to manufacture as well, can be

11  put together on-site very quickly.

12        The nozzle, again, related to the safety side of it.  In

13  the early days, if the water was turned off or if a person fell

14  off their board, there was a risk of them coming into the

11:50  15  machinery, and the nozzle prevented that, so it was a safety

16  aspect.

17  Q.   Thank you, sir.

18        In connection with the contribution agreement, did you

19  enter into any other agreements?  And I'm specifically

11:50  20  referring to any agreements that WhiteWater may have had

21  with -- with its wholly owned subsidiary, FlowRider Surf, Ltd.,

22  so I'm referring to, did you enter into an agreement with

23  FlowRider Surf, Ltd.?  And by "you," I mean WhiteWater.

24  A.   Yes.

11:51  25  Q.   And why would you have done so if you owned a large

1   percentage of that company?

2   A.   Well, in that case, that goes back to the notion that

3   Tom Lochtefeld earned 10 percent of FlowRider Surf, and we

4   owned 90 percent of it, obviously not 100 percent, so we needed

11:51   5   to have a license between FlowRider Surf and WhiteWater.

6   Q.   And what was the reason for that?  Did it have anything to

7   do with ADG?

8   A.   ADG as part of this, all the way along, we had agreed to

9   respect the understanding that Tom had with ADG, the agreements

11:51   10   that Tom had with ADG, so we, in turn, ended up doing a

11   sublicense from WhiteWater to ADG covering Eastern Canada and

12   the United States.

13   Q.   Does FlowRider Surf, Ltd., still exist?

14   A.   No.

11:52   15   Q.   What's happened to the company?

16   A.   It merged together with WhiteWater.

17        MR. TACHÉ:  If we could please bring up Exhibit 44.

18   BY MR. TACHÉ:

19   Q.   Do you recognize what's referred to as a Certificate of

11:52   20   Amalgamation as Exhibit 44?

21   A.   Yes.

22   Q.   And what is that, Mr. Chutter?

23   A.   It's effectively a merger of the two companies, folding

24   Surf into WhiteWater West Industries.

11:52   25   Q.   Thank you.

509

```
 1        So as of today, does WhiteWater West Industries own the
 2   '589 patent?
 3   A.   Yes.  I'm a great believer in the principle of KIS, keep it
 4   simple, and finally, through all of that, those machinations,
 5   we got it all down to everything in one company, WhiteWater.
 6             THE COURT:  So just out of curiosity, so since you
 7   folded Surf Loch [sic] and WhiteWater and Mr. Lochtefeld owned
 8   10 percent, does that mean that Mr. Lochtefeld still owns 10
 9   percent of WhiteWater?
10             THE WITNESS:  No.
11             THE COURT:  Any percentage of WhiteWater?
12             THE WITNESS:  He owns nothing of WhiteWater, never
13   has.
14             THE COURT:  Is there an interest in FlowRider Surf?
15             THE WITNESS:  He had a 10 percent interest in
16   FlowRider Surf, yes.
17             THE COURT:  What happened to it?
18             THE WITNESS:  It just ceased to exist.  His assets
19   were transferred into WhiteWater West Industries, and
20   "amalgamation" is a Canadian term which effectively means it's
21   closed down, it's disbanded, it's struck from the records, it
22   no longer exists, so --
23             THE COURT:  I know.  That's why I'm a little bit
24   confused.
25             MR. TACHÉ:  If I may, Your Honor.
```

11:53 (line 5)
11:53 (line 10)
11:53 (line 15)
11:53 (line 20)
11:54 (line 25)

510

|   |   |
|---|---|
| 1 | THE COURT:  I'll do it. |
| 2 | MR. TACHÉ:  Sorry. |
| 3 | THE COURT:  So he owned 10 percent of FlowRider Surf, |
| 4 | Ltd.? |

11:54    5      THE WITNESS:  Yes.

6      THE COURT:  WhiteWater owned 90 percent?

7      THE WITNESS:  Yes.

8      THE COURT:  Then you folded FlowRider Surf into

9  WhiteWater?

11:54   10      THE WITNESS:  Yes, the assets of.

