1                    United States District Court

2              for the Southern District of California

3

4
                                   )
5    WHITEWATER WEST INDUSTRIES,    )
     LTD., a Canadian Corporation,  )   No. 17cv1118-BEN
6                                   )
            Plaintiff,              )   December 6, 2019
7                                   )
                 v.                 )   San Diego, California
8                                   )
     PACIFIC SURF DESIGNS, INC., a  )
9    Delaware Corporation, and FLOW )
     SERVICES, INC., a California   )
10   Corporation,

11        Defendants.

12

                           VOLUME 4B
13                  TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE ROGER T. BENITEZ
14                United States District Judge

15   APPEARANCES:

16   For the Plaintiff:     SNELL & WILLMER LLP
                                 WILLIAM S. O'HARE
17
                            BUCHALTER
18                               ROGER L. SCOTT

19   For the Defendants:    THOMAS WHITELAW & KOLEGRAFF LLP
                                 JOSEPH E. THOMAS
20                               WILLIAM J. KOLEGRAFF

21

22
     Court Reporter:        Dana Peabody, RDR, CRR
23                          District Court Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California 92101
                            DanaPeabodyCSR@gmail.com
25

```
 1    Case:  Whitewater v. Pacific Surf Designs, Inc.
      Date:  December 6, 2019
 2

 3
                       INDEX OF WITNESSES
 4
      FOR THE DEFENDANTS:
 5                              E X A M I N A T I O N
                                   DIRECT  CROSS REDIRECT RECROSS
 6
      Richard Alleshouse
 7       Mr. Kolegraff               785              874
         Mr. O'Hare                        822
 8
      Yong Yeh
 9       Mr. Thomas                  877

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          San Diego, California, December 6, 2019

2                        *  *  *

3      (Proceedings held outside the presence of the jury panel.)

4          MR. KOLEGRAFF:  Could we allow the jury to come down

01:00   5   and physically touch this during a portion of the discussion

6   this afternoon?

7          MR. O'HARE:  These aren't even actual authenticated

8   versions of what the real product is.  We've kind of allowed it

9   for demonstrative purposes, but to suggest these are the

01:00  10   products -- in fact, we've had testimony that the first one

11   actually is not representative of what they were making.

12          THE COURT:  It's not in evidence.  I don't see

13   anything to be gained by letting them approach.

14          MR. KOLEGRAFF:  Thank you, Your Honor.

01:00  15          THE COURT:  Thank you.

16      (Proceedings held in the presence of the jury panel.)

17          THE COURT:  All right.  Welcome back.

18          MS. TRINH:  We have a brief housekeeping issue.

19   Previously we had called out Exhibit 53 during the testimony

01:02  20   that I read in, and that should have been Exhibit 34.

21          THE COURT:  Okay.  Any problems with that?

22          MR. KOLEGRAFF:  None at all.

23          THE COURT:  Okay.

24

25

| | | |
|---|---|---|
| | 1 | MS. TRINH:  Thank you, Your Honor. |
| | 2 | RICHARD ALLESHOUSE, |
| | 3 | DEFENDANT'S WITNESS, SWORN |
| | 4 | DIRECT EXAMINATION (In progress) |
| 01:02 | 5 | BY MR. KOLEGRAFF: |
| | 6 | Q.  Good afternoon. |
| | 7 | A.  Hi, Bill. |
| | 8 | THE WITNESS:  Real quick, Your Honor, during the |
| | 9 | break, I looked up Number 26 on the patent, and it is a flat |
| 01:02 | 10 | valve.  So the little circle should follow to be a hinge. |
| | 11 | THE COURT:  So that's like what you were talking about |
| | 12 | as a check valve? |
| | 13 | THE WITNESS:  Yes.  Water can go one direction, but |
| | 14 | when it goes the other direction, it closes shut and prevents |
| 01:02 | 15 | water from going the other direction. |
| | 16 | THE COURT:  Okay.  Thank you. |
| | 17 | MR. KOLEGRAFF:  Could we pull up Exhibit 1, page 21? |
| | 18 | You can leave it enlarged so we can read the lines 5 to 17 on |
| | 19 | Column 11. |
| 01:03 | 20 | THE WITNESS:  Okay. |
| | 21 | BY MR. KOLEGRAFF: |
| | 22 | Q.  Yes, can you go ahead and just read that to yourself?  It |
| | 23 | was shown in court a couple times yesterday.  Can you go ahead |
| | 24 | and read that very quickly for us?  And let me know when you're |
| 01:03 | 25 | done. |

A.   Okay.

Q.   As one skilled in the art, does anything in that paragraph disclose to you any hinged flap?

A.   No, these are -- no.

01:03  Q.   So these only deal with object properties, correct?

A.   Yes, these are object properties such as, you know, flexibility.

Q.   And nothing to do with motion?

A.   No motion is discussed in here at all.

01:03  Q.   So after reviewing this, what was your understanding of the '589?

A.   That it had to do with a flexible nozzle tongue.  So where one end is constrained and the other end flexes to accomplish the means.

01:04  Q.   You had no belief this could ever extend to cover a hinged metal flap?

A.   No, we never -- we absolutely did not imagine that it would ever be construed to cover a hinged metal flap, which is essentially a check valve.

01:04  Q.   Were you surprised when WhiteWater sued you?

A.   Yes, absolutely.

Q.   Did you at some point become aware that the '589 patent became lapsed because of failure to pay a maintenance fee?

A.   Yes.  So WhiteWater had originally filed suit against us in
01:04  the summer of 2014 and subsequently dropped it shortly

787

1    thereafter.  And after that, we were concerned, and so we

2    started tracking things, and Yong's very diligent with these

3    things, and about December, mid-December, he called me and

4    said, "Good news.  They let the patent for the nozzle flap

01:05    5    lapse."

6    Q.   And how did you react?

7    A.   We felt it was -- we were excited because we felt they were

8    really pushing the bounds of the patent by trying to assert it

9    against us on the hinged -- hinged design and, you know, felt

01:05    10   like great, you know, they figured out that it doesn't matter

11   and go on and not have to worry about being bothered about

12   that.

13   Q.   In the history of PSD, how many wave machines have you sold

14   in total?

01:05    15   A.   I believe seven sold:  five installed and operating, one

16   under construction, and one has been signed but is still in

17   manufacturing.

18   Q.   How many of those are in countries other than the U.S.?

19   A.   Three.

01:05    20   Q.   So that would leave four installations in the

21   United States?

22   A.   Two completed in the United States, one under construction,

23   and one pending, yes.

24   Q.   So what approximately is your total gross revenue from

01:06    25   these ride sales?

1    A.   From all seven?

2    Q.   Yes, please.

3    A.   I believe we'd be a little bit over $4 million.

4    Q.   Do you make a profit on your sales?

01:06   5    A.   Each sale does make a profit, yes.

6    Q.   Have you ever sold at or below your cost?

7    A.   No.

8    Q.   In the design that you're selling, the seven sales, what is

9    the ride surface you use?

01:06   10   A.   The ride surface is very similar to what's out here.  We

11   make a structure kind of like an airplane wing.  It has a bunch

12   of ribs, and we put something called expanded metal, which kind

13   of looks like diamond mesh, if you will.  And the nice thing

14   about that is it contours to whatever shape we want.  So if we

01:06   15   want it to have a contoured surf shape, we can contour the

16   ribs, stretch the expanded metal, and the foam padding that we

17   put over the top then follows the same contour of the expanded

18   mesh below.

19   Q.   And you would never consider this to be a trampoline

01:06   20   surface?

21   A.   No.

22   Q.   And you chose to use the foam because you knew you wanted

23   to avoid the Wave Loch patents?

24   A.   We wanted to avoid the patent, but also we felt like the

01:07   25   material properties at the time the Wave Loch patent were

1    invented were not advanced enough to allow this kind of surface

2    to be effective.  And as material properties increased and time

3    went on, well, now the foam and vinyl is better than it used to

4    be, so we can make a surface out of this and do it in a

01:07    5    different way that's actually reliable whereas back in the day

6    it wasn't.

7            MR. KOLEGRAFF:  Your Honor, would it be okay if

8    Richard came down and described some of these demonstratives

9    for us?

01:07    10            THE COURT:  Sure.

11    BY MR. KOLEGRAFF:

12    Q.  We're now going to be pointing to Exhibit NU.

13        So on the far left side -- it would be the far right side

14    for the jury -- could you describe what that is?

01:07    15    A.  This is a recreation of the flexible nozzle flap that's

16    down on the B Max at Belmont Park.

17    Q.  Who made the demonstrative that we're looking at right

18    here?

19    A.  I did.

01:08    20    Q.  You heard Mr. Thatcher testify that this foam flexible

21    tongue was not accurate.  Do you agree?

22    A.  No.

23    Q.  And why?

24    A.  I built it, and to build it, I -- Belmont Park has the

01:08    25    B Max, the Bruticus Maximus, still installed, but it's

790

1   underneath a stage.  And we tried to borrow the nozzle flap for

2   the purposes of this trial, but as we couldn't do that because

3   the stage was built over it.  I actually had to crawl under

4   there with a tape measure, and I had a set of calipers, and I

01:08   5   have an angle gauge, and it can tell me dimensions,

6   thicknesses, et cetera.  So I did the best I could to recreate

7   the features of this flap, and I think --

8   Q.  We also want the judge to be able to see.

9   A.  Other than, you know, the dimensional characteristics of

01:08   10   it, one thing that was also important was the fact that this

11   was tapering over its length, and I think we've got video that

12   might show that.

13          MR. KOLEGRAFF:  Can you pull up Video NG?

14          THE COURT:  Mr. Alleshouse, could you do me a favor:

01:09   15   If you're down there, would you turn towards us when you speak?

16   I'm having a hard time hearing you.  I don't know if my court

17   reporter can hear you, but we need to make sure that we're able

18   to hear you.

19          THE WITNESS:  Yes, Your Honor.

01:09   20          MR. KOLEGRAFF:  Would you like us to use a mic?

21          THE COURT:  No.

22          THE WITNESS:  I'll take care of it.

23          THE COURT:  Touché.

24   BY MR. KOLEGRAFF:

01:09   25   Q.  This is the video.  Would you describe for us what this

791

1    video is?

2    A.   So this was the -- this is the Bruticus Maximus Barrel down

3    in San Diego.  And as you can see, I'm down there, you know,

4    showing that this is a flexible nozzle flap, and I took this

01:09   5    video shortly after this lawsuit had been filed just to show

6    that -- I didn't know how long that barrel was going to be

7    there, so I wanted to make sure I got on -- at least something

8    on the record to show what that was.

9        And so, as you can see, I was grabbing it, and I was

01:10   10   lifting it up very much like this.  And, you know, you could

11   see in the video that the deflection down the nozzle is

12   actually decreasing, kind of similar to what we have here,

13   maybe a foot to 18 inches away.  It's actually moving very

14   little.

01:10   15   Q.   So this accurately reflects the Bruticus Maximus flap as it

16   exists today?

17   A.   Yes.

18   Q.   Now, you mentioned this was installed in 2005.  Do you

19   believe this accurately reflects the way it would have been

01:10   20   installed in 2005?

21   A.   Yes, that is the same nozzle flap that I installed on that

22   wave in 2005.  It's probably had another layer of the blue

23   coating put on, but it's the same nozzle flap.

24   Q.   How do you know that?

01:10   25   A.   Because I put it on.

1    Q.   You may have talked about this briefly, but I think it's

2    important to understand the history behind the Bruticus Maximus

3    in San Diego.

4         Can you walk us through again from the Swatch machine

01:11   5    through the installation, the timing of that?

6    A.   Yeah.  So the Bruticus Maximus, as it was known, was

7    originally designed, as Tom testified, for the original

8    Swatch-Siemens Mobile Wave Tour, and that would have been in

9    the late '90s.  And they first installed it in Munich, I

01:11   10   believe, in 1999, and it's 11 shipping-containers-shaped boxes

11   that essentially bolt together on-site to create this wave

12   machine.  And when they want to take it somewhere else, they

13   disassemble these boxes, and they take it, and they took it

14   over to Italy, and then they took it down to Australia, and

01:11   15   they took it six places over a year or something like that.

16   And then it ended up back in San Diego because Tom had the

17   lease on Belmont Park, and he needed to put an attraction to

18   satisfy his lease requirements.  He brought the attraction back

19   to Belmont Park.

01:12   20        So in early 2000 or mid-2000, it got installed in Belmont

21   Park.  It was there for about a year or so, and then they took

22   it out, trying to figure out how to reutilize the area where it

23   was installed, back to Lakeside where it was stored for a

24   number of years, and then it was brought back from Lakeside

01:12   25   after being, you know, mothballed for a number of years, and

1    then re-reinstalled it in 2005.

2    Q.   So the exhibit we see here on NU, that accurately reflects

3    the flap as it would have been originally installed?

4    A.   Yeah, so when we got the flap back in 2005 when I was out

01:12   5    there in Lakeside, and everything's covered in dust, and we're

6    sorting through what matters, there's the nozzle flaps, and

7    they're all covered in dust.  They weren't brand-new, and being

8    they were in storage for a number of years and only in service

9    for a year or two, the nozzle flap would not have been replaced

01:12   10   during that original time.

11        And actually, we looked at an image last night that Yong

12   found of the barrel installed in San Diego in 2000, and the

13   nozzle flaps were the same.  So I felt like this recreates, to

14   the best of my abilities, what I could do to create the same

01:13   15   nozzle flap.

16   Q.   Well, let's move down to the unit here at the far left

17   facing the jury.

18        And this is the metal hinge design, correct?

19   A.   Yes, this is the metal hinge design, and this was -- this

01:13   20   is an exact replica of what we build and put on the original

21   ProFlow and Supertube, the ProFlow in Texas, the Supertube in

22   France, the ProFlow in Trinidad, and the ProFlow at Whale's

23   Tale.  This is a 16-inch steel plate, three-sixteenths of an

24   inch thick.  It has a piano hinge with bolts that affix the

01:13   25   piano hinge to the nozzle flap and the piano hinge to the

1    nozzle.  It's the same padding, the same vinyl.  This is an

2    exact replica.  It's the same length.  This is to scale.  The

3    red nozzle is to scale, and this is exactly how it would be on

4    the ride.

01:14  5    Q.   Now, it's longer in the installation.  Aren't those several

6    feet long?

7    A.   Correct.  So this would be -- in the field, this would

8    cover the entirety of the nozzle.  So it would be -- I believe

9    it's 109 inches long and then have -- you know, the end would

01:14  10   be closed off with a little plate here that would then be very

11   similar to this one over here.  So it would be closed off a

12   little.

13   Q.   So let's talk about the demonstrative in the center.  What

14   is that one?

01:14  15   A.   This is a -- again, dimensionally accurate in terms of this

16   dimension and the foam padding and the metal plate inside,

17   recreation of what is in Texas -- or sorry -- in Cancun.  This

18   is, you know, what we wanted to build in response to the

19   plaintiff's allegations to make sure that hey, you know, first

01:14  20   off, as much as we think this doesn't infringe, this absolutely

21   does not infringe, and the customer that we sold it to -- the

22   video that they keep playing of the video of the guy rolling

23   around on the surface and ending up on the bottom smiling,

24   that's a venue called Moon Palace.  That's a venue called Moon

01:15  25   Palace in Jamaica, and I know that because I've been there, and

1  we've actually -- Pacific Surf Designs has refurbished the ride

2  putting new foam and vinyl on it.

3  Q.  We'll show Exhibit 492.

4       THE COURT:  That looks like a fun ride.

01:15  5       MR. KOLEGRAFF:  That could be me.

6       THE WITNESS:  It's a blast.

7     So he comes back down to the front -- and I think it's

8  relevant to mention that this video is at Moon Palace because

9  Moon Palace is owned by a company called Palace Resorts, and

01:15  10  they've got 11 resorts around the Caribbean.  One of their

11  other resorts in Cancun already has one FlowRider.  So in

12  addition to this FlowRider, they own two.

13     Well, they purchased their third attraction from us, and it

14  was the ProFlow Triple we put into Cancun, and it utilized this

01:16  15  nozzle flap.  They've probably got about a thousand people a

16  day going through this machine on this all-inclusive resort.

17  Nobody has -- they didn't care which nozzle flap we were

18  putting in, and we'd gotten no indications that there's been

19  any injuries or any difference of operation between the two

01:16  20  attractions or the three attractions.

21  BY MR. KOLEGRAFF:

22  Q.  So in describing the center one again, the hinged -- the

23  defixed flap, where does the water -- or what's the

24  relationship between the flap and the water?

01:16  25  A.  So the water would come out here below the flap, and

1    actually the design is specifically made so that the flap would

2    not touch the water.  So something Dr. Stevick brought up is

3    that this flap design here, the check valve actually impedes

4    the water flow.  This -- you guys can't feel this, but this

01:17   5    actually weighs about 15 to 20 pounds with everything said and

6    done, so it's actually pretty heavy.  So the water has to lift

7    that up to push it out of the way in order to go up and over

8    the surface.  That takes energy.  So by this flap actually

9    being slightly above, a quarter, half an inch above the water

01:17   10   flow, it doesn't impede any of the flow and allows the

11   attraction to run more efficiently.

12   Q.   To be clear, when you say that's 15 pounds, are we talking

13   about the short one-foot section you have here, or are you

14   talking about the entire 109 inches?

01:17   15   A.   No, this itself is 15 pounds.  The whole nozzle flap weighs

16   80 to 100 pounds, and it takes two guys.  It's a wrestling

17   match.

18   Q.   So are there any advantages other than you just talked

19   about for using the center one?

01:17   20   A.   Well, because the water isn't beating on the bottom, you

21   can imagine here, this thing, the constantly vibrating while

22   the water is hitting the bottom of it during operation, and

23   this one here, due to its weight, has a little bit of

24   vibration, but significantly less.  Well, this one here isn't

01:18   25   getting impacted at all by the water, so the number one cause

1    of warranty failures on wave machines is nozzle flaps.  So by

2    switching to this design, we've actually eliminated a

3    significant number of those warranty claims because this will

4    just simply not wear out as fast because it's not being

01:18    5    impacted by the water.

6    Q.   Comparing that foam flexible tongue over there to the

7    hinged nozzle we have closer to me, do they operate in the same

8    way?

9    A.   No.

01:18    10    Q.   Can you just demonstrate for us your understanding of why

11    they operate differently?

12    A.   Well, this one here is simply --

13    Q.   I'm talking about the hinged metal flap versus the foam.

14    A.   Well, the hinged metal flap, again, when the water turns

01:18    15    on, would be lifted up by the water force and allowed to

16    rotate, and then when the ride turns off, just like a check

17    valve, this will shut down whereas the fixed metal flap simply

18    doesn't move.  It's just a piece of padding on the ride, and it

19    has no movement to it whatever.

01:19    20    Q.   Referring back to the foam-metal pad, is the hinged metal

21    plate easier to make than the foam-metal pad?

22    A.   Yeah.  So I don't know if you guys can tell, but there's

23    quite a few drips on this.  Using foam and coat, which is kind

24    of the technology referred to here, you've got to take this big

01:19    25    piece of foam, get it in position, shape it by hand, and then

1  you have to coat it with this two-part urethane coating that

2  has to be shot out -- when I say "shot," I mean sprayed -- out

3  of special equipment, and it goes on really thick, and you end

4  up with runs, and it's really difficult to make it look good.

01:19  5      I was looking back to see if the picture was still on the

6  screen of -- can you put the picture -- the video back up of

7  the nozzle flap on the B Max at Belmont Park?  That might help.

8  Q.   This is Exhibit NG.

9  A.   Yeah, just pause it right there.  Back just a -- there.

01:20  10  Great.

11      See, you can tell there, we've got the same issues on that

12  as this one has here where the -- you can tell that it's not

13  quite smooth and perfect.  There's just bumps and wrinkles.  To

14  make this in the field is incredibly difficult because you have

01:20  15  to bring all that special equipment, you've got to ship all the

16  hazardous equipment out to site to actually do that.

17      When you're building either of these, you simply bring the

18  foam and vinyl, which you're already bringing, because we send

19  rolls of this in bulk because we're going to foam the entire

01:20  20  walls, and we have to cover the entire wall with vinyl.  So we

21  have -- this is essentially made out of the scraps that are

22  left over at the end of the job.  And it's -- you just glue the

23  foam to the vinyl or glue the foam to the steel, and then you

24  would wrap it with vinyl like a present.

01:20  25  Q.   So the hinged metal plate is less expensive than --

1    A.   The hinged metal plate would be less expensive and far

2    easier to make.

3    Q.   And is it easier to install and maintain?

4    A.   Absolutely.

01:20    5    Q.   You can go back to the witness stand.   Thank you.

6         So why do customers buy wave machines?

7    A.   Why do they buy them?

8    Q.   Yes.

9    A.   They want a wave machine.   The purchasing reasons?

01:21   10    Q.   Yes.   So what are the reasons that people purchase -- the

11   decision-making process that -- underlying buying a wave

12   machine?

13   A.   So most customers are price-sensitive.   They also want to

14   see a good product.   Some customers say our product looks very

01:21   15   clean.   It's something we're proud of.   We have clean lines on

16   our attraction.   Our detail work is very well done, so quality

17   of workmanship is definitely big, but oftentimes it comes down

18   to price.

19   Q.   Did they ever get into the cost to operate or maintain?

01:22   20   A.   Yeah, absolutely.   That's one of the big parts.   So our

21   pumps, we've spent a long time on -- a lot of time on -- the

22   finite element analysis is how you do computational fluid

23   dynamics.   You try and make this nozzle.   How do you shape it

24   so it has the least resistance to the water?   We spent a lot of

01:22   25   time on that and matching that to our pumps to make sure that

800

1  our system is the most efficient system we can possibly put

2  together for our customers.  And as a result, our system uses

3  10 to 15 percent less electricity than our competitors, and

4  we're not doing that by making the flow thinner.  We're not

01:22   5  slowing the water down.  It's simply the system is more

6  efficient.  It's like going from a Toyota Corolla to a Toyota

7  Prius.  The system is more efficient, so you get better

8  mileage.

9  Q.   Let's take a look at some of the other types of wave

01:22   10  machines that are out on the market.

11        MR. KOLEGRAFF:  Can you pull up Exhibit NH?  And I'm

12  sorry.  My monitor has died again, so I'm going to have to go

13  back here.

14  BY MR. KOLEGRAFF:

01:23   15  Q.   What is it we are looking at here?

16  A.   This is a video I took of the StingRay, Murphy's StingRay

17  that's installed in Manhattan City, Kansas.  And one of my

18  various trips, I went out and visited the attraction, and they

19  were kind enough to let me come onto the attraction and poke

01:23   20  around and see how it got put together, and this was a video of

21  it operating.

22  Q.   Does it have nozzle flaps?

23  A.   It has -- it's difficult to see from this view, but this

24  dark blue -- this dark blue flap above the water is actually a

01:23   25  secondary attachment that I would define as a nozzle flap.  And

801

