1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

WHITEWATER WEST INDUSTRIES,     .
4  LTD., a Canadian corporation, .
                                .  Docket
5              Plaintiff,        .  No. 17-cv-1118-BEN-BLM
                                .
6              v.                .  December 3, 2019
                                .  12:45 p.m.
7  PACIFIC SURF DESIGNS, INC., a .
   Delaware corporation, and FLOW.
8  SERVICES, INC., a California  .
   corporation,                 .
9                               .
              Defendants.        .  San Diego, California
10  . . . . . . . . . . . . . . .

11          TRANSCRIPT OF JURY TRIAL, VOLUME 1B
             BEFORE THE HONORABLE ROGER T. BENITEZ,
12        UNITED STATES DISTRICT JUDGE, AND A JURY

13                 A-P-P-E-A-R-A-N-C-E-S

14  For the Plaintiff:      Snell & Wilmer LLP
                           600 Anton Boulevard, Suite 1400
15                          Costa Mesa, California 92626
                           By:  WILLIAM S. O'HARE, ESQ.
16                          – and –
                           Buchalter, A Professional Corporation
17                          18400 Von Karman Avenue, Suite 800
                           Irvine, California 92612-0514
18                          By:  ROGER L. SCOTT, ESQ.
                                J. RICK TACHÉ, ESQ.
19
   For the Defendants:      Thomas, Whitelaw & Kolegraff LLP
20                          18101 Von Karman Avenue, Suite 230
                           Irvine, California 92612-7132
21                          By:  JOSEPH THOMAS, ESQ.
                                WILLIAM J. KOLEGRAFF, ESQ.
22
   Court Reporter:          Chari L. Bowery, RPR, CRR
23                          USDC Clerk's Office
                           333 West Broadway, Suite 420
24                          San Diego, California 92101
                           chari_bowery@casd.uscourts.gov
25  Reported by Stenotype, Transcribed by Computer

1          SAN DIEGO, CALIFORNIA; DECEMBER 3, 2019; 12:45 P.M.

2                            -o0o-

3      (The following proceedings were held in open court out of

4  the presence of the jury:)

5          THE COURT:  Be seated.  We will let you know when we

6  are ready to bring the jury in.

7      Counsel, with regards to the jury instructions, jury

8  instruction number one talks about the jurors have

9  instructions, to keep the instructions during the trial.  I

10 don't normally do that.  We would have to have eight jury

11 instructions, and I think that would be very distracting to

12 them.  So I am not going to let them have the jury instructions

13 during the trial, so everybody understands.

14         MR. O'HARE:  Yes, Your Honor.  That's fine.

15 (Pause.)

16         MR. THOMAS:  Your Honor, Mr. O'Hare and I have worked

17 out a pretty broad stipulation on the admissibility of most of

18 the exhibits.  To save everybody time, unless you prefer

19 otherwise, we can show -- the stuff he is going to put on, he

20 can show the witness without moving to admit it, unless you

21 want him to move to admit it, as far as I am concerned.  We can

22 put together a written stip covering those exhibits if the

23 Court would like that, but I am just -- in terms of getting the

24 trial on faster and more efficient, foundation is not going to

25 be an issue.  Moving stuff into evidence formally isn't.

1          THE COURT:  Okay.  So, can we do this:  Unless

2     there's an objection to the exhibit, once it is moved into

3     evidence, or once -- I guess that wouldn't work, would it?

4          MR. O'HARE:  Actually, I think we are going to have

5     something that's a little more comprehensive, Your Honor.  We

6     ultimately plan to have a comprehensive joint exhibit list, and

7     all but a relatively small number of those exhibits the parties

8     are going to agree may be admitted upon request, not dump all

9     of them necessarily into evidence, but as requested by either

10    side.  And I believe in one of the pretrial filings -- we are

11    going to update it because we have been talking more -- we will

12    actually identify those where we have objections and get those

13    before the Court before there's an issue on them.  So it's

14    going to be a relatively small subset of a large list.

15         For purposes of the opening and our initial witnesses, we

16    don't expect any speed bumps.  And the only reason we are

17    redoing the list is because we are making more agreements.

18         THE COURT:  Great.  Listen.  I always encourage

19    lawyers and parties to work these things out, and I thank you

20    for your efforts in doing that.

21         So, unless I hear something that alerts me to the fact

22    that there's some objection, I am going to just assume that

23    it's being admitted without objection.

24         MR. THOMAS:  Yes.  Yes.  And it can be shown to the

25    witness unless there's some objection.

1            THE COURT:  And you will alert me?  You are not shy?

2   You are not bashful?

3            MR. THOMAS:  No.  But we have agreed to continue to

4   meet and confer, and I think we can resolve everything.

5            THE COURT:  Great.  Wonderful.

6        I don't know where my juror went.

7            MR. THOMAS:  We had so many leave already. (Pause.)

8            THE COURT:  I tell you what.  I am going to step off

9   the bench.  When the juror gets here, which will be, hopefully,

10  sometime today, we resume trial.  Okay.

11       (Recess taken from 12:58 p.m. to 1:02 p.m.)

12       (The following proceedings were held in open court out of

13  the presence of the jury:)

14           THE COURT:  Since they are not here, these jury

15  instructions that apparently were agreed to, as I understand

16  it -- there's a jury instruction that says -- and I am at page

17  15.  It says the Court should show the jury the patent at issue

18  and point out the parts.  Is that right?  You want me to show

19  the jury the patent?  I thought you folks were going to address

20  that in your opening statement.

21           MR. THOMAS:  We are, Your Honor.  I am comfortable

22  withdrawing that.

23           THE COURT:  And it also says, "I have determined the

24  meaning of the claims of the '589 patent."  I guess that was my

25  claim construction.  But it also says, "You have been given a

1    document reflecting those meanings."  I don't have any such

2    document.

3              MR. O'HARE:  Perhaps it should be "will be"?

4              THE COURT:  Yes.  So it is not going to happen now.

5    They will be given a document reflecting those meanings, but it

6    won't happen at this stage of the trial.

7         If you want to address it, I certainly am not going to

8    stop you, because if I have already ruled on claim construction

9    in the claim, you can certainly address it.  You can say "the

10   judge has ruled," and I don't have any problems with that.

11   Okay.

12        All right.  I say this; I say I give this juror ten more

13   minutes.  If the juror is not here, we will get started.  I

14   hate to do it, but we can't wait around forever.

15             MR. THOMAS:  Can the Court inform us which juror is

16   missing?

17             THE COURT:  Let me find out.

18        (Brief discussion off the record.)

19             THE COURT:  I can't say I have ever had this happen

20   to me before.  Maybe we can talk about what to do if the juror

21   doesn't show up.  We have a couple of alternatives.  One is to

22   proceed with seven jurors.  We only need six, granted.  So we

23   could do that.  I am certainly open to any other suggestions

24   you might have.

25        (Brief discussion off the record.)

1          THE COURT:  Was that -- Juror Number 15?  Was that

2    the juror who worked in -- who said he was a tinkerer?

3          MR. THOMAS:  That's the guy.  He had an umbrella.

4       Your Honor, we are prepared to go with seven, if it comes

5    to that.

6          MR. O'HARE:  If it comes to that.  Otherwise, we have

7    to bring in more people, and I think we are fine with seven.

8    If you want to give them a few more minutes.

9          MR. THOMAS:  I don't mind giving them more time.

10         THE COURT:  Let's give him until quarter after.  I

11   don't want to jinx it, but obviously we could go down below

12   six, if the parties stipulate to it, if need be.

13         MR. O'HARE:  I think we will give that some thought.

14         THE CLERK:  Jury entering.

15      (The following proceedings were held in open court in the

16   presence of the jury:)

17         THE COURT:  Welcome back.  So, Juror Number 11, I

18   don't want to single you out, but I guess you have already been

19   singled out.  I said we would be here at a quarter till.  It's

20   now five minutes after.  I am going to say this for the benefit

21   of all of you.  It's important that you be here promptly at the

22   time that I say.

23      Now, sometimes I may not be here promptly because I may

24   have issues that I am talking to the lawyers about, or I may

25   have something that I need to be doing in my chambers that may

1    keep me from coming out at the time that I said I would be

2    here.  But I promise you, I will be here on time every day.

3    Whether you see me or not, I will be here on time, and it's

4    equally important that you all be here when I say you are here,

5    at least outside those doors, because otherwise the trial is

6    going to take a lot longer than we anticipate.  And, of course,

7    you are keeping other people waiting, and that's not a great

8    thing to do.  So please try to be prompt and timely from now

9    on.  Okay?

10            JUROR:  I apologize.

11            THE COURT:  All right.  Now, members of the jury, you

12   are now the jury in this case, and it is my duty to instruct

13   you on the law.  These instructions are preliminary

14   instructions to help you understand the principles that apply

15   to civil trials and to help you understand the evidence as you

16   listen to it.  You will be allowed to keep this set of

17   instructions at the time of your deliberation.

18       It is your duty to find the facts from all the evidence in

19   the case.  To those you will apply the law as I give it to you.

20   You must follow the law as I give it to you whether you agree

21   with it or not.  And you must not be influenced by any personal

22   likes or dislikes, opinions, prejudices, or sympathy.  That

23   means that you must decide the case solely on the evidence

24   before you.  You will recall that you took an oath to do so.

25            Please do not read into these instructions or anything

1    that I may say or do that I have an opinion regarding the

2    evidence or what your verdict should be.

3        This case involves a dispute relating to a United States

4    patent.  Before summarizing the position of the parties and the

5    issues involved in the dispute, let me take a moment to explain

6    what a patent is and how one is obtained.  Patents are granted

7    by the United States Patent and Trademark Office, sometimes

8    referred to as the "PTO."  A valid United States patent gives

9    the patent holder the right, for up to 20 years from the date

10   the patent application was filed, to prevent others from

11   making, using, offering to sell, or selling the patented

12   invention within the United States, or from importing it into

13   the United States, without the patent holder's permission.

14       A violation of the patent holder's rights is called

15   infringement.  The patent holder may try to enforce a patent

16   against a person believed to be infringing by a lawsuit filed

17   in federal court.  The process of obtaining a patent is called

18   "patent prosecution."  To obtain a patent, one must first file

19   an application with the PTO.  The PTO is an agency of the

20   federal government that employs trained examiners, who review

21   applications for patents.  The application includes what is

22   called a specification, which contains drawings and a written

23   description of the claimed invention, telling what the

24   invention is, how it works, how to make it, and how to use it.

25       The specification includes one or more numbered sentences.

1    These are the patent claims.  When the patent is eventually

2    granted by the PTO, the claims define the boundaries of its

3    protection and gives notice to the public of those boundaries.

4         After the applicant files the application, an examiner

5    reviews the application to determine whether or not the claims

6    are patentable -- that is, appropriate for patent protection --

7    and whether or not the specification adequately describes the

8    invention claimed.

9         In examining a patent application, the examiner reviews

10   certain information about the state of the technology at the

11   time of the application.  The PTO searches for and reviews

12   information that is publicly available or that is submitted by

13   the applicant.  This information is called the "prior art."

14   The examiner reviews this prior art to determine whether or not

15   the invention is truly an advance over the state of the art at

16   the time.

17        Prior art is defined by law, and I will give you, at a

18   later time during these instructions, specific instructions as

19   to what constitutes prior art.  However, in general, prior art

20   includes information that demonstrates the state of technology

21   that existed before the claimed invention was made or before

22   the application was filed.  A patent lists the prior art that

23   the examiner considered in determining whether or not the

24   invention is truly an advance over the state of the art at the

25   time.  This list is called the "cited references."

1    After the prior art search and examination of the

2    application, the examiner informs the applicant, through the

3    law firm representing the applicant, in writing of what the

4    examiner has found and whether the examiner considers any claim

5    to be patentable and thus would be allowed.  This writing from

6    the examiner is called an "office action."

7    If the examiner rejects the claims, the applicant

8    directly, or through legal counsel, has an opportunity to

9    respond to the examiner to try to persuade the examiner to

10   allow the claims and to change the claims or to submit new

11   claims.  This process may go back and forth for some time until

12   the examiner is satisfied that the application meets the

13   requirements for a patent and the application issues as a

14   patent or that the application should be rejected and no patent

15   should issue.

16   Sometimes patents are issued after appeals within the PTO

17   or to a court.  The papers generated during these

18   communications between the examiner and the applicant are

19   called the "prosecution history."

20   The fact that the PTO grants a patent does not necessarily

21   mean that any invention claimed in the patent in fact deserves

22   the protection of a patent.  For example, the PTO may not have

23   had available to it all other prior art that will be presented

24   to you.

25   A person accused of infringement has the right to argue

1   here in federal court that that claimed invention in the patent

2   is invalid because it does not meet the requirements for a

3   patent.  It is your job to consider the evidence presented by

4   the parties and determine independently whether or not Pacific

5   Surf Designs, Inc., and Flow Services, Inc., have proven that

6   the patent is invalid.

7        To help you follow the evidence, I will give you a summary

8   of the positions of the parties.  The parties in this case are

9   Whitewater West Industries, Ltd., referred to as "Whitewater,"

10  and Pacific Surf Designs, Inc., and Flow Services, Inc.,

11  collectively referred to as "PSD."

12       The case involves United States Patent Number 6,491,589,

13  filed by Thomas Lochtefeld and later transferred to Whitewater.

14  For your convenience and for the benefit of my court reporter,

15  the parties and I will often refer to this patent number by the

16  last three numbers of the patent number, namely, as the '589

17  patent.

18       Whitewater filed suit in this court, seeking money damages

19  from PSD for allegedly infringing the '589 patent by making,

20  selling, offering for sale, supplying or causing to be supplied

21  in or from the United States all or a substantial portion of

22  the components of a patented inferential within the United

23  States products, or products which are made by a process

24  patented in the United States, that Whitewater argues are

25  covered by Claims 1, 3, 13, 15, 17, 24 through 27, 29, 30, 37,

1   42 and 43 of the '589 patent.

2       The products that are alleged to infringe are PSD ProFlow

3   line of sheet-wave attractions, SuperTube sheet wave

4   attraction, and replacement and refurbishment services PSD

5   offers to owners of both its and Whitewater's sheet wave

6   attractions.

7       PSD denies that it has infringed Claims 1, 3, 13, 15, 17,

8   24 through 27, 29, 30, 37, 42 and 43 of the '589 patent.

9       PSD also argues that Claims 1, 3, 13, 15, 17, 24 through

10  27, 29, 30, 37, 42 and 43 are invalid.

11      I will instruct you later as to the ways in which a patent

12  may be invalid or unenforceable.  In general, however, a patent

13  is invalid if it is not new or is obvious in view of the state

14  of art at the relevant time or if a description in the patent

15  does not meet certain requirements.

16      A patent may be unenforceable if a party made a material

17  misrepresentation regarding the patent or had the intent to

18  deceive the PTO.  Your job will be to decide whether or not

19  Claims 1, 3, 13, 15, 17, 24 through 27, 29, 30, 37, 42 and 43

20  of the '589 patent have been infringed and whether or not those

21  claims are invalid or unenforceable.  If you decide that any

22  claim of the '589 patent has been infringed and is not invalid

23  or unenforceable, you will then need to decide any money

24  damages to be awarded to Whitewater to compensate it for the

25  infringement.

1        You will also need to make a finding as to whether the

2    infringement was willful.  If you decide that any infringement

3    was willful, that decision should not affect any damages award

4    you give.  I will take willfulness into account later.

