1              UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

WHITEWATER WEST INDUSTRIES,    .
4  LTD., a Canadian corporation, .
                               . Docket
5              Plaintiff,       . No. 17-cv-1118-BEN-BLM
                               .
6              v.              . December 4, 2019
                               . 9:00 a.m.
7  PACIFIC SURF DESIGNS, INC., a .
   Delaware corporation, and FLOW.
8  SERVICES, INC., a California  .
   corporation,                 .
9                              .
               Defendants.      . San Diego, California
10 . . . . . . . . . . . . . . .

11          TRANSCRIPT OF JURY TRIAL, VOLUME 2A
            BEFORE THE HONORABLE ROGER T. BENITEZ,
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13                  A-P-P-E-A-R-A-N-C-E-S

14 For the Plaintiff:     Snell & Wilmer LLP
                          600 Anton Boulevard, Suite 1400
15                        Costa Mesa, California 92626
                          By:  WILLIAM S. O'HARE, ESQ.
16                        - and -
                          BUCHALTER, A Professional Corporation
17                        18400 Von Karman Avenue, Suite 800
                          Irvine, California 92612-0514
18                        By:  ROGER L. SCOTT, ESQ.
                               J. RICK TACHÉ, ESQ.
19
   For the Defendants:    Thomas, Whitelaw & Kolegraff LLP
20                        18101 Von Karman Avenue, Suite 230
                          Irvine, California 92612-7132
21                        By:  JOSEPH THOMAS, ESQ.
                               WILLIAM J. KOLEGRAFF, ESQ.
22
   Court Reporter:        Chari L. Bowery, RPR, CRR
23                        USDC Clerk's Office
                          333 West Broadway, Suite 420
24                        San Diego, California 92101
                          chari_bowery@casd.uscourts.gov
25 Reported by Stenotype, Transcribed by Computer

1          SAN DIEGO, CALIFORNIA; DECEMBER 4, 2019; 9:00 A.M.

2                              -o0o-

3      (The following proceedings were held in open court out of

4  the presence of the jury:)

5          MR. O'HARE:  Your Honor, I have a small point I would

6  like to raise, if I may.

7          THE COURT:  What is that?

8          MR. O'HARE:  Counsel and I have one modest

9  disagreement, and that is whether retained experts may be

10 permitted in the courtroom while testimony is being given on

11 which they may rely or to assist counsel.

12         THE COURT:  What is the issue with that?

13         MR. THOMAS:  Your Honor --

14         THE COURT:  Go ahead.

15         MR. THOMAS:  -- we had asked that all witnesses be

16 precluded from sitting in the courtroom.

17         THE COURT:  That's normally my practice.  All right.

18 All witnesses will be excluded except for the parties.  All

19 right?

20         MR. O'HARE:  Thank you, Your Honor.

21         THE COURT:  All right.

22     (Brief discussion off the record.  The following

23 proceedings were held in open court in the presence of the

24 jury:)

25         THE COURT:  Good morning.

```
 1            ALL:  Good morning.

 2            THE COURT:  I hope you are all dry.  Traffic is a bit

 3    of a killer this morning.  We Southern California drivers are

 4    not used to the rain.

 5        All right.  Well, is the plaintiff ready to proceed?

 6            MR. SCOTT:  We are, Your Honor.

 7            THE COURT:  Please call your first witness.

 8            MR. SCOTT:  Plaintiff would like to call Thomas

 9    Lochtefeld.

10            THE COURT:  All right.  Please come forward and be

11    sworn.

12                         THOMAS LOCHTEFELD,

13                    PLAINTIFF'S WITNESS, SWORN

14            THE CLERK:  State your full name for the record,

15    spelling both your first and last name.

16            THE WITNESS:  Thomas Lochtefeld.  T-H-O-M-A-S.

17    Lochtefeld, L-O-C-H-T-E-F-E-L-D.

18            THE COURT:  Good morning.

19            THE WITNESS:  Good morning.

20                         DIRECT EXAMINATION

21    BY MR. SCOTT:

22    Q    Good morning, Mr. Lochtefeld.  Are you the inventor of the

23    '589 patent?

24    A    Yes.

25            MR. SCOTT:  Without objection, I would like to
```

1    display Exhibit Number 1, please.

2            THE COURT:  Okay.

3            THE CLERK:  Your Honor, is this admitted into

4    evidence?

5            THE COURT:  Yes.

6    BY MR. SCOTT:

7    Q    Mr. Lochtefeld, is this the cover sheet for your '589

8    patent?

9    A    Yes.

10   Q    I would like to direct you to page 21 of the '589 patent,

11   at column 11.

12       Blow up the first full paragraph, please.

13       Do you see this language?  Can you read for me the first

14   sentence here?

15   A    "The sluice cover or pad 130 is preferably made out of any

16   suitable soft, flexible material that will avoid injury upon

17   impact, yet rigid enough to hold its shape under prolonged

18   use."

19   Q    Yesterday, there was a claim made that the '589 patent

20   makes no reference to a structure inside a padded foam nozzle

21   cover.  Can you please read, skipping one sentence and going to

22   the next sentence, that begins at "the pad 130"?

23   A    "The pad 130 or pad material can be reinforced internally

24   or externally, if needed."

25   Q    Mr. Lochtefeld, I am going to show you what is marked as

1    plaintiff's demonstrative, Exhibit 493.  Can you tell me what

2    this is?

3    A    It looks like a pad that is reinforced with a -- looks

4    like a sheet of steel.

5    Q    This morning, did you inspect defendants' models of nozzle

6    flaps?

7    A    Yes.

8    Q    Did any of those three models appear to be, to you, a

9    flexible pad reinforced internally?

10   A    Yes.

11   Q    Can you tell us which one?

12   A    The one closest to us.

13   Q    Can you describe --

14   A    Which would be towards the jurors.

15   Q    Can you describe how that one works?

16   A    Yeah.  There's -- it has as its -- call it the plate, the

17   reinforcement, the steel, which is at the bottom.  And then

18   there's a foam pad that's been adhered to that, and then

19   wrapped with reinforced vinyl fabric.  And then there is a

20   hinge that connects those two separate pieces.

21   Q    Looking at plaintiff's demonstrative 493, the one in front

22   of you, how would you make that nozzle flap flexible?

23   A    You would just put a hinge right here, and that way, you

24   could open and close.

25   Q    The '589 patent uses the word "flexible" but not the word

1    "hinge"; is that right?

2    A    Yes.

3    Q    Is there more than one way to make a nozzle flap flexible?

4    A    Yes.

5    Q    Did you intend to have your patent cover only one way to

6    make a flexible nozzle flap?

7    A    No.

8           MR. SCOTT:  Mr. Lochtefeld -- I would like to admit

9    Exhibit Number 1 into evidence, without objection.

10          THE COURT:  I thought we had already agreed.

11          MR. SCOTT:  That's fine.  I will skip that formality.

12   BY MR. SCOTT:

13   Q    Mr. Lochtefeld, where are you from?

14   A    San Diego, California.

15   Q    How long have you lived in San Diego?

16   A    I was born here.

17   Q    Do you surf?

18   A    I do.

19   Q    How long have you been a surfer?

20   A    55 years.

21   Q    Where are you currently employed?

22   A    I have my own company up in -- by University Towne Centre.

23   Q    What is that company called?

24   A    Well, there's multiple companies, but the primary company

25   right now is SurfLoch.

1    Q    Do you also have a company called Wave Loch?

2    A    Yes, I do.

3    Q    What is your title at SurfLoch?

4    A    CEO.

5    Q    What is your title at Wave Loch?

6    A    CEO.

7    Q    What does SurfLoch do today?

8    A    Primarily, we manufacture wave equipment for creating

9    large waves.  My goal is to get to the Olympics, but to create

10   a surfing wave that is in deep water and progresses down the

11   pool and then breaks obliquely to the beach, just like the

12   ocean.

13   Q    What sort of products did Wave Loch build?

14   A    Wave Loch focused on sheet wave attractions, which are the

15   thin flow, which this patent was focusing on.

16   Q    How is what Wave Loch did with sheet waves different than

17   what you are doing now with SurfLoch?

18   A    The primary difference is that Wave Loch just did sheet

19   waves, and SurfLoch is the deep-water surfing waves; you paddle

20   in a pool.

21   Q    When was Wave Loch founded?

22   A    1991, June.

23   Q    When did it stop work in the sheet wave business?

24   A    Well, I still have, you know -- I have a project in China

25   that's still ongoing, so it's just kind of going very slow,

1    kind of winding down right now.

2    Q    Is there a point at which you stopped having Wave Loch's

3    primary business be sheet waves?

4    A    Yes, a few years ago, sold the primary business.

5    Q    Who did you sell the primary business to?

6    A    The Whitewater group, Whitewater West.

7    Q    How many totals patents do you have in the surfing field?

8    A    Over 50.

9    Q    Do you still regularly file for patents on your concepts?

10   A    Yes, many.

11   Q    Do you have patents pending now?

12   A    Yes.

13   Q    Was the '589 patent the first thing that you did in the

14   water ride industry?

15   A    No.

16   Q    How long had you been in the water ride industry before

17   you filed for the '589 patent?

18   A    Not counting my surfing, seriously into it, starting in

19   1981.

20   Q    What was your first involvement with water parks or water

21   rides?

22   A    I developed the Raging Waters theme park in Los Angeles,

23   followed by San Jose, Salt Lake, and other facilities.

24   Q    How long did you work with these Raging Waters parks?

25   A    That was seven years.

1   Q     Did you ever create any new water rides during your

2   involvement with Raging Waters?

3   A     Yes.

4   Q     What rides did you create?

5   A     Designed river rides with -- I think the one in particular

6   I remember was the shotgun slide.

7   Q     Can you tell me what the shotgun slide is?

8   A     It is a water slide, very short slide, that is up about

9   10 feet above a pool.  And you would get into the entry top,

10  slide off, and down into the pool.

11  Q     Which is a more complicated water ride, a shotgun slide or

12  a sheet wave?

13  A     A sheet wave.

14  Q     During the time you were developing the water parks, how

15  would you describe your learning curve with respect to

16  designing your own water attractions?

17  A     It is very much an iterative process.  It doesn't happen

18  overnight.  And you are constantly approaching different

19  elements.

20  Q     When you started in the water park business in 1980, would

21  you have been able to design a sheet wave at that time?

22  A     No.

23  Q     You said you were in the water parks for seven years,

24  until about '87?

25  A     Correct.

1    Q    What did you do next?

2    A    After I sold my interest, I took about -- you know, I

3    started to -- "What am I going to do with my life?"  I wanted

4    to surf, do something that was in the water park industry, so I

5    wanted to create what I felt would be the ultimate surfing

6    experience for a water park patron.

7    Q    How long did it take you from the time you thought about

8    developing a surfing ride for a water park to the first time

9    you had a working model, like even a scale working model?

10   A    It went through, as I mentioned, an iterative process.  So

11   I started out in my bathtub, and went to the swimming pool.

12   And then after I felt, you know, that we were getting

13   somewhere, I actually built, at Raging Waters, a plywood

14   incline covered with linoleum, you know, thousands of sandbags.

15   And once I rode it, I knew I had something.  And then I went to

16   Scripps Institute, really got into the modeling.  And that's

17   what I did.  Probably years to get to that point.

18   Q    During the time that you were developing sheet wave

19   attractions, was there anyone else out in the world who was

20   working on a similar idea?

21   A    Unbeknownst to me, yes, there had been.

22   Q    Who was that?

23   A    I found out, in 1991, a gentleman named Frenzl, Otto

24   Frenzl.  He lives in Austria.

25   Q    Did Mr. Frenzl have any patents?

1   A     Yes.

2   Q     Did he have a patent in the U.S.?

3   A     Yes.

4   Q     What was that patent about?

5   A     He did a different concept.  He started out with a

6   container, which was a pool.  And then the pool -- you could

7   swim in it, and then the pool would tilt and go at an angle,

8   and then he would use the water that was injected into the pool

9   to swim against to go up an incline.

10        But it was in a container, and mine was containerless, so

11  I was different.  But still, his, to me, was kind of an

12  extension, and I didn't particularly want someone else to get

13  ahold of that patent.

14  Q     What did you do when you found out that Mr. Frenzl had a

15  patent?

16  A     I licensed it.

17  Q     What is a license?

18  A     That's basically a contractual obligation to pay royalties

19  for the use of that particular improvement.

20  Q     Why did you take a license from Mr. Frenzl?

21  A     It was, you know, the right thing to do.  I didn't want to

22  infringe.

23  Q     Did you believe there was a risk if you did not take a

24  license from Mr. Frenzl?

25  A     Absolutely.

1    Q    What is that risk?

2    A    I would be in litigation and have penalties and be a

3    problem -- be stopped, basically.

4    Q    When did you sell your first sheet wave attraction?

5    A    1991.

6    Q    Where was that?

7    A    Schlitterbahn, Texas.

8    Q    Is Schlitterbahn the park or the city?

9    A    The park.  The city was New Braunfels.

10   Q    What was that ride called?

11   A    The Boogie Bahn.

12   Q    I would like to display Exhibit 397.

13        Mr. Lochtefeld, is this the Boogie Bahn?

14   A    Yes.

15   Q    How does the Boogie Bahn operate?

16   A    There is a big basin of water that was underneath this

17   ride but also connected onto a lazy river and it was to the

18   left, down 100 feet.  And water was pumped from that basin and

19   river up into a tank, which is located behind that

20   Schlitterbahn sign.  That tank -- then the water would elevate,

21   and then the head pressure would collect, so you get water

22   under pressure.  And then there was the gate valves, which were

23   at the bottom, underneath the Schlitterbahn sign.  That's kind

24   of black with the silver.  And that, then, would open.

25        There were hydraulic rams which would be able to open and

1    close those sluice gates, and that would then create the sheet

2    flow over which would be -- the padded surface was underneath

3    it, and riders -- like you see that little boy down at the

4    bottom of the incline, he would ride it.

5    Q    What was the shape of the ride surface on the Boogie Bahn?

6    A    It was the reverse curve coming out of the tank and across

7    the flat bottom and up the incline and to the recovery pool.

8    Where it says "Plaintiff's Exhibit," right there was a pool

9    where, when you wiped out, you go into that pool.

10   Q    What is behind that sign with Schlitterbahn --

11            JUROR:  Are we supposed to be seeing what he is

12   looking at?

13            THE CLERK:  Your Honor, it is not in evidence.

14            THE COURT:  There's no objection.  It is coming into

15   evidence.  Thank you.

16            MR. SCOTT:  Your Honor, is the jury seeing the

17   screens now?  Is it up?

18            JUROR:  Yes.  Now it is.

19   BY MR. SCOTT:

20   Q    Okay.  So, Mr. Lochtefeld, can you briefly -- I am just

21   going to compress my last couple of questions.  Tell me about

22   the wall, and can you demonstrate the ride shape, here, just

23   very briefly, since the jury couldn't see what you were just

24   talking about?

25   A    Sure.

1     The basic ride surface starts just underneath the

2    Schlitterbahn sign, because water is up in a tank behind the

3    Schlitterbahn sign and it's coming out of the sluice, which is

4    the black line with the little silver jags in it.  The water

5    comes down the reverse curve, down that decline, across the

6    flat plane where the boy is at, and then up an incline,

7    which -- the boy is at the toe of where the flat plane is in

8    the incline, and over, where you see the Whitewater in the

9    foreground, into a pool.  The pool is where it says

10   "Plaintiff's Exhibit."

11   Q    What is that vertical wall, where the Schlitterbahn sign

12   is, made of?

13   A    That -- I think it was a piece of plywood.

14   Q    Can a rider make contact with the wall on this Boogie Bahn

15   ride?

16   A    No.

17   Q    Why not?

18   A    One, it is quite a distance away, and the riders are going

19   against the friction of the water, and combined with the

20   reverse curve, which is that portion of the decline coming out

21   of the nozzle, you would have to go against gravity.  So,

22   basically, you would have to really get a lot of speed to get

23   up and over and hit that thing.

24   Q    Aside from hitting it, is there any possibility a rider

25   could actually ride over that wall?

1    A     Absolutely not.

2    Q     Is there padding on that wall?

3    A     No.

4    Q     Why not?

5    A     There was no need.

6    Q     Why was there no need for padding on that wall?

7    A     It was too far away, and it was too high for a rider to

8    ever achieve impact with that wall.

9    Q     How big was the Boogie Bahn?

10   A     Roughly, I believe, from the Schlitterbahn back to the

11   crest was roughly 40 feet -- no.  Excuse me -- probably 50,

12   maybe 50-plus feet.  And the width was, across that sign, was

13   40 feet.  And then there was the pool and other dimensions.

14   Q     How much did it cost?

15   A     The total facility was several million dollars.

16   Q     Could spectators watch people riding the Boogie Bahn?

17   A     What was the question?

18   Q     Could spectators watch people riding the Boogie Bahn?

19   A     Yes.

20   Q     Where were they?

21   A     Primarily located in the bleachers behind where that blue

22   umbrella is, in the top right corner.  Just behind them.  You

23   can kind of see, off to the left a little bit, there's a couple

24   of people sitting.

