1                   UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

WHITEWATER WEST INDUSTRIES,   .
4  LTD., a Canadian corporation, .
                              . Docket
5            Plaintiff,        . No. 17-cv-1118-BEN-BLM
                              .
6            v.                . December 5, 2019
                              . 12:50 p.m.
7  PACIFIC SURF DESIGNS, INC., a .
   Delaware corporation, and FLOW.
8  SERVICES, INC., a California  .
   corporation,                .
9                              .
             Defendants.       . San Diego, California
10 . . . . . . . . . . . . . . .

11           TRANSCRIPT OF JURY TRIAL, VOLUME 3B
            BEFORE THE HONORABLE ROGER T. BENITEZ,
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13                 A-P-P-E-A-R-A-N-C-E-S

14 For the Plaintiff:      Snell & Wilmer LLP
                          600 Anton Boulevard, Suite 1400
15                         Costa Mesa, California 92626
                          By:  WILLIAM S. O'HARE, ESQ.
16                         - and -
                          Buchalter, A Professional Corporation
17                         18400 Von Karman Avenue, Suite 800
                          Irvine, California 92612-0514
18                         By:  ROGER L. SCOTT, ESQ.
                               J. RICK TACHÉ, ESQ.
19

20 For the Defendants:     Thomas, Whitelaw & Kolegraff LLP
                          18101 Von Karman Avenue, Suite 230
                          Irvine, California 92612-7132
21                         By:  JOSEPH THOMAS, ESQ.
                               WILLIAM J. KOLEGRAFF, ESQ.
22

   Court Reporter:        Chari L. Bowery, RPR, CRR
23                         USDC Clerk's Office
                          333 West Broadway, Suite 420
24                         San Diego, California 92101
                          chari_bowery@casd.uscourts.gov
25 Reported by Stenotype, Transcribed by Computer

```
 1              SAN DIEGO, CALIFORNIA; DECEMBER 5, 2019; 12:50 P.M.

 2                               -o0o-

 3         (The following proceedings were held in open court in the

 4   presence of the jury:)

 5              THE COURT:  Welcome back.

 6         Mr. Thomas?

 7              MR. THOMAS:  Thank you, Your Honor.

 8                           GLEN CHUTTER,

 9             PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10                         CROSS-EXAMINATION

11   BY MR. THOMAS:

12   Q    Good afternoon, Mr. Chutter.  I don't believe we have been

13   formally introduced, so I am going to provide some good

14   American hospitality.  My name is Joe Thomas.  I am one of the

15   attorneys for PSD, working on this case.

16         If I could ask the Court if we could have the plaintiff

17   shown the sheet wave agreements.  This was not marked as an

18   exhibit.  This was a demonstrative that was given to us today,

19   so I don't have the ability to display it.

20         If we look on there, Mr. Chutter, the contribution

21   agreement, Exhibit 46, you have seen that, and that was done

22   January 31, 2014.  Do you recall that?

23   A    Yes.

24   Q    Now, if we could call up Exhibit BM, Defendants'

25   Exhibit BM, and go to the first page.  This is a memorandum of
```

1    understanding between Wave Loch and WhiteWater.  Do you recall

2    this document?

3    A    Do we have a date on it?

4    Q    We do.  We do.  It is -- if we go to the last page -- in

5    fact, I was going to ask you about this anyway.  The date below

6    the signatures is November 29, 2012.

7         And is that your signature?

8    A    Yes, on the left.

9    Q    So you are familiar with this because you signed it?

10   A    I certainly was on November 29, 2012.

11   Q    And you recall that this agreement had a 30-day

12   exclusivity period starting, essentially, November 29, 2012?

13   A    You mean the first bullet on that page?

14   Q    The first bullet.

15   A    Yes.

16   Q    And you recall also this was nonbinding?  Do you recall

17   that?

18   A    Yes.

19   Q    Okay.  So this agreement was signed.  There was no

20   commitment from WhiteWater nor was there a commitment from

21   Mr. Lochtefeld or his company, Wave Loch, to do a transaction.

22   It was an agreement you entered into to have discussions,

23   correct?

24   A    Yes.

25   Q    So you started these discussions sometime at the end of

1   November of 2012, and it took until January 31, 2014, for this

2   to conclude with this amalgamation agreement that we talked

3   about, Exhibit 46?

4   A    Correct.

5   Q    And those negotiations weren't easy, were they?

6   A    They took a long time.  They -- easy?  There was -- there

7   was a lot to them, purchasing, effectively, the core of

8   something that Tom Lochtefeld had built up over the years and

9   he wanted to think it through, and there was lots of back and

10  forth.  But there wasn't any acrimony if that's what you were

11  suggesting.

12  Q    Marshall Myrman, who's in the courtroom, he reports to

13  you, does he not?

14  A    He does.

15  Q    And runs this division, FlowRider division?

16  A    Correct.

17  Q    Are you aware he's already testified in this case?

18  A    Yes.

19  Q    He testified and used these words to describe your

20  relationship with Mr. Lochtefeld:  "Oil and water."

21  A    Okay.

22  Q    Do you agree with that?

23  A    Certainly, it would depend on what aspect of the two of us

24  he was referring to.

25       If it was, for example, different backgrounds, different

1    ways we approach business, that's probably pretty accurate.

2         If it was used to discuss a personal relationship between

3    Tom Lochtefeld and myself, it would be wholly inaccurate.

4    Q    And Mr. Myrman also went on to testify or use -- I am

5    going to paraphrase -- but basically use the statement that he

6    was like the cheese in the middle of the sandwich between you

7    and Mr. Lochtefeld at this time.

8    A    He was in a very difficult position.  On the one hand, he

9    was the president of Wave Loch, but reported to Tom, and

10   therefore had fiscal, fiduciary duties towards Wave Loch.  And

11   I was, of course, president and CEO of WhiteWater, and Tom

12   charged Marsh with trying to pull an agreement together.  So,

13   very much so.  He was the -- call it the arbitrator, the

14   mediator, the -- trying to bring two worlds together.

15   Q    And he resigned in April of 2013 from Wave Loch and joined

16   your company before this agreement was reached; isn't that a

17   fact?

18   A    Approximately that time.

19   Q    And he came to your company along with three other key

20   employees from Wave Loch in or about April of 2013?

21   A    Yes.

22   Q    And it was only after those key departures you were able

23   to successfully conclude an agreement with Mr. Lochtefeld and

24   Wave Loch?

25   A    Well, again, if your date of April was correct, it wasn't

1    just after that, it was almost a year later, nine months later,

2    anyway.

3    Q    You are right.  Nine months.

4         And they went on the payroll, Mr. Myrman and the other

5    three individuals, Thatcher and Oriol?

6    A    Yes.  Yes.

7    Q    So, effective April 13, they were being paid by you and

8    reporting to you?

9    A    Correct.

10        If I could clarify, the terms we had set down -- and the

11   dates are really important -- the December 1, 2012 date, or

12   November 29, 2012 date, we had agreed to pay all the expenses

13   of Wave Loch after that period.  So we had agreed, for

14   example -- even though payroll and rent and everything else was

15   running through Wave Loch, that when we did the deal, we would

16   retroactively go back and we would pay all of Wave Loch's

17   expenses, including Mr. Myrman's, and Mr. Thatcher's,

18   et cetera.

19        So, whether they came on the payroll in April directly or

20   indirectly, we were paying them.  It's a little bit six to one,

21   half a dozen to the other.

22   Q    Well, at the time they joined the company, there was no

23   binding agreement between Wave Loch and WhiteWater, correct?  I

24   am talking about April 2013.

25   A    No.  No.  There wasn't -- well, scroll down to the title

1    of this document, if you could.

2    Q    It's scrolling up to get there.

3    A    Or scroll up.

4        MOU.  We were working -- we had known each other a long

5    time.  We had had a dozen years of working together.  We both

6    felt confident that we would get to the end of the journey.

7    Q    And you weren't obligated -- I should say this --

8    WhiteWater was not obligated to pay any expenses of Wave Loch

9    until -- unless and until they entered into a binding agreement

10   dated January 31, 2014, correct?

11   A    Correct.  That was the trigger.

12   Q    So, no one knew how this was going to play out in April of

13   2013; isn't that a fair statement?

14   A    Not 100 percent, but we were both -- we both felt

15   confident we would conclude it.

16   Q    All right.  When you did this contribution agreement and

17   the amalgamation of FlowRider, it happened on January 31, 2014.

18   Mr. Lochtefeld's 10 percent ownership, it disappeared on that

19   date, in Wave Loch -- I am sorry -- in FlowRider Services?

20   A    Yes.

21   Q    All right.  Well, let's turn to another subject,

22   Mr. Chutter.  Let me put on the screen Defendants' Exhibit EA,

23   page 1.  Let's scroll down to the email Mr. Chutter authored at

24   the bottom there, dated Wednesday, June 19, 2013, at 5:44 a.m.

25       Do you recall this email?

1    A    Awfully early in the morning.

2         I don't recall it, but it's -- I certainly assume it is

3    mine.

4    Q    You sent this off to Mr. Vincente, who was one of the

5    individuals who joined your company from Wave Loch, and

6    Mr. Lochtefeld, and Mr. Myrman, correct?

7    A    Correct.

8    Q    And you say, "In spite of the fact that we are being

9    knocked off, we can't miss the opportunity here.  Each of these

10   knockoffs think that they have some tweak or two that improves

11   the system, and they could be right.  Our opportunity is to

12   study each of them to try and learn what we can do to FlowRider

13   to improve it.  Our advantage is that we are the original and

14   have the patent, but if there are improvements we can learn

15   about, it serves us well to incorporate those."

16        Do you recall saying that and writing that?

17   A    Yes.

18   Q    And you are directing your team to evaluate your

19   competitors' products and see if there were things of value

20   they were using that you could add back into your product,

21   correct?

22   A    Correct.

23   Q    You say, "First, it improves our product but also means

24   they have less differentiations, so it weakens them."

25        So it improves you and weakens them when you do that?

1    A     Yes.   That is a pretty accurate definition of the free

2    market that we live in.

3    Q     And you believe in the free market, do you not?

4    A     It is not a great system, but until somebody comes up with

5    a better one, I guess we will live with it.   Sort of like

6    democracy.

7    Q     But you believe in it?

8    A     I believe in it.

9    Q     You have done well by the free market system, have you

10   not?

11   A     I believe in it.   I am passionate.   I ran for public

12   office in the senior Canadian government in '93 and '97, and

13   these issues are dear to my heart.

14   Q     And you have received all kinds of awards -- we have seen

15   them earlier -- for entrepreneur and this and that.   So you are

16   proud of your work in the business field, correct?

17   A     Yes.   It's fair to say that the water park industry is a

18   new industry.   It's only 40 years old.   And the rules of

19   engagement in terms of how we treat each other in the industry

20   have evolved.   They have changed.

21        In the early years -- in the early years, if a competitor

22   came up with an idea, we didn't touch it, and there are all

23   sorts of examples of that.   We did not use it at all.

24        And about 20 years ago, my partner, Andrew Wray, came back

25   from Korea with an eight-and-a-half-by-11 cut sheet of one of

1    our big interactive play units that had been absolutely copied

2    by a domestic North American competitor, and also knocked off

3    our number one water slide, patented product, called the

4    Boomerango.  I remember seeing these on his return and

5    thinking, "Ah, the rules of engagement have changed."  And from

6    that day on, they did.

7        What it meant was that one company had changed the rules,

8    kind of violated the gentlemen's agreement of respect, which

9    meant that, all right, if -- unless you have intellectual

10   property, if there's something in the market there, it's fair

11   game.

12   Q    And you live by that today, do you not?

13   A    The world lives by it.  Certainly, our industry lives by

14   it.

15   Q    Yeah.  And your competitors --

16   A    Subject to IP, of course.

17   Q    Right.  Okay.

18       Now, you have been the CEO more or less from the inception

19   of WhiteWater to today?

20   A    Not "more or less."  Exactly the length of time of

21   WhiteWater.

22   Q    And from the time of the acquisition of Wave Loch,

23   Mr. Myrman has reported directly to you; is that correct?

24   A    Yes, that's correct.

25   Q    And you are generally familiar with the operations of his

1    division?

2    A    Yes.

3    Q    You are aware that his division not only sells Sheet Wave

4    machines, they also sell and refurbish nozzle flaps?

5    A    There's a service -- there's an individual within

6    Mr. Myrman's office that is responsible for parts and service.

7    Q    As the CEO of WhiteWater, Mr. Chutter, how much does

8    WhiteWater or Flow Services, how much do they charge for the

9    nozzle flaps when they sell those independently?

10   A    I do not have a clue.  I can't answer that.

11   Q    Does anybody know the answer to that question?

12   A    I expect Mr. Myrman would know and the people in San Diego

13   that run that business unit.

14   Q    Would Mr. Thatcher know?

15   A    I don't know.

16   Q    He is involved in sales, is he not?

17   A    He is.  I don't know whether he is involved in parts

18   sales.

19        I mean, imagine going to your car dealership, you buy the

20   car from one salesman.  That salesman that sells you the car

21   has no clue what a bumper costs.  You have to go to the parts

22   department for that.

23   Q    Would it surprise you to learn that the nozzle flaps that

24   are being marketed by WhiteWater for sale are priced in the

25   $3,000 neighborhood?

1  A    I can't comment on that.  I am sorry.  I just don't know.

2  Q    Generally speaking, you are looking to get close to a

3  million dollars when you sell a sheet wave machine; isn't that

4  your expectation?

5  A    It depends on the size of them.  We have a number of

6  sizes, and developed a product called Waveoz, which is a

7  180-degree FlowRider, which is double that, more than double

8  that.

9      A traditional, the number-one seller would be FlowRider

10 Double, which is around the $850,000 mark.

11 Q    Would it surprise you to know the cost of nozzle flap in

12 relation to the total price for that FlowRider Double is about

13 $3,000?

14 A    Yeah.  Back to my analogy, it would be like the tires on a

15 car are worth about a couple of thousand dollars.  The car is

16 worth 50,000.  Really difficult to drive a car without the

17 tires.

18 Q    Understood.  Okay.

19     But the components, each have a price, a different level

20 of value to the car?

21 A    Correct.  Correct.

22 Q    Let me go back to our exhibit that we have on the screen.

23 On page 1, if we could scroll up to the top email, this is from

24 Andrew Thatcher, dated Wednesday, June 19, 2013, 9:21 a.m.  You

25 are shown as a recipient.

1        Do you recall receiving this email?

2    A    No.  But I will say that I received it.  I don't recall it

3    offhand.  It was seven years ago -- six years ago.

4    Q    Mr. Thatcher is reporting to you that, "Richard, Pacific

5    Surf Designs, is also a big threat from a product standpoint"?

6    A    Yes.

7    Q    And is this the first time you learned of this?

8    A    It would be around that time period.

9    Q    He goes on to inform you, "He has no cash, so he is

10   struggling.  Now is the time to squash him."

11   A    I think -- I think Richard -- I know he left Wave Loch

12   prior to the acquisition, so it would be approximately that

13   time.  Yes.

14   Q    Well, I am going to ask you about something else here,

15   now.

16   A    Okay.

17   Q    Mr. Thatcher, who worked for you in 2013, continues to

18   work for you today, is telling you, as the CEO of WhiteWater,

19   that now is the time to squash Pacific Surf Designs.  Do you

20   see that?

