1              United States District Court

2          for the Southern District of California

3

4                                    )
5    WHITEWATER WEST INDUSTRIES,      )
     LTD., a Canadian Corporation,    )   No. 17cv1118-BEN
6                                     )
         Plaintiff,                   )   December 10, 2019
7                                     )
              v.                      )   San Diego, California
8                                     )
     PACIFIC SURF DESIGNS, INC., a    )
9    Delaware Corporation, and FLOW   )
     SERVICES, INC., a California     )
10   Corporation,

11       Defendants.

12
                         VOLUME 5A
13              TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE ROGER T. BENITEZ
14               United States District Judge

15   APPEARANCES:

16   For the Plaintiff:      SNELL & WILLMER LLP
                                 WILLIAM S. O'HARE
17
                             BUCHALTER
18                               ROGER L. SCOTT

19   For the Defendants:     THOMAS WHITELAW & KOLEGRAFF LLP
                                 JOSEPH E. THOMAS
20                               WILLIAM J. KOLEGRAFF

21


22
     Court Reporter:         Dana Peabody, RDR, CRR
23                           District Court Clerk's Office
                             333 West Broadway, Suite 420
24                           San Diego, California 92101
                             DanaPeabodyCSR@gmail.com
25

1    Case:  WhiteWater v. Pacific Surf Designs, Inc.
     Date:  December 10, 2019
2

3
                        INDEX OF WITNESSES
4

     FOR THE DEFENDANTS:
5                            E X A M I N A T I O N
                              DIRECT   CROSS REDIRECT RECROSS
6
     Yong Yeh
7      Mr. Thomas                      905
       Mr. O'Hare                              931
8

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | San Diego, California, December 10, 2019                      |
|       | 2  | * * *                                                        |
|       | 3  | (Proceedings held outside the presence of the jury panel.)   |
|       | 4  | THE COURT:  Well, good morning.  I hope you all had a         |
| 09:05 | 5  | great weekend.                                               |
|       | 6  | Are you ready to proceed?                                     |
|       | 7  | MR. O'HARE:  Your Honor, I have one housekeeping              |
|       | 8  | thing.  I would have done it at the close of our case, but    |
|       | 9  | we've generated in written form, so we don't have to read it  |
| 09:06 | 10 | all in the record, a list off our lined on, objected exhibit  |
|       | 11 | list of at least those we want to get into the record, that we|
|       | 12 | want to offer into evidence meaning just because something's on|
|       | 13 | the list, it's not objected to, there's a lot of stuff, doesn't|
|       | 14 | mean we're going to offer every single one, and of course, the|
| 09:06 | 15 | defendant can do the same thing.                              |
|       | 16 | MR. THOMAS:  Your Honor, he just handed -- Mr. O'Hare         |
|       | 17 | just handed it to us.  What I propose -- I have no reason to   |
|       | 18 | believe there's anything improper about what he's doing.  I'd  |
|       | 19 | like to check it and come back tomorrow.  We're going to rest  |
| 09:06 | 20 | probably tomorrow, and then we can jointly submit our defense  |
|       | 21 | list and the plaintiff's list.                                |
|       | 22 | THE COURT:  Okay.  Great.  Why don't we do that.             |
|       | 23 | Glenn, go get the jury, please.                               |
|       | 24 | THE CLERK:  Is there a witness on the stand?                  |
| 09:06 | 25 | MR. THOMAS:  Yes, there was.  Mr. Yeh was on the              |

1    stand.

2        (Proceedings held in the presence of the jury panel.)

3        THE COURT:  Please be seated.  Good morning.  Did I

4    miss anyone while I was walking past the -- I said good morning

09:08    5    to all of you?  Not you.  Where were you?  Never mind.

6        All right.  Go ahead, Mr. Thomas.

7                        YONG YEH,

8        DEFENDANTS' WITNESS, PREVIOUSLY SWORN

9        DIRECT EXAMINATION (Resumed)

09:08   10    BY MR. THOMAS:

11    Q.   We left off on Friday night, and just to kind of reset

12    everybody, we had a three-day weekend here.  Let's go back.  We

13    were discussing Exhibit 68.  If we could put up slide 1 on

14    Exhibit 68 just to refresh where we left off.

09:09   15        I know we covered this, but just to get everybody back on

16    the same page here, this is the presentation that you and

17    Mr. Alleshouse produced for this SVIEF conference on

18    October 23, 2013, correct?

19    A.   That's correct.

09:09   20    Q.   And this was the first attempt by you and Mr. Alleshouse to

21    really make any forward-looking projections of any kind for the

22    company.  Isn't that correct?

23    A.   In general, yes.  We never had a formal business plan at

24    the initial outset of our company.

09:09   25    Q.   So this was your very first stab at it, so to speak?

1    A.   For purposes of this forum, that's the only reason we did

2    this.

3    Q.   And again, remind us, this forum was -- tell us what the

4    forum was?

09:10   5    A.   SVIEF stands for Silicon Valley Innovation and

6    Entrepreneurship Forum.   It's a forum that focused on China and

7    English-as-a-second-language Chinese-speakers who are

8    interested in Silicon Valley.   Especially back then, it was

9    kind of the hot area where, I guess, people were innovating at

09:10   10   the time, and there was a forum for this one.   Al Gore was

11   speaking, so there were a bunch of people showing up, like

12   5,000 people.   And I got an email randomly that said do you

13   want to participate.   And I said sure.   Why not?   Let's fill it

14   out and see what happens, and they invited us.

09:10   15   Q.   You were required to submit something about your company?

16   A.   That's correct.

17   Q.   And this was done for that purpose.

18        MR. THOMAS:   If we could switch to slide 14 of Exhibit

19   68.

09:10   20   BY MR. THOMAS:

21   Q.   And this is described to be "Sales pipelines" with an

22   inverted triangle on the left.   On the right there was a box

23   with "Average sales cycle, six to 24 months," "Leads-to-close

24   ratio, 50:1."   Explain what this is.

09:11   25   A.   This was kind of trying to give an indication to the

1   audience how we -- the process in which we would sell one of

2   our products.  At the time, we had only one contract that we

3   were in negotiations with.  The rest were people who have come

4   to us through trade shows or blind emails.  And on the right,

09:11   5   here there's an average sales cycle, which is six to 24 months.

6   That was our guess at the time.  It's much longer than that

7   because you can have construction delays, financing issues on

8   the client's side.  In general, people take a long time to make

9   a big capital expenditure like one of our products.  And the

09:11   10   leads-to-close ratio, we found that to be a little higher than

11   that because we'll get an interest from people in high school,

12   people in college, business -- MBA students, all the way up to

13   heads of these water parks, and there's a large number of these

14   types of contacts before we end up closing a deal.

09:12   15   Q.   When you say "ratio," you've learned after this conference

16   the ratio leads to close was actually higher than 50:1?

17   A.   I think it's much higher.

18   Q.   Okay.

19           MR. THOMAS:  All right.  Now, let's shift over to

09:12   20   slide 16.  Let me see if I can -- well, I'll just leave that

21   there for now because I don't want to hit the wrong button.

22   Last time I did this, we had a problem with the console here.

23   It's clear now.  Okay.  Thank you.

24   BY MR. THOMAS:

09:12   25   Q.   Okay.  And we talked about this briefly on Friday, as I

908

1   recall, and you have "Revenue forecast" at the bottom.

2   A.   That's correct.

3   Q.   "Sources" at the top.   Just explain how the revenue

4   forecast line works since you prepared this.

09:13   5   A.   So what we were trying to do is convey to the audience at

6   this show that we would have a viable business -- the purpose

7   of the forum was just to -- for supply chain, things like that.

8   It was actually not for investment purposes.   I don't

9   think -- we never asked -- we actually mentioned a number of

09:13   10   times we're not seeking outside investment, and on the last

11   slide we saw, we started the company with $90,000.   That was

12   our initial investment, and our burn rate was so

13   long -- Richard and I weren't even paying ourself, so we were

14   not actually seeking investment.   We were there to get our name

09:13   15   out.   So with this, we were trying to show this revenue

16   forecast down here with the B2C model here.   We have yet to

17   achieve that, but at the time, we were thinking maybe in years

18   one or two, we would aggregate this, and then in years three to

19   five, this would be the total amount we would be getting, which

09:13   20   would include this amount, and then this one was -- if we ever

21   achieved the franchise model, which would be a pretty big

22   stretch since nobody in our industry has achieved this model,

23   that's where we kind of put in some of these numbers.

24   Q.   Okay.   These are not to be added together.   They are

09:14   25   basically, you know, an indication of anticipated growth over

909

1    the years.  Is that correct?

2    A.   Exactly, yes.  We don't add these together.

3    Q.   Okay.  You used a term "B2C," and I see the term "B2B."

4    Maybe you could explain to the jury what those terms mean.

09:14   5    A.   In our industry, when we're selling directly to someone who

6    will implement our wave, we'll call that business to business.

7    What we would hope to achieve is a business-to-consumer model

8    in which we own or control the actual venue.  The issue with

9    the B2B model is that we are reliant upon the client to execute

09:14   10   their end of the project.  And Richard and I have been in this

11   for a number of years now.  There are a whole host of things

12   that are -- that will come up that may be avoidable, may be

13   unavoidable, but when we don't control that, those delays will

14   add up.  It's better if we would control because we could see

09:15   15   what's going to happen.  That would be the B2C model.  We never

16   had the financing.  Since we only started the company with

17   $90,000, we didn't have the ability to make our own venue, so

18   we were hoping to sell to other businesses to build up our cash

19   reserves in which to deploy the B2C model, but we were never

09:15   20   able to do that.

21   Q.   Okay.  So this shows growth in part based on a B2C model

22   which you have not even achieved as you sit here today,

23   correct?

24   A.   That's correct, as a big expense for us is litigation, so

09:15   25   it keeps us down.

1    Q.   And the same thing with this franchise model; you have not

2    achieved that -- Pacific Surf Designs has not achieved that

3    section of the business build-out, have you?

4    A.   No.

09:15    5    Q.   Okay.  So when you look at those numbers, they were relying

6    on future things that you wanted to do but you weren't entirely

7    clear that you could do, and as it turned out, you haven't been

8    able to do that as of today.  Is that correct?

9    A.   That's correct.  The franchise model -- granted, this

09:16   10    presentation was focused on the Chinese viewer.  Franchising

11    culturally from the Chinese nationalist, that's the end goal

12    for any business, is to franchise.  That's why we added it

13    because it would appeal to the viewers.  It was something that

14    we would hope to do but was unlikely in our business, but it

09:16   15    was something that would be appropriate for this forum.

16    Q.   Okay.  So it was appropriate for the forum to include the

17    B2C and the franchise, and you basically came up with some

18    rough order-of-magnitude number for those areas when you

19    presented this in October of 2013?

09:16   20    A.   That's correct.

21    Q.   Okay.  And as you operate today from the beginning of your

22    company, you've already only achieved the B2B model, which is

23    the very far left model.  Isn't that correct?

24    A.   That's correct.

09:17   25    Q.   Okay.  So you learned sometime shortly after this

1  conference that you were not going to be able to implement the

2  B2C or the franchising model?

3  A.   That's correct.

4  Q.   And you learned as a result of that that these forecasts

09:17  5  that you tried to put into this presentation were not really

6  going to be accurate for purposes of raising investor money or

7  basing any negotiations with third parties or customers.   Is

8  that correct?

9  A.   That would be correct.

09:17  10  Q.   And you wouldn't have used these numbers, these

11  projections, so to speak, to negotiate a royalty license back

12  in 2013, would you?

13  A.   Absolutely not.

14  Q.   And you heard from Dr. Vigil, who was the expert for

09:17  15  WhiteWater, damages expert, and he assumed in a hypothetical

16  negotiation that Pacific Surf Designs would have negotiated to

17  pay a lump sum $2 million royalty nonexclusive with WhiteWater

18  to compete with WhiteWater.   Do you agree with that?

19  A.   Absolutely not.   As you guys saw on slide 14, we raised

09:18  20  $90,000.   $2 million was way out of what we could do, and I

21  believe Dr. Vigil continues to kind of misrepresent what I said

22  during my deposition.   I never said that I had access to

23  unlimited funding for purposes of starting this business.   I

24  mentioned that I had access to capital to defend myself

09:18  25  personally from the continuous litigation from plaintiffs.

1    That's the context of that.  They just failed to read the

2    sentence right above what he keeps mentioning.

3    Q.   Okay.  Thank you for that clarification.

4         Let's switch subjects, if we might.

09:18   5    You're familiar with -- you've been involved in selling the

6    sheet wave machines on behalf of PSD and been active with

7    customers.  Is that correct?

8    A.   Correct.

9    Q.   Do nozzle flaps drive sales?

09:18   10   A.   No.

11   Q.   Okay.  And have you ever had a -- in your experience, a

12   customer ever ask about nozzle flaps in connection with a sale

13   of a sheet wave machine?

14   A.   Absolutely not.

09:19   15   Q.   Okay.  And we've heard from Mr. Alleshouse about the more

16   recent or maybe most recent installation down in Mexico where

17   we -- you sold this fixed-hinge flap.  Did the customer inquire

18   about which kind of nozzle flap they were going to receive,

19   whether it was flexible or hinged or fixed entirely?

09:19   20   A.   No, absolutely not.  And this customer, they are a

21   sophisticated, sheet-wave-riding family.  The Japors, they ride

22   their waves, and they have two on-site.  One's a FlowRider and

23   one's ours, and they have never mentioned it, and I'm in

24   constant contact with them because that's what we do for our

09:19   25   clients; we follow up and see how things are going.

1    Q.   And the one that I think Mr. Alleshouse indicated the sale

2    you did make was a Triple.  Is that correct?

3    A.   That's correct.

4    Q.   So they're up to, I think he said, a thousand rides a day

09:19    5    because of the volume of ridership on that fixed-hinge one?

6    A.   Yeah, I believe that's the case.  This resort is

7    incredible.  It's two miles wide on the beach, and they have

8    their own sewage treatment plant, things like that.  They're

9    like a city.  They put through a ton of people, and there's

09:20   10    three lanes on ours, so it's 50 percent larger than the Double

11    even, so they have a higher --

12    Q.   Has there been any safety or incidence of reported injuries

13    or anything by using the fixed nozzle flap that you installed

14    in Mexico?

09:20   15    A.   No.

16    Q.   Okay.  And it's the same company that owns FlowRiders as

17    well, that has their version of the nozzle flap installed down

18    there?

19    A.   Correct.  They have one in Cancun where we have our

09:20   20    product, and they have a location in Jamaica, and they're going

21    to open a location in Punta Cana in the Dominican Republic with

22    our product.

23    Q.   And they've never had a discussion with you over any

24    differences between the FlowRider nozzle flap and the PSD

09:20   25    nozzle flap?

A.   No.

       MR. THOMAS:   Okay.  All right.  Let's call up Exhibit 60, if we could.  Okay.  All done.

BY MR. THOMAS:

09:21   Q.   Now, we're on to Exhibit 60.  You've seen this document before, Mr. Yeh?

A.   Yes.

Q.   Just explain for the jury what this document is.

A.   I believe it is a presentation made by Mr. Thatcher at
09:21   WhiteWater about the benefits of the FlowRider.

Q.   Okay.  And did you prepare some charts and graphs based on information contained in this presentation prepared by Mr. Thatcher?

A.   Yes.

09:21   Q.   Okay.

       MR. THOMAS:   Could we look at page 4 on this slide?

BY MR. THOMAS:

Q.   Okay.  Now --

       MR. THOMAS:   I don't know if we can make that any
09:22   bigger.

BY MR. THOMAS:

Q.   The information that you were basing your charts on, is it at the bottom here of page 4.  Is that correct?

A.   That is correct.

09:22   Q.   And just explain to the jury what that information is.

| | |
|---|---|
| 1 | A.   So Wave Loch was touting their installations up until 2010, |
| 2 | and each location it will say -- for example, Schlitterbahn |
| 3 | would be their first.  It was in New Braunfels, Texas.  It was |
| 4 | the Point Break, and it was installed in 1991, and that was |
| 09:22  5 | their first ride.  So using this list, I can see this is their |
| 6 | second attraction, this is their third, fourth, and this way |
| 7 | we're able to order the installations by location and date and |
| 8 | the actual sequence in which they were installed. |
| 9 | Q.   Okay.  And let's look at slide 5 off this Exhibit 60. |
| 09:23  10 | There's more information on this slide as well? |
| 11 | A.   That is correct, sir. |
| 12 | Q.   Okay.  Explain what you did with all that information. |
| 13 | A.   We basically aggregated the information to create some |
| 14 | charts as to the number of installations year over year from |
| 09:23  15 | the time of the nozzle flap patent through 2010. |
| 16 | MR. THOMAS:  Okay.  And I'd like to show the -- the |
| 17 | witness and the jury Exhibit NY-1.  Is there any objection? |
| 18 | MR. O'HARE:  We do have a -- which one is NY-1? |
| 19 | MR. THOMAS:  It's marked at the bottom. |
| 09:23  20 | MR. O'HARE:  We do have a foundational objection on |
| 21 | that.  No objection to our document that we provided.  We're |
| 22 | just objecting to the summary at this point. |
| 23 | MR. THOMAS:  I can -- I'll lay more foundation.  Happy |
| 24 | to do it.  It's an accurate representation of the data that |
| 09:24  25 | was -- |

1         THE COURT:  Go ahead and lay the foundation.

2         MR. THOMAS:  If I could have the screen set so that

3    the Court and the witness could see Exhibit NY but not the

4    jury.  And counsel.  You have it in front of you.