11      THE COURT:  The assets.

12         So what happens to his 10 percent?

13      THE WITNESS:  By agreement -- I don't recall the

14  financial agreement, but by agreement, Mr. Lochtefeld agreed

11:54   15  that that would happen, by his consent, so all parties were in

16  agreement with that.

17      THE COURT:  Okay.

18      MR. TACHÉ:  Let me try to clarify, Your Honor.

19  BY MR. TACHÉ:

11:54   20  Q.  Mr. Chutter, did you end up entering into a subsequent

21  agreement with Mr. Lochtefeld to buy that 10 percent interest

22  in the business sometime in fall of 2015?  I'm sorry, fall of

23  2014.

24  A.  A sublicense back to Wave Loch?

11:55   25  Q.  No, I'm sorry.  I did not mean to confuse you.

1      In fall of 2014, did Whitewater enter into a subsequent

2   agreement with Mr. Lochtefeld to acquire the remaining 10

3   percent of his business?

4   A.   Yes, I believe that was the case, that's how it occurred.

11:55   5   Q.   Yes, thank you.

6      And so that's how Mr. Lochtefeld's 10 percent interest

7   disappeared?

8   A.   Yes.

9           THE COURT:   So at the time of the amalgamation, he did

11:55   10   not own 10 percent interest?

11           THE WITNESS:   Yes, that would be correct.   Minutes

12   before, we acquired 10 percent and then merged.

13           THE COURT:   Okay.

14           MR. TACHÉ:   If we could please bring up Exhibit 218.

11:55   15   BY MR. TACHÉ:

16   Q.   A moment ago I asked you, Mr. Chutter, if Whitewater now

17   owns the '589 patent, and you affirmatively stated that you

18   did.   Is this the agreement that memorializes the acquisition

19   of that asset among other patents acquired from Surf Park in

11:56   20   fall of 2017?

21   A.   Yes.

22   Q.   Thank you.

23           MR. TACHÉ:   If we could please turn back to Exhibit

24   47, specifically page 9 and 10, Section 4.4.

11:56   25   BY MR. TACHÉ:

1   Q.   Mr. Chutter, this is a Section 4.4 out of the Surf Park

2   license agreement that you entered into in connection with the

3   contribution agreement.  Do you recognize this provision of the

4   agreement?

11:56   5   A.   Yes.

6   Q.   And what is this provision, Mr. Chutter, just generally, if

7   you can tell the jury?

8   A.   Generally, when you have a patent, it's governed by the

9   U.S. Patent Office, and the U.S. Patent Office charges fees

11:57   10   every few years to maintain the patent in good standing,

11   referred to as maintenance fees.  And this section indicates

12   that WhiteWater -- it was WhiteWater's right to pay for these

13   maintenance fees to ensure that the patents remained valid.

14   Q.   So is it your general understanding, Mr. Chutter, that

11:57   15   pursuant to this license agreement, WhiteWater was responsible

16   for paying the maintenance fees for all the patents, including

17   '589 patent --

18   A.   Absolutely.

19   Q.   -- that it had licensed?

11:57   20   A.   Absolutely.

21   Q.   In 2014 -- let me clarify a question, Mr. Chutter.  Is it

22   your understanding that under the license agreement,

23   that -- WhiteWater had sole responsibility to pay maintenance

24   fees under the Section 4.4 of the license agreement with

11:58   25   Surf Park?

A.   Yes.

Q.   In 2004, at the time of the agreement, was there someone at WhiteWater that was responsible for looking at the intellectual property portfolio?

11:58   A.   Yes.

Q.   And who was that person?

A.   Tim Kwasnicki.

Q.   What was Mr. Kwasnicki's title in 2014?

A.   He was the VP of risk management.

11:58   Q.   And at that time, what was the vice president of risk management responsible for at the company?

A.   He would, for example, review every contract that we entered into in terms of the supply of design services and products across all of our product lines, terms and conditions, liability, et cetera.  He was also responsible for maintaining patents and the maintenance fees.  In addition, if there were any accidents on waterslides, they would funnel to him to resolve.