```
       1   if you look at that from the side -- I'm going to do my best to
       2   draw.  You've got a box, and you've got a ride surface.  So
       3   that's -- this is the surface that the water is going up.  This
       4   is the box where the water comes out.  And what they've done is
01:23  5   taken a fiberglass sheet, and they've put foam on top of it,
       6   and then they've gone ahead and wrapped that in vinyl.  And
       7   that is what they utilize for the protection of the rider when
       8   they come down getting close to the nozzle.
       9   Q.   So it's not a movable structure, then?
01:24  10  A.   It's not a moveable structure, and it's -- yes, it's not a
       11  removable structure.
       12          MR. KOLEGRAFF:  Can we pull up LN?  LN as in Nancy.
       13  BY MR. KOLEGRAFF:
       14  Q.   Can you tell us what this is?
01:24  15  A.   This is a picture of a Wavesurfer.  This is the European
       16  competitor that all of us have to deal with.  Wavesurfer has
       17  built, I would say, 15 to 20 of these attractions.  And the
       18  reason that this is relevant, obviously, is because we've got a
       19  nozzle flap down here that's in the fixed position, very much
01:25  20  like the middle one here in the exhibit, and this is on a
       21  mobile attraction that Yong and myself had gone to visit.
       22          MR. KOLEGRAFF:  Can we pull up MC?
       23  BY MR. KOLEGRAFF:
       24  Q.   And what is this?
01:25  25  A.   This was actually the first iteration of the last product
```

1  we saw by Wavesurfer.  And you can see down here that they

2  actually have no nozzle flap, and they have instead elected to

3  simply pad the area where the water comes out.

4          MR. KOLEGRAFF:  Can we look at LJ?

01:25  5  BY MR. KOLEGRAFF:

6  Q.  And what is this?

7  A.  This is the My Wave Co machine, and there was an email

8  from -- I believe it was Tom Lochtefeld to Marshall Myrman that

9  said, "Here's another infringer, and note the downwardly bias

01:26  10  nozzles."  And, you know, this is the area here that he was

11  speaking about.  And again, we can see that there's another way

12  to solve this problem, and we've got a sheet wave machine

13  that's functioning and sold.

14          MR. KOLEGRAFF:  Can we look at LO?

01:26  15          THE WITNESS:  Again, this is another MyWave

16  attraction, and they've got their nozzle, and this is, again,

17  the one that Tom Lochtefeld was emailing Marshall saying, "This

18  is another infringer.  Go get them."  Because apparently that's

19  also a flexible nozzle flap.

01:26  20  BY MR. KOLEGRAFF:

21  Q.  So there's another competitor that I don't have a picture

22  of called Surf-Air.  Can you describe that to us?

23  A.  Surf-Air is created by Murphy's Waves.  They're owned by

24  WhiteWater.  So they're saying, on one hand, that you can't

01:27  25  have a wave machine without a nozzle flap, and, on the other

1    hand, they sell a wave machine without a nozzle flap.

2        The StingRay that we just looked at and in addition to

3    that, they have another product called the Surf-Air, which was

4    very similar to the first iteration of Wavesurfer.

01:27    5        Can we go back to that middle picture?  Another one.

6    Another one.  Down.  LW.  Try LW.  That one.  I like that one.

7    Q.   We're now showing MC?

8    A.   MC.  And so the --

9            MR. O'HARE:  NC or MC?

01:27   10            MR. KOLEGRAFF:  M as in Mary.

11            MR. O'HARE:  Okay.  Thank you.

12            THE WITNESS:  So the Surf-Air product --

13    unfortunately, we don't have a picture of it -- is in this area

14    right here, would actually -- it's inflatable, so this area

01:28   15    here is just an inflatable wall with the water coming out

16    directly underneath it.

17        And speaking to competition, I was on the phone in the

18    hallway a minute ago with a customer down in Alabama that

19    actually was considering FlowRider, us, and Surf-Air and ended

01:28   20    up purchasing the Surf-Air product from Murphy's, so I just

21    lost a sale to them.

22    BY MR. KOLEGRAFF:

23    Q.   Does anyone market nozzle flaps?

24    A.   No, nobody -- to my knowledge, there's no -- other than the

01:28   25    marketing that FlowRider put on their website, there's been no

|       |    | marketing discussion, questions, about nozzle flaps.                |
|-------|----|---------------------------------------------------------------------|
|       | 1  |                                                                     |

1  marketing discussion, questions, about nozzle flaps.

2  Q.   And that was done after the litigation started, correct?

3  A.   Correct.

4  Q.   And are flaps ever a part of sales discussion for your wave

01:28  5  machine?

6  A.   No.

7  Q.   So let's talk about the pricing for a ProFlow.

8      What's the total price for both your Single and your

9  Double?

01:29  10  A.   We've got -- we've had various price lists go out over the

11  time, and things tend to increase, obviously, tariffs being an

12  issue that affect our pricing.  Right now, I think we're at

13  850- for a Double, and 595- or 600- for a Single.

14  Q.   And --

01:29  15  A.   500,000 or, sorry, 600,000, 850,000.

16  Q.   And that's just for the machine?  That does not include

17  installation?

18  A.   No, that would include installation.

19  Q.   How much of that, then, is the installation component?

01:29  20  A.   Installation is approximately 45- to $50,000 of that.

21  Q.   And, now, when you look at some of the major components of

22  that machine, about how much is the steel worth?

23  A.   The structural steel alone, it's all stainless steel, it's

24  custom fabricated.  That's going to run about $200,000.

01:30  25  Q.   And these horizontal pumps that we talked about, how much

1  are they going to cost?

2  A.   They are about 45- to $50,000 each, so a Double would have

3  two of them.

4  Q.   And how much for the electrical support?

01:30    5  A.   The electrical system, so there's a big electrical system

6  that includes variable frequency drives, which control the

7  speed of the pumps, so you can vary that, if you need to, and

8  those run about $50,000.

9  Q.   And then there's some larger components and miscellaneous

01:30   10  tools and supplies that have to go along.  What do you estimate

11  for that?

12  A.   A lot.   Another $50,000, $80,000.

13  Q.   What's the cost for the flap itself, the metal flap?

14  A.   Materials, all in, with labor, you're probably cost at 1500

01:30   15  to $2,000 for a Double that would have two nozzle flaps, and

16  then we would sell one nozzle flap for about $3,000.

17  Q.   And as far as putting together one of these full-size

18  nozzle flaps, how much labor is involved in that?

19  A.   A lot.   It would take two guys about a day and a half to do

01:31   20  two nozzle flaps, and the reason is you first -- by the time

21  you install your wave machine, the concrete is different, the

22  steel is different, everything is always varying.  So the

23  reason we build them in the field is we build the nozzle, and

24  we put this whole thing together, and then you have to first

01:31   25  fit your steel into place and trim your steel to be the correct

1    size, and then you have to pull it off, and you have to glue on

2    your foam, and then you put it back on, and you trim the foam

3    such that it fits in all the dimensions and overlaps where you

4    want them, and then you have to pull that all back off, and

01:31   5    then you shape it, and then you wrap it with vinyl, and then

6    you put it back on.

7    Q.   So I think you said the total cost for a flap is about

8    $3,000, so that includes all the materials and the labor we

9    just talked about?

01:31  10    A.   Yes.

11    Q.   What we're going to do now is play for you a time-lapse

12    video of an actual installation of this.

13         So, Richard, if you could maybe just describe what this

14    installation is, a little bit about this before we play the

01:32  15    video, but we'll get ready to play it.   And the video is

16    Exhibit NJ.

17    A.   Perfect.   So right -- pause it right there, if you would.

18    Q.   Richard, can you tell us what installation this is and

19    where we're at?

01:32  20    A.   This is College Station in Texas, and this is kind of the

21    day one or day two of the installation.   You've got the giant

22    concrete tank, and the customer would have supplied that, and

23    that's about 50 feet by about 30 feet.   So it's about the same

24    size as this courtroom, but a little bit longer in one

01:32  25    dimension.   The two nozzles down below are stainless steel, and

807

1    those have been placed in place, and the first step is to place

2    them.  And like I said, you see all these little steel plates

3    everywhere.  And those are shims, and because the concrete can

4    vary, and the steel can vary, everything can vary on its final

01:32   5    location, so you can't build anything ahead of time that's

6    going to be a finished product to close off everything and make

7    everything perfect.

8    Q.   Before we go on on the video, were you the one taking this

9    video?

01:33   10   A.   No, there was -- we had 2-by-4 nailed to the side of the

11   concrete with a GoPro on it that would run pretty continuously,

12   and I think Yong was very diligent at swapping batteries and

13   memory cards on that.

14   Q.   Were you physically on-site when this was going on?

01:33   15   A.   Yes.

16   Q.   What do you do on these construction sites?

17   A.   We do everything.  So anything from unloading the truck to

18   rigging these nozzles up to there's a big line down the middle

19   there.  That's your center line, so you pull your tape to each

01:33   20   side.  I mean, the physical installation of snapping chalk

21   lines, drilling holes, bolting things together, lifting things

22   with cranes.  I mean everything, start to finish.

23   Q.   So even though you may use contractors for certain things,

24   you're actually out there throwing hammers and drilling holes?

01:33   25   A.   The independent contractors are there to assist us, but,

1   you know, as we don't have -- yeah, we're doing everything.

2   Q.   And we're going to play the video, and if you want to yell

3   out when you want us to pause it.

4   A.   Go ahead and pause about there.

01:34   5       So here you can see this is the expanded metal that I was

6   speaking about, the diamond mesh that is stretched over, you

7   know, these ribs here that are kind of like an airplane, and

8   that allows you to provide your shape.  So you can have these

9   organic shapes for these waves.  So you can make basically any

01:34  10   shape you want.  And you can see these things are 20 feet long

11   and, you know, eight feet tall, and these weigh about 2,000

12   pounds each, the nozzles weigh about 4,000 pounds each, and so

13   this is a lot of stuff that we're doing to build this on-site,

14   and this is only the steel portion of the work.

01:34  15       Go ahead, Tierra.  Pause it there.

16       So you can see now here we've got our pump in the

17   horizontal position down below.  This is our oil port where you

18   actually change the oil without having to drain the tank.

19   That's one of our innovations.  And you can see we're starting

01:35  20   to put the foam and vinyl on the ride.

21       So the foam goes on the walls first, is the general idea.

22   And we've got these big sheets of foam here, and we bought -- I

23   think we bought maybe 40 of these or 50 of these sheets.  And

24   you buy them from a rubber company, and they sell them to guys

01:35  25   who are making sports padding or any other -- seat cushions,

809

 1    et cetera.  And so you've got to cut them out and make them fit

 2    on the wall.  And this is actually -- if you've ever done

 3    upholstery work, this is like upholstering an entire wave

 4    machine, so it takes quite a bit of time.

 5         Go ahead and continue.

 6         You see, we're only a third of the way through the video,

 7    but the rest of the time is going to be spent on making the

 8    wave blue and putting the padding on, essentially.

 9         So go ahead and pause it there.  Can you back up just a

10    frame?  Too far.  Right about there.

11         Well, there you can see our stack of foam.  That's all our

12    foam that's going to go.

13         Try and go just another frame or two.  Right there.  Okay.

14    So if you wipe the screen again, please.

15         So you can see this roll right here.  That's actually a

16    roll of vinyl.  And so you've got rolls of vinyl kind of

17    everywhere.  These are bulk rolls, so this stuff is used

18    for -- if you've ever been in a swimming pool that has a pool

19    liner, they use this to line swimming pools.  If your pool is

20    really old and cracking and it's leaking, you would lay down

21    this liner membrane, and you go around with a heat gun, which

22    essentially causes the plastic to melt, and you weld all the

23    seams together, and so they use these on swimming pools all

24    over Europe and the U.S. for that purpose, and that's what all

25    the blue stuff is.

810

1       This right here is -- when Yong mentioned that we were

2   processing the foam and vinyl for our job in France, what we do

3   is we bring it into a factory, and we bond the foam to the

4   vinyl to put down on our ride surfaces.  So all the -- all

5   these rolls here -- not that -- they're not rolls anymore,

6   they're straight sections.  All those sections come off one of

7   these premade rolls.  And the reason we do that is we need to

8   have a bond line that's continuous the whole way through.  If

9   there's an air bubble in between the vinyl and the foam, it's

10  the same as having an air bubble between the foam and coat that

11  I was talking about that they were using in the '90s.  It will

12  delaminate that entire surface within minutes.  It's

13  detrimental.  But because we can do that in a factory because

14  the vinyl material properties are such that they stand up so

15  well to the environment now, we can use them on the surface.

16      On the walls, you can see that we're actually cutting and

17  shaping the foam for all the wall work.  We're doing that in

18  the field.  We're taking all the vinyl.  And these two little

19  rolls back here that I circled were little rolls that were

20  rolled up.  Those are, most likely, I'm going to guess, ready

21  for the step.  And so you measure a wall, you cut a piece of

22  vinyl, clean it with acetone, clean the wall, roll it up, put

23  the glue on the wall, put the vinyl over, and let it dry, and

24  detail it up.  So it's a very labor-intensive process that all

25  takes place on-site.

01:37
01:37
01:37
01:38
01:38

811

1      Go ahead.

2      You see more of the rolls coming in.

3      The video jumps around a little bit.

4      We had to pull the nozzles out because we had an issue with

01:38   5  the pumps.  We had to pull those out, the pumps went away, and

6  the pumps come back in, and we'll drop those back in here in a

7  second, but you can see we're still chugging around the outside

8  of the wave detailing the foam and vinyl work.

9      So right about here.  Can you just drag it back just a --

01:39  10  there you go.

11     Now, this is where we're taking our metal plates, and

12  there's two of them.  So one on the left, and one on the right,

13  and that's where we're actually fitting up the metal plates for

14  the nozzle flaps.

01:39  15     So we've got them on a hinge, just like here in the first

16  model, our first demonstrative where we had the yellow hinge.

17  They're bolted on, and we're basically checking the metal

18  fitment.  So do we need to redrill holes?  Do we need to trim

19  the steel so that there's a correct amount of overlap?  These

01:39  20  are all the things we're looking for.  And because we never

21  know where those nozzles are going to be and what the exact

22  dimensions between them are going to be, this work has to be

23  done in the field if you want to end up with a gap size of

24  below an eighth of an inch, which is really what we're shooting

01:39  25  for.  We want to have tight tolerances so you can't have a

1    finger in one of these holes.  So this is us fitting everything

2    together.

3        You can continue.

4        And it's going to go very quickly here in the next -- there

01:39    5    we go.

6        So now we've got the nozzle flaps almost on.  We need to

7    test the ride to make sure -- everybody's obviously excited

8    that they get to ride here shortly.  The owner has installed

9    the grass all the way around.  You can see that we're not at

01:40   10    all done with the job.  This construction site was active, and

11    I don't think they finished this construction site for another

12    two years after we installed this attraction.  So it was the

13    wave in the middle of a dirt field for a number of years, which

14    I think is how Marshall found it.

01:40   15        And so anyways, we'll just play and see it run now.

16        And the inflatable thing is a lane divider so you can have

17    more than one rider on each side.  And we see applying the

18    logo, you see the weather moving in, and now we get to start

19    having some fun.

01:40   20        So that's -- you can see out of the entirety of the

21    installation, the nozzle flap was the minute, last detail.

22    Q.  So I think you covered a little bit of this.  The metal

23    flaps are actually made right on-site for every one of your

24    installations, then?

01:41   25    A.  They're made oversized, and then when we get them to site,

1   we actually trim them to fit the specific installation.

2   Q.   And you ship -- the sheet metal is shipped to the site,

3   right?

4   A.   We ship -- the metal's premade, predrilled.  You don't want

01:41   5   to be drilling stainless steel on-site.  Drilling stainless is

6   very difficult, it's very hard, and so we make everything to

7   approximately the correct size and then do the finish fitment

8   on-site.

9   Q.   And you ship in rolls of foam to all the installations?

01:41   10   A.   Yes, the rolls of foam -- you can see that big roll that

11   was standing up vertically was only a portion of foam, but the

12   foam comes in 400-pound master logs that are six feet tall and

13   four feet around, and it's 105 feet of foam.

14   Q.   And you're shipping rolls of vinyl?

01:41   15   A.   Correct.

16   Q.   So let's talk about Flow Services for just a minute.  What

17   does Flow Services do?  That's a company that PSD owns, right?

18   A.   Flow Services is a subsidiary of Pacific Surf Designs that

19   is focused on repair and refurbishment of wave machines.

01:42   20   Q.   And is it mostly repair of the flaps that they're involved

21   with?

22   A.   It could be the nozzle flaps we've talked about.  Also, the

23   grating or the matting areas, especially in the rear, are one

24   of the items on any wave machine that would need more frequent

01:42   25   replacement than others.  And then after that, you would start

1   talking about replacing the entire foam padding around the

2   perimeter of the attraction.

3   Q.   But a little earlier you testified that the flaps

4   were -- they tend to wear out every two or three years?

01:42   5   A.   Yes.   Sorry.   The number one cause of warranty failure

6   would be the nozzle flaps.   The number two would be the

7   recovery areas.   And then the number three would be the wall

8   padding.   And I say "warranty claim."   I don't mean warranty

9   claim.   I mean the parts that wear out the most often would be

01:43   10   the nozzle flap and then would be the recovery and then would

11   be the wall padding.

12   Q.   What does it cost to completely refurbish a hinged metal

13   flap like this?

14   A.   I went through all of our proposals, and sometimes it's

01:43   15   high, and sometimes it's low, but the average cost to

16   redo -- the average cost per nozzle flap, installed, ready to

17   go, including labor, was $2,997.30.

18   Q.   In the process of refurbishing the flap, do you also

19   replace the hinge?

01:43   20   A.   Not always.   So the hinge would only get replaced if it was

21   damaged.   But most of the time you just unbolt the nozzle flap

22   from the hinge, you cut off the old foam and vinyl, you put on

23   new foam and vinyl, and you bolt the nozzle flap back to the

24   hinge.

01:43   25   Q.   Now, you've also been designated as an expert for

1    noninfringing alternative.  Is that correct?

2    A.   Yes.

3    Q.   And you've testified that that center version that we see

4    of NU is your noninfringing alternative?

5    A.   Yes.

6    Q.   Can you just describe for us again how you built that?

7    A.   That particular one, you can tell that the flap itself is

8    smaller than the flap to your left.  So the hinge flap is on

9    the left, and that one is 16 inches whereas the fixed flap, I

10   believe, is -- I'm going to say 12 inches from the bottom tip

11   to the top tip.  And the way I set that height is I simply

12   lifted the -- it was actually on a moveable hinge just as the

13   one on the left was.  I simply lifted it up to a given

14   position, I put a piece of foam underneath it, and then I went

15   back to the back side, and I welded each joint of the hinge so

16   that it could no longer rotate.

17   Q.   So that plate is fixed in one position all the time?

18   A.   Correct.

19   Q.   So even when the water's off, it sits up above the ride

20   surface?

21   A.   Correct.

22   Q.   When the water's off -- or on, it sits above the ride

23   surface?

24   A.   It sits above the ride surface and the water.

25   Q.   And the water.  How far above the water does it sit?

1   A.   The goal is to be, you know, close, but you don't want to

2   be actually impeding the flow such that you -- you take energy

3   out of it.

4   Q.   Is this the design you already are installing?

01:45   5   A.   Yes.  We've already, as I mentioned, installed that at

6   Moon Palace, and they operate daily, and we have not had any

7   issues over, I'm going to say, six months of operations, and

8   I'm -- I venture they probably put -- I would say they probably

9   put 30,000 people a month through that machine.

01:45   10             MR. KOLEGRAFF:  Can you play Exhibit LW?

11   BY MR. KOLEGRAFF:

12   Q.   Can you describe what this is?

13   A.   The ProFlow Triple at -- you can see the second half of the

14   word "Palace" and "Cun" underneath there for Cancun.  It's the

01:45   15   Grand at Moon Palace in Cancun.  That's their ProFlow Triple.

16   And obviously, because it's a Triple, they can have three

17   people.  So we've got higher throughput on this attraction than

18   a standard FlowRider Double would have, so this ride sees a lot

19   of people.

01:46   20   Q.   This uses the fixed-flap version, correct?

21   A.   This is exactly what's in the middle over there on the

22   demonstrative NU.

23   Q.   Is this fixed-flap design safe?

24   A.   Absolutely.

01:46   25   Q.   Is this the only installation you have it in right now?

817

1    A.   We've got it on another installation that is not complete.

2    Q.   Have there been any reported injuries?

3    A.   No.

4    Q.   What were the advantages of using the fixed plate versus

01:46    5    the hinged version?

6    A.   It was -- it's easier to put on because it's slightly

7    smaller, obviously.   Or sorry.   It's easier to build because

8    it's slightly smaller.   It's essentially -- I would say the

9    cost would be a little bit less.   It doesn't impede the flow,

01:47   10    as we discussed.   And it's not going to wear out as quickly

11    because it's not actually being continually abused by the water

12    flow.

13    Q.   Now, did you have a chance to take a quick review of the

14    claims that have been asserted in this action?

01:47   15    A.   Yes.

16    Q.   And when we look at Claims 1, 3, 13, 15, 17, 37, 42, 43,

17    these all recite a flexible tongue.   Is that correct?

18    A.   Yes.

19    Q.   Does the PSD sheet wave machine with a fixed metal flap

01:47   20    have such a flexible tongue?

21    A.   No.

22    Q.   Does the PSD wave machine with a fixed metal flap have all

23    of the elements of Claim 1, 3, 13, 15, 17, 37, 42, and 43?

24    A.   Absolutely not.

01:47   25    Q.   So you have this on one machine, this version, and you have

818

1    it -- it's going to be on your next machine that's currently

2    being installed.  So there are a handful of machines out there

3    that still have the hinged flap.  Is that correct?

4    A.   Can you reask that again?  I lost you there for a second.

01:48    5    Q.   There are a handful of machines out there being used that

6    have the hinged metal flap, as we see here?

7    A.   Correct, there are two operating machines in the

8    United States with a hinged-flap design.

9    Q.   Can that be retrofitted to have a fixed flap?

01:48    10   A.   Yes, just in the same way I fixed the flap in the middle

11   version, I could simply lift that flap up, as we show we can

12   do, and then I could go to the back of the flap and then weld

13   each joint at the hinge to prevent it from rotating.

14   Q.   And about how long would that take?

01:48    15   A.   20 minutes to an hour.  You'd probably go back and tack

16   weld it, and you'd pull a nozzle flap off, unbolt the hinge,

17   and have it welded up so you don't burn your vinyl, and then

18   you'd bolt it all together.  So you're probably an hour into

19   it.

01:48    20   Q.   What would be the cost to go back and change the hinged

21   metal flaps to fixed flaps on your existing installations?

22   A.   The cost to mobilize a welder or -- for example, our

23   customers in New Hampshire are great, and they probably could

24   do it themselves in a matter of hours, and they'd probably be

01:49    25   willing to do it.

1    Q.   Yesterday we heard Dr. Vigil express that in a hypothetical

2    negotiation held on December 18, 2013, PSD would have agreed to

3    pay an up-front lump sum royalty of $2 million.  What is your

4    reaction to that?

01:49   5    A.   That doesn't make any sense to us whatsoever.

6    Q.   If WhiteWater would have offered you a license to the '589,

7    would you have seen any benefit in taking such a license?

8    A.   No, there's so many ways that problem can be solved that,

9    you know, the relic version of the '589, we don't see any value

01:49   10   in it.

11   Q.   So you didn't see any value in the flap structures of the

12   '589?

13   A.   Correct.

14   Q.   Dr. Vigil said that PSD would have made a lump-sum payment

01:50   15   rather than paying a running royalty.  Is that true?

16   A.   No, we would have --

17   Q.   Why not?

18   A.   We would have simply done something else.  If they demanded

19   $2 million, we would have simply gone to one of the other

01:50   20   options that we've seen out there in the industry that people

21   are selling and people accept and we just lost a sale to.  I

22   mean, there's other options.  This isn't a difficult problem to

23   solve, and the obvious answer to -- you notice everything on

24   the right is blue.  If you're going to hit your head anywhere,

01:50   25   you put foam on it, and, as Dr. Vigil pointed out, putting a

hinge on something is obvious as well.  So foam and a hinge --

there's too many ways to solve it that would give us so much

room to operate without using the '589 that -- the '589, there

would be no reason to pay any money to it.

01:50  Q.   Now, you were a two-man start-up back in 2013.  Would you

have taken a $2 million investment and used it to license one

patent in a lump sum?

A.   If we had a $2 million investment, we would probably build

out an entire wave venue that we could use as a dealer

01:51  showroom.  That would be the best use of those funds.

Q.   So if you were actually forced into taking some sort of

license, you would have wanted to have a reasonable royalty as

a running royalty and not lump sum?

A.   If there was going to be any royalty at all, it would -- if

01:51  there had been a reasonable request for a royalty on the nozzle

flap itself, we would have probably considered that.

Q.   And you would have based the royalty on the cost of the

flaps.  Is that correct?

A.   Yes.

01:51  Q.   And what would be that approximate cost that you'd have

based it on?

A.   About $3,000.

Q.   So at a 10 percent royalty rate, what would be the royalty

per machine?

01:51  A.   There's two flaps per machine, so it would be $600 on a

1    Double or if there was a Triple, it would be three flaps.   So

2    depending on how many flaps, $300 per flap, per machine.

3    Q.   Do you know how much WhiteWater charges for its spare

4    flaps?