5        I have already determined the meaning of the claims of the

6    '589 patent.  You will be given a document reflecting those

7    meanings.  For a claim term for which I have not supplied you

8    with a definition, you should apply the ordinary meaning.  You

9    are to apply my definitions of these terms throughout this

10   case; however, my interpretation of the language of the claim

11   should not be taken as an indication that I have a view

12   regarding issues such as infringement and invalidity.  Those

13   issues are yours to decide.  I will provide you with more

14   detailed instructions and the meaning of the claims before you

15   retire to deliberate your verdict.

16       The '589 patent is directed to simulated wave-ride

17   attractions, wherein a nozzle or sluice injects water over an

18   inclined ride surface and a sluice-ride slide over-cover

19   ensures the safety of riders.

20       In deciding the issues I have just discussed, you will be

21   asked to consider specific legal standards, and I will give you

22   an overview of those standards now and will review them in more

23   detail before the case is submitted to you for your verdict.

24       The first issue you will be asked to decide is whether PSD

25   has infringed the claims of the '589 patent.  Infringement is

1    assessed on a claim-by-claim basis; therefore, there may be

2    infringement as to one claim but not infringement as to

3    another.  There are a few different ways that a patent may be

4    infringed.  I will explain the requirements for each of these

5    types of infringement to you in detail at the conclusion of the

6    case.  In general, however, PSD may infringe the '589 patent by

7    making, using, selling, or offering for sale in the United

8    States, or by importing into the United States, a product or by

9    using a method meeting all the requirements of a claim of the

10   '589 patent.  I will provide you with more detailed

11   instructions on the requirements of each of those types of

12   infringement at the conclusion of the case.

13        Another issue you will be asked to decide is whether the

14   '589 patent is invalid.  A patent may be invalid for a number

15   of reasons, including because it claims subject matter that is

16   not new or is obvious.  For a claim to be invalid because it is

17   not new, PSD must show by clear and convincing evidence that

18   all of the elements of a claim are present in a single previous

19   device or method or sufficiently described in a single previous

20   printed publication or patent.  We call these "prior art."  If

21   a claim is not new, it is said to be "anticipated."

22        Another way that a claim may be invalid is that it may

23   have been obvious.  Even though every element of the claim is

24   not shown or sufficiently described in a single piece of prior

25   art, the claim may still be invalid if it would have been

1   obvious to a person of ordinary skill in the field of

2   technology of the patent at the relevant time.  You will need

3   to consider a number of questions in deciding whether the

4   inventions claimed in the '589 patent are obvious.  I will

5   provide you with detailed instructions on these questions at

6   the conclusion of the case.

7       A patent may also be unenforceable if a person

8   meaningfully involved in the prosecution or reinstatement of

9   patent withholds material information or submits materially

10  false information or statements to the PTO, with an intent to

11  deceive the PTO.  This is called "inequitable conduct."  PSD

12  must show by clear and convincing evidence that inequitable

13  conduct occurred.

14      Where a written description or enablement defense is

15  presented, a patent may also be invalid if its description in

16  the specification does not meet certain requirements.  To be

17  valid, a patent must meet the written description requirement.

18  In order to meet to written description requirement, the

19  description of the invention in the specification portion of

20  the patent must be detailed enough to demonstrate that the

21  applicant actually possessed the invention as broadly as

22  claimed in the claims of the issued patent.

23      The disclosure of a patent must also meet the enablement

24  requirement.  To meet this requirement, the description in the

25  patent has to be sufficiently full and clear to have allowed

1   persons of ordinary skill in the field of technology of the

2   patent to make and use the invention without undue

3   experimentation at the time the patent application was

4   originally filed.

5        If you decide that any claim of the '589 patent has been

6   infringed and is not invalid, you will then need to decide any

7   money damages to be awarded to Whitewater to compensate it for

8   the infringement.  A damages award should put Whitewater in

9   approximately the same financial position that it would have

10  been in had the infringement not occurred, but in no event may

11  the damages awarded be less than what Whitewater would have

12  received had it been paid a reasonable royalty.  I will

13  instruct you later on the meaning of a reasonable royalty.

14       The damages you award are meant to compensate Whitewater

15  and not to punish PSD.  You may not include in your award any

16  additional amount as a fine or penalty above what is necessary

17  to compensate Whitewater for the infringement in order to

18  punish PSD.  I will give you more detailed instructions on the

19  calculation of damages at the conclusion of the case.

20       Now, when a party has the burden of proving any claim or

21  affirmative defense by a preponderance of the evidence, it

22  means you must be persuaded by the evidence that the claim or

23  affirmative defense is more probably true than not true.  You

24  should base your decision and on all the evidence regardless of

25  which party presented it.  When a party has the burden of

1   proving any claim or defense by clear and convincing evidence,

2   it means that the party must present evidence that leaves you

3   with a firm belief or conviction that it is highly probable

4   that the factual contentions of the claim or defense are true.

5   This is a higher standard of proof than proof by a

6   preponderance of the evidence but it does not require proof

7   beyond a reasonable doubt.

8       You should decide the case as to each party separately.

9   Unless otherwise stated, the instructions will apply to all the

10  parties.

11      Now, the evidence that you are to consider in deciding

12  what the facts are consists of the sworn testimony of any

13  witness, the exhibits that are admitted into evidence, any

14  facts to which the lawyers may have agreed or stipulated to,

15  and any facts that I may instruct you to accept as proved.

16      In reaching your verdict, you may consider only the

17  testimony and exhibits received into evidence.  Certain things

18  are not evidence and you may not consider them in deciding what

19  the facts are.  I will list them for you.

20      Arguments and statements by lawyers are not evidence.  The

21  lawyers are not witnesses.  What they may say in their opening

22  statements, closing arguments, and at other times is intended

23  to help you interpret the evidence, but it is not evidence.  If

24  the facts as you remember them differ from the way the lawyers

25  have stated them, your memory of them controls.  Questions and

1   objections by lawyers are not evidence.  Attorneys have a duty

2   to their clients to object when they believe a question is

3   improper under the rules of evidence.  You should not be

4   influenced by the objection or by the Court's ruling on the

5   objection.

6        Testimony that is excluded or stricken or that you are

7   instructed to disregard is not evidence and must not be

8   considered.  In addition, some evidence may be received only

9   for a limited purpose.  When I instruct you to consider certain

10  evidence only for a limited purpose, you must do so.  You may

11  not consider that evidence for any other purpose.

12       Anything that you may see or hear when the court was not

13  in session is not evidence.  You are to decide the case solely

14  on the evidence received at the trial.

15       Some evidence may be admitted only for a limited purpose.

16  When I instruct you that an item of evidence has been admitted

17  only for a limited purpose, you must consider it only for a

18  limited purpose and not for any other purpose.

19       Evidence may be direct or it may be circumstantial.

20  Direct evidence is direct proof of a fact, such as testimony by

21  a witness about what that witness personally saw or heard or

22  did.  Circumstantial evidence is proof of one or more facts

23  from which you could find another fact.  You should consider

24  both kinds of evidence.  The law makes no distinction between

25  the weight to be given to either direct or circumstantial

1   evidence.  It is for you to decide how much weight to give to

2   any evidence.

3        By way of example, if you wake up in the morning and see

4   that the sidewalk is wet, you may find from that fact that it

5   rained during the night.  However, other evidence, such as a

6   garden hose, may provide a different explanation for the

7   presence of the water on the sidewalk.  Therefore, before you

8   decide that a fact has been proved by circumstantial evidence,

9   you must consider all the evidence in light of reason,

10  experience, and common sense.

11       Now, there are rules of evidence that control what can be

12  received into evidence.  When a lawyer asks a question or

13  offers an exhibit into evidence and a lawyer on the other side

14  thinks it is not permitted by rules of evidence, that lawyer

15  may object.  If I overrule the objection, the question may be

16  answered or the exhibit received.  If I sustain the objection,

17  the question cannot be answered and the exhibit cannot be

18  received.  Whenever I sustain an objection to a question, you

19  must ignore the question and must not guess what the answer

20  might have been.

21       As I said before, sometimes I may order that evidence be

22  stricken from the record and that you disregard or ignore that

23  evidence.  That means that when you are deciding the case, you

24  must not consider the stricken evidence for any other purpose.

25       In deciding the facts in this case, you may have to decide

1   which testimony to believe and which testimony not to believe.

2   You may believe everything that a witness says, or part of it,

3   or none of it.   In considering the testimony of any witness,

4   you may take into account the opportunity and ability of the

5   witness to see or hear or know the things testified to; the

6   witness's memory; the witness's manner while testifying; the

7   witness's interest in the outcome of the case, if any; the

8   witness's bias or prejudice, if any; whether other evidence

9   contradicted the witness's testimony; the reasonableness of the

10   witness's testimony in light of all the evidence; and any other

11   factors that may bear on believability.

12       Now, sometimes a witness may say something that is not

13   consistent with something else that he or she said.   Sometimes

14   different witnesses will give different versions of what

15   happened.   People often forget things or make mistakes in what

16   they remember.   Also, two people may see the same event but

17   remember it differently.   You may consider these differences

18   but do not decide that testimony is untrue just because it

19   differs from other testimony.

20       However, if you decide that a witness has deliberately

21   testified untruthfully about something important, you may

22   choose not to believe anything that witness said.   On the other

23   hand, if you think the witness testified untruthfully about

24   some things but told the truth about others, you may accept the

25   part you think is true and ignore the rest.

1    The weight of the evidence as to a fact does not

2   necessarily depend on the number of witnesses who testified.

3   What is important is how believable the witnesses were and how

4   much weight you think their testimony deserves.

5    I will now say a few words about your conduct as jurors.

6    First, you must keep an open mind throughout the trial and

7   do not decide what the verdict should be until you and your

8   fellow jurors have completed jury deliberations at the end of

9   the case.

10    Second, because you must decide the case based only on the

11   evidence received in the case and on my instructions as to the

12   law that applies, you must not be exposed to any other

13   information about the case or to the issues it involves during

14   the course of your jury duty.  Thus, until the end of the case,

15   or unless I tell you otherwise, do not communicate with anyone

16   in any way and do not let anyone else communicate with you in

17   any way about the merits of the case or anything to do with it.

18   This includes discussing the case in person, in writing, by

19   phone or electronic means, via email, text messaging, or any

20   internet chat room, blog, website or application, including but

21   not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

22   Snapchat, or any other form of social media.

23    This applies to communicating with your fellow jurors

24   until I give you the case for deliberation.  And it applies to

25   communicating with everybody else, including your family

1   members, your employer, the media or press, and the people

2   involved in the trial, although you may notify your family and

3   your employer that you have been seated as a juror in this case

4   and how long you expect the trial to last.  But if you are

5   asked or approached in any way about your jury service or

6   anything about this case, you must respond that you have been

7   ordered not to discuss the matter, and report the contact to

8   the Court.

9       Because you will receive all the evidence and legal

10  instruction you properly may consider to return a verdict, do

11  not read, watch, or listen to any news or media accounts or

12  commentary about the case or anything to do with it.  Do not do

13  any research, such as consulting dictionaries, searching the

14  internet, or using other reference materials.  And do not make

15  any investigation or in any other way try to learn about the

16  case on your own.  Do not visit or view any place discussed in

17  the case and do not use internet programs or other devices to

18  search for or view any place discussed during the trial.  Also,

19  do not do any research about the case, law, or the people

20  involved, including the parties, the witnesses or the lawyers,

21  until you have been excused as jurors.  If you happen to read

22  or hear anything touching on this case in the media, turn away,

23  and report it to me as soon as possible.

24      These rules protect each party's right to have this case

25  decided only on the evidence that has been presented here in

1    court.  Witnesses here in court take an oath to tell the truth,

2    and the accuracy of their testimony is tested through the trial

3    process.  If you do any research or investigation outside the

4    courtroom or gain any information through improper

5    communications, then your verdict may be influenced by

6    inaccurate, incomplete, or misleading information that has not

7    been tested by the trial process.  Each of the parties is

8    entitled to a fair trial by an impartial jury, and if you

9    decide the case based on information not presented in court,

10   you will have denied the parties a fair trial.  Remember, you

11   have taken an oath to follow the rules, and it is very

12   important that you follow these rules.

13       A juror who violates these restrictions jeopardizes the

14   fairness of these proceedings and a mistrial could result that

15   would require the entire process to start over.  If any juror

16   is exposed to any outside information, please notify the Court

17   immediately.

18       If there is any news media account or commentary about the

19   case or anything to do with it, you must ignore it.  You must

20   not read, watch, or listen to any news media accounts or

21   commentary about the case or anything to do with it.  The case

22   must be decided by you solely and exclusively on the evidence

23   which will be received in the case and on my instructions as to

24   the law that applies.  If any juror is exposed to any outside

25   information, please notify me immediately.

1    I urge you to pay close attention to the trial testimony

2    as it is given.  During deliberations, you may not have a

3    transcript of the trial testimony.  If you wish, you may take

4    notes to help you remember the evidence.  If you do take notes,

5    please keep them to yourself until you go to the jury room to

6    decide the case.  Do not let note taking distract you.  When

7    you leave, your notes should be left in the jury room.  No one

8    will read your notes.

9    Whether or not you take notes, you should rely on your own

10   memory of the evidence.  Notes are only to assist your memory,

11   and you should not be overly influenced by your notes or those

12   of other jurors.

13   Only the lawyers and I are allowed to ask questions of

14   witnesses.  A juror is not permitted to ask questions of

15   witnesses.  If, however, you are unable to hear a witness or a

16   lawyer, please raise your hand, and I will try to correct the

17   situation.

18   From time to time, during the trial, it may become

19   necessary for me to talk with the attorneys out of the hearing

20   of the jury, either by having a conference at the bench, when

21   the jury is present in the courtroom, or by calling a recess.

22   Please understand that, while you are waiting, we are working.

23   The purpose of these conferences is not to keep relevant

24   information from you but to decide how certain evidence is to

25   be treated under the rules of evidence and to avoid confusion

1   and error.

2        Of course, we will do what we can to keep the number and

3   length of these conferences at a minimum.  I may not always

4   grant an attorney's request for a conference.  Do not consider

5   my granting or denying a request for a conference as any

6   indication of my opinion of the case or what your verdict

7   should be.

8        The trial will now begin.  First, each side may make an

9   opening statement.  An opening statement is not evidence.  It

10  is simply an opportunity for the lawyers to explain what they

11  expect the evidence will show.

12       There are two standards of proof that you will apply to

13  the evidence depending on the issue you are deciding.  On some

14  issues, you must decide whether certain facts have been proven

15  by a preponderance of the evidence.  As I said before,

16  preponderance of the evidence means that the fact that is to be

17  proven is more likely true than not.  In other words, that the

18  evidence in favor of the fact being true is sufficient to tip

19  the scale, even if slightly, in its favor.

20       On other issues that I will identify for you, you must use

21  a higher standard and decide whether the fact has been proven

22  by clear and convincing evidence; in other words, that you have

23  been left with a clear conviction that the fact has been

24  proven.

25       These standards are different from what you may have heard

1    about in criminal proceedings, where a fact must be proved

2    beyond a reasonable doubt.  On a scale, these various standards

3    of proof, as you move from "preponderance of the evidence,"

4    where proof need only be sufficient to tip the scale in favor

5    of the party proving the fact, to "beyond a reasonable doubt,"

6    where the fact must be proven to a very high degree of

7    certainty, you may think of "clear and convincing evidence" as

8    being between the two standards.

9        After the opening statement, Whitewater will present its

10   evidence in support of its contention that the asserted claims

11   of the '589 patent have been and continue to be infringed by

12   PSD and that the infringement has been and continues to be

13   willful.

14       To prove infringement of any claim, Whitewater must

15   persuade you that it is more likely than not that PSD has

16   infringed that claim.  To persuade you that any infringement

17   was willful, Whitewater must also prove that it was more likely

18   than not that the infringement was willful.