25   Q     Standing at ground level, can you watch somebody ride the

1    Boogie Bahn?

2    A    There was not a ground-level viewing area.

3    Q    What features did this ride have to ensure rider safety?

4    A    Primarily, the surface over which the water sheeted --

5    because the water was only a few inches thick, that surface was

6    padded foam, roughly an inch to two inches thick of closed-cell

7    urethane foam.

8    Q    Did you need anything else on this ride to protect the

9    riders?

10   A    No, not that I recall.

11   Q    You talked about you got into this because you wanted to

12   develop a ride for surfers.  Did the Boogie Bahn achieve your

13   goal of bringing surfing to the masses?

14   A    Yeah, did a pretty good job.

15   Q    How many rides designed like the Boogie Bahn did you

16   actually sell?

17   A    What period of time?  Just overall?

18   Q    No.  Designed like the Boogie Bahn, like this, where you

19   are talking about a reverse curve that has this wall next to

20   it.

21   A    I believe four, three or four, something like that.

22   Q    I would like to put up Exhibit 352, without objection.

23        What is this ride?

24   A    This is the Water Mania FlowRider.  This is my second

25   attraction, the next year after the Boogie Bahn.  This was in

1    Kissimmee, Florida.

2    Q     Same reverse curve?

3    A     Yes.

4    Q     Same wall?

5    A     Yes.

6    Q     I would like to show you now Exhibit 102.

7          What is this?

8    A     This is the RetroRider attraction.

9    Q     How is the RetroRider different than the Boogie Bahn and

10   the Water Mania ride we just saw?

11   A     The RetroRider, the objective was to kind of have a

12   through-put that was -- that would go in a circular fashion.

13   So we made -- we just had the curl portion, which is where the

14   rider is.  You would enter -- you kind of see that two parallel

15   bars that are dividing in the middle, right above the

16   "Colorado" sign?  The rider would enter just to the right of

17   that padded bar.

18         They would come down and turn at an angle and try to stay

19   where that gentleman is who is in the curl right now.  And

20   then, when they would wipe out, he would go with the flow and

21   down to a grated area that would drain, and get back in the

22   queue.  And you could see the queue line in the background.

23   Q     Where is this specific ride?

24   A     This was in Hyland Hills, Colorado.

25   Q     Was this your first RetroRider?

1   A    Yes.

2   Q    When did you install the Hyland Hills RetroRider?

3   A    I believe 1995 or sometime around there.

4   Q    I'd like to show you now Exhibit 58.

5       Is this also Hyland Hills?

6   A    Yes.  This is taken from another perspective, looking back

7   at the nozzle bank, and kind of the hillside behind it, and

8   exit ramps on the right.

9   Q    Can you tell me, what is going on in this picture?

10  A    Yeah.  The rider had just entered parallel with those two

11  bars that were the divider bars between the two sides, because

12  you could have two people riding at a time.  And she's down in

13  what is the flats, down in that belly of the trough, and just

14  planing.  And the water is moving at about 20 feet a second.

15  Q    Did the RetroRider have a reverse curve like the Boogie

16  Bahn?

17  A    It had a little one, yeah, not real -- you can kind of

18  tell a little bit over on the left side there, appears to be,

19  you know, a couple of feet high.

20  Q    And there's a wall there, just like the Boogie Bahn?

21  A    Yes.

22  Q    Is there any difference between the wall at the Boogie

23  Bahn and this wall?

24  A    Yeah.  The goal was try to make these things smaller, so

25  we shortened that distance.  But this wall that you see, that's

```
 1   still -- that houses the nozzles.  The whole nozzle assembly is
 2   underneath there.
 3   Q    Okay.  Is there padding on this wall?
 4   A    Yes.  That front wall is padded.
 5   Q    Why was that wall padded but not the one at the Boogie
 6   Bahn?
 7   A    Because of the shortening of the attraction and in the
 8   event anyone might hit that pad, you would want it to be
 9   padded.
10   Q    Were riders intended to hit the pad?
11   A    No.
12   Q    Could a rider ride over the top of that vertical -- of
13   that pad?
14   A    No.
15   Q    Did you sell any RetroRiders besides Hyland Hills?
16   A    Yes.
17   Q    I am going to show you Exhibit 62.
18        Just looking at the images on the first page, is this
19   another RetroRider?
20   A    Yes.
21   Q    Do you know where that is?
22   A    Lake Lanier Islands, in Georgia.
23   Q    About how many RetroRiders did you sell overall?
24   A    I think probably five or -- well, some of them were
25   double, but just the actual locations, I think five or six,
```

1   seven maybe.

2   Q    We talked about some of the things with the Boogie Bahn.

3   Was the RetroRider smaller or larger than the Boogie Bahn?

4   A    Smaller.

5   Q    Was it cheaper to build than the Boogie Bahn?

6   A    Yes.

7   Q    Was it safe?

8   A    Yes.

9   Q    What about rider visibility?  Was rider -- when I say

10  "rider visibility," I mean the ability to watch people on the

11  ride.  Was it better, the same, or worse than the Boogie Bahn?

12  A    It was a little better but still not ideal.

13  Q    What could you do to improve visibility on this ride?

14  A    The goal would be and what subsequently happened was to

15  try to lower that whole nozzle bank and actually allow people

16  to get closer and see it from the front because that had the

17  best view.

18  Q    Did you ultimately develop an attraction that got rid of

19  that wall?

20  A    Yes.

21  Q    Did that attraction have a name?

22  A    The FlowRider.

23  Q    What was the first one that you developed that got rid of

24  that wall?

25  A    The Mobile FlowRider was the first one.

1    Q    Anything before that?

2    A    Oh, well, we did -- there was, I guess you would say, the

3    Bruticus Maximus.  That one.  That was mobile, but still --

4    that was the name.

5    Q    Was the Bruticus Maximus the very first ride that you

6    designed that did not have that vertical wall?

7    A    Correct.

8    Q    I would like to show Exhibit 476.   (Exhibit played.)

9         So that was you?

10   A    That was a few years ago, yeah.

11   Q    And the way you described that the Bruticus Maximus works,

12   that's all accurate?

13   A    Correct.

14   Q    Where was that video taken?

15   A    That was down in Mission Beach, at the Wave House.

16   Q    Was that where the Bruticus Maximus was originally

17   installed?

18   A    No.

19   Q    What was it originally developed for?

20   A    It was originally -- had put together a program for Swatch

21   Watch.  You know, they are the watch company.  They wanted to

22   showcase a new product.  So it was for the Swatch group.

23   Q    How were you able to sell Swatch this Bruticus Maximus

24   ride?

25   A    I -- one of my salespeople had initially contacted, and

```
 1    then I went over to Switzerland, went to Geneva, and met with

 2    Nick Hayek.  He is the principal CEO of Swatch.  And I sold him

 3    on the idea.

 4    Q    Did you just talk to him or did you show him something?

 5    What did you do?

 6    A    No, we actually built this model, a small model, maybe two

 7    foot by two foot.  I brought it on the plane.  And -- we got a

 8    trash can over there and filled it with water, and I put in the

 9    pump and showed him the model, and it worked.  It was great.

10    Q    How sophisticated was the model that you showed the guys

11    at Swatch in Switzerland?

12    A    The shape was, you know -- that was polished and clean,

13    but it was a basic, very simplistic device.

14    Q    Did it have a nozzle?

15    A    There was a nozzle, but, you know, it was just an opening.

16    Q    Did the nozzle have a cover?

17    A    No.

18    Q    Not on the model?

19    A    No.

20    Q    Were you concerned that the model didn't have a nozzle

21    cover?

22    A    No.

23    Q    Why not?

24    A    That's -- you know, in the scheme of things, that's a

25    detail.  That's not a big issue.
```

1  Q    At some point, did you introduce a nozzle cover onto the

2  Bruticus Maximus?

3  A    Yes.

4  Q    At what point did you figure out that you were going to

5  put a nozzle cover on the Bruticus Maximus?

6  A    At one point I had to ride the attraction because we

7  needed a photograph.  We built the model, the Bruticus, in this

8  big warehouse in Texas, the same group that built the

9  Schlitterbahn.  And I rode it.  And I saw that front thing, you

10  could go right down and, you know, you could hit it.  So I knew

11  that it needed to be padded.  And that was probably the -- you

12  know, the first incidence of knowing that.

13  Q    You mentioned building this in a warehouse.  Was the

14  warehouse open to the public?

15  A    No.

16  Q    What year was it that you first rode that full-scale ride

17  and realized you needed to cover the nozzle?

18  A    That was in 1999.

19  Q    So what did you do?

20  A    Well, we didn't do -- that nozzle cover didn't really come

21  on board until we were in Munich, where the first event was,

22  and when we got there, we built it in the field right before we

23  opened.

24  Q    Okay.  How was that nozzle cover constructed?

25  A    At that time, it was just the urethane-coated foam with --

1    bolted down to the nozzle, nozzles.

2    Q    I would like to show Exhibit 468, which is also Exhibit NG

3    from your guys' list.

4         Mr. Lochtefeld, can you tell me what is in -- oh, it's

5    playing now.  (Exhibit played.)

6         Is this the type of nozzle cover that was on the Bruticus

7    Maximus?

8    A    Yes.

9    Q    So, just one piece of foam bolted down, like you said?

10   A    Correct.

11   Q    How did it work?

12   A    The foam was -- when it was coated with a urethane, it was

13   pretty heavy, so it had this bias downward.  So when the water

14   was injecting out, it would lift up, because it was flexible;

15   and then when the water would shut off, it would be able to

16   droop down and seal that opening, because we didn't want any of

17   the riders -- that was my concern, for safety, to try to avoid

18   them going into that opening.

19        You can see, that could be kind of problematic, if you

20   were to get your fingers or hands or feet inside.

21   Q    Why didn't you just use a nozzle cover that was fixed in

22   place, that wouldn't bend?

23   A    Then how would it close when the water decayed?  Because

24   what happens is you -- the sheet flow of water can actually

25   collapse, because it's very thin.  And when you get, in

```
 1    particular, a really large rider or someone who stays in the
 2    same position a lot, then it would start to cascade and come
 3    down.  And when it starts to fill up -- because it's kind of
 4    like a basin -- it will cause the entire sheet flow to not be
 5    able to make it over the crest of the wave anymore.  In that
 6    case, the riders come down, and they can hit that nozzle area.
 7    Q    Okay.  How did the Bruticus Maximus compare to the
 8    RetroRider in terms of size?  Was it bigger or smaller than a
 9    RetroRider?
10    A    It was -- the Bruticus was a little bit bigger because it
11    was a 40-foot wide, and the nozzle for the RetroRider was only
12    15 feet wide.
13    Q    Okay.  But in terms of rideability, was the ride of
14    Bruticus, did it have more surface area to ride than the
15    RetroRiders?
16    A    Oh, yeah.  Probably five times.
17    Q    So, in the same square footage, with the design of the
18    Bruticus, could you get more or less of a ride than the
19    RetroRiders?
20    A    Oh, significantly more, absolutely.
21    Q    What about visibility?  We talked about the Boogie Bahn
22    and the Hyland Hills had that wall.  Was visibility for people
23    watching the Riders on the Bruticus better or worse than the
24    RetroRiders?
25    A    Significantly improved.
```

1   Q     What about cost?  Was this more or less expensive than the

2   RetroRider?

3   A     The Bruticus was more expensive than the RetroRider

4   because it was much bigger.

5   Q     When did the Bruticus Maximus debut to the public?

6   A     That was in August of 1999, in Munich.

7   Q     I'd like to bring up Exhibit 1 again.

8         Does the Bruticus Maximus have any relationship to the

9   '589 patent?

10  A     The -- it embodied that sluice slide-over cover.

11  Q     What do you mean?

12  A     That was the first application where we put the nozzle

13  cover in that was out in the public.

14  Q     Okay.  Did anyone help you come up with the invention of

15  the nozzle cover that's in the '589 patent?

16  A     No.

17  Q     Did people help you create the drawings and things that

18  went into this application?

19  A     Yes.

20  Q     Did people help you create the drawings to actually build

21  the physical Bruticus Maximus?

22  A     Yes.

23  Q     Was one of those people a man named Bruce McFarland?

24  A     Yes.

25  Q     Who was Bruce McFarland?

1    A    He was an engineer that I hired to do the drawings.

2    Q    What role did he have in the creation of the Bruticus

3    Maximus?

4    A    He was doing structural engineering as well as the CAD

5    work that would be used to build the actual attraction.

6    Q    Did he come up with the idea for the Bruticus Maximus?

7    A    No.

8    Q    Did he come up with the idea for the nozzle flap?

9    A    No.

10   Q    How long did Mr. McFarland work for you?

11   A    He worked for me approximately, I think, seven or eight

12   years.

13   Q    Earlier, you said you are named on about 50 patents?

14   A    Yes.

15   Q    Do you have an understanding what the claims in the patent

16   are?

17   A    Yes.  It sets forth the boundaries of your invention.

18   Q    I want to show you page 22 of Exhibit 1 -- I am wrong.

19   Next page, please.  There we go.  Can you show the bottom right

20   hand, here.

21        This isn't all of the claims, but are these the claims or

22   the beginning of the claims of the '589 patent?

23   A    Correct.

24   Q    I didn't go through this before, earlier, but you went to

25   law school, right?

1    A    Yes.

2    Q    When was that?

3    A    I started in 1974 and graduated in 1977.

4    Q    Did you actually practice law after law school?

5    A    I did.

6    Q    For how long?

7    A    A few years.

8    Q    Did you ever practice patent law?

9    A    No.

10   Q    Did you write the claims for the '589 patent?

11   A    No.

12   Q    How did the claim language come to exist?

13   A    The base invention and description I did and developed.

14   The claims were done by the patent attorneys.

15   Q    Do you understand generally what the claims of the '589

16   patent mean?

17   A    Yes.

18   Q    What is your understanding of what the invention that is

19   embodied in the '589 patent is?

20   A    Basically, a nozzle cover that is padded and it has --

21   that padding is soft and squishy, and that's where, if someone

22   hits it, they are not going to get injured; but that the actual

23   nozzle has this -- call it a tongue that sticks out over that

24   nozzle aperture such that when -- when the water shuts down,

25   for safety, it will be biased downward and then close, so

 1   anyone who is coming down, if the water would decay, they would

 2   be able to come up and over that padding.

 3   Q    So, after the Bruticus Maximus goes to Europe and you file

 4   for this '589 patent, did you make any rides that did not have

 5   that flexible nozzle cover?

 6   A    No.

 7   Q    No more rides with reverse curves and walls?

 8   A    No.

 9   Q    How many Bruticus Maximuses did you make?

10   A    That class of FlowBarrel, I think five or six, something

11   like that, because they were so big.  Pretty intense.

12   Q    Did you develop -- you mentioned the word "FlowBarrel."

13   Is that a different kind of sheet wave ride?

14   A    That is what the Schlitterbahn-style wave, and what was at

15   Wave House, that big, barreling wave, that's the FlowBarrel.

16   Q    Is the FlowBarrel a newer iteration of the Bruticus

17   Maximus?

18   A    No.  That is --

19   Q    Let me show you Exhibit 385, page 3.

20        Is this a FlowBarrel?

21   A    Yes.

22   Q    This is different than the Schlitterbahn, right?

23   A    Yeah.  You are right.  I see.  Yeah.  It is different.

24   Yeah.

25   Q    This is more similar to the Bruticus?

1  A      Yeah.

2  Q      Did you develop any other rides that use the nozzle flap

3  besides this barreling-type ride?

4  A      There was the FlowRider.

5  Q      How was the FlowRider different than the Bruticus Maximus

6  or the FlowBarrel?

7  A      The FlowRider didn't have the barreling part.  All it had

8  was this area right in the foreground, just that part where the

9  water comes up and over the incline.  That's basically the

10  FlowRider.

11      So if you divided the rides in two, to the far side, where

12  that rider is in the barrel, that kind of connotes the

13  FlowBarrel element.  And when it's over on this side closest to

14  us, in this picture, that's the FlowRider.

15  Q      Okay.  When did you install your first FlowRider?

16  A      That design was at Belmont Park, it was the Mobile

17  FlowRider.

18  Q      Do you recall when that was?

19  A      2000 -- 2005 or 2006, sometime in there.

20  Q      Did you install any rides prior to 2005 that has a -- that

21  had a nozzle flap?

22  A      Just the -- yeah, we -- because after 2000, when we did

23  the Swatch Bruticus wave, every one had the nozzle flaps.

24  Q      Between, you know, say, 2005, that you mentioned, and

25  2012, when you sold the business, did the design of the

1  FlowRider substantially change?

2  A    No, it was pretty -- we were always making improvements,

3  but that was it.

4  Q    I would like to show you Exhibit 267.

5      Is this a FlowRider?

6  A    Yes.

7  Q    And during your time making FlowRiders at Wave Loch, did

8  all FlowRiders look basically like this?