21   A    I see that.

22   Q    And did you act on that?

23   A    No.

24   Q    Mr. Thatcher goes on to say, "He was the main engineer for

25   the FlowRider for five years, and he has made improvements."

```
 1   The phrase "he has made improvements" is in all caps, large
 2   letters.  You see that?
 3   A    I do.
 4   Q    And were you aware that Mr. Alleshouse had made
 5   improvements to your product?
 6   A    I wasn't aware of it and being informed of it.
 7   Q    Mr. Thatcher goes on to report to you that, "He has no
 8   sales force but his product is good.  If we do nothing, then
 9   this will be a problem."
10        And it was following this email that WhiteWater instituted
11   litigation; isn't that a fact?
12   A    Yes.  I believe so, yes.
13   Q    Let me turn to another exhibit, if I might.  Defendants'
14   Exhibit NK, page 1.  This document is entitled FlowRider 2.0,
15   you can see the 2.0 in the middle of the screen.
16        Mr. Chutter, do you see that?
17   A    Yes.
18   Q    Were you familiar with the fact that your division had
19   launched a product that they were marketing as FlowRider 2.0?
20   A    Yes.
21   Q    By the way, in context, this launching occurred following
22   your June 19, 2013 email, where you were instructing your staff
23   to look at your competitors' products and incorporate them to
24   make your product a better product.  Do you remember that
25   email?  We looked at that?
```

```
 1   A     Yes.

 2   Q     So your staff does more or less what you asked for and

 3   they come back with this, and they market it as a 2.0 version

 4   after they consider features on their competitors', including

 5   the biggest competitor identified by Mr. Thatcher, which was

 6   PSD?

 7   A     No, I would take exception to that.  Your assumption is

 8   these improvements were all from competitors, which I think is

 9   a stretch, first of all.

10        And, second of all, you are suggesting that the company

11   that was started by an individual that left Wave Loch, that has

12   their offices down the street, is the number one competitor,

13   which is categorically -- was, is, false.

14   Q     Well, I am not relying on anything I am saying here.  I

15   was relying on Mr. Thatcher's email to you and what he was

16   saying about PSD, which was --

17   A     From a theoretical standpoint, all competitors are a

18   threat.  And, obviously, if you have six competitors, there's

19   different degrees of threat.

20        We have incredibly strong competition in Europe, in Asia.

21   Our number one competitor would be a European.  Probably our

22   number two competitor would be Murphy's Waves.  So I don't

23   agree with your assumptions there that these improvements came

24   from looking at competitors' product.  Certainly could have.

25        But I will tell you that FlowRider has constantly led the
```

1    market in terms of new product development.  Some of those

2    awards you saw earlier are for FlowRider products.  The Waveoz

3    is the newest example, which caught the industry by complete

4    awe, and we are putting in a large number of those.  It's

5    worked really well for us.

6         The fact is that we have put in something like 220

7    FlowRiders.  I don't know what our nearest competition would

8    be.  I would suggest it's less than 20.  And you don't get to

9    that position by standing still.

10   Q    Well, in context, on June 19, you had advised your

11   management team, including Mr. Myrman, to go out and look at

12   your competitors' products and incorporate those on the same

13   date Mr. Thatcher sends out an email to you, among others,

14   informing you of big improvements made by Pacific Surf Designs.

15        Do you recall that language, "he has made improvements"?

16   We looked at that a moment ago.

17        And then following this email, we arrive at FlowRider 2.0,

18   which is on the screen right now.

19   A    Right.

20   Q    And if I can call your attention -- you know, I know you

21   are CEO of a very large company, and I am not suggesting that

22   you have to know everything about every detail of the company,

23   so I am only inquiring for my benefit and maybe the jury's

24   benefit as well.

25        What level of knowledge did you know of PSD's products

1  back in this time frame, of 2013?

2  A    Very little.

3  Q    So you wouldn't be the person to say, "Oh, yes, we went

4  and we looked at PSD's design, and we incorporated them," or,

5  "No, we didn't," because you just don't have that level of

6  knowledge?

7  A    No.  The level that I would get involved at is whether we

8  want to go down a road, for example, to develop a curl wave or

9  a Waveoz or a triple.  Or we have just introduced one that

10  floats in a lake.  These are all FlowRider innovations.

11      But you can take an email like that and make that the

12  story, but we have also got a 20-person R&D department

13  corporately, and we have dedicated new product development

14  people in San Diego that are generating our own rides,

15  internally, et cetera.

16      So, I mean, of course, in the marketplace, ideas come from

17  everywhere.  They come from our creative minds.  They come from

18  what we observe around the world in terms of competition, and

19  those are distilled down.  And that's how products in the world

20  get better and better.  That's how we live in the world that we

21  live in today.

22      And I would hope, for example, in my earlier example of

23  Tesla, that Ford and GM and BMW and Mercedes all come up with

24  electric cars that are improved, that make the world a better

25  place, that cause us to rely less on fossil fuels.  That's why

1    the human race is where we are today.

2    Q    Understood.

3        People look at their competitors and competitors look at

4    you.  Everybody -- everybody -- unless it's some specifically

5    protected IP, everybody is free to incorporate changes that

6    they think will improve the product?

7    A    The line for me is very clear.  There's a law out there.

8    Beyond the law, there's dealing on top of the table versus

9    under the table.

10       We don't get anywhere near under the table.  And, believe

11   me, in the international market, as I am sure you have read,

12   there is a ton of opportunity to go under the table.  People

13   are being thrown in jail left, right, and center in China for

14   bribery.  You have got to, early in your career, decide where

15   you are going to live, what side of the table you are going to

16   live.  We are crystal clear on that point.

17   Q    Understood.  And we are not here about bribery or anything

18   like that, to be honest with you.  We are here simply about

19   intellectual property.

20   A    But we, North Americans, have a different view on

21   intellectual property than other places in the world.

22   Q    Understood.  And that's --

23   A    And just because we do work in, for example, China, does

24   not mean we adopt China law or China ethics or China morals.

25   We take our guiding principles that we live by and apply those

```
 1   globally.
 2        And that's -- that's one thing that I will credit the U.S.
 3   President for doing, is going after China.
 4   Q    All right.  Well, we don't want to descend into politics,
 5   so we will go back to the case.
 6   A    As I said, I had a little journey into a political career.
 7   Q    I don't think you are running for office now.  Maybe you
 8   are.  You should tell me, because I think we are getting a
 9   political thing going here.
10   A    No, there's way too many running for office down here.
11   Q    Let's change the subject by changing the exhibit.  Maybe
12   that will help.
13        I am going to ask that we call up Exhibit BW-1.
14        And you are not shown on this.  I am going to ask you if
15   you could scroll down for a minute.  This is an email here on
16   the screen from a David Osborne.
17        Do you know who Mr. Osborne is?
18   A    I would be happy for you to remind me.
19   Q    He is with a company called Wave House.  Does that help
20   you?
21   A    Owned by Tom Lochtefeld?
22   Q    At one point, it was.  I don't know if it is today.
23   A    Yes, I recall the name.  I don't think I have ever met
24   him.
25   Q    In any case, there was an email that was circulated, and
```

1    they are talking about two patents here, the '589 being the

2    first one which is at issue in this case, and also a different

3    patent, the '530.  Do you see that?

4    A    Yes.

5    Q    And you talked about in trampoline-style, tensioned

6    membrane, which is a big safety feature you are proud of on

7    your products, correct?

8    A    Yes.

9    Q    That is one of the principal drivers of your marketing, is

10   about this tensioned membrane system that you use for padding?

11   A    Yes.

12   Q    And you don't contend, do you, Mr. Chutter, that my

13   client, Pacific Surf Designs, has in any way infringed on this

14   '530 patent for tensioned membrane?

15   A    Not yet.

16   Q    Let's move on, then, to --

17   A    But those are -- what I referred to earlier, a body of

18   patents that we acquired.  It's interesting those two are

19   identified in this email because those -- that's the heart and

20   soul of the acquisition, those two.

21   Q    Yes.  And you will see they are -- they were identified

22   here with the maintenance fee payment.  Do you see that?

23        At the end of each of these paragraphs, there's a date,

24   and they are describing when the 11-and-a-half-year maintenance

25   fee is due.  Do you see that?

```
 1    A    Yes.
 2    Q    I think you testified Mr. Kwasnicki -- if I pronounced it
 3    correct -- was responsible for all this?
 4    A    Yes.
 5    Q    Are you aware Mr. Kwasnicki sent an email saying he was
 6    too busy to pay attention to the maintenance fees of these
 7    patents?
 8    A    I am not.
 9    Q    You are not aware of that?
10    A    No.
11    Q    And you are proud of your best-run company, in Canada, I
12    guess, the award you received for that?
13    A    I am proud of the team.
14    Q    Did anyone report to you Mr. Kwasnicki wrote an email and
15    said he was just too busy to worry about these maintenance
16    fees?
17    A    No.
18    Q    Is that something that would have been acceptable to you?
19    A    No.  As you see, we are a company of 600 people.  And you
20    can imagine, if everybody does 20 or 30 emails a day, I am well
21    north of 100.
22         No.  I don't read every email that goes out of the office.
23    Q    Fair enough.  Let's turn now to exhibit -- Defendants'
24    Exhibit NS.  This is an email sent by Mr. Myrman to you, dated
25    February 10, 2014.
```

1          Do you recall receiving this email on or about

2     February 10, 2014?

3     A     No, but it looks legitimate.

4     Q     It's referencing to the revised license agreement, so I

5     don't want to have to go through and pull all these up.  We

6     looked at the license agreements, and your counsel did a

7     skillful job of charting those on a demonstrative for us all.

8     But you recall -- let's look at the reference in paragraph

9     Number 2, schedule 7.1K.  Do you see that?

10    A     Yes.

11    Q     Do you recall there was some list of potential infringers

12    that was provided as part of the license agreement?

13    A     That's how I read that, yes.

14    Q     And, "Question:  Does this add any potential liability to

15    us, and do we agree that they are infringing?"

16          These are question marks, sent to you.

17    A     Yes.

18    Q     He goes on to say, "Just because we get knocked off

19    doesn't guarantee infringement."  Do you see that?

20    A     Yes.

21    Q     You agree with that statement, do you not?

22    A     Absolutely.

23    Q     Did you answer any of these questions, to Mr. Myrman?

24    A     I couldn't tell you.  I notice the email, down, actually

25    predates --

1    Q    If you don't recall, that's fine.

2    A    I mean, these are -- I think these are -- many of these

3    are statements of facts.  I mean, he had asked some questions

4    here.  It wouldn't surprise me if we had a discussion on it

5    after the fact.

6    Q    It would or would not?

7    A    Would not have surprised me.

8    Q    But you can't recall as you sit here?

9    A    I can't recall.

10   Q    And you can't recall responding in email to these

11   questions, can you?

12   A    No, but if you have got one, I would be happy to look at

13   it.

14   Q    I wish I had one, but I don't.  That's why I am asking you

15   these questions; trying to make sure we get all the information

16   out.  That's all.

17   A    I just don't want you setting me up.

18   Q    I wouldn't do that.  I will tell you, though, since you

19   brought this up with Mr. Lochtefeld, the surfer and lawyer

20   combination is very powerful.

21   A    I was going to ask you if you surf?

22   Q    I do.  Let's go back to business.  Let's move on to our

23   next exhibit, BL-1.

24        You are cc'd on this email, November 24, 2014.  It is from

25   Mr. Lochtefeld to Mr. Myrman.  Do you recall this email?

1    A    No, but I can read it.

2    Q    Are you familiar with this company, MyWave?

3    A    I am not.

4    Q    Has WhiteWater sued MyWave for infringement?

5    A    No.

6    Q    And you will see that the --

7    A    I don't know if they even exist.  I have no knowledge.

8    Certainly not one that I have seen in a trade show.

9    Q    What Mr. Lochtefeld is saying here, on November 24 of

10   2014, there is, among other things, a downward-biased, padded

11   nozzle, on this -- what he is accusing as an infringer.  Do you

12   see that?

13   A    Yes.  I see that.

14   Q    But there was never any litigation filed?

15   A    No.

16   Q    Let's move on to Plaintiff's Exhibit 234.  And let's

17   scroll down to page 2, first -- because these start at the

18   bottom and work themselves back up -- to have some context.

19       You know who David Keim is?

20   A    Yes.

21   Q    Who is he?

22   A    He works for -- is a salesman for ADG, Aquatic Development

23   Group, the company that I described earlier, that we

24   sublicensed to, covering the U.S. market.

25   Q    Did you receive a copy of this email sometime on or after

1   this date?

2   A    If you could help me out with that answer.  I don't know.

3   Q    Okay.  This is information that Mr. Myrman, who reports to

4   you, received from Mr. Keim?

5   A    Reports to?

6   Q    To you?  Mr. Myrman reports to you, does he not?

7   A    Sorry.  Yeah.

8   Q    "Marsh, we have been advised by Mike Friscia, close

9   industry friend" -- do you know who Mike Friscia is?

10  A    I don't.

11  Q    "We are in serious danger of losing a FlowRider to

12  Richard.  This is solely being driven by price."

13       Do you see that?

14  A    Yes.

15  Q    In fact, that's what most customers in this industry make

16  their buying decision on, is price, is it not?

17  A    No.

18  Q    So you disagree with that statement?

19  A    Yes.

20  Q    Second paragraph says, "We have already discounted the

21  ride, fully installed, to 785,000 from our original 850,000,

22  and we sense that Richard is in the $650,000 range.  Clearly,

23  we don't want Richard to get another installation, which would

24  continue to provide funding to Pacific.  I believe we should

25  discuss what, if anything, we could do to starve them out of

1    the business."

2        Do you see that?

3    A    Yes.

4    Q    Did you have discussions with anyone about what you were

5    going to do to starve Richard and Pacific Surf Designs out of

6    business?

7    A    No.  No.

8        I think you have to understand the context of this.  Our

9    head office -- I am from Vancouver, where the majority of the

10   employees are.  FlowRider's handled virtually solely out of

11   San Diego and the emails that you have read and this email

12   display a lot of anger.  And they display a lot of anger

13   because there's a sense that the company had been robbed and a

14   foul deed was done to the company.

15       Whereas we are taught to turn the other cheek, when

16   somebody whacks you in the left side of the face, your guard

17   immediately goes up, and there's a tendency to want to punch

18   back.  And that's what I see this as.

19   Q    Is that part of your corporate culture that you were so

20   proud of?

21   A    As I say, we are from -- the majority of the company is to

22   the north, and we didn't have this direct communication.  As a

23   result -- this was not acted upon corporately at all.  But I --

24   I understand the anger.

25       And it is the same anger you have when you come home from

1    a vacation and you find your house has been burglarized and

2    everything stolen out of it.  There's anger that develops, huge

3    anger.

4    Q    And you are the biggest dominant player in the sheet wave

5    industry in North America, are you not?

6    A    Yes.

7         And to go to your point, we are also known as the most

8    expensive out there, and yet you indicated that price was what

9    dictated success in the industry.  We are the largest in the

10   industry and we are known as the expensive one out there.  So

11   your conclusion does not jibe with reality.

12   Q    Well, with all due respect, Mr. Chutter --

13   A    We push -- we push service and customer intimacy and

14   those -- for us, those values are the ones that have taken us

15   to where we are today.

16   Q    Understood.  Your values --

17   A    Not price.  Not price.

18   Q    -- we have heard those considerably today.  And these are

19   not my statements, by the way, Mr. Chutter.  I want you to

20   understand that.