5         THE COURT:  Would somebody clear that screen?  Thank

6    you.

7    BY MR. THOMAS:

8    Q.  Okay.  Mr. Yeh, explain for us what is depicted in this

9    chart, if you will.

10   A.  So the -- these are the FlowRider sales from 1991 to 2010.

11   These shaded areas are the trailing two-year windows, which we

12   took into account as it would take time following certain

13   implementations of feature sets on FlowRider implemented at an

14   installation, so we have a trailing two-year view of what's

15   being installed.  We took the Wave Loch and ADG sales,

16   aggregated them into this blue line, and what we're trying to

17   show is following the game-changing concept, nozzle flap --

18   Q.  Alleged game-changing.

19   A.  Allegedly, sure.

20       -- following 1999, that sales actually didn't change for

21   about five years following, and then all of a sudden, following

22   the invention of the tension ride surface in around 2002 and

23   signing up the WhiteWater and ADG licenses to give them

24   worldwide coverage on sales, that's when sales shot up.

25   Q.  Okay.  And the tension surface patent which is referenced

```
 1   here, that's the '530 patent that we've discussed previously in
 2   this trial?
 3   A.   Yes, sir.
 4   Q.   Okay.  We heard questioning on cross-examination on Friday
 5   from Mr. O'Hare, and he was challenging Mr. Alleshouse that
 6   sales really shot up after the 19 -- after 1999 when the '589
 7   patent was issued by the PTO.  Do you recall those questions?
 8   A.   I do.
 9   Q.   And the data that you've charted all comes off of Exhibit
10   60.  Is that correct?
11   A.   That's correct.
12   Q.   And it's true and accurate as far as you can tell?
13   A.   I'm basing my numbers on what Wave Loch was providing,
14   correct.
15   Q.   Okay.  And does this chart show that sales did not take off
16   after -- of sheet wave machines after 1999?
17   A.   No, it would be misleading to say that.  Actually, it would
18   be wrong.  They took off after 2004, 2005.
19           MR. THOMAS:  I'd like to move into evidence Exhibit
20   NY.
21           MR. O'HARE:  The foundational concern I have at this
22   point --
23           THE COURT:  I don't want a speaking objection.  The
24   objection is overruled.
25           MR. O'HARE:  Objection.  Foundation as to who was
```

1    making the sales.

2              THE COURT:  Objection's overruled.

3              MR. O'HARE:  No personal knowledge.

4              THE COURT:  It's overruled.

09:27    5    MR. THOMAS:  Okay.  And if we can switch that to the

6    jury so the jury can see this, and what I'll do is clear it

7    again since the jury couldn't -- didn't participate in that

8    dialogue the first time, if you can now, with the jury having

9    access to this graph, explain this chart, once again.  I hate

09:27   10    to make you do it again.

11    A.   That's fine.

12         And so we use the data from that Exhibit 60 that listed the

13    installations in sequence.

14              PANEL MEMBER:  We have a couple monitors that are not

09:27   15    up-to-date with the current screen.  They're just snow.

16    Monitors on the left, fine.

17              THE COURT:  Let me invite you to move, if you wish to.

18              PANEL MEMBER:  Perfect.

19              THE COURT:  Feel free to do that.  I apologize.  That

09:27   20    happens from time to time.

21              MR. THOMAS:  We've all experienced that on this end,

22    too, from time to time.

23    BY MR. THOMAS:

24    Q.   Okay.  I'm sorry.  Let's go back again and maybe start your

09:28   25    explanation again of what your -- what the graph is depicting.

A.   Okay.  So using the data from that last exhibit, we're able
to not only order the installations, we can aggregate the dates
of their installations, their locations, and what the products
were.  So we came up with this in which -- and we were
providing -- each of these shaded areas are two-year trailing
windows to provide any sales following the advent of the '589
patent, the tension surface patent, and the licenses between
WhiteWater and ADG.

     The significance of this chart is plaintiffs have been
claiming that the '589 patent is some kind of
game-changing -- I mean, like you may have remembered from
Dr. Vigil's presentation, there was a slide in which there were
eight quotations where seven of the eight quotations were
provided by their fearless leader, Marshall Myrman, and it
would kind of be like a movie trailer in which every quote was
saying, "Awesome," "Blockbuster," "Event of the summer,"
"Must-See Movie," and say "Marshall Myrman."  "Incredible
movie, Marshall Myrman."  It doesn't really tie into the actual
data, so we wanted to provide this chart, so we're trying to
show that even after the advent of the tension ride surface
patent, sales didn't really shoot up.  The reason we believe
the sales shot up was taking the pumps, putting them
underneath, adding the tension ride surface, and compounding
them with the global coverage of salesmen provided by
WhiteWater and ADG.  Before this, it was just Andrew, I

1   believe, and a few other people.  This is where the data

2   indicates that the sales shot up after 2005.

3   Q.   And there was no measurable increase at all after 1999.  I

4   see at the bottom here, going into 1999 when the patent was

09:30   5   issued, there were four sales.  They actually diminished to

6   less than two in 2000, and they kind of hit four again in 2001,

7   declining again in 2002, going flat again in 2003, and then

8   this very sharp increase, based on the data provided by

9   Wave Loch and WhiteWater, of increasing sales starting in 2004.

09:30   10   Is that correct?

11   A.   That's correct.

12   Q.   Okay.  Now, we have another chart, and it's based on the

13   same information.  I don't want to have to do this unless I'm

14   going to get an objection, so I'll ask Mr. O'Hare if you'll

09:30   15   object to our next chart, which is Exhibit NZ.

16           MR. O'HARE:  I think the only foundation objection

17   concerns what ride is being sold.

18           THE COURT:  I'm not sure.

19           MR. THOMAS:  Well, then, we'll have to --

09:30   20           THE COURT:  Just ask questions.  If you can lay a

21   foundation, go for it.

22           MR. THOMAS:  I'm going to ask that we show the

23   counsel, the witness, and the Court Exhibit NZ, and I'll go

24   through the foundation.

09:31   25           THE COURT:  Before you show it to the jury, that's a

1    good idea.

2          MR. THOMAS:  Okay.  I'll clear the screen.

3    BY MR. THOMAS:

4    Q.   Okay.  Now, explain for us what this graph represents,

09:31   5    which has been marked for identification as Exhibit NZ?

6    A.   So this is using the same data from that Exhibit 60 that we

7    just saw, and what we're kind of bifurcating here are the

8    first-generation attractions by Wave Loch and the second

9    generation.  And the first generation are the ones in which the

09:31   10   pumps were in the vertical configuration, kind of towards the

11   front, which made the ride larger, and the second generation is

12   having the pumps underneath in the horizontal position with the

13   tension fabric.

14   Q.   And how were you able to determine which sales were first

09:31   15   generation and which sales were second generation of these

16   sheet wave machines?

17   A.   WhiteWater lists all their attractions, so we can just look

18   online, which ones were which, and we're familiar with a number

19   of these attractions.

09:32   20   Q.   Did you go online and verify so you were properly, in terms

21   of this chart, allocating between the first generation and the

22   second generation sales of WhiteWater?

23   A.   Yes.

24   Q.   Okay.

09:32   25         MR. THOMAS:  Your Honor, I'd like to move into

1    evidence Exhibit NZ.

2          MR. O'HARE:  Objection.  Hearsay and lacks foundation

3    as to --

4          THE COURT:  Overruled.  It will be admitted.

09:32   5    BY MR. THOMAS:

6    Q.   If we could show that to the jury, and I apologize for

7    having to do this a little bit again.

8          Now that you have access to the Exhibit NZ, Mr. Yeh, would

9    you explain for the jury what -- how this chart is organized

09:32   10   and what it represents.

11   A.   Sorry you guys have to hear this again.

12         Same thing with the windows.  The two-year trailing windows

13   here, the blue indicates the first-generation sales, which kind

14   of go up and down over time until about 2013.  This is when the

09:33   15   pumps started to be implemented in the horizontal position

16   underneath the attraction allowing the attraction to be much

17   smaller, but the tension surface replaced the foam and coat,

18   which you've heard testimony from plaintiffs, it was kind of a

19   maintenance nightmare to have this.  And after that happened,

09:33   20   compounding that with the WhiteWater and ADG global licensing

21   and their sales force, that's when you see this, the increase

22   in sales.

23   Q.   Okay.  But we heard, at least through cross-examination of

24   Mr. O'Hare, that somehow, some way this '589 patent over the

09:33   25   nozzle flap somehow stimulated an enormous growth of sales

1    between 1999 and onward, and this graph doesn't show that, does

2    it?

3    A.   No, it actually -- if you were to actually look at the data

4    from this graph, if the '589 nozzle flap was so vital to their

09:34    5    sales, their sales almost went to zero, so it would -- if I was

6    them, I would take that flap out because it shows, based on

7    what they're saying, is it's hurting their sales, their sales

8    are going down after the implementation of the flap.

9    Q.   And we also heard from the WhiteWater witnesses,

09:34    10    Mr. Myrman, I believe even Mr. Chutter, about the -- they

11    acknowledged they moved away from the flexible nozzle design to

12    a hinged metal flap in 2009.  Do you remember that testimony?

13    A.   I do.

14    Q.   Okay.  And I know that's an issue that the jury will

09:34    15    eventually have to reconcile, but if they actually -- it looks

16    like they changed the nozzle flap, as it was shown at least on

17    the claims of the '589 patent, beginning in 2005.  Is that

18    correct?

19    A.   That's correct.

09:34    20    Q.   Okay.  And that also coincides with this growth in sales.

21    Is that correct?

22    A.   Yeah, but I believe they're -- plaintiffs are conflating

23    correlation and causation.  Just because something started to

24    appear at a certain time, that's not the cause of the increase

09:35    25    in sales.  It's almost like if there was -- during the advent

1    of the Model T Ford back in the beginning of the 20th century,

2    the horse and buggy companies were saying the Model T

3    implements one of their door handle designs, and that's why the

4    Model T increased in sales.  That's not true.  It may have

09:35    5    happened, but the internal combustion engine, that's why the

6    Model T took off, not because of the handle that the buggies

7    had at the time.

8    Q.   Okay.  That's a good illustration.

9         Just so we're clear, the apropos analogy would be the shift

09:35    10   from the -- to the horizontal pump system where you had more

11   room -- where you reduced the footprint of the sheet wave ride

12   would be the analogous piece for that Model T horse and buggy?

13   A.   Yeah, and making it -- the ride surface not fail as

14   frequently.

09:36    15   Q.   Okay.  Thank you.

16        Let's then move on to -- you know, we've heard a lot of

17   discussion through Mr. Myrman and Mr. Chutter and their expert,

18   Dr. Vigil, about how important these nozzle flaps are to

19   customers.  And are you aware of any competitors in the

09:36    20   marketplace that are selling sheet wave machines without nozzle

21   flaps.

22   A.   Yeah, there are many.

23   Q.   Could you just name one or two or three?

24   A.   Murphy's Wave, which is a actually a WhiteWater subsidiary,

09:36    25   they do.  Wavesurfer does.  My Wave does.  MADEA Concept does.

1    Q.   And you know that because you monitor your competitors in

2    the industry and looking at their websites to ascertain how

3    they work?

4    A.   Yeah, and we're friendly with their owners.

09:37    5    Q.   So there are actually sheet wave machines that are being

6    sold as of even today that don't have any nozzle flaps, and the

7    customers were accepting those?

8    A.   That's correct.  It's also -- it's one of the concepts that

9    Mr. -- Counsel O'Hare and Dr. Vigil were bringing up that

09:37    10   the -- you know, customers were still purchasing FlowRiders in

11   greater numbers.  That may be true because they're the market

12   leader, but the better question would be what's the ratio year

13   over year of attractions that are being purchased with the

14   metal hinge versus the ones that don't have that?  And maybe

09:37    15   back in 1990, I would say it would be 100 percent of the -- or

16   2005, it would be 100 percent because that was the only company

17   selling them.  But nowadays, there's Wavesurfer has a fixed

18   nozzle flap, they sell two to three a year; StingRay has no

19   nozzle flap, they sell two to three a year; we sell two to

09:38    20   three a year.  I mean, I would say the market's now 50 percent

21   adoption of nonhinged nozzle flaps.

22   Q.   And you said StingRay.  That's a Murphy's Wave product.  Is

23   that correct?

24   A.   Yes, sir.

09:38    25   Q.   Were you able to go to their website and download a video

1    of that StingRay machine without a nozzle flap?

2    A.   We've downloaded both StingRay and Surf-Air products from

3    their website.

4             MR. THOMAS:  Okay.  And I have a video.  I think

09:38   5    there's an objection by Mr. O'Hare that -- the witness has and

6    can authenticate as personally downloading that video off the

7    Murphy's Wave website, showing the sheet wave machine without

8    nozzle flaps, and it's about a 30-second video.  I'd like to

9    show that to the jury.

09:38   10            MR. O'HARE:  I don't think I'll have an objection if

11   I'm clear what it is.  Which exhibit number?

12            MR. THOMAS:  OB.  It's -- I don't have a -- we gave

13   you the link last night, but I don't have -- it's about a

14   30-second video clip that we sent over.

09:39   15            MR. O'HARE:  NX-1?

16            MR. THOMAS:  No, Exhibit OB.  It wouldn't --

17            MR. O'HARE:  OA?

18            MR. THOMAS:  You're not going to find a hard copy of

19   it because it's a video.  It was sent as a link.

09:39   20            MR. O'HARE:  I'm told we have no objection.

21            MR. THOMAS:  Okay.  I apologize for that.

22        So if we could then call up the Exhibit OB, which is the

23   video that Mr. Yeh downloaded off of Murphy's Wave showing a

24   rider on the StingRay sheet wave machine, and I think it's

09:39   25   Baltic Park.

BY MR. THOMAS:

Q.   Do you know where Baltic Park is?

A.   It's in Swinoujscie, which is a small town in Poland.

Q.   All right.

09:39   MR. THOMAS:  With that we'd like to go ahead -- I've got to clear the screen.  Hold on.  Can we start again?  The screen wasn't ready.

THE COURT:  I could do that.

MR. THOMAS:  These guys are good.

09:40   THE COURT:  Amazing.  Well, not so much.

MR. THOMAS:  Okay.  Stop there.  Can we go back and just stop it where he slides into the nozzle flap so that the jury can see that?  Right there.  Stop it there.  Thank you.

BY MR. THOMAS:

09:41   Q.   And you can see --

MR. THOMAS:  I'll let Mr. Yeh describe that.

BY MR. THOMAS:

Q.   That is a -- what kind of nozzle flap is on that, if any?

A.   It looks like a piece of foam that's covered in vinyl

09:41   that's fixed in place, like a bumper pad.

Q.   Okay.  So that would be an example of a fixed nozzle flap that's being -- that's been sold into the marketplace.  Is that correct?

A.   Yeah, it's been sold by plaintiffs.

09:41   Q.   Okay.  Great.

```
         1        All right.  Now, you also -- monitoring your competitors.
         2   You've visited the FlowRider website as well, have you?
         3   A.   Yes, sir.
         4   Q.   And did you -- we have two exhibits.  I'll go to the first
09:41    5   one, which is NX-1, but I want to make sure we don't have an
         6   objection.  This was a screenshot of what was on the FlowRider
         7   website showing a sheet wave machine that doesn't have nozzle
         8   flaps.
         9             MR. O'HARE:  No objection.
09:42   10             MR. THOMAS:  Okay.  So if we could put up NX-1.
        11        Now, just show the jury, if you could --
        12   BY MR. THOMAS:
        13   Q.   You can circle where the device without the nozzle flap
        14   sold by WhiteWater is.
09:42   15   A.   It is located at Wave House, Durban, in South Africa.
        16   Q.   Circle the area where the nozzle flap should be that are
        17   not.
        18   A.   They should be -- since this is where the nozzle -- they
        19   should be here, but they're not.
09:42   20   Q.   So they've sold product, and customers have accepted
        21   product, without nozzle flaps.  Is that correct?
        22   A.   Correct.  This is actually the same attraction as the
        23   Bruticus Maximus that Mr. Lochtefeld and Mr. Myrman and
        24   Mr. Chutter were talking about.  This is just two of them that
09:43   25   are mirror images of each other.  It's just the same product,
```

1  which for some reason, they don't have nozzle flaps.  It's not

2  necessary, I guess, according to WhiteWater.