Q.   Is Mr. Kwasnicki still employed at WhiteWater?

11:59   A.   No, he retired about five years ago.

Q.   At the time he worked at WhiteWater, was Mr. Kwasnicki an attorney?

A.   No.

Q.   Do you know whether or not he had any legal training?

11:59   A.   He did not.

1  Q.  Was he actually an engineer by training?

2  A.  He was a Professional Engineer.

3  Q.  In 2014, did WhiteWater use an outside law firm to maintain

4  or track its patent portfolio?

12:00  5  A.  No.

6  Q.  At that time period, did WhiteWater use any other agency to

7  help track and maintain its patent portfolio?

8  A.  We used a company referred to as CPA, which was a large

9  international company that provided the service of monitoring

12:00  10  patents, and we engaged them.

11  Q.  And your reference to CPA, is that a company called CPA

12  Global?

13  A.  Yes.

14  Q.  Are you aware that in -- at some point in late 2014 that

12:00  15  the '589 patent that's at issue in this case lapsed because a

16  maintenance fee was not timely paid?

17  A.  Yes.

18  Q.  When did you first learn of the lapse of the '589 patent?

19  A.  Beginning of February 2015.

12:01  20  Q.  And how did you learn about the lapse?

21  A.  I was told by Mike Heaven.

22  Q.  And who is Mr. Heaven?

23  A.  He's a chief operating officer, COO, of WhiteWater.

24  Q.  Is Mr. Heaven currently with the company?

12:01  25  A.  No, he's retired.

1  Q.   Upon learning of the fact that the '589 patent had lapsed

2  for failure to pay a maintenance fee, did you conduct any kind

3  of investigation within the company to find out why it

4  happened?

12:01  5  A.   Yes.

6  Q.   And what did you learn?

7  A.   We -- I learned that the file of patents that were to be

8  transferred to WhiteWater had never been turned over to CPA

9  Global.

12:02  10  Q.   Could you please explain that to the jury a little bit

11  more.

12  A.   We'd engaged CPA Global to administer all our patents, to

13  give us notification when maintenance payments were due and to

14  be the body responsible for the management of the patents.  Of

12:02  15  course, they can only do that if they know of the patents, and

16  in this transaction, the patents that were transferred to

17  WhiteWater, we failed to tell CPA Global about these patents.

18  Q.   And just to be perfectly clear, when you say "the patents

19  that were transferred to WhiteWater," were those the patents

12:02  20  that were acquired from Wave Loch directly as part of the

21  contribution as well as the licensed patents from Surf Park?

22  A.   Correct.

23  Q.   And so is my understanding correct that because CPA Global

24  did not have these patents in its database at the time in 2014,

12:03  25  they did not provide WhiteWater, and more particularly

1   Mr. Kwasnicki, with a notice of the fact that their maintenance

2   fee was due for the '589 patent?

3   A.   That's correct.   They were unable to because they didn't

4   know they existed.

12:03   5   Q.   And is that the reason why the maintenance fee wasn't

6   timely paid in 2014 when it was due?

7   A.   That's correct.

8   Q.   In 2014, did Mr. Kwasnicki have the authority to

9   unilaterally decide whether or not to pay a maintenance fee?

12:03   10   A.   He did not.

11   Q.   Has WhiteWater ever intentionally not paid a maintenance

12   fee?

13   A.   Yes.

14   Q.   And how is that decision made?

12:03   15   A.   Case-by-case basis, but if, for example, we had a license

16   on a particular product and we were no longer selling that

17   product, it was no longer commercially interesting for us,

18   there would be no point in making the maintenance payments, and

19   we would stop.

12:04   20   Q.   Who would be involved in that decision at WhiteWater?

21   A.   I would.

22   Q.   Anybody else?

23   A.   It would go -- in the case of FlowRider, it would go from

24   Mr. Kwasnicki to Mr. Myrman, who is the president of the

12:04   25   FlowRider business unit, and Mr. Myrman would bring it to my

1    attention, and we would, between the two of us, determine

2    whether we wanted to keep it going or not.