01:52   5    A.   Yes, specifically we've seen a proposal that says they

6    charge $3,000.

7              MR. KOLEGRAFF:   Can we put up NW?

8    BY MR. KOLEGRAFF:

9    Q.   Do you recognize this document?

01:52   10   A.   Yes.

11   Q.   And what is it?

12   A.   This is a quote to -- again, this was Moon Palace down

13   in -- if you scroll back up, I believe it's Moon Palace in

14   Cancun.   And this is quoting them another set of nozzle flaps.

01:52   15   And if you scroll down, you'll see that right here is the price

16   for the new nozzle flap system.   I don't know what is in their

17   system, but I assume it includes two nozzle flaps, and

18   actually, that's two nozzle flaps for $3,000 where we would be

19   more in the range of 3,000 per nozzle flap.

01:53   20   Q.   So you mentioned as an alternative to taking a license to

21   the '589, you just would have gone with a fixed flap of some

22   sort.   How much would that have cost you to move to these

23   noninfringing alternative?

24   A.   I think by the images at the other attractions that we've

01:53   25   seen that have solutions implemented, there's essentially no

1    barrier of cost.  You'd still be using foam and vinyl to pad

2    something, and it's just a matter of how you configure that.

3    There'd be no change, and it might save money.

4    Q.   It actually might be less expensive and easier to assemble?

01:53   5    A.   Correct.

6    Q.   So how long did it take you to come up with this idea of

7    the noninfringing alternative?  How difficult was that to go

8    from this design that you were doing and then realizing, you

9    know, I need to come up with an alternative design?  How long

01:53   10   did that take you to do?

11   A.   Once we understood that they were asserting that the hinge

12   was -- the flexible component per se, well, we just stopped

13   making it flexible.  So we restrained it so it's -- it can't

14   move at all, there's no motion, and it was a simple -- it was a

01:54   15   simple task.

16          MR. KOLEGRAFF:  No more questions.

17          THE COURT:  Mr. O'Hare.

18          MR. O'HARE:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

01:54   20   BY MR. O'HARE:

21   Q.   Good afternoon.  It's Mr. Alleshouse, correct?

22   A.   You kind of do all three of them:  All-S-house, and you

23   mash it together.

24   Q.   Alleshouse?

01:54   25   A.   You got it.

1 Q. I've heard it every way.

2 A. I appreciate that.

3 Q. If I may, just so we're clear, which one of these is

4 better:  your welded flap or the moveable -- we would say

01:55 5 flexible -- hinged flap?  Which is better?

6 A. I think they both have good properties, but I, frankly,

7 don't think there's a clear difference between the two.

8 Q. Didn't we just hear you say -- correct me if I'm wrong --

9 this one's cheaper, it's easier to make, it doesn't mess up the

01:55 10 flow of water?

11   Did we not --

12 A. Correct.

13 Q. -- understand you to say that your welded fixed flap is

14 better than the moveable flap?

01:55 15 A. Correct.

16 Q. Okay.  So and that fixed flap, things like that -- I think

17 you showed us some pictures -- a number of other folks around

18 the world had used that before?

19 A. A number of folks have used that and still use that.

01:56 20 Q. You didn't invent that?

21 A. I don't think that's an invention.  I think it's pretty

22 obvious.

23 Q. At some point in the dawn of time, somebody may have

24 invented it, but you didn't, correct?

01:56 25 A. Correct.

824

Q.   Okay.  And so this was something you knew existed when as a
possibility, based on your familiarity with the industry?

A.   I can't say for sure, but I know I looked at the -- I
started looking at waves outside of Wave Loch after I left, so
it probably would have been after 2012.

Q.   So all that time you spent at Wave Loch, you didn't look at
what anybody else made?

A.   There was only one installation of the StingRay, and that
was in 2010 or so, or 2008, and Wavesurfer was coming online,
but we weren't focused on any particular aspect and
especially -- the aspect everybody at Wave Loch was focused on
was the ride surface.  Did they have a tension ride surface?
No, they didn't have a tension ride surface.  Nobody was
inspected -- nobody cared about the nozzle flaps.

Q.   So just so we're clear, did you look at what other
competitors did, or did you not, when you were at Wave Loch?

A.   In regards to nozzle flaps, no, not at all.

Q.   So you looked at everything but nozzle flaps?

A.   No.  Like I said, we were mostly concerned about the ride
surface.  And then you look at the ride quality.  I think
American Wave Machines came out, but we were so biased by the
culture of, you know, Bruce McFarland used to work for Tom, and
he was being sued, and that machine was terrible, that that was
the culture-think of the company at the time.  So I don't think
we were looking objectively at it to see if there were any

1    benefits that we could implement.

2        And additionally, the Wavesurfer came out, and it was a

3    very -- I believe it wasn't until about 2010 when the

4    Wavesurfer came out, and you could actually see that it had the

01:58   5    vertical wall with padding.  That was the iteration that came

6    out, I believe, when I was working for Wave Loch, but I don't

7    think we were particularly paying any attention to any of the

8    nozzle flap aspects of the attraction.

9    Q.   And you say -- you don't think the folks at Wave Loch were

01:58   10   looking at it objectively?

11   A.   Not the American Wave Machines wave that was built by

12   Bruce McFarland because he was essentially painted as an

13   infringer even though he hadn't done anything wrong.

14   Q.   But I mean, objectively, who was selling the most rides,

01:58   15   sheet wave rides, objectively?

16   A.   At that time, Wave Loch.

17   Q.   Today, objectively?

18   A.   I'm not sure which entity is actually selling them, but

19   somebody under WhiteWater.

01:58   20   Q.   Okay.  But the -- the FlowRider ride, who today is selling

21   the most sheet wave rides?

22   A.   I'll go with WhiteWater because that will ensure we capture

23   all of them.

24   Q.   And that's been the case since at least the year 2000, was

01:59   25   it not?

1   A.   It was Wave Loch, and they licensed it to WhiteWater, so
2   we'll just call them all FlowRiders.  FlowRiders have sold the
3   most.
4   Q.   Okay.  And are they -- objectively, what have customers
5   bought more of, this or something like this welded thing or
6   this, a hinged or moveable nozzle flap?  What have customers
7   actually bought more of, objectively?
8   A.   I think you're correlating the nozzle flap to the success
9   of the attraction.  I would say if you did the same analysis on
10  padded ride surfaces over concrete versus tension fabric ride
11  surfaces, you'd find a distinctly more direct correlation
12  between the number of sales and when they started versus if you
13  started to look at nozzle flaps.
14       I mean, the '589 was developed in 2000 or '99.  And
15  Wave Loch kept selling the original Generation 1 vertical
16  nozzle with a big tank design until about 2003 when they
17  finally signed the license agreements with ADG and WhiteWater.
18  That's when the design shifted, not when the actual flexible
19  nozzle flap was made, but when the tension ride surface was
20  patented in 2003.
21  Q.   Didn't sales start taking off in 2000?  Haven't you seen
22  all the sales data that your partner, Mr. Yeh, put together
23  that shows sales of sheet wave rides increasing significantly
24  starting in the year 2000?
25  A.   Just because it's raining doesn't mean you're going to get

01:59
01:59
02:00
02:00
02:00

1    wet, right, so it's -- you can use an umbrella.  You're

2    correlating the nozzle flap to the success where I'm saying in

3    all the marketing materials and all the data and all the sales

4    presentation claims, that the biggest benefit is the composite

02:01    5    membrane ride surface, and that is the one that is driven home

6    in every piece of marketing literature of Wave Loch ever since

7    2002.  That's why WhiteWater and ADG hopped on board in 2003,

8    not in 2001 or 2000 after the nozzle flap had been built.  It

9    was after the ride surface went to the tension membrane and

02:01    10   solved the issues of the original foam and coat ride surfaces

11   over concrete, got rid of all the original headaches of owning

12   a wave machine.  That's when the sales started accelerating.

13   Q.   What were you doing in 2003?

14   A.   I was studying fluid dynamics.

02:01    15   Q.   Where?

16   A.   At Berkeley.  One of the top two or three engineering

17   universities in the U.S.

18   Q.   So these events that you're describing in the early 2000s,

19   you were not a participant in any of them, were you?

02:01    20   A.   No, but being in the industry for a number of years and

21   hearing a number of stories and exactly how things happened, I

22   mean, you can easily repeat and use people's anecdotes for what

23   really changed it, and it was the composite membrane ride

24   surface.

02:02    25   Q.   You're repeating stories that people, like Tom Lochtefeld,

1    Andrew Thatcher, and others, lived, correct?

2    A.   Andrew actually came on board, I believe he said, in 2002,

3    which is right when the tension ride surface came on board as

4    well.

02:02    5    Q.   Right.  So you're reliving their stories; you didn't live

6    them?

7    A.   Well, I'm not reliving them.  I'm simply looking at the

8    market objectively and saying, you know, you can correlate

9    nozzle flaps to success, but we know that after 2000 when that

02:02    10   flexible nozzle flap was invented, vertical -- the pumps were

11   still in the front of the ride.  We can put that nozzle flap on

12   a vertical pump design anywhere we want, and the ride will not

13   get any smaller.  It's moving the pumps underneath the

14   attraction, that's what started the rides to get smaller.

02:02    15   Moving away from the pumps in the vertical position and moving

16   away from a foam coat ride surface over concrete that had all

17   the maintenance and all the surfacing issues.  We won't even

18   service those rides.  You cannot reliably make a foam-padded

19   ride surface over concrete because the water can't drain

02:03    20   anywhere.  Going to the tension ride surface is what changed

21   that, along with the pumps being able to go underneath.  The

22   nozzle flap is -- to say that had any impact on that, yeah,

23   it's in there somewhere on the same time, it's a little bit

24   before, but there's a -- more of a direct correlation with a

02:03    25   composite membrane ride surface.

829

1    Q.   I'd like to go back to objective.  Objectively, did sales

2    go up significantly in the year 2000 of sheet wave rides after

3    the '589 and before the patent -- or the flexible ride surface;

4    yes or no, if you know?  Did sales go up?

02:03    5    A.   I don't know what sales did during that time, but based on

6    their install list, it looks like they were still installing

7    the vertical turbine wave machines or vertical pump-oriented

8    wave machines until about 2002.  And after that, they started

9    getting a lot more industry licensing agreements and traction

02:04    10   due to the ride surface patent.

11   Q.   Again, do you know whether their sales went up starting in

12   2000 or not?

13   A.   Looking at their installation list -- so they publicize

14   their installation list online.  You can see the dates that

02:04    15   everything was installed.  I would assume that an installation

16   correlates to a sale.  So their sales would be correlated to

17   the number of installations per year, which really started

18   accelerating after they got the license agreement with ADG and

19   WhiteWater.

02:04    20       WhiteWater is the biggest distributor in the world, and ADG

21   is the biggest distributor in North America.  So once you got

22   those two licensing agreements, with a tension ride surface,

23   with the pumps underneath the rides -- it's when the tension

24   ride surface, the licenses to ADG and WhiteWater, spelling out

02:04    25   as the only specific feature of those waves in their license

1    agreement as being the composite membrane ride surface.  It's

2    when those licenses were signed in 2003 and the sales network

3    went from being Tom and whoever he could muster together to

4    sell a wave machine to being the global representation of ADG

5    and WhiteWater combined, that is when the sales started

6    increasing.

7    Q.  Mr. Alleshouse, you're giving me the why, and I'm trying to

8    get the what.  True or false:  Sales went up significantly on

9    these sheet wave rides starting in year 2000?  Do you know?

10   A.  They increased much more quickly after 2002.

11   Q.  Okay.  How about 2000?  Did -- if you know.  If you don't

12   know, you can tell us.

13   A.  From what I remember, on the install list before 2002 was

14   one to two installations a year.  Kind of flat between '91 and

15   2002.  Maybe there was less than that.

16   Q.  So we can come up with some data that your partner

17   accumulated to show a lot more than that -- have you looked at

18   that data?

19   A.  You want us to put it together right now?

20   Q.  Have you looked at it?

21   A.  Yeah, we look at it.  Like I said, there's a list of all

22   the waves online.

23   Q.  Okay.  I'll show it when we talk to Mr. Yeh, then.  He's

24   the one that put that together, isn't he?

25   A.  I wouldn't say we put it together.  I'm saying there's a

1    list online that lists the rides and the years they were

2    installed.

3    Q.   The StingRay, you mentioned there's a number of different

4    rides that have -- similar to this fixed cover.  How many of

02:06    5    those have been sold in the United States, ever?

6    A.   I think there's only one StingRay in the U.S.

7    Q.   Okay.

8    A.   But I've stopped following that product significantly.

9    Q.   So is it fair to say that very few rides have been sold

02:06    10   having this sort of fixed flap as compared to a moveable or

11   hinged flap?

12   A.   Domestically, I know of that one.  Internationally, I know

13   they've sold a handful more, and, again, we lost a sale to them

14   in, I believe it was, Oman in the past six months, so yeah,

02:07    15   they're still selling them, and we're still competing.

16   Q.   Again, as a proportion -- you've listed some of your

17   materials.  Over 200 installations around the world of sheet

18   wave rides, and are we talking about ten, 15 or so that include

19   this fixed nozzle cover?

02:07    20   A.   Probably about 25.

21   Q.   Over 200?

22   A.   25 is not over 200, correct.

23   Q.   25 out of over 200?

24   A.   Correct.

02:07    25   Q.   Then so when you left Wave Loch, at that time you say you

832

1   hadn't really paid much attention to nozzle flaps.  Is that
2   correct?
3   A.   Other than that they were a constant warranty claim issue
4   for us at Wave Loch, and that's why Marshall had me put
02:08   5   together a document telling the field guys how to put these
6   things together.
7        The big issue we were having is the field guys would go off
8   and do whatever they wanted, so some of the pictures we've seen
9   of FlowRiders show -- you know, you could tell that Phil built
02:08   10  that one and Adam built that one and Dirk built that one and
11  Wayne built that one because they're all -- they all had their
12  own differences.  Some of them, the burrito plate we saw on the
13  sunrise -- I believe the judge asked what that burrito plate
14  was coming towards the rider sitting down.  Sometimes those
02:08   15  were affixed.  Sometimes those were not.  Sometimes --
16       (Phone interruption.)
17            MR. O'HARE:  Don't take that to heart.
18            THE COURT:  I had that happen to me one time.  I was
19  in a big meeting, and my phone went off and said, "I did not
02:08   20  understand what you said."  I said, "what?"
21  BY MR. O'HARE:
22  Q.   You were paying attention to nozzle flaps more as a
23  maintenance item?
24  A.   They were the number one cause of warranty claims, and when
02:09   25  you build a million-dollar attraction and you have to fly

833

|   |   |
|---|---|
| | 1 |
| | 2 |
| 02:09 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 02:09 | 10 |

1  somebody around the world to fix a $1,000 part, it's highly

2  obnoxious.

3  Q.  So why -- so but you hadn't really thought very much about

4  the design of nozzle flaps, is that right, by the time you

5  left?

6  A.  You mean before or after this lawsuit was filed?

7  Q.  No, at the time you left Wave Loch.

8  A.  Other than we tried to minimize failures, we hadn't really

9  thought about, you know, changing the original check valve

10  design of having the plate on the hinge.

11  Q.  Okay.  And so and that's the same design you decided to use

12  when you started PSD, correct?

13  A.  Check valve design is the easiest, simplest way to, you

14  know, put a door over something and --

15  Q.  It's the design you'd learned at PSD, correct?

16  A.  It's a standard design in engineering, to use a check

17  valve, yeah.

18      MR. O'HARE:  And if we could display Exhibits 384 and

19  22 side by side.

20  BY MR. O'HARE:

21  Q.  So you were here during the opening when we had displayed

22  these pages?

23  A.  Correct.

24  Q.  Did you do these two -- what do you call them, schematics,

25  drawings?

1    A.   These are drawings, yes.

2    Q.   And did you do them?

3    A.   I believe I did.

4    Q.   Okay.  And the one on the right is one that you did while

02:10    5    you were at Wave Loch for at least a part of the nozzle flap

6    assembly?

7    A.   Correct.

8    Q.   And the one on the left is the drawing that you did after

9    you started PSD; same thing, a part of the nozzle flap

02:10    10   assembly?

11   A.   Same general part, but different design, but yes.

12   Q.   So -- well, let me ask, then, are you saying -- does this

13   third thing, the hinged, padded nozzle flap -- is this what you

14   have presented as a rendering of what, if not precisely,

02:11    15   generally, Wave Loch and WhiteWater have used?

16   A.   No.  So if you look at the drawing on the right, you can

17   see that there's actually two plates here.

18   Q.   I'm not focused in on the drawing.  If you could stick with

19   me, I'm looking at the pad that I'm holding here.  Is this

02:11    20   intended to represent what you believe Wave Loch and WhiteWater

21   have used on their rides?

22   A.   In the past, while I was working there, they had put a

23   metal plate on a hinge or two metal plates for multiple things

24   on a hinge and put -- placed padding on it, yes.

02:12    25   Q.   And is that what this is intended to represent?

A.   That's intended to represent the Pacific Surf Designs'

attractions, but it also represents some of the nozzle flaps

that may have been built by Wave Loch.

Q.   Okay.  And it's a nozzle flap design you came to learn

about while you were at Wave Loch?

A.   Yeah, and anybody who bought a ticket on a ride could go up

and inspect that and simply lift it up and see that it's a

plate on a hinge.

Q.   So on at least the first four rides that you sold, this is

the design -- this -- that -- this is representative of on the

far left of -- what's this exhibit number?

        MR. SCOTT:   NU.

BY MR. O'HARE:

Q.   This is NU.  You ended up adopting a design that was the

same or similar to what you were doing at Wave Loch?

A.   Similar.

Q.   Okay.

A.   But somehow we've managed to do it without warranty claims.

Q.   Well, maybe you built it better.

A.   We have.

Q.   And so if -- let's show the patent, Exhibit 1, Column 11.

We've heard a number of references to a metal nozzle flap.  You

have never installed a metal nozzle flap, have you?

A.   Well, we installed -- yeah, all the time.

Q.   Is this metal?

836

1    A.   It has metal in it.

2    Q.   It has metal in it, correct?

3    A.   Correct.

4    Q.   But it's not a metal nozzle flap, is it?

02:13    5    A.   It's not a wood nozzle flap.  Metal is more accurate than

6    wood, I would say.

7    Q.   So you think this is mostly metal?

8    A.   Most of the mass is metal.

9    Q.   The weight, but in terms of volume, what is this mostly?

02:13    10   A.   Potato, potato.

11   Q.   You're the engineer.  Give me a break.

12   A.   Mostly it's comprised of foam and vinyl.

13   Q.   Okay.  So this is not a metal nozzle flap.  It's a nozzle

14   flap that is internally reinforced with some metal?

02:13    15   A.   It has a piece of metal it in, yes.

16   Q.   And it's internal, meaning it's inside this vinyl

17   upholstery, correct?

18   A.   Correct.

19   Q.   Okay.  So nobody -- because we've seen some pictures of

02:14    20   what looked like guillotines of metal pieces that we've seen

21   described as a metal nozzle flap.  I just want to be clear:

22   You have never deployed one of those in that form, have you?

23   A.   A guillotine?

24   Q.   A sheet of metal, and that's it, on a ride?

02:14    25   A.   Oh, no, that was to display how we had to fit the nozzle

1   flap to the attraction before we actually took it off to put

2   all the foam padding on.

3   Q.   That's the internal --

4   A.   The metal plate.

02:14   5   Q.   -- reinforced or whatever of the metal that is then padded

6   and wrapped, correct?

7   A.   Correct.

8   Q.   So nobody's putting out a metal nozzle flap?

9   A.   Wavesurfer's nozzle flap was kind of metal for a while, the

02:14   10   image that was on there.

11   Q.   I take it you don't think that would have been a good idea?

12   A.   We did not employ that option.

13   Q.   Okay.  I'm pretty sure of that.

14         MR. O'HARE:   If we could go to Exhibit 1.

02:15   15   BY MR. O'HARE:

16   Q.   So now, you're not an expert on patents, right?

17   A.   No.

18   Q.   You've become a student of them during the past few years,

19   I imagine?

02:15   20   A.   More so than I would have imagined, but it is pretty

21   interesting.

22   Q.   And probably less so if you're not a

23   participant -- probably more so if you're not a participant?

24   A.   Sure.

02:15   25   Q.   Anyway, so this item on the left here, the moveable, hinged

838

1   nozzle flap, it's got a pad, and it's got pad material,

2   correct?

3   A.   I'm sorry?  It has foam?

4   Q.   Well, I don't know.  Is that a pad?

02:15   5   A.   Are you talking about the one closest to you?

6   Q.   Right.

7   A.   Yes, it has foam.

8   Q.   Okay.  And foam would be the pad or pad material?

9   A.   Could be.

02:16   10   Q.   Well, is it?  If you don't know, just tell me.

11   A.   I would say foam is generally associated with padding.

12   Q.   Okay.  And it can be reinforced internally or externally,

13   so is this moveable, hinged, padded flap reinforced internally?

14   A.   Yeah, you could say that.

02:16   15   Q.   Well, would you say that?

16   A.   Yeah, it has a metal plate inside the vinyl.

17   Q.   So the answer is yes, it is reinforced internally?

18   A.   Yes.

19   Q.   Okay.  And you're aware the patent also says it could be

02:16   20   reinforced externally as well?

21   A.   Correct.

22   Q.   Okay.  And leaving aside whatever fencing people have done

23   about how thick this is or isn't, is there a thick coating that

24   was actually put on the older rides, as best you've been able

02:17   25   to figure out, back from the beginning?

1    A.    A thick coating over foam?

2    Q.    Well, you tell me.

3    A.    No, what was your question?

4    Q.    Was there a thick coating put on the exterior of these pads

5    on the earliest rides, as best you've been able to determine?

6    A.    Yes.

7    Q.    And in fairness to you, all this, at least originally, was

8    happening -- you were in high school then?

9    A.    I would have been graduating high school at that point,

10   yes.

11   Q.    So you don't have firsthand knowledge of this from the

12   1990s, do you?

13   A.    Well, the result of it, I do.

14   Q.    You went back?

15   A.    I didn't actually build it, but by being around this

16   industry for a long time and building a lot of things, I know

17   exactly how it was built by the guys that were actually

18   building it at the time.  They actually helped us with the

19   installation as well.

20   Q.    Okay.  And this is externally reinforced?

21   A.    Sure.

22   Q.    With whatever coating they put on it?

23   A.    Yes.

24   Q.    And then what is this thing here?  I mean, I don't know how

25   to show it here.  I'm going to wreck into somebody.

1    Between -- what is the red thing?

2    A.   So what I was trying to achieve there was you notice in the

3    video from the Belmont Park wave is the reference distance

4    between the ride surface and the top of the nozzle flap was

5    much greater than on the current iterations.  And so that's

6    because of the way the sluice was designed on that particular

7    attraction.  So I was trying to match the elevation, and so the

8    red chair, if you will, that the nozzle flap is bolted to is

9    there to match the elevation, the same elevation as in the

10   Belmont Park installation, so we can have the most accurate

11   recreation.

12   Q.   What is this plate under the pad?

13   A.   Yeah.  So if you notice in the video, there's a point where

14   the nozzle actually deforms.  The deformation going uphill kind

15   of stops.  And that's because there's internal reinforcement

16   inside of that flexible pad because -- and same as this one;

17   there's metal on the bottom right there, and the reason is if

18   you put a bolt through foam alone and the wave comes down, it

19   will basically rip the bolt through the foam.  So you need some

20   kind of internal reinforcement where the bolts are going

21   through to prevent the foam pad from getting ripped off.

22   Q.   Am I right, this is some exterior reinforcement?

23   A.   External, the foam; internal, the coating.

24   Q.   But is it metal?

25   A.   Yeah, it's stainless steel.

1  Q.   This one has some metal on it?

2  A.   Correct, but all these are contingent upon -- these are all

3  material -- material properties of the flexible nozzle flap.

4  Q.   Understood.

02:20   5      And so would you agree that -- what you're saying, I take

6  it, is your belief that this hinged, flexible nozzle flap that

7  Wave Loch was using when you left the company and continues to

8  use, that, in your non-patent expert opinion -- you don't think

9  this constitutes a flexible tongue, correct?

02:20  10  A.   Absolutely not.  And we can take that nozzle flap there off

11  and leave the hinge on because the hinge is not part of the

12  nozzle flap.  So if we pull that nozzle flap off, and you can

13  take it, and you can try and bend it over your knee or

14  something.

02:20  15  Q.   Good luck.

16  A.   If you bend it, I think I should leave.

17  Q.   So what you're saying is, in your view, Wave Loch, with

18  this design, wasn't -- wasn't practicing its own patent?

19  A.   That's basically it.  I think they developed this -- look,

02:21  20  the flexible nozzle flap, the close one to us, I think that's a

21  cool thing.  It had a time and a place.  Was it the simplest

22  way to solve the problem?  Absolutely not.  As Dr. Vigil said,

23  you can put a hinge onto something, and padding something is

24  obvious.  Putting a hinge onto something is obvious.  That

02:21  25  right there is -- it's shown.  That picture is shown in the

842

1   '402 patent by Frenzl.

2   Q.   We'll come back to that.

3   A.   Okay.

4   Q.   Would you agree if the jury concludes that the '589 patent,

02:21   5   when it says a flexible, padded nozzle flap that can be

6   reinforced internally, is covered by the patent -- would you

7   agree that your nozzle flap on the first four rides infringes?

8   A.   Absolutely not.

9   Q.   Still not?

02:22   10   A.   Because the description as Tom Lochtefeld has said, and

11   we've discussed before, the claims are the boundary of the

12   invention, and we keep going back to this, and, again, these

13   are all object properties.  The sluice cover.  This is talking

14   about the object properties.  Flexibility is an object

02:22   15   property.  The hinge restricts movement.  Movement is the

16   ability of the object to go around and do its thing.

17   Q.   I understand.  If you're right, maybe you win.  I'm just

18   asking, if the jury concludes we're right --

19   A.   Maybe?

02:22   20   Q.   Okay.  The jury concludes we're right and that this patent

21   when it says a flexible nozzle flap includes a flap that's

22   flexible by virtue of a hinge, would you agree that your first

23   four rides infringe?

24   A.   No, our first four rides do not infringe unless, of course,

02:23   25   the jury were to decide that that particular plate bolted to a