19       PSD will then present its evidence that the asserted

20   claims of the '589 patent are invalid and/or unenforceable.  To

21   prove invalidity or unenforceability of any claim, PSD must

22   persuade you by clear and convincing evidence that the claim is

23   invalid and/or unenforceable.  In addition to presenting its

24   evidence of invalidity and/or unenforceability, PSD will put on

25   evidence regarding Whitewater's proof of infringement and

1  willfulness.

2      Whitewater may then put on additional evidence responding

3  to PSD's evidence that the claims of '589 patent are invalid

4  and/or unenforceable and to offer any additional evidence of

5  infringement and willfulness.  This is referred to as "rebuttal

6  evidence."  Whitewater's rebuttal evidence may respond to any

7  evidence offered by PSD.

8      Finally, PSD may have the option to put on its rebuttal

9  evidence to support its contentions as to the validity and

10 enforceability of some of the claims of the '589 patent by

11 responding to any evidence offered by Whitewater on that issue.

12     After the evidence has been presented, the attorneys will

13 make closing arguments, and I will give you final instructions

14 on the law that applies to the case.  These closing arguments

15 by the attorneys are not evidence.  After the closing argument

16 and instructions, you will then decide the case.

17     The parties have agreed to certain facts.  Those will be

18 stated to you later by the attorneys.  The Court has also

19 decided to accept as proved certain facts, which will also be

20 explained to you later at the final conclusion of the case.

21     During the trial, you will hear deposition testimony.

22 Deposition testimony is the sworn testimony of a witness taken

23 before trial.  The witness is placed under oath to tell the

24 truth, and lawyers for each party may ask questions.  The

25 questions and answers are recorded.

1      You should consider deposition testimony presented to you

2   in court in lieu of live testimony in the same way as if the

3   witness had been present to testify.  You should not place any

4   significance on the behavior or tone of voice of any person

5   reading the questions and answers.

6      All right.  Counsel, are you ready to proceed with your

7   opening?

8           MR. O'HARE:  Yes, Your Honor.

9           MR. THOMAS:  Can we have a brief sidebar, Your Honor?

10          THE COURT:  Sure.  Come on up.

11      (The following proceedings were heard at sidebar:)

12          MR. THOMAS:  Regrettably, Juror Number 5,

13   Mr. Sanford, I observed he slept through --

14          THE COURT:  Juror Number 5?

15          MR. THOMAS:  Yes.  Mr. Sanford.

16          THE COURT:  You mean Juror Number 11?

17          MR. O'HARE:  Formerly known as Juror Number 11.

18          MR. THOMAS:  He still is.  He didn't listen to one

19   word of your instructions, and I think, given his lateness and

20   given his inattention, that we should excuse him.

21          THE COURT:  What do you think?

22          MR. O'HARE:  Why don't we wait until the end of the

23   day and regroup.

24          THE COURT:  Let's do that.  It won't hurt to wait

25   until the end of the day.

1          MR. O'HARE:  I know.  And I know you were reading and

2    you couldn't observe him.

3          THE COURT:  I was so animated in my reading of the

4    jury instructions, I don't know how somebody could fall asleep.

5          MR. THOMAS:  That's what I thought.

6          MR. O'HARE:  Let's see if I can wake him up.

7      (The following proceedings were held in open court:)

8          MR. O'HARE:  May I proceed, Your Honor?

9          THE COURT:  Absolutely.

10         MR. O'HARE:  Thank you.

11    May it please the Court, counsel for the defendants,

12    ladies and gentlemen of the jury, I am Bill O'Hare, on behalf

13    of the plaintiff, Whitewater.

14    In 1980, a San Diego tax lawyer and avid surfer, named Tom

15    Lochtefeld, began a long journey.  It is a journey that started

16    with him being the part owner of some surf parks that you may

17    have heard of, called Raging Waters, in Southern California and

18    in Utah, and it led to the creation of an entirely new industry

19    over the years that followed, an industry that allowed people

20    to enjoy the thrill -- or at least close to it -- of surfing,

21    but not doing it on the ocean, doing it in a park or on a

22    cruise ship or somewhere else, on an attraction that he

23    invented, a sheet wave ride, that ultimately became known as

24    the Flow Rider.

25         The ride uses nozzles that jet out -- there's Tom

1    Lochtefeld, the fellow who is actually the inventor of the '589

2    patent, that we have already heard about.  This is an early

3    version of one of his rides at a location -- it's got these

4    German names, but it's actually somewhere down in Texas, that

5    had some sort of German theme to it, I guess.  And what this

6    ride did -- it's a bit different but the same in some ways,

7    similar in broad concept to some of the newer ones -- is it

8    shoots or jets out a shallow sheet of water from those jets

9    that are running under the Schlitterbahn Boogie Bahn sign.

10        It is a relative shallow sheet wave, that's why they call

11   it a sheet wave, and here there's a young boogie boarder on the

12   lower right of it, and you can ride on top of this sheet wave.

13        Tom Lochtefeld's journey, this tax lawyer turned sheet

14   wave inventor, didn't happen overnight.  He worked very long

15   and hard over many years to create his new invention.  He spent

16   years learning about water parks, being involved in these

17   businesses he was part owner of.  He spent more years in his

18   home and his garage trying to sketch out ideas and come up with

19   actual working models of these rides that didn't exist.

20        But what we are here for and what you will learn during

21   the course of this trial is that taking somebody's invention,

22   as the evidence will show the defendants have done here, is a

23   lot easier, faster, and much less expensive to do.

24        In 1991, Tom Lochtefeld founded a company in San Diego

25   that was called Wave Loch, and it ended up growing to become

1    the biggest maker and seller of sheet wave products in the

2    world, these simulated sheet wave products.  He sold rides

3    throughout the world either directly or licenses, contracts,

4    permission that he gave to other people, and he ended up

5    becoming the named inventor on more than 50 patents.

6         Along the way, even after he started some of his early

7    rides, he never stopped trying to think of new ideas to make

8    his products better, safer, more attractive to both the people

9    who rode them and the customers, the water park owners, who

10   would buy them.

11        And one of the ideas led to this patented invention that

12   we are here in court to enforce, called the '589 patent.  It is

13   the last three digits of that seven-digit number that His Honor

14   read out to us earlier, and then -- the '589 patent, with the

15   date that the patent was issued and that '589 digit.

16        This is an example, here.  And you note, as we go along,

17   there's little references in the bottom, typically, like EX

18   387.  That's shorthand for "Exhibit 387."  These are things, if

19   you are keeping track, that you will likely see throughout the

20   course of the trial.

21        And if you look at this one, what it does is, compared to

22   that ride we saw with the big wall, down in Texas, at the

23   German-style park, that wall is gone.  The ride is open, and

24   all the public and spectators and people in the restaurant and

25   lounge can look in and see it.

1    And the difference is, right in front of where the rider

2  is, you can see the jets of water are coming out from under

3  this padded cover that is flexible.  It doesn't have to sit

4  behind a wall.  And you don't have to worry about the rider

5  actually riding right over it.  In fact, it is designed so the

6  rider can ride right over it.

7    So what it does is -- I will give you an example of how

8  the thing works in practice.  He can go over the end of it,

9  back up again, and down again.  As compared to that

10  old-fashioned ride, if you wanted to call it -- he is happy

11  with himself -- where you can surf up that -- what they call a

12  reverse curve.  The rider would go down on a curve, then come

13  up on a curve towards that big wall, but the idea was to not

14  get you running into the wall and certainly not trying to go

15  over the wall; whereas, this one, they took out the whole

16  reverse curve --

17    (Telephonic interruption.)

18        JUROR:  I apologize.  I thought I turned that off.

19        MR. O'HARE:  Good to go?

20    -- took out that whole reverse curve, and it made the ride

21  shorter.  And space is money.  So if you are operating a water

22  park and if you can have the same riding surface but not that

23  big wall, not that reverse curve, you can use a smaller piece

24  of real estate to put in the same ride; plus, if it's a smaller

25  installation, it costs less money to put it in.

1        So the plaintiff in this case is Whitewater West

2   Industries.  They are the folks that I think there was

3   something in the instructions that over a period of years --

4   first they licensed these Flow Rider products and the ability

5   to use this '589 patent, and then eventually, as you will

6   learn, became the owner of the patent.  That's why it's

7   Whitewater here in court now.  You will also hear from

8   Mr. Lochtefeld, the inventor, during this trial.

9        So Whitewater, on its own, is actually the world's largest

10  designer and maker and installer of all kinds of different

11  water park attractions, pools, slides, other things like that.

12  But as proud as Whitewater is of their work, they also

13  recognize that the inventor of this patent -- Tom Lochtefeld --

14  he is the leader, was/is the leader in the sheet wave industry.

15       So Whitewater and its CEO, Chief Executive Officer, and

16  founder, Mr. Chutter -- who I think we pointed out to you

17  earlier, Geoff Chutter -- and they were competitors, but he did

18  what an honest competitor did.  They approached Mr. Lochtefeld

19  and paid for the right, the license, to sell these sheet wave

20  products, and ultimately buy it in 2014.

21       Now, the principal defendant in this case is Pacific Surf

22  Designs, or PSD.  And that's a new business that was started up

23  in 2012 by another lawyer, Mr. Yong Yeh, who partnered up with

24  his college fraternity brother.  They both went to UC Berkeley

25  together.  And Mr. Yeh had no experience in the water park

1   business or water ride business, but Mr. Alleshouse did.

2       And how did he get that experience?  Well, Mr. Alleshouse,

3   who is one of the two partners in PSD, Pacific Surf Designs, he

4   worked at Wave Loch, Tom Lochtefeld's company, for five years,

5   as an engineer and manager.  And during those five years, he

6   had full access and opportunity both to learn the sheet wave

7   business, understand the technology, of course learn about

8   their patents, and so forth.

9       When they started PSD, the evidence will show, instead of

10  investing all the time, money, and effort needed to develop

11  their own new ideas, the way Tom Lochtefeld did when he started

12  Wave Loch, or going to Mr. Lochtefeld to get a license or

13  paying money to him or Whitewater, like Whitewater did when

14  they wanted to get into this business, they took a shortcut,

15  and they did that by deciding to build their business on

16  knocking off or copying Wave Loch's products and practice the

17  '589 patent design without paying for it.

18      And I use the words "knockoff" on purpose because, as you

19  will see in an email I will show you later, that's the very

20  word that Mr. Alleshouse used in communicating with Mr. Yeh

21  early on in their business in talking about what their product

22  line was going to look like.

23      So, only three months after Mr. Alleshouse left his

24  employment at Wave Loch, they already had a full line of

25  products up and ready and being shown in a trade show in

```
 1    November 2012.  So from just starting their business in August
 2    of 2012 to November 2012, they already developed a full line of
 3    products.
 4         So this case is going to be, in our view, about one of
 5    those lessons that we learn as children from our teachers,
 6    parents, coaches, Sunday school and synagogue, that it's wrong
 7    to take something that belongs to somebody else, and certainly
 8    wrong if you don't pay for it.
 9         So I would like to spend the rest of the time I have with
10    you this afternoon telling you more about the plaintiff in the
11    case, my client, Whitewater, and how they came together, with
12    Mr. Lochtefeld; about the '589 patent and how it transformed
13    the sheet wave business; about the defendant, Pacific Surf
14    Designs and an affiliated company, a subsidiary, an owned
15    company, called Flow Services -- they do refurbishment and
16    repairs on water rides -- and how the evidence will show that
17    PSD built their business by knocking off Tom Lochtefeld's '589
18    patent, the patent that Whitewater paid to use.
19         So, Whitewater.  They are a Canadian-based company, but as
20    you will learn, when they acquired Mr. Lochtefeld's sheet wave
21    business, they developed operations here in San Diego, not far
22    from the courthouse.  But they are the world's largest
23    installer of a number of different water park attractions.  You
24    will see Mr. Chutter, here, shown receiving an award that he
25    seems quite happy about.  And he is the CEO, the Chief
```

```
 1    Executive Officer.  He is somebody else who reinvented himself.
 2    Remember, Tom Lochtefeld was a tax lawyer turned water ride
 3    inventor?  Geoff Chutter was a certified public accountant, and
 4    nearly 40 years ago, he began what was Whitewater and became
 5    Whitewater to build it into what it is today.
 6          And then they have a number of whimsical -- different
 7    kinds of water rides that don't look anything particular to
 8    sheet waves.  And then here is one like a kids' jungle gym kind
 9    of thing, except it is resting on top of water.
10          Along the way, they received a number of different awards.
11    They got the award for the best managed company in Canada and a
12    number of accolades for product innovation and good
13    citizenship.
14          So, in 2003, Mr. Chutter, the CEO, wanted to expand
15    Whitewater's range of products, and he knew, if he wanted to
16    get into sheet waves, he needed to talk to Tom Lochtefeld, and
17    that's what he did.  Initially, he got a license for a smaller
18    group of the products in areas outside of North America, so,
19    foreign sales.  And then that license was expanded a few years
20    later to include the entire line of Flow Rider products.  And
21    ultimately, in 2014, given how successful the relationship had
22    been, he ended up entering into a transaction to buy the entire
23    sheet wave business -- not all of Mr. Lochtefeld's water ride
24    business, because he does other things, too.
25          They spend two years negotiating the deal.  They started
```

1    in 2012; finally got a final, final contract in 2014.  And then

2    when they signed the contract, they dated it to be effective as

3    of late 2012, which is when they started negotiating.

4        I won't linger too long on this, but the idea of this

5    slide here -- which has a number of different exhibit

6    references -- is basically to at least give a little bit of a

7    road map between Tom Lochtefeld, at the top, who was the

8    original inventor, and the path by which this '589 patent found

9    its way to Whitewater West Industries, who is here in court.

10       So there are a series of assignments between different

11   entities on the left here, initially controlled by

12   Mr. Lochtefeld.  Like a lot of businesses, they will form

13   separate corporate entities for -- to hold specific parts of

14   their business or enter into business transactions, and that

15   happened here.

16       And then, ultimately, what happened is all of these

17   licenses and assignments -- you will see on the lower right,

18   there's what they call the 2016 amalgamation.  "Amalgamation"

19   is another word they use in Canada for "merger."  What that

20   means is the company here on the right, Flow Rider Surf, Ltd.,

21   they had ended up becoming part of Whitewater.  That company

22   disappeared and came into Whitewater.

23       So, at the end of the day, Whitewater ends up owning this

24   patent we are here in court to discuss.

25       And then, after they bought the business, they decided to

1    name this business they bought from Mr. Lochtefeld by the name

2    of the product, the sheet wave product they are selling.  So

3    they call it Flow Rider Surf, Inc.  And they kept it here in

4    San Diego, over near Lindbergh Field.

5        And they also kept the same person who was running the

6    business for Mr. Lochtefeld.  Mr. Myrman, who you have seen

7    here in court, he had been the one who was running this

8    business or was the chief operating officer of the business,

9    working under Mr. Lochtefeld.  So, when the deal happened with

10   Whitewater, he agreed to stay on and keep -- help keep managing

11   the business or Whitewater.

12       Now, as an aside, I should mention, there are times when

13   Mr. Myrman may leave the room while court is in session.  It is

14   for a medical reason.  Nothing horrible is going to happen, but

15   it is for a medical reason, and it is not out of any disrespect

16   or disinterest in what we are saying or what I might be saying

17   if he gets up and leaves the room, so bear with us if that

18   occurs.

19       Now, Mr. Myrman and others are going to help explain

20   during this trial why these Flow Rider products are so popular,

21   why they are the best-selling sheet wave products in the world,

22   and that's going to be a significant part of the evidence in

23   the case, is people are going to be going -- different

24   witnesses saying, "Hey, it is just a nozzle flap.  It is not

25   that big a deal."  But much of the evidence that we are going

1    to put in is saying, "Well, how big a deal is this invention?