9  A    Yes.

10  Q    Can you tell from this picture where this FlowRider is?

11  A    This was on one of the cruise ships for Royal Caribbean.

12  Q    You sold FlowRiders to cruise lines?

13  A    Yes.

14  Q    I would like to put this exhibit here side by side with

15  Exhibit 62, which is one of the RetroRiders we looked at.

16      Looking at the RetroRider here, what is the design

17  differences between the two?  Actually, let me phrase it this

18  way.

19      If you could pick one thing to explain how these are

20  different, what would it be?

21  A    There would be that nozzle flap area and the ability that

22  that enabled to reduce cost.  And what you don't see, over to

23  the left of this picture that's on the left, is how the crowds

24  could assemble right in front of the ride and actually see the

25  expression and parents could take pictures of their kids.  That

1   was really the defining element.

2   Q    Is the FlowRider, on the left, bigger or smaller than the

3   RetroRider, on the right?

4   A    The FlowRider, on the left, is smaller.

5   Q    If I asked you to build me a RetroRider -- and I know you

6   haven't built one in a while -- would it cost more or less than

7   the FlowRider?

8   A    RetroRider is more.

9   Q    What allowed you to make that change from the RetroRider

10  to the FlowRider?

11  A    That padded nozzle cover.

12  Q    Did the design of the nozzle flap evolve over time from

13  that first one we saw at the Bruticus Maximus to what was used

14  in 2012, when you sold the business?

15  A    Yes.

16  Q    How did it evolve?

17  A    We introduced -- what happened was when you just had the

18  flexible padding, the problem was, over time, water that was

19  sheeting underneath -- the water, you can imagine, is just

20  constantly -- it starts to peel away the vinyl coating that was

21  over the foam, so that then would result in delaminations.  And

22  it was just -- it was too harsh of an environment.

23       So we added the plate, which you saw on this thing, either

24  a fiberglass or steel plate, as a mechanism to properly protect

25  that foam -- what we did is put a hinge -- and still keep the

```
 1   flexibility.
 2            THE COURT:  Sir, would you mind if I look at that?
 3            THE WITNESS:  Yes.
 4            THE COURT:  Go ahead.
 5   BY MR. SCOTT:
 6   Q    No matter how you made the nozzle flap between the
 7   Bruticus Maximus and when you have sold the business, did all
 8   the nozzle flaps have the same function?
 9   A    Absolutely.
10   Q    What function was that?
11   A    That was to protect the rider, number one, in the event of
12   any flow decay or in the event they came down and happened to
13   go too quickly and went on top of the nozzle.  So we wanted it
14   padded.
15        And what else did you want in your question?
16   Q    How did they work?
17   A    Well, they -- in terms of the flexibility?  Or give me a
18   little more context.
19   Q    What was the function of any nozzle flap that you
20   installed between the Bruticus Maximus and when you sold the
21   business, in 2012?
22   A    Well, the function was multipurpose.  I mean, one was it
23   allowed you to shorten the ride.  That shortening of the ride
24   was fewer materials.  Less materials, less cost, yet it still
25   had the safety built in.  So, all around, it was the key to the
```

1   FlowRider attraction.

2   Q    No matter how you built it -- no matter how you built the

3   nozzle flap, did it move up and down with the water on the

4   ride?

5   A    Yes.

6   Q    If I turn the water off on any ride you built between the

7   Bruticus Maximus and 2012, what would the nozzle cover do?

8   A    It would go down, shut.

9   Q    The nozzle flap was part of the '589 patent application?

10  A    Yes.

11  Q    When you want to apply for a patent, what do you do?  You,

12  Thomas Lochtefeld, not everybody.  What do you do?

13  A    I would write up the description in a conceptual way.

14  That would be used to do a patent search.  Then we just keep --

15  based upon the search and the results that came back, we would

16  write up our entire description.  And then I would direct the

17  pictures, you know, kind of, the illustrations.  And I would

18  have other people write it because my hands kind of shake a

19  lot.  But then we turn it over to the attorneys.

20  Q    What information do you give to your attorneys?

21  A    I would give them the description, which was defining what

22  the patent is and explaining how it worked, and the

23  illustrations, kind of sketches, hand sketches.

24  Q    Did you think it was important for your attorneys to have

25  more or less information?

1    A    No, more.

2    Q    For the '589 patent application, did you give your

3    attorneys everything that you thought they needed?

4    A    Absolutely.

5    Q    Did they ask you questions?

6    A    All the time.  Yeah.  Hundreds of questions.

7    Q    Did you answer their questions?

8    A    Yes.

9    Q    Did your attorneys, to your recollection, ever ask you for

10   photos of your prior installations?

11   A    Yeah, they could, sure.

12   Q    If they did, would you have provided them?

13   A    Absolutely.

14   Q    Do you have an understanding of what "prior art" is?

15   A    Yes.

16   Q    What is "prior art," in your understanding?

17   A    That would be an -- either written documentation,

18   publication, prior patent, something that is evidentiary that

19   you could then submit, and it covers what the current patent

20   that you are trying to get would involve.  So it's basically --

21   it existed prior to the time of your patent.

22   Q    I would like to put up Exhibit 250, please.

23        Mr. Lochtefeld, what is happening in this picture?

24   A    There's the FlowRider, and you have one of the riders

25   coming down.  He slid down and went up and over the padded

1    nozzle flap.

2    Q    I would like to put this next to an exhibit we looked at

3    before, Exhibit 58.

4         I think you said earlier this, on the right, is Hyland

5    Hills?

6    A    Yes.

7    Q    What is happening in that picture?

8    A    The girl who is riding is -- has come down, and she is

9    just in the trough of the sheet flow ride.

10   Q    What is she riding towards?

11   A    Towards the nozzle cover and that padded area on the

12   nozzle assembly.

13   Q    What is the shape of that padded area?

14   A    It's a big wall.

15   Q    Okay.  I know this is a long time ago, but did it occur to

16   you at the time that you applied for the '589 patent that

17   photos like the one on the right had anything to do with what

18   the nozzle cover was, on the left?

19   A    No.

20   Q    Was this redesigned FlowRider popular with customers?

21   A    Yes.

22   Q    So, between 1991, when you installed the Schlitterbahn,

23   and 1999, with the Bruticus Maximus, how many rides did you

24   sell that had that reverse curve and wall?

25   A    Maybe a dozen.  I am guessing.

1   Q    Okay.  Now, between 2000, when -- or 1999, when the

2   Bruticus was installed, and 2012, when you sold your business,

3   how many sheet waves using a nozzle cover did you sell?

4   A    Oh, five, six times that amount.  I don't know.  70?  80?

5   Q    During the time Wave Loch was selling sheet waves, were

6   there any competitors in the marketplace?

7   A    If you could call it that.  Yeah, there were competitors.

8   Q    You say "if you could call it that."  Did you think they

9   had competitive rides?

10  A    No.

11  Q    But there were other people that competed with you that

12  sold rides kind of like yours?

13  A    Correct.

14  Q    Did anybody sell rides sort of like yours in the United

15  States?

16  A    Yes.

17  Q    Are you aware of a company called Murphy's Waves?

18  A    Yes.

19  Q    Do they have a sheet-wave-type attraction?

20  A    Yes.

21  Q    Do you know what they called it?

22  A    The Stingray.

23  Q    Have you seen a Stingray?

24  A    I have.

25  Q    How many Stingrays are there in the United States?

1    A    I believe one.

2    Q    Have you been there?

3    A    Yes.

4    Q    Where is it?

5    A    In Kansas.

6    Q    Did you ride the Stingray in Kansas?

7    A    I did.

8    Q    I would like to show you Exhibit 396.

9         Does this appear to you to be the Stingray that you rode

10   in Kansas?

11   A    Correct.

12   Q    Does the Stingray have a nozzle cover that can be ridden

13   over by the rider?

14   A    No.

15   Q    What does it have, in this picture?

16   A    There's a padded box that sat over their multiple nozzle

17   array.

18   Q    Are you aware of a company called American Wake Machines?

19   A    Yes.

20   Q    Do they sell a product that competed with the FlowRider?

21   A    Yes.  I mean, it was a sheet -- deep-water flow.  It was a

22   little different.

23   Q    Okay.  The product that you are talking about, does it

24   have a name?

25   A    Surf Stream.

1    Q    How was the Surf Stream different to you than a FlowRider?

2    A    The water was probably five times deeper.  It was

3    primarily for surfing with a surfboard with fins.  And it

4    was -- as I analyze it now, it was a containerized version, as

5    opposed to containerless.

6    Q    Have you seen a Surf Stream?

7    A    I have never personally seen one.  I have seen photos and

8    video.

9    Q    Based on the photos and videos that you have seen, does

10   the Surf Stream have a nozzle cover that can be ridden over by

11   the rider?

12   A    No.

13   Q    Do you know how many Surf Streams American Wave Machines

14   has sold in the U.S.?

15   A    A few.

16   Q    Do you know who owns American Wave Machines?

17   A    Yes.

18   Q    Who is that?

19   A    Bruce McFarland.

20   Q    Your former employee?

21   A    Correct.

22   Q    At some point, did you sue American Wave Machines?

23   A    Yes.

24   Q    When was that?

25   A    Oh, roughly 10, 15 years ago, something like that.

1   Q    Why did you sue American Wave Machines?

2   A    I felt that they were infringing my patents, my ride

3   inventions.

4   Q    Did you sue American Wave Machines over your nozzle

5   patent, the '589?

6   A    No.

7   Q    When you sued American Wave Machines, was it your goal to

8   acquire American Wave Machines?

9   A    No.

10  Q    So, what happened in that litigation?

11  A    I lost.

12  Q    How long did it take?

13  A    That was five years.

14  Q    Did you learn any lessons?

15  A    Yeah, you learn.

16  Q    What lessons did you learn from your suit with American

17  Wave Machines?

18  A    You know, things that you might believe to be kind of --

19  in that context, an infringement, aren't.  So, you know, I was

20  wrong.

21  Q    Okay.  You were wrong in that instance, right?

22  A    Correct.

23  Q    I want to turn to the '589 patent one more time.

24       You are the inventor, right?

25  A    Yes.

1    Q    I want to highlight the top left corner here, says

2    "inventor and assignee."  It says the assignee is Light Wave?

3    A    Yes.

4    Q    What is Light Wave?

5    A    Light Wave was my holding company that held intellectual

6    property, such as patents and trademarks.

7    Q    We heard about SurfLoch and Wave Loch, and now we have

8    heard about Light Wave.

9         How many companies do you have?

10   A    Quite a few.  There's different projects.

11   Q    Why do you have so many companies?

12   A    The primary reason is to kind of insulate liability, just

13   create an entity for that purpose, so you have that specific

14   purpose, usually, what that company is doing.

15   Q    When did you transfer the '589 patent to Light Wave?

16   A    Right, almost -- I believe immediately after the

17   invention -- the application.

18   Q    Why did you do that?

19   A    Just -- it was logical to get it over to the holding

20   company, Light Wave, because -- and then we would license back

21   the use and ability to use that patent to Wave Loch.

22   Q    Did you ever license your inventions to other people

23   besides companies you controlled?

24   A    Yes.

25   Q    Why would you license your patents?

 1    A     One was to generate revenue, because you get royalties

 2    from the license.  Two, you would analyze who a licensee might

 3    be, and if they had particular expertise and capability that

 4    could extend your -- beyond what, say, Wave Loch could do, that

 5    was a good fit.  So then we would license to try to take

 6    advantage of their expertise, and for Wave Loch and Light Wave

 7    to generate revenue.

 8    Q    Who did you license to?

 9    A    I would license to Aquatic Development Group.  That was

10    one company in the U.S. that we did.  And the other was

11    Whitewater, Whitewater West, out of Canada.

12    Q    Who is ADG -- who is Acquatic Development Group?

13    A    Yes.  ADG, they are one of the larger water park builders

14    and equipment -- equipment providers, swimming pools, things

15    lining that, in the U.S.A.

16    Q    What about Whitewater West Industries?  Who is that?

17    A    Whitewater is similar, but their primary expertise was

18    over in -- when I initially did this, was in Asia.  He had a

19    lot of capability in the Asia market.

20    Q    I would like to show you Exhibit 51, please.  Just blowing

21    up the top portion, there.

22         Do you recognize this document?

23    A    Yes.

24    Q    What is this?

25    A    This was the license agreement for FlowRider to Aquatic

1  Development Group.

2  Q    I'd like to go to page 12, please.

3       When is this dated?

4  A    September 26, or 25, over there, with Kenelis --

5  Q    Is this your first license agreement between Wave Loch and

6  Aquatic Development Group?

7  A    Yes.

8  Q    I would like to look at page 4.  Highlight section M, just

9  above 2.2.

10      Can you tell me what this language means?

11  A    We were requiring Aquatic Development Group to sell six

12  FlowRiders, and that was to make sure that we got a guaranteed

13  amount of money, because there was a royalty attributable to

14  each of the units, the FlowRider units.

15  Q    Six units, ever?

16  A    No, that was every year.

17  Q    Okay.  So, six units every year.  And that was -- I am

18  sorry.  Why was that?

19  A    Excuse me.  It says for each of the two calendar years --

20  yeah.  Six units.  Yeah.

21  Q    Okay.  What was the purpose of having that six-unit

22  minimum per year?

23  A    To make sure that Wave Loch got royalties and received

24  money, because if they didn't sell any, then you would end up

25  with nothing, so you wanted a guarantee that they would

1  provide.

2  Q    Okay.  Looking at the bottom of page 4, and it continues

3  onto page 5, what were the royalties that ADG had to pay to you

4  under this license agreement?

5  A    There was a -- it was based on gross proceeds, which was

6  the gross selling price of the entire attraction that was

7  relevant to the equipment sold, and it was in a -- kind of a

8  sliding scale.  There was a higher royalty on the first three

9  units, and then -- that was at 15 percent.  It dropped to 12

10 and a half for the next four, five, and six.  And then seven

11 through ten, it was at 10 percent.

12 Q    Okay.  I think there's one more line.

13 A    Yeah, 11.  Above 11, it was seven and a half.

14 Q    Okay.  I'd like to look at Schedule A, on page 13.

15      Is this the list of patents that you are licensing to ADG

16 under this agreement?

17 A    Yes.

18 Q    Is the '589 patent on this list?

19 A    Yes, it is, right towards the bottom there, right before

20 the "RE..."

21 Q    The last thing on this one, I would like to show you

22 section 1.1, on page 1, and carries onto page 2.  The license

23 territory here -- actually, can you back up and do the whole

24 thing.

25      The license territory here, where was ADG allowed to sell

1    these products?

2    A    Primarily, North America, Caribbean, and South America.

3    Q    I'd like to go to Exhibit 108.

4         Sorry.  This part is a little boring.  We are going to go

5    through the same process.

6         What is this document?

7    A    It is a FlowRider license agreement.

8    Q    Who is this one with?

9    A    Whitewater West.

10   Q    We are going to do the same thing again.  Go to the date

11   on the signature page, on page 12.

12        When is this one executed?

13   A    October 3, 2003.

14   Q    Around the same time you did your first ADG license?

15   A    Correct.

16   Q    Let's look at section 2.1M, again, on page 6.

17        Did this license agreement also have a minimum that

18   Whitewater had to sell?

19   A    Yes.

20   Q    ADG's was six.  What is this one?

21   A    Five.

22   Q    Five per year?

23   A    Yes.

24   Q    Looking at section 3.11, on page 6, what was the royalty

25   rate that Whitewater had to pay to you for its sales?

1   A    10 percent of the equipment gross.

2   Q    Do you know if the Schedule A on this one also mentioned

3   the '589 patent?

4   A    I am pretty sure it would have.

5   Q    Let's look at pages 1 through 3 and talk about the

6   geographic scope on this one.  There is a whole lot of

7   countries here.  Start with page one.  It does keep going.

8        Where was Whitewater licensed to sell the products?

9   A    This would have been outside the U.S., and primarily Asia,

10  and they had some European countries as well.

11  Q    If you look at the next page, it keeps going.  Africa.

12       Why did you have these two different license agreements,

13  one to ADG and one to Whitewater?  What were they splitting up

14  here?

15  A    Just in terms of territories and where they would be

16  allowed to operate.

17  Q    Okay.  I'd like to show you Exhibit 52.  Looking at the

18  top, this one is with who?

19  A    Aquatic Development Group.

20  Q    Looking at page 11, for the signature block, when was this

21  one signed?

22  A    November 18, 2006.

23  Q    Look at section 2.1M.

24       Still have a quota minimum?

25  A    Yes.

1    Q     Looking at page -- section 3.1.

2          What is the royalty that ADG has to pay you under this

3    agreement?

4    A     Ten percent.

5    Q     Do you know, did the geographic scope change

6    substantially -- actually, let me just show you.  Look at

7    page 1 for the geographic scope, please.  This is where ADG was

8    allowed to sell under this agreement?

9    A     Correct.

10   Q     Canada and the United States?

11   A     Yes.  So it was reduced scope.

12   Q     What was reduced out of this one, do you recall?

13   A     Primarily, South America was eliminated.

14   Q     Let's look at Exhibit DM.  Who was this license agreement

15   with?