21   A    Yeah.

22   Q    This is a statement made to your divisional president,

23   Mr. Myrman, saying price -- "this is solely being driven by

24   price."  This is not my statement.  This is by somebody who is

25   a close industry friend, according to this email, who is giving

1    you inside information, your company inside information.

2        So this notion that the customers are making decisions,

3    buying decisions, based on price has nothing to do with what I

4    am saying; it has to do with the evidence that we have in this

5    case.

6    A    On this email, I agree with you on that point.

7    Q    Now we have that straight.

8        And you testified earlier in response to the Court's

9    questions about your gross margins, which I thought you said

10   were 45 percent; is that right?

11           THE COURT:  40 percent.

12   BY MR. THOMAS:

13   Q    I am sure you would like them to be 45.  But 40 is a

14   pretty good number, is it not?

15           THE COURT:  Could I get the extra 5 percent?

16           THE WITNESS:  Yes, 40 percent --

17   BY MR. THOMAS:

18   Q    40 percent is a pretty healthy number, is it not?

19   A    Yes and no.  Yes, it is a good number as it stands on its

20   own.  When you look at the fact that we have an indebtedness of

21   16 to $18 million, it takes a lot of those to make that work.

22   Q    And that 16 million to $18 million number, that's a number

23   you threw out earlier today.  I think you testified that that's

24   what you are having paid or will pay Mr. Lochtefeld?

25   A    Over the term of the ten-year agreement.

1    Q    How much has he been paid to date?

2    A    Well, let me go at it a slightly different angle.

3         The FlowRider division does approximately 20 million a

4    year in sales.  It's a ten-year deal.  That's 200 million.

5    10 percent of 200 million is 20 million.  So I said 16 to 18.

6    I am a CPA, a little bit conservative.

7         We have paid the lion's share of that to date.

8    Q    It is your testimony Mr. Lochtefeld has received the

9    lion's share of 16 to $18 million from your company as you sit

10   here today?

11   A    Yes.  Yes.

12   Q    Well, in any case, if you were to drop your price, as this

13   email is indicating you might have to do, from your $785,000

14   number down to a $650,000 number -- and you are a CPA, by

15   training, so I know you are good at this stuff -- how much

16   margin would you make on a $650,000 transaction,

17   percentage-wise?

18   A    You will make me get out a calculator.

19        Well, if it was 40 percent --

20   Q    650 --

21   A    40 percent on 850, because that's where it's relevant,

22   that's, what, 260,000?

23              THE COURT:  Here.  It will make your life easy.  How

24   is that?

25              THE WITNESS:  You really want to go through this?

```
 1   BY MR. THOMAS:
 2   Q    I don't think it is that hard.  I didn't mean to push you
 3   beyond your skill set.
 4   A    So, on 850, it's 320.  If I take 850 minus 320, to get
 5   cost, that's 530 of cost.  So if I take 650, minus 530, that
 6   gives me a margin of 120.  120 divided by 650 is 18.5.
 7   Q    Almost 20 percent?
 8   A    18.46.
 9            MR. THOMAS:  Thank you.
10            THE WITNESS:  Thank you.
11            THE COURT:  You bet.
12   BY MR. THOMAS:
13   Q    So, even if you drop your price, you are making money; it
14   is a question of how much you are making?
15   A    No, it's not making money.  That's margin.  And margin is
16   the difference between selling price and cost of sales.  You
17   still have overheads, which are things like salaries, rent,
18   marketing, trade shows, travel, blah, blah, blah, which
19   generally runs in the 25 percent mark.
20   Q    Okay.
21   A    So you are losing money.
22   Q    Okay.  That would be a reason why --
23   A    There might be some anger.
24   Q    Well, there's a reason why you would -- you would -- your
25   employees anyway, in the U.S., may be looking for an
```

1    opportunity to starve out Mr. Alleshouse as well as his

2    company?

3    A    I don't think they were talking about picketing Safeway or

4    anything like that.  I think that was terminology they were

5    using, and you can take it with a grain of salt.

6    Q    Okay.  And these global -- these corporate concepts that

7    you discussed that are -- corporate values you have, those are

8    supposed to be implemented here in San Diego as well as in

9    Canada, are they not?

10   A    Absolutely.

11   Q    Do you do anything to ensure that is done?

12   A    Yes.

13   Q    What do you do?

14   A    We have -- we have an HR department in which we have two

15   individuals that focus on coaching, that focus on management

16   practices and culture, to ensure that, to the greatest degree

17   possible, our values are practiced throughout the organization.

18   Q    Let's move on to another exhibit, Plaintiff's Exhibit 33,

19   which is a license agreement you have seen previously.  Call up

20   the first page.

21        Do you recall this document?  This is the license

22   agreement between Wave Loch and WhiteWater.

23   A    Do you have a date on this one?

24   Q    I believe this is 2009.  Exhibit 33.  I will look for your

25   counsel to correct me if I'm wrong, but that's my memory of it.

1  A     As I recall, there were a number of --

2  Q     There were.  And I certainly appreciate that question

3  given the number of documents we have seen in this case.

4  A     Right.  And you are a surfer, right?

5  Q     Not when I am trying cases.

6         THE COURT:  What do you have against surfers?

7         THE WITNESS:  Nothing.  Individually, a surfer, and a

8  Californian, and a lawyer are wonderful.  Mr. Lochtefeld, if

9  you put them all together -- that's the five or six agreements.

10 That's my point.  It took a long time.

11 BY MR. THOMAS:

12 Q     Okay.  I believe it's in or about the 2009 time frame this

13 license agreement was signed.

14        THE COURT:  Wouldn't it just be easier to go back to

15 the back page and see?  And we wouldn't all have to guess.

16        THE WITNESS:  Some of them were not dated, actually.

17 BY MR. THOMAS:

18 Q     Mr. Taché has confirmed it's 2009.  I was just trying to

19 make it easier and faster.

20 A     Thank you.

21 Q     If we could go to page 7 of Exhibit 33, this is the

22 royalties provided for on this 2009 license.  You looked at

23 this briefly, with Mr. Taché.  And you will recall this, I am

24 sure because you signed this agreement, did you not,

25 Mr. Chutter?

1    A     Yes.

2    Q     So, under 3.1.1, there's a 20 percent royalty, and it goes

3    on in the second sentence to say, "This 20 percent royalty is

4    comprised of a 10 percent license fee for the opportunity to

5    exercise those rights in U.S. Patent Number 5,236,280 and

6    corresponding foreign patents; a 5 percent license fee to

7    exercise the rights protected under U.S. Patent

8    Number 6,676,530; a 5 percent license fee to use Wave Loch's

9    non-patented proprietary know-how in existence at the time of

10   the execution of this agreement."  Do you see that?

11   A     Yes.

12   Q     This is the royalties section of this license agreement?

13   A     It is.

14   Q     There is no call-out at all of any royalty associated with

15   the '589 patent?

16   A     Correct.

17   Q     You mentioned that Mr. Lochtefeld was one of the

18   originators of the sheet wave industry.  The "father" of it is

19   I think the term you may have used.  Is that right?

20   A     He was the one, yes.

21   Q     Well, the one -- he's testified prior to you.  He's had

22   this wonderful opportunity that you now have.

23         But when he came in, he talked about when he got into the

24   space, there was a patent, and he use -- the named is Frenzl.

25   Have you ever heard of the name, "the Frenzl patent"?

1    A    Yes, I recall that name.

2    Q    You recall that name.

3         And the first thing he did is go license the Frenzl patent

4    so that he could start building sheet wave machines.

5         Do you know what he paid for that license?

6    A    No, I don't know anything.

7    Q    $10,000 a year.

8    A    Okay.

9    Q    And the licenses that -- let me back up.

10        You have been involved in patent litigation before -- your

11   company, I should say?

12   A    I don't recall being involved in patent litigation before.

13   Q    You have never testified in a patent case before?

14   A    I am trying to think.  I don't think so.

15   Q    Okay.  And you are familiar with licensing?  You went at

16   length today --

17   A    I am familiar with licensing.

18   Q    Have you ever -- it was your testimony -- I don't want to

19   put words in your mouth; I just want to be sure I am getting it

20   right -- that you think a 10 percent royalty is a reasonable

21   royalty?

22   A    In this sector of the industry, the range, for us, is

23   between 10 and 20.  As you can see with the later, most current

24   license we have got is with ADG, and that's at 20 percent.  By

25   and large, our licenses with Tom have been 10 percent.

```
 1   Q     10 percent off of gross proceeds?

 2   A     Gross proceeds.  So, effectively, applying to that

 3   850,000, that you referred to earlier.

 4   Q     When was the last time you spoke to Mr. Lochtefeld?

 5   A     Two and a half weeks ago, at the IAAPA convention.

 6   Q     Your company still owes Mr. Lochtefeld money?

 7   A     Yes.  We pay him monthly.  Yes.

 8   Q     And those payments are out into the future for a number of

 9   years yet?

10   A     They go until the end of the patent, in 2022.

11         MR. THOMAS:  Okay.  I have no further questions, Your

12   Honor.

13         THE COURT:  All right.  Redirect?

14   You are not finished yet.

15         THE WITNESS:  You were getting my hopes up.

16                     REDIRECT EXAMINATION

17   BY MR. TACHÉ:

18   Q   Mr. Chutter, you were asked about the price of nozzle

19   flaps by Mr. Thomas.  Would WhiteWater entertain selling a

20   nozzle flap to a direct competitor?

21   A   No.

22   Q   Who is the market leader in the sheet wave industry?

23   A   When you say "WhiteWater," we have two entities here.  We

24   have got FlowRider, and we have got WhiteWater.

25         And my answer for both of those would be no.
```

1  Q     Thank you.

2        Mr. Chutter, is FlowRider Inc. the market leader in the

3  sheet wave industry?

4  A     Absolutely.

5  Q     You were asked the question by -- let me strike that.

6        Mr. Chutter, why did you sue Pacific Surf Designs over the

7  '589 patent?

8  A     I was offended by the fact that they broke into my house

9  and took the painting above my fireplace, and I just want the

10 painting back.  That's what happened to me.

11       Corporately, we had -- as discussed in the numbers, we

12 have paid and we will continue to pay an amount that approaches

13 16 to $18 million for a series of patents, two of which define

14 the ride we are talking about.  And one of them in particular

15 is absolutely key to the safety of the kids that ride that --

16 that ride.  And when you make an investment like that, the last

17 thing I want to see happen is to have somebody, from our

18 standpoint, take that away from you.

19       And that's the reason for this -- this suit.  We -- these

20 patents were registered with the U.S. Patent Office.  They were

21 found to be bona fide.  They are good patents, solid patents.

22       Wave Loch spent a huge -- Tom spent his entire life

23 developing this product line.  It is what he is known for.  And

24 then he sold it, theoretically, to have a nest egg in his

25 retirement.  And we are obliged to fund that.  And the only way

1    we can pay for that investment is selling FlowRiders.

2        And if we have to -- if somebody else takes that away from

3    us so we are not able to do that, or if we have to drop our

4    prices so we go from a 40 percent margin to an

5    18-point-whatever percent margin, we don't last in business

6    very long.  We lose money.  And that's not what you make the

7    investment for.

8        If somebody wants to come and compete with me with their

9    own ideas, that they have got IP on, I am A-OK with that.  It's

10   our intellect versus their intellect.  That is the free market

11   system.  If I get up earlier, chances are I am going to get

12   more worms.  That's the system that I have been brought up in.

13   My family were all cattle ranchers.  They get up early in the

14   morning to get those worms.

15       It is intolerable that somebody would violate us like

16   that.

17            MR. TACHÉ:  Thank you, Mr. Chutter.

18       No further questions, Your Honor.

19            MR. THOMAS:  Just briefly, Your Honor.

20                       RECROSS-EXAMINATION

21   BY MR. THOMAS:

22   Q    You are aware that Mr. Lochtefeld, when he controlled Wave

23   Loch, filed a patent infringement case against a competitor and

24   lost that case?

25   A    Who is the competitor?

1    Q    American Wave was the defendant.

2    A    I am not -- I am not familiar with it.  I know there was a

3    case.  I am not familiar with how it ended.

4    Q    You never were told that they filed a case, went to trial,

5    and lost it?

6    A    I am not aware of that.

7    Q    And you were given some -- you have given some testimony

8    about this house, and how it's like stealing a painting out of

9    your living room or over your fireplace or whatever example you

10   might have used.

11        You are not technically trained in any way, are you,

12   Mr. Chutter?

13   A    Not personally.  But we have 120 engineers that work for

14   WhiteWater, and in a position of leadership, you learn to trust

15   those who are on the team.  And over the course of X number of

16   years, you learn which opinions tend to rise to the surface and

17   be accurate the vast majority of the time.

18        But, of course, that's what this case is about.  I mean,

19   these learned gentlemen and gentlewomen may find that we are

20   incorrect in this assertion.  Everything in my fiber says

21   absolutely not, common sense, engineering and otherwise.

22   Q    You don't have any engineering training, do you?  You

23   don't have any engineering training, do you?

24   A    No.

25   Q    So you are relying on others or your common sense when you

1    make these statements; is that correct?

2    A    As president and CEO, that's absolutely right.

3    Q    You have to do that?

4    A    You have to do that.

5         MR. THOMAS:  You have to rely on others?

6    All right.  I have no further questions, Your Honor.

7         THE COURT:  Now I am going to let you off the hook.

8    Talk care.  Have a great trip home.

9         THE WITNESS:  Thank you.

10   (Witness excused.)

11        THE COURT:  All right.  Probably be a good time for

12   us to take a little break.  Anybody mind?  Anybody object?

13        MR. THOMAS:  No objection, Your Honor.

14        THE COURT:  Let's take ten minutes.  It's 1:56.  Be

15   back at ten minutes after 2:00.  Great.

16   (Recess taken from 1:56 p.m. to 2:10 p.m.)

17   (The following proceedings were held in open court in the

18   presence of the jury:)

19        THE COURT:  Welcome back.

20   Please call your next witness.

21        MR. O'HARE:  Thank you, Your Honor.

22   Plaintiff WhiteWater calls Dr. Robert Vigil.

23             ROBERT VIGIL, Ph.D.,

24           PLAINTIFF'S WITNESS, SWORN

25        THE CLERK:  State your full name for the record,

1    spelling both your first and last name.

2         THE WITNESS:  Robert Vigil.  R-O-B-E-R-T.  Vigil, V,

3    as in Victor, I-G-I-L.

4                        DIRECT EXAMINATION

5    BY MR. O'HARE:

6    Q    Good afternoon, Dr. Vigil.

7    A    Good afternoon.

8    Q    What is it you are a doctor of?

9    A    I am a doctor in economics.  I have a Ph.D. in economics.

10   Q    And what is your business or profession?

11   A    I am an economist.

12   Q    You have been engaged to provide expert opinions, expert

13   consultation in this case?

14   A    I have.

15   Q    And what is the scope of your engagement?  What were you

16   asked to do in this case?

17   A    I was asked to provide an opinion regarding the amount of

18   damages that Pacific Surf Designs should have to pay WhiteWater

19   should the jury find that the '589 patent is valid and is

20   infringed.

21   Q    If I could, I would like to display Slide Number 2 for

22   this witness and ask you a little bit about your background and

23   qualification.

24        Where do you work?

25   A    I work at company called Analysis Group, Inc.

1  Q    What does Analysis Group, Inc., do?

2  A    We are an economic, financial, and strategy consulting

3  firm of about 1300 people.  We provide research and analysis in

4  a variety of business, litigation, and regulatory-related

5  matters.