3          MR. THOMAS:   If we could show Exhibit OA.

4  BY MR. THOMAS:

09:43   5  Q.   This is, I believe, another screenshot of the video that

6  was shown on that website, and that's a close-up, if you will,

7  of the area without the nozzle flaps at the bottom.

8  A.   Yeah, so the aperture for where the water would come out

9  would be somewhere here, and instead of using a nozzle flap,

09:43   10  which WhiteWater continues to claim is so important, they use,

11  like, the -- if you look at your home, where your hot water

12  heater is, they use like the insulation for your hot water

13  piping, and they just kind of glue it on right here.  You can

14  see some of it has fallen off.

09:43   15  Q.   But there's no cover below the aperture or opening, is

16  there?

17  A.   No, you have -- the water comes out from right here.

18  Q.   Okay.  All right.  Now, let's change subjects.  We can take

19  this down off the screen.

09:44   20  A.   Sorry.  I wanted to add --

21  Q.   I'm sorry?

22  A.   -- this video is actually different than the one we just

23  saw.  This is from 2012.

24  Q.   Okay.

09:44   25  A.   So from 2001, when that product went in, which was after

1    the '589 patent, for the 11 years following, they never put in

2    anything even -- because no one cares.

3    Q.   Okay.  Did you cover everything you needed to on that?

4    A.   Yes, sir.  Sorry.

09:44    5    Q.   No worries.

6         MR. THOMAS:  All right.  If we could take Exhibit OA

7    off the screen because I'm going to change subjects now.

8    BY MR. THOMAS:

9    Q.   You were -- back in the 2014, 2013 time frame, you became

09:44   10   aware, did you not, of the '589 patent lapsing because of

11   failure to pay maintenance fees?

12   A.   Yeah, that was around the holiday season in 2014.

13   Q.   And you recall it was December 10, 2014?

14   A.   I believe so.

09:45   15   Q.   And then eventually -- we'll cover this with some other

16   witnesses later, but eventually they were able to convince the

17   PTO to revive the patent on August 25, 2015.  Do you recall

18   that?

19   A.   I do.

09:45   20   Q.   Okay.  Now, in that time where you believe that the

21   patent -- well, the patent did lapse.  It doesn't really state

22   that window between December 10, '14 and August 25, '15.  You

23   understood that?

24   A.   Correct.

09:45   25   Q.   You were free to sell anything in that time period.  Did

1    you make sales in that time period between December 10, '14,

2    and August 25, '15?

3    A.   We made two sales in that window.

4    Q.   Okay.  And tell us about those two sales.  Who were they to

09:45   5    and when were they done?

6    A.   So the first one was made in February of 2015.  That was

7    the sale of our ProFlow Double in Trinidad and Tobago.

8    Q.   Okay.

9    A.   And then the second sale was in April of 2015, and that was

09:46   10    our Supertube in the South of France.

11    Q.   Okay.  And so both of those sales were finalized while the

12    patent was lapsed, correct?

13    A.   Correct.

14    Q.   Okay.

09:46   15         MR. THOMAS:  I have no further questions of the

16    witness at this time, Your Honor.

17         THE COURT:  All right.  Mr. O'Hare.

18                   CROSS-EXAMINATION

19    BY MR. O'HARE:

09:46   20    Q.   Mr. Yeh --

21    A.   Good morning.

22    Q.   Good morning.  That was my next thing, but thanks for

23    jumping the gun for me.

24         Mr. Alleshouse told us that Murphy's Waves StingRay, the

09:46   25    one that doesn't have a ride-over nozzle flap, that he's aware

932

```
        1   of only one sold in the United States.  Do you agree with that?
        2   A.   Are you referring to the Surf-Air or the StingRay?
        3   Q.   The StingRay.
        4   A.   The StingRay.  I believe there are -- there's one in the
09:47   5   U.S.
        6   Q.   Okay.  And then he wasn't sure about overseas
        7   installations, but thought maybe a couple?
        8   A.   There's probably around eight.
        9   Q.   Okay.  So you think there's more?
09:47  10   A.   Correct.
       11   Q.   Okay.  And this Durban ride --
       12           MR. O'HARE:  If somebody can remind me what exhibit
       13   that is.  NX.  If we could display that, please, Gary.
       14   BY MR. O'HARE:
09:47  15   Q.   When was that sold and installed?
       16   A.   I'm not sure of the actual sale date, but it was installed
       17   in 2001.
       18   Q.   Now, back in 2001, what were you doing?
       19   A.   I was in college.
09:47  20   Q.   You were not involved in the water attraction business,
       21   correct?
       22   A.   No, sir.
       23   Q.   So are you aware that this is actually the only ride
       24   precisely like this that Wave Loch ever sold?
09:48  25   A.   I would actually argue that Wave Loch has sold more rides
```

1    like this, not precisely, maybe a few inches off, but they've

2    sold this before.

3    Q.   A few inches?

4    A.   No, I'm not sure exactly the dimensions, but they've sold a

09:48   5    Double FlowBarrel.

6    Q.   Are you aware that, for example, this ride is actually much

7    larger than their other Double FlowBarrels?

8    A.   Can you define what "larger" means?

9    Q.   Bigger, longer, for example, a longer transition surface at

09:48   10   the end, meaning that flat space between the bottom of the wave

11   and the nozzles.

12   A.   Do you mean safer?

13   Q.   I didn't say safer.  Longer, bigger.

14   A.   Based on the image, it looks like it's a seven-pump

09:48   15   attraction, which is the same that they have in Abu Dhabi.

16   Q.   Different question.  If you're not aware, that's fine.  You

17   were in college at the time.

18       Do you, in fact, know whether this particular ride has a

19   much longer transition surface at the end than any of the other

09:49   20   rides they sold?

21   A.   I can't confirm or deny.

22   Q.   And as far as you know, is this the only ride that

23   Wave Loch itself ever sold with this sort of nozzle-cover

24   design, sort of the deck and then an opening in the front?

09:49   25   A.   I do not know.

1   Q.   And then based -- have you actually seen this ride in

2   operation?

3   A.   I've seen videos of this ride in operation.

4   Q.   But have you seen it sort of in the flesh?

09:49   5   A.   No, I've not been to Durban.

6   Q.   Are you aware that based on the ride design of this

7   particular design, that the way that the water is recovered and

8   recycled, there's virtually no risk of that flow decay that we

9   saw with the big guy on the video where the flow of the water

09:50   10   is interrupted and so the wave breaks down?

11   A.   I don't believe that's true at all.

12   Q.   Do you know if that's the case on this particular ride?

13   A.   Just based on your question, if you look right now, this

14   entire center lane right here is a lane for riding.  They just

09:50   15   turn the water off.  So anyone who goes anywhere over here will

16   just slide all the way down.

17   Q.   But I'm talking about specifically decay of the water flow.

18   Do you understand that the -- one of the main reasons there's a

19   decay of water flow is the water can't get up to the very top

09:50   20   left here to the -- to a water recovery system?

21   A.   If the pump turned off, you would have a decay.

22   Q.   Obviously --

23   A.   But that's a decay.

24   Q.   Obviously you turn the ride off.

09:51   25      I'm talking about what we saw happen with that big guy on

1    the video where, because he fell down, he interrupted the flow

2    of water, so it couldn't get to the top, and it couldn't keep

3    pumping water.  Do you understand that phenomenon?

4    A.   I understand, and based on the fact that they have seven

09:51    5    pumps, that is possible, depending upon what configuration

6    they're running.

7    Q.   Okay.  So if this thing is, in fact, configured that the

8    water gets recycled, not by going to the top, but by going off

9    to the side, did you tell me whether this ride does or doesn't

09:51   10    have a significant risk of a decay of that water flow?

11    A.   Yeah.

12    Q.   This ride you've never seen?

13    A.   It's very much possible if this pump is on and you turned

14    off these pumps right here, you would have the same situation

09:51   15    as that gentleman you keep referring to sliding down the front.

16    Q.   If you turned off the pump?

17    A.   There are seven pumps on this attraction.  You can turn off

18    each pump individually.

19    Q.   Mr. Yeh, I'm not talking about turning off the pump.  I'm

09:52   20    talking about this water flow decaying because somebody falls

21    down on it and it interrupts the recycling of the water.

22    A.   Yeah, but that's very much possible, exactly.  Based on

23    what you're saying, that is possible.

24    Q.   So you're saying, you're just looking at this picture, and

09:52   25    what you've seen, that you think you can make that assessment,

936

1  that, in fact, this ride has the same risk of flow decay or

2  decay in that flow of water as the ride we saw in that video?

3  A.   So just to be clear, are you claiming that no -- there's

4  products in the world that are sheet wave machines that are

09:52   5  impossible to have flow decay?

6  Q.   I'm not talking about impossible, and I'm not claiming

7  anything.  I'm just trying to find out what you know.

8        Do you know whether this ride does or doesn't have a much

9  lower risk of flow decay than the rides that are smaller with

09:52  10  the shorter recovery surface that have the water being recycled

11  over the top?  Do you know?

12  A.   I do not know.

13  Q.   So based on what you know, Wave Loch sold one ride with a

14  fixed nozzle cover almost 20 years ago?

09:53  15  A.   Which ride would that be?

16  Q.   The one we're looking at.

17  A.   What would be the fixed nozzle cover in this image?

18  Q.   Isn't that what's on the bottom right, meaning it's

19  something that covers the nozzle and doesn't have that

09:53  20  ride-over feature to it?

21  A.   You mean the hot water piping insulation?

22  Q.   I'm not talking about hot water insulation.  Maybe that's

23  the mechanism, but my question is:  As far as you know, this is

24  the only ride that Whitewater -- excuse me -- that Wave Loch

09:53  25  sold that had this sort of a nozzle-cover design?

1    A.   Based on the way yourself and the rest of your team have

2    been speaking, it would seem in this image that there's no

3    nozzle cover, period.

4    Q.   Okay.  So let me reframe it then.  As far as you know, is

09:54   5    this the only ride that -- I think you already told me that the

6    Wave Loch sold that was designed like that?

7    A.   I can't confirm that.

8    Q.   Okay.  You're not aware of any others?

9    A.   Some have been closed down, which may have this.

09:54   10   Q.   But you're not aware of any others?

11   A.   No.

12   Q.   Okay.  And, in fact, on the information taken from the

13   website, is that a list of any ride ever installed or is that

14   rides that are still open?

09:54   15   A.   So what WhiteWater does is they -- if an -- if a venue

16   closes down, they will take their time, change -- updating

17   their website, so sometimes places will close that are on their

18   website, and sometimes after awhile, they will update it and

19   remove those.

09:54   20   Q.   So but at least to some extent, rides that were installed

21   back in the day at places that have closed or replaced rides or

22   gone out of business, they aren't on the website?

23   A.   Some are still on their website.

24   Q.   And some aren't?

09:55   25   A.   Uh-huh.

1   Q.   Is that a yes?

2   A.   Yes.

3   Q.   Okay.  So particularly since we're going back to the early

4   2000s, do you know whether there's any installations of rides

09:55   5   that WhiteWater -- or excuse me -- that Wave Loch or any of its

6   licensees made that have since closed?

7   A.   Yes.

8   Q.   Okay.  And, therefore, may not be listed on the

9   installations that you charted out?

09:55   10   A.   That is possible.

11   Q.   Would you agree the further back in time you go, the more

12   likely it is that a ride may no longer be operating?

13   A.   So I'm just answering your question of whether -- this is

14   just based on the Wave Loch website.  There are other sources

09:55   15   in which we could figure out which rides have closed and are

16   currently open.

17   Q.   But this is based on the Wave Loch website, that Exhibit

18   60?

19   A.   That is not the Wave Loch website.

09:56   20   Q.   Exhibit 60, the -- that screenshot that --

21   A.   Pardon me, Counsel.  This is your exhibit.  That is not the

22   Wave Loch website.

23   Q.   Okay.  What is Exhibit 60?  I thought that was what you

24   based your chart on.  I'm sorry, the marketing brochure,

09:56   25   correct?

```
 1   A.   Correct.

 2   Q.   Okay.  That's what you based your chart off of?

 3   A.   That is partly what we based our chart on.

 4   Q.   Okay.  But isn't that what you just went through

 5   previously, saying that you based it on that website or on

 6   that -- excuse me -- marketing material?

 7   A.   And publicly available information with what we've already

 8   known.

 9   Q.   Did you have any of that here?

10   A.   For example, just to know which ones are the ADG rides, we

11   can look at that.

12   Q.   Okay.  But ultimately, all the rides that you show as

13   installed on that chart are the rides that are listed on

14   Exhibit 60?

15   A.   That's correct.  And based on the fact that Wave Loch

16   produced that document, there would be -- we would have no

17   reason to believe that Andrew Thatcher could possibly lie.

18   Q.   No, and I'm not suggesting that anything that's shown on

19   there wasn't actually installed.  I think the question is

20   whether there's earlier rides that were installed and are no

21   longer operating, which we've already covered.

22        So in any event, so as far as you know, they sold --

23            MR. O'HARE:  Can we put that exhibit back up?

24   BY MR. O'HARE:

25   Q.   Would you call this design similar to your fixed nozzle
```

1   flap?

2   A.   No.

3   Q.   Okay.  And for one thing, does this appear to be a design

4   that you can ride over?

09:57   5   A.   Yes.

6   Q.   Okay.  This on Exhibit NX-1 looks like a design where you

7   can ride over that -- whatever's covering the nozzles?

8   A.   Yes.

9   Q.   How would one get over that?

09:58   10   A.   You would do a rail slide.

11   Q.   Okay.  So you'd have to somehow take off from the water?

12   A.   You can just lift the nose.

13   Q.   So if somebody was skilled enough to lean back on the rear

14   of their board and get it up over it, then they could do it?

09:58   15   A.   I believe so.

16   Q.   But if they didn't do it right, they'd go under the cover?

17   A.   They -- most riders would just ride under the cover.  It

18   doesn't look very safe at all.

19   Q.   Okay.  And so but again, that's different from the design

09:58   20   that you all used.  You have a nozzle cover, even the fixed

21   one, that is just above the flow of water, correct?

22   A.   Currently, that's correct.

23           MR. O'HARE:  If we could turn to Exhibit NY-1.

24           THE COURT:  Please clear the screen.

09:59   25           MR. O'HARE:  Let me remove these annotations here so

 1  we can start fresh.

 2  BY MR. O'HARE:

 3  Q.   So these shaded colored lines, they're designed to tell us

 4  when a -- and in the case of the '589 patent, that goes back

09:59   5  to, what, the date -- the provisional application for it was

 6  filed?

 7  A.   The date in which the patent was applicable.

 8  Q.   But what -- I mean, the patent didn't issue till December

 9  2003, correct?

09:59  10  A.   I'd have to look at the face page.  I think it's 2002, so I

11  think you're wrong.

12  Q.   Okay.  That may be.

13       MR. O'HARE:  Why don't we pull up Exhibit 1 just to

14  confirm.  So the issue date, December -- wrong part of the

10:00  15  patent.  December 2002.  And then if we could go back to the

16  full page.  And if we could enlarge the left side, the upper

17  left side.

18  BY MR. O'HARE:

19  Q.   And so it was filed August 2, 2000, but it's based on a

10:00  20  provisional application back in 1999, correct?

21  A.   Correct.

22  Q.   So it's -- go back to your chart, if we may, Exhibit NY.

23       So this 1999 date, that's roughly the date of the very

24  first application, the provisional application?