3    Q.   Mr. Chutter, in this particular instance, with respect to

4    the '589 patent, did WhiteWater intentionally let the '589

12:04  5    patent lapse?

6    A.   Absolutely not.

7    Q.   And why not?

8    A.   The biggest reason -- well, two reasons:  One, we had an

9    obligation under the agreement to maintain -- pay the

12:05  10   maintenance fees and maintain the patents in good status; but

11   more importantly, it's just a huge financial reason.  I had

12   agreed to pay Mr. Lochtefeld somewhere between 16 and

13   $18 million for a series of assets.  That particular patent was

14   a key piece of intellectual property.  I wasn't about to

12:05  15   acquire something for $16 to $18 million and then not maintain

16   it, particularly when the maintenance fees were $7,400.  It

17   would be the height of stupidity.

18   Q.   After you learned of the failure to timely pay the

19   maintenance fee, did WhiteWater implement any processes or

12:06  20   procedures to minimize the risk of this ever happening again

21   with respect to any other patent they owned?

22   A.   We did.  As often happens in business, when there's a

23   process that you discover doesn't work as you had intended, you

24   adjust it so that that will never happen again.  And in this

12:06  25   particular case, we retained a Vancouver-based patent law firm

518

1    to be a double-check, you might say, on patents and be

2    responsible for letting us know whether maintenance fees --

3    when they were due.

4        The other thing we did is we went back to CPA Global and

12:06    5    changed the relationship with them, and that change was that we

6    were giving them instruction to pay maintenance fees if they

7    don't hear back from us; in other words, default to paying.  If

8    a maintenance fee was due at a particular time and for whatever

9    reason they didn't hear back from us, they had full authority

12:07    10    to pay it and then to charge us for it, so the default was pay,

11    not not pay.

12    Q.   Thank you.

13        Have you ever contacted a company called Murphy's Waves

14    about the '589 patent?

12:07    15    A.   Yes.

16    Q.   And what was the nature of that communication from Murphy's

17    Waves?

18    A.   It started with a correspondence to Murphy's Waves bringing

19    to their attention that we thought that they may be infringing

12:07    20    on that particular patent.

21    Q.   And what was the response that you received from Murphy's

22    Waves?

23    A.   I actually received a call from Douglas, Douglas Murphy,

24    the founder of Murphy's Waves, we knew well.  Not simply from

12:08    25    the industry, but my partner in WhiteWater, business partner,

1    is a man named Andrew Wray.  His father was Ian Wray, who

2    started a company called Barr and Wray out of Glasgow.

3    Douglas Murphy worked for Barr and Wray, so my partner knew him

4    for years beforehand.

12:08   5        When Ian Wray decided to sell the company to his employees,

6    he did not select Douglas Murphy as one of the employees he

7    would sell Barr and Wray to.  Douglas Murphy then left the

8    company and started Murphy's Waves.

9        So we had a long relationship with him in the industry, but

12:08   10   particularly my partner, Andrew, knew him from earlier days

11   because prior to Andrew joining WhiteWater, he was -- he worked

12   for Barr and Wray North America, so they all worked for the

13   same company.

14   Q.   Did you end up acquiring Murphy's Waves?

12:09   15   A.   We did.

16   Q.   And why was that?

17   A.   In conversation with Douglas, he made it abundantly clear

18   that he was wanting to sell Murphy's Waves.  In fact, he was

19   well down the road on putting a deal together with another

12:09   20   party.  He did express that he had concerns as to whether the

21   other party had the financial wherewithal to complete the deal.

22   He brought that opportunity to our attention, and his main line

23   is wave generating for the big-wave pools, and that that's one

24   of our lines as well, so it made sense to us to acquire that

12:09   25   company.  And in the UK, there was a very unique, interesting

1   tax provision that really encouraged small companies not to

2   close their doors, but to sell on, to keep the companies going.

3   It was particularly interesting for us, and it was particularly

4   interesting for Douglas to allow him to minimize the tax that

12:10   5   he would have to pay on the gains that he made by selling

6   Murphy's Waves, so it was a true win-win deal for both of us.

7   Q.   Have you kept in touch since the acquisition with the

8   gentleman, Douglas Murphy, who Murphy's Waves is named after?