```
     1   hinge, which the hinge is not part of the nozzle flap -- if
     2   they say that, then, I mean, that's why we're here.
     3   Q.   So the answer to my question is yes, if they decide that,
     4   then --
02:23 5   A.   Well, if they decide it does, then they've decided that,
     6   and that's their right.
     7   Q.   Incidentally, hinges move, right, don't they?
     8   A.   Hinges move?
     9   Q.   Yeah, don't hinges move?
02:23 10  A.   I mean, if you were to grab a hinge and move it, then the
    11   hinge moves.
    12   Q.   Okay.  And something that's flexible, does that move?
    13   A.   Well, so, for example, a fishing pole is flexible, and if
    14   it lays on the floor, it doesn't move, but if I were to pick it
02:24 15  up and move it, then the flexible fishing pole would move.
    16   Q.   Okay.
    17   A.   But adding a -- you couldn't replace a fishing pole by
    18   taking two metal sticks and putting a hinge in the metal, and
    19   if you did the same thing with a ski, you can't take two metal
02:24 20  strips and put a hinge in the middle and call that a ski.  A
    21   ski is -- the material -- the object is flexible.  By adding a
    22   hinge, you're letting two things next to each other move in
    23   relation to each other.
    24   Q.   The question is, are they both flexible?
02:24 25  A.   A ski and a fishing pole?
```

844

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | Q.  You think a fishing pole is flexible?                    |
| 2   | A.  A fishing pole is flexible.                              |
| 3   | Q.  A ski is flexible?                                        |
| 4   | A.  A ski is flexible.                                        |
| 5   | Q.  Is this flexible?                                         |

02:24  5

6   A.  No.

7   Q.  Okay.

8   A.  Again, if you put a hinge between two plates of steel,

9   that's not a ski.

02:24  10          THE COURT:  So in the interest of time, how many more

11  times are you going to ask that question, and how many more

12  times are you going to try to answer the question?

13          MR. O'HARE:  Okay.

14          THE COURT:  I think the jury's heard and gotten your

02:24  15  point.  Let's move on.

16  BY MR. O'HARE:

17  Q.  All right.  Let's go to Exhibit KB, which, again, my

18  monitor isn't working.

19      This is this Frenzl patent.  It wasn't clear to me whether

02:25  20  you were saying -- are you saying the '589 patent is not valid

21  because what's in the '589 was already invented by Frenzl, or

22  did I read too much into your testimony?

23  A.  I think you read too much into my testimony.

24      What I'm -- the reason I was interested to find Frenzl is

02:25  25  because it shows a sheet wave-type attraction 30 years before

845

1    Tom actually built one.  And Tom being the inventor -- don't

2    get me wrong.  Tom is a really smart guy.  And he basically

3    drove this thing home and made it what it is, but it looks to

4    me like Frenzl invented this stuff.  And I think the main

02:26    5    benefits of moving from a pump-in-front design to a

6    pump-underneath design, we're moving the pump underneath the

7    wave, and that would have been the most valuable thing to

8    patent; however, Frenzl got in the way of that, and Frenzl got

9    in the way of putting a hinge on the nozzle because it's shown

02:26   10    on Figure 8 that there's a nozzle with a hinge on it with a

11    flap extending past that, and if that had not been there, I'm

12    sure the word "hinge" would have been mentioned in the '589

13    patent.

14    Q.  Where do you get -- somebody told you that?

02:26   15    A.  Can we look at Image 8 again, please?

16    Q.  Has somebody told you that if the word "hinge" weren't in

17    there, they wouldn't have mentioned it in the patent, in the

18    '589?  Did somebody tell you that?

19    A.  Can you reask the question, please?

02:26   20    Q.  Has somebody told you if the word "hinge" were not in the

21    Frenzl patent, then Tom and his lawyer would have put the word

22    "hinge" in the '589?  Has somebody told you that?

23    A.  Can we look at Figure 8 of the '402?

24    Q.  I'm trying to figure out what you've heard.  Have you been

02:27   25    told that by somebody that that's what Tom's actually thinking?

846

1    A.   My understanding of an invention is it needs to be novel,

2    and it needs to be not preceded by prior art.   In this case,

3    you've got clear a sheet wave machine with a pump underneath

4    the surface, and Figure 8, if we can go back to it, I'm sure

02:27   5    you don't want to --

6    Q.   I can't see anything, so if somebody wants to show us

7    Figure 8, I'm happy to look at it.

8    A.   So, again, can we zoom in on Figure 8?   Beautiful.

9         So, again, you've got the water coming out, going up here,

02:27   10   following that arrow, and you've got this -- that round thing

11   right there with a flap extending in front of it.   So you could

12   not have -- to me, that looks exactly like what we've got built

13   there closest to you.   It's a nozzle flap extending off the end

14   of a nozzle where the water comes out, and, again, putting

02:28   15   padding on something is an obvious way to make it safe.   We pad

16   everything on the rides.   It's just what you do.

17   Q.   Can we pull up the whole picture here and make sure we're

18   all on the same perspective?   Is that flap in here where 25 and

19   26 are?

02:28   20   A.   No, 25 and 26 -- that's the check valve I was talking

21   about.

22   Q.   Right.

23   A.   This flap also mimics that check valve where the water

24   comes out, and this thing rotates by the hinge up, and the

02:28   25   water comes off, and it rotates back down.   So that's also a

1    check valve, but I think it's redrawn in Figure 8 to be more

2    applicable specifically to where the water's actually exiting

3    the nozzle onto the ride surface.

4    Q.   Where's that?  I don't really see that here.

02:28    5    A.   It's what we just looked at in Figure 8.

6    Q.   I know it's Figure 8.  I'm trying to figure out where it is

7    on the machine.

8    A.   I'll try my best to trace that arrow.

9         That's where the water comes out over the ride surface, and

02:29   10    you've got this really-convenient-for-me hinge right here,

11    right above that.

12    Q.   Is that hinge moveable, or is it fixed?

13    A.   I would assume -- I mean, "hinge" by definition is

14    moveable, otherwise it's fixed, right?

02:29   15    Q.   Well, you could lock it, couldn't you?

16    A.   You could lock it?  I'm sure you can lock any hinge.

17    Q.   Do you know if that's a locked hinge?

18    A.   It doesn't specify anything about that hinge.

19    Q.   If we go to the '589 patent, Exhibit 1, and enlarge the

02:29   20    references, so just, again, so we're clear, you're not

21    suggesting that because of that patent, this patent's invalid?

22    A.   No, I think that by looking at the '402 by Frenzl, you

23    could see the real value of the second-generation wave machines

24    was putting the pumps underneath the ride surface.  That would

02:30   25    have been the thing to patent.  But you couldn't do that, so

1    the best you had, the '589 simply focused on the flexible metal

2    tongue, which is a cool little solution, but not as simple as

3    the check valve that we just saw on Frenzl.

4    Q.   And, in fact, the Frenzl patent was considered by the

02:30   5    patent office when they issued the '589?

6    A.   It probably was.

7    Q.   Well, did you read the patent or not?

8    A.   No.  I mean, it's on there, right?  I believe it's this

9    one, right?

02:30   10   Q.   So what?

11   A.   Yes, absolutely.

12   Q.   Okay.  And it was considered again when PSD took a run at

13   challenging the validity of this patent during the litigation

14   with the patent office?

02:30   15   A.   Yeah, which I think backs up the fact that a flexible

16   tongue nozzle flap is a pretty cool little invention.  It is

17   not a check valve with a hinge rotating about an axis point.

18   Q.   Okay.  It's not a check valve with a hinge.

19        All right.  Let's take a look at Exhibit 13.  And this, I

02:31   20   believe, is a matrix of various patents that you and Mr. Yeh

21   were concerned about in 2012?

22   A.   Yes.

23   Q.   Now, you had said -- when did you say you prepared this?

24   A.   I think I said Yong prepared this.

02:31   25   Q.   And -- okay.  Then I'll give you an out.

1    If Mr. Yeh testified that this wasn't prepared -- this was

2  actually prepared for a specific customer, Mr. Phillips, of

3  HMH.  Is that who he's from?

4  A.   Yeah, Heath Phillips.

02:31   5  Q.   And it was prepared after that November 2012 IAAPA

6  conference, and meaning sometime at the end of 2012 or

7  beginning of 2013.  And we can deal with this with him, or I

8  can read the testimony.  But if he says that's when it was

9  done, do you have any reason to disagree with him?

02:32  10  A.   If this specific Appendix B -- this looks like it's an

11  appendix, so it probably came to you by virtue of being an

12  attachment to an email that you get through discovery.  But the

13  Excel sheet that this was based on was probably at some other

14  point in time.

02:32  15  Q.   Okay.  So if he said it was prepared after November 2012,

16  do you agree or disagree?

17  A.   I -- this Appendix B was probably whenever Yong said it was

18  done, but I think -- the Excel sheet, I know, was much before

19  that.

02:32  20         MR. O'HARE:  And then in -- if we could show Exhibit

21  483, please.  And referring to Exhibit 483, if we could kind of

22  enlarge the first third of it, including the address, please.

23  All the way to the top.

24  BY MR. O'HARE:

02:33  25  Q.   So you recognize this January 25, 2013, letter from Pacific

1    Surf Designs to somebody named Heath at HMH Aquatic

2    Enterprises?

3    A.   Yeah, that's Heath Phillips, yes.

4    Q.   And was this a customer -- that was actually your first

02:33  5    installation in Texas?

6    A.   Yes.  So we would have met Heath at IAAPA in 2012.  That's

7    the trade show again when we were exhibiting, and Heath had an

8    interest in our attraction but also had reservations.

9    Q.   He wanted some additional comfort regarding patent-related

02:33  10   issues, meaning he was concerned whether some of your products

11   might infringe patents?

12   A.   I think he was mostly concerned that we were potentially

13   going to be his first installation, and that's where he got

14   most of his heartburn.

02:33  15   Q.   The first line says, "You want additional comfort

16   concerning patent-related issues."  So that was at least the

17   first thing he mentioned, right?

18   A.   Correct.  I'm sure he had many issues.  I'm just saying

19   that one of them was this, and there was other ones that I

02:34  20   think were bigger.

21   Q.   And then this letter is about addressing those issues?

22   A.   I think it's going to speak to them.  I don't know if it's

23   addressing them, but it will speak to them.

24   Q.   Okay.  Why don't we see the rest of the page in this

02:34  25   letter.  You --