2    How big a deal is this product?  What are people buying?"

3         The evidence will show 95, 97 percent of the sheet wave

4    products sold everywhere, this is what they are buying.  And so

5    the customers are voting with their feet and their wallets.

6    And what -- we will hear from Mr. Myrman and others, the '589

7    patent and the invention in it is an important part of that,

8    and also an important part of protecting them from, you know,

9    unfair competition or copying from others.

10        Here is Tom Lochtefeld again.  Mr. Lochtefeld is going to

11   produce testimony about how these sheet wave rides work and

12   explain some of the story behind how he came up with the '589

13   patent invention.  He is also going to explain some of the

14   details of the '589 patent and the way the rides were at the

15   time that patent was first being filed, prosecuted, processed,

16   and ultimately issued by the patent office.  And, again, he

17   started with this big wall, there, where those nozzles or jets

18   of water are, and what we call the reverse curve.

19        So, instead of going downhill and right over where those

20   nozzles are, you have this curve to make sure this little boy

21   doesn't boogie board up into those nozzles.

22        Well, with the '589, the entire ride changed.  So we

23   showed you this Exhibit 387 earlier, which, as you can see,

24   visually is very different, and it is because of this nozzle

25   flap assembly that is at the bottom of the ride, where, instead

1  of sitting behind that big wall, it is sitting behind a profile

2  of a moveable or flexible flap that moves up and down with the

3  flow of water.

4       So if the water level fluctuates, that flap stays on the

5  water.  If, goodness, the ride shuts down, the water stops, and

6  the flap will lower.  And that's part of the safety thing so

7  riders won't run into the nozzle or get trapped.  And as you

8  saw in the video, they can ride right over it.

9       Here is a version or example of one of the drawings in the

10 United States patent, the '589, of one way of making that work.

11      And, incidentally, as you will learn during the trial,

12 these patents often describe -- and this one does too -- a

13 variety of ways of accomplishing the result that the invention

14 and the inventor has come up with.  There's not always one way.

15      So, this drawing on the left, it's got this, what appears

16 to be a flexible flap.  As you will learn, as this project

17 evolved, they started using metal reinforced, padded nozzle

18 covers and then changed the construction so it was attached

19 with a hinge, so you still get the same flexibility and

20 movement under and down.  Again, here is the two rides side by

21 side.  The left, that old one, before they had the '589 nozzle

22 flap design; the curve is gone; the visibility is improved.

23 And it is a smaller ride, but it's got the same riding surface,

24 so there's still as much riding to be done.

25      And then Mr. Lochtefeld is going to explain how these

1   improvements in the '589 patent revolutionized the sheet wave

2   business.  Sales dramatically increased.  The evidence will

3   show maybe a dozen of these rides, of this type, on the left,

4   were sold all through the '90s, up until around '99 or 2000,

5   when the '589 patent was first filed.  100 or more since.  In

6   fact, I believe the evidence will show just the Surf Rider

7   rides, over the past seven, eight years, has been like over 100

8   rides, but all of that occurring after this development or

9   improvement of the '589 was introduced.

10       So, this is the logo of the patent office.  The PTO, His

11  Honor spoke about earlier.  It is part of the Department of

12  Commerce.  That's who issued this patent along with all the

13  others.  They have been doing it ever since the beginning of

14  the republic, which is why those numbers are getting so high in

15  terms of the digits.

16       This is the -- what we call the face page of the patent.

17  It's got a number of pieces of information:  The number, the

18  date the patent is issued, the inventor, when this was filed.

19  It is not highlighted, but there was actually something called

20  a provisional application, which is really the first filing of

21  this patent, which was a year before.  It was actually first

22  filed in 1999.

23       And then there's the title of the patent.  Now, the title

24  says, "Mobile Water Ride Having Sluice Slide-Over Cover."  So

25  "sluice slide-over cover" -- and we will have testimony from a

number of people on this, including some experts -- that's
the -- what is also called the nozzle flap assembly or that
cover, that's at the bottom of the new ride.  And some of the
versions of it covered in these patents, you will learn, are
mobile, but they are not all mobile.  So -- I am not going to
go through every element of this patent right now.  We will
have plenty of time in the trial to do it.  But as you will
see, a number of the different claims of the patent don't have
anything to do with "mobile."  Some cover the entire ride, some
just cover that nozzle flap assembly, but you can't just base
it on the title.  You have to look at the whole patent.

     Then these are what is called the written descriptions.
In other words, even though the boundaries of the claim, as I
believe the Court has already indicated, are what are called
"the claims," there's a lot of explanation that's provided in a
patent application and that finds its way into a patent.
There's discussion of the background, what they are trying to
improve; importantly, how do you do it.  They explain that in
words, drawings, to help give examples of how somebody else,
who is in this business, could do it.

     And you say, "Why are you laying all that out?  Isn't this
something that you want?"

     Well, that's the bargain the inventor makes with the
government and the people of the United States.  If you are
willing to write all this stuff down, satisfy the patent office

1    examiners that it really is a new or improved thing that you

2    have invented, and lay it all out for everybody to see how to

3    do it, what you get in exchange, for 20 years, you are the only

4    one who gets to do it.  And the idea is encourage people to

5    innovate, so that if they innovate, what they get in return is

6    they get to be the only ones who use it.  And then, of course,

7    after that, it belongs to all of us.

8         So, over the course of years after years after years, in

9    exchange for giving people this protection -- you could call it

10   a monopoly but it is a limited one -- they are adding to the

11   knowledge of us all and hopefully progress in the sciences.

12        This is, at the end of the patent, what is called the

13   claims.  And there will be a fair amount of testimony, through

14   experts and others, even though there's all these drawings and

15   stuff, here it is, Claim 1.  And you basically have to read the

16   words of the claim to understand, does -- what does this

17   invention -- what are the definitions of boundaries in the

18   invention.  And when we are looking at, say, a product that the

19   defendant PSD did, does it meet each of the elements of the

20   claim?

21        As the Court indicated, there's going to be some claim

22   terms, words, where the Court will give an instruction saying,

23   "Hey, this means," whatever; and otherwise, they will say, "No,

24   you can give it its so-called ordinary and customary meaning,

25   just what we all would understand a word to mean."

1       But these are the boundaries of it.  The drawings and so

2  forth provide context, but it is words of the claim that you

3  start with.

4       I do want to mention, there were a couple of foreign

5  sales.  Two of the first four rides that PSD sold were

6  installed in France, and in the island of Trinidad and Tobago

7  in the Caribbean, and Whitewater doesn't have patents there.

8  But the evidence will show that a substantial portion of the

9  components of the patented design, covered by the '589, were

10  shipped from the U.S. to be assembled in the Caribbean, and

11  that's why we are going to be addressing those sales as well.

12       So, who is PSD?  It's Mr. Alleshouse and Mr. Yeh, the

13  college classmates, who I believe you have had introduced to

14  you here in court.  Mr. Alleshouse worked at Wave Loch.  That's

15  the sheet wave business that Whitewater bought from

16  Mr. Lochtefeld.  And he was an engineering, manufacturing and

17  product manager of the Flow Rider product line that ended up

18  applying, incorporating the technology of this '589 patent.

19       Mr. Myrman, who, in addition to now working with

20  Whitewater, he was Mr. Alleshouse's supervisor at Wave Loch.

21  As you remember, Mr. Myrman started out working with Tom

22  Lochtefeld and carried over to the business when our client

23  acquired it.  So, he gave Mr. Alleshouse every other Friday off

24  work to go work on his master's in business administration, his

25  MBA, over at USD.  And it's hard to ignore the timing of his

1    resignation.

2         Within weeks of completing his MBA, on July 27, 2012,

3    Mr. Alleshouse sends an email to Marsh, or Marshall Myrman,

4    saying he is going to resign from his position as of August 3,

5    a week later.  And not a word about a competing business.  It

6    is this sort of generic, "I am ready to take some time off and

7    pursue other opportunities," and the evidence will show there

8    was no time taken off.  In fact, Mr. Alleshouse had already

9    started some preliminary work on his new business, and he was

10   definitely to work by August 3.  There was no time off.

11        Now, that said, Mr. Alleshouse -- you will hear from the

12   folks at Whitewater.  You will hear he had every right to quit

13   his job -- he wasn't chained to his desk -- to start a new

14   business and compete fairly and aboveboard, but that's not what

15   he did.  We are here because we believe the evidence will show

16   Mr. Alleshouse and Mr. Yeh decided to take a shortcut and get a

17   head start.  In other words, rather than to develop their own

18   technology or buy the right to use technology from others, they

19   went a different path.

20        And here is that knockoff email I mentioned earlier.  This

21   is August 20, 2012, just a couple of -- few weeks after

22   Mr. Alleshouse left Whitewater, or Wave Loch at the time, and

23   they are talking about product lines they are going to be

24   offering.  And it's always -- as Mr. Alleshouse indicates here,

25   group one is the Flow Rider "knockoffs," which is another term

1    for "copy."  And then they talk about different versions of it.

2         At this time, they were using more whimsical sort of

3    Hawaiian geographic references, Waikiki and Makaha.  We will

4    see later how they changed that.

5         And then they acknowledge these are the mockups they are

6    doing for their products.  So they look like Flow Riders.  And

7    maybe there's no crime like that; although, you will learn

8    during the case, they more than just look like Flow Riders.  At

9    least our evidence is going to be it also -- they look like

10   them and infringed or copied the technology of this '589

11   patent.

12        And, "How do we want to make them at least look different?

13   Angle some slide walls, do something to at least make it look

14   slightly different."

15        They did.  They did angle the walls.  There's another part

16   of it -- there's actually another patent that nobody is

17   claiming they infringed because they didn't go that path.

18   There was like a trampoline-style riding surface.  That's the

19   part of the ride that's under the water where the rider is

20   riding.  That's a patented design.  They didn't do that.  They

21   ended up just having a padded, hard surface.  So, both of them

22   are designed to make sure when somebody falls off their board,

23   hopefully they hit something soft and not anything too hard.

24        So they did make some changes.  No patented changes.  They

25   just took what they took from looking at these other rides,

1    made some changes, but they haven't got any other patents of

2    their own on that.

3        Of course, Mr. Yeh and Mr. Alleshouse knew about the '589

4    patent and all the patents that Whitewater and Wave Loch had.

5    He knew, of course, because Mr. Alleshouse had been the product

6    manager there.  And the evidence will show Mr. Yeh actually did

7    go and look at Wave Loch's website where they list all their

8    patents and made some effort over a period of time to actually

9    read the patents.

10       There will be some evidence that will suggest that the

11   patents may have been read, but particularly the '589 patent,

12   was -- may have been looked at carefully.  But in explaining to

13   others how their product differed from the '589, they kind of

14   glossed over what all the similarities are between the way they

15   did their nozzle flap design and that '589 patent.

16       Now, we expect the folks at PSD to tell us that this '589

17   patent is only a minor invention, and that even if it appears

18   that they copied or infringed it, they didn't really need to,

19   and that there's an easy way to design around this patent,

20   meaning do the same thing as good or better another way that

21   doesn't infringe.

22       And indeed, just this year, PSD has installed -- and one

23   is up in running as we understand it, in Mexico, and another

24   that's under way in El Paso -- some sheet wave rides that have

25   a different nozzle flap design.  The first four rides they sold

1    all had this moveable, flexible nozzle flap that floats on the

2    water, that's padded, that you can ride over.  And

3    Mr. Alleshouse came up -- here is -- these are the products

4    from examples of the products from PSD, from the defendant.

5    There's one on the left.  One on the right is called I think a

6    Flow Barrel, or is it a Super Tube -- I am sorry.  I confused

7    that with ours.

8        The one on the right, it is a Super Tube, because it kind

9    of creates a tube, like a ride in the ocean, based on the

10   curvature of the back of the ride, so when you shoot it out,

11   you get more of a wave-like thing.

12       But as you see on the right, they both have flexible,

13   moveable, hinged nozzle flap, padded assembly, so you can ride

14   right over it, not the big wall that used to be in the old

15   design.

16       The other thing, in terms of the similarities, these are

17   two schematics, both drawn by Mr. Alleshouse.  One was in

18   March 2009 -- that's the one on the left -- and the other one,

19   on the right, looks like it's early 2013.  You will notice the

20   one on the left was drawn while he worked at Wave Loch.  The

21   one on the right is while he worked at Pacific Surf Designs.

22       What we will show you during the course of the trial is

23   that this hinged piano, like, nozzle flap, that the drawings

24   that he ended up doing when he got started over at PSD are

25   strikingly similar to the same drawings he drew while he worked

1    at Wave Loch.  This isn't the entirety of it because you add

2    the padding to it and there's a number of steps that you will

3    hear about during the trial.

4        They also had made some changes to their product names.  I

5    mentioned started out as sort of whimsical Hawaiian names, like

6    Makaha and Waikiki, and then for the main line, they switched

7    from calling them that to -- not identical names, but Flow

8    Rider Single.  They used to be the Makaha Single or Makaha.

9    And so even the names begin to start looking a little bit more

10   similar between the Flow Rider product -- that's our client's

11   products -- and then the products that PSD sells.

12       So, here is this design-around that we will hear about

13   from Mr. Alleshouse.  This is without the water on.  It is a

14   ride that's under construction, Exhibit 480.  And the way this

15   thing is set, this nozzle flap or cover is actually welded in

16   place, so that it can't move down with the flow of water.  So

17   if you can imagine, when the water is running, and it's got a

18   four- or six-inch or whatever depth, it's going to run right up

19   to the edge of this flap, the one that you saw in the rides

20   where the riders would come down and ride right over it.  But

21   it doesn't move, and it won't move down.  As we understand it,

22   from Mr. Alleshouse, we believe it's welded in place and then

23   it's got these pieces here on the side that stop it from going

24   down.

25       So the evidence will show this design-around, this

1    alternative design -- and the first ride they installed with

2    this I believe was June of this year.  So, seven years in

3    business.  Up until then, they hadn't installed anything like

4    this.  It was all the moveable nozzle flap or nozzle flap

5    assembly or nozzle cover assembly that we showed you earlier.

6         But this ride, the evidence will show, is not a safe or

7    true substitute for the '589.  Why is that?  What happens if

8    the water level drops?  Or if there's a power failure?  Or if

9    you have to shut down the ride because somebody fell on the

10   ride?  Maybe there's another rider on board.

11        This is one of our rides, not theirs.  It's got the safe,

12   removable nozzle.

13        This poor fellow is having a heck of a time.  When he is

14   riding on it, it disrupts the flow of the water, and it kind of

15   messes up that.  And ultimately, boom, right down into the

16   nozzle flaps.  And he's got a smile on his face because when

17   that nozzle flap is flexible, moveable, no harm.  But if you

18   had that fixed, immovable one, would he get underneath?  Or if

19   somebody is not doing it -- let's say they are on their board.

20   And instead of them falling down, the power cuts off, down in

21   Mexico, and they come sliding down like that; the board goes

22   under the cover and they keep going.

23        So the evidence will show this is not a safe and

24   equivalent substitute, and only time will tell what happens

25   when and if the power shuts off or somebody falls on the ride

1    and whether these two rides -- the first one just installed

2    this year and the next one I believe about to be opened --

3    whether those are the last two that they sell.

4         The other thing we know is the vast, vast, vast, vast

5    majority of rides of sheet wave rides that are even closely

6    configured to these do have this moveable, covered, padded

7    nozzle flap.  And of course they are mostly sold by Whitewater

8    or Flow Rider and its licensees because of the patent.