16   A     That's with Whitewater; Wave Loch and Whitewater West.

17   Q     The signature page is on page 18.  Go back to the top,

18   first page, Gary.

19         Do you know when this was signed?

20   A     I believe there was an effective date provision in the

21   agreement.  Maybe it is a little further down.

22   Q     I apologize.  Well, let me focus on the important parts,

23   here.  Let's look at page 7, section 2.2.14.

24         Before, we looked at all the agreements, and they had a

25   minimum number of rides that had to be sold.  What is different

1   here?

2   A     Just a minimum dollar figure.

3   Q     Why did you change from a minimum number of rides to a

4   minimum dollar figure?

5   A     It provided Wave Loch more consistency in terms of its

6   planning capability.

7   Q     Okay.  What do you mean?

8   A     Cash flow.  So we got a consistent cash flow every month.

9   Q     Okay.  I'd like to look at section 3.1, on page 8.

10        Before, we looked, and the royalty just said a percentage.

11  What is different here?

12  A     We are at different percentages that are allocated to

13  different time periods.

14  Q     Okay.  I notice that you reference some specific patents

15  here.  It says, "20 percent royalty contracted on or before

16  September 30 of 2010 based on gross proceeds."  It says it's

17  "comprised of 10 percent license fee for the opportunity to

18  exercise those rights protected under U.S. Patent 5,236,280,"

19  and it goes on to mention a second patent and give a second

20  date.

21        Why did you mention those two patents?

22  A     The only reason those specific patents were mentioned was

23  because it had dates certain when they expired.  So, when these

24  patents would expire, that kind of would retrigger the royalty

25  amount.

1  Q    Okay.  I want to show you Schedule A on this license, page

2  19.

3       Are all of these patents licensed under this license

4  agreement?

5  A    Yes.

6  Q    And the '589 is one of those?

7  A    Correct.

8  Q    Did you intend to only value those two patents that were

9  listed up in the section 3.1 when you did this license

10  agreement?

11  A    No.

12  Q    What was the purpose of listing those two patents?

13  A    It was just to have a way to, let's say, specify dates,

14  dates when the royalty percentages would change.  It was just a

15  date calculation.

16  Q    Thank you.

17       Just so I can close this up, can you look at page 14,

18  section 10.1.  We found the date.

19       When did this license agreement start?

20  A    February 20, 2009.

21  Q    All right.  There we go.

22       So, in all of these license agreements, you licensed a

23  whole group of patents, right?

24  A    Yes.

25  Q    How did you calculate the royalties?  We saw 7.5, some

```
 1   10 percent, some going up to 15 percent.
 2        How did you calculate that royalty amount?
 3   A    It was just negotiation.
 4   Q    What was it that you were licensing?  I am sorry.  That's
 5   a bad question.
 6        What did you want to get a percentage of?
 7   A    It would be the entire amount of the equipment package
 8   sold.
 9   Q    Did it matter to you how many patents were being licensed?
10   A    No.
11   Q    What mattered to you?
12   A    It was that overall -- the amount that either Whitewater
13   or ADG would sell, I would get a royalty defined by that
14   percentage equal to what they sold, total.
15   Q    What did the package of patents that you licensed to them
16   allow ADG to do, for example?
17   A    They could manufacture the entire ride, and that's what
18   they did.  They would install it.
19   Q    And if there were even just one patent that allowed them
20   to manufacture the ride, would you ask for the same amount of
21   royalties?
22   A    Absolutely.
23   Q    Are you aware of a company called Surf Park?
24   A    Yes.
25   Q    Do you own that company?
```

1    A    No.

2    Q    Do you have any business relationship with that company?

3    A    I sold them the patents -- the principals of that company,

4    I had a relationship with in Singapore, because they operated

5    the Wave House in Singapore.

6    Q    Did you sell the '589 patent to Surf Park?

7    A    Yes.

8    Q    Do you know when that was?

9    A    I believe approximately 2012.

10   Q    Let's look at Exhibit 240.  Does this refresh your

11   recollection as to when you assigned the '589 patent to Surf

12   Park?

13   A    Yeah.  It spanned a couple -- May 18, 2011.

14   Q    When did you actually sign it, though?

15   A    18th of July 2013.

16   Q    Do you know Richard Alleshouse?

17   A    Yes.

18   Q    How did you come to know Mr. Alleshouse?

19   A    He worked for me.

20   Q    When did he start working for you?

21   A    I believe back in -- he did some kind of fix-it work

22   down -- in 2005, at Wave House.

23   Q    Did he come to work for you after that?

24   A    Yes.

25   Q    When did he start working for you after just doing the

1   fix-it work?

2   A    I believe he then became an employee.  He -- he graduated

3   and was an engineer, I believe, and I think that was 2007.

4   Q    Do you know what Mr. Alleshouse's title was at the time he

5   left Wave Loch?

6   A    I believe he was a field engineer.

7   Q    What were Mr. Alleshouse's responsibilities when he worked

8   at Wave Loch?

9   A    He would be R&D, materials analysis, because we are

10  constantly trying to solve the problems of failure.  So he

11  would be working with glues and different types of soft

12  material, foams and plastics.

13  Q    Did he work on any specific products?

14  A    He worked on all the products.

15  Q    To your knowledge, did Mr. Alleshouse work on installing

16  FlowRiders?

17  A    Yes.

18  Q    Do you know how many FlowRiders he worked on installing?

19  A    There was quite a few.

20  Q    As part of his job, was Mr. Alleshouse required to

21  understand the FlowRider product?

22  A    Absolutely.

23  Q    Do you believe he did understand the FlowRider product?

24  A    Yes.

25  Q    When did Mr. Alleshouse stop working for you?

1   A    I believe he terminated his employment -- I think around

2   2012.

3   Q    Are you aware of company called Pacific Surf Designs?

4   A    Yes.

5   Q    What do you know about Pacific Surf Designs?

6   A    They sell a knockoff FlowRider.

7   Q    When did you -- do you know who owns Pacific Surf Designs?

8   A    Richard Alleshouse.

9   Q    When did you first learn Richard Alleshouse started

10  Pacific Surf Designs?

11  A    It was a couple of months after he left, my employees told

12  me, "You can't believe this.  Take a look at this website."

13  They gave me the link, and there was basically every single

14  ride that we have.  It was just shocking.

15  Q    What was your reaction?

16  A    I just -- I was flabbergasted.

17  Q    Did you do anything?

18  A    Yeah.  I wrote a letter basically outlining to Richard --

19  I said, "Hey, Richard, you signed a confidentiality agreement.

20  There's a noncompete that was related to the confidential

21  information.  So, you know, what are you doing?"  Basically.

22  Q    Did Mr. Alleshouse or anyone at Pacific Surf Designs ever

23  ask you to license the '589 patent?

24  A    No.

25  Q    If they asked you to license the '589 patent in late 2012,

1   would you have?

2   A    No.

3   Q    Why not?

4   A    I have spent, I mean, what, over 20 years developing this

5   thing?  I had all these employees that were counting on it, you

6   know, as part of their survival.  No, that just didn't make any

7   sense.

8   Q    We have talked before about how you sold Wave Loch's sheet

9   wave business to Whitewater.  I would like to look at

10  Exhibit 46.

11       Do you recognize this document?

12  A    Yes.

13  Q    What is this?

14  A    This is the contribution agreement, which was basically a

15  contract which enabled the sale of all of the assets of Wave

16  Loch and FlowRider to a company called Flowrider Surf, which

17  was one of the subsidiaries of Whitewater West.

18  Q    Why did you decide to sell all of your sheet wave business

19  to Whitewater?

20  A    I wanted to focus on my ultimate dream, which was to bring

21  surfing to the Olympics and the deep-water waves, so I knew

22  that that needed my full-time commitment, so that was my

23  motivation.

24  Q    I would like to look at page 5.  Can you blow up that

25  first paragraph, please, Gary.

1       What is the date of this agreement?

2   A   31st January 2014.

3   Q   Does it have another date in the paragraph?

4   A   December 1, 2012.

5   Q   Why does it refer to December 1, 2012?

6   A   We started the negotiations on the December 1, 2012 date.

7   Q   So you have basically backdated the agreement from

8   January '14 to December '12?

9   A   Yes.

10  Q   We talked about Whitewater taking over your business.  Why

11  does this agreement talk about a company called Flowrider Surf?

12  A   Flowrider Surf was the subsidiary company of Whitewater

13  West.

14  Q   How many patents were transferred as part of the

15  contribution agreement?

16  A   Quite a few.

17  Q   Do you know who owned the patents that were transferred as

18  part of the contribution agreement?

19  A   Wave Loch, LLC, had a few, but the bulk of them were Surf

20  Park.

21  Q   How did Surf Park transfer patents to Whitewater under the

22  contribution agreement?

23  A   I believe they licensed -- I think it was a license,

24  initially a license, because there was, my recollection -- when

25  they purchased those patents from me, from Wave Loch, they --

1  it was under a tax -- they had a -- in Singapore, the country

2  of Singapore had a special tax advantage, but they had to hold

3  those patents; they couldn't resell them again.

4      So my understanding is, as part of the deal, they held the

5  patents and therefore just licensed those patents over to

6  Whitewater.

7  Q    I would like to look at Exhibit 46, page 86.

8      Do you recognize this?

9  A    Yes.

10 Q    Is this the cover page of that license agreement?

11 A    Correct.

12 Q    Do you know, did the '589 patent get licensed from Surf

13 Park to Flowrider Surf?

14 A    I believe it did.

15 Q    Did Whitewater -- excuse me -- did FlowRider have the

16 ability to sublicense those patents, basically to take the

17 patents it licensed from Surf Park and license them to other

18 people?

19 A    Yes.

20 Q    Do you know if they actually did that?

21 A    I would -- I don't know, but I would assume they would.  I

22 don't know.

23 Q    Based on your understanding of the contribution agreement,

24 as of the effective date, December 1, 2012, who was responsible

25 for maintaining the '589 patent?

1  A    Whitewater.

2  Q    Did you intend Flowrider Surf to have the rights and

3  responsibilities for maintaining -- Flowrider Surf or

4  Whitewater to have those rights and responsibilities of

5  maintaining the patents?

6  A    Yes.

7  Q    After you executed the contribution agreement, did you do

8  anything to make sure that Whitewater was maintaining those

9  patents?

10  A    No.

11  Q    Why not?

12  A    When I sold, I sold.  I mean, it wasn't my responsibility,

13  so I didn't really feel any need to.

14  Q    Okay.  Under the contribution agreement, who was

15  responsible for suing other people with respect to the license

16  patents?

17  A    That would have been Flowrider Surf or Whitewater.

18  Q    Did you intend Flowrider Surf to be limited in enforcing

19  the patents licensed to them in any way?

20  A    No.

21  Q    Would that include patent infringement of the '589 patent?

22  They could sue for that?

23  A    Correct.

24  Q    In the contribution agreement, did you call out anyone

25  specifically you thought was infringing the '589 patent?

1    A    Yes.

2    Q    I would like to look at Exhibit 46, at 77.  This is right

3    in the contribution agreement.  You called out Richard

4    Alleshouse, correct?

5    A    Yes.

6    Q    Why did you do that?

7    A    Because he had apparently what appeared to be just a

8    direct copy of the base FlowRider technology.

9    Q    At the time, had you actually seen any of Pacific Surf

10   Designs' products?

11   A    Physically, I had not seen it.  I only saw video and

12   pictures.

13   Q    Then why did you think he was infringing?

14   A    My employees told me.

15   Q    We talked a couple of times about how you transferred

16   ownership of the '589 patent to Light Wave and then Surf Park.

17   It was Surf Park that actually licensed the '589 patent under

18   the contribution agreement, correct?

19   A    Yes.

20   Q    I would like to show you Exhibit BG.  Go to page 9,

21   please.

22        It gets a little grainy, but do you recognize this

23   document?

24   A    It's one of the documents that --

25   Q    Let me highlight the very top portion where -- the title

1    of the document, and also highlight the signature block.

2         Does that help?

3    A    Yes.

4    Q    What is this document?

5    A    This is a power of attorney to prosecute before the patent

6    office.  That's what it is.

7    Q    Is that your signature?

8    A    Yes.

9    Q    What is the date?

10   A    March 27, 2015.

11   Q    Do you know, did this power of attorney relate to the '589

12   patent?

13   A    I don't -- you know, to be honest, I don't know.

14   Q    Okay.  Did you -- but you didn't own the '589 patent at

15   this time, right?

16   A    No.

17   Q    And in fact, it's getting grainy as we blow it up, but you

18   signed this on behalf of Light Wave, didn't you?

19   A    Yes.  Because Blade Loch was the managing member for Light

20   Wave.

21   Q    Why did you sign this?

22   A    Well, they -- the attorneys for Whitewater asked me to,

23   and I was just complying with the -- you know, our agreement.

24   Q    Did you have an obligation under the contribution

25   agreement to cooperate with Whitewater?

1    A    Yes.

2    Q    Were you aware at the time that you signed this, in March

3    of 2015, that Whitewater had failed to pay the maintenance fees

4    on the '589 patent?

5    A    No.

6    Q    Do you have any financial stake in this litigation,

7    Mr. Lochtefeld?

8    A    No.

9    Q    Then why are you here?

10   A    Well, I believe in the process and, you know, the laws

11   that we have, and I -- what Richard did was wrong.  And I just

12   want to make sure I follow through on my end of the agreements.

13            MR. SCOTT:  Thank you, Mr. Lochtefeld.

14            THE COURT:  Let's take a little recess, ten minutes.

15   Be back outside the doors promptly at five minutes to 11:00.

16   Okay.  Remember my admonition.  Thank you.

17       (Recess taken from 10:45 a.m. to 10:55 a.m.  The following

18   proceedings were held in open court out of the presence of the

19   jury:)

20            MR. KOLEGRAFF:  Your Honor, we would like to use the

21   demonstrative during the cross-exam.

22            THE COURT:  Sure.  Move it out.

23            MR. KOLEGRAFF:  When I am out here, would you prefer

24   I use a microphone, or do you think I can project well enough?

25            THE COURT:  I prefer you use the microphone, please.

```
 1              MR. THOMAS:  Your Honor, Mr. Lochtefeld would like to
 2    bring some tea up there with him.  Is that okay?
 3              THE COURT:  Sure.  Come on up.
 4        (The following proceedings were held in open court in the
 5    presence of the jury:)
 6              THE COURT:  You may proceed.
 7                          CROSS-EXAMINATION
 8    BY MR. KOLEGRAFF:
 9    Q    Good afternoon, Mr. Lochtefeld.
10    A    How do you do?
11    Q    Your degree is in sociology; is that correct?
12    A    Yes.
13    Q    You also have a law degree?
14    A    Yes.
15    Q    And you have practiced as an attorney?
16    A    Correct.
17    Q    You started a company called Wave Loch in approximately
18    1991?
19    A    Yes.
20    Q    As part of that, you licensed patents from -- Frenzl
21    patents?
22    A    Yes.
23    Q    What was the royalty rate on that?
24    A    I believe $10,000 a year, minimum.
25    Q    How much did you end up paying under these licenses?
```

1   A    For the term of the patent until it expired, so -- I don't

2   know what year it expired.  I can't recall.

3   Q    Do you recall making the $10,000 payment per year?

4   A    Yes.

5   Q    The FlowRider is a sheet wave machine; is that correct?

6   A    Correct.

7   Q    Prior to August 2, 1999, you had several sheet wave

8   machine installations around the world?

9   A    Yes.

10  Q    One of those FlowRider installations was in Hyland Hills,

11  Colorado?

12  A    Correct.

13  Q    Hyland Hills was installed about 1996?

14  A    Yes.  Yes, approximately.

15  Q    Let's put up Exhibit BI.

16       This is the Hyland Hills installation, correct?

17  A    Yes.

18  Q    This is a sheet wave machine, correct?

19  A    Yes.

20  Q    Now, the man in the picture is sitting on a nozzle deck,

21  correct, this man right there?

22  A    Sitting on what?

23  Q    A nozzle deck?

24  A    Yes.

25  Q    So there are nozzles underneath where that man is sitting?

1    A    The nozzle assembly, yes.

2    Q    And those are nozzle apertures that eject water onto the

3    ride surface?

4    A    Yes.

5    Q    The young lady on the board is gliding over the jet of the

6    water stream; is that correct?

7    A    Yes.

8    Q    There's a padded vertical bumper on the front of the deck?

9    A    Correct.

10   Q    Those padded bumpers protect the rider from impacting the

11   nozzles?

12   A    That whole assembly, correct.

13   Q    There's a foam pad extending from the bottom portion of

14   the vertical bumper, this guy right there?

15   A    Okay.  Yep.

16   Q    That foam pad protects the riders from impacting the

17   outlets?

18   A    Yes.

19   Q    The foam pad has given flexibility similar to a common

20   wrestling mat?

21   A    Correct.

22   Q    A rider speeding toward the bumper could ride over that

23   foam pad?

24   A    No.

25   Q    As that rider comes down towards it, they would be able to

1    hit that foam pad, wouldn't they?