6  Q    What is your educational background?

7  A    I have a bachelor's in economics from Pepperdine

8  University, which is located in the Los Angeles area, and a

9  Ph.D. in economics from the University of Maryland.

10  Q    And exactly what kind of work do you do for the Analysis

11  Group, your company?

12  A    Part of my work involves calculating damages in litigation

13  cases like this, and part of my work involves helping companies

14  solve various business-related problems outside of the context

15  of litigation.

16  Q    Can you give us some examples of the kinds of

17  business-related problems that you help companies solve?

18  A    Yes.  I am frequently asked to help companies value

19  different types of assets; so, for example, different types of

20  technologies or different types of products or product lines.

21  Q    And have you ever been involved in providing -- outside of

22  the litigation world -- to help somebody put a value on a

23  patent or patents?

24  A    Yes, many times.

25  Q    And how does that happen?  Why would somebody come to you

1   and say, "What is my patent worth," or, "What is his or her

2   patent worth?"

3   A     One context is when one company wants to license or sell

4   its patents to another company, I am often asked to help them

5   figure out what a fair price should be or what a fair royalty

6   should be in order for the one company that wants to buy or

7   license the patent, what that price should be.

8   Q     Other than your degrees from Pepperdine, here in Southern

9   California, and University of Maryland, back in College Park,

10  have you got any other -- College Park, Maryland, that is --

11  any other certifications or professional designations that you

12  have got?

13  A     Yes.  I was awarded the Certified Licensing Professional's

14  designation by the Licensing Executive Society.

15  Q     What does that mean?

16  A     It is a designation intended to distinguish people that

17  have demonstrated knowledge or experience, proficiency in the

18  licensing of intellectual property, such as patents.  It is

19  kind of like a CPA but for licensing.

20  Q     And have you written, published, spoken on any topics

21  related to your field as an economist?

22  A     Yes.  I have done all of that related to damages, and

23  different kinds of valuation methods and techniques over the

24  years.

25  Q     I am not going to go through it all, but if we could

1    display what has been marked as Exhibit 473, I think that's the

2    witness's resume.  Is this your resume?

3    A    Yes.

4    Q    And is it relatively current?

5    A    Yes.  It is.

6    Q    If we could scroll a page or two, I want to get -- okay.

7    These are different cases that you have testified as an expert

8    witness in?

9    A    That's right.

10   Q    And have any of those cases involved assessing economic

11   loss or damages in a patent infringement case?

12   A    I would say most of them, it is probably the area that I

13   specialize in the most.

14   Q    Gary -- if we could go another page or so here, there's --

15   you list a number of different consulting experiences you have

16   had where you didn't actually testify?

17   A    Yes.  Some of my work involves supporting professors from

18   different universities that offer different kinds of testimony

19   in litigations.

20   Q    And if you could keep scrolling, please, Gary.  One more.

21   One more.  One more.  Another.  Keep going.  There we go.

22        There's various non-litigation consulting experiences you

23   have had that you have listed here?

24   A    Yes.  Those are just some examples of different types of

25   patents or technologies that I have been asked to value over

1    the years.

2    Q    And, Gary, we could go a little further in this long

3    resume.

4         And then you have articles and publications and speaking

5    engagements that you have engaged in?

6    A    Yes.

7    Q    And they are all listed on your resume?

8    A    They are.

9    Q    Now, in connection with this case, what did you do by way

10   of research, investigation, looking at things, talking to

11   people, reading testimony?  What did you do to sort of gather

12   up information in order to carry out your engagement?

13   A    I reviewed a large number of documents that were produced

14   by both parties in this case including license agreements,

15   sales and financial documents, business plans, marketing

16   presentations, things of that nature.

17        I also reviewed a large number of deposition transcripts

18   from witnesses from WhiteWater and Pacific Surf Designs, and

19   also some deposition transcripts of actual customers that have

20   bought these types of products.  I also had a number of

21   conversations with people at WhiteWater, as well as

22   conversations with Dr. Stevick.

23   Q    Could you describe generally what methodology or approach

24   you followed to carry out your engagement to try to calculate

25   damages?

1    A    I calculated what is called reasonable royalty damages in

2    this case.

3    Q    And what does that mean?

4    A    A reasonable royalty is a type of payment that one company

5    makes to another company when they want to use something that

6    belongs to the other company, kind of like a rental fee.  You

7    could think of it as if I want to use someone's house for a

8    week during the summer, want to have the right to use that

9    house.  Regardless of whether I actually use it, if you want to

10   have the right to use it, you have to pay them a fee in order

11   to have that right to use it.

12       It's similar with this case.  If the jury finds that

13   Pacific Surf Designs used the '589 patent, then they should

14   have paid a reasonable royalty or a fee in order to be able to

15   have the right to use that technology.

16   Q    Now, I take it, you are not an engineering or water

17   park/ride design expert, technical expert, are you?

18   A    I am not a technical expert, no.

19   Q    So, for purposes of your testimony, obviously, you don't

20   know yet what the Court and jury are going to decide on whether

21   there's been patent infringement, right?

22   A    That's right.  I am only relevant if the jury finds that

23   the '589 patent has been infringed and that it is valid.

24   Q    So, for purposes of your analysis, you have been asked to

25   assume, without deciding that the Court and jury at some point

1    will come to that conclusion, that there has been infringement,

2    and that therefore they need to consider damages?

3    A    Yes.  That's right.

4    Q    In terms of the sales of Pacific Surf Designs that have

5    been evaluated in your analysis, have you considered both past

6    sales and any sales that may be made in the future, or just one

7    or the other?

8    A    No, my analysis is focused only on the sales that they

9    have made to date, not any future sales.

10   Q    So, at least, is it fair to say another assumption in your

11   analysis, if the Court and jury decides there's been

12   infringement and if damages are awarded, that it is as if there

13   will be no other sales of infringing products?

14   A    Yes.  My damages calculation assumes that there will be no

15   more.

16   Q    And if I could display Slide 3 from the witness's

17   presentation, please.

18        And with the benefit of Slide 3, could you explain to us

19   what this framework is that you utilized in order to come up

20   with a reasonable estimate of a reasonable royalty?

21   A    Sure.  I use what a called a hypothetical negotiation

22   framework to figure out what a fair royalty would be for

23   Pacific Surf Designs to have to pay WhiteWater.  This framework

24   assumes that the parties would have sat down at the time that

25   Pacific Surf Designs first needed a license and negotiated a

1  license to the '589 patent in exchange for the payment of a

2  royalty.  And that's what I have structured my analysis based

3  on.

4  Q   We have heard some testimony in the case to the effect

5  that WhiteWater would not have wanted to -- would not have been

6  willing to license the '589 patent willingly to a competitor

7  like PSD.  Am I correct this framework of a hypothetical

8  negotiation, you are still basically asked to determine -- even

9  though they don't want to, we have to suppose somehow they

10  would have anyway?

11  A    Yes.  We know that this negotiation didn't actually take

12  place or we wouldn't be here.  All we are saying is had Pacific

13  Surf Designs first come to WhiteWater and asked for a license

14  and had they negotiated a license to the '589 patent, what

15  would they have agreed to?  What would they have considered to

16  be a fair royalty, a fair price, for letting Pacific Surf

17  Designs use the patent for a six-year period?  That's what we

18  are doing with this framework.

19  Q   Now, is this some concept that you, as an economist,

20  invented, or is it your understanding that this is a framework

21  that comes out of the law?

22  A   Yes, it is my understanding that this is a framework that

23  the courts have identified as an appropriate way to determine

24  what a fair price or a fair royalty would be for a patent

25  infringement.

1    Q    Now, is there a particular time frame during which you,

2    for purposes of your analysis, assume the hypothetical

3    negotiation would have occurred?

4    A    Yes.  I assume that the hypothetical negotiation would

5    have occurred in December 2013, which corresponds to the time

6    when Pacific Surf Designs would have first needed a license.

7         That also corresponds to the time when they first sold a

8    product that's being accused of using the '589 patent.

9         So we go all the way back to when they first needed the

10   license, and we say what would have happened at that point had

11   they actually negotiated willingly a license to the '589

12   patent?  What would they have determined a fair price to be at

13   that point in time?

14   Q    And you understand that that first sale occurred on

15   approximately December 18, 2013?

16   A    Yes.  That's right.

17   Q    So this hypothetical negotiation would have occurred

18   shortly -- sometime before that moment in time?

19   A    Yes, probably in the several weeks prior to when they

20   first sold the product.

21   Q    Now, when you do your analysis on what the parties would

22   have agreed to in this hypothetical world, are you looking at

23   the benefits that the folks at Pacific Surf Designs actually

24   got from infringing the patent?  Or are you looking at the

25   benefits that they and WhiteWater anticipated they might get at

1  the time of the negotiation?

2  A    The focus is on the benefits that the parties anticipated

3  or expected Pacific Surf Designs to get over the next six-year

4  period, more on expectations rather than what actually

5  happened.

6  Q    And why is that?

7  A    Two reasons.  First, it is my understanding that that is

8  what the law requires.  And second, as an economic matter, it

9  wouldn't be fair to give Pacific Surf Designs the benefit of

10  hindsight when determining what royalty they should have to

11  pay.

12  Q    What would be unfair about that?

13  A    Well, in the real world, the price you have to pay for

14  something is generally before you buy it, right?

15      When you go into a store and you are determining how much

16  you are going to pay for a product, you are basing that price

17  on the benefits you expect to get from it over the next, you

18  know, year or two or several years that you are going to be

19  using the product.  You don't base the price on the benefits

20  you actually receive because you don't have the product yet.

21  You can't take possession of the product, determine whether you

22  like the product, whether you are able to use the product,

23  whether you have benefits from the product, and then go back to

24  the store, say, "Based on that, this is what I think should

25  pay."

1      It would be like me buying a treadmill.  I go into the

2  store and I anticipate that I am going to get a lot of use out

3  of the treadmill, a lot of benefits from it.  I am going to use

4  it every day.  I am going to get in shape.  But I take it home,

5  and as the case with most treadmills, you use it for a month,

6  and then it kind of sits idle, collecting dust.

7      And I can't then go back to the store and say, "You know

8  what?  I know I thought I was going to get a lot of use out of

9  this treadmill, so I should have to pay a pretty low price for

10  it."

11      No.  You pay based on the benefits you think you are going

12  to get from it, going forward.  It is the same concept here.

13  Q    Okay.  And then even though the focus is evidently on what

14  the parties expected they would give or get at the time of the

15  hypothetical negotiation, do you consider at all what actually

16  happened afterwards?

17  A    Yes, you can consider what actually happened as long as

18  what actually happened is consistent with what the parties

19  would have expected.  But if what actually happened is

20  inconsistent with what the parties would have expected when

21  they were negotiating the agreement or when they were

22  determining whether they are going to purchase the license, you

23  have to give greater weight to what they expected at the time

24  they were negotiating the license.

25  Q    So if we could please display slide Number 4, could you

1   explain the steps or elements that you have considered in this

2   hypothetical negotiation analysis.

3   A    Sure.  I looked at four different factors that I believe

4   the parties would have considered in the hypothetical

5   negotiation.  And I believe that these four factors all provide

6   some information regarding what royalty they would have

7   believed was fair, was reasonable, it was appropriate.

8   Q    So, the four factors -- one is what PSD -- what the

9   defendants would have expected to gain?

10  A    From the license, yes.

11  Q    And this is what they would have hypothetically expected,

12  or maybe in the real world expected, back in late 2013?

13  A    Yes.

14  Q    And then, am I correct?  So the second element, what is

15  that?

16  A    That's WhiteWater's expected loss from granting the

17  license.  In other words, if WhiteWater, in giving the license

18  to Pacific Surf Designs, was expecting to lose something as a

19  result of that, then they would want to take those losses into

20  account when determining what a fair royalty would be.

21  Q    And then, what is your third factor?

22  A    Comparable patent license agreements; in other words,

23  other licenses that involve the '589 patent in exchange for a

24  royalty.

25  Q    And then you have something here called *Georgia-Pacific*.

1    Isn't that like a lumber company?

2    A    Yes.

3    Q    What does a lumber company have to do with this?

4    A    The *Georgia-Pacific* factors are a set of factors that the

5    courts have identified as being potentially relevant for the

6    determination of a royalty.

7    Q    So, evidently, it was a court case involving a lumber

8    company?

9    A    Called *Georgia-Pacific*.

10   Q    Okay.  So it is not because lumber has anything to do with

11   this case?

12   A    No.  No.

13   Q    So, based on your qualifications and expertise, all the

14   information that you gathered, and the methodology that you

15   generally described, what conclusion or opinion did you come to

16   on what a reasonable royalty would be in this case?

17   A    I have concluded that, should the jury find that the '589

18   patent is valid, and infringed, Pacific Surf Designs should

19   have to pay reasonable royalty damages to WhiteWater of

20   $2 million.

21   Q    And let's take a look at, if we may, at Slide 5, please.

22        I take it the structure I am taking you through is you

23   came up with sort of four basic factors you are considering?

24   A    Yes, four factors or four buckets of information that I

25   have looked at.

1  Q    Okay.  And I would like to take you through those four in

2  turn.

3       Here is factor 1.  How have you considered Pacific Surf

4  Designs' expected gains from a hypothetical license to the '589

5  patent?

6  A    Based upon my review and analysis of all the evidence, I

7  have concluded that Pacific Surf Designs would have expected to

8  benefit from the license to the '589 patent in two ways.

9  First, it would have expected the license to the '589 patent to

10 enable it to offer products that had features that customers

11 demanded in the marketplace.  And second, that it would have

12 enabled Pacific Surf Designs to generate substantial revenues

13 and profits as a result.  This is what it would have expected

14 the license to give it, standing in December of 2013.

15 Q    You have already indicated you are not a technical expert

16 on ride design and technology, so what has been the basis for

17 your observations about some of the benefits that would have

18 been enjoyed by Pacific Surf Designs from getting permission to

19 use the '589 patent?

20 A    Among other things, that would come from testimony from

21 Mr. Lochtefeld, who is the inventor of the '589 patent.  It

22 would come from testimony from other WhiteWater employees.  It

23 would come from Dr. Stevick.  But it would also come from just

24 marketplace evidence that I have seen regarding the impact that

25 the '589 patent has on the entire sheet wave ride industry.

1    Q     So have you seen and learned about how many sales of these

2    sheet wave rides have occurred during, before, and after the

3    '589?

4    A     I have.

5    Q     And at a high level, before the '589, were more or fewer

6    rides, sheet wave rides, sold as compared to after the '589 was

7    introduced?

8    A     It is my understanding that prior to the invention of the

9    '589 patent, very few of these types of sheet wave rides were

10   actually sold, roughly around 10.

11         But once the '589 patent was invented and began to be

12   implemented, the sales of the sheet wave rides just took off

13   such that, in the next many years, they have sold hundreds of

14   these rides, and all of the rides that have been sold, except

15   for just a very, very small handful, have all used the '589

16   patent.

17   Q     And so what does that tell you in terms of whether this is

18   a technology or design that is desired by customers and

19   therefore people like PSD would want to be able to sell it?

20   A     It tells me that the marketplace -- consumers believed

21   that the rides that have the '589 patented features in them are

22   very valuable, very important.  It is no coincidence that,

23   prior to the invention, there weren't very many of these rides

24   around, and all of a sudden you have the new ride design that

25   was enabled by the '589 patent, and everything just took off.

1  So that tells me, as an economist, that consumers demanded the

2  features that were enabled by the patent.