10:00  25  A.   Correct.  And it's also the date that Mr. Lochtefeld first

|       |    |                                                                         |
|-------|----|-------------------------------------------------------------------------|
|       | 1  | implemented the flexible nozzle flap on his Bruticus Maximus in          |
|       | 2  | Europe.                                                                  |
|       | 3  | Q.  Based on what you've heard in court?                                 |
|       | 4  | A.  Based on, yeah, Mr. Lochtefeld's testimony and the                   |
| 10:01 | 5  | promotional materials for that Swatch tour.                              |
|       | 6  | Q.  So the patent actually issued, then, here at the end of              |
|       | 7  | 2002, correct?                                                           |
|       | 8  | A.  Correct.                                                             |
|       | 9  | Q.  Boy, this thing.  That's what we've got.                             |
| 10:01 | 10 | The first line for the tension surface patent, what's that              |
|       | 11 | intended to represent?                                                   |
|       | 12 | A.  The same thing.                                                      |
|       | 13 | MR. O'HARE:  And so if we could pull up Exhibit 3, I                     |
|       | 14 | believe that's the '530 patent.  Whoops.  And if we could               |
| 10:02 | 15 | enlarge -- we need to go down further on this, Gary.                     |
|       | 16 | BY MR. O'HARE:                                                           |
|       | 17 | Q.  So this patent, the provisional application was actually             |
|       | 18 | filed back in early 2001, correct?                                       |
|       | 19 | A.  Correct.                                                             |
| 10:02 | 20 | Q.  And the later application on that provisional application            |
|       | 21 | was filed the following year, correct?                                   |
|       | 22 | A.  Correct.                                                             |
|       | 23 | Q.  If we could go back to your Exhibit NY.  So your first line          |
|       | 24 | for the tension surface patent is in 2002, correct?                      |
| 10:02 | 25 | A.  Correct.                                                             |

943

1   Q.   But it actually was filed early the previous year, the

2   provisional application, correct?

3   A.   Correct.

4   Q.   So if we're doing apples to apples, you picked the early

10:03   5   date for the '589 patent, meaning the 1999 provisional

6   application date, but when you made this chart up for the

7   tension surface patent, you picked a later date, the date the

8   actual full application was filed, correct?

9   A.   It's the '589 patent and the tension surface patent.

10:03   10   They're based on the public implementations of the concept.

11   Q.   So not based on when they'd actually filed the patent?

12   A.   If it's based on -- no, that's not correct.

13   Q.   Well, did you base it on the provisional application date

14   or not for the '589?

10:03   15   A.   That's not what's mentioned in the chart.

16   Q.   Okay.  So you didn't base it on the provisional application

17   date?

18   A.   No.

19   Q.   Okay.  So but if we were to actually base it on when these

10:03   20   applications were made, which means you could have practiced

21   the tension ride patent and still had protection, the relevant

22   date would be April 2001, correct?

23   A.   Correct, that would actually help our data, so thank you

24   for pointing that out.

10:04   25   Q.   Well, I mean, maybe, but it would show that the tension

 1   surface patent ended up actually overlapping in that period

 2   between when the '589 was first applied for and then when the

 3   '589 was actually issued at the end of 2002?

 4   A.   That would be really helpful because now it shows the jury

10:04  5   a better image that the WhiteWater/ADG global sales force

 6   implementing the generation two.  That's what caused the hockey

 7   stick, so thank you for that.

 8   Q.   I'll come to that.

 9        And so by the time the hockey stick starts, whoever is

10:04  10   selling these things had the benefit of both the '589 and the

11   tension surface or trampoline surface patent, correct?

12   A.   And the fact that the pumps were in the horizontal position

13   underneath, the foam-and-coat method was gone, and the global

14   sales force, correct.

10:05  15   Q.   Okay.  And so, in fact, when -- do you know when the ADG

16   and WhiteWater license agreements were entered into, meaning

17   when Wave Loch entered into contracts with ADG and WhiteWater

18   to let them sell FlowRider products?

19   A.   It depends because there were a number of them, but we can

10:05  20   go through and get the exact dates.

21        MR. O'HARE:  Why don't we show Exhibit 51.  That would

22   be the ADG one.  And if we could find the date, maybe it's on

23   the signature area.

24   BY MR. O'HARE:

10:06  25   Q.   So September 25, 2003, that's when the ADG license was

1   apparently first executed?

2   A.   That's correct.

3        MR. O'HARE:   And then if we could turn to Exhibit 108.

4   That's the WhiteWater, the first WhiteWater license.   And,

10:06   5   again, I think we're going to need to go to the end to find a

6   date.

7   BY MR. O'HARE:

8   Q.   So this one's on either October 3 or October 7, 2003.   Is

9   that correct?

10:06   10   A.   That's correct.

11   Q.   So we go back to Exhibit NY, the chart.   So as of the time

12   those license agreements were entered into in 2003, the '589

13   patent had already issued, correct, the previous December?

14   A.   Correct.

10:07   15   Q.   And the tension surface patent was pending, but it hadn't

16   actually issued yet?

17   A.   No.

18   Q.   Okay.   I did a double negative.   Is it correct that the

19   tension surface patent didn't issue till the following year,

10:07   20   2004?

21   A.   That's correct.

22   Q.   Okay.   Then, at least according to your chart, assuming it

23   isn't missing any of the sales of rides that have closed in the

24   past 20 years, the significant event follows the execution of

10:07   25   these license agreements with WhiteWater and ADG?

946

A.   I believe the significant event follows the pump modules

going in the horizontal position underneath compounded with the

ride surface not being foam coat anymore.

Q.   And you base that on --

A.   That's your narrative.

Q.   -- that the pumps made the difference?

A.   That the nozzle flap made the difference.

Q.   Okay.  I got it, but -- I'll come back to that.

So but do you not agree that both of these technologies,

even according to your chart, were available, but the

significant event in 2003 was the signing of these two license

agreements?

A.   That would be a big help on selling.

Q.   Okay.  And, in fact, at that time, Wave Loch was a

relatively small company, wasn't it?

A.   You heard Mr. Lochtefeld testify that it was around ten

employees, and I believe it's around eight employees today, so

about the same.

Q.   But they were not a big company back then.  They weren't

selling a lot of rides, according to this chart, either, were

they?

A.   I would think five a year is okay.  I'm not sure.  You

would have to ask Mr. Lochtefeld.

Q.   Well, we have.  And then at this point in time, would it be

fair to say -- well, again, you weren't in the business in this

1    time frame, 2003, correct?

2    A.   No, sir.

3    Q.   Okay.  Do you have any reason to doubt or disbelieve

4    testimony that we have heard that in 2003 and 2004, WhiteWater

10:09    5    already had much greater access to the worldwide market to sell

6    water rides than Tom Lochtefeld did?

7    A.   I believe Mr. Lochtefeld and Mr. Chutter both testified

8    that WhiteWater had access to the Chinese market.

9    Q.   Okay.  And so would you -- do you have any basis and

10:10    10    personal knowledge to disagree that ADG back in 2004 had much

11    better access to the North American market than Wave Loch did

12    at that time?

13    A.   Oh, when you say "access," can you clarify what you mean?

14    Q.   Meaning that they had an established presence in the

10:10    15    market, sales people, capability of achieving sales in a way

16    that Wave Loch couldn't do on its own?

17    A.   You can make that argument.

18    Q.   Okay.  And, in fact, we do know that after those two

19    license agreements were signed the following year and beyond,

10:10    20    the sale of FlowRiders did go up significantly.  Is that

21    correct?

22    A.   That's correct.

23    Q.   And the rides, at least as you understand it, included both

24    the '589 nozzle flap design and this trampoline tension

10:11    25    surface?

```
            1   A.   And some of the rides were still that first generation as
            2   well with no nozzle flap on -- of the '589.
            3   Q.   But in terms of the sales jumps, it was the stuff that
            4   included, as you understand it, the technology of both of those
10:11       5   patents?
            6   A.   I believe so.
            7   Q.   And --
            8   A.   But sorry.  As we've seen, some of their products don't
            9   have the nozzle flap, period, like the one in Durban.
10:11      10   Q.   From 2001?
           11   A.   Correct.
           12   Q.   Not from 2004, '5, and anytime after?
           13   A.   No, but they never implemented their so-called
           14   game-changing safety feature on a product they sold a customer.
10:11      15   Q.   In 2001?
           16   A.   In 2005 they could have done that.
           17   Q.   Excuse me?  They could have done what in 2005?
           18   A.   Updated their product with the safety feature that they're
           19   saying it was vital.
10:12      20   Q.   Gone back and replaced it?
           21   A.   Or implemented it.
           22   Q.   Maybe I'm lost.  Aren't you saying that in 2005 and beyond,
           23   the products that -- the FlowRider products that are being sold
           24   practiced both the '589 patent, or the moveable nozzle cover,
10:12      25   and the trampoline?
```

1  A.   Well --

2  Q.   Do they or not?

3  A.   There are two defendants in this case.  One of them does

4  repair jobs, so there would be sales of -- I mean, if we were

10:12   5  back then, we would probably implement our nozzle flap on to

6  the one in Durban because they need to be foamed and coated

7  every year, it looked like.

8  Q.   Again, are the sales shown on your Exhibit NY sales -- the

9  increase from sales, are they an increase in sales of products

10:13   10  that include both the nozzle flap and the trampoline?

11  A.   They may be mutually exclusive.  I can't confirm that, at

12  that time.

13  Q.   So you don't know?

14  A.   We know that they had the tension surface, and we know that

10:13   15  they had -- some of them had the hinged nozzle flap, but I

16  can't confirm with you that 100 percent of them had both.

17  Q.   Okay.  Because you weren't around then, and you haven't

18  seen all the rides?

19  A.   Nobody in this room was around back then.

10:13   20         THE COURT:  Well, wait.  I was.

21         THE WITNESS:  In the industry.

22  BY MR. O'HARE:

23  Q.   Well, we've had people in this room raise their right hand

24  who were around.

10:13   25  A.   Correct, but they didn't attest to your question, so I

1    can't confirm that.

2    Q.   Neither can you.

3        All right.  Would you agree that the folks at WhiteWater

4    and Wave Loch would have firsthand knowledge of why

10:14    5    Wave Loch -- WhiteWater chose to enter into a license with

6    Wave Loch in 2003?

7    A.   Can you ask that question again?

8    Q.   Would you agree that the folks at Wave Loch and at

9    WhiteWater would have firsthand knowledge of why they entered

10:14   10    into a license agreement in 2003?

11   A.   I believe some individuals at Wave Loch and some

12   individuals at WhiteWater may have firsthand knowledge, but as

13   Mr. Thatcher already attested, he had no idea what was going

14   on.

10:14   15   Q.   Okay.  Mr. Lochtefeld would have firsthand knowledge.   You

16   agree with that?

17   A.   I believe so.

18   Q.   And Mr. Chutter would have firsthand knowledge?

19   A.   I believe so.

10:14   20   Q.   Okay.  And you don't?

21   A.   No.

22   Q.   And are you an engineer or expert in the design of these

23   rides?

24   A.   No, I majored in molecular and cell biology.

10:15   25   Q.   And so did you know or do you know that the '589 patent,

1    the moveable nozzle cover, was actually an invention that was

2    necessary for the implementation of the trampoline ride -- or

3    the trampoline surface?

4    A.   No.

10:15   5    Q.   And to your knowledge, would that trampoline surface, if

6    you know, even work on that old-style big ride with the wall

7    and the reverse curve?

8    A.   That's one of the weaknesses of the '530 patent, is that it

9    cannot create a complex curved ride surface.

10:16   10   Q.   Okay.  And so in order to be able to use that trampoline,

11   you needed to have a less complex ride surface?

12   A.   To use the trampoline, it was not even necessary, but it's

13   just another feature set that they offered since you would be

14   forced to purchase the replacement trampoline from Wave Loch,

10:16   15   like a razor blade.

16   Q.   That wasn't my question.  If you don't know, just tell me.

17        Does the trampoline surface -- would it work on that

18   old-style ride with the wall, with the reverse curve?

19   A.   I believe you could do that.

10:16   20   Q.   Have you ever seen it done?

21   A.   As they stopped selling that version, I haven't seen it,

22   but conceptually it makes sense.  It's not a complex curve.

23   Q.   As far as you know, it's never been done?

24   A.   As far as I have seen, no.

10:17   25   Q.   So as far as you know, an additional benefit that came out

1    of the '589 patent, the nozzle flap patent, was to enable

2    Wave Loch to do the trampoline?

3    A.   That's not true.

4    Q.   So you know that not to be true?

10:17  5    A.   That doesn't make any sense.

6    Q.   To you?

7    A.   I would say objectively.

8    Q.   Okay.  Now, PSD, Pacific Surf Designs, in terms of the

9    rides you sell, am I correct the only rides you sell are sheet

10:17  10   wave rides and only sheet wave rides?

11   A.   That Pacific Surf Designs manufactures and sells, correct.

12   Q.   And that business, we've heard, started -- or at least the

13   company was formed in August of 2012?

14   A.   Correct.

10:18  15   Q.   And as of that time, you had no experience in the water

16   ride or water park business?

17   A.   That's correct.

18   Q.   And when did you graduate from law school?

19   A.   2006.

10:18  20   Q.   And then you took another year to get a -- what's called a

21   master's in tax law?

22   A.   It's an LLM.

23   Q.   Isn't that a master's?

24   A.   It's a master's in law with an emphasis in taxation.  It's

10:18  25   not a master's in taxation.

1   Q.   Okay.  Fair enough.

2        And what year was that?

3   A.   2007.

4   Q.   And then so, roughly, five years between your completion of

10:18   5   your legal education and when you started Pacific Surf Designs

6   with Mr. Alleshouse?

7   A.   That's correct.

8   Q.   And during those five years, you worked in three different

9   law firms, correct?

10:18   10   A.   Correct.

11   Q.   And doing -- correct me if I'm wrong; you were doing tax

12   and employee benefit legal work?

13   A.   I also worked at the IRS during that time.

14   Q.   That would be tax, wouldn't it?

10:19   15   A.   It was transfer pricing.

16   Q.   Does that relate to taxation?

17   A.   It does.

18   Q.   Okay.  So you were doing tax and employee benefit work?

19   A.   And corporate tax and public company work.

10:19   20   Q.   Tax work?

21   A.   No, public company work.

22   Q.   What kind of work for public companies?

23   A.   Public disclosures, 10-Ks, proxies.

24   Q.   Okay.  Just general corporate stuff?

10:19   25   A.   Correct.

1   Q.   Not just tax or employee benefits?

2   A.   Correct.

3   Q.   Okay.  So during that period of time, the three law firms,

4   you did taxation work, employee benefits work, and some general

10:19   5   corporate work for public companies?

6   A.   Correct.

7   Q.   And then I believe you had -- for about six months you had

8   a nonlegal job working for one of your family's businesses?

9   A.   No.

10:19   10   Q.   Oh, what was the nonlegal job?  It had to do with a company

11   that was trying to figure out how to put Chinese characters on

12   a computer or something like that?

13   A.   Yeah, I have other business ventures that I engage in.

14   Granted, I think you guys looked at my LinkedIn profile, but

10:20   15   that doesn't list everything.  It's just on the website.

16   Q.   So you didn't work for six months for a family business?

17   A.   When you say "six months," I do other things on the side.

18   They're not the entire six months, so I don't know how to

19   characterize that.

10:20   20   Q.   Well, did you work -- I didn't mean to make this a big

21   deal.  Did you work for a family business, meaning a business

22   owned by your family, that had something to do with putting

23   Chinese characters into some computer format?

24   A.   No.

10:20   25   Q.   You've never worked on that?

955

1   A.  I founded a business, if that's what you mean.  It was not

2 owned by anyone else.

3   Q.  Okay.  Did you work in a business that had something to do

4 with Chinese characters?

10:20   5   A.  Yes.

6   Q.  Okay.  I take it, before you started with PSD, had you done

7 any work in patent law?

8   A.  When you say have I done any work in patent law, I've not

9 been a patent attorney, no.

10:21   10   Q.  And not provided legal advice to people on patent law?

11   A.  No.

12   Q.  So would it be fair to say that PSD got a bit of a head

13 start in the sheet wave business based on Mr. Alleshouse's time

14 at Wave Loch?

10:21   15   A.  When you say "head start," what do you mean?

16   Q.  Well, I mean at the time you started PSD, you had no

17 experience in this industry, correct?