9   A.   Yes.   In fact, he's a very creative man, and he's come back

12:10   10   to us with a couple of ideas on new products.

11   Q.   And does Murphy's Waves continue to exist today?

12   A.   It does.

13   Q.   And what is WhiteWater's ownership interest in Murphy's

14   Waves?

12:10   15   A.   75 percent.

16   Q.   And who is the current president of Murphy's Waves?

17   A.   A gentleman named Jim Stuart.   He had been with Murphy's

18   Waves prior to the acquisition.

19   Q.   And does Mr. Stuart report directly to you?

12:11   20   A.   On the organization chart, he reports directly to me.

21   Having said that, I have not talked to him in two years, and

22   I've not talked to him in two years -- not that I don't love

23   the man, he's absolutely a gem, but for purely commercial

24   reasons, it made sense for us to treat the acquisition

12:11   25   completely at arm's length.   And the reason for that is -- as I

```
       1   said, we are in the wave business, so obviously our

       2   competition, for example, in the waterslide business aren't

       3   likely to buy wave equipment from us.  They would from him.  So

       4   we wanted to keep those doors open, particularly because we

12:11  5   just had acquired the company.  We wanted to make sure that

       6   those doors -- to try and make sure that those doors remained

       7   open, and the best way to do that was to treat the whole

       8   transaction as an investment only and at arm's length, and we

       9   have -- we have stuck with that solidly from the beginning.

12:12 10   Q.  And who owns the remaining 25 percent of the business?  Is

      11   that Mr. Stuart?

      12   A.  Mr. Stuart and the chief engineer.

      13   Q.  Thank you.

      14       As part of your acquisition of Murphy's Waves, did

12:12 15   WhiteWater acquire any intellectual property rights?

      16   A.  We did.

      17   Q.  And do you recall what that was?

      18   A.  It was for -- it was a patent relating to sheet flow

      19   technology that they had in the U.S.

12:12 20   Q.  Did you enter into any agreement subsequent to the

      21   acquisition with Murphy's Waves in connection with that patent?

      22   A.  We did.  We -- WhiteWater licensed that patent back to

      23   Murphy's Waves, the new Murphy's Waves.

      24   Q.  Thank you.

12:13 25           MR. TACHÉ:  If we could please bring up Exhibit 164,
```

1    page 1, Section 3.1.1.  I'm sorry.  3. -- Section 3.2, page 1.

2    BY MR. TACHÉ:

3    Q.   In the agreement back with -- in the agreement with

4    Murphy's Waves, did you grant a license back to them for that

12:13  5    patent?

6    A.   Yes.

7    Q.   And did that license include a minimum annual royalty?

8    A.   Yes, in U.S. dollars, it was approximately 300- U.S.

9    dollars.  I think it was 160-, 180,000 pound sterling, 180,000

12:13  10   pound sterling, which is approximately 300,000 U.S.

11   Q.   And what was the royalty that Murphy's Waves and Mr. Stuart

12   agreed to pay you under that license agreement?

13   A.   20 percent.

14   Q.   And as with the other agreements we've talked about, so to

12:14  15   the extent that Murphy's Waves did not sell any rides at all in

16   any given year, did they still owe you the minimum annual

17   guarantee?

18   A.   Absolutely.

19   Q.   And why did you enter into an agreement structured this way

12:14  20   with a company that WhiteWater had a partial ownership with?

21   A.   As I said, we've entered into a number of license

22   agreements over the course of our history.  They've all been

23   the same format.  It's all worked well for us.  They've been

24   absolute win-win agreements for both sides.  To the best of my

12:15  25   knowledge, none of them have ever been terminated, they've gone

1    their full length, very successful, so we stuck with the

2    program that always worked.

3    Q.   Thank you.

4        Has WhiteWater ever licensed technology to a third party

12:15  5    other than, for example, in connection with the Murphy's Waves?

6    A.   We have on occasion.

7    Q.   And why would you agree to license WhiteWater technology to

8    a third party?