```
 1              MR. KOLEGRAFF:  Can we enlarge it?
 2    BY MR. O'HARE:
 3    Q.  There's a number of discussions down here.
 4              MR. O'HARE:  If we could enlarge the bottom half.
 5    BY MR. O'HARE:
 6    Q.  You address a number of Wave Loch patents, and you list a
 7    whole bunch of them, and the '589 patent, that's in there on
 8    the -- that's one of them, correct?
 9    A.  Yeah, this was a -- this was off the FAQs from the
10    Wave Loch site, and this was the technology that was claimed by
11    Wave Loch at that time in 2013.
12    Q.  So all -- in fact, I believe it is a list of a whole bunch
13    of patents?
14    A.  26 patents.
15              THE COURT:  Wait.  One at a time, please.
16    BY MR. O'HARE:
17    Q.  It's a whole bunch of patents, including a number that have
18    expired, correct?
19    A.  Correct.  It was 26 patents.  Of those 26 patents had
20    already expired.  "Of the remaining nine patents still in
21    effect, we feel that eight out of the nine patents apply to
22    products unrelated to Makaha, and we will illustrate this for
23    you below so you can make your own determination."
24    Q.  So we go to the next remaining nine --
25              MR. O'HARE:  Let's go to the next page.  And let's
```

1   enlarge from the paragraph above that matrix and then through

2   the matrix.

3   BY MR. O'HARE:

4   Q.   And so you basically -- so there are nine left, and in this

02:36  5   summary here, you basically say hey, eight of them don't even

6   apply?

7   A.   That's what we're -- that's what our belief was.

8   Q.   And with respect to C4, that's, "Mobile water ride having

9   sluice slide-over cover."  That's the title of the '589,

02:36  10   correct?

11   A.   Yeah.

12   Q.   And then you're saying it's not relevant because it applies

13   to mobile attractions, correct?

14   A.   Yeah, I believe there was -- I believe you guys are

02:36  15   asserting a certain number of claims in the '589, and I believe

16   there's other ones that are specific to mobile attractions, and

17   so as we felt that the nozzle flap ones didn't matter, we were

18   simply saying yeah, there's still a patent on some kind of

19   mobile thing covered in the '589.

02:36  20   Q.   But, I mean, you're telling me here -- I mean, one of these

21   relates to waterslides, so it's not relevant, one to water

22   sculptures and boats, and you're telling them this one just --

23   it doesn't even apply because it applies to mobile attractions,

24   correct?

02:37  25   A.   And attractions with flexible nozzle flaps that nobody uses

1    anymore, but yeah.

2    Q.  Okay.  That's not what that says.  It says it's not

3    relevant because it applies to mobile attractions.

4    A.  Sure.

02:37  5    Q.  Okay.  But had you looked at the patent before you wrote

6    that?

7    A.  I think you know we had.  We had a big spreadsheet.  This

8    work didn't come out of nowhere.  There was a lot of work and

9    phone calls and patent reading that went into this.

02:37  10   Q.  When you prepared this, you knew that the '589 applied to

11   more things than just mobile attractions?

12   A.  It applied to flexible nozzle tongues on sheet wave

13   attractions.

14   Q.  Not mobile ones?

02:37  15   A.  I think there are mobile-specific claims in the patent that

16   don't cover nozzle flaps.

17   Q.  Did you think when you wrote this that the '589 only

18   applied to mobile attractions?

19   A.  Well, I think the title is -- the title is "Mobile."

02:38  20   Q.  I know.  That's why I asked you if you read the patent.

21   A.  We did.

22   Q.  What?

23   A.  We did read the patent.

24   Q.  Okay.  So when you wrote this, you knew that the '589

02:38  25   applied to more than just mobile attractions, fair?

1    A.   Yes, sure.

2         MR. O'HARE:   And if we could go back to the full text

3    of this, please.   And then to the next page and the next page.

4    So let's enlarge this whole page.

02:38   5    BY MR. O'HARE:

6    Q.   So out of these nine patents, you just selected one to do a

7    very detailed analysis -- it's kind of like we're doing in this

8    trial, claim by claim.   You went through the file history, all

9    that, right in this letter.   You went through that?

02:39   10   A.   Yeah, so this -- the reason -- this was the '859, which was

11   a patent that Wave Loch was asserting against American Wave

12   Machines.   And this was essentially a patent covering water

13   going up a hill and being able to surf on it.   And this is

14   where we were confused because if you look at Frenzl, it shows

02:39   15   water going up a hill and a guy surfing on it.   So we couldn't

16   figure out how Tom got any patents in this space.

17        But that aside, that was the one, because it was being

18   asserted against American Wave Machines, we thought well,

19   shoot, that's the one they're probably -- if they were going to

02:39   20   try to assert against somebody else, that's the one we probably

21   gave the most weight.

22   Q.   You gave a very detailed analysis for this one.   It goes on

23   for pages, correct?

24   A.   I haven't looked at this in a while, but I'll take your

02:39   25   word that it's probably pretty detailed.   Yong is pretty

855

1    detailed.

2    Q.   Around this time frame, you said you talked to a patent

3    lawyer who gave you some tips, if I understood it correctly, on

4    how to read a patent.  Is that correct?

02:40   5    A.   She guided us on -- yeah, on what mattered around --

6    essentially it goes back to the claims are the boundaries of

7    the invention, and that's what we were -- you know, what we

8    started focusing on.

9    Q.   But you elected not to get her to actually read the patents

02:40   10   for you, look at what you were doing, and give you some sort of

11   reasoned opinion as to whether you had --

12   A.   Using her input, we started analyzing the patents, and then

13   Yong's an attorney, and he's worked in New York and

14   San Francisco in a number of places, and he's gone to law

02:40   15   school in two locations, and we went to Berkeley, so we've got

16   a -- we've got a big resource pool of people that we can

17   casually call up and say hey, talk to me about this for ten

18   minutes, and we can run through our assumptions and checks and

19   balances, so we probably had a dozen of those phone calls.

02:41   20   Q.   With this same lawyer?

21   A.   With all the lawyers.  I mean, just with whoever would talk

22   to us, whoever we would feel to call.

23   Q.   So other than talking to people in Berkeley and New York

24   and whatever, did you -- other than getting some sort of

02:41   25   informal, armchair, free advice, am I correct that you chose

1   not to engage this one lawyer or any lawyer that actually was a

2   patent lawyer to look at this and give you a reasoned opinion

3   whether you were on good ground?

4   A.   Specifically about the '859, or are you talking about the

02:41   5   flexible flap versus the check valve?

6   Q.   What you put in this analysis in terms of deciding whether

7   or not you were infringing any of these patents.   Other than

8   getting this armchair advice, did you engage a lawyer to -- a

9   patent lawyer to do the analysis and give you an opinion?

02:41   10   A.   We did not have a lawyer give us an opinion.

11   Q.   Were you afraid of what the lawyer would tell you if you

12   did?

13   A.   No.

14   Q.   So it's the 20 grand, that was it?

02:42   15   A.   Well, I mean, that was -- I think that was quoted

16   specifically on -- I don't know if -- I don't know if that was

17   per patent or on a specific patent or on all the patents, but

18   it was a good chunk of change.

19   Q.   You only had one or maybe two that required any deep

02:42   20   analysis.   The one you did and maybe the '589.

21   A.   Yeah, maybe.

22   Q.   Okay.   So you're going to start this business.   You've seen

23   Mr. Yeh's testimony that he had access to unlimited funds upon

24   request from his family, from his family's venture capital

02:42   25   fund, correct?

1  A.   I haven't seen that testimony.  I've heard it paraphrased.

2  Q.   And you're going to go into a business where a single

3  product is going to be what, almost a million dollars?

4  A.   Anywhere from -- starting price is maybe -- we had a

5  Waikiki that we were trying to do around 350- and 350- to

6  whatever, 350- and up, 350- to 2 million bucks.

7  Q.   And you didn't want to spend 20 grand to make sure --

8  A.   We didn't have 20 grand.

9  Q.   -- what happened to this other fellow that Tom sued

10  wouldn't happen to you?

11  A.   What, being sued unfairly?

12  Q.   Sure, that's what you think.  You thought that was

13  happening to this other guy, so you knew all that, but it

14  wasn't worth $20,000 to you --

15  A.   We didn't have --

16  Q.   -- to make sure you were on solid footing?

17  A.   We didn't have $20,000 to allocate to that.

18  Q.   Because you didn't request it?

19  A.   Just because you have access to something doesn't mean you

20  just use it whenever you need to.  You still have to rely on

21  hard work and getting something done and doing the best you

22  can.

23  Q.   So it wasn't important enough to do a professional legal

24  analysis with a patent lawyer?

25  A.   On the '589 or the '859?

1    Q.   On anything.

2    A.   We deemed that after reading all the patents and seeing

3    what was out there with Frenzl, we didn't think the patents,

4    frankly, held any weight, and basically the '859 got turned

02:44   5    over three times, and it was essentially -- it was a shell of a

6    patent by the time Bruce was done with it because all the

7    claims were deemed invalid.

8    Q.   The '589?

9    A.   The '859.

02:44   10   Q.   Oh.

11   A.   Very similar.

12   Q.   Well, the --

13   A.   Sorry, this is the '859 patent here that we're talking

14   about.

02:44   15   Q.   You spent all the time on the patent that was deemed

16   invalid?

17   A.   We spent a lot of time looking at all the patents.

18   Q.   Okay.  You mentioned that there was a period during which

19   the '589 patent, not to be confused, lapsed for several months,

02:44   20   and you learned about that from Mr. Yeh?

21   A.   Mr. Yeh.

22   Q.   Now, see, that's another one.  It's not ya, it's yay?

23   A.   Yay.

24   Q.   Okay.  My apologies.  Somebody steered me wrong.

02:45   25        And so there had been an initial lawsuit and filed in the

middle of 2014 that you mentioned, and that was dismissed

voluntarily, what they call without prejudice, correct?

A.   Yeah.  We believe that was the test-the-waters lawsuit, but

yes, dismissed shortly thereafter.

02:45   Q.   It was without prejudice, meaning that meant they could

refile?

A.   Yes, I believe that's what that means.

Q.   And, in fact, PSD and WhiteWater entered into -- or an

affiliate of WhiteWater entered into what's called a tolling

02:45   agreement, meaning that during the period the lawsuit was

dropped, they'd agree that the statute of limitations would be

tolled or would stop running, correct?

A.   That's my understanding, yes.

Q.   And it was Mr. Yeh that at the end of 2014 in monitoring

02:46   the website had found that somebody hadn't paid the maintenance

fee and the patent had lapsed?

A.   Yeah, despite suing us with that specific patent a few

months earlier.

Q.   He was very --

02:46   A.   They let it lapse, and when I was working at Wave Loch, I

remember Marshall was getting very aggravated with Tom because

he had over 50 patents.  Well, if you look at the average

maintenance fee you've got to pay, that's $25,000 a year

average you've got to pay out for maintenance fees on patents,

02:46   and when you've got patents on flexible nozzle flaps that,

1   frankly, nobody's using and, frankly, don't hold any water, at

2   some point people are saying we've got to cull the herd.

3       They filed a lawsuit on us using that patent, and then they

4   let it lapse six months later, so I'm going, they're finally

5   starting to let some of these things go because they don't need

6   them, and they're worthless.

7   Q.   You were actually surprised that that happened, weren't

8   you?

9   A.   I was and I wasn't.  I mean, we never gave the patent any

10  weight, like we discussed, and so when they let it lapse, it

11  seemed to make -- you know, Geoff Chutter is a great

12  accountant.  He's got one of the best-run businesses in Canada.

13  For them to cull the herd, that's what you do if you run a good

14  business.  You don't just blindly pay things.

15  Q.   But you were surprised that that had happened, were you

16  not?

17  A.   We were happy that it happened, but I wasn't too surprised.

18  Q.   You didn't think they messed up, that they were idiots?

19  A.   I -- we thought that -- we were happy that it had lapsed.

20  Q.   Okay.  But you knew that they could revive it by filing an

21  application to get permission to file -- to pay the fee late,

22  or did you know that?

23  A.   Yeah, so we were familiar -- Yong was pretty familiar with

24  the whole maintenance fee cycle, but I guess you get a warning

25  letter six months before your patent needs to be paid, and then

861

1    you get a warning letter again a month before it technically

2    expires, and then as it expires, you get another letter, and it

3    goes into a six-month grace period where you have another six

4    months, and you get more letters from the PTO, and there were

02:48    5    more letters from everybody's attorneys telling everybody this

6    thing was going to expire, and so at the end of that, we only

7    knew about the PTO stuff, and so we're just thinking hey, at

8    the end of all these emails coming to these people and this

9    thing expired, yeah, they probably let it go.

02:48   10    Q.   Did you know about all those emails in December 2014?

11    A.   I just stated I did not.  We just knew about the notices

12    that would have come from the patent office that are public.

13    You can look it up in something called the file of the patent.

14    You can look up all the notices that have been sent out, and

02:48   15    there were a number of notices that had been sent out to

16    whatever entity, whoever owned it or pretended to own it or

17    whatever, that they needed to pay the maintenance fee.

18    Q.   And that was pretty confusing because this patent kept

19    getting transferred around?

02:48   20    A.   We did not know any of that at that time.

21    Q.   So in any event, when you learned -- Mr. Yeh learned that

22    they missed -- the maintenance fee lapsed, you also knew that

23    there was a process to revive it?

24    A.   Well, Yong was pretty excited because he said this -- the

02:49   25    patent -- the patent didn't lapse today.  It lapsed months

1  earlier when they failed to pay the maintenance fee when it was

2  due, but this was the end of the grace period, which was the

3  extra time allowed by the patent office to say are you really

4  sure you meant to let that go?  And six months later you get

02:49  5  that final notice saying okay; it's officially gone now.

6  You've lost this patent.  So later we learned that there's a

7  system to revive that by saying oops, I messed up, and --

8  Q.  So did you know that at the time?

9  A.  We did not know that at the time, so we believed the patent

02:49  10  to be gone.

11  Q.  Did Mr. Yeh know that, if he were to testify?

12  A.  You'd have to ask him.

13  Q.  Okay.  Fair enough.

14       THE COURT:  Well, now's a really great time for us to

02:49  15  take a little break.

16     When you said that this patent didn't hold any water --

17       THE WITNESS:  No pun intended.

18       THE COURT:  I was going to ask.  Were you intending a

19  pun?

02:50  20       THE WITNESS:  I was not.

21       THE COURT:  Okay.  All right.

22     Well, let's take a little ten-minute recess.  Please

23  remember my admonition.  Okay?  Great.  Thank you.

24     You may step down.

02:50  25       THE WITNESS:  Thank you, Your Honor.