9         Now, in order to help explain some of the technical

10   expects of the case, we have engaged Dr. Glen Stevick, who is a

11   technical expert who will tell us more about the technology of

12   this patent and how Pacific Surf Designs, certainly the initial

13   product, the ones they already installed, infringed the various

14   claims of the patent.

15        We will walk through those claims.  You will see things

16   like this, and this is not going to cover everything, but

17   basically the process will be -- this is Claim 1.  We will go

18   through the language of the claim and then pick out, you know,

19   these are PSD rides.  So one element is a water attraction.

20   That's easy stuff.  Does it have a nozzle?  Does it have a

21   nozzle cover?  Does it have a flexible tongue?  They will walk

22   you through each of these.

23        The evidence will show probably the thing that the experts

24   on each side are going to be arguing most about is this notion

25   of a flexible tongue, that cover that goes in front of the

1    nozzles.  What is a flexible tongue?

2        And we expect PSD, the defendants, to tell us, "Hey, we

3    don't have a flexible tongue," on their nozzle flap, because

4    it's -- I don't think this is actually one of theirs, but it is

5    an example of ours.  It is a metal piece that's padded, and

6    because it's a little heavier, it is attached with a hinge.  So

7    that's not a flexible tongue.

8        Now, you will hear evidence from the experts and you will

9    be asked to apply your common sense and ordinary meaning to

10   some of these words as well, but the key that we believe you

11   will learn is that the tongue or flap on the PSD rides moves up

12   and down with the flow of water.  And there are many ways to

13   make something, this tongue or flap, move up and down.  And

14   PSD's own technical expert, at least at one point, actually

15   relied on a dictionary that defined a hinge, which is what, on

16   the more recent products, attaches this thing, to allow it to

17   move up and down, that a hinge -- a hinge is flexible, a

18   flexible tongue or flap or whatever you want to call it.  Now

19   we expect that he may be changing dictionaries to see if he can

20   find something else.

21       But beyond dictionary definitions and boring experts, when

22   you get a chance to look more closely at this patent during the

23   trial, you will see that those parts of the patent talk about a

24   written description of the various ways you can do this.

25   Mr. Lochtefeld specifically mentioned how the flexible tongue

1   can be made not just of loose, floppy, padded material with no

2   reinforcement, but it could actually be enforced internally

3   with something rigid that would hold it in place and then be

4   padded and then, in some fashion, able to move up and down.

5       We didn't invent the hinge.  Hinges have been around for a

6   while.  But the idea of using a hinge or any number of

7   different ways, depending on the structure you used to get this

8   concept of we are going to have this moveable, padded nozzle

9   flap assembly that will safely allow riders to move over and do

10  all the other things that change the configuration of the ride.

11  And that's what is, in our view, and the evidence will show is

12  taught by the '589.  There are other claims that are brought up

13  in the patent, and we will save them for during the trial.

14      Now, Dr. Stevick will also testify that, based on his

15  analysis of the '589 patent, that the Wave Loch rides that

16  existed back before this '589 patent was filed were very

17  different; that this really was a novel invention and

18  advancement, and the patent office got it right when they

19  issued it.

20      You won't be surprised to hear that the defendants, of

21  course, are going to both deny that they think they are

22  infringing or they are going to suggest that the patent office

23  got it wrong.

24      We have heard instructions that if they can prove it by

25  clear and convincing evidence that the patent office got it

1    wrong in issuing this patent, that's certainly something that

2    can be addressed in court.  Even though the patent office spent

3    over two years on this and granted it -- and you will hear

4    there were some later proceedings in front of the patent office

5    where PSD tried again to invalidate the patent -- they will

6    attempt to make the case here that the patent's invalid; the

7    patent office got it all wrong.

8         Now, we also expect that PSD is going to change the

9    subject to take the spotlight off of what they did and suggest

10   Mr. Lochtefeld somehow tricked the patent office into issuing

11   this; that, indeed, when he applied for his patent, Wave Loch

12   did have a number of these older-style rides, with the walls,

13   out there.  And we expect that certainly the expert for PSD is

14   going to say, "Oh, well, these things actually have all the

15   elements of that new '589 invention that got granted and issued

16   or applied for in '99 and got issued in 2002."

17        And you will get a chance to look at each of the elements

18   of that, and we believe that the evidence will show that PSD's

19   expert is doing somersaults to establish that these rides that

20   you see here on these exhibits -- these are -- actually have

21   all the elements of that invention, that totally changed the

22   way these rides were put together after the '589 patent was

23   applied for and issued.

24        And indeed, the more you know about these old ride

25   designs, we believe the evidence will convince you that all the

1    more just how big an improvement Mr. Lochtefeld's invention

2    was, and the proof is in the pudding.

3         As I indicated earlier, only about a dozen of these rides,

4    the old-style rides, sold before this patented invention.  And

5    once Mr. Lochtefeld started selling the new ones, he never went

6    back.  They never sold any more of these, and sales took off.

7         Except for Pacific Surf Designs, the handful of people out

8    there selling these products, virtually -- tiny numbers of them

9    being sold today that don't practice this -- what we are

10   calling the '589 design, with the padded, moveable nozzle cover

11   design.

12        We also expect PSD is going to try to change the subject

13   again and make an issue about Whitewater making a late payment

14   of a $7,400 maintenance fee.  And that one of Whitewater's

15   lawyers, maybe Whitewater, intentionally lied to the patent

16   office.

17        What happened is you get the patent, but the patent office

18   isn't done with you.  They want you to keep paying fees.  Do

19   you want to keep the patent alive for the full 20 years?

20   Periodically -- and it happened to be the payment due at year

21   11 and a half.  It was a $7,400 payment.  And if it's being

22   done right, companies hire people or internally monitor all

23   these things to make sure we don't miss a payment.  Because if

24   you miss the payment, your patent can lapse, at least

25   temporarily.  There's a procedure that you will hear about

 1    during the trial to say, "Oh, whoops, I didn't mean to do that

 2    on purpose," and the patent office will take your money late,

 3    provided you fill out the right paperwork.

 4         But the allegation we expect to hear here is not only did

 5    they miss the payment but they intentionally lied about it.

 6    And the judge has already read you an instruction having to do

 7    with deceiving the patent office.  If you are going to make an

 8    issue of that, it not only has to be by clear and convincing

 9    evidence, but you can't just make a mistake.  You have to, on

10    purpose, intend to deceive the patent office either when you

11    are prosecuting the patent, by lying to them, or, in the case

12    of this, where you are saying, "Hey, we paid the fee late," not

13    that you just messed up but you lied.  That's the accusation.

14         Under Whitewater's agreement when they acquired this

15    business with Tom Lochtefeld's company, Whitewater, even though

16    they were initially licensing it -- they didn't own it yet --

17    they agreed in the contract they were going to be the ones to

18    pay the maintenance fees, not only on the '589 patent but a

19    number of other patents included in the deal.

20         In the process of transition between the companies during

21    2014, the payment on the '589 patent was the accidentally

22    missed.  So the patent indeed lapsed in December 2014.

23         Now, one of Whitewater's outside lawyers, this lawyer,

24    Erik Squier, will explain how, when he discovered the missing

25    payment on February 4, in looking at the patent office website,

1   he prepared and filed, 16 days later, a petition with the

2   patent office to get this patent reinstated, which was

3   ultimately granted.

4       It took until August.  It had to do with some -- I will

5   explain it to you.  They had an automated payment system, and

6   Mr. Squier thought he was on the list of people who could be

7   authorized to charge fees with the patent office at his law

8   firm, and unbeknownst to him, his name had been taken off.  And

9   it took the patent office five months after that happened to

10  say, "Oh, by the way, you are not an authorized signer."

11      So they fixed that, renewed it, and ultimately got

12  approved.

13      So, all on the form petition to get permission to do a

14  late payment requires -- and you will see it on that form -- is

15  basically three things:  You pay the fee, you pay a late fee,

16  and you confirm, I think -- I don't know if it is a check in

17  the box; I think it is just right in the form, that you confirm

18  that the delay in payment was unintentional, meaning you didn't

19  not pay it on purpose.

20      And during that 16-day period, the evidence will show that

21  Mr. Squier did confirm that information that he got during that

22  period, and it was information that he got from the client, but

23  through another lawyer, Mr. Taché.

24      Now, some of these communications, the judge has already

25  instructed you there may be certain objections to certain

1    questions during the trial.  Given we have got lawyers and

2    communications with clients, there may be issues, when we have

3    a lawyer on the stand, as to just how far can he both ethically

4    and legally go in revealing the contents of some of these

5    communications.  There may be occasions where you will either

6    see limits on the details that he can disclose because of

7    client confidentiality or even some documents that have parts

8    blacked out.

9         But aside from Mr. Squier, you will hear directly from the

10   folks at Whitewater, who were the people who were supposed to

11   be paying the fee, that they certainly didn't intentionally

12   miss the deadline to pay this fee, and it made no sense for

13   them, that same year, pay millions of dollars to Mr. Lochtefeld

14   and his company to buy this business, only to get the key

15   patent, one of the key patents they were buying, get lost

16   because somebody didn't, you know, remember to pay or decided

17   not to pay a $7,400 fee.

18        And above all, the evidence is going to show, certainly

19   not Mr. Squier or anybody else we can point to, did this on

20   purpose, which that he certainly wouldn't have put his

21   reputation or his law business at risk by lying to the patent

22   office.

23        You will also learn that during this December 2014 to

24   August 2015 time period, PSD sold two rides during that gap

25   period, before the patent was revived, and we expect them to

1    say somehow they did that and they were watching the site and,

2    "Oh, the patent has lapsed, so I guess it's okay; now we can

3    change our designs and sell products that follow the '589

4    patent."

5         But the evidence will show that both of those sales they

6    made were already in the works well before that patent

7    initially lapsed.  They didn't change their product design.

8    They sold the same rides with the same type of moveable nozzle

9    flap.  They didn't change to that new design until much more

10   recently, long after that patent was revived.

11        As the Court indicated, the relief, the remedy, the

12   compensation we are seeking in this case is money damages.  We

13   have asked Dr. Vigil, who is a Ph.D. economist and expert in

14   damages, to testify to what the amount of damages are.  And we

15   can't undo what has been done.  So the question is how do we

16   come up with what is a reasonable and lawful measure of damages

17   to compensate Whitewater as best they can, to compensate

18   Whitewater, who, given a choice, would never have licensed this

19   technology to a direct competitor.  What they call this is a

20   hypothetical negotiation.  They call it "hypothetical" because

21   it didn't happen.

22        But what the experts will be doing is they are going back

23   in time, and saying, "Okay.  Let's suppose, instead of somebody

24   infringing, Whitewater and PSD had come together and said,

25   'Okay.  We are going to do a license.  We are going to do a

1    contract,'" and try to put a price tag on it.  The date of that

2    is December 2013.  That is because that's when they sold their

3    first allegedly infringing product.

4        So the idea is, by taking in a variety of

5    considerations -- and there will be lots of them -- we are

6    trying to reconstruct what reasonably would these two parties

7    have agreed to.  And that's ultimately part of what you, as a

8    jury, will be called upon to decide.

9        The conclusion Mr. Vigil came up with is it would have

10   been a lump sum, meaning an upfront, fully paid-up royalty of

11   at least $2 million.  That's the damages.

12       Now, why a lump-sum royalty?  Why that amount?

13       First and foremost, under this hypothetical license, PSD

14   would have been permitted to sell these patented products in

15   competition directly with Whitewater, and there was one other

16   company, called ADG, that they had given a consensual license

17   to sell to certain parts of the world in North America.  For

18   every sale that PSD would give, Whitewater or its licensee

19   would lose a sale.  You could say, "Well, I am getting a

20   royalty, but I am losing a sale."

21       Lest there be any doubt -- we know this is just one

22   example -- these are written materials prepared in

23   October 2013, just less than two months before this

24   hypothetical negotiation would have happened, prepared by PSD,

25   and they have a list of different players.  As you can see,

1    they have the number of installations at the bottom.  Back in

2    2012, Wave Loch, which is the business Whitewater bought, had

3    120-plus sheet wave rides.  Sheet wave is all that Pacific Surf

4    Designs has been selling.  And other people -- they are

5    guesstimating, but it is just a handful.

6         Under the column "direct competitor," there's only one,

7    and it's Wave Loch.  What are you competing for?  Sales.  Every

8    sale Pacific Surf Designs gets -- maybe they will pick one up

9    here and there, but clearly, the thrust of the business plan --

10   and we will show you more evidence of this -- is, "We are

11   competing with you, Whitewater, Wave Loch, to get your sales."

12        When they are doing the hypothetical license, that's what

13   both parties presumably would have in mind.

14        So why would we base it on -- take into account sales of

15   the entire ride, because there's going to be some, "Heck, it's

16   only one component, just the nozzle flap; why should it be

17   based on the entire thing?"

18        And the evidence will show, number one, some of the

19   patents do cover the entire ride.  But, number two, how

20   critical that nozzle flap assembly design is to so many other

21   elements of the ride in order to do it effectively and safely.

22   So you will hear testimony about that as well.

23        Now, you will also hear the $2 million, as it turns out,

24   is more than PSD's total profit, and it is a good chunk of what

25   their sales are to date.  True enough, PSD has sold only six

1    rides, two -- one -- not quite completed on one -- two that

2    have that fixed, welded nozzle flap, four others.  They have

3    sold six rides since 2012, and during that same period, over

4    100 Flow Riders, our products, have been sold.

5         So, for one thing -- and if PSD has been marketing

6    themselves in the same materials -- they make a better, safer,

7    product, evidently customers don't agree, because that's not

8    what they are buying.  At least they are not buying the

9    numbers.  But that's also about the benefit of hindsight.  We

10   look back and, yeah, they didn't sell as many as they would

11   have hoped or expected back when they were doing projections,

12   but here is what they were looking at back in October of 2013.

13   This is what they would have been considering at the time of

14   the hypothetical negotiation.

15        So, what you will hear about from Dr. Vigil and what the

16   evidence will show is because they will not have completed the

17   sales yet, they are going to be looking at what they

18   realistically expect to do.

19        Why wouldn't Whitewater just say, "We will take a

20   percentage of whatever it is you do sell?"  Again, both because

21   they are a competitor and, frankly, because they are new, why

22   get a new person on the scene unless you get a sizable payment

23   up front?  Given a choice, you will understand from the

24   evidence, Whitewater wouldn't have wanted to license to them at

25   all.

1        From a practical standpoint, from PSD -- granted, they are

2   a start-up, even if they lost money early on, that's what

3   start-up businesses do.  The question is would this have been a

4   good investment to get permission for this.

5        And you will hear evidence, from Mr. Yeh, that both he and

6   PSD had virtually unlimited access to funds from his Yeh family

7   venture capital fund.  Doesn't mean it's there to be wasted,

8   but the point is, if there was something that was worthwhile to

9   invest in, like technology or equipment or whatever it might

10  be, the funding is there to supply it.

11       So they may have been a start-up.  They are a start-up.

12  Obviously, Whitewater was a start-up at one time.  But this is

13  a start-up that had the resources to do things the right way.

14       So, at the conclusion of the trial, we are going to ask

15  you to find that they infringed.  You award us some damages.

16  $2 million.  And that you make a determination that the

17  infringement was willful; they did it consciously.

18       I haven't anticipated everything that might be said by my

19  colleagues.  This is one point in the trial where one side gets

20  up, then the other, and then you move on.  Most of the trial,

21  it is like a Ping-Pong match; one side gets up, and the other

22  side gets up.  So that's not going to happen now.  You may hear

23  some suggestions that we have left out some important parts of

24  the story, and they are going to tell you the rest of the

25  story, and no doubt, there may be parts we didn't anticipate,

1    so you will have to wait to hear from us later on.