2    A    Yes.

3    Q    And if they lift their board slightly, they would be able

4    to go up on the foam pad?

5    A    No.

6    Q    Why --

7    A    I mean, that -- do you want me to explain?

8    Q    Yes.

9    A    That foam pad goes all the way up to the top of the deck.

10   How is he going to get over that thing?

11   Q    Would he be able to ride onto the 45-degree-angle portion?

12   A    There's no 45-degree.

13   Q    There's a bent angle toward the water stream, right?

14   A    Correct.

15   Q    Would the rider be able to ride on that portion?

16   A    They would bump into it.

17   Q    Would they be able to lift their board onto that?

18   A    They would bump into it.

19   Q    But they would be able to lift their board and put it onto

20   that foam pad?

21   A    No.

22   Q    A rider standing on the deck can drop down over that

23   bumper and enter the water stream, correct?

24   A    Not a rider.

25   Q    A person on a surfboard could be standing where that man

1   is and drop down onto the water?

2   A    If he wanted to break the rules.

3   Q    Okay.  Can I get Exhibit BH-5, please.

4        This is a fax from Bruce Lochtefeld to Hyland Hills; is

5   that correct?

6   A    Bruce McFarland.

7   Q    Bruce McFarland?

8   A    Yes.

9   Q    He was sending fabrication drawings to Hyland Hills?

10  A    I don't know what follows this, but --

11  Q    Put up the next page, please.

12       These are fabrication drawings for Hyland Hills?

13  A    Yes.

14  Q    Can you go to BH-7.

15       Do you recognize this as the side view of the Hyland Hills

16  installation?

17  A    Correct.

18  Q    So Hyland Hills has a two-inch foam riding surface; is

19  that correct?

20  A    Approximately.

21  Q    And it has a water nozzle that comes out here?

22  A    Correct.

23  Q    The output aperture projects a jet of water onto the ride

24  surface?

25  A    Yes.

```
 1   Q     There is a foam pad that sits in front of the bumper?

 2   A     Correct.

 3   Q     That foam pad is removable?

 4   A     I don't -- I am not 100 percent sure.

 5   Q     Right there, it says, "Pad must be removed to adjust

 6   aperture"?

 7   A     Okay.

 8   Q     So the pad is removable?

 9   A     Yes.

10   Q     And the foam pad protects the riders from impacting the

11   vertical wall?

12   A     Correct.

13   Q     Now, at the top, we see this L piece.  That's a hinge,

14   correct?  I am sorry.  The L piece is a nozzle plate?

15   A     Correct.

16   Q     And it's actually hinged right there, correct?

17   A     Yes.  I believe that is a -- that was an axle for a hinge,

18   yes.

19   Q     So what we have here is a metal plate that is hinged to

20   the nozzle; is that correct?

21   A     Yes.

22   Q     And that can be rotated down into the water stream?

23   A     No.

24   Q     It's there to set the depth of the water stream; isn't it?

25   A     When the water is turned off, you can adjust that nozzle,
```

1   that piece of steel, yes.

2   Q    When the water is turned off, you can adjust that; you can

3   rotate that metal flap downward to set the thickness of the

4   water?

5   A    Correct.

6   Q    So we have a metal flap that is hinged against the nozzle

7   that is used to set the depth of the water?

8   A    Correct.

9   Q    Did Wave Loch also do an installation in Guam?

10  A    Yes.

11  Q    And that installation was done after Hyland Hills?

12  A    I believe so.

13  Q    Were they both done in about 1996?

14  A    Ballpark.

15  Q    Can we get CJ-4, please.

16       Is this a picture of the Guam installation -- I am sorry.

17       Is this the picture of the nozzle assembly for the Guam

18  installation?

19  A    I can't tell.  Yeah, it looks to be, yes.

20  Q    If we look up here at this, it has a slightly different

21  shape to the bumper, doesn't it?  If you look at the bumper,

22  right there.

23  A    What is different?

24  Q    This is a single-piece bumper that extends down and has --

25  appears to be a 45-degree-angle bias down towards the water;

1    isn't that correct?

2    A    Let me see.  The -- yes.  There's what appears to be soft

3    foam padding that is thinner and covers that wall and the

4    nozzle.

5    Q    Right.  So now we have the nozzle that's going to have

6    water coming out approximately there, right?

7    A    Correct.

8    Q    So, from the looks of this drawing, that foam pad is only

9    sitting about an inch above the top of that water stream, isn't

10   it?

11   A    No.

12   Q    How far is it above it?

13   A    At least two, probably a little over two inches.

14   Q    So, as a rider is riding towards that bumper, all they

15   have to do is get up two inches and they are up riding over

16   that foam, aren't they?

17   A    No.  They would hit the foam.  They don't ride over it.

18   Q    If they lifted up the board, two inches is all they would

19   have to do to ride on the bumper?

20   A    How are they going to get over that thing?  That foam goes

21   up to the top deck.  That is several feet.

22   Q    If you look at this piece right there, which extends

23   approximately a 45-degree angle from the vertical wall, they

24   would only have to lift their board two inches and they are up

25   riding on the 45-degree-angle tongue, aren't they?

1   A    It was contiguous piece of foam.  To get over that foam,

2   you have to go up several feet.  You can't just go up a little

3   tip of it.  That doesn't make sense.

4            THE COURT:  Let me see if I can solve this.  I think

5   maybe we are arguing over the how many angels can ride on the

6   head of a pin.

7        He is using the word "ride."  But if you were on a boogie

8   board, for example, and you were following that top line -- you

9   see the top line there?  I don't know what it is, but there's a

10  top line just above where the nozzle is.  Do you see that?

11           THE WITNESS:  Yes.  Yes.

12           THE COURT:  Okay.  If somebody was riding their

13  boogie board -- and I don't know if it's possible or not -- but

14  somehow they came closer to that wall, could a rider's board go

15  over that section that has been circled?

16           THE WITNESS:  The rider's board could go up and hit

17  that and hit the vertical wall.  So I guess if you want to

18  describe that one little section, could it go up -- I am having

19  a problem with "over."  How does it go over?

20           THE COURT:  Let me try.  Here is that little section.

21  Here is the wall.  Okay.  You have the boogie board, and it

22  comes over that, on top of it.

23           THE WITNESS:  Yes.  It could go on top of it, yes.

24           THE COURT:  Yay.

25           MR. KOLEGRAFF:  We need to introduce your hand into

1    evidence.

2         THE WITNESS:  I have a different definition of

3    "over."

4    BY MR. KOLEGRAFF:

5    Q    Let's introduce NG.  (Exhibit played.)

6         Do you recognize this as the installation at Belmont Park?

7    A    Correct.

8    Q    How many different flow machines around the world have

9    been installed with this style of mat tongue?

10   A    I would guess it was used for a few years.  Maybe five.

11   Q    Five total systems?

12   A    That's what I am guessing.

13   Q    That would have been from the time frame of approximately

14   1999 to 2004?

15   A    Let's assume so.  I don't quite recall.

16   Q    So when we talk about the cover being -- having a flexible

17   tongue, this represents the installation at Belmont Park where

18   you have basically a mat coming across the top.  Do you

19   recognize this as being what the Belmont Park installation

20   would look like?

21   A    I don't recall if that was used at Belmont Park.

22   Q    Does this look like what the flexible tongue would have

23   looked like at Belmont Park?

24   A    I know that was what was used in Munich, in the Bruticus,

25   yes.

1    Q     When the water comes through here, this causes the mat to

2    go up; is that correct?

3    A     That is correct.

4    Q     When the water comes up, it causes the mat surface to

5    deform; is that correct?

6    A     It looks like it would.  I don't know if that's the case,

7    because it would come out equally, so it would probably go up

8    uniformly, so I don't know that it would deform.

9    Q     Then let's put it the other way around.

10         You have a uniform water coming through, and a rider comes

11   in here and hits this portion of the tongue.  This portion

12   deforms down, then, correct?

13   A     If a rider would hit it, yes, it could deflect down.

14   Q     This part does not deform, over here?  Away from the point

15   of impact does not deform?

16   A     That would be most likely, yes.

17   Q     So there's a deformation going along the front edge here,

18   when this moves; is that correct?

19   A     Say that again.

20   Q     There's a deformation across this front edge as this is

21   moved; is that correct?

22   A     As you are moving it, yes.

23   Q     And there's a deformation along here as it's lifted; is

24   that correct?

25   A     I didn't see deformation at the top.

1    Q    To this crease area?

2    A    Oh, yeah.

3    Q    So this is the flexible tongue that was installed

4    basically in San Diego, and it's also the one that is shown in

5    the figures of the '589 patent; is that correct?

6    A    As I said, I don't know that that specific one was

7    installed in San Diego.

8    Q    At some point you moved to that hinged design, is that

9    correct, in approximately 2005?

10   A    Correct.  At some point, it was moved to a hinged design.

11   Q    You said that was primarily because of a maintenance

12   issue?

13   A    Yeah, it was -- it provided greater longevity.

14   Q    That hinged design is still being used today?

15   A    I believe so.

16   Q    And so the metal hinge design is a better design than what

17   you see right there?

18   A    That is correct.

19   Q    Can we put Figure 3A on, please.  I am sorry, that would

20   be Exhibit 1-5 -- Exhibit 3 of the patent.  Exhibit 1-5.

21        Do you recognize this as being from your '589 patent?

22   A    Yes.

23   Q    Just as we talked about before, we have a cover -- that's

24   the cover; is that correct?

25   A    That is correct.

1    Q    And then there's a flexible tongue at the end of the

2    cover; is that correct?

3    A    Yes.

4    Q    Who came up with the idea of getting rid of the foam mat

5    piece and putting in a hinge?

6    A    I did.

7    Q    And you came up with that idea in about 2005?

8    A    Yeah, I mean, in that context.  It was always contemplated

9    it could be in there.  Yeah.

10    Q    Did you file a patent application on the hinge?

11    A    It was in the context of the '589 patent.  Yes.

12    Q    But you did not file a patent application on this hinge

13    embodiment?

14    A    Specific to a hinge, no.

15    Q    None of the figures in your patent show any hinges?

16    A    No specific pointing out of a hinge.

17    Q    In fact, you never used the word "hinge" once in the

18    entire patent?

19    A    I don't believe so.

20    Q    You never used the word "rotate" in this patent?

21    A    I don't believe so.

22    Q    You never used the word "metal flap" in this patent

23    application?

24    A    I don't believe so.

25    Q    You only talk about metal twice in this patent

1    application, and that has to do with the metal for the nozzle;

2    is that correct?

3    A    I would have to read the patent.

4    Q    So, a hinged metal plate is not described anywhere in the

5    patent application?

6    A    I think there's reference to the concept of having what I

7    recall was a rigid body, and it was -- still had flexibility.

8    To me, that encompasses a hinged element.

9    Q    But there's no words that talk, in the patent, about using

10   a hinge?

11   A    There's no specific reference, to my recollection, to a

12   hinge.

13   Q    If I go to this device, which a hinged flap -- would you

14   agree this is a hinged flap?

15   A    Yes.

16   Q    Can we agree that this piece is rigid, that the flat piece

17   is rigid?

18   A    Well, the foam is -- has -- it's squishy and flexible, so

19   the bottom subsurface is a plate, which is steel, which is

20   rigid.

21   Q    But -- so this is a rigid structure, then, when it's got

22   the steel plate on it?

23   A    A what structure?

24   Q    Rigid.  This is a rigid --

25   A    There's a rigid -- let's call it a skeleton that's in it,

```
 1   that holds the shape.  That is correct.
 2   Q    So, where you are telling me you get the flexibility from
 3   is purely from that hinge?
 4   A    There's flexibility from the hinge, and also the padding
 5   has -- you know, it's flexible in the context that it moves,
 6   too.  It's somewhat squishy.  It's forgiving.
 7   Q    You don't give any guidance in your patent application for
 8   selecting the steel material for that steel plate, do you?
 9   A    I just -- to me, "rigid material" covers steel.
10   Q    BG-11.  This is a document that I believe we saw earlier.
11   This is you signing a power of attorney; is that correct?
12   A    Yes.
13   Q    And you signed this document on March 27, 2015?
14   A    Yes.
15   Q    And I know it's fuzzy to read, but you executed this as
16   president of Blade Loch, Inc., managing member, Light Wave
17   Ltd., correct?
18   A    Yes.
19   Q    Neither of these entities owned the '589 patent on
20   March 27, 2015, did they?
21   A    No.
22   Q    So when you signed this, that was incorrect?  They did not
23   own that patent?
24   A    Correct.
25   Q    A little earlier, you made the statement that you would
```

```
 1   not have licensed the '589 in 2012 when Richard Alleshouse
 2   left; is that true?  Did you make that statement earlier?
 3             MR. SCOTT:  I am sorry, Your Honor.  I couldn't hear
 4   the question.
 5        Can you repeat that, Mr. Kolegraff?
 6   BY MR. KOLEGRAFF:
 7   Q    On the record today, you answered a question today saying
 8   you would not have licensed the patents, the '589 patent, to
 9   Richard Alleshouse in 2012, when he left?
10   A    Correct.
11   Q    You did not own the '589 in 2012, did you?
12   A    What date?  2012?
13   Q    Any time in 2012, because you were -- they were assigned
14   to Surf Park in 2011?
15   A    Okay.
16   Q    So you did not own the '589 in 2012?
17   A    Correct.
18   Q    You would have had no ability to license that patent or
19   not license that patent to Mr. Alleshouse in 2012, then?
20   A    That is correct.
21   Q    During your direct examination, you identified several
22   license agreements.  First was ADG in 2003.
23        How much royalty did you receive under that license?
24   A    Let's see.  I would have to guess, but it was in the tens
25   of thousands.
```

1   Q    Do you know how many machines they sold?

2   A    I don't recall.

3   Q    You did another license with ADG in 2006.  How many

4   machines were sold under that agreement?

5   A    I don't recall.

6   Q    Do you recall what the total royalty was that you

7   received?

8   A    It would have been in the hundreds of thousands.

9   Q    In the Whitewater agreement that you executed in 2009, the

10  royalties are based on two identified patents; is that correct?

11  A    Correct.

12  Q    So there's no royalty allocated to the '589 in that

13  agreement?

14  A    Well, I mean, I don't -- I disagree.

15  Q    Where in that document would it show that it is allocated

16  to the '589?

17  A    It was licensed, the entire '589 and -- there was -- I

18  don't know, 20 other patents were part of the license

19  agreement.  There was royalty applicable to all of those.

20  Q    But the question is was there any royalty allocated to the

21  '589?

22  A    You mean in terms of a specific dollar amount?

23  Q    Correct.

24  A    No.

25  Q    Now, did you have any -- you mentioned that Whitewater,

```
 1   when you sold the patents to Whitewater, they were then in
 2   charge of keeping the patents maintained?
 3   A    Correct.
 4   Q    Did you have any input into that process at all?
 5   A    No.
 6   Q    So Whitewater was free to make a decision whether they
 7   wanted to keep something alive or whether they would let it
 8   lapse?
 9   A    Correct.
10   Q    By the way, this demonstrative is Exhibit NU.
11        So, this has a solid metal plate, this first flexible
12   hinge.  Now, this has a solid metal plate.  This one does not
13   rotate.  Do we agree on that?  This is not hinged?
14   A    Correct.
15   Q    This is not a flexible tongue?
16   A    Well, the padding, as I mentioned before, has flexibility,
17   but it doesn't have the capability to have a predisposed bias
18   downward, which is key.  It's got to be able to close,
19   otherwise some guy could get their finger, toe or foot in
20   there.
21   Q    BF-2.  You produced this document during this litigation,
22   correct?
23   A    I don't really know.  I don't recall that.
24   Q    If you look at the bottom, it has a signature, a Bates
25   label down here, that starts with TL, Thomas Lochtefeld.  So
```

1    this was produced by you or your attorneys.

2    A    Oh, is this -- what is all that black stuff?

3    Q    This is where your attorneys have redacted out information

4    that they thought was attorney-client privilege or not

5    relevant, having left just this one little section in the

6    middle.

7    A    All right.

8    Q    If you look at the top section, it says the project is the

9    '589 patent, correct?  The project, the country, and the patent

10   number.  This references the '589?

11   A    Correct.

12   Q    It shows that the '589, for purposes of tax filings, is

13   owned by a company called Wave the Planet, correct?

14   A    Okay.

15   Q    It shows, for purposes of dealing with the United States

16   Patent and Trademark Office, you are going to claim the owner

17   is Light Wave Ltd.; is that correct?

18   A    Yes.

19   Q    And as far as being the owner in front of the Singapore

20   PTO, Surf Park PTE Ltd. would be the owner of that particular

21   patent?

22   A    Okay.

23   Q    So you have three companies all claiming ownership of the

24   same patent and you decide which company to use depending what

25   business goal you are trying to forward?

1    A    I didn't understand the last part.

2    Q    You have three different companies --

3    A    Right.

4    Q    -- and you choose which one to use depending upon what

5    particular business goal you are forwarding at that moment?