3  Q    And based on the testimony of what I will call the real

4  experts on the technology, Mr. Lochtefeld and others, could you

5  briefly describe what you understand to be the benefit that the

6  '589 patent technology enables you to put into a ride that

7  customers will want?

8  A    Yes.  One of the benefits is that the '589 patent

9  increased the safety of the ride by preventing riders from

10 colliding into the nozzles that eject the water.

11 Q    Any other benefits that this enables, that you have been

12 made aware of?

13 A    Yes.  The '589 patent also, as I understand it, enables

14 the design of a smaller ride, with a reduced footprint, which

15 has the added benefit of reducing the cost of the ride, the

16 manufacturing cost and the shipping cost of the ride.

17      I also understand that the '589 patent also increases the

18 area of the ride that riders can ride on.

19      And it increases the spectator visibility of riders as

20 they are watching their friends and relatives that are using

21 the ride.

22 Q    And are you aware -- again, though, you are not a

23 technical expert -- that a lot of what this invention is about

24 is a nozzle assembly that has a flexible cover over the

25 nozzles, you know, that will move up and down with the flow of

1  water and let riders ride over it?

2  A    Yes, that's right.

3  Q    And there had been some testimony already that at least

4  some customers don't care specifically about nozzle flaps or at

5  least they don't ask about nozzle flaps, and maybe people

6  aren't promoting nozzle flaps.

7      What, if any, significance does that have?

8  A    I guess I would say two things.  First, I have seen

9  evidence that some customers do care about the nozzle flaps,

10  and the nozzle flaps are important to some customers.

11      But regardless of whether all customers know the details

12  of nozzle flaps, what these customers do know is the benefits

13  that are enabled by the nozzle flaps.  So, as I understand it,

14  the nozzle flaps enable a completely different ride design, a

15  completely different ride functionality and that's ultimately

16  what consumers care about, even if they don't know the details

17  about the nozzle flap.  They care about the design of the ride.

18  Q    They may not necessarily know how that's made to happen?

19  A    Exactly.

20  Q    If we could show Slide 6, please.

21      I think you just mentioned you had seen some written

22  materials, testimony, statements by customers or others in the

23  industry, that indicate that at least some informed consumers

24  and sellers of these products are focused on this '589

25  technology?

1   A     Yes.  I have seen references to the '589 patent, patent

2   features being the breakthrough part of the attraction.  I have

3   seen references to the '589 patent being vital, being critical,

4   being a game changer.  I have seen references to the '589

5   patent being the most important feature at the time that the

6   ride was designed and the reason why -- the way it is what it

7   is today.

8        I have seen references to the fact that the '589 patented

9   feature was what allowed for a complete redesign of the ride

10  itself.  Remember, prior to the invention of the '589 patent,

11  the ride looked completely different than it looked after that,

12  and that ride design is what consumers care about and want.

13  Q     If we could show Slide 7, this is some excerpts from the

14  deposition of Tim Gantz, which the Court and jury will hear

15  perhaps later this afternoon or tomorrow morning.

16       But have you seen and reviewed the deposition testimony of

17  Tim Gantz?

18  A     I have.

19  Q     And based on that, who do you understand Mr. Gantz to be?

20  A     He is one of WhiteWater's customers.  He's actually

21  purchased these types of rides that we are talking about.

22  Q     And the testimony that's displayed here, on Slide 7, is

23  this part of what you were made aware of in terms of what are

24  some of the features of rides that practice this '589 patent

25  technology?

1    A    It was.  And it was relevant to me because what Mr. Gantz

2    is saying here is that he believes that the nozzle flaps are

3    unique.  And the reason he says they are unique is because they

4    are part of the main functions of the ride.  They are what make

5    the ride run properly.  They are what make it a functional

6    attraction.  So the nozzle flap isn't some minor,

7    inconsequential aspect of the ride.  Customers like Mr. Gantz

8    believe that the nozzle flaps are the main function of the

9    ride.  It is what makes the ride run properly, function

10   properly.

11   Q    If we could please display Exhibit 68.

12        Do you recognize Exhibit 68?

13   A    Yes.

14   Q    What is Exhibit 68?

15   A    This is an October 2013 presentation that was prepared by

16   Pacific Surf Designs for potential investors.

17   Q    And so, this date, October 23, 2013, is just a matter of

18   weeks before your hypothetical negotiation that came before the

19   December 18, 2013 first ride sale?

20   A    Yes.  I think this presentation was relevant because of

21   the time frame.  What the two parties expected, what did

22   Pacific Surf Designs expect in 2013?  Well, they would have

23   been negotiating in the months prior to that, so this is the

24   exact time periods when Pacific Surf Designs gave this

25   presentation to potential investors, so it gives us a good

1    sense of what they were thinking at the time.

2    Q    As we will see, there's a number of elements to this,

3    including some projected sales, and so forth.

4         But is this -- based on all the evidence you have seen, is

5    this the one written record closest in time to the date of this

6    hypothetical negotiation that expresses what Pacific Surf

7    Designs' expectations were?

8    A    It does.

9    Q    If we could turn to page 6, please, of Exhibit 68.

10        Is there anything here?  You have already talked about a

11   number of the benefits of the '589 patent technology.  Anything

12   on here that you saw that was consistent with what you were

13   hearing from either other customers or other sources?

14   A    Yes.  This is very consistent with what I saw in

15   WhiteWater's materials, consistent with what we saw from the

16   testimony from Mr. Gantz, the customer.

17        If you look at the very last bullet point, Pacific Surf

18   Designs is identifying what benefits there are in its product,

19   and two of the benefits are smaller footprint and lower

20   construction costs, and both of those things relate to or were

21   enabled by the '589 patent.

22   Q    If you could turn to page 6 of Exhibit 68, please.

23        (Counsel confer.)

24        Oh, it is.  Excuse me.  How about page 10, then.

25        And this is another portion of this same presentation?

1   A     It is.

2   Q     And what is the first reason Pacific Surf Designs is

3   giving as to why they are doing this, why they think they can

4   be successful?

5   A     Well, the first reason is, at the very front, Pacific Surf

6   Designs is saying that it thinks it will be successful if it

7   launches because there are not that many competitors.  There's

8   a lack of options, it says.  Pacific Surf Designs says if it

9   launches into the market, it will be the only viable competitor

10  to the only other company on the market, which is WhiteWater.

11  Q     Or, slash, Wave Loch?

12  A     Yes.

13  Q     You understand that WhiteWater acquired a business of

14  sheet wave rides that had been operated by a company Tom

15  Lochtefeld had called Wave Loch?

16  A     Yes.

17  Q     And just to confuse things more, the name of the product

18  is FlowRider?

19  A     Right.  I am using "WhiteWater" and "Wave Loch"

20  interchangeably in much of this discussion.

21  Q     If you could tell us what other observations you have from

22  this page about the reasons that PSD was thinking it made sense

23  for them to launch this business.

24  A     Pacific Surf Designs is telling potential investors why it

25  thinks it will be successful.  And in the very first bullet,

1   the reason that it's giving for which it will be successful is

2   the market into which it's being launched is a growing market.

3   Pacific Surf Designs estimates growth at 13 percent per year.

4       And second, Pacific Surf Designs says that the market into

5   which it's launching is a very large market.  Pacific Surf

6   Designs estimated that every year, this market generates over

7   $20 million in revenues.  That's a lot of money.

8       Pacific Surf Designs is saying to potential investors, "We

9   think you should invest in us because we are going to be

10  successful going forward.  And one of the reasons we are going

11  to be successful going forward is this is a very large market.

12  There's $20 million a year in play here, and we are going to

13  only be the second player in the market.  We are the first

14  viable alternative to Wave Loch/WhiteWater."  And that, to

15  them, was a very compelling reason for why they should launch

16  into the market.

17  Q    And if we could take a look at page 16 of Exhibit 68, it

18  is from this same document.

19      What is page 16 of Exhibit 68?

20  A    This is a forecast that was prepared by Pacific Surf

21  Designs showing the amount of revenues that it expected to

22  receive going forward.

23  Q    Have you seen any testimony or other indication as to who

24  prepared these forecasts and they were based on?

25  A    Yes.  There was deposition testimony from Mr. Yeh, and

1    Mr. Yeh testified at his deposition that he believed these

2    forecasts were accurate at the time they were prepared.  And he

3    based these forecasts on a financial analysis that he did

4    regarding the overall size of the market, $20 million per year,

5    and what portion of that market he and Pacific Surf Designs

6    believed they could capture.

7    Q    And if you could walk us through this.  So, based on your

8    interpretation of this, is this indicating that in, I guess,

9    one to two years after October 2013, they are forecasting

10   somewhere between 1.6 million and 4.1 million in revenue?

11   A    Yes.  And that would be for a two-year time period.  And,

12   obviously, beyond that two-year time period, they would still

13   generate revenues through selling surfing attractions and

14   maintenance, but there likely would be a growth to that.

15   Earlier in the presentation, they estimated growth at

16   13 percent per year.

17   Q    Is that one to two years -- you interpret this to indicate

18   what the source of that revenue was going to be, those items

19   one and two?

20   A    Yes.  The 1.6 to $4.1 million, I interpret that as being

21   sales of surfing attractions and servicing and maintenance.

22   Q    So, these items here?

23   A    Yes.

24   Q    And what does this forecast indicate in terms of what is

25   being apparently anticipated in years three through five?

1 A    So, in addition to the revenues that are going to continue

2 in years three through five from the selling of surfing

3 attractions and servicing and maintenance, in addition to that,

4 they are going to generate 4 to $8 million a year in licensing

5 and the operation of stand-alone venues.

6 Q    At least, if we were to read this, in addition to the 1.6

7 and the $4.1 million they expect in years one and two, this

8 revenue from licensing and operation of venues is going to

9 generate between 4 and $8 million a year?

10 A    Yes.  I interpret that, just looking at the document, as

11 being additional revenue.  But we have to make sure that we

12 recognize that the 1.6 to 4.1, that doesn't stop in year three.

13 They are continuing to sell surfing attractions and servicing

14 and maintenance.  That continues at some growth going forward.

15 The 4 to 8 would be in addition to that.

16 Q    Do you have any reason to believe, based on your reading

17 of this entire presentation, that they would have expected to

18 sell between 1.6 million and 4.1 million in selling rides and

19 servicing, and that in this market that's increasing 13 percent

20 year over year, they would expect those sales to stop?

21 A    No.

22 Q    And now, this second category, the additional revenue from

23 licensing and operation of venues, why would that be a factor

24 in the hypothetical negotiation?  This is licensing revenue and

25 selling food and beverages at a water park.

1    A    Because these revenues are only possible because you are

2    selling the rides.  You are not going to be able to sell food

3    at a water park if you don't have a ride for people to watch as

4    you are eating.  People are buying the food because they are

5    going for the ride attraction.  All these other things are

6    enabled because they are selling these kinds of products.

7    Q    And then this sort of third bucket that -- you know, years

8    five and beyond, what do you -- based on your reading of this

9    entire presentation, what do you interpret this to be telling

10   you?

11   A    That those would be additional revenues that they expected

12   to make from franchising their business operations.

13   Q    Meaning that they would, based on having developed the

14   rights, sold the rides, developed venues, then trying to

15   franchise the whole package?

16   A    Yes, that's right.

17   Q    To other people who could open a park and buy their rides?

18   A    Yes.

19   Q    And then based on this analysis or forecast that was

20   prepared by Pacific Surf Designs, what were you able to

21   determine in terms of a -- and I recognize it is a range, it is

22   a forecast -- but what the revenue and profits that Pacific

23   Surf Designs would have been forecasting or expecting at the

24   time of this hypothetical negotiation?

25   A    I used the information from these forecasts to determine

 1   what revenues and profits Pacific Surf Designs would have been

 2   expecting over the next six years.

 3   Q    And what did you come up with?

 4   A    I think I have a slide with those numbers, to be exact.

 5   Q    Okay.  If that will help you.  Let's go to Slide A, see if

 6   I can --

 7   A    Yes, that's the one.

 8   Q    These are figures that you drew out of that Exhibit 68, we

 9   were just looking at, the one prepared -- the investor

10   presentation prepared by Pacific Surf Designs?

11   A    Yes.  The numbers in the blue chart show what is implied

12   by the revenue forecasts that were in the investor

13   presentation.  And you can see these revenue forecasts suggest

14   that Pacific Surf Designs expected to generate revenues between

15   27.3 and $53 million, and profits between 7.8 million and

16   $15.1 million over a six-year period.

17   Q    If we could go back to Exhibit 68, page 16, again, please.

18        Now, you understand that there have been some suggestions

19   in the case that you shouldn't add these numbers together; that

20   it -- they are only, for example, projecting 5 million per year

21   total in years five and beyond?

22   A    Yes.

23   Q    And based on -- I believe there's a damages accountant

24   that PSD has engaged who has indicated that's what he was told?

25   A    Yes.  There's some suggestion that the $5 million per year

1   you see in the last column, that that is not just for

2   franchising but that is for franchising as well as selling the

3   surfing attractions and servicing and maintenance and operation

4   of stand-alone venues, and that that's the correct way to

5   interpret that.

6   Q    In the context of the total presentation, saying this a

7   big -- 13 percent, year over year, growing market, just on the

8   rides, does that interpretation make sense to you?

9   A    It doesn't make sense to me because if you just look at

10  the numbers in the presentation, numerous pages identify the

11  substantial growth that they expected.  But in order for that

12  interpretation to make sense, you would have to be assuming

13  that here they are forecasting a decline over time in revenues.

14  And that just doesn't make sense based on looking at the entire

15  document.

16  Q    Meaning, for example, in years three to five, they are

17  estimating 4 million to 8 million per year.  And five years and

18  beyond, they are estimating only 5-million-plus a year?

19  A    Yes.

20  Q    And, that said, if we could go back to slide Number 8, if

21  you were to accept the idea that, no, they didn't intend these

22  numbers to be additive, as the slide said, but those are just

23  the totals for each of those periods, have you at least

24  calculated what the anticipated revenue and profits of PSD

25  would be if you used those lower numbers?

1    A    Yes.  If you used the lower numbers that are implied by

2    the alternative interpretation, I have that in the box at the

3    bottom under "alternative interpretation."

4         What is implied there is, using that interpretation,

5    Pacific Surf Designs would have expected revenues between 18.6

6    and $36.1 million, and profit between 5.2 and $10.1 million.

7         So the revenues and profits are lower, but it ultimately

8    doesn't change the conclusion that either way, standing in

9    December 2013, Pacific Surf Designs expected to generate a lot

10   of revenues and profit from selling these rides.

11   Q    Have you seen some suggestion that somehow, between

12   October 23, 2013, and just a few weeks later, that all these

13   projections that Pacific Surf Designs had done, that things

14   happened that they didn't think they were accurate anymore?

15   A    Yes, I have seen that suggestion.

16   Q    Exactly what is the suggestion that you have seen in that

17   regard?

18   A    The suggestion is that these forecasts were prepared in

19   October, the end of October, 2013.  The suggestion is that

20   between October 2013 and the beginning of December, they lost a

21   sale.  And because they lost a sale, all of a sudden they were

22   much more pessimistic about their financial success in the

23   future.

24   Q    So, at least what has been suggested -- this is from the

25   testimony of PSD's damages expert?

1    A    Yes.

2    Q    That they were very optimistic, expecting millions and

3    millions on October 23, but by the beginning of December, they

4    were pessimists?