18   A.  That's correct.

19   Q.  And within three months, PSD was at that big show in

10:21   20 November 2012, the IAAPA water attraction conference in

21 Orlando, correct?

22   A.  Correct.

23         MR. O'HARE:  We can show Exhibit 404.

24 BY MR. O'HARE:

10:22   25   Q.  And here you are in August 8.  This is an exchange of

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | emails between you and Mr. Alleshouse on August 8, 2012?                     |
|       | 2  | A.   That's correct.                                                         |
|       | 3  | Q.   Just five days after he left Wave Loch?                                 |
|       | 4  | A.   Do you have a question?                                                 |
| 10:22 | 5  | Q.   Was it just five days after he left Wave Loch?                          |
|       | 6  | A.   Correct.                                                                |
|       | 7  | Q.   And so you're already filling out the form to go to the                 |
|       | 8  | conference.                                                                  |
|       | 9  |            MR. O'HARE:   If we could go to the later pages.                  |
| 10:22 | 10 | BY MR. O'HARE:                                                               |
|       | 11 | Q.   So there's the form that -- did you fill that out?  Is that            |
|       | 12 | your handwriting?                                                            |
|       | 13 | A.   It is.                                                                  |
|       | 14 | Q.   Okay.  And so you registered for this conference in three              |
| 10:22 | 15 | months.  Were you there with a line of products?                            |
|       | 16 | A.   Correct.                                                                |
|       | 17 | Q.   And you had models, scale models, of products?                         |
|       | 18 | A.   Yeah, correct.  We saw Mr. Taché there.                                 |
|       | 19 | Q.   Is that the only person you saw?                                        |
| 10:23 | 20 | A.   We saw Marshall.                                                        |
|       | 21 | Q.   Okay.  You just saw two people?                                         |
|       | 22 | A.   We saw customers there.                                                 |
|       | 23 | Q.   Okay.  So anyway, my question was, you had scale models               |
|       | 24 | there, right?                                                                |
| 10:23 | 25 | A.   Correct.                                                                |

1  Q.   And did you have them for multiple lines of -- or types of
2  products?
3  A.   I believe so.
4  Q.   And what were the basic types of products that you had in
5  this conference just a few months after you started your
6  business?
7  A.   The Makaha, the Off-the-Wall, and the Supertube.
8        MR. O'HARE:   And if we could go to 68 -- Exhibit 68.
9  BY MR. O'HARE:
10 Q.   So when you started your business, you obviously touted
11 Mr. Alleshouse's Wave Loch experience in promoting the business
12 of PSD, correct?
13 A.   We would tout everyone's experience in whatever expertise
14 they have, so yes.
15 Q.   So but the expertise that you touted of Mr. Alleshouse was
16 his years in the sheet wave business with Wave Loch?
17 A.   Amongst his engineering background, that would be part of
18 it.
19 Q.   Okay.
20        MR. O'HARE:   If we could go to page 2 of the exhibit.
21 BY MR. O'HARE:
22 Q.   And then Mr. Alleshouse, under his description, "Over seven
23 years experience designing and installing 30-plus sheet wave
24 machines," and then you mentioned yes, he's got an educational
25 background.  Correct me if I'm wrong.  Didn't he testify he

```
        1   only had five years at Wave Loch, not seven?
        2   A.   It was five years following 2007, but he was there in 2005,
        3   and at this time, he was at our company for one year, so if you
        4   add that up, that would be seven.
10:25   5   Q.   Fair enough.  Okay.
        6        And at this point -- this is October 13 -- "Installing
        7   30-plus sheet wave machines," that would have been, of course,
        8   all at Wave Loch, correct?
        9   A.   Correct.
10:25  10   Q.   And then Exhibit 79-1 -- that means 79, page 1.  And if we
       11   add up management, and then they describe this complementary
       12   set of skills, that Mr. Alleshouse was the lead engineer at
       13   Wave Loch, and you were an attorney at one of the top law
       14   firms.  Actually, you were an attorney at three different top
10:25  15   law firms, correct?
       16   A.   Sure.
       17   Q.   Okay.  Now, of all the type of water rides in the world,
       18   you and Mr. Alleshouse decided to sell sheet wave rides and
       19   only sheet wave rides?
10:26  20   A.   Correct.  And I want to point out, this document you're
       21   showing, this is a draft.  We've never sent this to anyone for
       22   investment.
       23   Q.   Didn't you give this to a couple of investors?
       24   A.   I gave them to a couple of my friends to take a look to see
10:26  25   what they could do to help me out with the draft.
```

1    Q.   Didn't you give it to a couple of potential investors?

2    A.   The potential investors were my friends, and --

3    Q.   Okay.  So you did?

4    A.   But they weren't investing in my company.  They were

5    investors, but they weren't for investment in my company.

6    Q.   You gave it to a couple of potential investors, correct?

7    A.   I gave it to my friends who are investors by their

8    profession.

9    Q.   Did you give it to a couple of potential investors or not?

10   A.   If I was to show my friends in general, the majority of

11   them would fall under that category of "investing," so I would

12   not be able to show anyone based on what you're asking.

13   Q.   Okay.  So but in your direct examination, you certainly

14   gave the impression you didn't give this to anybody who was a

15   potential investor, didn't you?

16   A.   This draft?

17        MR. O'HARE:  Okay.  Why don't we run the witness'

18   deposition at page 272, line 98 through 99.  Or excuse me.

19   307, line 2 through 10 and 308, line 4 through 8.  This would

20   be in the Alleshouse litigation.

21        MR. THOMAS:  Counsel, can I ask, is this a deposition

22   in a different proceeding?

23        MR. O'HARE:  Yes, it's been lodged with the Court.

24        MR. THOMAS:  Your Honor, I would object.  I'll

25   withdraw the objection.

|  | 1 | MR. O'HARE:   307, line 2 through 10 and 308, line 4 |
|---|---|---|
|  | 2 | through 8. |
|  | 3 | And so we're referring to -- before we start running this, |
|  | 4 | it was numbered here as Exhibit 76, and it's got the PSD |
| 10:28 | 5 | marking 27298.   If we could briefly display Exhibit 79 again, |
|  | 6 | Gary. |
|  | 7 | THE COURT:   76? |
|  | 8 | MR. O'HARE:   27298. |
|  | 9 | THE COURT:   Wait.   It says 76.   You said 79, I |
| 10:29 | 10 | believe. |
|  | 11 | MR. O'HARE:   I understand.   This was a deposition |
|  | 12 | marking, and I'm referring to the Bates number to establish |
|  | 13 | it's the same document. |
|  | 14 | THE COURT:   Okay.   All right. |
| 10:29 | 15 | MR. O'HARE:   And so if you look at the bottom right, |
|  | 16 | if you could enlarge that so the numbering is 27298, and then |
|  | 17 | in the deposition reference, it's the same marked page.   And |
|  | 18 | then if we could run the deposition testimony concerning this |
|  | 19 | same document that's now marked as Exhibit 79. |
| 10:29 | 20 | (A video was played.) |
|  | 21 | MR. O'HARE:   308, lines 4 through 8. |
|  | 22 | (A video was played.) |
|  | 23 | BY MR. O'HARE: |
|  | 24 | Q.   So of all the rides in the world that you could have gotten |
| 10:30 | 25 | involved with or all the businesses in the world, the one you |

1    decided to get into were the sheet waves in competition with

2    Wave Loch, the FlowRider ride, correct?

3    A.  Correct.

4         MR. O'HARE:  And Exhibit 204, if we could show that.

10:30    5    BY MR. O'HARE:

6    Q.  And at least initially the plan was --

7         MR. O'HARE:  If we could enlarge this.

8    BY MR. O'HARE:

9    Q.  -- based on this August 20 email, to knock off or copy at

10:31   10   least some of the FlowRider products?

11   A.  Correct.  And I want to point out, in that deposition

12   video, the potential investors that you were mentioning were

13   not -- they're not investing in my company, they're potential

14   investors in general.

10:31   15   Q.  All right.  But you showed it to -- I'm not going to fence

16   with you anymore.  I already showed the video.

17        If we could --

18   A.  But I do want to point out, as I mentioned --

19        THE COURT:  I'm sorry.  There's not a question

10:31   20   pending.

21        THE WITNESS:  Okay.

22        MR. O'HARE:  All right.  If we could show Exhibit --

23   BY MR. O'HARE:

24   Q.  Now, all the products that are shown here were the same or

10:31   25   similar to FlowRider products, the Wave Loch products, correct?

A.   When you say "similar," what do you mean?

Q.   Well, there was a -- why don't I show you Exhibit 68 at page 11.   That's your October 2013 forecast and projection.

And so you mentioned the Waikiki, the Makaha, the Supertube.   You have one product here, the Off-the-Wall, which you describe as the industry's first and only rideable half-pipe, a PSD exclusive.

So that's a ride that you all came up with?

A.   Correct.

Q.   And Wave Loch/WhiteWater, at least at this time, didn't have one that was similar to it?

A.   No, and currently we have a product that's substantially different than this.   This is pretty old.

Q.   And so on this product that was a PSD exclusive, how many of those have you sold?

A.   Zero.

Q.   And how many -- so all your sales have been of these other products, and I know they've changed some of the names, but the other three categories of products shown here?

A.   That's incorrect.

Q.   What are the categories of products that you've sold?

A.   We've sold a total of zero Waikikis or the current version of that.

Q.   And that is -- what's that one called?

A.   ProFlow Mini.

1    Q.    And then the Makaha?

2    A.    Is the ProFlow.

3    Q.    And you've sold those?

4    A.    Correct.

10:33  5   Q.    And the Supertube, that's what you installed over in

6    France?

7    A.    Correct.  But as we custom design every one of our

8    products, they aren't -- they just kind of -- these are

9    categories, but that's not generally what we install.  Every

10:33  10  product we install is different.

11   Q.    But the categories of products that you've installed are

12   the Makaha, now known as the ProFlow, and the Supertube?

13   A.    To date.

14   Q.    To date.

10:33  15        Let's take a look at the first page of Exhibit 68.  This is

16   something that you prepared for presentation at this conference

17   in Silicon Valley in October 2013?

18   A.    Correct.

19   Q.    There were 5,000 people there?

10:34  20  A.    Around that.

21   Q.    And at the time you prepared this, fair to say you believed

22   what you put in here to be true?

23   A.    Correct.

24   Q.    And --

10:34  25  A.    For purposes of this forum.

1  Q.  Well, did you believe it to be true for purposes of the

2  truth?

3  A.  I believed it to be accurate for the SVIEF presentation.

4  Q.  Again, did you believe that what you put in here was true?

10:34  5  A.  I do.

6  Q.  Okay.  And I mean, you weren't trying to win this

7  competition by lying to those 5,000 people, were you?

8  A.  The competition had no prize.  There was no award at all.

9  It was just to present so people could figure out who you were,

10:35  10  to talk to you about supply chain stuff or just Chinese market.

11  Q.  Am I wrong?  Wasn't this a competition?

12  A.  It was a presentation to the forum as part of the forum.

13  It was a competition with no prize.

14  Q.  But you came in second in this competition with no prize?

10:35  15  A.  Correct, and the winner was a company that allowed you to

16  restart someone's heart by stimulating a muscle inside their

17  inner ear, and the other companies were kind of like that too,

18  so it wasn't really -- we shouldn't have been there.

19  Q.  But you came in second?

10:35  20  A.  Because it's about surfing.

21  Q.  Okay.  Anyway, so you must have done a pretty good job.

22       MR. O'HARE:  So if we could go to Exhibit 68, page 3.

23  BY MR. O'HARE:

24  Q.  And, of course, all the discussion in this presentation is

10:35  25  about sheet wave surf simulators because that's all you were,

|        |    |                                                                  |
|--------|----|------------------------------------------------------------------|
|        | 1  | at this time and today, building, selling, and installing,       |
|        | 2  | correct?                                                         |
|        | 3  | A.   Correct.  And the -- just to point out so there's no       |
|        | 4  | confusion, the "Surf Anywhere" slogan is what we used back in     |
| 10:36  | 5  | 2012, 2013.  That's currently what WhiteWater uses, but just to  |
|        | 6  | avoid confusion, we were the ones who did it back then.  We      |
|        | 7  | don't do it anymore.  Just because they're the same, that's      |
|        | 8  | what they do now --                                              |
|        | 9  | Q.   So they copied you?                                         |
| 10:36  | 10 | A.   I don't know what they did.                                 |
|        | 11 | Q.   Okay.                                                       |
|        | 12 | A.   That's just what happened.                                  |
|        | 13 |       MR. O'HARE:  So if we could go to page 4, please.          |
|        | 14 | BY MR. O'HARE:                                                   |
| 10:36  | 15 | Q.   And, then, this is more for you to explain to folks what a  |
|        | 16 | sheet wave is, correct?                                          |
|        | 17 | A.   Correct.                                                    |
|        | 18 |       MR. O'HARE:  And then page 6.                              |
|        | 19 | BY MR. O'HARE:                                                   |
| 10:36  | 20 | Q.   And then you have down here the benefits of it.  It's       |
|        | 21 | popular with young folks that are hard to capture; you can sell  |
|        | 22 | food and beverage; and then the last one --                      |
|        | 23 |       MR. O'HARE:  If we could enlarge that.                     |
|        | 24 | BY MR. O'HARE:                                                   |
| 10:37  | 25 | Q.   -- smaller footprint, lower construction costs, and lower   |

1    costs of ownership compared to alternative simulators, and

2    that, indeed, was an advantage of the sheet waves that you were

3    planning to make and sell?

4    A.   It wasn't the advantage of the sheet waves.   It was the

10:37    5    advantage of having this type of product compared to cable

6    wakeboard parks and wave pools, which were magnitudes larger.

7    Q.   And in order to have this smaller footprint and lower cost

8    of ownership or these other benefits, did you need a trampoline

9    surface to do that?

10:37    10    A.   Absolutely not.   I think you were misunderstanding what

11    this bullet point is.   It's comparing it to wave pools and

12    cable wakeboard parks, which are giant bodies of water.   So you

13    don't need anything to be smaller than them other than just not

14    being as big as a lake.

10:38    15    Q.   But you don't need a trampoline surface in order to achieve

16    this benefit, do you?

17    A.   The benefit of having a smaller footprint than a lake?

18    Q.   Right.

19    A.   Sure.

10:38    20    Q.   Okay.   In fact, you didn't need a trampoline surface to

21    achieve any of the benefits of PSD's rides, did you?

22    A.   No.

23            MR. O'HARE:   If we could go to 68, page 6.   Oh, that

24    is page 6.   Let's go to a different -- go to the next page

10:38    25    then.

                   1          THE COURT:  How much longer do you have, Mr. O'Hare?

                   2          MR. O'HARE:  Long enough that if Your Honor wants to

                   3   take a morning break, we should.  Or not.

                   4          THE COURT:  I think it's a good idea.

10:38              5          MR. O'HARE:  Okay.  Thank you.

                   6          THE COURT:  All right.  I need to talk with the

                   7   lawyers for a little bit outside of your presence, so we're

                   8   going to take a little longer.  Please indulge me.  I think

                   9   that says 20 till 11:00.  So let's come back at five till

10:39             10   11:00.  Okay.  Again, I may not be here right at five till, but

                  11   bear with me.  Remember my admonition.

                  12      Sir, you may step down.

                  13      (Proceedings held outside the presence of the jury panel.)

                  14          THE COURT:  Okay.  The jury has left the courtroom.

10:39             15      Counsel, I've been telling you that I am supposed to sit

                  16   with the Ninth Circuit on Friday.  And I forgot -- I don't know

                  17   why I didn't think of this before, and I apologize, but I

                  18   forgot that I have to travel to Seattle, and so I tried to

                  19   confirm what time and when we would be leaving, and I'm

10:40             20   actually going to be leaving San Diego at mid-day, thereabouts,

                  21   on Thursday.

                  22      So I bring that to your attention because it strikes me

                  23   that we may not be able to hold court on Thursday.  So I want

                  24   you to think about it.  I can certainly try -- if the case has

10:40             25   been submitted to the jury Wednesday afternoon, I can certainly

1    try, but I can't -- obviously I can't assure you.  I can try to

2    find a judge who would sit and take questions from the jury or

3    possibly take a verdict.  Or, on the other hand, I could just

4    simply adjourn Wednesday night, give them a four-day weekend,

10:40    5    and come back on Monday.  So why don't you all think about it,

6    and I'll come back, and we'll talk about it again.

7              MR. O'HARE:  Question.  Does Your Honor normally

8    deliver the instruction -- the final instructions before or

9    after argument?

10:41    10              THE COURT:  Before.

11              MR. O'HARE:  Okay.

12              THE COURT:  I preinstruct.

13         Okay.  Thank you.  We're in recess.

14         (Recess.)

10:54    15         (Proceedings held outside the presence of the jury panel.)

16              THE COURT:  All right.  We're back on the record

17    outside the presence of the jury.

18         Any thoughts on Thursday?

19              MR. O'HARE:  I'm sorry, what?

10:54    20              THE COURT:  Any thoughts on Thursday, what to do on

21    Thursday?

22              MR. O'HARE:  Well, I guess maybe we talked briefly

23    that we think that we'll know better at the end of the day, but

24    likely, the last two witnesses for the defense will be on

10:54    25    tomorrow morning and hopefully off, and then we're going to

1   have at least one known rebuttal witness.  We haven't seen the

2   rest of the case.  Possible.  So my guess is we'll be -- we

3   will consume all or most of Wednesday on evidence, and then I

4   don't know the Court's thought on when we were going to convene

10:55   5   to sort through the jury instructions.  We have a lot that are

6   agreed to, but we do have some that aren't.  So I don't know if

7   the Court wants to do that if there's time Wednesday or if

8   there's any time Thursday morning without missing the flight.