9    A.   We would only do it if we were exiting a particular product

12:15  10   line.  Generally, as a principle, we would never do it, but if

11   we were exiting a particular product line, we would enter into

12   a license agreement rather than just, for example, close that

13   product line down.

14   Q.   Would you ever grant a license to a direct competitor?

12:16  15   A.   No.

16   Q.   And why wouldn't you do that?

17   A.   I don't believe in suicide.  I fundamentally don't think

18   it's a smart idea.

19   Q.   Can you please explain that to the jury.

12:16  20   A.   If you -- imagine two competitors in any business.  If one

21   has some intellectual property which gives them a competitive

22   advantage, if they license that to the competitor, all of a

23   sudden, their competitive advantage disappears.  And it's just

24   not in the financial long-term interest.  Understand, when you

12:16  25   develop a new idea or a patent, traditionally they cost a huge

amount of money.  And the only way -- the only way to recoup

that money is through sales of that product, and hopefully you

get it right, which is why the international community has come

up with this idea of patents to encourage investment, to

12:17   encourage job creation, and in fact, it's massively timely

right now.  I mean, this whole China-U.S. fight, the central

core of it is about intellectual property and the United

States' determination to make sure that China respects

intellectual property, which historically they have not done.

12:17   We know that firsthand.  Our largest market historically has

been China.

Q.  You mentioned that it was suicide.  Can you please explain

to the jury specifically what you mean by that from a financial

perspective?

12:17   A.  Well, from a final perspective, if you're -- if you're

giving away, you might say, trade secrets and methods on how to

manufacture something to a competitor, it means that your

sales, your revenues, are going to drop significantly, and if

your sales drop significantly or are eroded away, you won't

12:18   last in business very long.

Q.  What would you say with respect to the FlowRider your gross

margin would be on the sale of a product if WhiteWater makes

it?

A.  Do I have to say that?

12:18   Q.  Let me --

1  A.   Marshall is going to get mad at me.

2        THE COURT:  You're under oath, and you've been asked

3  the question.  I'm dying to hear.

4        THE WITNESS:  Gross margin, which is the difference

12:18    5  between sales and cost of sales --

6  BY MR. TACHÉ:

7  Q.   Let me withdraw the question.

8  A.   40, 45 percent.

9  Q.   How much would you make on a license if you licensed it to

12:18   10  a direct competitor?

11  A.   10 percent.

12  Q.   So there's a difference between what you'd make if you sell

13  the product versus whether or not --

14  A.   Absolutely, and if we sell the product, we'd have a 40

12:18   15  percent gross margin; if we license the product, a 10 percent

16  gross margin.  So the only way you can actually justify doing

17  licenses if you're on the other side is if they're going to

18  bring an awful lot of volume, and if you're going to bring four

19  or five or six or ten times more volume, then all of the sudden

12:19   20  it makes sense.

21  Q.   And that's typically only if it's in a market outside of

22  where you're currently operating, isn't it?

23  A.   That's correct.  And so it would never make sense for us

24  because we're global, but for a small company that perhaps --

12:19   25  for example, our Aqua Lube license, it's only in Germany, and

 1    they only do work in Germany.  They make an awful lot more
 2    money by licensing us, and we can sell that around the world.
 3              MR. TACHÉ:  Thank you, Mr. Chutter.
 4              THE COURT:  Finished?
 5              MR. TACHÉ:  I am, subject to redirect.
 6              THE COURT:  Great.
 7         It's a wonderful time for us to take a break for lunch.
 8    What do you think?
 9         All right.  Mr. Chutter, you may step down.
10         We'll come back at ten minutes till 1:00.  Remember my
11    admonition.  Please keep an open mind; don't do any research;
12    don't talk to anyone about the case, electronically or
13    otherwise; and don't read or watch any news accounts, if any.
14    See you at ten till 1:00.  Thank you.
15                              ---oOo---
16
17
18
19
20
21
22
23
24
25

1                        C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated December 5, 2019, at San Diego, California.

7

8
                              /s/ Dana Peabody_____
9                             Dana Peabody,
                              Registered Diplomate Reporter
10                            Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25