```
 1        (Recess.)
 2        (Proceedings held outside the presence of the jury panel.)
 3             THE COURT:  We're outside the presence of the jury.
 4        Counsel, I need to alert my boss as to what time she is
 5   supposed to pick me up tonight, so are you going to be finished
 6   with your cross before 4:00?
 7             MR. O'HARE:  Oh, yes.
 8             THE COURT:  Okay.  In that case, I thank you.
 9        Go ahead and take the stand.
10             MR. KOLEGRAFF:  I misspoke an exhibit number.
11             THE COURT:  We'll do it in front of the jury so the
12   jury can hear it.
13             MR. KOLEGRAFF:  Great.  Thank you.
14             THE COURT:  That way plaintiff's counsel won't be the
15   only ones.
16        All right.  Bring in the jury, please.
17        (Proceedings held in the presence of the jury panel.)
18             THE COURT:  All right.  Be seated.  Welcome back.
19             MR. KOLEGRAFF:  A quick housekeeping message here.  I
20   mistakenly said in the direct examination of -- it was Exhibit
21   4.  It was actually Exhibit LV, page 4, LV-4, LV-5, and LV-6,
22   that we used.  It was not Exhibit 4.  Thank you.
23             THE COURT:  Okay.  Great.
24        Mr. O'Hare, go ahead.
25             MR. O'HARE:  Thank you, Your Honor.
```

03:00 (line 5)
03:00 (line 10)
03:00 (line 15)
03:01 (line 20)
03:02 (line 25)

1    If we could display Exhibit 400, please.

2         THE COURT:  Are you sure it's Exhibit 400?

3         MR. O'HARE:  Well, it's 400 --

4         THE COURT:  I'm teasing you.

03:02  5         MR. O'HARE:  It's 428, but yes, it is 400 trial

6    exhibit.

7    BY MR. O'HARE:

8    Q.  This is your resignation email where you tell Marshall

9    Myrman, your boss, I'm ready to take some time off, correct?

03:02  10   A.  Yeah, the date's July 27th up there, and Marshall forwarded

11   it on July 30th.

12   Q.  Fair enough.

13       You're going to be gone in a week, correct?

14   A.  Correct.

03:03  15   Q.  And you already at least started -- you'd figured out what

16   kind of business you were going to be in with Mr. Yeh, correct?

17   A.  We'd talked about going into wave machines, yes.

18   Q.  And if we could show -- and you had already given some

19   thought to what you were going to do and how you were going to

03:03  20   launch the business?

21   A.  Maybe a little bit, but not really.  I was actually

22   planning a vacation with my wife to Italy, so that was kind of

23   our main focus.

24   Q.  When did you leave for Italy?

03:03  25   A.  September 3rd, I think, so about 30 days later.

1    Q.   So when you told him in -- on July 27 I'm quitting on

2    August 3rd to take some time off, you meant you were going to

3    take a vacation in September?

4    A.   Yes.  Is that okay?

03:03    5    Q.   It's okay, yeah.  But you didn't take some time off, you

6    know, immediately, I take it?

7    A.   Was I obliged to?  I don't know.

8    Q.   Why did you tell him you were going to take time off?

9    A.   I mean, I took some time off.  I did.  I went to Mexico,

03:04   10    and I went fishing.  I went to Italy.  It was great.

11    Q.   Okay.  And so let's go to Exhibit 401.

12         And then this is on July 30, so you're still working at

13    Wave Loch, correct?

14    A.   Yes, I suppose I was.

03:04   15         MR. O'HARE:  If we could enlarge the top half of this

16    email.

17    BY MR. O'HARE:

18    Q.   So you're talking about creating some pre-event buzz, and

19    the event you're talking about is the IAAPA, the water park big

03:04   20    conference down in Orlando?

21    A.   Correct, yeah.  This was an email from Yong to myself, but

22    yes.

23    Q.   And so you -- well, at the bottom, I think it may be an

24    email from you to him.  Let's scroll down.  Right.  So you're

03:05   25    saying the same thing.  You're trying to get ready for this.

1      So by then, you obviously knew what kind of business you

2  were going to be in or you wouldn't know what kind of

3  conference to go to.

4  A.   Yeah, I mean, anything -- anybody who sells any kind of

03:05  5  sheet wave or wave machine or slide or anything is at IAAPA.

6  Q.   Okay.  So you knew what your business was going to be?

7  A.   We had a pretty good idea.

8           MR. O'HARE:  If we could go to Exhibit 404.  And

9  Exhibit 404, if we could just blow up the email.  Not that one.

03:05  10          THE COURT:  Let me read that one.  No, never mind.

11  BY MR. O'HARE:

12  Q.   There's a -- I wasn't trying to do that.  There's a comment

13  where you say there's some S- that we messed up on.  Here

14  you're filling out the -- they've already got the corporation

03:06  15  documents for your company on August 8 being prepared, correct?

16  A.   Yeah, that was something Yong took upon himself.

17  Q.   And then you're filling out the IAAPA forms, so by August

18  8, just a few days after your resignation was effective from

19  Wave Loch, you actually had the form filled out.

03:06  20          MR. O'HARE:  Why don't we show the form.  I think it's

21  a page or two later.  There we go.  That's the application.

22  Just blow up the top.

23  BY MR. O'HARE:

24  Q.   That's the application you got to fill out to go to this

03:06  25  attractions expo down in Orlando?

1   A.   That would -- Yong did all this, but yes, that is the form.

2   Q.   Okay.  So by August 8, you know, you've got your paperwork

3   in for your corporation, you've talked even before you left

4   WhiteWater about generating pre-event buzz.  This is

03:07   5   before -- this is right after you quit WhiteWater, you're

6   working on this business, right?

7   A.   Yeah.  Yeah.  We were working on a -- I think it says here

8   we're working on surfable, standing waves.  And at that point

9   we were kind of surveying the market to figure out what we

03:07   10   really wanted to focus on.

11         MR. O'HARE:  And if we could go to Exhibit 204.  And

12   we could enlarge this.

13   BY MR. O'HARE:

14   Q.   So by August 20, just two weeks after you've left

03:07   15   WhiteWater, you now have started to come up with some

16   renderings of what your rides are going to look like, the Group

17   1 FlowRider knockoffs, which wouldn't necessarily be

18   infringement unless you're knocking off a patented invention,

19   right?

03:08   20   A.   Yeah, I think we already discussed that knockoffs are not

21   infringement.

22   Q.   Just copying something, and some copying is okay, and some

23   copying is not okay.

24   A.   Yeah.  And, again, I think this was, as we discussed

03:08   25   before, a little poor choice of words, and as we saw, the wave

868

1  design that I actually designed had significantly different

2  features than anything else out there.

3  Q.  As you say down here at the bottom, "Look at the Waikiki

4  models.  They look like FlowRiders."  And you want to make them

03:08  5  look different.  At least in these emails, you don't -- this

6  email you don't say anything about actually making them

7  different.  You just are talking about making them look a

8  little different.

9  A.  Yeah, we want them to be different.

03:08  10  Q.  Okay.  And then -- and at least look slightly different,

11  and that's at least what you had in mind on August 20?

12  A.  Yeah.  I mean, the whole point of this email is to say hey,

13  let's make this general set of products, this general set, and

14  this general set, and so half-pipes, and that was something we

03:09  15  were looking into because we wanted to have more, you know,

16  exciting products, and then we've got a barreling wave that we

17  were looking at, and then, obviously, this rendition of, you

18  know, Waikiki, that would be coming in a Single, Double, and a

19  Triple.  A lot of that stuff was new at that time.

03:09  20  Q.  The first category, Group 1, the FlowRider knockoffs,

21  that's similar to some WhiteWater rides -- or excuse me --

22  Wave Loch rides, correct?

23  A.  I was trying to not make it similar, but it was

24  categorically the same as having a Tesla Model S or a Model 3

03:09  25  and another sedan.  So sedans are the number-one selling

869

1    things, so if you want to start selling cars, you should

2    probably sell a sedan first.

3    Q.   Since in this case pretty much only one company is selling

4    these sheet waves, you wanted to sell one that was similar to

03:10    5    the product that people were buying?

6    A.   Yeah, sell something that would compete in the marketplace.

7    Q.   And that Group 3, these barreling waves, Wave Loch also had

8    one of those products, correct?

9    A.   Correct.

03:10    10    Q.   And theirs was called the FlowBarrel?  Yes, they called

11    theirs the FlowBarrel, correct?

12    A.   They had a FlowBarrel Five and a Ten, which --

13    Q.   And yours is the -- I don't know if you'd come up with a

14    name.  You ended up calling it the Supertube for your version?

03:10    15    A.   Yeah, I think originally it was named the Pipeline.  It was

16    also Supertube.

17    Q.   And then this group in the middle, these half-pipe waves,

18    and here you're saying they were basically a Murphy's Wave

19    half-pipe, but with some differences?

03:11    20    A.   Water, yes.

21         MR. O'HARE:   Okay.  And then if we could scroll down

22    on this Exhibit.

23    BY MR. O'HARE:

24    Q.   And in this rendering on August 20, 2012, did you already

03:11    25    have a shallower -- or smaller water tank on this initial

1  rendering of the Waikiki Single?

2  A.   Yeah, on an order of magnitude, if this was a -- I forgot.

3  This was less than, like, 10,000 gallons, which is an

4  incredibly low volume of water in the sheet wave space.  It's

03:11  5  minute.  And the construction cost that this would have taken,

6  it only requires excavation for a small area, and the rest is,

7  I mean, essentially at grade level.  There's almost no

8  excavation, so the whole goal was to make something that would

9  be -- if we could maintain -- if we could lower construction

03:11  10  costs and make the total cost -- say a customer is going to buy

11  a wave and has a million dollars in the budget for it.  Well,

12  if one wave is 800,000, but comes with $200,000 in construction

13  costs, and the other wave is 850,000, but comes with 100,000 in

14  construction costs, we could charge more for our product, and

03:12  15  the customer would still save money on the net package of

16  building the equipment.

17  Q.   Is this something you'd thought of while you were at

18  Wave Loch?

19  A.   No, this was when I started noodling on how to basically

03:12  20  reduce cost when we were looking at how to compete in the

21  marketplace.

22  Q.   Wasn't that your job at Wave Loch, to do that?

23  A.   No, I was a product manager.  When I started taking my MBA,

24  it was product development, and got into that, and that's when

03:12  25  we started calling people and getting feedback.  Oh, I use a