2        But we would like to suggest that if PSD and

3    Mr. Alleshouse and Mr. Yeh had been honest and told the whole

4    story back in 2012, meaning Mr. Alleshouse was leaving Wave

5    Loch to start a competing business -- nothing wrong with

6    that -- but been forthright and negotiated a fair price to use

7    the technology or gone and done it a different way, none of us

8    would be here now.

9        So, thank you for your time, your attention, and your

10   service as jurors.

11           THE COURT:  Let's take a short, ten-minute recess.

12   And I do mean ten minutes, no more than that.  Be back here at

13   three o'clock.  Thank you.

14       (Recess taken from 2:51 p.m. to 3:00 p.m.)

15       (The following proceedings were held in open court out of

16   the presence of the jury:)

17           MR. THOMAS:  Mr. O'Hare and I have discussed we can

18   excuse --

19           THE COURT:  Are you sure?

20           MR. THOMAS:  Very sure.

21           MR. O'HARE:  We are interrupting his phone call.

22           THE COURT:  With the "Sanford and Son" ringtone?  Did

23   you pick up on that?  I had a hard time not to break up

24   laughing.

25           MR. O'HARE:  Yes, we did.  That was the only time he

1    was awake during my opening.

2           THE COURT:  All right.  We will excuse him.

3           MR. THOMAS:  At the end.

4           THE COURT:  All right.  Bring the jury in, please.

5       (The following proceedings were held in open court in the

6    presence of the jury:)

7           THE COURT:  Welcome back.

8       Mr. Thomas?

9           MR. THOMAS:  Thank you, Your Honor.

10       And good afternoon, ladies and gentlemen.  Again, I will

11    reintroduce myself.  Joe Thomas, on behalf of the defendant,

12    PSD.  With me is Mr. Kolegraff, my partner; Ms. Mendiola,

13    senior paralegal; Mr. Alleshouse; and Yong Yeh.

14       I do want to bring to your attention, Richard's wife is

15    expecting his third child in two weeks and he is on standby, so

16    if we were to have to suddenly leave the scene, he will do

17    that, but you should take no offense, or lack of interest, or

18    anything like that.  It is just being a good parent and

19    husband.  So, hopefully, his wife -- I think is two weeks --

20    she will make it two weeks and we will be okay on the trial,

21    but it's possible it could come sooner.

22           THE COURT:  I told him if he did leave because his

23    wife was delivering, I would hold him in contempt and fine him,

24    just in order to make sure that my mean reputation continued

25    intact.

1           MR. THOMAS:   Thank you.

2       Ladies and gentlemen, we are the defendant, so we get to

3   go second, not by choice but by law.   And I appreciate the fact

4   that you have listened patiently, and I expect you will do the

5   same for me as you did for Mr. O'Hare in presenting my opening

6   statement, and also an open mind is what we want you to bring

7   to this because you only heard part of story.   You didn't hear

8   the whole story.   And we are going to fill in the gaps and

9   information that you hear in the trial and put it in context.

10  We think the case is a fairly simple case.   It is a technical

11  case at a high level, because it is a patent case, you have

12  patent language, engineering language, you have drawings, you

13  have specifications.   But at a more modest level, which is kind

14  of the level I think, at the end of the day, you are going to

15  appreciate this case is fairly simple, easily understood, and

16  easily explained.   With that, let me begin.

17      We prepared for your benefit -- because as the old saying

18  goes, a picture is worth a thousand words.   Lawyers can give

19  you a thousand words, but I think showing you the evidence and

20  showing you some pictures of things is the best way to kind of

21  educate you on this case so that when we get in the testimony

22  phase and the actual evidence phase, you will have a lens

23  through which you can hear the questions and the answers and

24  the cross-examination.

25      With that, I will begin our opening statement, and I will

1    ask you to pay attention, if you could, to the monitors and

2    listen to me at the same time so we will have both of those

3    medium going at the same time.

4          As you know, the parties are Whitewater West Industries.

5    We refer to them as "Whitewater."  As you heard, they are a

6    large Canadian company.  They have the largest market share in

7    the world of sheet wave ride and other types of surfing events.

8    They have been around since 1980.  And they were not an

9    inventor.  They went out and purchased this Flow Rider

10   technology from Wave Loch, that you have heard already.  Bruce

11   Lochtefeld was listed as the inventor to the original '589

12   patent.  His company was the original commercial effort to

13   launch and sell those products, so it was really

14   Mr. Lochtefeld's invention, if you will, at the time, and I

15   think that's important.  Whitewater is here because they own

16   it, and they are here to enforce it, but you understand that

17   they didn't invent this.

18         Pacific Surf Designs, PSD, is a small start-up company.

19   You heard that.  Mr. Alleshouse and Mr. Yeh started it in 2012.

20   And they are two friends from UC Berkeley.  Mr. Alleshouse is

21   an engineer himself, University of California Berkeley, and has

22   his MBA from USD.  You heard that.  Mr. Yeh is a graduate of

23   Cal Berkeley as well.

24         They were surfers, they were friends, and they wanted to

25   make a better wave machine and wanted to create a more fun ride

experience.  And what they did is obtained start-up investment
from friends and family, and some of this did come through
Mr. Yeh's family, and they do have access to capital.  But they
wanted to build a dream business because these were lifelong
surfers and people interested in advancing the enjoyment of
that sport beyond the ocean, and it began to have success.

So after they went in the business -- and you will hear
that Mr. -- you have already heard that Mr. Alleshouse worked
for a period of time at Wave Loch, and did not have a covenant
where he couldn't do go out and compete.  He could go out and
start his job.  A fundamental principle of the system is free
enterprise and you can go and do things in the public domain,
and that is what this case is about.  What is really owned by
Whitewater and what can we lawfully do?

And you will hear evidence, we think the evidence will be
clear, that Mr. Alleshouse was very careful, being a Cal
Berkeley engineer, understanding the patents, understanding
what he could lawfully use in a lawful domain and what the
patent covered and didn't cover.

After they went into business, PSD was sued.  You will
hear evidence PSD's potential customers were given letters
threatening them with litigation.  You will hear the sales
weren't successful, but part of this was really the activity of
Whitewater.  The question is why was Whitewater so aggressive?
What is this reaction?  We aren't the only competitor in this

1    business.  They have other competitors besides this small

2    start-up.

3         You will hear, at least from our client, we made a higher

4    quality, safer, and higher performance sheet wave machine.  And

5    I won't go into the details of that, but we basically built a

6    better product, which is really what free enterprise is about.

7    The marketplace will decide who has the better product.

8         PSD's product uses -- has much more efficient use of

9    electricity.  It is not only the cost of buying the product;

10   there's a cost of maintenance on the product.  So once you

11   start powering these machines up, the more efficient machine is

12   more valuable to the customer than the less efficient machine.

13   And you will hear evidence our product is more efficient,

14   cheaper up front, and a better performance.

15        With lower operating and lower construction or capital

16   expenditure costs, the market accepted the improvements, and

17   the product.  The top-tier customers, Mr. Alleshouse will

18   testify about who they are, but they began replacing the Flow

19   Riders, that were sold previously by Whitewater and Wave Loch,

20   with the PSD ProFlow.

21        How do we approach the design?  This is the important

22   phase of the case.  You are hearing about willfulness, about us

23   deliberately doing things.  Let's put it in context.  We knew a

24   lot.  We were people who were in the business.  Mr. Alleshouse

25   was in the business.  He was a professional engineer.  He

1    understood what was available to him in the marketplace, what

2    was in the public domain, how to design something that didn't

3    infringe on a patent.

4          We wanted to compete in the sheet wave machine market.

5    Because, as we explained, Whitewater is the dominant leader.

6    There are other competitors.  Murphy's Waves, makes a Stingray

7    product; American Wave, makes a Surf Stream; and AFP.  So we

8    are not the only company doing it.  There are others.  But the,

9    clearly, biggest dog on the block is Whitewater.

10         And you will also hear evidence most aspects of the wave

11   machines -- this is not putting rockets on the moon.  This is

12   simple technology for the most part.  And most of the aspects

13   of the wave machine technology is in the public domain, which

14   means any company, whether it is my client or others, can go

15   assemble, with information publicly available, and use

16   technology and create competitive products.  There's nothing

17   illegal, nothing wrong with that.  It is, in fact, encouraged.

18         We will talk about the elements of these wave machines.

19   And most of these elements, as I mentioned, are in the public

20   domain.  They consist of pumps to pump the water through the

21   nozzle sluice onto the surface.

22         They have water jets; they are in the public domain.  Ride

23   surfaces; they are in the public domain.  Padding; that's in

24   the public domain.

25         And hinges.  Eventually, you will learn that Whitewater

1   modified what it had patented.  It changed what it was building

2   beyond the scope of the patent.  It added a solid structure,

3   sheet metal inside it.  It added a piano hinge.  Neither of

4   those elements are included in the patent.

5       All these things they later added to their sales and

6   marketing efforts are beyond the scope of the boundaries, if

7   you heard the Court, of the patent.

8       So, how do we approach this design?

9       Wave Loch are known to be aggressive, and Whitewater, in

10  asserting their patents.  PSD, our client, went to their

11  website, pulled down a list -- a list of published patents, so

12  it's easy to figure this out.  Pull them all down and research

13  the patents.  We knew that many of these patents had already

14  expired, so those technologies that were expired on expired

15  patent are now dedicated to the public and pose no risk.

16      We made sure to avoid all of Wave Loch's.  These are not

17  Whitewater patents; these were owned by the other company, Wave

18  Loch, Tom Lochtefeld's company.

19      And after considering these active patents, including the

20  '589, which was an active patent back in 2012, when this

21  company got started, we looked at the one Wave Loch patent -- I

22  think Mr. O'Hare referenced this.  There was a trampoline-style

23  surface.  We purposely did not use that.  We respected the

24  intellectual property.  That was an improvement that was valid

25  in the marketplace, so we did a lawful design-around patent.

1   That's lawful.  Nothing illegal, nothing nefarious.  You are

2   entitled to design around known patents, and that's what we did

3   with the trampoline style.

4        You will hear about this flexible tongue.  And in front of

5   us, by the way, I have a demonstrative exhibit, really, to show

6   you -- because we have lots of photos, but this is up close and

7   personal; you will be able to see this and understand what we

8   are talking about in the way of a flexible tongue and

9   understanding the various other elements that were added to

10  this that changed, what was patented.

11       So the '589, the boundaries of this patent is limited to a

12  flexible-tongue nozzle flap, which PSD has never used.  We have

13  never used a flexible tongue.  And I will explain that.  There

14  are three -- the flexible tongue is one of the -- which is part

15  of the '589 patent.  There is only one disclosed invention as

16  it relates to the flexible tongue, and that's stated inside the

17  '589.  It is a padded foam material, and we will show you the

18  patent.  It doesn't include the piano hinge and doesn't include

19  a structure inside the foam padding.  And the example on the

20  far left, the dark blue, is the foam padding, without the piano

21  hinge and without the metal plating inside of it.  And that is

22  the limit, the metes and bounds of their patent.  It doesn't

23  include these other items.

24       The hinge metal flap as used in Wave Loch's

25  installation -- the patent, as you heard from Mr. O'Hare, was

1   filed back in 2000, and it was obtained within a year or so of

2   that.  But by 2005, they changed their design.  They are

3   entitled to do that.  They don't have to always follow their

4   own patent.

5        It happens all the time.  You get a patent on something

6   and realize, "You know, there's a better way to do this."  And

7   what they did is went in and added a piano hinge, which is in

8   the public domain.  You heard that from Mr. O'Hare today.  They

9   added the sheet metal inside the foam, which didn't exist in

10  the patent.

11       From 2002, after five years of being in business, they

12  changed their own design and went beyond the scope of their own

13  patent.  So they are using what we call technology that's

14  available to anybody.  Piano hinges, sheet metal; all these

15  things are available for anybody to use.  And you will find

16  that they didn't go back and try to put a new patent out or get

17  an amendment to their patent to include these elements.

18       We know why they didn't because they wouldn't have been

19  allowed.  Those technologies are so common, there's nothing

20  novel or new about a hinge or piece of sheet metal.

21       The '589 was installed in the Flow Rider starting in 1999.

22  They used a heavy foam mat that extended over the nozzle and

23  outlets.

24       Your Honor, if I can approach.

25       This is the heavy foam, here, and you'll see there's

1   nothing structural inside that.

2        This is the fixed, welded-shut flange, which Mr. O'Hare

3   talked about.  This is what we started using, which was a piece

4   of sheet metal inside this, not a padded foam tongue, but

5   rather a structure that included a piano hinge.  The piano

6   hinge is not part of the flap.  It is not included in the

7   design of the patent.  It is not referenced in any way, so it

8   is -- again, the boundaries of the patent.  We added things

9   that were not in the patent, and we were functioning with our

10  nozzle flap being something that is beyond the scope of this

11  patent.

12       So, a flexible tongue is a foam pad without structure.

13  Just a piece of gym mat, wrestling mat.  No hinge on it.  No

14  metal inside.  No nothing.  Just flops up and down.  It's

15  biased -- you will hear that term, "biased."  That means it's

16  facing down, towards the water.

17       Wave Loch moved to a hinged metal flap, as I explained, in

18  2005.  So, they moved away from what they were doing under the

19  patent.  Nothing illegal about that.  They are entitled to do

20  it.  But what they are not entitled to do is claim patent

21  protection for it.

22       They stopped using a flexible foam tongue, like I showed

23  you, on the end of this demonstrative exhibit, and they began

24  using a bolted metal plate to the nozzle with the piano hinge

25  and they incorporate what we say was public technology.  It is

 1    fair for them to do it, but it's also fair for us to do it.

 2    And a water stream that pushes the metal plate off of the ride

 3    surface.  I mentioned to you this hinge here, which has -- is

 4    not flexible in any way, does get affected by the water coming

 5    underneath the surface on the ride area.

 6        And as I mentioned before, they never filed a patent

 7    application for adding a hinge or adding structure inside of

 8    this flap.  They continued to live off of the same patent even

 9    though they changed their design, but the only intellectual

10    property they patented was for the foam padding, without a

11    piano hinge and without sheet metal.

12        As a result, we were free to use a hinged metal flap in

13    2012.  It is not covered by any patent, and we will show you

14    the '589 drawings don't have a hinged metal flap.  They don't

15    have any metal inside them.  And they don't have a piano hinge.

16        So when Mr. Alleshouse left, he understood, as an

17    engineer, those things were in the public domain, and they have

18    been used for decades, hinged flaps, to close water outlets.

19    He reviewed Wave Loch's patents with Mr. Yeh for coverage of

20    any hinge flaps and they determined there are not any patents;

21    that that technology, as we said, is in the public domain.

22        You will hear -- you heard from Mr. O'Hare how important

23    all these flaps are and all this.  That's an interesting thing

24    in this case because we believe the evidence, even from their

25    side, is going to prove the opposite.  The customers don't

1   really care about nozzle flaps.  This is just a piece -- a

2   small piece of a bigger device that they are buying.  In fact,

3   we will have evidence that these flaps, depending on which one,

4   cost only about $2,000, and the machines are many times the

5   total value of that flap.  But not one customer has ever asked

6   PSD about what kind of nozzle flap they use.  Not a single one.

7   It is not used in the marketing literature, not used on the

8   website.  And most competitors of Whitewater and PSD don't even

9   use nozzle flaps, but they are making sales.

10      So these are not, as suggested by Mr. O'Hare, driving the

11  force of this industry by any stretch.  In fact, they are

12  little known except to the inventors of the patent how

13  important they are.