6    A    Who chooses?

7    Q    You.

8    A    No.  I had no control over Wave the Planet or Surf Park

9    PTE Ltd.  Those are Singapore companies.

10   Q    But the '589 patent, this is where you go to see who has

11   ownership of the '589.

12   A    Okay.

13   Q    And the owner is different depending upon if you are

14   dealing with the Singapore PTO, the U.S. PTO, or dealing with

15   tax filings; is that correct?

16   A    That's what it says.

17   Q    A little earlier, you said you are not being compensated

18   here today, for your testimony; is that correct?

19   A    Correct.

20   Q    Have you been compensated in any way for working with

21   Whitewater on this litigation?

22   A    Not on this litigation, no.

23   Q    Have you been compensated by Whitewater -- has any of the

24   entities you control been compensated by Whitewater in this

25   litigation?

1    A    No.

2    Q    Are you providing any consultation services to Whitewater?

3    A    No.

4         MR. KOLEGRAFF:  That's all.

5    Thank you, Mr. Lochtefeld.

6         THE WITNESS:  You are welcome.

7         THE COURT:  Redirect?

8                    REDIRECT EXAMINATION

9    BY MR. SCOTT:

10   Q    Mr. Lochtefeld, do you know when this document was

11   created, what year?

12   A    The one that's on the screen?

13   Q    Correct.

14   A    1993, down at the bottom.  Is that correct?

15   Q    That's a Bates number.  That's out of your -- do you have

16   any idea when this was created?

17   A    No.

18   Q    Do you have any idea what purpose you created this for?

19   A    No.

20   Q    Prior to Mr. Kolegraff showing this to you, do you recall

21   this document even existing?

22   A    No.

23   Q    Okay.  The patent office, if I go to the website, it shows

24   who is the registered owner with the patent office, right?  If

25   I go to the United States Patent Office website and look up the

```
 1    '589 patent, that website will tell me who the registered owner
 2    is with the patent office; is that correct?
 3    A    Correct.
 4    Q    Is it possible for the registered owner with the PTO to be
 5    different than the actual owner?
 6    A    Yes.  Absolutely.
 7    Q    I would like to look at Exhibit 58, please.  We have
 8    looked at this a couple of times.
 9         This guy right here, is that a spectator or a lifeguard?
10    A    No, that's a lifeguard.
11    Q    This isn't just somebody watching; he is there for a job?
12    A    No.
13    Q    Now, there was an extended back-and-forth over the
14    difference between "riding over" in your mind and "over" in
15    Mr. Kolegraff's mind.
16         Mr. Kolegraff asked several questions where he used the
17    word "impacted."
18         Is it your understanding that this padded wall, here, even
19    with that little kicker plate at the end, stopped a rider from
20    impacting the nozzles?
21    A    Well, yes.  Yes.
22    Q    Can you put Exhibit 250 next to this, please.
23         What is -- can you explain, using these pictures, the
24    difference in your mind between "impacting" and "riding over" a
25    nozzle cover?
```

1  A    Yes.  On the left picture, the Hyland Hills park, if the

2  person comes down, they would -- if they were going really

3  fast, they would hit that padding that was protecting them from

4  actually hitting any steel or concrete that's in the nozzle

5  housing; versus over on the right-hand side, you can see that

6  the rider goes up -- and this is where I was kind of hung up, I

7  guess, and the judge raised this point.  Yes, he is riding up,

8  but here you can see he is riding up and over.  This, to me, is

9  the defining feature of the nozzle pad.  It is a sluice cover

10 that allows you to ride up and over and onto the upper deck.

11 Q    I'd like to go to Exhibit BH, page 7.

12     Looking at this picture, is this nozzle pad, this pad

13 here, six-inch foam pad, connected -- is it attached to this

14 nozzle aperture, here?

15 A    No.

16 Q    This nozzle aperture here that I just circled, if I turn

17 the water off, does it close automatically?

18 A    No.  As a matter of fact, you can see that assembly, to

19 the right of it, that kind of circle with the oval element,

20 that's what you bolt down and tighten, and that locks it in

21 place so it can't move.  There's absolutely no possibility of

22 moving.

23 Q    Looking here, is this fixed in place to regulate the flow

24 of water?

25 A    It's not fixed in place.  It does not regulate the flow of

1    water.

2    Q    It moves with the flow of water, right?

3    A    Correct.

4    Q    Look at Exhibit CJ, page 4, please.  This is the padded

5    wall at Guam that Mr. Kolegraff referred to.

6         Do you recall that?

7    A    Yes.

8    Q    Is the nozzle aperture, here -- this is where the water

9    comes out?

10   A    Correct.

11   Q    Water comes out like this?

12   A    Correct.

13   Q    Does the water touch this pad?

14   A    No.

15   Q    Look at Exhibit 1, please, and go to page 21, column 11.

16   Please blow up that first paragraph.  Highlight the sentence

17   "the pad 130."

18        "The pad 130 or pad material can be reinforced internally

19   or externally, if needed."  Do you see that?

20   A    Yes.

21   Q    Did you list out every single possible way that you could

22   reinforce a nozzle pad?

23   A    No.

24   Q    How long would the patent be if you listed every single

25   way to reinforce a nozzle pad?

1    A     It could go on quite a few pages.

2    Q     Could I reinforce this pad over here by using a laminate

3    that made this stiffer?

4          Excuse me.  I will move this box so you can see it closes

5    down.

6          If I reinforced it with laminate, would that be

7    reinforcement?

8    A     Yes.

9    Q     If I attached a steel plate, would that be reinforcement?

10   A     Yes.

11   Q     Could I use fiberglass to reinforce it?

12   A     Yes.

13   Q     Plastic?

14   A     Yes.

15   Q     Wood?

16   A     Yes.

17   Q     Could I use this computer monitor, put it in the nozzle

18   flap, and reinforce it?

19   A     You could.

20   Q     Is there a reason you didn't specify steel in here?

21   A     It would be a limitation.

22   Q     I would like to look at page 5 of the patent, exhibit

23   image 3A.

24         Is this drawing in the patent intended to be the only way

25   you can build a flexible nozzle pad?

```
 1   A      No.
 2                THE COURT:  Recross?
 3                           RECROSS-EXAMINATION
 4   BY MR. KOLEGRAFF:
 5   Q      But you are aware that in a patent, the entire scope of
 6   coverage that you can infringe on is set by the language of the
 7   claims; is that correct?
 8   A      Yeah, I am not an expert when it comes to claim language,
 9   so I can't comment on that.
10   Q      Okay.  Can we put up BI again.
11          So, in this drawing, we have this -- this structure at the
12   very bottom that comes out at an angle that is aiming towards
13   the water.  Is that a good way to say that?  It's positioned
14   towards the water -- this was the way it was actually
15   installed, correct?
16          Can we go to BI, please, or BH.
17   A      Yes.
18   Q      And this was the fabrication drawings that we looked at a
19   little bit earlier.  Do you remember that?
20   A      Yes.
21   Q      If you look at that bumper, which is the six-inch foam
22   pad, you see it has a different shape; is that correct?
23   A      Correct.
24   Q      So, from the time that it was in the design, it was shaped
25   like that, where it would be impossible for someone to come up
```

1    and ride on top of that, to the structure you saw in the

2    picture, where now you can ride on top of that little angle at

3    the bottom; isn't that correct?

4    A    I don't know that's the case.

5    Q    Can we pull up 58, please.  It is the same drawing.

6         Something in your testimony confused me a little bit.

7    There's no internal stiffening or structure in that, there, in

8    that foam pad, is there?

9    A    I don't know.

10   Q    Okay.  Would it help to look back at the fabrication

11   drawing, or you just don't know?

12   A    Well, you can't assume that what is in a fabrication

13   drawing equals what was done in the field.  It is just

14   inherent.  Things change, you know.

15             MR. KOLEGRAFF:  Fair enough.  Thank you.

16             THE COURT:  All right.  Thank you, sir.

17        Please call your next witness.

18        (Witness excused.)

19                   GLEN STEVICK, Ph.D.,

20                PLAINTIFF'S WITNESS, SWORN

21             THE CLERK:  State your full name for the record,

22   spelling both your first and last name.

23             THE WITNESS:  Sure.  My name is Glen Stevick.

24   G-L-E-N.  Stevick, S-T-E-V, as in, Victor, I-C-K.

25

                         DIRECT EXAMINATION

BY MR. TACHÉ:

Q    Good morning, Dr. Stevick.

A    Good morning.

Q    Please briefly describe your educational background.

A    Sure.  I have a bachelor's in mechanical engineering from

Michigan Tech; a master's in mechanical engineering from

UC Berkeley; and a Ph.D. in mechanical engineering from

UC Berkeley.

Q    Thank you.

     And what do you currently do for a living?

A    I am the director and one of the founders of Berkeley

Engineering and Research.  It is a consulting firm that does

mechanical, electrical, and civil engineering.

Q    And the company that you work for, does that have an

acronym, BEAR?  And I assume it has something to do with the

Berkeley Bears?

A    Yes.  It's Berkeley Engineering and Research.

Q    Generally, what type of work does BEAR do?

A    We do a lot of legal consulting.  We do a lot of unusual

products that others are not willing to take on.

     We designed dampers for the Golden Gate Bridge so it

doesn't shake too much in an earthquake.

     We do a lot of product development.  One of them right now

s a mask for burn victims.  Turns out, if you are severely

1    burned and wear a flexible plastic mask, it will reduce the

2    scarring tremendously.

3         So it is a wide range of products and incidents that we

4    investigate.

5    Q    Thank you.

6         Does any of the work that you do at BEAR involve fluid

7    flow?

8    A    Yes.  A great deal does, actually.

9    Q    Can you give me a couple of examples of the kind of things

10   you have done involving fluid flow?

11   A    We have assisted in designing offshore platforms in the

12   North Sea, where the average wave, in the wintertime, is

13   50 feet; designed offshore platform for wind turbines.  We have

14   also done a lot of work on down-hole oil and gas flow, those

15   type of things.

16   Q    That's an unusual list of items.  Do you also do things

17   involving sort of what most of us would consider more

18   traditional fluid-flow things, dealing with boats or anything

19   like that?

20   A    Yes.  We developed modeling for how boats go through the

21   water under various conditions.  I have also analyzed water

22   rides, as a matter of fact.

23   Q    Has any of the work you have done at BEAR involved water

24   ride attractions?

25   A    It has.

1  Q    Are you a member of any professional organizations?

2  A    Yes.

3  Q    Can you give us a list of which ones you belong to?

4  A    I am a member of the American Society of Mechanical

5  Engineers, American Society of Civil Engineers, and ASTM, which

6  is American Society of Testing and Materials.  And I do

7  participate on the code committees for these various things.

8  Q    Are you also a professional engineer?

9  A    Yes, I am a registered professional mechanical and civil

10  engineer.

11  Q    During your time at Berkeley, did you teach any courses?

12  A    Yes.  I taught the senior design course in the mechanical

13  engineering department, which is sort of a capstone course that

14  puts everything together, where you have to take into account

15  all the things you have learned, stress analysis, fluid flow,

16  heat transfer, stress analysis -- which I already mentioned --

17  and do a project.

18  Q    Have you authored any reports or publications?

19  A    Innumerable.  Yes.  Many.

20  Q    Can you give us an example of some of the reports that you

21  have written in the past?

22  A    Sure.  I have done reports for the U.S. Navy on the --

23  helping them with the submarine drive systems, going through

24  the water; the Golden Gate Bridge, the dampers we designed, so

25  it doesn't shake too much in an earthquake, how do you maintain

1  them.  Those type of things.

2  Q    Other than your involvement with Whitewater in connection

3  with the current lawsuit, have you ever worked with Whitewater

4  before?

5  A    Yes, I have.

6  Q    And what was the nature of that involvement?

7  A    There was a water slide up in Walnut Creek, California.

8  It was a space frame.  So, this water slide took a very

9  circuitous route down to a pool, and there was a failure, with

10  many injuries and I believe some fatalities.  What had happened

11  is a group of high school kids had rushed 30 kids onto the

12  slide, and it was really designed for one or two at the most at

13  a time.  They overwhelmed the operators, and it did result in

14  the water slide coming down.

15      So I assisted them in improving the safety factors so,

16  even if this type of event happened, you could survive it.

17  Q    And, as part of your analysis, did you determine whether

18  or not Whitewater's either design, manufacture, or installation

19  had anything at all to do with the failure of the slide?

20  A    No, the slide -- it was primarily due to the over 30

21  persons running onto the slide quickly and being all in a very

22  short section.  However, you could still improve any design,

23  and that's what I helped them do.

24  Q    Did Whitewater tell you why they wanted you to improve the

25  design?

1  A    Well, they didn't -- just in case something like this

2  happened again.

3  Q    So, it was safety driven?

4  A    Exactly.

5  Q    In addition to your work at BEAR, as an engineer, are you

6  also involved in litigation?

7  A    Yes.  It's through BEAR, but yes.

8  Q    And what kinds of cases have you been involved with in the

9  past?

10  A    A wide range.  It can vary from boats going through the

11  water to the Deep Water Horizon case, where BP spilled five

12  million barrels of oil in the Gulf.  I actually testified in

13  the case about the blowout preventer that was supposed to shut

14  the well but did not.  And the reason, when I was working for

15  Chevron, I did assist with the blowout preventer designs.  So

16  that's just one example, but there's many.

17  Q    Have any of the cases you have been involved with been

18  patent cases?

19  A    There's been many patent cases.  Over 50.  Yes.

20  Q    Were any of these cases involving fluid flow?

21  A    Yes.  One involved or several have involved down-well

22  equipment, including the pumps, and the separators that

23  separate the oil and gas before it goes into the pump, far down

24  the well, thousands of feet down, where the pressures are

25  sometimes as high as 10,000 psi; all the way to air-bed cases

1    and vacuums, where you are looking at pressures that are less

2    than 10 psi.  And the fluid is air.

3    Q    Can you please bring up Exhibit 471.

4         Can you please identify what is Exhibit 471, Dr. Stevick.

5    A    Yes.  It is my resume.

6    Q    And does this resume contain a list of all of your

7    qualifications and a list of all the other prior cases you have

8    testified to, lists some of the articles that you have

9    published and presented?

10   A    It lists many, yes.  Not everything.

11   Q    How recently has that been updated?

12   A    Probably a month ago or so.  Well, this one actually looks

13   like it's maybe a year old.

14   Q    Thank you.

15        In connection with your retention -- were you retained by

16   Whitewater in connection with this case?

17   A    Yes, I was.

18   Q    What were you retained to do on behalf of Whitewater in

19   connection with this lawsuit?

20   A    I was retained to look at the patent and evaluate its

21   validity and the infringement of the PSD design, whether they

22   infringed or not infringed.

23   Q    Were you also asked -- I am sorry.

24        Did your engagement also involve any other topics in

25   connection with this lawsuit?

1   A    Sure.  Whether new designs infringe the patent or not,

2   which is, again, infringement.

3   Q    And just so we are clear, are you referring to addressing

4   non-infringing substitutes?

5   A    Yes.

6   Q    Thank you.

7        Did you prepare an expert report in connection with this

8   lawsuit on behalf of Whitewater?

9   A    Yes, I did.

10  Q    And I see that you have a copy with you at the witness

11  stand.

12  A    I do.

13  Q    And is your intended purpose of using that today to

14  refresh your recollection with respect to questions I might ask

15  you in the course of your testimony?

16  A    If needed.

17  Q    In connection with preparing your report, what steps did

18  you take?

19  A    As in most patent cases, you look at the patent, you look

20  at the patent history, the back and forth between the inventor

21  and the patent office in terms of what claims mean and how far

22  they really go.

23       You look at the products involved.  And in this case, I

24  actually went to the water attractions and rode them myself, so

25  I am very familiar with them.

1    You read the depositions of other experts in the case.

2  You read interrogatories.  And then you begin to form your

3  opinions.

4  Q    I am sorry.  I may have misheard.  Did you say that you

5  looked at the '589 patent and the file history as part of your

6  preparation?

7  A    I am not sure if I did, but I certainly did look at that

8  first.

9  Q    Thank you.

10    Did you happen to look at any websites in connection with

11  preparing the report?

12  A    Yes.  Quite often, the websites represent how products

13  work, and that's a good source of information.  So we

14  definitely do that.

15  Q    I am testing my memory and my hearing with this question,

16  so I apologize.

17    Did you mention, as part of the things that you read or

18  watched or did in preparing your report, did you also look at

19  the deposition testimonies of the defendants in this case?

20  A    I did.

21  Q    Thank you.

22    And you mentioned that you went to visit some rides.  If

23  we could please put up Exhibit 481.

24    Is this one of the rides that you went to visit,

25  Dr. Stevick?

1    A    Yes.  This is the Pacific Surf Design Whale Tail.  It is

2    at the Whale Tail Park in New Hampshire.

3    Q    Did you happen to ride the ride at Whale Tail?

4    A    Yes.  Some people may not consider what I did riding, but

5    I was out there.

6    Q    When we retained you on behalf of Whitewater in connection

7    with the case, did we disclose the fact that you would have to

8    put on a bathing suit and possibly make a fool of yourself on a

9    ride?