5    A    That's what the contention is, yes.

6    Q    If we could scroll back on Exhibit 68 -- I don't remember

7    the exact page, but I am guessing it's before 16.  So if you

8    could take me to page 16 and go backwards.  There we go.

9         Here we are, at page 14 of that same material, prepared by

10   PSD for investors.

11        What does page 14 of Exhibit 68 portray?

12   A    Well, this shows what Pacific Surf Designs' sales pipeline

13   was at the time.  This is one of the things that Mr. Yeh

14   testified that he relied upon in coming up with the forecast.

15        And one of the things that's relevant about this sales

16   pipeline is at the right, the box at the far right, the

17   rectangle says, "Leads to close ratio 50:1."  That tells me

18   that underlying these forecasts is the idea that Pacific Surf

19   Designs was only going to be able to make one of the sales that

20   it -- for which it had a lead, so it was only going to close

21   one out of every 50.

22        So even if, at the end of October, it lost a sale, that

23   was there, baked into the forecast.  It was baked into the

24   forecast that they were going lose 49 out of 50 sales.  It

25   doesn't make sense to me that losing one sale would

1    fundamentally change the forecasts that were prepared just a

2    few weeks earlier.

3    Q    One, or two, or 49?

4    A    Yes.

5    Q    And right before that part that's highlighted, what is a

6    "sales cycle"?  Where it says "sales cycle," six to 24 months?

7    A    That tells you what Pacific Surf Designs thought in terms

8    of how long it was going to take from the time that they first

9    got the lead to the time that they would actually close the

10   sale.  And what Pacific is saying is they think it's going to

11   take anywhere from six months to 24 months.  So it is a

12   relatively long period of time.

13        In my mind, just the two-month period that we were looking

14   at from October, the end of October to the beginning of

15   December, that's just too short of a period of time for

16   anything dramatic -- so dramatic to have happened, to

17   fundamentally change what they were expecting in terms of its

18   future revenues.

19   Q    Again, we don't have anything, at least nothing in

20   writing, in terms of a forecast prepared by PSD that's any

21   closer in time to this early December hypothetical negotiation

22   than this Exhibit 68?

23   A    No, this is the closest that we have.

24   Q    And then have you seen any other evidence, written

25   evidence, from PSD, Pacific Surf Designs, that suggests whether

1    they were or were not still optimistic about their prospects,

2    even after December 2013?

3    A    Yes.  There was another projection, forecast, that Pacific

4    Surf Designs --

5    Q    Slide 9, I think that has it.  And this is an extract from

6    Exhibit 79.

7         What does Slide 9 portray?

8    A    The underlying document is a Pacific Surf Designs business

9    plan that was prepared for investors.  It was prepared in 2016.

10   And what we see in this business plan is that, even as late as

11   2016, Pacific Surf Designs was still projecting it was going to

12   be able to make a significant amount of revenues and profits

13   going forward.  And that's even after the reality that in 2013

14   and 2014 and 2015, their sales didn't materialize as they had

15   hoped.

16        Even though their sales didn't materialize as they had

17   hoped in the early years, they were still quite hopeful, even

18   in 2016, in terms of the revenues and profits that they would

19   be able to generate.

20   Q    If we could display Exhibit 79, the document on which this

21   is based, let's go to the first page -- go back to the first

22   page, if we may, so we can identify it, and blow up, maybe, the

23   top part of it a bit.

24        Is this that 2016 document that was prepared for potential

25   investors by Pacific Surf Designs that you just drew those

1  figures out of?

2  A    Yes, it is.

3  Q    If we could look at the heading down below or scroll down,

4  where they say "target market."  If you could enlarge that

5  whole paragraph.

6       So, they are now talking about what -- 29 sheet wave

7  installations a year, up from 20 in 2014.

8       Is that consistent with the projection that the market is

9  growing?

10  A    Yes.  It says the market is growing, and that's large,

11  that they are saying in just a single year, 29 of these sheet

12  wave rides were sold.  And according to their 2013 investor

13  presentation, there's only two companies that are really able

14  to sell these types of rides, that are viable competitors, and

15  that's just Pacific Surf Designs and WhiteWater.

16  Q    So is this how it turned out in the first few years for

17  Pacific Surf Designs?  Were they as successful as they thought

18  they would be, at least early on in late December 2013 or early

19  December 2013?

20  A    No.  They were not as successful as they anticipated.

21  Q    If we could show Slide 10, please.

22       And what is Slide 10.

23  A    This shows the revenues that Pacific Surf Designs actually

24  earned from selling these types of products.

25  Q    So I -- given that there are sales -- these were four

1    sales they had made as of the time you prepared your report --

2    what weight or consideration did you give to the fact that

3    their actual sales were much lower than their projected sales?

4    A    It is information that I considered in coming up with my

5    opinions, but it was very clear to me that Pacific Surf Designs

6    did not think, standing in 2013, December 2013 -- there's just

7    no way that they thought they were only going to sell four

8    rides.  That's just inconceivable to me when you look at the

9    forecast information and their projecting such big revenues and

10   profits.

11        So, while it is information I considered, I gave it less

12   weight than I gave the forecasts that were prepared within

13   weeks of when the hypothetical negotiation would have occurred.

14   Q    I believe PSD, based on total profits based on these sales

15   and more recent sales that they made, say they have made less

16   than a million dollars.  Why would it be reasonable for them to

17   pay a lump-sum royalty of $2 million that's less -- excuse

18   me -- that's more than their total profit?

19   A    Because the amount that you have to pay for a product is

20   not based on the benefits that you actually received.  It is

21   based on the benefits that you expected to receive, the use you

22   expected to get out of it.  And so the royalties that Pacific

23   Surf Designs should have to pay WhiteWater is based on expected

24   value from the license, not what actually occurred.

25   Q    As a start-up business, before they even had any sales --

1   at the time of the hypothetical negotiation, they were just

2   about to sell their first ride, correct?

3   A    Yes.  That's right.

4   Q    So how could they possibly afford to pay a big lump-sum

5   royalty up front?

6   A    It is not unusual for start-ups to make investments up

7   front before selling the products.  They get investor funds,

8   and we see different presentations they were giving to try to

9   get money from investors, and that is what investors do is to

10  invest money in the start-up.  They did have access to that

11  type of money.

12       There's also testimony from Mr. Yeh that he and Pacific

13  Surf Designs had access to an almost unlimited line of credit

14  from his family's venture capital fund.

15  Q    If we could go to Slide 11.

16       We talked about your first factor.  Let's talk about your

17  second factor, which is Whitewater's expected losses.  Why did

18  you consider that?

19  A    Because WhiteWater would have wanted to be compensated for

20  any losses that it incurred as a result of granting the license

21  to Pacific Surf Designs.  They wouldn't want to be worse off as

22  a result of giving a license to Pacific Surf Designs.

23  Q    Show Slide 12.

24       What would be the loss WhiteWater would get for giving a

25  license to PSD?

1    A     WhiteWater would have expected to lose sales and royalties

2    on sales that were made by Pacific Surf Designs that otherwise

3    would have been made by WhiteWater or one of WhiteWater's

4    subsidiaries.  It also would have expected to have to reduce

5    its price and grant other concessions to customers in order to

6    compete with Pacific Surf Designs.

7    Q    Why would WhiteWater expect sales that PSD would make

8    would be at the expense of WhiteWater or its licensee, ADG?

9    A    Because WhiteWater was really Pacific Surf Designs' only

10   real competitor in the marketplace.

11   Q    I recall, in that Exhibit 68, did Pacific Surf Designs

12   identify -- well, Wave Loch as the only direct competitor they

13   had?

14   A    Yes.  There are lots of documents where Pacific Surf

15   Designs is saying that the only competitor, the only real

16   competitor it has in the marketplace is Wave Loch/WhiteWater.

17   Q    If we could show Slide 13, please.

18        Is this examples of materials from PSD that is referenced

19   in various exhibits, some of which have been shown that

20   indicates, at least from PSD's point of view, all the sales

21   they are going to get, they are going to get them from

22   WhiteWater or FlowRider?

23   A    Yes.  We see in the first example, Pacific Surf Designs

24   says that there's only one company, FlowRider, that has

25   97 percent of the market.  FlowRider is the name of the product

1   sold by WhiteWater and Wave Loch.

2       In the second example, Pacific Surf Designs says there's

3   only one single dominant competitor, and that's WhiteWater.

4       In the third example, Pacific Surf Designs says that the

5   FlowRider product sold by WhiteWater is its only competitor and

6   that "They are who we are taking market share from."

7       So, Pacific Surf Designs itself is identifying that it's

8   taking share from WhiteWater.  It doesn't say, "We are taking

9   share from WhiteWater and these other competitors."

10       It's saying, "There's only one competitor that we have.

11   It's WhiteWater.  And that is who we are taking share from."

12       The last example, Pacific Surf Designs is saying customers

13   who want a premium product only have two choices.  It is just

14   Pacific Surf Designs or the FlowRider product, sold by

15   WhiteWater.

16   Q   When you go to Slide 14, how does that fit into your

17   valuation of what WhiteWater might have expected to lose if

18   they granted this hypothetical license to PSD?

19   A   This calculates what loss, what lost profits WhiteWater

20   would have expected if you only focus on the four sales that

21   Pacific Surf Designs actually made made.  So it is only looking

22   at the sales they actually made, not the sales they expected to

23   make.  So it gives you a floor for what losses they would have

24   expected, just looking at four sales.

25   Q   So if they had made a whole bunch more sales, the losses

1    WhiteWater expected would have been higher?

2    A    Yes.  Standing in 2013, again, there is just no way that

3    Pacific Surf Designs or WhiteWater would have expected them to

4    only make four sales in six years.  So, in 2013, they would

5    have expected a lot more losses than this, because this is just

6    assuming that they only make four sales.  But in 2013, based on

7    the forecast at that time, they were expecting a whole lot more

8    than four sales.

9        We saw one presentation, there were 29 rides sold in a

10   given year, one single year.  So there's no way -- you multiply

11   29 times six, that is a lot of rides.  There's no way that the

12   parties would have expected just four rides.

13   Q    When you look at Slide 15 as an example for just one of

14   the sales, is this the methodology you used to figure out what

15   WhiteWater's anticipated losses would have been on all four of

16   those sales?

17   A    It is.

18   Q    Walk us through this, briefly, if you would.

19   A    For each of the sales, I first looked at which entity

20   would have made the sale had Pacific Surf Designs not been on

21   the market.  So in this case, I determined that Pacific Surf

22   Designs sold a product to HMH Aquatic.  On December 18, 2013,

23   they sold a ProFlow Double.  Had Pacific Surf Designs not been

24   on the market, the entity that would have sold the product

25   would have been FlowRider, Inc., which is sublicensee of

1   WhiteWater.

2       I determined that the price that the customer would have

3   paid for this product was $825,000.  That price is the price

4   after discounts that real customers, actual customers, paid for

5   this same product during that time period.

6       I then determined what losses WhiteWater would have

7   expected from that.  Well, if FlowRider, Inc., its sublicensee

8   had made that sale, FlowRider, Inc., would have had to pay

9   royalties to WhiteWater.  And after WhiteWater netted out the

10  royalties it had to give to Wave Loch and Surf Park, the prior

11  owners of the patent, who get 10 percent of the purchase price

12  as a royalty.  If you take 10 percent of $825,000, it gives you

13  82,500.  That's what they would have expected if you just look

14  at this one sale.

15      If you look at all four sales, the total loss that they

16  would have expected would have been about $1.3 million.

17  Q   Why did you use the price that you say FlowRider or

18  WhiteWater would have expected to sell the ride for as opposed

19  to what PSD actually sold it for?

20  A   Pacific Surf Designs basically gave the product away at

21  its own costs in order to gain traction in the marketplace.

22  And WhiteWater wouldn't have needed to do that because they

23  were already an established player.

24      So, a better proxy for what consumers would have been

25  willing to pay for this product is what price did actual

1    consumers really pay for this product in the real world at the

2    same time period.  That's what I did, I looked at the sales

3    made at the same time period, recognizing there were discounts.

4    So I took the price after discounts, and the price after

5    discounts for that very product was $825,000.  So lots of

6    customers thought that was a fair price for that product.

7    Q    You are not using WhiteWater or FlowRider's list price to

8    figure out what they would have expected to get if they had

9    made this sale?

10   A    No.  I am using the price that customers actually had to

11   pay, which reflect some credit and different discounts that

12   might have been given.

13   Q    Were there any other losses or examples of losses that you

14   considered that WhiteWater would have expected to incur at the

15   time of this hypothetical negotiation?

16   A    Yes.  I think it makes sense that WhiteWater would have

17   expected to have to lower price and grant other concessions to

18   its own customers in order to compete with Pacific Surf

19   Designs.  Prior to Pacific Surf Designs getting on the market,

20   they were the only product that was being sold, effectively.

21        So, now, all of a sudden, you have a new player on the

22   market that's selling a very similar product.  Pacific Surf

23   Designs characterized its products as being knockoffs of

24   WhiteWater's product.  You have a very similar product being

25   sold.  It only makes sense, as an economic matter, WhiteWater

1    would have had to grant price and other concessions.  And we do

2    see some evidence that actually happened.

3    Q    We have also heard evidence that WhiteWater had price

4    pressure just from customers before.  And am I correct you

5    found evidence that they did discount their prices even before

6    PSD came into the picture?

7    A    Yes.  So the relevant price concessions that would be

8    relevant for damages would be any price pressure that was

9    specifically caused by having to compete with Pacific Surf

10   Designs.

11   Q    If we could show Slide 16.

12       We have heard about what is called a Sick-X project

13   involving two Finnish people, whose names some people are

14   having trouble pronouncing.  But is that what that slide

15   concerns, a number of sales, both actual and anticipated,

16   starting with a project in Thailand, with these two Finnish

17   fellows?

18   A    Yes.  According to Mr. Thatcher, who was the vice

19   president at WhiteWater, as a result of having to compete with

20   Pacific Surf Designs, WhiteWater had to significantly reduce

21   its price on products sold to Sick-X and had to extend the

22   payment terms over a four-year period, both of those things

23   being tied directly to competition with Pacific Surf Designs.

24   Q    We have heard testimony from Mr. Thatcher that they

25   lowered their price to meet competition, and they -- are you

1    also aware, we have heard it that the buyer also insisted --

2    requested they make an investment into the Sick-X project?

3    A    Yes.  I think it was not WhiteWater's preference to make

4    an investment in Sick-X.  That's not their business.  Their

5    business is to sell rides.  But in order to get the sale, it

6    agreed to that and these other concessions.

7         There's lots of documents that we see where Pacific Surf

8    Designs is corresponding with Sick-X, and Pacific Surf Designs

9    is telling Sick-X, "If you give us the sale, we will give it to

10   you at cost."

11        So Sick-X is then going to WhiteWater, saying, "Well, I

12   can buy a similar product from Pacific Surf Designs, and they

13   are going to give it to me at cost, so what can you do for me?"

14        It makes sense that there would have to be some

15   concessions in order for Sick-X to give the sale to WhiteWater.

16   Q    Look at Slide 17, please.

17        It looks like this is a -- why do you have all these

18   variables of one ride or ten rides?  What is that about?

19   A    Because Sick-X envisioned at the time that they were going

20   to buy up to ten rides from WhiteWater, and so I have

21   calculated what would the expected losses be from just one

22   ride, and then you have expected losses from having to reduce

23   the price of roughly $157,000 per ride, and 70,000 from the

24   payment extension.