9           THE COURT:  Yeah, no, there won't be any because

10:55   10  getting through security this time of year is kind of

11  difficult.  So why don't we try to get through the jury

12  instructions on Wednesday night, Wednesday afternoon, if we

13  can.  By the way, on that subject, would you all be nice enough

14  to resend your jury instructions to me in 14-point type?

10:55   15  You're all much younger except -- you know, you're all much

16  younger than I am, and your eyesight is probably a whole lot

17  better than mine, but that's painful.

18          MR. O'HARE:  It would help me too.

19          THE COURT:  Oh, good.

10:55   20          MR. THOMAS:  Do you want us to email those?  How do

21  you want them delivered?

22          THE COURT:  I don't care.  It doesn't matter.  However

23  you filed them before.  Email.

24          MR. THOMAS:  We electronically filed them.

10:56   25          THE COURT:  That's fine.  Go ahead and do that.

1          MR. O'HARE:  I guess we'll do it since we're the ones

2     that prepared it with the small type.

3          THE COURT:  It's your fault.

4          MR. O'HARE:  Not my fault.  It's his fault.

10:56    5          MR. SCOTT:  My fault.

6          THE COURT:  I know I have a special --

7          MR. THOMAS:  You guys did the joint.  We did our own

8     filing for ours, the ones that were not agreed to.

9          MR. SCOTT:  If you want to send me a Word version, why

10:56   10     don't we do what we did last time, which is everybody combines

11     their 14-point stuff and submits it as a joint.  We said joint,

12     plaintiff's proposed, defendants' proposed.

13          THE COURT:  Work it out over lunch.  Just let me know.

14     I do have criminal matters on Monday and Tuesday.  We will

10:56   15     change the -- I will move my Monday matters to Wednesday.  I

16     can do criminal calendar while I also have jury deliberating,

17     so that shouldn't be a problem.

18          MR. THOMAS:  While we're on the subject, we did

19     receive a draft of the verdict form late yesterday afternoon.

10:57   20     I've reviewed it.  I'm still going to review it, but my plan

21     for that is we'll exchange our red-line comments with you and

22     try to work it out.  If we can't, then we'll each submit our

23     own version of the verdict tonight with the 14-point jury

24     instructions.

10:57   25          THE COURT:  Okay.  Great.

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | MR. O'HARE:  And a 14-point verdict form.                          |
|       | 2  | MR. THOMAS:  I would think so.                                      |
|       | 3  | THE COURT:  That's so nice of you.                                 |
|       | 4  | All right.  All right.  Go get the jury, please.                   |
| 10:57 | 5  | Mr. Yeh, you're on the witness stand.                              |
|       | 6  | (Proceedings held in the presence of the jury panel.)             |
|       | 7  | THE COURT:  All right.  Be seated.                                 |
|       | 8  | Mr. O'Hare, you may proceed.                                        |
|       | 9  | MR. O'HARE:  Thank you, Your Honor.                                |
| 10:59 | 10 | Display Exhibit 68, page 10, please.                               |
|       | 11 | BY MR. O'HARE:                                                     |
|       | 12 | Q.  Again, we're referring to this October 23, 2013,              |
|       | 13 | presentation that PSD prepared for that conference up in the      |
|       | 14 | Bay Area.                                                          |
| 10:59 | 15 | And so one of the things you point out here, "There's a          |
|       | 16 | single dominant competitor," and that single dominant             |
|       | 17 | competitor that you were facing at that time was FlowRider,       |
|       | 18 | Wave Loch?                                                         |
|       | 19 | A.  It was Wave Loch.                                             |
| 10:59 | 20 | Q.  But the seller of the FlowRider products?                      |
|       | 21 | A.  And the FlowBarrel.                                           |
|       | 22 | Q.  "And high barriers to entry."  What did you see as the high   |
|       | 23 | barriers to entry?                                                 |
|       | 24 | A.  It's a -- it's an expensive product from a cost point of     |
| 11:00 | 25 | view, so that naturally would create a higher barrier to entry.  |

In general, just since it's expensive, it's difficult.

Q.   So your products are from the hundreds of thousands to the millions each, correct?

A.   Correct.

11:00    Q.   And you went into this business -- I take it, were you prepared to tackle those high barriers to entry?

A.   Yes.

     MR. O'HARE:  If we could go to page 16 of Exhibit 68.

BY MR. O'HARE:

11:00    Q.   So this is your revenue forecast, correct?

A.   For purposes of this competition forum, yes.

Q.   Well, do you have any other written revenue forecasts at or near this time?

A.   I would have to look back.

11:01    Q.   Maybe I missed it.  Can -- does one come to mind?  I haven't seen one.  Do you know of one?

A.   We had no -- as we already received our initial funding of $90,000 back in the fall of 2012, there was no reason for us to create revenue sources.  This was created solely for the

11:01    purpose of this form.

Q.   So is the answer to my question then no?  No, you did not have any other revenue forecasts at or near this time?

A.   I believe we had a project potentially in France that we would have projected our revenue from that project.

11:01    Q.   But in terms of projecting revenue for the whole business,

1   is this the only revenue forecast that you all had prepared in

2   writing at or near this time frame?

3   A.   As the project potentially in France was our only project,

4   that would be our entire revenue forecast.

11:02   5   Q.   This is a revenue forecast, isn't it?

6   A.   For the purpose of this SVIEF forum, this was a revenue

7   forecast for these purposes.

8   Q.   Other than this revenue forecast and whatever you thought

9   you'd get from that single French sale, did you have any other

11:02   10   written revenue forecasts in -- between October and December

11   2013?

12   A.   I don't recall.

13   Q.   This revenue forecast done on October 23, 2013, you

14   understand that it's relatively close in time to the

11:02   15   hypothetical negotiation that we've already heard about during

16   this trial?

17   A.   Well, Dr. Vigil based his entire analysis based on this

18   start-up form that we did.

19   Q.   I'm just trying to get the date.  Is this revenue forecast

11:03   20   on October 23, 2013, the only revenue -- written revenue

21   forecast you have that is closest in time to early December

22   2013?

23   A.   I believe so.  I'm not sure, though.  We may have.  I don't

24   know if we have any.  If we have them, please show me.

11:03   25   Q.   I beg your pardon?

1    A.   If you have them, please show me.

2    Q.   I don't.  I'm asking you if you do.

3    A.   There may be.  I don't recall.

4    Q.   You can't think of one?

11:03  5    A.   I'm not sure.  I can't tell you yes or no whether we've had

6    other things where we've written down what we might make as a

7    company.

8    Q.   Okay.  Well, if you find one, let us know.

9         This one is less than two months before that early December

11:04  10   hypothetical negotiation date, correct?

11   A.   Correct.

12   Q.   And the methodology that you used -- am I correct -- you

13   looked at this $20-million-a-year sheet wave market.  You

14   considered that?

11:04  15   A.   Yes.

16   Q.   And you considered that it was growing at the rate of -- I

17   think you said 13 percent a year that market was growing?

18   A.   That was our guess at the time.

19   Q.   And you looked at your own sales pipeline, meaning the

11:04  20   prospects you had, the folks you were negotiating with, that

21   one signed letter of intent you had in France.  You considered

22   all of that?

23   A.   Yes.

24   Q.   And then -- and from all that, you derived this forecast?

11:05  25   A.   Yes.

1    Q.   And the forecast --

2    A.   It's not just me.  It was Richard and I did this.

3    Q.   You both had input on this?

4    A.   Uh-huh, yes.

11:05    5    Q.   And then so the revenue forecast on that first column, in

6    the next one to two years, looking forward, you were at least

7    forecasting a range between 1.6 million and 4.1 million during

8    those two years?

9    A.   That's what the document says, yes.

11:05    10    Q.   And at least as I understand that, you list --

11         MR. O'HARE:  If you could lower that blowout a little.

12    BY MR. O'HARE:

13    Q.   The items that you say that that consists of were this one

14    little i or romanette, sales of surfing attractions and

11:06    15    servicing and maintenance?  Those would be the sources of that

16    $1.6 to 4.1 million in forecasted revenue?

17    A.   That's what the document states, that's correct.

18    Q.   And the servicing and maintenance, that's work that's been

19    done mostly by Flow Services, your wholly owned subsidiary?

11:06    20    A.   That's correct.  Flow Services did not exist at this time.

21    Q.   I realize that, but in terms of what actually happened, is

22    most of the servicing and maintenance work that's been done by

23    you and Mr. Alleshouse been done through that subsidiary, Flow

24    Services?

11:06    25    A.   Yes.  PSD does some of it, but the majority of it is Flow

1    Services.

2    Q.   Okay.  At this time, it was contemplated PSD would do that,

3    correct, back in October 2013?

4    A.   Correct.

11:06    5    Q.   And then when did you form Flow Services?

6    A.   2015.

7    Q.   And then in 2015, the idea was that the refurbishment, the

8    servicing, the maintenance business would be done through

9    Flow Services mostly?

11:07    10    A.   Yeah, the purpose of that is we hired an individual to run

11    Flow Services, and so we would want to have that done through a

12    separate entity, and then a couple years after that, whitewater

13    hired him away from us.

14    Q.   And the Flow Services entity, the servicing and maintenance

11:07    15    and refurbishment that both PSD and Flow Services has done

16    includes, among other things, replacement or refurbishment of

17    moveable nozzle flaps?

18    A.   You mean hinged nozzle flaps?

19    Q.   I purposely used the word "moveable" so I wouldn't get into

11:08    20    a hinge fight with you.  So if you could go with me on that,

21    does the -- the servicing and refurbishment services that PSD

22    and Flow Services has done, does it include repair,

23    replacement, refurbishment of nozzle covers with moveable

24    flaps?

11:08    25    A.   I just want to make the distinction.  We have not -- Flow

1    Services nor PSD has ever worked on the flexible nozzle flap

2    under the '589 patent in the demonstrative.  We've only worked

3    on the hinged nozzle flaps, and I think we've done five or six

4    of those.

11:08    5    Q.   And those hinged nozzle flaps are -- they move, correct?

6    A.   They rotate.

7    Q.   Okay.  They rotate up and down?

8    A.   They rotate on its axis.

9    Q.   Up and down?

11:08    10    A.   Well, on its axis, so based on what you're doing with your

11    hands, I guess that would be up and down.

12    Q.   Okay.  Good.

13        So now, in years three through five on your revenue

14    forecast, you say there's the addition of a B2C -- that's the

11:09    15    business-to-consumer model -- where you develop venues, meaning

16    parks or attractions, that have your rides in it, correct?

17    A.   Yes.

18    Q.   And then the revenue drivers for that period would be a

19    third item:  licensing of products and operation of standalone

11:09    20    venues, correct?

21    A.   Yes.

22    Q.   And that would be between 4 million and $8 million each

23    year between years three and five?

24    A.   That's what the document says, yes.

11:10    25    Q.   Now, as I understand -- I mean, reading what you have here,

1   it says "addition," meaning are these revenues on the bottom

2   added to the sales of surfing attraction?

3   A.   No.

4   Q.   Can you understand that by at least reading this, using the

5   word "addition," that the reader might conclude that you're

6   supposed to add those numbers together?

7   A.   No, that's not how I would read that at all.

8   Q.   Okay.   And that by including under that -- or above that 4

9   to $8 million a year, only two revenue drivers, the licensing

10   and the standalone venues, that that would convey to the reader

11   that you were hoping to get an additional 4 to $8 million a

12   year from this B2C model?

13   A.   I think you just answered your own question.   It's

14   romanette 3 and romanette 4, which would imply it's a

15   combination of romanette 1, romanette 2, romanette 3, and

16   romanette 4, so yeah, you would combine them all into one 4 to

17   $8 million.   That's what that's reading.

18   Q.   That's what you're saying you intended?

19   A.   If I was just to aggregate them, I would put romanette 1

20   and romanette 2 again.   If it was in addition.

21   Q.   Well, I guess that's my point.

22       Anyway, so is the 4 to $8 million a year just from the two

23   items you list above it?

24   A.   No.

25   Q.   It's not.

1      So it's actually -- what you're saying is you intended that

2  that 4 to $8 million a year would include not only the two

3  items that are listed above it to be added to the others, but

4  would also include items 1 and 2?

11:12  5  A.   That's why it's romanette 3 and 4.

6  Q.   Okay.  And then in the five years out, you forecast

7  $5 million a year -- and I guess the same question:  Was that

8  supposed to be $5 million a year just from franchising?

9  A.   No.

11:12  10  Q.   So you're saying the $5 million a year was supposed to be

11  the combination of the 1.6 to 4.1 million, plus the revenues

12  from the 4 to 8 million from -- well, let me back it up.  Are

13  you saying the $5 million a year for years five and later was

14  going to be all the revenue from sales of rides, licensing and

11:13  15  operation of venues, and the franchising, all of those five

16  items together?

17  A.   Correct, because there would be no more B2B model at all,

18  and granted, as I mentioned before, the audience at the SVIEF

19  forum were Chinese nationals and Chinese-Americans living here

11:13  20  in the U.S., and culturally, they almost need to see the

21  franchise model in any kind of business.  That is the end goal

22  for many of these businesses as you can probably see just going

23  around to -- wherever you live here.

24  Q.   So you expected the revenue to -- if I'm understanding you

11:13  25  correctly, for years three to five, you expected total revenue

|        |    |                                                                                  |
|--------|----|----------------------------------------------------------------------------------|
|        | 1  | between 4 and 8 million a year, but then starting in year five,                  |
|        | 2  | you expected it to essentially drop to the lower range of that?                  |
|        | 3  | A.   As the franchise model, the goal of the franchise model is                  |
|        | 4  | to do less labor and more passive income, so yes, that is what                   |
| 11:14  | 5  | it states.                                                                        |
|        | 6  | Q.   So if you were to add all this up, what's your math on the                  |
|        | 7  | range of revenue that you're projecting here from, I guess it                    |
|        | 8  | would be, the year 2014 through 2019?  That would be six years.                  |
|        | 9  | A.   Assuming that we achieved every milestone?                                  |
| 11:14  | 10 | Q.   Just what you forecast.  I'm just asking -- to do the math                  |
|        | 11 | because it looks like there's a couple of ways to do it, so I                    |
|        | 12 | just want to have you do it.  What's your math and what the                      |
|        | 13 | total range of revenue is that you're forecasting for the years                 |
|        | 14 | 2014 through 2019, a six-year period?                                            |
| 11:14  | 15 | A.   I would aggregate column 1 for two years, I would aggregate                 |
|        | 16 | column 2 for three to five years, and I would aggregate column                  |
|        | 17 | 5 for the years following that.  So the amount would be 1.6                      |
|        | 18 | plus 1.6 plus 4 plus 4 plus 4 plus 5 --                                          |
|        | 19 | Q.   1.6 --                                                                       |
| 11:15  | 20 | A.   -- for the total revenue.                                                   |
|        | 21 | Q.   -- plus 4, plus 5, so --                                                     |
|        | 22 | A.   It would be 20.2.                                                            |
|        | 23 | Q.   How much?  20.2 million?                                                    |
|        | 24 | A.   Based on each year from whatever -- 2014 to 2020.                           |
| 11:15  | 25 | Q.   And that would be the low range?                                            |

```
 1    A.   Sure.
 2    Q.   And the high range would be what?
 3    A.   Do exactly what we just did with the high range.
 4    Q.   Did you include $8 million a year for years three through
 5    five?
 6    A.   Do you want me to redo the calculation?
 7    Q.   Yeah.   Isn't the math you just gave me the low range of
 8    revenue?
 9    A.   Sure.
10    Q.   What would be the high range of revenue?
11    A.   4.1 plus 4.1, which is 8.2, plus 8 plus 8 plus 8, which is
12    32.1, plus 5, which is 37.1.
13    Q.   So 37.1.   Is that correct?
14    A.   Correct, based on achieving every one of these milestones,
15    which we haven't done.
16    Q.   Understood.   It's a forecast.
17    A.   It's for the SVIEF forum solely.
18    Q.   But it's a forecast that you believed?
19    A.   For the purposes of this forum.   Do I believe we're going
20    to franchise our model?   Probably not.   But for this forum,
21    sure, it's possible.   So we put it in because it's culturally
22    required.
23    Q.   So you didn't believe it?
24    A.   We believed it for purposes of this forum.
25    Q.   So was it true?
```

1   A.   Is it true?

2   Q.   Is it true that you actually believed this forecast when

3   you handed it out and let 5,000 people see it?

4   A.   We believed that as our company, we would want to stay, you

5   know -- we would want to be able to own our own forums -- our

6   own venues, but for the purposes of this SVIEF forum, adding

7   franchising as a potential business -- part of our business is

8   completely possible.