```
 1   lot of chemicals.  Oh, chemicals are directly related with
 2   water volume, so if you minimize water volume, you minimize
 3   chlorine usage, construction costs, filtration costs, all the
 4   energy associated with those things.
```
03:13 ` 5   Q.  So five years at Wave Loch, you didn't think of this, but`
```
 6   less than 20 days at PSD, you came up with this?
 7   A.  I was never tasked with reinventing at Wave Loch, but when
 8   we left, the first thing we did was call people, and this was
 9   the first iteration of -- like, once we started talking to
```
03:13 `10   people, you notice where the pump is.  It's right here.  So if`
```
11   you're a forklift, you could drive up and pull that pump
12   straight off the top.  That solves the whole oil change issue.
13   Remember, we were changing the oil down below.
14   Q.  Didn't you know about that before?  You changed oil.  You
```
03:13 `15   put in pumps.`
```
16   A.  No.
17   Q.  You picked all this up in 20 days from talking to
18   customers, and none of it from five years working for
19   Wave Loch?
```
03:13 `20   A.  Feedback from customers stated that changing oil on the`
```
21   pumps was an incredibly difficult task on a FlowRider, and we
22   had not yet spoken with our current pump supplier about
23   changing the oil port to a position where it could be changed
24   without moving the pump in the horizontal position under the
```
03:14 `25   attraction.  So the idea of hey, we can now put the pump in an`

1    easily serviceable position, minimize water volume, these were

2    all -- these were all in response to feedback we got.  You

3    know, you call 20 venues, you get a bunch of feedback.  This is

4    probably an hour with a modeling on the machine.

03:14    5    Q.   So all those five years out in the field, on airplanes,

6    installing rides, fixing rides, you never got customer

7    feedback?

8    A.   We did, but I was never working with the owners.  I was

9    never working with the decision-makers who were actually the

03:14    10   ones purchasing the attractions.  I would work with the

11   maintenance guy who would show up and meet me at the door.  He

12   would unlock it, and he'd say I don't like that right there.

13   It keeps breaking.  That's the guy I would deal with.  That's

14   important to get that feedback, but it's really important to

03:14    15   get the feedback from the decision-maker.

16   Q.   It sounds like the answer to my question, in your five

17   years as an engineer and product manager, you didn't figure

18   this out, but in less than 20 days at PSD from all the things

19   you did, that's when you figured this out, correct?

03:15    20   A.   Yeah, based on the market feedback and the research we were

21   doing, that's what led me to this design, which is something

22   like nobody else was doing at the time.

23   Q.   Did you get a patent for this?

24   A.   I don't think you could apply for a patent on that.  I

03:15    25   think it's just a good design.

1    Q.   For any of the changes that you showed in the earlier

2    slides today, did you get a patent for any of those design

3    improvements?

4    A.   No.  We discussed doing patents, and basically the net idea

5    of water going up a hill was kind of the original nexus.

6    That's, like, you couldn't do anything other than -- in the

7    sheet wave space without that patent.  So as that patent

8    expired, that was kind of like the blue ocean patent that

9    covered everything that could possibly be done in the space.

10   Q.   You're giving me the why.  I'm trying to figure out the

11   what.

12       Did you get any patents on any of those?

13   A.   We didn't think any of the features were innovations that

14   we did were that innovative that would justify a patent.

15   Q.   Again, Mr. Alleshouse --

16   A.   What's the point of having a patent on a cup if I can buy

17   another cup?

18   Q.   You're giving me the why.  I'm trying to get the what, if

19   we can get through this this afternoon.

20       Does PSD have any patents today?

21   A.   No.

22   Q.   Were you the first person to come up with the idea of

23   reducing the size of the water reservoir?

24   A.   In the history of man or in --

25   Q.   In the history of sheet wave water rides.