14      Whitewater, for the first time, added its hinge flap to

15  its marketing materials in 2018.  We will show you this.  This

16  is important, because you are going to hear from Whitewater,

17  "Oh, my God.  This revolutionized, this was an important thing

18  for all our customers."

19      They never got to use on the website or marketing

20  materials until 2018.  The lawsuit was filed in 2014.  They

21  realized, "Oh, my God, if we are going to go to trial and we

22  are going to tell the ladies and gentlemen of the jury this is

23  important, we better add something; otherwise, we will look

24  silly."  That's what they did, they put it in in 2018.

25      But if this had been so important to the marketing and so

1    important to the customers, to drive sales, it would have been

2    replete, all over the website, part of the sales literature,

3    been the biggest selling device they had.  And, in fact, they

4    didn't use this to sell anything.

5        What you will learn is the customers -- which is not a

6    surprise in any business -- they buy on price, they buy on

7    reliability, and they buy on efficiency.  That's what drives

8    sales.  If you can make it better, cheaper, faster, safer, the

9    market is going to gravitate towards you, and that's lawful.

10       This case is all about nozzle flaps, and I have to

11   apologize.  We do need to spend a little bit of time talking

12   about the claims.  We are being charged with infringing on a

13   large number of claims, 14 claims.  So I am going to spend just

14   a few minutes so you can get an idea of why this case, at least

15   from our standpoint, doesn't hold water.

16       This is a list of claims.  You will hear a difference

17   between dependent and independent claims, and I will cover that

18   in a minute.  But to infringe a claim, every limitation in the

19   claim must be found in the accused device.  It sounds legalese,

20   but I think we can get this in fairly easily with pictures.

21       We do not do any -- do not infringe on any claims of the

22   '589 patent.  We do not infringe on any claims.  We looked at

23   what was in the public domain, looked at what was covered by

24   their patent, and what we did when we began operating the

25   business in 2012 was to build a system that was outside of the

1    scope of this patent.

2        Start with Claim 1.  Claim 1, again, is a -- probably the

3    most important claim from their standpoint.  It is a flexible

4    tongue, a nozzle cover comprising a padded material -- you will

5    see no reference in this patent to a sheet metal structure, to

6    a piano hinge, to anything else.  The only thing they are

7    talking about is a padded material, which is what we have on

8    the far end of the demonstrative exhibit.

9        Biased, angled down, against the flow of the water.

10       What we have here is just a close-up thing.  It shows it

11   without the covering assembled on top of it.  That blue vinyl

12   that you see here is not there, but this is what is beneath

13   that.

14       The left side, you have the nozzle sluice, which is the

15   end where the jets push the water through onto the ride

16   surface.  There's a piano hinge, as I mentioned.  That's not

17   mentioned in the patent.

18       There's a metal plate.  That is not mentioned in this

19   patent.

20       Underneath, this flap, that the -- the water comes out

21   beneath the flap, onto the ride surface.

22       PSD has a metal plate.  It does not have a nozzle cover,

23   including a flexible tongue, which is biased downward.

24       You heard the Court mention it has done some claim

25   construction.  This term, "flexible tongue," is not one of the

1   ones that the Court construed.  This is going to be subject to

2   your common sense.  You will hear from experts.  You will hear

3   from our client.  But what makes sense?  We know there's no

4   reference to a hinge.  There is no reference to a structure

5   inside that padded foam.  And we think common sense will tell

6   you we are not practicing this invention that, frankly, was

7   abandoned by Whitewater in 2005.  They went to a different

8   path.

9        They are going to assert the hinge metal plate is a

10  flexible tongue.  So this is where the gymnastics come in.  We

11  have to say it's something it is really not.  Somehow they are

12  going to have to convince you that this fixed piece of sheet

13  metal is really flexible.

14       You will hear engineering dictionaries disagree.  Our

15  expert, Mr. Pribonic, will testify.  He disagrees.

16       And most importantly, from your standpoint, we are going

17  to have one of the designers of the '589 patent, who then

18  worked for Mr. Lochtefeld -- his name is Bruce McFarland -- he

19  will testify for us.  And he was involved in these drawings.

20  And he is going to disagree that this flexible tongue would

21  include a piano hinge and a piece of a sheet metal.

22       Common sense disagrees.

23       A wood frame is a solid piece bolted with a hinge to a

24  frame.  Yet, would you consider a door to be a flexible tongue?

25  The answer is no.  We know the door is not flexible.  It is on

1  a hinge that rotates, but the hinge is not part of the flap.

2  The hinge is not included in the design of that padded flap

3  they have a patent on.

4      So we know from Claim 1, which we don't infringe,

5  Claims 3, 13, and 15 are also -- we are also accused of

6  infringing on, but they all rely or depend on Claim 1.  So if

7  Claim 1 fails, in your mind, dependent Claims 3, 13, and 15, by

8  law, cannot infringe.

9      So there's a lot of claims floating around, but when you

10  cut them down, most of them fall by the wayside, because one

11  depends on the other.  If you find that the '589 patent is --

12  the boundary is limited to a foam-padded flexible tongue and

13  not a hinged metal structure inside a padding, then these --

14  all these claims fail, by law.

15      Moving on, there's Claim 17, a separate claim, and we will

16  spend a little bit of time talking about that, but it is

17  talking about a contoured flexible pad.  You see that in red,

18  with a flexible tongue at the downstream end, and we have

19  covered that.  I don't want to repeat myself.  So, you

20  understand our position on the flexible tongue.

21      What we have here -- again, just an illustration -- is the

22  hinge, the nozzle sluice, and the ridged steel on the

23  downstream end, which is not a flexible tongue, as defined in

24  the patent.  So we have a hinged metal plate.  We do not have a

25  contoured flexible pad or flexible tongue, which also defeats

1    Claim 17.

2         PSD does not infringe Claim 24.  What is Claim 24?

3    Claim 24 speaks to a cover which covers and extends over the

4    top surface of the sluice.  The sluice is where the jets for

5    the water are -- occupy.  We will show you a picture.  This is

6    a picture of the flap on the right, and you will see there's an

7    area next to it with the piano hinge.

8         And then this blue area, with this blue grating, are the

9    nozzle sluices.  And this picture doesn't go all the way to the

10   left, but this is a fairly significant area, a four- to

11   five-feet area, where these nozzles occupy below that.

12        And this patent would require us -- to infringe, would

13   require the plaintiff to demonstrate that we have a cover over

14   this entire nozzle sluice, which we do not have.

15        We have a cover -- and the language of the claim is pretty

16   simple, a cover which covers and extends over the top surface

17   of the said sluice.  The said sluice is the entirety of that

18   nozzle system.

19        Here is another picture to maybe better illustrate.  We

20   have a small area that we have a board on, with the piano hinge

21   and that.  But the nozzle sluices are uncovered by that

22   particular board, so this claim is not infringed on that

23   aspect.

24        This big round thing in the middle is the lane divider.

25   Mr. O'Hare mentioned that to you.  That allows people to safely

1    board on either side.

2         Moving on to the rest of these claims, 25, 26, 27, 28, and

3    30, cannot infringe.  I will try to go through this quickly.

4         A lot of these go back and rely on this tongue-like pad.

5    We have demonstrated that this independent claim, which 25, 26,

6    27, 28, and 30, depend on the existence of Claim 24, and we

7    have shown you -- through the pictures, I just established that

8    we do not infringe on Claim 24, so these dependent claims

9    cannot, by law, be infringed.

10        Finally, on these claims, there is 37, 42, and 43, we are

11   accused of infringing.  As to Claim 37, we do not -- we do not

12   have a flexible tongue, as we talked about, so a lot of these

13   gets back to the same definition.  What is a flexible tongue

14   that's urged downward?  We have a hinged metal plate, as we

15   mentioned.

16        So when you get through all this and understand what they

17   patented and used until 2005, and they decided they were going

18   to change what they used and went beyond the scope of the

19   patent.  They are entitled to do that, but you can't come back

20   and expand the patent and say, "We meant to cover all these

21   things, but didn't bother to put it in the patent."  They can't

22   do that.

23        Okay.  There's other issues you are going to be asked to

24   decide in this case.  And we believe there are evidence of

25   false, misleading statements made to the PTO, and I will try to

1    spend a brief amount of time.  There are jury instructions you

2    will get about acting ethically from the patent office.  The

3    patent office has to rely on the lawyers telling them things,

4    and they do things based on representations by lawyers.

5        Mr. O'Hare touched on this.  There were patent maintenance

6    fees.  This is true for all patents, not just to one.  And the

7    payments are due at intervals over time.  The first one, the

8    cheapest, $1,600; the second one, $3,600, seven and a half

9    years later.  And last one, the most important and biggest one,

10   is $7,400.  That may not sound like a lot of money in the

11   context of other things.  But if you are looking at paying your

12   maintenance fees, the last one is the most important because it

13   is the most significant payment in relation to those moneys.

14       You have a one-year window to pay that fee.  If the fee is

15   not paid, the patent lapses; the technology goes back into the

16   public domain; and that's what happened here.

17       I want to give you a quick timeline instead of walking you

18   through a lot of different emails and things.  We will cover

19   that during the trial.  But some of this starts back as early

20   as 2014.

21       There was an email to Mr. Taché, here, seated at counsel

22   table, giving them notice of a maintenance fee due on

23   December 10, 2014.  They get these.  "You are here as counsel.

24   You are getting notice you have to pay this $7,400 by

25   December 10."

1        September 5, another reminder email goes over to

2    Mr. Taché.  The maintenance fee is due December 10.  There's a

3    notice of lapse on that because it wasn't paid.  And then a

4    notice on January 22, to Mr. Taché, of 2015.

5        You will hear evidence and we will talk about this.  It is

6    true that Whitewater took the responsibility of paying these,

7    but the owner of the patent has the responsibility versus the

8    PTO, and the owner of the patent at the time was identified as

9    a different entity than Whitewater.

10        And you will see and hear evidence about how they tried to

11    reinstate this patent.  And the first time they filed the

12    petition to revive the patent, they filed it incorrectly.  It

13    was denied.  The sequence started with Mr. Taché getting

14    notices, and finally Mr. Squier gets information about a lapse

15    way late in the game, after receiving all these emails.  And

16    there are other emails not on this timeline that reinforce the

17    idea they were told many times in advance, and they allowed --

18    as you heard from Mr. O'Hare, there's an amalgamation, a

19    merger, and they took all these other patents and kept a

20    spreadsheet of what other patents are due, and they

21    intentionally allowed any number of patents to lapse, because

22    it is expensive.

23        If you are not using the patent, you are not going to pay

24    the maintenance fee because you don't care.  And you have heard

25    from our side, and you will hear from our side that they were

1    not really practicing what they patented, with that patented

2    foam tongue.  They moved away from it.  They were tired of

3    paying maintenance fees, potentially allowed any other number

4    of patents associated with this amalgamation to go and wasn't

5    until they decided they weren't -- were going to try to sue us,

6    they needed to come back and change this.

7        So, on February 5, 2015, Mr. Taché emailed his client; the

8    client approves the maintenance fee; and this is when they are

9    ramping up to start litigation.  And they couldn't have

10   litigation without the patent.

11       After getting all these notices, not really practicing the

12   invention, allowing it to expire, missing the most critical

13   payment, $7,500 payment.  February 6, Mr. Taché directs

14   Mr. Squier, who is another member of his firm, to revive the

15   patent.  And as I mentioned, Mr. Squier files a petition to

16   revive it.  That was rejected.  And we will get into the

17   details of what happened there.  That gets into some of the

18   inequitable conduct.  They filed another amended petition.  We

19   will get into those details, too, which gets to more

20   inequitable conduct.

21       Based on certain representations made by the lawyers, the

22   patent office relied on and revived this.  And we think we can

23   show you and are entitled to show you, yes, with clear and

24   convincing evidence, there is evidence this was an intentional

25   act done, that they later changed their mind on when they

1  decided they were going to pursue litigation.

2      Mr. Squier was required by law to make a declaration that

3  he did an investigation, and you will hear evidence that he

4  didn't determine if the delay was unintentional.  We know that

5  no one paid the 11-and-a-half-year maintenance fee, the $7,500

6  fee, so, by law, it lapsed.

7      He later paid.  Mr. Squier paid the fee, swore the delay

8  was unintentional.

9      We know from Mr. Squier, because we took his deposition,

10  he didn't do any investigation of the delay at all.  He just

11  followed the direction of his partner, Mr. Taché.  And

12  Mr. Taché is a lawyer on the trial team, but he is not the

13  client, and he is not the one to know or not know.

14      Whitewater claims -- we talked about the attorney-client

15  communication between Mr. Squier and Mr. Taché, and they are

16  entitled to assert that.  You have heard jury instructions.

17  They can do that.  But they haven't disclosed the basis for

18  asserting this delay and explaining it was unintentional.

19      In any case, we are back with the PTO.  There was an

20  affirmation made by Mr. Squier that the delay was

21  unintentional.  And we do know from what limited information

22  made available to us, that they would talk about, is Mr. Squier

23  never talked to the client.  So he made an affirmation to the

24  PTO this was unintentional not from Mr. Taché's standpoint but

25  from the client's standpoint.  As a result of all that, we

1   believe, just on the basis of that alone, '589 is

2   unenforceable.

3       I mentioned Mr. McFarland.  He was a subcontractor, worked

4   with Wave Loch, worked with Mr. Lochtefeld, who you heard lots

5   of glowing descriptions from Mr. O'Hare about Mr. Lochtefeld

6   and didn't really mention Mr. McFarland.  You are going to hear

7   directly from Mr. McFarland.  He was one of the key designers

8   of this 1999 sheet wave machine that was shown in the '589.

9       He was hired as a subcontractor to design the improved

10  sheet wave machine by Mr. Lochtefeld.  The older wave

11  machines -- and we will show you photos of this -- had a tall

12  vertical bumper covering the nozzles, and Mr. McFarland

13  designed the key components of the sheet wave machine.  He will

14  testify and tell you.

15      In fact, Mr. McFarland created the flexible tongue

16  figures, the ones inside that are the '589 patent.  He will

17  testify what is embodied by that.

18      So, back to the asserted claims are -- there's another

19  basis of invalidity.  We talked about inequitable conduct.  Now

20  we will talk about claims that are not really patentable

21  because they are not new or novel, and that's part of our

22  defense in this case.

23      You heard from Mr. O'Hare, patents can only be granted to

24  inventions that are novel.  You can't patent things that

25  already exist.  If anyone has used the claimed invention for

1     more than one year before the date of the filing of the patent,

2     then the use is known in the law as "anticipated," and it is an

3     anticipated use.  The anticipated claims are invalid under the

4     law and cannot be enforced.

5          The '589 patent was applied for August 2, 2000.  The

6     critical date is one year prior to the filing, which would push

7     that back to August 2, 1999.

8          Now we have to investigate what was the known art, the

9     practiced prior art, prior to August 2, 1999.  And I will show

10    you.

11         Wave Loch, Mr. Lochtefeld's company, which later was

12    amalgamated into Whitewater, but back in 1996, you will hear

13    testimony directly from Mr. McFarland they installed a Flow

14    Rider machine in Hyland Hills in 1996, three years before

15    the -- prior to the date of this patent.  The Hyland Hills

16    installation was used publicly prior to the critical date of

17    the '589, which would be August 2, 1999.

18         This installation -- I will show you pictures in a

19    minute -- has every limitation of the accused claims, including

20    the flexible tongue.  This so valuable, so innovative, so great

21    thing, well, Mr. Lochtefeld, through his company, Wave Loch,

22    and Mr. McFarland, they had already began using a flexible

23    tongue back in 1996, which, if we establish that, you will

24    learn, renders this invention invalid.