10   A    No, I think you glossed over that point.

11   Q    Did you happen to visit any of the Whitewater rides in

12   connection with your involvement in this case?

13            THE COURT:  Wait.  That kind of piqued my curiosity.

14   Do you have a video?  I mean, if you disclosed that he could

15   possibly make a fool of himself, why not share it with the rest

16   of us?

17            MR. TACHÉ:  I think he was holding the camera, Your

18   Honor.

19            THE COURT:  Never mind.

20   BY MR. TACHÉ:

21   Q    I am sorry.  Did you happen to look at any of the

22   Whitewater rides or visit any of the Whitewater rides in

23   connection with this case?

24   A    I did.

25        And I, fortunately, held the camera in that case also.

1    You can't see me.

2    Q     Have you ever been named as an inventor on any patents,

3    Dr. Stevick?

4    A     Yes, I have.

5    Q     Approximately how many patents have you been named as an

6    inventor on?

7    A     Five patents.

8    Q     That's a fairly small list.  Can you give us a sense of

9    what those cover?

10   A     Sure.  It is a variety of things.

11         Several are directed to a structure light scanner, so you

12   get a 3D image of someone with a flash picture, and we use that

13   type of technology for the mask, for the burn victims.  We have

14   to be able to match the person's face fairly accurately.

15         Also, sensors so you can determine if a pipeline is

16   leaking.  No matter what kind of fluid it is, you can measure

17   that.

18         And lastly, it is a like a coffee mug that can both heat

19   and cool.

20   Q     As an inventor, do you consider yourself to be relatively

21   familiar with the process for getting a patent?

22   A     Yes.

23   Q     If we could please put up Exhibit 1.

24         Do you recognize Exhibit 1, Dr. Stevick?

25   A     Yes.  It is what we are referring to as the '589 patent.

1    Q    Using the '589 patent as an example to walk through what
2    we are going to cover next, we have in front of you what is
3    referred to commonly as the face page of the patent.
4         Can you please identify the title of the invention?
5    A    Sure.  It is -- I don't know if this highlights or not.
6         There it is, right there.  It is the Mobile Water Ride
7    Having the Sluice Side-Over Cover.
8    Q    I wish we came up with a better name.  It's difficult to
9    pronounce, even for me.
10        When was the patent issued?
11   A    It was issued -- that's right here -- December 10, 2002.
12   Q    When was the application filed?
13   A    August 2, 2000.
14   Q    Immediately below the circle that you just made, there's
15   something called a related U.S. application data.  What does
16   that mean?
17   A    This means that a provisional patent was filed.  It is a
18   placeholder in terms of the date of the patent.  You can see
19   here, it's August 2, 1999.
20   Q    Thank you.
21        If we could turn to Exhibit 1, page 16, there's a section
22   of the patent called the "Background of the Invention."
23        Do you see that, Dr. Stevick?
24   A    Yes.
25   Q    What is that?

1   A     The background explains the area that the patent relates

2   to.  In this case, it is a simulated wave water ride

3   attraction.  It also describes what has been done in the past

4   and what the problems are, the things that you probably want to

5   improve, and what this patent will actually be directed to.

6   Q     Thank you.

7         Specifically directed now to the '589 patent and the

8   background that's in front of you, what were some of the

9   problems that Mr. Lochtefeld was attempting to solve?

10  A     Sure.  In the past, there always had to be a long

11  transition region.  If you came down the slope and were riding

12  towards the nozzles, there had to be a long enough length that

13  your energy and speed would be stopped before you got to the

14  nozzle area, just for safety reasons.

15        So if you have -- we can go into what the solution was,

16  but that was the problem.  You were using a lot of real estate

17  for unused portions.  You couldn't really ride in that area.

18  It was really there to stop you and push you back up.

19  Q     Did the background section of the '589 patent have another

20  solution to that problem?

21  A     Yes.  The prior art included both a long transition region

22  to stop you and head you the other way as well as sloping up

23  towards the nozzles.

24        That's another way of dissipating energy.  You can relate

25  kinetic or velocity energy to, simply, height.

1   Q     So, the next section of the patent is called the "Summary"

2   of the patent, if we could get there.  I don't have the page

3   number.  I believe it is the next page.

4         Do you see that section called "Summary of the Invention,"

5   Dr. Stevick?

6   A     Yes.

7   Q     Can you please briefly describe the purpose of this

8   section of the patent.

9   A     Well, it states that the object and advantage of the

10  present invention is to overcome some or all of the

11  limitations, to provide a mobile simulated wave water ride

12  attraction, and then it goes on to talk about transportation.

13  Q     Attempting to understand the explanation you just

14  provided, is the section called Summary of the Invention, is

15  the purpose of that section to highlight the benefits or

16  advantages obtained by the patent?

17  A     Yes.

18  Q     And in this particular instance, with respect to the '589

19  patent, what would some of these advantages be as set forth in

20  the '589 patent?

21  A     Sure.  As you are getting rid of that upward slope towards

22  the nozzles and shortening that transition section, making the

23  ride so you can actually ride over the nozzles onto the decking

24  area, you have increased the amount of rideable area relative

25  to the footprint of the entire ride, so now it is a much more

1    optimized, much more efficient ride, whether it's big or small.

2        You can also view -- everyone is sitting in chairs, and

3    you will see this; people will have chairs lined in front of

4    the ride.  There will be the decking area, and then the ride

5    area.  So now you can see there's no wall and no drop down to

6    the ride surface.

7        So there's a lot of advantages.

8    Q    Thank you.

9        Let's turn to the last section of the patent, referred to

10   as the claims.  I believe that's Exhibit 1-23.  Thank you.

11   Let's just focus for a second on the first claim.

12       What are the claims in a patent, Dr. Stevick?

13   A    This is where the inventor describes what he is patenting.

14   This is the novelty, the invention, and he's laying it out in

15   the claims.  And there's usually anywhere from three to 50 or

16   more.

17   Q    Why are the claims important?

18   A    They are actually drawing a boundary around what is

19   actually patented and what is not.

20   Q    Let's focus on why we are here today.  If we could please

21   have the demonstrative with the asserted claims.

22       So you just mentioned or just testified that there are

23   certain claims listed at the back of the patent.  Below the

24   face page of the '589 patent is a list of claims.

25       Are those -- to the best of your recollection, are those

1  the claims you were asked to evaluate in the context of the

2  case being asserted against PSD?

3  A    Yes, they are.

4  Q    Which of Pacific Surf Designs' products are accused in

5  connection with this case?

6  A    The ProFlow line and the Supertube.

7  Q    Are these the two -- I am sorry.

8       Are these the two product lines that you just testified

9  about?

10 A    Yes.  The ProFlow is on the left, and the Supertube is on

11 the right.

12 Q    Can you briefly explain, based on your having gone to see

13 these rides, how they operate, for the benefit of the jury?

14 A    Sure.  Underneath is a pool or sump area that collects the

15 water.  It's pumped to the right in both cases, and then it

16 goes through a nozzle piping configuration that sends the water

17 out in a sheet over the ride surface, and sends it under this

18 contoured ride area, and you have a wide range of area that the

19 rider can do tricks and enjoy surfing.

20 Q    Thank you.

21      Specifically now focused on the ProFlow product, on the

22 left-hand side --

23 A    Yes.

24 Q    -- does PSD sell variations of that product?

25 A    Yes.  They have the ProFlow Single, Double, and Triple,

```
1    which essentially is the same, just getting wider so you can
2    have one, two or three riders on simultaneously.
3    Q    If you could please bring up Exhibit 90.
4         Do you recognize what is identified as Exhibit 90,
5    Dr. Stevick?
6    A    This is the ProFlow Quarterpipe.
7    Q    Is that a variation of the ProFlow line of product?
8    A    Yes.
9    Q    What is the Quarterpipe?
10   A    It is a similar ride but the contour -- the ride area is
11   different.  That's the -- really the primary difference.  It
12   allows you to swing around, and it may form a barrel on the
13   right side.
14   Q    We don't have a photograph of a ProFlow Quarterpipe.  We
15   are using this drawing.
16        Do you know the reason for that?
17   A    I assume it's because none have been built.  I am not
18   aware of any being built.
19   Q    Thank you.
20        Can we look at Exhibit 91, please.
21        Do you recognize what is marked as Exhibit 91,
22   Dr. Stevick?
23   A    This is another PSD design called the Halfpipe.  It used
24   to be called Off the Wall.  I don't believe any of these have
25   been built either, so we are looking at drawings and renditions
```

1    of that ride.

2    Q    We talked about the left-hand side of the ProFlow line of

3    products.  With respect to the product on the right, which I

4    believe is the Supertube product --

5    A    Yes.

6    Q    -- to your knowledge, does PSD make variations of that

7    product?

8    A    I don't believe so.  Not that I am aware of.  I believe it

9    is just one design.

10   Q    Looking at the two products side by side, what are the

11   differences in the nature of -- sorry.  Strike that.  Let me

12   try it again.

13        Looking at the two products side by side, what are the

14   differences that you see between the two products?

15   A    Well, the differences are -- for the purposes of this

16   case, it is really just the shape of the ride surface.  The

17   nozzle assembly and all the things that are the subject of this

18   case are really very similar, almost identical.

19   Q    And looking at the two rides placed side by side, what do

20   they have in common?

21   A    Well, they are a sheet flow ride.  They have a sump and

22   water pool underneath that collects the water from the various

23   drains.  It has a pump that takes the water and circles it back

24   into and emits it as a sheet onto the ride surface area.  Those

25   are the similarities.

1     And the differences are really just the contour of the

2  ride area itself.

3  Q    So, if I understand your testimony correctly, other than

4  the shape -- other than differences in the way the rides are

5  shaped, all the other elements are in common or similar?

6  A    Yes.

7  Q    If we could please look at demonstrative Claim 1.  We are

8  now going to turn to the claims themselves, and let's focus

9  first on independent Claim 1, and we are going break it down

10 into its constituent parts, starting with the nozzle assembly

11 for a water ride attraction.

12     Do you see that, Dr. Stevick?

13 A    Yes.

14 Q    I don't think there's much debate.  Dr. Stevick, are the

15 PSD accused products water ride attractions that have the claim

16 elements and nozzle assembly for a water ride attraction, as it

17 appears in the first line of column one?

18 A    Yes.

19 Q    Let's look at the next claim limitation.

20     "A nozzle having an outlet aperture adapted to emit a jet

21 of water onto a ride surface."

22     Do the accused PSD products contain a nozzle having an

23 outlet aperture adapted to emit a jet of water onto a ride

24 surface?

25 A    Yes.  That's how the sheet water is formed.  It is emitted

1    from the nozzle onto the surface.

2    Q    Turning to the next claim limitation -- which is a long

3    one, so I apologize -- "a nozzle cover comprising a padded

4    material substantially covering said nozzle and including a

5    flexible tongue which is biased downward against the flow of

6    water to prevent injury to riders riding over said nozzle."

7         Do you see that?

8    A    I do.

9    Q    Okay.  Let's break this down into smaller parts so we can

10   all understand it.  Let's focus first on the claim element "a

11   nozzle cover comprising a padded material."

12   A    Okay.

13   Q    If we could please display Exhibits 98 and 488.

14        Can you please describe what is shown in front of you,

15   Dr. Stevick, in Exhibits 98 and 488?

16   A    Sure.  On the left, this is a tongue section of the cover

17   for the PSD design, and you can see the pad right here with

18   the -- reinforced with a steel plate, on the underside.  And on

19   the right, you can see it flipped up the other way.  And this

20   is the padded material, with the vinyl cover, the blue cover.

21   Q    So, in your opinion, based on the analysis that you have

22   done on the drawings that you see before you, do PSD's products

23   contain a nozzle cover comprising a padded material?

24   A    Yes, they do.

25   Q    Let's focus now on the nozzle cover substantially covering

1     the nozzle or "said nozzle," as it appears in the claim.  The

2     claim element uses the word "substantially."  How would a

3     person of ordinary skill in the art know what the word

4     "substantially" means in the context of Claim 1?

5     A     Sure.  If you read the entire patent, it's very obvious

6     what it means.  It doesn't mean it has to cover the entire

7     nozzle.  What it means is that it has to adequately cover

8     enough of the nozzle so that, from the rider's perspective, you

9     can go up and over the nozzle safely from the ride area to the

10    deck area.

11    Q     Is that what is shown in Figure 3B, in describing the

12    specification in the left-hand side?

13    A     It is.

14    Q     So, in Figure 3B, there are -- I am color-blind, so I

15    don't know what colors these are, but there appears to be a

16    lighter color; is that the nozzle, Dr. Stevick?

17    A     Yes.

18    Q     And there's a darker color -- I think it's gray -- that

19    has part number 150.  What is that?

20    A     Well, that's the cover, the tongue portion, and the cover.

21    Q     So, is this how you are determining whether or not it

22    "substantially covers," as described in the patent?

23    A     Yes.

24    Q     So, based on your review of the '589 patent, what is

25    the -- what is your understanding of the plain and ordinary --

1    in your opinion, what is the plain and ordinary meaning of the
2    claim term "substantially covering"?
3    A    Well, what I said earlier is it does not mean it has to
4    cover the entire nozzle.  It has to adequately cover enough of
5    the nozzle so that a rider can safely ride over it.
6    Q    Thank you.
7         I believe you testified earlier as part of preparing your
8    report, you reviewed the file history of the '589 patent; is
9    that a correct understanding?
10   A    I did.
11   Q    Based on that review of the file history, is it consistent
12   with the plain and ordinary meaning of the claim term as you
13   have just described it?
14   A    Yes.
15   Q    So, in your opinion, do all of PSD's products have a
16   nozzle cover substantially covering said nozzle?
17   A    Yes, they do.
18   Q    Let's turn now to the nozzle cover including a flexible
19   tongue.
20        Does the '589 patent show and describe what is being
21   referred to as a "flexible tongue" in Claim 1?
22   A    It does.
23   Q    And if we could please bring up that demonstrative.  Thank
24   you.
25        Can you please describe what is shown -- I am sorry.  Can

1   you please explain your understanding -- can you please explain

2   what is being shown in the description of the '589 patent in

3   Image 3A?

4   A      Sure.  What is labeled here 160 is the tongue portion of

5   the cover that extends out over the water and allows the rider

6   to safely go over this without coming in contact with the

7   nozzle itself.

8   Q      Thank you.

9          In his opening, defendants' counsel stated that a nozzle

10  cover having a hinge and a nozzle flap is not within the scope

11  of the '589 patent.

12         Do you agree with that statement, Dr. Stevick?

13  A      No.  That is absolutely incorrect.

14  Q      And why do you believe that it's incorrect?

15  A      Well, the patent is very clear that flexibility is its

16  ability to move down against the water and allow the rider to

17  safely transition from the ride area to the deck.

18         Now, if we could go to the patent itself, column 11, line

19  11 -- let me read that part.  Maybe that's what you have up.

20  Q      I do.

21  A      How about that?  Let's see.  Where does that start?

22  Q      I believe it begins in the second -- third break --

23  A      There it is.  The pad -- it says 130; that's supposed to

24  be 150, and in the certified corrections, it's 150.

25         "The pad or pad material can be reinforced internally or

1    externally, if needed.  In other preferred embodiments,

2    alternate materials may be" —— effectively —— "efficaciously

3    used, as required or desired, giving due consideration to the

4    goals of providing a suitably soft, flexible, yet rigid pad."

5    And it goes on to say, "and/or achieving one or more of the

6    benefits and advantages as taught or suggested herein."

7         So, the patent is not limiting.  It is not applying a

8    limitation as to how that movement is gained.

9    Q    So, why does that, in your opinion, suggest that

10   Mr. Thomas was wrong in his opening statement with respect

11   to —— that a reinforced pad —— and I believe they used a steel

12   plate —— and a hinge is flexible as it's explained in the

13   patent?

14   A    Well, because you can reinforce the tongue area.  That's

15   anticipated by the writer of this patent.  He didn't want to

16   limit how you allowed it to move.  And certainly, a hinge is a

17   commonly known method for doing that.

18   Q    And is that what is shown in Figure 3A?

19   A    Yes.

20   Q    And do most inventors —— I am sorry.

21        In your opinion, in Figure 3A, was it intended to cover

22   various alternatives or embodiments that would have included a

23   reinforced steel plate and a hinge to act as the flexible

24   tongue, as it's described and claimed in Claim 1 of the '589

25   patent?

1    A    Yes.  And what is actually said here is that you can

2    reinforce it.  And so, when you then have a rigid tongue, you

3    have to provide its flexibility in some manner.

4        And patents are like research.  You stand on the -- what's

5    been done in the past.  And a POSITA, a person of ordinary

6    skill in the art, would understand that that's one of the

7    methods for providing the movement, which is the flexibility

8    referred to in this patent.

9    Q    Thank you.

10       When you evaluate -- as a technical expert in connection

11   with patent cases, when you evaluate the scope of claims as

12   part of your infringement investigation, do you ever

13   investigate the patent owner's products?