25        Total, their expected losses on each ride were about

1   $227,000.  But in granting those concessions, WhiteWater was

2   expecting to lose that for not just one ride but multiple

3   rides.  So, given what the losses would be under different

4   assumptions for how many rides WhiteWater would have actually

5   expected to have to provide to Sick-X.

6   Q    So, if we could go to Slide 18, does this summarize what

7   we just went through, meaning a range of expected losses on

8   just the four rides that PSD sold, and up to ten rides that

9   WhiteWater hoped to sell to Sick-X?

10  A    Yes.  If you just look at the four rides they actually

11  sold, not the ones they expected to sell, the expected losses

12  are about 1.3 million.

13       If you only look at the one customer that we have access

14  to here, the Sick-X product, we see the expected losses are

15  between 227,000 and 2.3 million.

16       So, in total, WhiteWater would have expected losses

17  between 1.3 and $3.6 million as a result of granting the

18  license to Pacific Surf Designs.

19  Q    Now, in December of 2013, am I correct neither WhiteWater

20  nor PSD knew about any of the sales, did they?

21  A    No, they did not.

22  Q    Except the first one they made, the one they were making

23  in December, they would have known about that one?

24  A    The HMH Aquatic, yes.

25  Q    But that's the one for --

```
1   A     82,500, that's HMH Aquatic.
2   Q     Other than that, they didn't know about these other sales
3   listed here, did they?
4   A     No, they didn't know about those sales.
5         What we are doing here is we are just saying what would
6   they have expected?  What would the magnitude of these losses
7   have been?
8         This just gives you an example of, if you only look at
9   four sales, on average, what type of losses are you talking
10  about?  Millions of dollars?  Hundreds of thousands of dollars?
11  What is the relative magnitude you are talking?
12        They clearly would have expected to lose sales.  And we
13  are saying, just on the four, what would they have expected?
14        And similarly, they didn't know about the Sick-X project,
15  but they knew they were going to have to lower their prices on
16  other projects like this.  So this just gives you a sense of
17  the magnitude of the kinds of losses that they would have been
18  expecting at that time.
19  Q     And, again, I take it, in December 2013, neither party
20  knew for sure what sales would be made, what sales would be
21  lost?
22  A     That's right.  They did not.
23  Q     Are you just using that as a metric to say we know they
24  would have -- PSD expected to make some sales; WhiteWater
25  expected to lose some sales; and this is just, what?  A
```

1    reference point, or what that might have been?

2    A    It is a benchmark for the magnitude of losses they would

3    have expected on rides like this.  Did they know about

4    HMH Aquatic?  Or take the second customer, Fourain.  Did they

5    know about Fourain in particular?  No, they didn't know it in

6    December 2013, but they knew that there was going to be a lost

7    ride like Fourain.

8         So we don't know which ride that would be, but just saying

9    let's take that ride as an example.  What would they lose just

10   on that ride?  What would they expect to lose?  And that's what

11   we are doing, just using those as benchmarks for what is

12   reasonable to assume in terms of their expected losses.

13   Q    So, if PSD's projections, forecast they made, had come to

14   pass, would there have been more lost sales or less lost sales?

15   A    There would have been a lot more because, again, there's

16   just no way that, in 2013, the end of 2013, that Pacific Surf

17   Designs was going to launch a new business thinking that, over

18   six years, it was going to sell four products.  They clearly

19   were much more optimistic at the time of the hypothetical

20   negotiation than that.

21   Q    Go to Slide 20.  This is other licenses -- excuse me.

22   Let's go to Slide 21.

23        Did you look at a series of licenses to help inform your

24   analysis?

25   A    I did.  I looked at other license agreements that involved

 1   the '589 patent, that involved a payment of royalties in

 2   exchange for rights to that patent.

 3   Q    And did not each of these licenses include more than just

 4   the '589 patent?

 5   A    They did.  They included other patents as well as

 6   know-how.

 7   Q    Were you able to find a license that just included the

 8   '589 patent?

 9   A    No, there were no licenses that were entered into that

10   only involved the '589 patent.

11   Q    Were these the closest you could get to that?

12   A    Yes, that's right.

13   Q    But all of them included the '589 patent?

14   A    They did.  They all included the '589 patent plus other

15   patents, and know-how.

16   Q    And the Court and jury have heard about a number of these.

17   The first is between Wave Loch and the company ADG.  Let me

18   back up.

19        Did each of these licenses -- did they include any kind of

20   minimum sale, minimum royalty, lump sum, anything like that?

21   A    Yes.  The way the royalties in these agreements worked is

22   that the licensee agreed -- there's two parts to the royalty.

23   The first part was the licensee agreed to pay a percentage of

24   the price of every ride it sold as a royalty to the licensor.

25   So if the licensee sold a product for a million dollars, they

1    would have to pay 20 percent of that as royalty.

2         The second part of the royalty in these licenses required

3    the licensee to pay a minimum amount of royalties every year to

4    the licensor, regardless of how many royalties -- how many

5    rides were sold or how much revenues were generated.

6    Q    So, did every one of these license -- did any one of these

7    licenses involve a fully-paid-up, lump-sum royalty up front?

8    A    No.  These involved kind of a combination of running

9    royalty, you pay a percentage of the price of the product every

10   year, every sale, and a -- like a lump-sum payment.  It is a

11   guarantee, a guaranteed royalty.

12        The licensor says to the licensee, "You have to pay

13   royalties" -- at least in the first three instances, "You have

14   to pay royalties as if you sold three rides, five or six rides

15   every year.  If you have sold no rides in a year, you still

16   have to pay royalty as if you sold five or six."

17        In the last three agreements, the licensor tells the

18   licensee, "You have to pay me minimum royalties of between

19   $120,000 per year and $600,000 per year regardless of how much

20   revenue you actually receive."

21        There's a guaranteed component in all of these.  So you

22   have a running royalty component and a guaranteed lump-sum

23   component in all of them.

24   Q    Why would PSD have agreed to pay a lump sum, $2 million,

25   all up front?

1    A    Pacific Surf Designs would never have agreed to pay a

2    running royalty rate; in other words, the type where you pay a

3    percentage of the price of every product.  Pacific Surf Designs

4    would never have agreed to that because it would have hurt it

5    in its ability to competitively bid against WhiteWater.

6         Mr. Alleshouse testified that if WhiteWater or any other

7    competitor asked it for its pricing information, they would say

8    no.

9         The way the running royalty agreements work is you have to

10   tell the licensor information about every sale.  "I sold a

11   product to this customer at this price."

12        Pacific Surf Designs -- Mr. Alleshouse said they would

13   never do that because they wouldn't want to give the price

14   information to WhiteWater.  Because they would never agree to

15   that kind of royalty, the most appropriate royalty to think

16   about is a lump-sum royalty because that would not require

17   Pacific Surf Designs to have to give that confidential pricing

18   information to WhiteWater.

19   Q    And why would WhiteWater be insistent on that sort of a

20   royalty arrangement, a guaranteed royalty?

21   A    In this case, WhiteWater would have insisted on it because

22   Pacific Surf Designs was the new company.  They didn't have a

23   track record of paying royalties.  So WhiteWater would have

24   wanted some guarantee up front.  It would not have wanted to

25   bear that risk.

```
 1          Plus, in this case, every licensee, all six of them, they

 2    all had to pay these minimum royalties.  They all had to pay

 3    this type of royalty.  It would only make sense that Pacific

 4    Surf Designs would also to have pay that kind of royalty.

 5    Q    Is it your understanding that, with perhaps some overlap,

 6    that all the licensees on these other royalty arrangements

 7    involving either a Wave Loch or Lochtefeld entity or a

 8    WhiteWater entity, that they generally were not actually

 9    competing with each other?

10    A    Yes.  Generally, that's true.  There were different

11    territories that were involved.  So the licensor and licensee

12    in those agreements, they didn't view themselves as competitors

13    in the same way WhiteWater and Pacific Surf Designs would have.

14    They didn't mind exchanging the confidential pricing

15    information because they weren't bidding against each other.

16    Q    Look at Slide 22, please.

17          In each of these licenses, did you attempt to, sort of, in

18    your analysis, in coming up with the figures that you did, try

19    to assess the differences and similarities between each of the

20    licenses that you were looking at and the hypothetical license

21    that you have here?

22    A    Yes.  There were lots of similarities of these licenses

23    with the hypothetical license, but there were differences as

24    well, so it was important for me to account for those

25    differences and make any adjustments that are appropriate in
```

1   light of any difference that existed.  And these are some of

2   the differences that I looked at and accounted for.

3   Q    If we could go to Slide 23.

4        I asked you earlier, our hypothetical license is one

5   patent; these licenses, I take it, have a range of patents.

6   Why wouldn't that have a big impact on the amount that would

7   have to be paid in a case like ours?

8   A    Because the minimum royalties that were required in these

9   licenses didn't depend on the number of patents that were

10  licensed.  You can see that by looking at the table.

11       The first agreement, the September 2003 agreement, there

12  were 23 licensed patents.  Over time, these patents began to

13  expire, such that, by the last license, the November 2011

14  license, there were only six patents.

15       But over that time period, as the number of patents

16  decreased, the minimum royalty did not decrease.  In fact, the

17  minimum royalties were greatest at a time when you had the

18  fewest number of licensed patents.

19       So if you look at these agreements, the minimum royalties

20  that had to be paid by the licensee did not depend on how many

21  patents were actually being licensed.

22  Q    Are all patents created equal?

23  A    No.  Some are more valuable than others.

24  Q    And we heard testimony earlier today from Geoff Chutter,

25  the chief executive officer of WhiteWater, that at least he saw

1    two of the patents he was getting from Mr. Lochtefeld's

2    organization as sort of the basis for these sheet wave

3    products, and the '589 was one of them.

4         Assuming for the moment that is true, because I know you

5    are not the inventor or technology expert, what impact would

6    that have on the willingness of the parties in this

7    hypothetical negotiation to pay a lot or demand a lot for that

8    license for that patent?

9    A    The more valuable the patent is, the more that the patent

10   is needed in the marketplace, the more that the licensee -- in

11   this case, Pacific Surf Designs -- would have been willing to

12   pay for the product.

13        But, that notwithstanding, regardless of which patent was

14   licensed, even if the only patent they needed was the '589

15   patent, the minimum royalty under these agreements would still

16   be the same.

17   Q    So, if you needed this patent to build that ride, is that

18   what would drive the royalty?

19   A    Yes.

20   Q    If you could look at page 24 -- Slide 24, rather.

21        Is this the sort of summation of your conclusion on what

22   this factor, these licenses, mean in your calculation of a

23   reasonable royalty?

24   A    It is.  What I have done here is I have taken the minimum

25   royalty that was required in the November 2011 WhiteWater-ADG

1    license, and that minimum was $600,000 a year.  And I made an

2    adjustment to that royalty to account for the fact that that

3    license also had know-how attached to it, and these licenses

4    said that half the royalties were for patents and half was for

5    know-how.  So I took out $300,000 of that.  And that gave us

6    $300,000 per year in minimum royalties.

7        I then multiplied that $300,000 per year by the number of

8    years in the damages period, in this case, which is six, and

9    that gets us $1.8 million.

10       So, based on these licenses, that tells me that WhiteWater

11   and Pacific Surf Designs would have agreed to minimum royalties

12   of 300,000 per year, which equate to about $1.8 million in

13   total over the six-year period.

14   Q    Just by comparison, from that whole period that ADG –– if

15   you remember them; licensed initially from Wave Loch, then from

16   WhiteWater –– from 2003 to 2016, how much did they pay in

17   royalties for their license for the package that included the

18   '589 patent?

19   A    They paid over $53 million.  It equates to about

20   $4 million per year.

21       Here, I am saying that WhiteWater and Pacific Surf Designs

22   would have agreed to roughly $300,000 per year.

23   Q    Much less?

24   A    Much less than what another party actually paid.

25   Q    But again, in fairness, it included some other elements to

1  it?

2  A    Yes.

3  Q    And then, if we could, go to Slide 26, what you referred

4  to as the *Georgia-Pacific* factors.  I see they are listed here.

5       Are these just a series of, I guess, 15 things that you

6  are supposed to take into account in trying to evaluate how

7  this hypothetical license compares to what you have seen in the

8  other licenses that you have been able to evaluate?

9  A    Yes, they are.  These are just 15 factors that may have

10  some relevance to what the parties would have considered a

11  reasonable royalty to be.  Most of these factors overlap with

12  things that we have already talked about today.  They are not

13  additive.

14  Q    And fair to say, you didn't find a single license that was

15  exactly -- really close to what we were looking -- what we were

16  having as our hypothetical license?

17  A    There was no license that was identical, so you had to

18  make some adjustments to it.

19  Q    These were the best you could find?

20  A    Yes.

21  Q    And as far as you know, the best that either side could

22  find?

23  A    Yes.

24  Q    If you could go to Slide 27, please.

25       Is this now pulling it all together, factor one, factor

1   two, factor three, plus factor four, in terms of how you

2   arrived at a final conclusion?

3   A     Yes.  The first factor was, again, Pacific Surf Designs'

4   expected benefits from the license.  And we saw evidence that

5   it expected revenue upwards of $53 million and profits upwards

6   of $15.1 million for the six-year period.

7       And the second factor was WhiteWater's expected losses.

8   What would it lose by granting the license?  And we saw

9   losses -- potential losses between 1.6 and $3.6 million.

10      The third factor is the comparable patent license

11  agreements.  If you look at the minimum royalty clauses in

12  those agreements, which would have been binding, they suggest a

13  royalty of $1.8 million.

14      So if you put those together and weigh it, I determined a

15  fair royalty would be $2 million, to take into account the fact

16  the, yes, the '589 patent is valuable and critical, but it is

17  not the only thing that's important in the accused products.

18  There's other technology that goes into them as well.

19      So I think taking an amount that's towards the middle of

20  the different benchmarks is appropriate.

21          MR. O'HARE:  Okay.  Thank you.

22      Counsel may inquire.

23          THE COURT:  All right.  Go ahead.

24          MR. THOMAS:  Thank you, Your Honor.

25

```
 1                        CROSS-EXAMINATION

 2   BY MR. THOMAS:

 3   Q    Good afternoon, Dr. Stevick.

 4             MR. O'HARE:  I think you mean Vigil?

 5   BY MR. THOMAS:

 6   Q    Good afternoon, Dr. Vigil.

 7        We had two doctors today and it is late in the day.

 8   Excuse me.

 9        I will introduce myself.  I am Joe Thomas, counsel for

10   PSD.  And welcome to our courtroom.

11   A    Thank you.

12   Q    You are hired as an expert in this case, correct?

13   A    Yes.

14   Q    What are -- how do you charge, by the hour?

15   A    I do.

16   Q    What is your hourly rate?

17   A    $635 per hour.

18   Q    And how many hours have you worked on this project from

19   the time you were first engaged to today?

20   A    I don't know the exact number, but it would be over 100

21   hours.

22   Q    Over 100 hours?

23   A    Yes.

24   Q    Would it be over 200 hours?

25   A    It likely would be between 100 and 200.  I don't have a
```

1    specific number.

2    Q    So, if we took a mid-range, 150, and we multiplied that by

3    the hourly rate, that's approximately how much you charged for

4    your testimony here today?

5    A    That's what our firm has charged and collected, not

6    myself, per se.

7    Q    The company you work for.

8         Are you an equity owner in that company?

9    A    Yes.

10   Q    You are an owner of the company that's receiving the

11   revenue?