9         MR. O'HARE:   Okay.   Now, if we could go to page 68-14.

10  BY MR. O'HARE:

11  Q.   So this is -- I think you already addressed this.   This is

12  the sales pipeline of explaining how you go from leads to

13  signed contracts?

14  A.   Correct.

15  Q.   And this describes the leads and customers that, at least

16  as of October 23, you had in the pipeline?

17  A.   Correct.

18  Q.   And at this point in time, you're estimating a sales cycle

19  of six to 24 months, meaning from what?   From your first

20  contact with a customer to getting to a contract?

21  A.   Correct.

22  Q.   And even when you get to a contract, there can sometimes be

23  a significant lag between the contract and then actually

24  completing the installation?

25  A.   When you say "significant lag," what do you mean?

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        |  1 | Q.  Well, for example, on your Trinidad installation, I think          |
|        |  2 | you told us you signed a contract in the spring of 2015 while          |
|        |  3 | the patent was lapsed, correct?                                        |
|        |  4 | A.  Correct.                                                           |
| 11:18  |  5 | Q.  And then am I correct, you didn't actually install the ride        |
|        |  6 | until 2017?                                                            |
|        |  7 | A.  That's correct.                                                    |
|        |  8 | Q.  So in that instance, at least from the time you signed the         |
|        |  9 | contract to when you actually completed the job, it was about         |
| 11:19  | 10 | two years?                                                            |
|        | 11 | A.  Correct.                                                          |
|        | 12 | Q.  And now, would that have been on the long side or the            |
|        | 13 | typical side of how long that takes?                                 |
|        | 14 | A.  That would be on the long side.                                  |
| 11:19  | 15 | Q.  Okay.  So generally, is there going to be a delay of             |
|        | 16 | anywhere from six months to, say, two years between the time         |
|        | 17 | you sign a contract and you actually install a ride?                 |
|        | 18 | A.  That's not what this is saying.                                  |
|        | 19 | Q.  I didn't say that's what this is saying.  I'm asking you.        |
| 11:19  | 20 | Based on your experience, from the time you get a contract           |
|        | 21 | signed until you get a ride installed, is it a range of             |
|        | 22 | anywhere from six months to two years?                              |
|        | 23 | A.  After we sign one of our contracts, we are looking out for       |
|        | 24 | the best for our client, so whenever they are ready to move is       |
| 11:19  | 25 | when they're ready.  If they choose to move a year later or six      |

1   months later, just whatever they want, so I couldn't say

2   there's anything typical.  Again, as we custom design

3   everything, it depends.  The answer would be, it depends.

4   Q.   Well, on the -- I mean, you haven't sold that many

11:20   5   products.  What I'm trying to find out is, based on your

6   experience, what has been the range of time from the date you

7   signed the contract to the date you got a ride installed?  We

8   know one of them was two years.

9   A.   I'd say five months to over two years, potentially.

11:20   10   Q.   Okay.  And so incidentally, would you agree that -- do you

11   have any reason to doubt that the folks at Wave Loch would have

12   had a similar experience in terms of the time it would take

13   from the time they made a sale or signed a contract until they

14   got a ride installed?

11:20   15   A.   Again, it would depend on their client.  Hopefully, they

16   would be out to serve the client.

17   Q.   And then in those reports of sales that you tried to

18   assemble, those are install dates?

19   A.   Are you referring to the Exhibit 60?

11:21   20   Q.   No, I was -- well, I was actually referring to the summary

21   you did, those NZ exhibits.

22   A.   That's based on the Wave Loch document.

23   Q.   For install dates?

24   A.   I believe those are install dates, but, again,

11:21   25   Andrew Thatcher came up with that, and if he was untruthful, I

1   can't confirm that.

2   Q.   Okay.  So if those are install dates, then the actual sales

3   that are shown on those charts, the contracts would have

4   happened anywhere from six months to a couple years before

11:21   5   that?

6   A.   I can't speak to that.

7   Q.   Okay.  But if their experience is similar to yours, that

8   would be the case?

9   A.   Again, I can't speak to that.

11:21   10   Q.   And, then, I think you indicated at this time your

11   lead-to-close ratio that you were predicting was 50:1, but at

12   least that's what you thought in October 2013, correct?

13   A.   Yes.

14   Q.   And did I hear you correctly on direct examination to say

11:22   15   that right after you prepared this, you already knew --

16          MR. O'HARE:   If we could go back to page 16.

17   BY MR. O'HARE:

18   Q.   Did you say you already knew between October and December

19   2013 that you weren't going to do the B2C model anymore?

11:22   20   A.   I didn't say that.

21   Q.   Oh, okay.  And, in fact, you -- oh, okay.  I'll leave it at

22   that.

23          Incidentally, you do say on page 14, again, if we may, the

24   sales pipeline, France -- what you had for France was a signed

11:23   25   letter of intent?

1    A.   Correct.

2          MR. O'HARE:   And if we could show Exhibit 180.

3    BY MR. O'HARE:

4    Q.   And here's the first page.   I think this is on August 2013.

11:23   5    This is -- I believe there's two letters of intent, but this is

6    a letter of intent you had with Les Parcs du Sud, which is

7    translated to be south park?

8    A.   South parks.

9    Q.   South parks.

11:23   10         This is the letter of intent you had with the folks in

11   France?

12   A.   That's not correct.

13   Q.   It's not?

14   A.   No.

11:23   15   Q.   Who is this with?

16   A.   It's a draft.

17   Q.   Let me see the next page of it.   Isn't it signed by Les

18   Parcs du Sud?

19   A.   Correct, but we didn't sign it because there's bracketed

11:24   20   language all over it.

21   Q.   Okay.   So this was a draft of that.

22         So let's take a look at Exhibit 181.   Is this the letter of

23   intent?

24   A.   Are there more pages?

11:24   25   Q.   Sure.   We can flip ahead.   And to the last page.   So that's

1   it.

2       Is this the letter of intent?

3   A.   Again, it's not signed, so I'm not sure if this is a draft

4   or not.

11:24   5   Q.   So but what you're saying is you did actually have a signed

6   letter of intent with these folks in France when you did

7   Exhibit 68, that forecast?

8   A.   We had -- at some point we had a nonbinding letter of

9   intent.

11:24   10   Q.   But before you did that presentation?

11   A.   I believe so.

12   Q.   I mean, that's what you said you had.  You actually said

13   you had a signed contract, but you had some kind of agreement

14   signed with the folks in France before you prepared that

11:25   15   Exhibit 68, the presentation?

16   A.   Yeah, I believe so.

17   Q.   And is it fair to say that back in late 2013, that you

18   expected that all of the sales you were forecasting would come

19   at the expense of FlowRider or Wave Loch?

11:25   20   A.   No.

21       MR. O'HARE:  If we could go to page 10 of Exhibit 68.

22   BY MR. O'HARE:

23   Q.   So up at the top, you describe yourself as a second mover

24   providing the first viable alternative to the status quo.  And

11:25   25   I take it the status quo at that point was a single dominant

competitor, Wave Loch?

A.   That's correct.

Q.   And that on page 68 -- or Exhibit 68, page 9, here you describe a number of competitors, but you single one out as a direct competitor.  That would be Wave Loch, correct?

A.   Correct.

Q.   And from what you show here, based on the estimates of sales you had then, Wave Loch had installed 120 or so rides as of late 2013?

A.   That was our understanding.

Q.   And then these other folks had -- these are -- looks like estimates, but had only installed a handful?

A.   If you were to do it most recently, I would say that they -- based on the 2013 timeline, they were installing much more if you compared it by a ratio of the marketplace to Wave Loch.

Q.   I'm just trying to find out, up until this point, I mean, were these the numbers you thought were accurate at that time in late 2013 in terms of what all these other people had installed?

A.   Yes.

Q.   And then were you targeting to get a share of that 120 rides, or were you targeting more to get rides from these other people?

A.   We were targeting the current market, not the historic

1   market.  I think you're conflating the two.  So if Wave Loch at

2   the time was selling ten to 12 rides a year, we were looking to

3   be a part of that market with StingRay and American Wave

4   Machines and Wavesurfer, who were selling, let's just say, one

11:27   5   each.  So out of those 15 waves a year, we were looking to get

6   some of that, not the 120 because that already happened years

7   ago.

8   Q.   So why did you single Wave Loch out as a direct competitor?

9   A.   Because this is a presentation for English-as-a-second

11:28   10   or -third or -fourth-language-speaking group.

11   Q.   You only told people who spoke Chinese that Wave Loch was

12   your primary, if not sole, competitor?

13   A.   If you read the entire presentation, we use very simplified

14   language just to be clear that we're not confusing the viewers,

11:28   15   and putting "direct competitor" and putting "direct

16   competitors," that was just a decision we made.

17   Q.   Just to be clear, did you not -- not in this, but in other

18   places -- also tell English-speaking audiences or people that

19   Wave Loch was your primary, if not only, competitor, or did you

11:28   20   just tell it to people who spoke Chinese?

21   A.   All of these companies we provide -- we're all in the same

22   sheet wave industry, so naturally it depends on how you define

23   "competition."  Granted, we are losing sales to all of these

24   companies, so based on what you're saying, I guess they all are

11:29   25   our competitors.

1    Q.   The answer to my question is, did you tell

2    non-Chinese-speaking audiences that Wave Loch was your sole or

3    primary competitor?

4    A.   Given that we have not done another presentation in front

11:29   5    of a large group of people, then the answer to that would be

6    no.

7           MR. O'HARE:   Let's take a look at Exhibit 414.   And if

8    we could blow up the top part of it just to help the witness

9    identify it.   Before I do, just to clean up something, can we

11:29   10   show Exhibit 203?   I think it's the signed letter of intent

11   with the folks in France.   And let's show it.

12   BY MR. O'HARE:

13   Q.   Is this the one that you signed?

14   A.   Correct.

11:30   15   Q.   And did they countersign it at some point?

16   A.   I'm not sure.

17   Q.   Okay.

18          MR. O'HARE:   Let's go back to Exhibit 414.

19   BY MR. O'HARE:

11:30   20   Q.   So this is an email from you to Ray Smegal at ProSlide on

21   October 1, 2014?

22   A.   Correct.

23   Q.   And you copied Mr. Alleshouse?

24   A.   Correct.

11:30   25   Q.   And you were at this time in discussions with ProSlide

1    about entering into some sort of contract with them for them to

2    be able to build and sell PSD rides?

3    A.   No.

4    Q.   What was your business relationship with ProSlide?

11:30    5    A.   ProSlide, just for purposes of your guys' education,

6    they're the premier waterslide supplier in the world.  If you

7    go to any water park, they're, like, the -- they have the huge,

8    iconic rides that you might remember.  So we were interested in

9    increasing our distribution for our products.  ProSlide had

11:31   10    never gone out-of house in their 30-plus year history to

11    license anyone's product or do anything like that.  They always

12    developed all of their attractions in-house, so the fact that

13    they were interested in talking to us about possibly creating a

14    Single and Double white-label version for them, that's where

11:31   15    the initial discussions came about.

16    Q.   And then you ultimately did sign a contract with them?

17    A.   We signed a license for them -- for ProSlide to -- it was a

18    two-year long license for them to sell the white label Single

19    and Double ProSlide Surf Single and ProSlide Surf Double.

11:31   20    Q.   Was that before or after this email, Exhibit 414?

21    A.   It was after.

22         MR. O'HARE:  Okay.  So if we could go back to the

23    entire text of the email.

24    BY MR. O'HARE:

11:32   25    Q.   And then if we go to the -- actually, the bottom of the

1    email, you're listing a number of competitors here, and this is

2    as of 2014, correct?

3    A.   Correct.

4    Q.   And you're saying, "AFP has done a total of three or four

11:32   5    waves since pre-2009."  And then you're going through a number

6    of these different sales, and then now WhiteWater/ADG/Wave Loch

7    have sold -- at this point it's up to over 200, correct?

8    A.   Correct.

9    Q.   So this is not some market that was Wave Loch and

11:33   10   WhiteWater's in the past.  They were getting a growing share of

11   sales, correct?

12   A.   Growing sales of -- growing number of sales since 1991.

13   Q.   No, since 2013.  You had them with 120 rides, and here we

14   are at the end of 2014, and you're estimating they've sold over

11:33   15   200?

16   A.   The presentation for the SVIEF forum, we were just

17   providing estimates at the time.  It was just to practice

18   speaking in public.

19   Q.   Turns out, they'd actually sold a lot more?

11:33   20   A.   When you say "sold a lot more" --

21   Q.   Than what you estimated the year before.

22   A.   Well, I'm including WhiteWater and ADG.

23   Q.   Sure, but those are all licensees from Wave Loch, correct?

24   A.   But the presentation you keep referencing says "Wave Loch."

11:33   25   Q.   Oh, so you were saying Wave Loch alone was selling 120, so

1    as of 2013, you'd add to that more sales?

2    A.   Again, you're incorrectly stating what I've just said.

3    They have sold 120 since 1991, so if you divide that out over

4    the 12 years following this, they would sell, I don't know,

11:34    5    nine or ten a year.

6    Q.   So just so I'm clear, on Exhibit 68, those 120 rides, were

7    those just rides that you thought were sold by Wave Loch, or

8    were you including rides that Wave Loch's licensees had sold?

9    A.   For that presentation, there was not that level of

11:34   10    specificity.  It was just a guess --

11    Q.   But --

12    A.   -- for purposes of that presentation to

13    non-English-speakers.

14    Q.   Right, but was it a guess for what the combined sales were

11:34   15    either by Wave Loch or its licensees?

16    A.   I can't speak to that.  I don't remember.

17    Q.   So what about this guess?  This one -- this one's intended

18    to include them all, correct?

19    A.   This is based on the WhiteWater website at the time.

11:35   20    Q.   Okay.  And this was intended to include the sales by both

21    Wave Loch and its licensees, WhiteWater and ADG?

22    A.   I cannot attest to the accuracy or truthfulness of

23    plaintiff's website.  This was just what was on the website, so

24    when we were showing Mr. Smegal, he had a reference.

11:35   25    Q.   So this is what -- but that's what you were intending to

1    convey --

2    A.   We were providing --

3    Q.   -- that it was the sales of all three?

4    A.   Yes.

11:35   5    Q.   Okay.  And then the next line, you see that FlowRider and

6    its different iterations -- and that's referring to WhiteWater,

7    ADG, and Wave Loch, correct?

8    A.   And Murphy's Waves.

9    Q.   -- control over 94 percent of the market.  That's what you

11:35   10   said?

11   A.   Yes.

12   Q.   And then the next sentence you say, "FlowRider is our

13   direct competitor and we feel is our only competitor," correct?

14   A.   That's what it states.

11:36   15   Q.   Did you believe it?

16   A.   We feel any company that takes away a sale is our

17   competitor.

18   Q.   But here you say the FlowRider is your only competitor?

19   A.   It's for purposes of speaking with Mr. Smegal and ProSlide.

11:36   20   That is their direct competitor, is WhiteWater.  So as

21   WhiteWater sells the FlowRider, that's all they wanted to talk

22   about.

23   Q.   You said it's our only competitor.  So you didn't mean it.

24   You meant it's your only competitor?

11:36   25   A.   If you look throughout this document, we refer to "our" as

1    all of us.

2    Q.   Okay.  And then you go on to say they, FlowRider, are who

3    we are taking market share from.  Was that a true statement?

4    A.   The "they" in this sentence is FlowRider, and the reason

11:36   5    we're mentioning it is the next line, which says, "They have

6    focused their energy on slowing us down," this is the whole

7    squash them, let's sue them, that's what we're referring to

8    when ProSlide references that above.

9    Q.   But is it a true statement that you said here to Mr. Smegal

11:37   10   that they, FlowRider, is who you are taking market share from?

11   A.   And they have focused their energy on slowing us down,

12   correct.

13   Q.   So both are true?

14   A.   We believe that we are taking market share from the market,

11:37   15   and if they are part of the market, then naturally, they would

16   be having a reduction in their market share.

17   Q.   So just true or false:  Did you feel that FlowRider was

18   your only competitor?

19   A.   False.

11:37   20   Q.   And did you feel that they were who you were taking market

21   share from?

22   A.   Partly.

23   Q.   Let me show you Exhibit 70.  And just to take a glance at

24   this, is Exhibit 70 a document that you prepared that was

11:38   25   summarizing various sales of sheet wave rides?

1    A.   Depending on the date of this document.  If you can verify

2    that, I can tell you the individuals who have worked on it.

3    Q.   Did it come from PSD?

4    A.   It looks like it.

11:38    5    Q.   Okay.

6             MR. O'HARE:  If we could enlarge sort of the left-hand

7    side of it.