```
 1  A.  I don't think I can claim that.
 2  Q.  And did, in fact, Wave Loch have any rides that had
 3  reduced-capacity water reservoir?
 4  A.  I don't think it was ever a focus and definitely not at all
 5  to the extent that this was --
 6  Q.  So the answer to my question, did they have sheet wave
 7  water rides, like the Wave-In-A-Box that had a much smaller
 8  water reservoir, did they?
 9  A.  They had a Wave-In-A-Box that had a smaller water reservoir
10  because its footprint was smaller.
11  Q.  Okay.  And you were familiar with that from the time you
12  were at Wave Loch?
13  A.  Yes, the ride was smaller, and, therefore, it had less
14  water volume.  It wasn't designed to minimize water volume.
15  Q.  Okay.
16          MR. O'HARE:  Counsel may inquire.  Thank you.
17          THE COURT:  All right.
18                     REDIRECT EXAMINATION
19  BY MR. KOLEGRAFF:
20  Q.  Richard, could I ask you to come down here again?
21  A.  Yes, sir.
22  Q.  This will hopefully take two minutes.  We'd like to take
23  two bolts out, and I will assist, if I can.  Is that
24  acceptable?
25          THE COURT:  That's fine by me.
```

```
 1        MR. O'HARE:  I don't mean to be a fly in the ointment.
 2  I have no idea what they're going to do.
 3        THE COURT:  Well, I don't either.  We're going to find
 4  out in a minute.
 5  BY MR. KOLEGRAFF:
 6  Q.  A little earlier, we were talking about what the metal flap
 7  was.  What is the metal flap?
 8  A.  This is the metal nozzle flap.
 9  Q.  Does the metal flap have any flexibility whatsoever?
10        MR. O'HARE:  Let me try.  I was going to bend it over
11  your knee.
12        THE WITNESS:  I mean --
13        THE COURT:  Did you say bend it over his head or --
14        THE WITNESS:  No, this is stiff as a board.  If you
15  would --
16  BY MR. KOLEGRAFF:
17  Q.  And so that metal plate, the metal flap is then attached to
18  the nozzle with a hinge?
19  A.  The metal flap would be, you know, attached with those two
20  bolts that we just saw come out and attached to this hinge that
21  restricts its movement to rotate off this axis.
22  Q.  So the metal flap is an entirely separate piece from the
23  hinge?
24  A.  Yes, this is a nozzle flap piece.  That is a hinge.
25  Q.  You're welcome to go back.
```

03:18 (line 5)
03:19 (line 10)
03:19 (line 15)
03:19 (line 20)
03:20 (line 25)

876

A.   And contrast that to this where this is one continuous
piece.

Q.   You're welcome --

     MR. KOLEGRAFF:  I have no further questions.

     MR. O'HARE:  Nor do I, Your Honor, and I don't want to
try to put that back together.

     THE COURT:  No, you're done.  You're excused.  Thank
you.

   Okay.  Well, just out of curiosity, Counsel, how much
longer do you have as far as your case is concerned?

     MR. THOMAS:  You know, I --

     THE COURT:  I'm not trying to rush you.

     MR. THOMAS:  It's an important question for everybody
to know.

   I would do our best to -- we think we can complete our
testimony phase of this case on Tuesday, but it might run into
Wednesday morning.

     THE COURT:  Okay.  Call your next witness.

     MR. THOMAS:  We call Mr. Yong Yeh.

                           YONG YEH,

               DEFENDANT'S WITNESS, SWORN

     THE CLERK:  Would you state and spell your full name
for the record.

     THE WITNESS:  Yong Lee Yeh, First name Y-O-N-G, last
name Y-E-H, and it's Yankee Oscar November Golf, Yankee Echo

1    Hotel.

2           THE COURT:  You're going to have to slow down, I can

3    tell you right now.

4           THE WITNESS:  I'm sorry.

03:21   5      THE COURT:  Slow down.  All right.

6                       DIRECT EXAMINATION

7    BY MR. THOMAS:

8    Q.   Okay.  So we're all going to speak slow.  I was in a

9    courtroom one time, and the judge would always have a "No

03:22   10   Speeding" sign behind the witness stand.

11          Okay.  Good afternoon, Mr. Yeh.  Where are you currently

12   employed?

13   A.   I'm currently employed with Pacific Surf Designs,

14   Incorporated.

03:22   15   Q.   And what is your position?

16   A.   CEO.

17   Q.   And prior to your joining Pacific Surf Designs, give us

18   your background, your educational background, beyond high

19   school.

03:22   20   A.   I attended UC Berkeley and majored in molecular and cell

21   biology with a minor in English literature.

22   Q.   What a diverse array of topics to be majoring in.

23          And I think I heard from Richard that you guys attended

24   Cal Berkeley at the same time.

03:22   25   A.   That's correct.  We were in the same fraternity.

1   Q.   Okay.  And following your graduation at Cal Berkeley, what

2   did you do next in the way of your education?

3   A.   I received a JD at the University of San Diego School of

4   Law, and then I received an LLM in taxation from the Georgetown

03:23   5   University Law Center in Washington, D.C.

6   Q.   Okay.  And are you a member of the California Bar?

7   A.   That's correct.

8   Q.   Okay.  And at some point, did you practice law?

9   A.   I did.  I started out at Weil, Gotshal & Manges out of

03:23   10   New York City.  If you've been out there, it's where the Apple

11   store is with the big glass cube.  I was there for a couple

12   years practicing tax law, and then I went to Morrison &

13   Foerster in Silicon Valley doing some public company work.  And

14   then I went to Cooley doing some start-up work and public

03:23   15   company work.

16   Q.   Okay.  And so you were at three, what we'll call, major

17   national law firms.  Is that correct?

18   A.   That's correct.

19   Q.   Okay.  But you never specialized in patent law while you

03:23   20   were practicing law, did you?

21   A.   I did not, but I'm qualified to sit for the patent bar

22   based on my educational background.

23   Q.   Have you done that?

24   A.   I have not.

03:23   25   Q.   Okay.  So you didn't really practice patent law.  You are

1   qualified to take the patent bar, but you haven't done that

2   process, correct?

3   A.   That's correct, sir.

4   Q.   Let's go back to Pacific Surf Designs.

03:24   5        When did you first get involved with Mr. Alleshouse in

6   deciding to form this company?

7   A.   Back in the spring of 2012, I had left Cooley, which was

8   the law firm I was at, to -- at the time my father was quite

9   ill and was on his way out, so I kind of wanted to spend as

03:24   10  much time with him before he went.  He ended up passing away

11  the day after Whitewater sued us, so you'll learn about that.

12  But then I was doing some investing on behalf of my family's

13  venture business, and I have a foundation myself, so I was

14  doing some charitable work.

03:24   15  Q.   Okay.

16  A.   And so then that's when I found out my wife was pregnant

17  with our first daughter, and I went and called Richard, because

18  he was one of my good friends from college, to let him know,

19  and we kind of started talking, and he was at a point in his

03:25   20  life where he wanted to do something different, and I was at

21  the same junction in my life as well.

22  Q.   When was that phone call?  Do you recall?

23  A.   July, maybe June, July 2012.

24  Q.   Okay.  So you originally -- you just called him to give him

03:25   25  news and updates about you and your wife and your first child?

1  That was the primary purpose of that phone call?

2  A.   Yeah, I was calling other people telling them the same

3  thing.

4  Q.   And then as you -- the conversation continued, you started

5  talking about what you were doing professionally and what he

6  was doing professionally, which led to a discussion about

7  possibly a future business opportunity together?

8  A.   Yeah, I think we were both wanting to have more control

9  over the hours, the -- kind of our own boss, so to speak.

10  Q.   Okay.  All right.  And then following this phone call in or

11  about July of 2012, what happened next in connection with your

12  efforts regarding Pacific Surf Designs?

13  A.   I started to kind of -- I wanted to get -- when I was an

14  attorney, we had a due diligence process.  Whenever we would do

15  any kind of transactional work, you want to understand both

16  parties, so I started taking that approach and looking at this

17  sheet wave industry or just the wave industry in general.  So I

18  looked at different people in the space, Richard's company

19  Wave Loch, American Wave Machines, there's, like, Webber Pools,

20  which is trying to make a surf pool.  Anything I could look at,

21  American Wave Machines' products and videos.

22  Q.   And how did you access that information, by just going to

23  publicly available information on the websites or there's some

24  other ways that you did that?

25  A.   Yeah, the websites were the first thing I would look at.

1    YouTube videos, newspaper clippings, things like that.

2    Q.   Beyond that, what else did you do?

3    A.   Talked to Richard, kind of looked at their FAQ pages,

4    things like that.

03:26    5    Q.   Okay.  And at some point, did you start considering the

6    patents that were in the sheet wave industry space?

7    A.   Yeah.  Because at the time, Wave Loch was suing American

8    Wave Machines, so that was something that would pop up on any

9    Google search.  I went to Wave Loch's FAQ page, like their

03:27   10    frequently asked questions page, and noticed a large number of

11    patents listed, and I noticed that a lot of them had leading

12    numbers with 4s, which would indicate these patents were quite

13    old, and so I kind of looked into it because at the time, I

14    think Your Honor might remember, there was a Solo cup case that

03:27   15    had just come out, where if you mislabel a product with an

16    expired patent or a wrong patent number, you are entitled

17    potentially for $500 per instance of that violation.  And a

18    Solo cup, like what you drink, that you go to a party and drink

19    beer out of or something, each one of those cups were

03:27   20    mislabeled, so the damages of every one of those cups that was

21    manufactured times $500 was like $5 trillion in damages, which

22    was half of our national debt.  So it would be kind of hard for

23    Solo to pay that.  And so everyone knew in the general,

24    nonlegal space that it was kind of a funny outcome.

03:28   25        So I looked at theirs, and I noticed that 17 or 19 of the

1    26 patents had already expired, and I was wondering how could

2    they just do that even though this case had come out a couple

3    days earlier?  Why wouldn't they switch their website?  It got

4    me curious.

03:28    5    Q.  Let's go back.  You mentioned this FAQs.

6            MR. THOMAS:  Let's put up Exhibit LZ, Defendant's

7    Exhibit LZ, if we could, on the screen.  I'm going to have to

8    return over here.

9            THE COURT:  Glenn, call IT and find out what's going

03:28   10    on with our monitors.

11            THE CLERK:  I already did, Judge.

12            THE COURT:  While he's doing that, the $64,000

13    question:  Are you a surfer?

14            THE WITNESS:  I am.

03:28   15            MR. THOMAS:  And you're a lawyer, and you live in

16    California.

17            THE WITNESS:  Yeah, so sorry, Mr. O'Hare.  Oh, no,

18    sorry.  Who was -- sorry, Mr. Chutter.  I grew up surfing,

19    playing baseball, playing football, basketball, snowboarding.

03:29   20            MR. O'HARE:  That's okay.

21    BY MR. THOMAS:

22    Q.  Back to business.  I think we have the screen up.

23        This is Exhibit LZ.  You can see that, I think, and I

24    believe the jury can as well.

03:29   25        This is what you referred to in your testimony, these FAQs

1  or frequently asked questions?

2  A.  Correct.

3  Q.  Okay.

4  A.  This is from FlowRider's website, which is like 2014, but

03:29  5  Wave Loch had the exact same text on their site.

6  Q.  Okay.  So you went on there, and then this is how you

7  discovered the patents that were being displayed on the

8  website?

9  A.  Yeah.  If you scroll down, you'll see where they're listed.

03:29  10  Right there.

11  Q.  And --

12          MR. THOMAS:  Make it slightly bigger.

13  BY MR. THOMAS:

14  Q.  And did you ascertain that some of these referenced patents

03:30  15  on the -- on this FlowRider website were expired?

16  A.  Yes, I think 19 out of the 26 were expired.

17  Q.  And I believe you testified that Wave Loch had a website

18  with the same information on it.  Is that correct?

19  A.  That's correct.

03:30  20  Q.  And you looked at that as well?

21  A.  I did.  This website did not exist at the time, in 2012.

22  Q.  Okay.  So you first looked at the Wave Loch website, and

23  did it have that exact same information about the patents?

24  A.  Yeah, almost word for word.

03:30  25  Q.  Okay.  So you determined that there were a lot of patents,

1    but then you discovered that there were patents that had

2    expired, and I don't know how many were listed there.

3         Can you recall how many there were without taking the time

4    to count them?

03:31   5    A.   Yeah, there's 26.

6    Q.   26, and only nine were active.  Is that right?

7    A.   I believe so.

8    Q.   Okay.  Let me show you Exhibit 483, page 9, and we'll try

9    to blow that up.

03:31  10        First off, you recognize this document, Mr. Yeh?

11   A.   I do.

12   Q.   Okay.  Just explain to the jury, what is this document?

13   A.   Yeah.  So as counsel for plaintiffs was asking Richard, at

14   the top of this, you'll see an Appendix B if you scroll up a

03:31  15   little bit, so the document that Richard was just looking at,

16   that was to Heath Phillips, this was the Appendix B that's

17   referenced in that document, so I created this for Mr. Phillips

18   as we were hoping to sell him our first wave, and he had -- you

19   know, at the time, Wave Loch was suing American Wave Machines,

03:32  20   and Mr. Phillips was aware of that, so he asked us at IAAPA,

21   and this is part of the document we created to kind of

22   alleviate some of his concerns.

23   Q.   Okay.  So you met Mr. Phillips at the IAAPA conference?

24   A.   That's correct, in November of 2012.

03:32  25   Q.   And where was that held?

1  A.   Orlando, Florida, where it is every year.

2  Q.   Okay.  And so you met with him, you had a discussion with

3  him, and then you -- he expressed some interest in the designs

4  that you guys were contemplating for Pacific Surf Designs.  Is

03:32  5  that correct?

6  A.   That's correct.  Heath was a younger gentleman and seemed

7  kind of Richard and I's age, and we seemed to connect with him

8  quite well and wanted to work with him.

9  Q.   And the -- I'm standing back, so it's hard for me to read.

03:32  10  The left-hand column are all the patent numbers.  Is that

11  correct?

12  A.   That's correct.  Those are all the patent numbers from the

13  Wave Loch website.

14  Q.   Okay.  This would have been the 26 or so patents that were

03:33  15  on that website that you reviewed, correct?

16  A.   Yes, sir.

17  Q.   And then on the right-hand column, it shows the following

18  date, issue date, expiration date.  Do you see those headings

19  at the top?

03:33  20  A.   I do.

21  Q.   And then on the far right side, it's in shaded red color.

22  Those that are below that shaded red color are a little harder

23  to read.  If you're close, you can read them, I guess, but

24  nonetheless, the column with the shaded red on it, those are

03:33  25  expired patents.  Is that correct?

1   A.   Yes, sir.

2   Q.   Where they're not expired, I can see that there were some

3   that were close to expiring at the time because you showed

4   expiration dates of October 15, 2013, for the '859; and March

03:34   5   9, 2014, for the '597; May 13, 2014, for the '584.   Do you see

6   those three?

7   A.   Yes, sir.

8   Q.   So those were on the cusp of expiring at the time you

9   prepared this?

03:34   10   A.   That's correct.

11   Q.   Okay.   And so you provided this information as a follow-up

12   to Mr. Heath.   Is that correct?

13   A.   Yeah, his name is Heath Phillips.

14   Q.   Sorry.   Heath Phillips.

03:34   15       Okay.   All right.   Now, you were here when Mr. Alleshouse

16   testified, and he mentioned that there were discussions at

17   times with lawyers about patent interpretation and patent

18   reading.

19   A.   Yes.

03:35   20   Q.   And were you part of those discussions?

21   A.   I was.

22   Q.   And did you engage with some of the lawyers who you knew to

23   help facilitate those discussions?

24   A.   No.

03:35   25   Q.   Okay.   I mean, were you participating in some of those

 1   phone calls?

 2   A.   Oh, yes.

 3   Q.   I didn't mean to confuse you with the word "engagement."

 4   You didn't formally engage a law firm, but you availed

 5   yourselves of legal advice through a friends network that you

 6   had.  Is that right?

 7   A.   Yes.

 8   Q.   And approximately how many different lawyers did you speak

 9   to, do you recall, back when you were investigating these

10   patents?

11   A.   I would say maybe half a dozen.

12   Q.   Half a dozen.

13       Okay.  And Mr. Alleshouse testified that he was told and

14   that the boundaries of the claims are -- boundaries of the

15   patent are identified inside of the claims and not the

16   specifications.  Were you present for that discussion?

17   A.   Yes.

18   Q.   Okay.  All right.  And when you were looking at these

19   patents, is that how you evaluated the scope of the patents, by

20   looking at the claims?

21   A.   Of course, because the claims themselves, the body of the

22   patent, could talk about a whole host of things, but you have

23   to look at the claims because that's what's being protected.

24   Q.   Okay.  And when you looked at this '589 patent -- I could

25   show it to you, if we need to, but everybody's seen it so many

1    times, I'm going to avoid doing that on Friday afternoon, if I

2    can.  When you looked at the '589 claims, there was as it

3    relates to Claim 1, and Claim 1 is an independent claim, so

4    it's associated with several other dependent claims, as you

03:36    5    know.  But that independent claim where it talks about the

6    padded flexible tongue, you read that, correct?

7    A.   Yes.

8    Q.   And there's nothing in there about a hinge?

9    A.   No.

03:36   10    Q.   There's nothing in there about a metal plate inside the

11    flexible tongue as described in Claim 1?

12    A.   No.

13    Q.   All right.  And based on that, were you comfortable or

14    confident, based on your experience as a lawyer,

03:37   15    Mr. Alleshouse's experience as a mechanical engineer and

16    knowledge of the industry, that your launch of your sheet wave

17    products was not going to infringe on the '589 patent?

18    A.   That's correct, sir.

19    Q.   Okay.  Now, let me turn to, if I might, Exhibit 79.  I'm

03:37   20    sorry.  Yes.  Do you recognize this document, Mr. Yeh?

21    A.   Yes.

22    Q.   What is this?

23    A.   This was a draft of a -- like an investor pitch document

24    that I would have come up with at some point, 2014 maybe, 2015.

03:38   25    Q.   Okay.  And you do call this an investor pitch document.

1      Let me back up.  Were you trying to raise money at the time

2   you prepared this document?

3   A.  Well, this document was made after this litigation had

4   begun, so at this time -- I mean, I've done some investing

03:38   5   myself.  If a company's being sued, the likelihood of investing

6   in that company is pretty small, so this is kind of a draft

7   hoping, but not really being that hopeful.

8   Q.  Was it created for a specific event that you were going to

9   attend?

03:38   10  A.  No.

11  Q.  Okay.  Was it used at any events or given to anybody for

12  the purpose of raising money or investing money in Pacific Surf

13  Designs?

14  A.  No.

03:38   15  Q.  Okay.  And did this ever result in anyone investing -- any

16  third party, independent party, investing in the company as a

17  result of the projections and information that you put in this

18  document?

19  A.  No.

03:39   20      MR. THOMAS:  Now, let's scroll down, if we could.

21  Okay.  Stop there.

22  BY MR. THOMAS:

23  Q.  Target market.  You're talking about here in 2015 there

24  were 29 sheet wave installations globally, up from 20 in 2014.

03:39   25  Do you see that?

1   A.   I do.

2   Q.   Okay.  And how did you get that information?

3   A.   At this time, WhiteWater/FlowRider would have their

4   locations around the world on their website, and also we

03:39   5   knew -- at this point, we knew a lot of people in the industry

6   already, so we kind of knew where the projects were, and we

7   would know which projects we would not get that ended up

8   being -- that would end up having a sheet wave, so this is kind

9   of what we were using, publicly available information.

03:40   10          MR. THOMAS:  Let's scroll down a little further.

11   Okay.  Stop there.

12   BY MR. THOMAS:

13   Q.   You talk about sales and marketing.  This document talks

14   about, "PSD competes primarily with FlowRider."  Do you see

03:40   15   that?

16   A.   Yes.

17   Q.   "And with some additional lower-priced competition out of

18   Europe."  Do you see that?

19   A.   I do.

03:40   20   Q.   Okay.  You go on to say, "Buyers find us through Internet

21   searches and word of mouth.  Basically, if a buyer is

22   interested in a sheet wave, they will find us online.  We

23   supplement our marketing by exhibiting at several amusements

24   and real estate-focused trade shows a year with some targeted

03:40   25   magazine advertisements."

891

1    Do you see that?

2    A.   I do.

3    Q.   Was that accurate at the time, that you were basically

4    relying on word of mouth or people searching on the Internet if

03:41  5    they were looking for opportunities -- opportunities to select

6    a vendor for a sheet flow wave machine?

7    A.   Yes.

8    Q.   Okay.  All right.

9         MR. THOMAS:  Now, let's scroll down.

03:41  10   BY MR. THOMAS:

11   Q.   You mentioned litigation.  You have a section here on

12   pending litigation.  Do you see that?

13   A.   I see it.

14   Q.   So you were up front in saying anybody who saw this would

03:41  15   understand it, the point you made a moment ago, that you were

16   in litigation.  You didn't expect anybody to invest in a

17   start-up company that was subject to a patent litigation

18   lawsuit, did you?

19   A.   No.

03:41  20   Q.   And you mentioned you worked at Cooley in Silicon Valley.

21   You worked in an area of practice you were engaged in was in

22   the start-up practice.  Is that right?

23   A.   That's correct.

24   Q.   Okay.  And now, let's look at what you have down here.  You

03:41  25   have financials.  USD.  You go from '13, '14, '15, '16, and

1   '17, with '16 and '17 just being projected.  Do you see that?

2   A.   I do.

3   Q.   And so this would have been prepared sometime in '15.  Is

4   that right?

03:42   5   A.   That's correct.

6   Q.   And the numbers that were to the left in '13, '14 were

7   actual numbers.  Is that fair to state?

8   A.   Yes.

9   Q.   Okay.  And then for '16, you were projecting a sales

03:42   10  increase to 3.3 million and '17 to 7.5 million.  How did you

11  arrive at those projections?

12  A.   Those were from anticipated projects that we were going to

13  sign up.

14  Q.   Okay.  And we saw earlier in the trial some document -- I

03:42   15  think Mr. O'Hare put it up -- where their success rate was one

16  in 50?

17  A.   Yeah, one in 40, I think.

18  Q.   One in 40?

19  A.   One in 50, something like that.

03:42   20  Q.   And do these numbers reflect that one-in-40 success rate,

21  or they --

22  A.   I think, it's -- I mean, at the time, I don't really recall

23  exactly what the ratio would be, but it's a lot of leads you

24  would have to kind of go through.

03:43   25  Q.   Right.  Okay.  And like any financial projection, no one

1    would know for certain how viable they are, and so --

2    A.   No, no, from -- I'm from Silicon Valley, and some of these

3    hockey stick projections you'll see on these kind of

4    projections are -- I mean, they're, like, much more aggressive

03:43    5    than what we're doing.

6    Q.   Right, but investors tend to underestimate these

7    projections, these go-forward projections?

8    A.   Oh, of course, they're assumed to be -- they're assumed to

9    be more than is probably going to happen.

03:43   10    Q.   Right.

11           MR. THOMAS:   Okay.  Let's scroll down, if we might.

12    BY MR. THOMAS:

13    Q.   Well, then let's look at the -- talk about the sheet wave

14    market back at the time you prepared this document.

03:44   15           MR. THOMAS:   Leave it up for a moment.

16    BY MR. THOMAS:

17    Q.   Who were the -- who were the primary customer targets that

18    you would have had back in 2015?

19    A.   Well, I think our customer targets have been the same for

03:44   20    throughout our company's history.  We'd be going after water

21    parks because that's naturally a market that would benefit from

22    a sheet wave; hotels; FECs, which from, like, family

23    entertainment complexes; shopping malls, and that's even more

24    so today because a lot of the big-box stores are closing, and

03:44   25    they need more kind of like an experiential type of product to

1   bring people with foot traffic, so that's why we go to that

2   real estate show that was mentioned; resorts; stand-alone

3   venues.  That's a big one for us because all of our products

4   are custom-designed, so that's kind of what the big driver is

03:45   5   to a stand-alone venue is the ability to fit it into some

6   existing space and kind of have a little bit different than

7   another place.  That's -- and at the end of the day, it's

8   whoever would buy one.  If one of you guys wanted one in your

9   backyard, put it there.

03:45   10   Q.  Listening to Mr. Alleshouse's testimony, it sounds like

11   they -- while you have categories of product offerings, at the

12   end of the day, a lot of these are just custom-fitted to the

13   location and the needs of that specific customer.  Is that a

14   fair way of stating it?

03:45   15   A.  That's correct.  When we first started out, we went to,

16   like, a start-up form.  It's not this document, it's a

17   different one, but that was the one that plaintiffs kept asking

18   about.

19   Q.  We're going to get to that.

03:45   20   A.  Okay.

21   Q.  I'll show you that.  I just want to cover a little more

22   foundation.  We'll go into that in a moment.

23   A.  Sorry about that.

24   Q.  No worries.

03:45   25       So we talked about the potential customer list and then who

895

1    were -- who would you have considered were direct competitors

2    at that time?

3    A.   In 2012?

4    Q.   Well, yeah, 2012.

03:46  5    A.   2012 it was Wave Loch.  When Richard and I started the

6    company, I didn't know who WhiteWater was.  I didn't know who

7    they were for a year, and American Wave Machines was out there,

8    Murphy's Waves was out, Wavesurfer was out at the time, and

9    then there was another French company called MADEA Concept;

03:46  10   they were around.

11   Q.   So there were a number of competitors, but the largest of

12   which would have been what you thought was Wave Loch, which you

13   now learn is essentially WhiteWater?

14   A.   That's correct.

03:46  15   Q.   Okay.  Now, if we could call up Exhibit 68, I think this is

16   the document you were referencing a few minutes ago.  And,

17   Mr. Yeh, take a look.  Is this the document that you were

18   jumping ahead towards talking about?

19   A.   Yes.

03:46  20   Q.   Okay.  All right.  So we've got the right one up.  This is

21   a document.  It's entitled October 23, 2013, SVIEF

22   Presentation.  It has Mr. Alleshouse's name and your name.  And

23   what is the SVIEF presentation?

24   A.   This will clear up what Dr. Vigil was talking about.

03:47  25   Silicon Valley Innovation and Entrepreneurship Forum.  It's an

1    annual conference in Santa Clara for Chinese Nationals and

2    English-as-a-second-language-speaking Chinese citizens of the

3    United States to attend a forum where -- the year we were doing

4    it, Al Gore was going to speak, so a bunch of people coming to

03:47    5    learn about Silicon Valley, who weren't really very familiar

6    with the space, hear about how startups might function, meet

7    other startups, and maybe connect the supply chain to China.

8    That was the purpose of the forum.

9        We were interested because I got a random email saying

03:48    10    would you like to apply?  And Richard and I had yet to do a lot

11    of public presentations yet, public speaking, so we said hey,

12    why not?  Let's try.  Granted, the start-ups they were looking

13    for was not us, they were looking for apps, medical devices.

14    Q.  High tech?

03:48    15    A.  Yeah.

16    Q.  So this was actually held in or around October 23, 2013, in

17    the Silicon Valley?

18    A.  That's correct, Santa Clara Convention Center.

19    Q.  Okay.  So it was at the Convention Center, so it was a very

03:48    20    large gathering?

21    A.  Yeah, it's huge.

22    Q.  Okay.  Who prepared this document?  Did you both work on

23    it?

24    A.  Yeah, we're a two-person company.  Pretty much everything

03:48    25    we do, we both work on because that's just naturally how it

1  happened.

2  Q.   Okay.  So the team is you and Mr. Alleshouse.  So

3  that's -- and that's at the time an accurate description of

4  your backgrounds.  Is that correct?

03:49  5  A.   That's correct.

6         MR. THOMAS:  Okay.  Now, if we could turn to page 10

7  of this document.  Okay.  I'm sorry.  Go back previous.  Here.

8  Okay.  Page 9.

9  BY MR. THOMAS:

03:49  10  Q.   Now, this is identifying your competitors, direct

11  competitors, and those with comparable offerings.  Do you see

12  that?

13  A.   I do.

14  Q.   Okay.  And it also gives market pricing.  These are the

03:49  15  offerings that are -- the pricing that was -- you determined by

16  looking at websites.  Is that correct?

17  A.   For the pricing, not a lot of pricing would be available on

18  the website; for example, Wave Loch, I think, at the time said

19  their price was between a Ferrari and a spaceship or something

03:49  20  like that.  I don't know.  So some of these were -- I could

21  glean from any kind of municipal project would have public

22  information, but others, just kind of asking around or hearing

23  what the pricing was.  It was just -- the ones I wasn't sure

24  of, I just made an educated guess based on the information I

03:50  25  had.

1    Q.   Okay.  Now, you brought this document, did you not, to this

2    conference at the Santa Clara Convention Center?

3    A.   That's correct.

4    Q.   And did you hand it in to anybody or --

03:50    5    A.   It was provided to the SVIEF personnel.

6    Q.   Okay.  And you mentioned you got a random email is how you

7    got connected to this opportunity?

8    A.   Yeah, tickets were free, so there were like 5,000 people

9    that attend annually.

03:50    10   Q.   Okay.  And it was kind of a blind or -- the email was

11   uninvited by you, it was kind of unexpected?

12   A.   Yeah, of course.

13   Q.   Okay.  And then you had to fill out some paperwork, and you

14   had to put together some materials for your company to

03:51    15   participate in this event at the Santa Clara Convention Center,

16   correct?

17   A.   Yes, sir.

18   Q.   Okay.

19        MR. THOMAS:  Unfortunately, my screen again has left

03:51    20   me, so I'm going to --

21        THE COURT:  Then that's a good time for us to break

22   for the evening.  See, the Lord works in mysterious ways.  All

23   right.  Now, before you go -- you can step down.

24        THE WITNESS:  Okay, thanks.

03:51    25        THE COURT:  Before you go, so you're going to get a

899

1    three-day weekend.  Very, very tempting during that time to do

2    a couple of things:  First of all, to make up your mind as to

3    how you're going to decide this case.  Don't do that.  Because

4    you haven't heard the whole case.  More importantly, you

03:51    5    haven't heard my riveting jury instructions that will follow

6    the case, which is the law that you live by.

7         The second thing that's very tempting to do is to talk to

8    people about the case.  Don't do it.

9         The third thing that's really easy to do is to get online

03:52   10    or get out your dictionary perhaps or start looking up things

11    that might have come to your mind.  Okay?  Don't do that.

12    Okay?  If you do, some really bad things could happen.  I don't

13    want bad things to happen.  I want to be a happy camper.

14         So let's have a very, very nice and safe weekend.  We will

03:52   15    see you on Tuesday morning promptly at 9:00 -- yes, sir?  You

16    have a question?

17              PANEL MEMBER:  Juror Number 16.

18         You had mentioned possibly next Friday when you were

19    uncertain whether you were going to be here or not.  Do we have

03:52   20    any decision on that?

21              THE COURT:  I don't have a decision because I don't

22    know how the case is going to unfold.

23              PANEL MEMBER:  Okay.

24              THE COURT:  It may be that I can get another judge to

03:53   25    sit in for me.  I'm not going to tell you why.  So it's

1    possible that if you're deliberating, I may be able to get
2    another judge to sit in for me, in which case I will have you
3    come in for deliberations.  Probably, but don't hold me to
4    this, probably, I'll give you a three-day weekend next weekend
03:53   5    as well.  Okay?  But don't hold me to it.
6        All right.  Have a great weekend.  See you on Tuesday
7    morning at 9:00 a.m.  We're in recess.
8        Counsel, sit still for just a second.
9        (Proceedings held outside the presence of the jury panel.)
03:54   10       THE COURT:  The jury has left the courtroom.
11       First of all I want to thank you all.  I am really enjoying
12   this presentation.  I think everybody's doing a great job and
13   some really good lawyering going on, I might add.  I've enjoyed
14   the witnesses on both sides, and I just want to tell you that
03:54   15   because usually what we hear from people is, you know, you're
16   going to whine and complain about something, and I just wanted
17   to be positive.
18       MR. THOMAS:  Thank you.  It's nice to hear a very
19   veteran and experienced judge like yourself.  That's a high
03:54   20   compliment.
21       MR. O'HARE:  Never heard a complaint from the bench,
22   ever.
23       MR. THOMAS:  Well, I have.
24       THE COURT:  Anyway, but I did give you some homework
03:54   25   to do over the weekend.

1          MR. THOMAS:  We're in the process with that.  I'm

2    going to get their draft by tomorrow morning, and maybe even

3    tonight, and I'll go through that.

4          THE COURT:  Great.  You've got till Tuesday, so

03:54  5    anyway, I wish you a great three-day weekend.  See you on

6    Tuesday morning.  We are in recess.

7                              ---oOo---

8

9                    C-E-R-T-I-F-I-C-A-T-I-O-N

10

11        I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14        Dated December 6, 2019, at San Diego, California.

15

16
                              /s/ Dana Peabody_____
17                            Dana Peabody,
                              Registered Diplomate Reporter
18                            Certified Realtime Reporter

19

20

21

22

23

24

25