25         All accused claims are invalid, being anticipated by Wave

1    Loch's Hyland Hills installation.  This is the picture of the

2    Hyland Hills installation, and yes, there are differences from

3    what Mr. O'Hare talked about, but the primary thing, in terms

4    of this invention, is this, as you heard, this flexible tongue.

5    The Hyland Hills installation is a nozzle assembly for water

6    ride.  There's waters underneath pushing the water ride onto

7    the surface area, where the little girl is boogie boarding.

8    The nozzle assembly is below that deck area.

9        The nozzle has an outlet, an aperture adapted to admit a

10   jet of water onto a ride surface.  That's definitely included

11   in the Hyland Hills installation in 1996.  Here is the drawings

12   for the 1996 Hyland Hills installation.  And I will show you --

13   these are not easy to read, but you will see there's a water

14   jet.  You will see there's padded bumpers.  You will see that

15   there's a nozzle, having an outlet.  We have an aperture, here

16   on the right.  The nozzle is also the sluice.  It is where the

17   water is emitted through.  The aperture is the opening.

18       There's a ride surface.  That's part of this claimed

19   invention in the '589 patent.

20       So you are seeing everything that's covered in this

21   so-called groundbreaking invention that changed the whole

22   landscape, already done, not by a third party, but done by

23   Mr. Lochtefeld and Wave Loch in 1996.

24       So this is, again, another diagram of the installation,

25   the other elements of the claim.  A nozzle cover comprising a

1   padded material substantially covering said nozzle, which we

2   know they had padded materials, and a flexible tongue, which is

3   biased towards the flow of water.

4        If you look to the right, there, you will see -- this is

5   the actual drawings for this Hyland Hills installation.  The

6   highlighted section, on the upper right, six-inch foam pad --

7   that is exactly what is described in the '589 patent -- and

8   must be removed to adjust the aperture.

9        You can see the existence of the pad on the far right of

10  the demonstrative exhibit being used three years before this

11  patent, being used by Mr. Lochtefeld.

12       And we talked about prior art, cited references.  What is

13  very significant in this case, when they filed for the patent,

14  the never disclosed to the PTO that Wave Loch had done this

15  very same thing, with a flexible tongue, back in 1996, with the

16  Hyland Hills.  It couldn't be a mistake.  It couldn't be

17  oversight.  They knew, because they did it.  But it wasn't part

18  of the prior art references.

19       The Hyland Hills, this -- reading the patent against the

20  Hyland Hills installation, biased downward against the flow of

21  the water.  We showed you the flexible tongue to prevent

22  injuries to riders, over the nozzle.

23       Here is a better example, the little girl on the boogie

24  board.  We drew a red line there.  You can see there's the same

25  kind of angle that you see on the tongue, on the far right side

1   of my demonstrative, it appears it's a padded foam.  You saw

2   the drawings.  It is a padded tongue with no hinge or sheet

3   metal in it.  And it is biased over the water.  And it allows

4   the girl, or any riders, to ride up over it.  This is 1996.

5        So this groundbreaking, earth-shattering development that

6   they are claiming occurred with the patent, in '589, was

7   actually practiced by themselves in 1996.

8        So, as we said, Claim 1 is not novel, and is invalid, and

9   the same for all the other claims.

10        Now, there's another doctrine, called obviousness, and I

11   am going to explain that.  It is similar to "anticipation," but

12   it is slightly different.

13        Patents can only be granted on inventions that are not

14   obvious.  What is obvious?

15        Well, if two items, you have two items that practice prior

16   art that exist, one has 90 percent, one has 10 percent; one has

17   50 percent, one has the other 50 percent.  The combination of

18   those two pieces of prior art render the patent unenforceable

19   because it was obvious.  You had all elements in the public,

20   maybe through two different pieces of prior art.

21        There's a second piece of prior art that we want to

22   demonstrate that also establishes that this is an unenforceable

23   patent.

24        If you have find for some reason Hyland Hills doesn't have

25   every limitation of the asserted claims, we believe the

1    evidence will show a combination of the Hyland Hills Flow Rider

2    installation and the Flow Rider installation at Guam -- there's

3    a second installation they did before they filed the patent in

4    1989.  This is the Guam Flow Rider.  This is the drawings.

5    They are very similar to what we saw at Hyland Hills.

6        There is the nozzle, covered by the patent.  This is the

7    area that -- just the section of the section of the drawings

8    where the nozzle shows the adjustable aperture, but what is

9    significant, if you look above, there's a padded cover, and

10   there's a flexible tongue.  This new thing that they think the

11   '589 changed was being used and practiced by Wave Loch in 1996

12   in Hyland Hills, in 1998 in Guam, using the same groundbreaking

13   innovation, this flexible tongue.

14       So, patents can only be granted on inventions that are not

15   obvious and not anticipated.  We think the Hyland Hills shows

16   every limitation.  Certainly, in combination with the Guam,

17   they show all asserted claims are invalid as both being

18   anticipated and obvious.

19       So, now, a word about damages.  You heard about this

20   $2 million hypothetical.  We owe these guys all this money for

21   something that is really not part of the patent.  What you will

22   hear from us, there are no damages.  Number one, we didn't

23   infringe.  So, if we are not infringing any valid claim, there

24   can't be any damages.

25       And in order to show what they are seeking is

1    unreasonable, it is wildly unreasonable -- and you will hear
2    testimony about royalties have to be reasonable -- you heard
3    instructions from the Court this morning or afternoon -- after
4    lunch, rather -- it is not here to punish the defendant.  It's
5    only here to put them in the same position they might have been
6    had they gotten some kind of royalty.  And here, they are
7    asking for some $2 million paid-up royalty for, frankly, items
8    that are beyond the scope of the patent and the public domain.
9        But we mentioned this earlier from our client, our
10   customers, our client, no one cares about the flaps.  They are
11   not buying these for the flaps.  They are buying these for
12   efficiency, safety, price, for operating costs.  And flaps, as
13   I mentioned, cost only about $2,000.
14       We have a new design.  We talked about that.  And that's
15   on this end closest to me.  That's a fixed position; one welded
16   in place.  It doesn't move up or down.  It is a design-around.
17   We mentioned this before.  It is entirely legal and lawful to
18   design around a patent.
19       In this case, we did it not so much because we felt we
20   were infringing, but we needed to get away from litigation.
21   These people have claimed everything we do is infringing.
22       So we have a new design.  And the existing installations
23   can be converted for only about a $500 fee.  So it isn't --
24   none of this is that significant in terms of our business model
25   whether we use that design or this design.  This isn't

1   significant dollars, and they are certainly not driving sales.

2       I mentioned we are using the fixed metal flap bolted to a

3   metal plate.  Could I ask Mr. Kolegraff to come up, my partner,

4   and maybe walk through using this demonstrative what the

5   elements are of this, start over there.  This structure,

6   complete foam padding, flexible tongue, as described in the

7   patent.

8       And then where he is standing, by the way, is all of that,

9   the nozzle area, is a four-foot area behind that that you are

10  not seeing.

11      Then the next one, which would be the hinged one, which

12  you can see is not -- it moves up and down like a door.  You

13  can go in and out, but a door is not flexible.  That is not

14  flexible.  And that is not what is described.

15      There's the piano hinge he is pointing to, which is not

16  part of the flap assembly described in the patent.  They have

17  no reference to a piano hinge or any hinge or structure inside

18  the foam pad.

19      And the middle one is the new design, a stiff bracket.

20  You can't move it up or down any which way, so there's no

21  possible way anybody could claim that's an infringing item.

22      Thank you.

23      So, anyway, we think showing you is the best way to teach.

24  And we just want to get away from these aggressive patent

25  attacks.  They are the big dog.  They are the biggest in the

1    world.  You heard that.  They have lots of money to throw at

2    lawyers.

3         This is just a picture.  You saw this actually in

4    Mr. O'Hare's presentation, the fixed metal plate, the ride

5    surface.  We did -- we have sold one.  There's another sale

6    pending.  I don't know what the point of discussing whether we

7    are safe or unsafe.  The market will decide whether this is

8    something they want to buy or not, and I can tell you we have

9    had no reported incident on any of these, nor to my knowledge

10   has the plaintiff.

11        Whitewater's damage position, let's talk about that a

12   minute.  You have heard the reasonable royalty is $2 million,

13   lump-sum payment.  Core facts to keep in mind, you will be

14   asked -- it is your job to decide, if there is infringement,

15   number one; and two, what is a reasonable amount?

16        Since we were formed, we have a total revenue of

17   $4 million.  They want half the total revenue as the royalty

18   payment.  Sounds like punishment.  And we have only had a gross

19   profit of $600,000.  They are seeking basically an unreasonable

20   royalty of 50 percent of our gross revenue and a royalty they

21   think is reasonable of three times our gross profit.

22        You will hear from our expert as well, and none of these

23   fit within the legal parameters of what is reasonable.  That's

24   one of the questions you are going to have to decide is are

25   they being reasonable here.

1          We know they never filed a patent application on a hinged

2     metal flap.  They never augmented the patent filing.  They

3     moved away from it in 2005 for business reasons.  They are

4     entitled to do that, but they are not entitled to come to court

5     and claim their patent covers something other than what is

6     shown in the patent.

7          As I said, they are trying to get you to stretch the scope

8     of the '589 patent and assert that a hinged metal flap is

9     really the same thing as a flexible tongue.  You will be the

10    deciders of that.  Again, the Court hasn't construed this

11    language.  But the language is clear, a padded, foam, flexible

12    tongue.

13         They are seeking a 50 percent royalty.  The patent expires

14    in eight months.  This patent is nearly up in eight months.  To

15    the extent it's even valid, it would revert to the public

16    domain.

17         As I mentioned before, this is covering a very minor

18    component of a very large wave machine -- a very small

19    component, one the customers don't pay any attention to.  As we

20    said, we are using a fixed metal flap.

21         And finally, we know they did allow this to lapse, and we

22    think, as a result of that failure to pay the maintenance fee

23    and the way they handled themselves with the PTO -- and you

24    will hear more evidence than I covered today -- really will

25    demonstrate with clear and convincing evidence there was

1   inequitable conduct associated with this.

2       That's all I have for you now.  We will be able to talk to

3   you again at closing, but thank you again for being so

4   attentive this afternoon.

5           THE COURT:  All right.  Well, thank you.  That's

6   pretty good timing, I might add.  It's pretty close to four

7   o'clock.

8       So I think, ladies and gentlemen, I am going to send you

9   home for the evening.  I know you have got a lot of information

10  today and I suspect you may want to think some of these things

11  over; but please remember not to do any research on your own.

12  And so, I am going to ask you to be outside those doors

13  promptly at 9:00 a.m. tomorrow.  Okay?

14      Juror number 11, if you could stay with us for a few

15  minutes.  All right?

16      So, thank you.  See you tomorrow morning.  Leave your

17  notebooks on the chair.

18          (The following proceedings were held in open court out of

19  the presence of the jury:)

20          THE COURT:  The rest of jury has left the courtroom.

21      Juror Number 11, Mr. Smith, after further discussion with

22  the attorneys, we have all agreed that perhaps this is not a

23  case that you should be sitting on.  So I am going to ask -- I

24  am going to excuse you from this jury panel.  I am going to ask

25  that you go back to the jury commissioner's office, let them

1   know that you have been excused from this jury.  I thank you

2   very much for giving us your time.  And with that, I wish you a

3   good evening.  Okay.  Great.  Please leave your notebook on the

4   chair.  Thank you.

5           JUROR:  Okay.

6           THE COURT:  Counsel, if you could please remain.

7           JUROR:  Go back to the jury room now?

8           THE COURT:  Yeah, go back there now.  Yes.  Thank

9   you.

10      (Excused juror left the courtroom.)

11          THE COURT:  All right.  Please be seated.

12      I just wanted to put on the record, just in case there

13  should ever be an issue -- one never knows.  I am sure that

14  everybody noticed Juror Number 11, Mr. Smith, is

15  African-American.  I wouldn't want him to think that he was

16  excused because of his race.  So I wanted to put on the record

17  some of the things that I observed and see if you both agreed

18  he should be excused, and I agree with you.  So I will simply

19  put on the record a couple of things that I observed.

20      First of all, when I was doing voir dire and I asked him

21  what was it he did for a profession or occupation, I found his

22  answer to be rather vague and perhaps somewhat unintelligible.

23  In fact, I asked him additional questions to try to clarify.  I

24  never did get an answer to my satisfaction.  I was frankly kind

25  of surprised that he was left, but of course you only have so

1    many peremptories.

2         Secondly, I noted that when we went out to lunch, I asked

3    the jurors to be here at a specific time.  Mr. Smith was 20 to

4    25 minutes late, which caused us a considerable delay, caused

5    the other jurors to sit around and wait.  We didn't know

6    whether he was ever coming back.  In fact, we talked about what

7    to do in the event that he did not come back.

8         Thirdly, we noted -- I know you noted it, Counsel; you

9    brought it to my attention, but you didn't have to because I

10   had already noticed it, and, in fact, my CRD on his screen had

11   a great big -- you couldn't see it, but he had a great, big

12   sign that said "Juror is asleep."  I am not sure if he said

13   Juror Number 5 or Juror Number 11, but anyway, he pointed out

14   that the juror was asleep, and he was.

15        He appeared to me to be asleep.

16        And, in fact, Mr. Thomas, not to insult you or anything,

17   but it appears to me while you were doing your opening

18   statement, he seemed to be nodding off at that time as well.  I

19   don't know whether it was my riveting instructions that made

20   him go to sleep in the first place, or whether I woke him up

21   but then with your riveting opening statement, you put him back

22   to sleep.  I don't know.

23        And then I've got to tell you -- so, as my courtroom

24   deputy pointed out, there are only so many coincidences, right?

25             MR. O'HARE:  The cell phone going off?

```
 1          THE COURT:  While Mr. O'Hare was delivering his

 2   opening statement, the sound of the theme from "Sanford and

 3   Son" started playing in the courtroom.  And I note that outside

 4   of my courtroom, there's a big sign that says "Please turn off

 5   all cell phones."  There was the sound from "Sanford and Son"

 6   coming from Juror Number 11's cell phone, which he apologized

 7   and turned off.  Just to show you how life works in

 8   serendipitous ways, Juror Number 11's name is Sanford Smith.

 9   You just can't make that up.

10       I watched him.  He was nodding off.

11       Given the complexity of this case, I can't see how he

12   could possibly, possibly have done the job that we expected him

13   to do.

14       So, do you folks have anything else you wanted to add?

15          MR. THOMAS:  Yes, Your Honor.  I fully agree with

16   every observation you put on the record, plus the sleeping

17   seemed to be almost continuous, from the jury instructions

18   through Mr. O'Hare and including my opening.

19          THE COURT:  I see.  So you are saying Mr. O'Hare's

20   opening wasn't riveting either?

21          MR. THOMAS:  I think we fell in the same category.

22          MR. O'HARE:  I did appreciate that the phone went

23   off, because it did wake him up prior to my presentation.  But

24   I have nothing to add to what Your Honor said.

25          THE COURT:  Good.
```

1    I would like you folks to work out the time each of you is

2  going to spend on the case.  I have given you my parameters as

3  far as when I need the case to be finished and the days that I

4  am going to be off, so you can work out among yourselves how

5  you are going to distribute that time.  Appreciate it.  Okay.

6  See you tomorrow morning at 9:00 a.m.  Thank you.  We are in

7  recess.

8    (End of proceedings at 3:58 p.m.)

9                                 -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11          DATED:  December 4, 2019, at San Diego,

12   California.

13

14                         /s/  Chari L. Bowery

15                         _____
                           Chari L. Bowery
16                         CSR No. 9944, RPR, CRR

17

18

19

20

21

22

23

24

25