14   A    No.  That's completely irrelevant.

15   Q    And why would it be irrelevant?

16   A    Because the patent is what is being claimed.  It has

17   nothing to do with what the owner's building now or in the

18   future.

19   Q    And so, if, in the current situation, Wave Loch modified

20   its product in 2005, does that in any way affect your

21   infringement analysis as to whether or not PSD's products

22   accused -- I'm sorry -- whether or not PSD's accused products

23   infringed?

24   A    No.

25   Q    Why is that the case?

1   A    Well, I believe they intended that the patent still

2   covered what they were doing, for one thing.

3        Secondly, it really doesn't matter what the patent owner

4   is doing.  It is what PSD is doing.  That's what the suit is

5   about.

6   Q    You testified earlier today that you didn't have any

7   self-incriminating evidence about your rides or your experience

8   on water rides, and I believe you testified you went to see one

9   of the Whitewater rides.  If it has nothing to do with your

10  investigation as to infringement, why would you have gone to

11  see a Whitewater ride?

12  A    Well, it had been modified.  My understanding is Flow

13  Services had put a new front section on the ride.

14  Q    So you were looking at it in connection to infringement

15  with respect to another claim and not Claim 1?

16  A    Correct.

17  Q    Thank you.

18       If we could please display Exhibits 377, 193 -- let's

19  start right there.  Can you please describe the video -- I am

20  sorry.

21       Do you recognize the video on the right-hand side,

22  Dr. Stevick?

23  A    Yes.  That's a video I took of the Whale's Tale, or the

24  Whale's Tale park, the ProFlow ride that I rode on.  And it

25  shows the tongue section, moving up and down with the water,

1    and it's biased down by gravity and its weight.

2    Q    Can you explain, for the benefit of the jury, compared to

3    Figure 3A, the relative parts and how it works?

4    A    Sure.

5    Q    This tongue section is equivalent to the tongue section

6    here.  We have a substantially flat section to the left, which

7    is equivalent to this area.  And it does exactly what is shown

8    in 3A.  The urging downward is caused by the weight of that

9    reinforcing plate, for one thing, and presses down towards the

10   water.

11   Q    So, the fact that PSD's accused products have a steel

12   plate that is covered with foam padding and vinyl and they use

13   a hinge, is that contemplated as being covered by Claim 1 of

14   the '589 patent?

15   A    Yes, it is.  Claim 1 has no limitation as to how that

16   flexing is implemented.

17   Q    Thank you.

18        Bring up Exhibit 133 and 92.

19        Can you please describe what is shown on the screen in

20   Exhibit 133 and Exhibit 92?

21   A    This is actually the bones of what we just looked at, if

22   you will.  The flap or tongue -- that's the steel plate.

23   There's the hinge, which provides the flexibility.  And then

24   there's a bolt, which applies attachment.

25        So you can see the parts -- this is a cross section on the

1    left, and on the right is the actual entire tongue section.

2    Q    Can you please, for benefit of the jury, identify the

3    hinge in the right-hand-side drawing, Exhibit 92?

4    A    That's the hinge section.

5    Q    What is the nozzle flap section?  If you could circle one

6    of those, please.

7    A    Sure.

8    Q    So, what is shown is multiple hinges and two nozzle flap

9    sections; is that correct?

10   A    That's correct.

11   Q    That corresponds to the section view drawing on the

12   left-hand side, Exhibit 133?

13   A    Yes.

14   Q    So, in your opinion, Dr. Stevick, do PSD's accused

15   products have a flexible tongue, as set forth in Claim 1?

16   A    Yes, they do.

17   Q    If we could please go back to the drawing.

18        Whose drawings are these, Dr. Stevick?

19   A    These are PSD drawings.

20   Q    Thank you.

21        Let's turn to the next section of the patent, and I

22   believe you covered this a little bit in your explanation.  You

23   sort of jumped the gun, but we will pick this up again.

24        Let's focus now on the nozzle cover, which is biased

25   downward against the flow of water.  Is this claim term shown

1    in the '589 patent?

2    A    Yes.

3    Q    May I have that demonstrative?

4         Can you please describe where that's shown in the

5    specification on the '589 patent?

6    A    Sure.  Well, the first sentence at the top says it's

7    urged -- "preferably urged downward."  And if you skip down,

8    "as the skilled artisan will recognize, other suitable

9    resilient means can be efficaciously used to bias or urge the

10   tongue-like pad or tongue into a downward direction towards the

11   ride surface."

12   Q    There's a reference to the "skilled artisan."  Is that

13   commonly known in patent parlance as "a person of ordinary

14   skill in the art"?

15   A    Yes.

16   Q    Based upon your experience, would you consider yourself to

17   be a person of ordinary skill in the art?

18   A    Yes.

19   Q    Thank you.

20        If we could show the video again, please.

21        Is that the biasing downward that you are referring to?

22   A    Yes.  In this case, on the right, the heavy steel plate

23   gives you a gravity force, as well as the padding, pushing

24   downward against the water.  And the left side shows how the

25   flexibility is obtained and the actual components.

```
 1    Q     Does it also show the biasing downwards?

 2    A     It does.

 3    Q     Thank you.

 4          So, based on -- is it your opinion that the PSD's accused

 5    products have a flexible tongue that's biased downwards against

 6    the flow of water?

 7    A     Absolutely, they do.

 8    Q     Let's go to the last claim limitation in Claim 1, "to

 9    prevent injury to riders riding over said nozzle."

10          If we could please display Exhibit 379.

11          Is this another video that you took, Exhibit 379?

12    A     Yes.

13    Q     If we could run that again, please.

14          What is being shown here, Dr. Stevick?

15    A     It shows a rider going over top of the nozzle assembly and

16    doing it safely because of the biased downward tongue and pad

17    combination.

18    Q     This person's skill set is probably about as good as mine

19    on a FlowRider.  Would a more experienced rider be able to ride

20    directly from the ride surface over the nozzle cover and then

21    onto the decking?

22    A     Yes.  I have seen the better riders do that.

23          But this guy is actually pretty good.  I got my camera out

24    a little too late, and he didn't do too well in the time I

25    photographed him.
```

1   Q      So I shouldn't disparage him.

2          Do defendants admit their accused products meet this claim

3   limitation?

4   A      Yes, they do.

5   Q      So, summarizing Claim 1, Dr. Stevick -- if we could,

6   please, bring up all of Claim 1 -- were you able to identify

7   each and every element of Claim 1 in the PSD's accused ProFlow

8   and Supertube products?

9   A      Yes.  Each element of Claim 1 is in the PSD products.

10  Q      Thank you.

11         And based on your analysis of the '589 patent in the

12  context of Claim 1, what, in your opinion, is the purpose of

13  the nozzle cover?

14  A      Well, the purpose of the nozzle cover is to allow riders

15  to go over the nozzle area safely, without injury; and also to

16  shorten the transition section; and facilitate viewing because

17  you don't have the ride surface below the viewing area; and

18  optimize the actual ride area compared to the real estate

19  that's actually being taken up by the entire attraction.

20  Q      Thank you.

21         And how is this purpose achieved?

22  A      Well, it's achieved with every element that is actually

23  talked about here.  It is a padded device that's -- flexibly

24  moves downward, against the water, and provides us a safe path

25  overtop the nozzle area.

1   Q    And do PSD's products operate the same way?

2   A    Yes.

3   Q    And for the same purpose?

4   A    Yes.

5            MR. TACHÉ:  Thank you.

6       Your Honor, I am not sure when you wanted to take lunch.

7   I am about to move on to another claim.

8            THE COURT:  Go ahead.  We will take lunch at 12:30.

9            MR. TACHÉ:  Thank you.

10  BY MR. TACHÉ:

11  Q    If we could, please, turn to Claim 3.  This claim is an

12  awful lot shorter than Claim 1, so we are off to a good start.

13       What is the difference between Claim 1 and Claim 3?

14  A    Claim 3 is a dependent claim, which means, as it states,

15  "The nozzle assembly of Claim 1" -- so, it's incorporating

16  Claim 1, plus it's adding another limitation or element.

17  Q    In this particular case, Claim 3, what is being added to

18  Claim 1?

19  A    The cover is removably connected to said nozzle.

20  Q    And what is the plain and ordinary meaning of the claim

21  element, "removably connected to said nozzle"?

22  A    It means it can be detached with reasonable means.

23  Q    If we could please bring up the demonstrative.

24       And could you please identify what is marked as

25  Exhibit 92, and then a still from a video, of 285?

```
 1   A     Sure.

 2         On the left, we have a parts list showing we do have

 3   bolts.  You can also see it in the drawing.  And on the right,

 4   you see a gentleman presumably attaching the tongue.

 5   Q     So, in your opinion, Dr. Stevick, do PSD's accused

 6   products have the limitation set forth in Claim 3?

 7   A     Yes.

 8   Q     Let's turn to Claims 13 and 15.  Do these two claims

 9   depend upon Claim 1?

10   A     Yes, they do.

11   Q     And so, what is added to -- I am sorry.

12         What is the addition of Claim 13 to the elements of

13   Claim 1?

14   A     Claim 13 adds "An outlet aperture is configured to emit a

15   sheet flow of water."

16   Q     What is added to -- what is the addition of Claim 15?

17   A     It's adding a padded, fixed decking.

18   Q     Does PSD admit that its accused products have claim

19   limitations contained in Claims 13 and 15?

20   A     Yes, they do.

21   Q     In your opinion, Dr. Stevick, do these two product lines

22   show that?

23   A     Yes, they do.

24   Q     If we could turn to Claim 42, please.

25         This is another independent claim.  It's Claim 42.  Let's
```

1    begin with the preamble, "A nozzle assembly for a water ride

2    attraction."

3         Dr. Stevick, this looks an awful lot like the language we

4    saw in connection with Claim 1.  Are PSD's rides water

5    attractions?

6    A    Yes.

7    Q    Do they have a nozzle?

8    A    Yes, they do.

9    Q    Let's go to the next claim limitation, a nozzle cover

10   comprising a contoured, flexible pad.  Do you see that?

11   A    I do.

12   Q    Dr. Stevick, based on your review of the products that you

13   saw in person and your review of the '589 patent itself, do you

14   believe that PSD has these claim limitations in its products?

15   A    Yes.

16   Q    And if we could move on.

17        Just for the record, Dr. Stevick, what is a contoured,

18   flexible pad?

19   A    A contoured, flexible pad is just what it says.  It has a

20   contour, and it's a flexible pad, meaning it has some

21   squishiness, some softness, so it can resist impact injury to

22   the rider, or prevent it.

23   Q    Was contoured -- was the word "contoured" construed by

24   Judge Benitez as part of this lawsuit?

25   A    It was.

1   Q   And do you recall what Judge Benitez said the meaning of

2   "contoured" was?

3   A   It's made or shaped.

4   Q   And this was the second time we have seen the word

5   "flexible."  The first time was in Claim 1, in connection with

6   the claim limitation "flexible tongue"; is that correct?

7   A   In Claim 1, yes.

8   Q   So you just gave a different meaning to the word "flexible

9   pad" different from what you provided in Claim 1.  Why would

10   you do that?

11   A   "Flexible" is an adjective that -- you really have to take

12   it in context.  When we are talking about a flexible tongue, it

13   is its movement down toward and against the water.

14       Here, we are looking at a flexible pad, which is its

15   through-thickness, squishiness, to prevent injury.

16   Q   Thank you.

17       So -- just to make sure we cover it, so, in your opinion,

18   Dr. Stevick, do each of PSD's accused products have a nozzle

19   cover comprising a contoured, flexible pad?

20   A   Yes.  And here is picture of the pad with the vinyl cover

21   removed.

22   Q   If we could go to the next claim limitation.

23       I believe we just saw this language, "being removably

24   affixed to said nozzle" in the context of dependent claim --

25   one of the dependent claims we just reviewed; is that correct?

1   A    That's correct.

2   Q    And in your mind -- there it is.  Claim 3.  Thank you.

3        Is your opinion the same with respect to this element in

4   Claim 42 as it was in connection with Claim 3?

5   A    Yes.

6   Q    In your opinion, do PSD's accused products have the claim

7   element?

8   A    Yes, they do.  You can remove the bolts outside the hinge

9   area and remove the tongue cover.

10  Q    Next is "The nozzle cover, including a flexible tongue at

11  a downstream end extending over the water that flows from said

12  outlet."  So, let's break this down.

13       The first part, "said nozzle cover including a flexible

14  tongue."  That sounds an awful lot like the language we just

15  looked at in connection with Claim 1.  Is my understanding

16  correct?

17  A    Yes.

18  Q    Are your opinions with respect to this claim element the

19  same here as they were in Claim 1?

20  A    Yes.

21  Q    Do you believe that PSD's accused products have this claim

22  element?

23  A    Yes.  And it extends over the water that flows from said

24  outlet, the nozzle outlet, yes.

25  Q    Thank you.

1    And the last -- the last claim element is, "Said tongue

2  being urged downward" -- sorry.  Go to the next claim element.

3    "Said tongue being urged downward against the flow of

4  water from said outlet."  Do you see that?

5  A    Yes.

6  Q    Is this the same as the biased downward limitation claim

7  we just discussed in Claim 1?

8  A    Yes.  The steel reinforcement would urge it downward, just

9  via its weight.

10  Q    Since claim terms matter and precision matters in

11  reviewing claims, this claim element is referred to as "urged

12  downward" as opposed to "biased downward."  Do those two words

13  mean the same thing?

14  A    I think, in the context of this patent, yes.

15  Q    And what leads you to believe that?

16  A    How they are used.

17  Q    And is there a description of that in the specification?

18  A    Yes.  And it uses the same language with a different word,

19  being "biased" on the left, "flexible tongue which is biased

20  downward against the flow of the water," and "said tongue being

21  urged downward against the flow of the water."

22  Q    Thank you.

23    So, looking at Claim 42 in its entirety, in your opinion,

24  Dr. Stevick, did PSD's accused ProFlow and Supertube products

25  meet each and every claim limitation set forth in Claim 42?

1    A    Yes.

2    Q    Let's turn next to Claim 43.  Is this a dependent claim,

3    Dr. Stevick?

4    A    Yes.  43 is dependent on Claim 42.

5    Q    And what does Claim 43 add that was not in Claim 42?

6    A    "The nozzle cover has a generally flat portion at an

7    upstream end of the cover."

8    Q    And is the word "generally," this "generally flat

9    portion," described anywhere in the specification?

10   A    Yes, I believe it is.  "A rear generally flat portion 170

11   that in the upstream direction abuts to the padded fixed

12   decking 190."

13   Q    There's this word "generally" in this claim limitation.

14   Does that present a problem to a person of ordinary skill in

15   the art in terms of determining what "flat" actually means?

16   A    No.  It's just being honest.  Everything -- well, like

17   this tabletop here, it's generally flat.  But is it perfectly

18   flat?  No.  And never is a pad perfectly flat.  It uses vinyl,

19   so it will have in variations.

20   Q    So how much can one change this to still be within the

21   realm of the definition of the plain and ordinary meaning of

22   the term "generally flat portion"?

23   A    Well, I think it has to generally follow the contour of

24   the top of the nozzle and down onto the ride surface.

25   Q    And is that item, element 170, identified on the

1    right-hand side of the image, Figure 3A?

2    A    It is.

3    Q    In your opinion, Dr. Stevick, do the accused PSD products

4    have a generally flat portion at the upstream end of the cover?

5    A    Yes.

6    Q    I apologize.  If we could please go back to the prior

7    screen.

8         What does "the upstream end of the cover" mean as it's set

9    forth in Figure 3A?

10   A    Sure.  Downstream means to the right, direction of the

11   water flow, on the ride surface.  So upstream would be the

12   opposite direction.

13   Q    Thank you.

14        So, again, all of PSD's products have this claim

15   limitation?

16   A    Yes.

17             MR. TACHÉ:  Thank you.  We are turning next to

18   Claim 24.

19             THE COURT:  All right.  Well, it is a good time for

20   us to take our lunch break.  Let's be back promptly at five

21   minutes after 1:00.  Please remember my admonition.  Thank you.

22        Sir, you may step down.

23        (End of morning proceedings at 12:35 p.m.)

24                              -o0o-

25

```
1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4   qualified and acting official Court Reporter for the United

5   States District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with rules and requirements of the United States Judicial

10  Conference.

11          DATED:  December 5, 2019, at San Diego,

12  California.

13

14                      /s/  Chari L. Bowery
                        _____
15                      Chari L. Bowery
                        CSR No. 9944, RPR, CRR
16
```

I N D E X

CHRONOLOGICAL INDEX OF WITNESSES:                    PAGE    VOL.

**THOMAS LOCHTEFELD — PLAINTIFF'S WITNESS**
     DIRECT BY MR. SCOTT ...........................172     2
     CROSS BY MR. KOLEGRAFF ........................230     2
     REDIRECT BY MR. SCOTT .........................250     2
     RECROSS BY MR. KOLEGRAFF ......................255     2

**GLEN STEVICK, Ph.D. — PLAINTIFF'S WITNESS**
     DIRECT BY MR. TACHÉ ...........................257     2