12   A    Yes.

13   Q    Have you worked for WhiteWater before?

14   A    Yes.

15   Q    How many times?

16   A    One other time.

17   Q    Was that a patent infringement case?

18   A    No.  That was a breach of contract case.

19   Q    How long ago was that?

20   A    The trial for that case, I believe, was earlier this year,

21   and I think my work on that case spanned the prior year or two.

22   Q    So you were first engaged on this breach of contract case

23   and engaged on this patent infringement case; is that fair to

24   state?

25   A    No, I believe that the patent infringement case was first

1  and then the breach of contract case.  But the work on both

2  cases overlapped in terms of the time period when I was working

3  on it.

4  Q    And was your hourly rate the same for the breach of

5  contract case that you charged WhiteWater?

6  A    Yes.

7  Q    And how many hours did you charge for your work on the

8  breach of contract case?

9  A    I don't remember the exact number, but my guess is it's

10  less than -- my work on that case was probably less than my

11  work on the patent infringement case, but -- probably more than

12  100 hours but less than 200 hours.

13  Q    More than 100 hours and less than 200 hours on the

14  contract case, and roughly 150 hours on this case, correct?

15  A    Approximately.

16  Q    So, WhiteWater is one of your bigger clients in terms of

17  fees in the last several years; is that fair to say?

18  A    Actually, it is not, no.  These are relatively smaller

19  cases compared to the ones that I have typically worked on.

20  Q    Okay.  Have you testified as an expert in a patent

21  infringement case prior to today?

22  A    Yes.

23  Q    And are you familiar with the damage rules for patent

24  infringement cases?

25  A    I am not a lawyer, but I have worked in this area, so I am

1    generally familiar with the legal requirements.

2    Q    Okay.  And there are lots of ways you can measure a

3    royalty; isn't that correct, Dr. Vigil?

4    A    Yes, that's correct.

5    Q    And you chose one method, which is this paid-up license,

6    lump-sum payment, for $2 million.  You think that's the

7    fairest, most reasonable approach; is that your testimony?

8    A    My testimony is that it's the appropriate -- it is an

9    appropriate way to view what a fair royalty would be in light

10   of the fact that other methods of running royalty, for example,

11   were not possible, given Mr. Alleshouse's testimony that he

12   just wouldn't agree to one of the other methods.

13   Q    Okay.  So you are saying you limited this only because of

14   what Mr. Alleshouse said, "I would not want to give my

15   financial information over to my biggest competitor, who is

16   trying to put me out of business," so you relied on that to

17   say, "I am not going to go with a running royalty rate"?

18   A    No.  I think even if you had gone with a running royalty

19   rate but based that running royalty rate on the expected

20   revenues and profits that they would have anticipated, I think

21   the number would be very similar.

22   Q    Well, if you did running royalty rate on actual sales, it

23   would be much lower, wouldn't it?

24   A    It would be lower, but, again, the hypothetical

25   negotiation is based on what they would have expected at the

1    time that they were doing the negotiating.

2    Q    And this royalty that you have come up with, this

3    $2 million royalty payment, based on your vision of this

4    hypothetical negotiation, that would be a nonexclusive license,

5    wouldn't it?

6    A    Yes.  There were other parties that were able to use the

7    technology.

8    Q    I just want to set this in the context of common sense.

9    What you are saying is my client, in a start-up business, where

10   cash is near and dear, as you well know, would have gone

11   through all of its resources to pay $2 million for the

12   privilege of competing against the behemoth in the industry and

13   allow them to continue to sell into the marketplace at the same

14   time; is that correct?

15   A    It is.  Because if you look at the presentation we looked

16   at, WhiteWater [sic] was optimistic.  They said it was a

17   $20-million-a-year business; they were the only viable

18   competitor at the time.  So the $2 million in light of the

19   revenue they were projecting is relatively small.  So I think

20   they would have.

21   Q    I understand what you think.  I am just trying to put it

22   in context, for the Court and jury, what you are saying.

23        You are saying you think, in this hypothetical world, a

24   start-up company would access, through credit or other ways of

25   getting access to $2 million worth of money, for the privilege

1   of continuing to compete against its biggest competitor.  Am I

2   accurate?

3   A    Yes, that's accurate.

4   Q    Have you ever seen that done before in the real world?

5   A    I think it's done all the time where you have start-ups

6   that have pretty high expectations of success going forward

7   that make very sizeable investments in business.  And sometimes

8   those investments pan out and sometimes they don't.  But people

9   make big investments in businesses on their expectations all

10  the time.

11  Q    Well, Dr. Vigil, you know the difference between an

12  exclusive license and a non-exclusive license, do you not?

13  A    Yes.  The agreement that I used for my reasonable royalty

14  was a non-exclusive agreement.  That was the WhiteWater-ADG

15  agreement.

16  Q    Based on your expertise and knowledge and experience in

17  licensing and looking at other licenses, you know, typically, a

18  non-exclusive license is more valuable to the licensee -- I am

19  sorry -- an exclusive license is more valuable to the licensee

20  than a non-exclusive license.  Wouldn't you agree with that?

21  A    I would say, as a general matter, that is true.  But it is

22  not always true.

23       In this case, the agreement that has the highest minimum

24  royalties of the six we looked at, was a non-exclusive

25  agreement between WhiteWater and ADG.  And that had the highest

1    minimum royalties, $600,000 per year, compared to another

2    agreement that had exclusive rights, the minimums were lower.

3        So you can't necessarily conclude that.  Generally, I

4    agree with what you are saying, but it kind of depends on the

5    situation.

6    Q    Right.  Right.

7        Now, you are not giving any opinions here today on the

8    validity of the '589 patent, are you?

9    A    No.  I am not.

10   Q    And your opinions all assume, for purposes of your

11   testimony, that PSD's accused product all infringed the '589

12   patent?

13   A    I am sorry.  Say that again?

14   Q    Your opinion testimony that you have given here today all

15   assumes that my client's accused products have infringed the

16   '589 patent; isn't that correct?

17   A    Yes, that's right.

18   Q    Okay.  Now, let's call up Exhibit 1, which I think is the

19   patent.

20       You looked at that patent, did you not?

21   A    I did.

22   Q    If we could scroll down.  Up a little higher.  The title

23   of the patent.

24       Mobile water ride having a sluice slide-over cover.  You

25   read that, did you not?

1    A    I did.

2    Q    You understood this patent really covered an element of

3    the water ride attractions that were being sold by WhiteWater?

4    A    I am not sure I completely understand the question.  If

5    you are asking if there are other aspects to these rides

6    besides the '589 patent, yes, I believe that's correct.

7    Q    In fact, did you look at what we refer to as the '530

8    patent?

9    A    Yes.

10   Q    And can you tell the jury what that patent is for?

11   A    My recollection is that that had to do with the tension

12   surface of the ride itself.

13   Q    Right.  And in fact, all of the matting on the entirety of

14   the ride, they use this -- what they call a trampoline,

15   tension-mounted surface.  Do you understand that?

16   A    Generally.

17   Q    And you also understand that the FlowRiders that are being

18   sold by WhiteWater are covered by two patents, covered by the

19   '530 patent, which deals with all of this tension-mounted

20   padding, which is a big safety feature and marketed as such by

21   WhiteWater, and then also this nozzle sluice patent, which is

22   the '589 patent, correct?

23   A    My understanding is that the FlowRider products do use

24   these patents.

25   Q    And you also understand that the '530 patent is not a

```
 1   patent-in-suit; in other words, my client has not been accused
 2   of infringing that patent?
 3   A     That's right.  I think Pacific Surf Designs, in its
 4   correspondence with the customers, says it believes that that
 5   patent or that patented feature is not good and kind of tells
 6   customers it is not something that they would want in their
 7   products.
 8   Q    Are you aware that the marketing materials that have been
 9   assembled by WhiteWater continuously, up through the start of
10   this lawsuit, and even to some extent afterward, really only
11   marketed to the clients the benefits of this trampoline-style
12   matting and safety features; they never specifically marketed
13   this nozzle sluice cover?
14   A     No, I don't think that's correct.
15   Q     You don't think that's correct?
16   A     I know that is not correct.  There are lots of marketing
17   materials from WhiteWater where they explicitly reference the
18   nozzle flap.  And even in ones where they don't mention the
19   nozzle flap, they mention the attributes of the ride that were
20   enabled by the nozzle flap.
21        But it's definitely something that is talked about.
22   Customers talk about it.  It is the thing that makes the ride
23   functional.
24   Q    You use this fancy word "enabled" by.  You use it to
25   describe, "The '589 patent enabled everything that follows it."
```

1    But, in fact, this '530 patent enables a big, big feature on

2    the WhiteWater FlowRider, does it not?

3    A    It enables a feature, and I believe WhiteWater believes it

4    is an attractive feature of its rides.  But you don't need that

5    feature to sell the product in the marketplace.

6         Pacific Surf Designs didn't use that feature in its

7    products.  It has some other surface in its rides that it

8    sells, but it used the '589 patent.

9         Just based on the fact it's using the '589 and not the

10    '530 tells me Pacific Surf Designs thinks the '589 is likely

11    more valuable.

12   Q    Well, do you understand that the marketing materials from

13    WhiteWater market specifically and significantly the safety and

14    the benefits of this trampoline-style matting, that is covered

15    by the '530 patent?

16   A    Yes, they also market the advantages of that patent.

17   Q    Are you aware that my client -- I think you indicated, in

18    response to questions from Mr. O'Hare, that you looked at some

19    deposition transcripts; is that correct?

20   A    Yes.

21   Q    Are you familiar with the deposition testimony provided by

22    Mr. Yeh and Mr. Alleshouse?

23   A    Yes.  I reviewed a number of deposition transcripts from

24    them.

25   Q    And you are aware, then, that my clients' deposition

1    testimony has been that no customers of PSD have even asked

2    about nozzle covers?  Are you aware of that?

3    A    Yes, I am aware that's what they said.

4    Q    And they have testified the nozzle flaps are not driving

5    the customer's decision; that it's price that's driving the

6    customers' decisions?

7    A    What is relevant is not, as an economic matter, whether

8    customers know about the nozzle flap, per se, but do they know

9    about what the nozzle flap does?  In other words, the rides

10   before you had the nozzle flap looked completely different.

11   They didn't sell in the marketplace.

12        Once you had the nozzle flap, you were able to have a

13   smaller ride, and those are the rides that sold.

14        They clearly were aware of the design of the ride itself,

15   which was not possible without the '589 patent.

16        So that's -- in my mind, as an economic matter, that is

17   relevant.

18   Q    Okay.  We talked earlier about these rules.  You have

19   testified in federal court as an expert on patent infringement

20   and damages.  Are you familiar with the rule of the smallest

21   saleable component, where you measure royalties against a

22   device that includes lots of features, like this wave ride

23   machine, you look at the smallest saleable component?  Are you

24   familiar with that rule?

25   A    Yes.

```
 1   Q    As it relates to the '589 patent and the FlowRider
 2   machine, you would agree, would you not, that the nozzle flap
 3   would be considered the smallest saleable component?
 4   A    No.  I think that the smallest saleable component would be
 5   the ride itself if the jury finds that claims that cover not
 6   just the nozzle cover but the ride as well are valid and
 7   infringed.  In that case, the entire ride would be the smallest
 8   saleable unit.
 9   Q    You understand my client is the not being accused of
10   infringing on the trampoline matting; they are only being
11   accused of infringing on the padded nozzle cover?  Do you
12   understand that?
13   A    Yes.  But the patent isn't just on the nozzle cover, as I
14   understand it.  I am not a technical expert, but my
15   understanding is that some of the claims relate to a ride that
16   has the nozzle cover.  So it is not just the nozzle cover
17   that's at issue.
18   Q    But the claims that relate to the ride with the nozzle
19   cover depend upon the independent claim of the nozzle cover?
20   Do you understand that?
21   A    I am not sure I have an opinion on that.
22   Q    You don't know what an independent claim or dependent
23   claim is?
24   A    No.  That's more legal.
25   Q    So maybe that confusion is giving you this idea of
```

1    enablement in a different way than maybe I understand it, maybe

2    our expert understands it.  But let's --

3              THE COURT:  That confusion leads me to a great segue

4    into concluding for the evening.

5         So, ladies and gentlemen of the jury, I am going to ask

6    that you be here promptly tomorrow at 9:00 a.m.  Please

7    remember my admonition not to discuss the case, not to do any

8    legal research, not to read, watch, or listen to any news

9    accounts of the case.  And please continue to have an open

10   mind.  Remember, there's two sides to this case.

11        Okay.  Sir, you may step down.

12        Thank you.  We will see tomorrow.

13        Counsel, hang on just a minute very briefly.  I have to

14   run, but I want to talk to you about something very quickly.

15        (The following proceedings were held in open court out of

16   the presence of the jury:)

17             THE COURT:  The jury has left the courtroom.

18        I know you folks don't have enough to do, and so I am

19   going to ask you to do something else for me, to keep you

20   occupied and keep you out of trouble; and that is, would you

21   folks mind working on a proposed verdict form that we can

22   submit to the jury at the conclusion of the case?  I would

23   prefer to have one that's agreed upon.  But if not, I will

24   accept competing versions, and then I will do what they pay me

25   the big bucks for, which is to decide which one I will accept

1    or I will modify.  But I really do think perhaps you should try

2    to come up with a joint verdict form.

3         I also would like to -- I know this has been a contentious

4    case from the very, very beginning.  I don't expect that has

5    changed much in the time that the case has been pending.  But I

6    think we have now heard at least one side of the story, and we

7    have seen the witnesses, and you have had an opportunity to

8    assess them, and so on.  And so I was just kind of hoping that

9    perhaps starting now, or at least over the weekend, you folks

10   work on trying to see if you can reach an amicable settlement

11   or disposition of the case.

12        And, of course, I will offer the services of one of our

13   magistrate judges to assist in that regard, if -- if -- if both

14   sides think that it would be appropriate to do that.  Okay?

15   All right.

16        See you tomorrow morning at 9:00 a.m.  Thank you.

17            ALL:  Thank you, Your Honor.

18        (End of afternoon proceedings at 3:57 p.m.)

19                           -o0o-

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11          DATED:  December 6, 2019, at San Diego,

12   California.

13

14                         /s/  Chari L. Bowery

15                         _____
                           Chari L. Bowery
16                         CSR No. 9944, RPR, CRR

17

18

19

20

21

22

23

24

25

I N D E X

ALPHABETICAL INDEX OF WITNESSES:                    PAGE    VOL.

**CHUTTER, GLEN – PLAINTIFF'S WITNESS**
    CROSS BY MR. THOMAS ...........................529      3
    REDIRECT BY MR. TACHÉ .........................562      3
    RECROSS BY MR. THOMAS .........................564      3

**VIGIL, Ph.D., ROBERT – PLAINTIFF'S WITNESS**
    DIRECT BY MR. O'HARE ..........................567      3
    CROSS BY MR. THOMAS ...........................620      3


CHRONOLOGICAL INDEX OF WITNESSES:                  PAGE    VOL.

**GLEN CHUTTER – PLAINTIFF'S WITNESS**
    CROSS BY MR. THOMAS ...........................529      3
    REDIRECT BY MR. TACHÉ .........................562      3
    RECROSS BY MR. THOMAS .........................564      3

**ROBERT VIGIL, Ph.D. – PLAINTIFF'S WITNESS**
    DIRECT BY MR. O'HARE ..........................567      3
    CROSS BY MR. THOMAS ...........................620      3