8    BY MR. O'HARE:

9    Q.   So here you're listing sales from a number of folks.

11:38    10   You've got some American Wave Machine rides that are being sold

11   and then Wave Loch.

12        So in these places, like, on line 6 down there in that

13   second cell right there, where you say "Wave Loch" and then in

14   parentheses "ADG," is that intended to signify it's a Wave Loch

11:39    15   sale, but through their licensee, ADG?

16   A.   That was our understanding.

17   Q.   And then down in the next cell where it says on line 1

18   "Wave Loch," in parentheses "WWI," was that intended to signify

19   it's a Wave Loch sale, but one being made through WhiteWater

11:39    20   Industries?

21   A.   So the purpose of this spreadsheet -- those are just

22   descriptions.  The purpose of it were just to list the number

23   of waves we knew out there.  Whether it was WWI or ADG, it

24   really made no difference to us for the purposes of this

11:39    25   spreadsheet.

997

1   Q.   I'm just trying to find out what it means.   When you say

2   "Wave Loch" and in parentheses "WWI," does it mean a Wave Loch

3   sale by WhiteWater Industries?

4   A.   Whether that's the case or not, it wasn't important, so it

11:40   5   may be true or it may not.   But for purposes of this, it was

6   just a list of the attractions as we knew them.

7   Q.   I'm not asking you whether it's important.   I'm just asking

8   you what it means.   If your chart here says "Wave Loch" and in

9   parentheses "WWI," does it mean a Wave Loch sale being made by

11:40   10   WhiteWater Industries?

11   A.   That's what it indicates.   Whether or not it's the case,

12   that wasn't the point of this.

13   Q.   Okay.   And if we could go to Exhibit 79.   And this is the

14   presentation that you presented to -- you prepared -- was this

11:40   15   in early 2016?

16   A.   As it was a draft, I'm not sure when it was prepared.

17   Q.   Well, let's look at the second page.   So if we could look

18   at the chart in the bottom.   So am I correct that you're

19   reporting actual sales through 2015 and then projected sales

11:41   20   beyond?

21   A.   Correct.

22   Q.   And so would that suggest to you that this was prepared

23   sometime after the end of 2015?

24   A.   Correct.

11:41   25           MR. O'HARE:   If we could go back to the first page of

1   this.

2   BY MR. O'HARE:

3   Q.   So in the business summary, the second paragraph, again,

4   here you're referencing your competition at that last sentence,

11:41  5   "With over 200-plus waves already on the market manufactured by

6   PSD's primary competitor, you all have now entered the market."

7   And, again, is your primary competitor here Wave Loch,

8   WhiteWater, ADG, meaning their combined sales?

9   A.   Well, as Wave Loch, as you guys have spent a day trying to

11:42  10  show, was no longer part of this market, it would be

11  WhiteWater.

12  Q.   Okay.  Who by then, in 2016, had acquired the technology

13  and essentially Wave Loch's sheet wave business?

14  A.   I believe they did that in 2014.

11:42  15  Q.   Okay.  So that's the primary competitor you're referring to

16  here, correct?

17  A.   Who?

18  Q.   WhiteWater.

19  A.   In this document, yes.

11:42  20  Q.   Then -- and WhiteWater at this point, they're selling the

21  FlowRider sheet wave product?

22  A.   I believe they've been selling the FlowRider since 2003.

23  Q.   Okay.  And they were at the time of this presentation or

24  this draft?

11:43  25  A.   Yes.

1   Q.   So if we could go to the paragraph, "Consumer" -- or,

2   "Customer problem."  And then you highlight that only one

3   company, FlowRider, dominates the entire market with a 97

4   percent share.  Did you believe that to be a true statement

5   when you made it in 2016?

6   A.   Yeah.  FlowRider was the subsidiary of WhiteWater.

7   Q.   Okay.  So then on the last sentence, you're saying our

8   customers, they now have a choice between either a brand name

9   or a better product.  The better product, in your view, was

10  PSD, correct?

11  A.   Correct.

12  Q.   And the brand name was FlowRider and WhiteWater?

13  A.   We don't view WhiteWater as the brand name.

14  Q.   FlowRider?

15  A.   Correct.  Again, I mentioned that I'd not heard of

16  WhiteWater when I first started this company.

17  Q.   Because you had no history in the business, right?

18  A.   I had no history in the blowing-your-nose-tissue business,

19  but I know what Kleenex is.

20  Q.   Okay.  Anyway, the choice that you saw your customers had

21  was between you or FlowRider?

22  A.   For purposes of this presentation, yes, or for this

23  document, yes.

24       MR. O'HARE:  And if we could go to the second page of

25  the document.  "Sales and marketing strategy."  There again you

1  say, "PSD competes primarily with FlowRider"?

2  A.   With some additional lower-priced competition out of

3  Europe.

4  Q.   Then on the next one, the next paragraph, "Competitors."

5  Then you go on to say again, "FlowRider is our primary

6  competitor," correct?

7  A.   Correct.

8  Q.   And then here in the middle -- well, then you say,

9  "FlowRider Wave Loch had 200-plus installations worldwide since

10  the 1990s and with the majority installed within the past six

11  to eight years."  So they were still -- I mean, over a hundred

12  of those rides were the last six to eight years, meaning before

13  2016.  That's what you're saying?

14  A.   Correct.

15  Q.   And then you go on to say, "We have some lower-priced

16  competitors out of Europe, such as Wavesurfer and MADEA

17  Concepts.  We do not often compete directly for projects with

18  the lower-price-point competitors, as customers seeking a

19  premium product choose between PSD and FlowRider."  And was

20  that a true statement when you made it?

21  A.   So we normally don't compete with the more inexpensive

22  products.  That's mainly because we offer our products to the

23  premium clients in the world, but at the same time, certain

24  clients are unable to afford our products or FlowRider's

25  products.  At that point sometimes they will go with the less

1    expensive ones, but at the same time, we will also lose

2    projects to Wavesurfer and MADEA Concepts to premium clients.

3    Q.   Okay.  So are you saying this statement is untrue?

4    A.   It's not that it's untrue or true.  There's nuances.

11:47   5    There's more than like -- it says, "We do not often compete."

6    Q.   Okay, okay.  So you would occasionally compete with these

7    other folks?

8    A.   Today more so than then.

9    Q.   Okay.  And then, incidentally, if we go to "Competitive

11:47   10   advantage," I think Mr. Alleshouse mentioned this, but just to

11   clear it up, it says here that PSD holds some patents.  In

12   fact, PSD does not hold any patents, do they?

13   A.   No.

14   Q.   Now, would it be fair to say that --

11:48   15           MR. O'HARE:  You can take that down, Gary.

16           THE WITNESS:  But we did at the time of this document,

17   so if you're inferring that, that's incorrect.  We did hold

18   patents at the time of that document.

19   BY MR. O'HARE:

11:48   20   Q.   Which you had to transfer to WhiteWater, correct?

21   A.   Correct.

22   Q.   Because they were invented while Mr. Alleshouse was working

23   at WhiteWater or working at Wave Loch?

24   A.   Richard Alleshouse is the only named inventor on all of

11:48   25   those patents.

```
          1    Q.   Understood, but you understand he had to transfer those to

          2    Whitewater because he did the work of invention while he was

          3    working at Wave Loch?

          4    A.   That's the -- that's based on his employment agreement

11:48     5    assignment clause.

          6    Q.   Okay.   Now, would it be fair to say that you and Whitewater

          7    have taken some swipes at each other out in the marketplace as

          8    you compete for potential customers?

          9    A.   I would completely disagree with that.

11:49    10    Q.   Okay.

         11    A.   And the reason being is I think maybe once or twice they

         12    think we have, but we tend to talk about how -- the benefits of

         13    our products, and Whitewater, as you noticed through the emails

         14    and -- even their own documents, they tend to badmouth the

11:49    15    competition because that's -- that's just how they do things.

         16    But yeah, you'll notice that some of our projections are

         17    not -- we didn't get our projections because after 2015, they

         18    have gone out of their way to emphasize that they are suing us

         19    to every one of our customers, and now we have the emails from

11:49    20    some of those customers to confirm that.

         21    Q.   So you've never been in a situation where you've tried to

         22    badmouth Whitewater or Wave Loch?

         23    A.   When you say "badmouth," what do you mean?

         24    Q.   Well, for example -- I'm just having somebody pull it up.

11:50    25         Wasn't there some email traffic between you and
```

1003

1    Mr. Alleshouse where you were actually disagreeing that you

2    wanted to say things about FlowRider products, like one guy who

3    got his finger injured, and, therefore, that meant the whole

4    ride was unsafe?

11:50    5    A.   Richard and I will have our internal discussions where we

6    don't agree with each other.  Ultimately, what comes out is

7    different.  So at the time, FlowRider's sales -- it changes

8    from time to time the way they badmouth us, but at the time,

9    they were telling our customers that our products were unsafe

11:50    10   and that theirs were completely safe.  So the purpose of that

11   interaction was to point out that, granted, these are action

12   sport rides.  People can get hurt much like you can get hurt

13   playing basketball.  But if they're going to say our rides are

14   unsafe, they have more feature sets on theirs that are

11:51    15   inherently dangerous.

16   Q.   Okay.  So let's take a look at Exhibit 12.  So Exhibit 12,

17   that's a PSD Facebook page?

18   A.   Yeah, it looks like it.

19   Q.   And you and Mr. Alleshouse control the content of this

11:51    20   page?

21   A.   Correct.

22   Q.   And you're actually the one who made this post?

23   A.   I'm not totally sure, but yeah, it's possible.

24   Q.   And so if we go down to this -- these hashtags,

11:51    25   #pacificsurfdesigns, #waveclub, the hashtag #FUWWI -- is that

1004

| | |
|---|---|
| 1 | intended to signify FU, WhiteWater Industries? |
| 2 | A.   No. |
| 3 | Q.   And what are the initials of the CEO of WhiteWater? |
| 4 | A.   I'm not sure what Mr. Chutter's middle name is. |
| 11:52  5 | Q.   How about the first and last name, Geoff Chutter? |
| 6 | A.   G -- well, JC? |
| 7 | Q.   It's GC, isn't it?  He spells it with a G. |
| 8 | A.   Okay. |
| 9 | Q.   Okay.  So was the second hashtag intended to convey FU, |
| 11:52  10 | Geoff Chutter? |
| 11 | A.   No. |
| 12 | Q.   It's just coincidence? |
| 13 | A.   I mentioned that FUWWI was our new slogan.  Which was Fun |
| 14 | Using Water Waves and Innovation. |
| 11:52  15 | Q.   What was that again? |
| 16 | A.   Fun Using Water Waves and Innovation. |
| 17 | Q.   Just coincidental it reads FU, WhiteWater Industries? |
| 18 | A.   As Mr. Chutter mentioned, WhiteWater is a highly respected |
| 19 | company.  Where would you draw that inference from? |
| 11:53  20 | Q.   Okay.  And then it's just accidental that the next FU |
| 21 | happens to be corresponding to the initials of the CEO of |
| 22 | WhiteWater International?  Just a mistake? |
| 23 | A.   I mentioned, I told you that before.  I don't know why |
| 24 | you're bringing it up again. |
| 11:53  25 | Q.   How about Exhibit 496?  Let's take a look at that.  And is |

1   this another Facebook page posted by PSD?

2   A.   Correct.  And as you can see, it's part of our research

3   tank, and that's Fun Using Water Waves and Innovation.

4   Q.   So it's not intended to be FU, WhiteWater Industries?

11:53   5   A.   If that's how WhiteWater is taking it, that's unfortunate,

6   but as Mr. Chutter and Mr. Myrman and every other individual

7   keeps saying how wonderful that company is, what would be the

8   grounds for us to say something like that?

9   Q.   I mean, given all that's happened, I mean, you do

11:54   10   have -- it's fair to say, you don't have good feelings about

11   WhiteWater, do you?

12   A.   It's not that we don't have good feelings about WhiteWater.

13   They just approach business and treat ethics in a way that is

14   contrary to ours, but other than that, they're another company.

11:54   15   Q.   Is there some reason you just don't want to own these posts

16   and say hey, I was upset; they were suing me, so I said FU,

17   WhiteWater Industries?  Why not just own it?

18   A.   Because it was our slogan at the time --

19   Q.   Okay.

11:54   20   A.   -- for these two posts, and we -- no one uses hashtags, and

21   no one uses Facebook in our industry.

22   Q.   Is there anything where that's actually written out, the

23   slogan Fun Using Water Waves -- and what's the I?

24   A.   Innovation.

11:54   25   Q.   Innovation.  Have you got that written out anywhere in any

1    marketing materials?

2    A.   We used it for our hashtagging because -- but no one uses

3    them, so we stopped.   No one uses any of our hashtags.

4    Q.   Again, have you ever used the slogan you just told us you

11:55    5    had:   Fun Using Water Waves and Innovation?

6    A.   We have not.

7    Q.   Have you ever used that slogan in any written materials?

8    A.   We may have.

9    Q.   Can you think of any place that is?

11:55   10    A.   It's possible.   I'm not sure.

11    Q.   Okay.   Have you looked?

12              THE COURT:   Now's a great time for us to take a lunch

13    break.   Well, I guess we've got five minutes.   I'll give you

14    five minutes whether you like it or not.

11:55   15    BY MR. O'HARE:

16    Q.   So back in late 2013 at the time of the hypothetical

17    negotiation that, of course, didn't happen, fair to say that

18    PSD and you had the financial resources to pay a $2 million

19    lump sum royalty if that was something you wanted to do?

11:56   20    A.   Absolutely not.

21    Q.   And if you could look at Exhibit 68 at page 14.   And down

22    at the bottom -- I don't know how to get rid of all my stuff

23    here.   Down at the bottom, you mentioned you got that initial

24    90,000 from Kaeru Ventures.   That's a Yeh family venture

11:56   25    capital fund?

1    A.   It's an angel fund in which one member of my family is the

2    general partner, but that's not how venture funds tend to work.

3    They have LPs, so to say that would be incorrect.

4    Q.   What's incorrect?

5    A.   They have limited partners.

6    Q.   Oh, okay.  So they have other investors that are in it?

7    A.   Yeah, correct, or why would you set it up like that if you

8    didn't have LPs?

9    Q.   Excuse me?  I lost you on that.  I'm sorry.

10   A.   It's an angel fund consisting of an investor group in which

11   one of my family members is the general partner.

12   Q.   Okay.  And then isn't it true that you had unlimited funds

13   available to you from this source, this credit line?

14   A.   I did not say that.

15   Q.   If you needed them upon request?

16   A.   For what purpose and what are you referencing?

17   Q.   Upon request.

18   A.   The reference of that was in response to WhiteWater suing

19   us and Richard and I being sued personally the first time for,

20   I don't know, whatever reason that they wanted to squash us,

21   and that was in response to the family closing ranks, that they

22   would protect me personally from whatever random lawsuit they

23   were doing at the time.

24   Q.   So you had unlimited funds to spend on lawyers, but no

25   funds to license technology.  Is that what you're saying?

```
        1   A.   It would make sense that if you were to have your son being
        2   sued for no reason that the family would close ranks and
        3   protect that son.
        4   Q.   Okay.
11:58   5   A.   If you were to have that son want to invest in, let's say,
        6   a burger stand, that may not be the same access.  So that's why
        7   we started our company with $90,000 because that was what was
        8   necessary for us to get going.  If we wanted more money, we
        9   would have tried to apply for it back then.
11:58  10   Q.   And then you also had access to a network of accredited
       11   investors as a resource?
       12   A.   A network of accredited investors is just saying someone
       13   has a certain net worth.
       14        MR. O'HARE:  Okay.  Why don't we go ahead and play
11:59  15   some deposition excerpts.  Page 128, Mr. Yeh's deposition,
       16   line 10 through line 16.
       17        (A video was played.)
       18        MR. O'HARE:  And if we could go to page 128, line 18
       19   to 129, 6.
12:00  20        THE COURT:  All right.  You just turned into a
       21   pumpkin.
       22        MR. O'HARE:  I ran out the clock.
       23        THE COURT:  You ran out the clock.
       24      Let's take a lunch break.  Let's come back at 12:30.
12:00  25   Please remember my admonition.  Keep an open mind.  Don't do
```

1    any research.  Don't talk to anyone about the case.

2       Mr. Yeh, you may step down.  Thank you.

3                     ---oOo---

4

5                C-E-R-T-I-F-I-C-A-T-I-O-N

6

7       I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9

10       Dated December 10, 2019, at San Diego, California.

11

12

13                    /s/ Dana Peabody_____
                        Dana Peabody,

14                   Registered Diplomate Reporter
                   Certified Realtime Reporter

15

16

17

18

19

20

21

22

23

24

25