1       United States District Court

2         for the Southern District of California

3

4
                                    )
5   WHITEWATER WEST INDUSTRIES,      )
    LTD., a Canadian Corporation,    )   No. 17cv1118-BEN
6                                    )
        Plaintiff,                   )   December 11, 2019
7                                    )
            v.                       )   San Diego, California
8                                    )
    PACIFIC SURF DESIGNS, INC., a    )
9   Delaware Corporation, and FLOW   )
    SERVICES, INC., a California     )
10  Corporation,                     )

11      Defendants.

12
                      VOLUME 6A
13           TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE ROGER T. BENITEZ
14           United States District Judge

15  APPEARANCES:

16  For the Plaintiff:      SNELL & WILLMER LLP
                                WILLIAM S. O'HARE
17
                            BUCHALTER
18                              ROGER L. SCOTT

19  For the Defendants:     THOMAS WHITELAW & KOLEGRAFF LLP
                                JOSEPH E. THOMAS
20                              WILLIAM J. KOLEGRAFF

21

22
    Court Reporter:         Dana Peabody, RDR, CRR
23                          District Court Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California 92101
                            DanaPeabodyCSR@gmail.com
25

Case:   WhiteWater v. Pacific Surf Designs, Inc.
Date:   December 11, 2019

INDEX OF WITNESSES

FOR THE DEFENDANTS:

E X A M I N A T I O N

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Edward Pribonic | | | | |
| Mr. Kolegraff | 1154 | | 1214, 1224 | |
| Mr. Taché | | 1174 | | 1222 |
| Justin Lewis | | | | |
| Mr. Thomas | 1225 | | | |

|      |                                                                                     |
|------|-------------------------------------------------------------------------------------|
| 1    | San Diego, California, December 11, 2019                                             |
| 2    | *  *  *                                                                              |
| 3    | (Proceedings held outside the presence of the jury panel.)                          |
| 4    | THE COURT:  Well, good morning.  All right.  Anything                                |
| 5    | we need to address outside the presence of the jury?                                 |
| 6    | MR. THOMAS:  Nothing, Your Honor.  We have -- I would                                |
| 7    | like, with the Court's permission, to introduce a member of our                     |
| 8    | trial team, who has been working from the office.  My son,                           |
| 9    | Grant Thomas, is a member of our firm, recent bar admittee last                      |
| 10   | year.                                                                                |
| 11   | THE COURT:  Well, congratulations.  Welcome.  And I                                  |
| 12   | see the family resemblance.                                                          |
| 13   | MR. THOMAS:  So is it okay if I introduce him to the                                 |
| 14   | jury just so that there's no --                                                      |
| 15   | THE COURT:  Any objection?                                                           |
| 16   | MR. O'HARE:  Sure.  You can introduce your son.  He's                                |
| 17   | a fellow Laguna Beach High School graduate along with my two                         |
| 18   | boys.                                                                                |
| 19   | THE COURT:  Seriously?                                                               |
| 20   | MR. THOMAS:  Yes.  We're neighbors.                                                  |
| 21   | THE COURT:  I did not know that.                                                     |
| 22   | MR. THOMAS:  We had Thanksgiving dinner together.                                    |
| 23   | MR. O'HARE:  Well, sort of.  We were in the same                                     |
| 24   | restaurant.                                                                          |
| 25   | THE COURT:  Okay.  That's what I like to hear.                                       |

09:03 (line 5)
09:04 (line 10)
09:04 (line 15)
09:04 (line 20)
09:04 (line 25)

1      All right.  Bring the jury in.  My courtroom deputy reminds

2  me that I asked you to work on the verdict form.

3          MR. THOMAS:  We did that.  We exchanged a red-line

4  draft last night.  We tried to endeavor to agree as much to

09:05    5  their form.  We haven't heard back.  I think we'll be able to

6  work through it.  You tell me.

7          THE COURT:  All right.  Well, let's see if we can get

8  it done today.  Great.  Thanks.  Bring the jury in.

9      (Proceedings held in the presence of the jury panel.)

09:06   10          THE COURT:  Good morning.  Please be seated.

11      We have a new member of the defense legal team with us

12  today Mr. Thomas would like to introduce.

13          MR. THOMAS:  You might notice he looks a little bit

14  like me.  That's my son.  He's a lawyer, within one year of

09:06   15  passing the bar.  He's been working on the case, but from the

16  office the first week, but he'll be in court throughout the

17  remaining proceedings.  Thank you.

18          THE COURT:  You're here to watch dad perform.

19          MR. THOMAS:  That's worthwhile too.

09:06   20          THE COURT:  All right.  Go ahead.

21                     EDWARD PRIBONIC,

22          DEFENDANTS' WITNESS, PREVIOUSLY SWORN

23               DIRECT EXAMINATION (Resumed)

24  BY MR. KOLEGRAFF:

09:07   25  Q.  Good morning, Mr. Pribonic.

1   A.   Good morning.

2   Q.   If someone wants to make something rotate, as one skilled

3   in the art, what would you do?

4   A.   Put it on a shaft, bearings, or put it on a hinge and swing

09:07   5   it.

6   Q.   Having worked in the water park industry for 30 years in

7   the field of safety, if there's something that a rider is going

8   to run into, what do you do?

9   A.   You put padding on it.

09:07   10   Q.   So now I'm going to go back.  And at the end of the day

11   yesterday, we just started looking at invalidity, and this, of

12   course, is where we look at Hyland Hills, and we compare that

13   to Claim 1.  Do you recognize what Exhibit BI is?

14   A.   Yes.

09:07   15   Q.   So we're going to walk you through Claim 1 limitation by

16   limitation, and you can tell us where -- and you can use your

17   drawing finger to show us where on these pictures you find that

18   limitation.

19       So the first limitation is a nozzle assembly for a water

09:08   20   ride attraction.  Where do you find that?

21   A.   The nozzle is generally right behind the pad you see

22   sticking out and you see water jetting out from under there.

23   Q.   And this is certainly a water ride attraction, correct?

24   A.   Yes, absolutely.

09:08   25   Q.   And even though you can't see the nozzles because they're

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | hidden by that padded structure, you know they're back there?            |
|       | 2  | A.   Yes.                                                                |
|       | 3  | Q.   The next limitation is a nozzle having an outlet aperture.           |
|       | 4  | Can you tell us what we see on this Exhibit BH?                           |
| 09:08 | 5  | A.   Yes, we can see the aperture, which is this area right               |
|       | 6  | here, which is nothing more than a hole.                                  |
|       | 7  | Q.   Let me clear the prior annotation.   Thank you.                      |
|       | 8  | A.   This area where this little arrow is pointing to, that's             |
|       | 9  | just a hole through which water comes.   It's an aperture.                |
| 09:09 | 10 | Q.   Can you tell us where the nozzle is?                                 |
|       | 11 | A.   Well, the nozzle, as defined in the patent, goes from the           |
|       | 12 | aperture all the way back in this direction to the end of                 |
|       | 13 | the -- what they call the nozzle.                                         |
|       | 14 | Q.   And is this adopted to emit a jet of water onto a ride               |
| 09:09 | 15 | surface?                                                                  |
|       | 16 | A.   Yes, it is.                                                          |
|       | 17 | Q.   And just for, again, looking at -- where is the ride                 |
|       | 18 | surface here?                                                             |
|       | 19 | A.   You see where this young lady is on the board?  This whole           |
| 09:09 | 20 | area where we see the water flow, this is the ride surface.               |
|       | 21 | Q.   And from this area where you see the young lady, that                |
|       | 22 | slopes upward as it goes further away from the nozzles?                   |
|       | 23 | A.   Yes, it does.                                                        |
|       | 24 | Q.   Is there a nozzle cover comprising padded material?                  |
| 09:09 | 25 | A.   Yes.                                                                 |

```
 1    Q.   And where do you see that?

 2    A.   That would be all of this area.

 3    Q.   Is that substantially covering said nozzle?  Now I'm back

 4    on BH.

 5    A.   Yes, it goes -- in this drawing, this is represented as the

 6    pad, and since this is the nozzle down below, it's covering the

 7    nozzle.

 8    Q.   Now, yesterday we had some testimony that this was an early

 9    fabrication drawing, and it's clear we can see that this nozzle

10    area that you've drawn up here, the padded area that you draw

11    up there isn't like the one in the installation.  Can you

12    describe what the differences are?

13    A.   Well, the only difference, really, is that this pad was

14    reshaped so that it came down, and it came out like this.

15    Q.   So what --

16    A.   It's the same pad over the nozzle.

17    Q.   So what you've drawn in red is the way it's actually shown

18    in the picture as installed?

19    A.   Yes.

20    Q.   Then we have, "Including a flexible tongue which is biased

21    downward against the flow of water."  Do you see that in this

22    Picture BI?

23    A.   Yes.

24    Q.   And can you point it out for us?

25    A.   Again, it's the same area of that flap.
```

```
 1   Q.   And it's there to prevent injury to riders riding over said
 2   nozzle?
 3   A.   Yes.
 4   Q.   And how do we know a rider could ride over that nozzle or
 5   ride over the flap?
 6   A.   How do we know?
 7   Q.   Yes.
 8   A.   It's within the range of the boards that the riders use,
 9   and it's something that we've witnessed at many, many water
10   parks.  We don't have a picture of that here, but . . .
11   Q.   And that area right there is padded.  Is that correct?
12   A.   Yes.
13   Q.   That wouldn't be padded unless you expected riders to ride
14   up onto that flexible tongue and hit that, correct?
15   A.   Yes, that's right.
16   Q.   So have you found all the limitations of Claim 1 in this
17   Hyland Hills installation?
18   A.   Yes, I see them all.
19   Q.   So Hyland Hills anticipates Claim 1?
20   A.   Completely, yes.
21   Q.   Now, because we're doing anticipation, finding claims
22   invalid, we actually have to do the dependent claims as well,
23   correct?
24   A.   Yes.
25   Q.   So we're going to have to go through all 14 claims that
```

1  have been asserted.  So here's Claim 3, which depends from

2  Claim 1, and this adds the limitation, "Wherein said nozzle

3  cover is removably connected to said nozzle."  Do you find that

4  on Exhibit BH?

09:12  5  A.   Yes.

6  Q.   And where is that?

7  A.   Well, right here where it describes the six-inch foam pad

8  beneath that.  The small writing said, "The pad must be removed

9  to adjust the aperture."  So you anticipate that you're going

09:13  10  to have periodic adjustments of the aperture; therefore, you

11  need to have some method to remove and replace it without

12  damaging it or causing other problems.

13  Q.   Moving on to claim -- excuse me.  So do you find Claim 3

14  limitation is found in Hyland Hills?

09:13  15  A.   Yes.

16  Q.   So is Claim 3 anticipated by Hyland Hills?

17  A.   Yes, it is.

18  Q.   Moving on to Claim 13, this again is a dependent from

19  Claim 1.  This adds a limitation of, "Wherein said output

09:13  20  aperture is configured to emit a sheet flow of water."  Can you

21  find that on this diagram?

22  A.   Yes.

23  Q.   Where is that?

24  A.   It's on the photo.  This is the water flow that's going

09:13  25  over the ride surface.  And that's sheet flows described by the

1  patent.

2  Q.  So are all the limitations of Claim 13 found in Hyland

3  Hills?

4  A.  They're all there, yes.

09:13  5  Q.  Does Hyland Hills anticipate Claim 13?

6  A.  Yes.

7  Q.  Same thing on Claim 15, "Further comprising a padded fixed

8  deck."  Do you find that here?

9  A.  Yes.

09:14  10  Q.  First of all, where do you see the fixed decking?

11  A.  Well, the fixed decking is this entire structure here.

12  Q.  And do you find padding on that structure?

13  A.  We find padding on the front; we find padding on the sides;

14  and it goes up over the top.  It appears to go over the top

09:14  15  somewhat.

16  Q.  So when you look at Claim 15, are all the limitations of

17  Claim 15 found in Hyland Hills?

18  A.  Yes.

19  Q.  Does Hyland Hills installation anticipate Claim 15?

09:14  20  A.  It does, yes.

21  Q.  Also on to Claim 17, which is another independent claim,

22  "This requires a cover for a water ride sluice gate for which

23  water jets" -- "of which water jets out."  Do you find that?

24  A.  Yes.  Again, it's another description of this piece here.

09:15  25  Q.  "Comprising a sluice gate having an outlet for injecting a

1    flow of water onto a ride surface."

2    A.   Yes, again, it's this nozzle portion of the sluice.

3    Q.   "Covering said sluice gate with a padded material."

4    A.   Once again, padded material is all of this.

09:15    5    Q.   "Having a flexible tongue extending over the flow of water

6    emitted from said sluice gate."

7    A.   Again, here's the tongue.

8    Q.   "Biasing said tongue downwards to squeeze said tongue

9    against flow of water emitted from said sluice gate."

09:15   10    A.   Here's the biasing downward.

11    Q.   And where's our sluice gate?

12    A.   And here's the sluice.

13    Q.   "To seal off said sluice gate outlet from possible

14    injurious contact from a rider."

09:16   15    A.   That's this padding, which is described as "Protecting

16    riders from contact with sluice gate," which is right here.

17    Q.   And what does it mean "to seal off"?

18    A.   Well, in this context, I would read that to mean just to

19    block or be something in the way, you know, seal off that

09:16   20    corridor, seal off the door, whatever, to prevent entrance or

21    contact with.

22    Q.   And if in one orientation it's not sufficiently sealed,

23    what would you do?

24    A.   Put more padding on it or extend the padding.

09:16   25    Q.   Can you draw for us what that might look like?

1    A.   Well, you can do what we looked at before and just extend

2    the padding down this way, which again looks like the same

3    configuration that Hyland Hills was using.

4    Q.   So --

09:17    5    A.   You can make this as long as you want and get as close as

6    you want to the ride surface.

7    Q.   So Hyland Hills inherently shows someone skilled in the

8    art -- how they would make that flexible tongue seal off to

9    prevent injury?

09:17    10    A.   Yes.

11    Q.   And, again, "whereby said ride surface is configured to

12    have a substantially inclined ride surface and a shortened

13    horizontal transition surface."  Do you find that?

14    A.   Yes.  Here's your ride surface, and it continues out in the

09:17    15    other direction, and it's curved like that.

16    Q.   So on Claim 37, do you find all the limitations of Claim 37

17    in Hyland Hills installation?

18    A.   Yes, I do.

19    Q.   Does Hyland Hills anticipate Claim 37?

09:17    20    A.   It does.

21    Q.   So we'll go to Claim 42.  A nozzle assembly for a water

22    ride attraction.  We've seen that, so this gets pretty

23    repetitive.  "A nozzle outlet having adapted to emit a flow of

24    water onto ride surface."

09:18    25    A.   Yes, as we discussed before, it's this area here.

1  Q.   "A nozzle cover comprising a contoured flexible pad being

2  removably affixed to said nozzle."

3  A.   Right, same thing we discussed earlier.

4  Q.   "Nozzle cover, including a flexible tongue at downstream

09:18  5  and extending over the water that flows from said outlet."

6  A.   That's this.

7  Q.   "Tongue being urged downward against the flow of water from

8  said outlet."

9  A.   Yes, you can see the slope at which the tongue is directed

09:19  10  downward bending at that point.

11  Q.   So are all the limitations of Claim 42 found in Hyland

12  Hills?

13  A.   Yes, they are.

14  Q.   Does Hyland Hills installation anticipate Claim 42?

09:19  15  A.   Yes, it does.

16  Q.   Claim 43 depends from Claim 42 and adds a limitation,

17  "Wherein the nozzle cover has a generally flat portion at an

18  upstream end of the cover."  Do you find that?

19  A.   It's a flat portion of the cover here and here.

09:19  20  Q.   So on Claim 43, do you find all the limitations of Claim 43

21  in Hyland Hills?

22  A.   Yes, I do.

23  Q.   Does claim -- does Hyland Hills installation anticipate

24  Claim 43?

09:19  25  A.   Yes.

1   Q.   Moving to Claim 24, do we have a water ride attraction?

2   A.   Yes.

3   Q.   We do?

4   A.   Yes, we do.

09:20   5   Q.   Does it have a contoured ride surface?

6   A.   Yes, it does.

7   Q.   And where would that be?

8   A.   It's contoured.  It slopes down this way, curves back up,

9   and is contoured back up to the far end, downstream end, of the

09:20   10   ride.

11   Q.   Does this have "A sluice gate sized and configured to

12   inject flow of water onto said ride surface"?

13   A.   Yes, it does here.

14   Q.   "A cover which covers and extends over the top surface of

09:20   15   said sluice."

16   A.   This cover.

17   Q.   "To prevent riders from possibly colliding with or riding

18   over or interfering with ride operation."

19   A.   Yes, because it's in between the sluice and the rider.

09:20   20   Q.   So when you look at Claim 24, have all the limitations

21   found in Claim 24 been found in Hyland Hills?

22   A.   Yes, they have.

23   Q.   Does Hyland Hills installation anticipate Claim 24?

24   A.   It does.

09:21   25   Q.   Now, we've got some dependent claims to go through.

1  Claim 25 which depends from Claim 24, adds the limitation of,

2  "Wherein a substantial portion of said ride surface is sloped."

3  Do you see that?

4  A.   Yes, I do.

09:21  5  Q.   And, again, is that just the ride surface as it goes up?

6  A.   It's the ride surface, and it's all sloped.

7  Q.   So for Claim 25, do you find all the limitations of Claim

8  25 in the Hyland Hills installation?

9  A.   Yes.

09:21  10  Q.   Does Hyland Hills installation anticipate Claim 25?

11  A.   Yes.

12  Q.   For Claim 26, it also depends from Claim 24.   "Where it

13  comprises a tongue-like pad."  Do you see that?

14  A.   Yes, sir.

09:21  15  Q.   Are all the limitations of Claim 26 found in Hyland Hills?

16  A.   Yes.

17  Q.   Does the Hyland Hills installation anticipate Claim 26?

18  A.   Yes.

19  Q.   Claim 27 also comes from Claim 24.   "Where the outlet

09:22  20  aperture is configured to emit a sheet flow of water."  Is this

21  in the Hyland Hills installation?

22  A.   Yes.   Outlet aperture is behind there, and it's emitting

23  this sheet flow of water onto the ride surface.

24  Q.   Are all the limitations of Claim 27 found in Hyland Hills?

09:22  25  A.   Yes.

1  Q.   Does Hyland Hills anticipate Claim 27?

2  A.   Yes, it does.

3  Q.   Claim 29 adds limitation, "Further comprises a circulation

4  pump."  Does this installation have a circulation pump?

09:22  5  A.   Yes, it does.

6  Q.   You can't see it here, though, can you?

7  A.   No, you can't see it, but it's somewhere in the system

8  here.

9  Q.   You know because of all that water jetting out, there's got

09:22  10  to be a pump some place?

11  A.   No pump, no water.

12  Q.   So are all the limitations of Claim 29 found in Hyland

13  Hills?

14  A.   Yes, they are.

09:22  15  Q.   Does Hyland Hills installation anticipate Claim 29?

16  A.   Yes.

17  Q.   And this should be the last dependent claim.  "So this

18  further comprises decking for performing surfing, skimming,

19  tricks."  Does this installation have a deck?

09:23  20  A.   Yes.

21  Q.   And where is that?

22  A.   It's this structure here.

23  Q.   Are all the limitations of Claim 30 found in the Hyland

24  Hills installation?

09:23  25  A.   Yes.

| | |
|---|---|
| 1 | Q.   Does Hyland Hills installation anticipate Claim 30? |
| 2 | A.   Yes, it does. |
| 3 | Q.   I apologize.  I think I had something go wrong with the |
| 4 | presentation.  We didn't get through Claim 17.  There we go. |
| 09:23  5 | There was just a single animation.  We'll just walk through |
| 6 | this one real quickly. |
| 7 | So this -- I think I did this part.  "A cover for a water |
| 8 | ride sluice gate from which water flows out."  We've got that? |
| 9 | A.   Yes. |
| 09:23  10 | Q.   And I don't have the red animation on this one. |
| 11 | "Comprising a contoured flexible pad."  Do we have that? |
| 12 | A.   Yes. |
| 13 | Q.   And where would that be? |
| 14 | A.   (Indicating.) |
| 09:24  15 | Q.   "Configured to removably affix the cover to said sluice |
| 16 | gate." |
| 17 | A.   Yes. |
| 18 | Q.   We talked earlier about it being removable. |
| 19 | A.   Yes, you can see some of the bolt holes. |
| 09:24  20 | Q.   And how about, "A flexible tongue at the downstream end of |
| 21 | the cover, the tongue configured to extend over the water that |
| 22 | jets from said sluice gate"? |
| 23 | A.   That's it there. |
| 24 | Q.   And here, where would you find, "The generally flat portion |
| 09:24  25 | at an upstream end of said cover"? |

1    A.    That area on the front, front of the deck.

2    Q.    And that tongue is being urged downward against the flow of

3    water?

4    A.    Yes, the tongue is.

09:24    5    Q.    So have we found all the limitations of Claim 17 in the

6    Hyland Hills installation?

7    A.    Yes, we have.

8    Q.    Does the Hyland Hills installation anticipate Claim 17?

9    A.    Yes.

09:24   10    Q.    Just give me a moment.

11          So yesterday we talked a little bit about obviousness, and

12    that's where you can take two pieces of things and mix them

13    together, and you can be obvious because you've combined two

14    things?

09:25   15    A.    Yes.

16    Q.    Do you recognize what's here?   This is CJ-4.   Do you

17    recognize this installation?

18    A.    Yes, this is the Guam installation.

19    Q.    And is this similar to the installation that was done at

09:25   20    Hyland Hills?

21    A.    Very similar, yes.

22    Q.    And can you describe a little bit of the difference,

23    especially at the tongue area?

24    A.    Well, it's even called out here on the drawing.   It

09:25   25    highlights that area.   Whereas Hyland Hills had the tongue that

1    looked like this coming down, this now has that sloped

2    extension that I suggested was inherent to come down further

3    into the water stream, if necessary.

4    Q.   Is this another FlowRider installation?

09:26   5    A.   Yes.

6    Q.   And this was also installed at about 1996?

7    A.   Yes.

8    Q.   So this is prior art --

9    A.   Yes.

09:26   10   Q.   -- to the '589 patent?

11   A.   Yes.

12        MR. KOLEGRAFF:  Can you pull up Exhibit JO?  Can you

13   rotate, please?

14   BY MR. KOLEGRAFF:

09:27   15   Q.   Do you recognize this?  This is Exhibit JO.  Do you

16   recognize this as being the Hyland Hills fabrication drawings?

17   A.   It's still moving around.

18   Q.   Technical difficulties.

19   A.   This is how Hyland Hills was built, yes.  The drawing

09:27   20   itself was from Guam.

21   Q.   And, again, can you just point out where the nozzle and the

22   sluice gate and the pads are?  This is a little better picture

23   of it.

24   A.   Yes.

09:27   25   Q.   Can you point out the major features?

1    A.   Okay.  I'm sorry.

2    Q.   With your drawing finger.

3    A.   This is the pad that extends down to the flexible tongue

4    which is covering the nozzle here.  This is the ride surface.

09:28    5    And the rest of this area on all four sides is the deck.

6    Q.   So in this Guam installation, that flexible tongue is

7    riding just above the water?

8    A.   Yes.

9    Q.   If you took everything that you have in Hyland Hills

09:28    10    installation and everything you have in the Guam installation,

11    would that have made all the asserted claims obvious?

12    A.   Yes, it would.

13        MR. KOLEGRAFF:   Can we pull up Exhibit KB-1, please?

14    BY MR. KOLEGRAFF:

09:29    15    Q.   Do you recognize this patent?

16    A.   Oh, yes Frenzl.

17    Q.   And this was identified on the front page -- front face of

18    the '589 as prior art.  Is that correct?

19    A.   Yes.

09:29    20    Q.   And just to be clear, the Hyland Hills installation and the

21    Guam installation were not identified on the front page of the

22    '589?

23    A.   That's right.

24    Q.   So the examiner never had an opportunity to consider the

09:29    25    impact of the Hyland Hills installation or the Guam

1  installation?

2  A.   No, he didn't.

3  Q.   In this litigation, WhiteWater has asserted that a hinged

4  metal plate can be a flexible tongue.  Is that something that

09:29  5  would be possible?

6  A.   I didn't hear the last half of your question.

7  Q.   The patent examiner -- excuse me.  WhiteWater has asserted

8  that a hinged metal plate is a flexible tongue.  Is that

9  possible?

09:30  10  A.   No.

11  Q.   So why is that?

12  A.   Well, I think we discussed it pretty well yesterday.  The

13  flexibility and squeezability and deformity are not the same as

14  a hinge on a rigid object.

09:30  15       MR. KOLEGRAFF:  Can you go to KB-5, please, and rotate

16  and hopefully get into Figure 8.

17  BY MR. KOLEGRAFF:

18  Q.   Now, this is Figure 8 from the Frenzl patent that the

19  examiner considered.  Would the -- would -- WhiteWater be

09:30  20  allowed to extend the reach of their flexible tongue to include

21  a hinged flap?

22  A.   No.

23  Q.   And why is that?

24  A.   Well, because Frenzl shows it, a hinged flap here in this

09:31  25  area, so it's already been disclosed and used.

1172

|       | 1  | Q.   Is that hinged flap in the nozzle area? |
|-------|----|----------------------------------------------|

09:31   1   Q.   Is that hinged flap in the nozzle area?

2   A.   Yes, it is.

3   Q.   And is this a sheet wave machine?

4   A.   Yes, it is.

09:31   5   Q.   Does WhiteWater need to have the same construction that it

6   uses in infringement and that they use when they're doing the

7   invalidity analysis?

8   A.   Yes.

9   Q.   So they can't take one position just to try to get an

09:31   10   infringement on us and then come over here and take a different

11   position to try to keep their patent invalid?

12   A.   No, he's got to be consistent.

13        MR. KOLEGRAFF:   May we move the demonstrative up,

14   please?

09:31   15   BY MR. KOLEGRAFF:

16   Q.   Are you familiar with the noninfringing alternative that

17   Mr. Alleshouse made?

18   A.   Yes, I am.

19   Q.   Or at least that PSD made.

09:32   20       If it would be helpful, you can come down here.   We're

21   pulling up the demonstrative, and you, and you can help

22   describe that to the jury.

23        MR. TACHÉ:   Objection, Your Honor.   This exceeds the

24   scope of Mr. Pribonic's testimony.   He was not deemed an expert

09:32   25   on the noninfringing substitute.   Mr. Alleshouse was.

09:32

1      MR. KOLEGRAFF:  He's here to talk about the
2  noninfringement positions, and this, again, just extends our
3  noninfringing position.  We take the position that the hinged
4  flap is not --

5      THE COURT:  Well, wait.  Let's not have this argument
6  in front of the jury.  Come on up to sidebar, please.

7      (Proceedings were heard at the bench.)

8      THE COURT:  You have to identify yourself when you
9  speak, but let me ask a question:  Did he submit a report?

09:33

10      MR. THOMAS:  He did.

11      THE COURT:  Did he address this in his report?

12      MR. KOLEGRAFF:  Not directly.

13      THE COURT:  Then the objection is sustained.  Thank
14  you.

09:33

15      (Proceedings held in the presence of the jury panel.)

16  BY MR. KOLEGRAFF:

17  Q.  So is it your opinion, as one skilled in the art, that all
18  the claims that are asserted against PSD have been invalidated
19  either by Hyland Hills in anticipation or made obvious by a

09:34

20  combination of Hyland Hills, Guam, and Frenzl?

21  A.  Yes, that's my opinion.

22  Q.  And as one skilled in the art, is it your opinion that the
23  PSD device does not infringe?

24  A.  That's my opinion, yes.

09:34

25      MR. KOLEGRAFF:  Thank you.

1      MR. O'HARE:  May we move the device out of the way?

2      THE COURT:  Sure, yes.

3                          CROSS-EXAMINATION

4  BY MR. TACHÉ:

09:35  5  Q.   Good morning, Mr. Pribonic.

6  A.   Good morning.

7  Q.   Do you recall yesterday you were asked a number of

8  questions by Mr. Kolegraff about specific issues relating how

9  you're supposed to read the patent on the law of infringement

09:35  10  and invalidity?  Do you recall that?

11  A.   Yes.

12  Q.   And most of his questions, Mr. Kolegraff actually told you

13  the answers, what the answers were, and all you had to do was

14  agree that -- to what he was asking.  Isn't that because this

09:35  15  is the first time you've ever testified as a patent expert in a

16  case?

17  A.   No, that's not true.

18  Q.   So you've testified in court before as a patent expert on

19  technical issues?

09:35  20  A.   I've testified in deposition on a patent case.

21  Q.   And how many cases is that?

22  A.   Two.

23  Q.   Did you write any reports in connection with those cases?

24  A.   On one, I did, yes.

09:36  25  Q.   But to specifically answer my question, this is the first

1    time you've ever testified in court as an expert in a patent

2    case?

3    A.   Yes.

4    Q.   And do you recall yesterday that you informed the jury that

09:36    5    you've been an expert in hundreds of cases as a technical

6    expert?

7    A.   Yes.

8    Q.   In fact, that work as a technical expert is in conjunction

9    with water ride accidents, isn't it?

09:36    10    A.   Many of them, yes.

11    Q.   So then you wouldn't consider yourself to be an expert in

12    patent law, would you?

13    A.   Pardon?

14    Q.   You wouldn't consider yourself to be an expert on patent

09:36    15    law, would you?

16    A.   I do, yes.

17    Q.   Based on three cases?

18    A.   Pardon?

19    Q.   Based on working on three cases?

09:36    20    A.   Yes, based on learning the technology that's involved in

21    those cases and testifying on it.

22              MR. TACHÉ:   Move to strike, Your Honor.

23              THE COURT:   Overruled.

24    BY MR. TACHÉ:

09:37    25    Q.   As part of your engagement in this case, Mr. Pribonic, did

 1  you go to visit any of the accused PSD products as part of your

 2  analysis?

 3  A.   No, I didn't.

 4         MR. TACHÉ:   Can we please bring up Exhibit 1, page 23?

09:37  5  BY MR. TACHÉ:

 6  Q.   Let's turn to Claim 1, shall we?   Looking at the preamble,

 7  do you agree that each of PSD's accused rides -- or pardon me.

 8  Do you agree that each of PSD's accused products are, in fact,

 9  water ride attractions?

09:37  10  A.   Yes, I do.

 11  Q.   And do you also agree that each of PSD's accused products

 12  have a nozzle assembly?

 13  A.   Yes.

 14  Q.   And that each of their products has a nozzle cover that

09:38  15  comprises of padded material?

 16  A.   Yes.

 17  Q.   And that each of PSD's accused products have a padded

 18  material substantially covering the nozzle?

 19  A.   Yes.

09:38  20  Q.   Do you also agree that each of PSD's accused products meet

 21  the claim limitation to prevent injury to riders riding over

 22  said nozzle?

 23  A.   No.

 24         MR. TACHÉ:   Can we please play Mr. Pribonic's

09:38  25  deposition testimony from September 28, 2018, page 75, lines 22

1    through page 76, lines 2.

2        (A video was played.)

3    BY MR. TACHÉ:

4    Q.   Previously, Mr. Pribonic -- previously you disputed that

5    PSD's accused products had a flexible tongue that was biased

6    downward against the flow of water, but yesterday you

7    acknowledged to this Court that you'd made a mistake based on

8    a -- I think you said a bad drawing, and now you admit that

9    PSD's accused products and hinged flap is biased downward

10   against the flow, do you not?

11   A.   The top of the flap is biased downward, yes.

12   Q.   So then the only element --

13        MR. TACHÉ:  If we could please bring up Claim 1 again.

14   Thank you.  If we could extend it.  Thank you.

15   BY MR. TACHÉ:

16   Q.   The only element in Claim 1 that you dispute is whether or

17   not the hinged flap is flexible.  Is that correct?

18   A.   No, I also said that it does not prevent injury to riders

19   riding over the nozzle.

20   Q.   We just played that testimony where you admitted that fact,

21   did you not?

22   A.   That's right.  Between that time and this time,

23   WhiteWater's redefined what they consider the nozzle.  At the

24   time of the deposition, we were speaking of the first couple of

25   inches in which the flap sits in front of that.  Now WhiteWater

1  is saying the nozzle extends from the aperture all the way back

2  under the deck, and under those circumstances, that flap

3  couldn't protect anyone.

4  Q.  Mr. Pribonic, can you please point to something that was

09:41  5  submitted to this Court or filed in connection with this case?

6  A.  I can't hear the last part of your question.  Can you get

7  closer to the mic?

8  Q.  Can you please identify specifically what you're referring

9  to in a document that's been filed or anything else that's been

09:41  10  stated in this Court with respect to a change in Whitewater's

11  position?  We've been consistent through four years of this

12  trial.  Can you, please, identify anything that supports your

13  testimony?

14  A.  Mr. Stevick's report where he contends the nozzle projects

09:41  15  from the front of the aperture to the back, and the cover, as

16  configured by Whitewater, needs to go from the nozzle over the

17  back all the way to the back of the nozzle.

18  Q.  I believe you were deposed in September of 2018.  Is that

19  correct?

09:41  20  A.  I'm not sure the date, but that sounds about right.

21  Q.  Okay.  Prior to your deposition testimony, which you

22  admitted, and we just saw it on the record, that this, in fact,

23  was a limitation that PSD's accused products met, did you not

24  have access to Dr. Stevick's report on infringement?  In fact,

09:42  25  you'd had it months before?

1    A.   Yes, I did.

2    Q.   So then your -- so let's go back to the flexible tongue

3    claim limitation.  According to the definition that you

4    provided of a person skilled in the art, is it your opinion

09:42   5    that that person would need to be an engineer?

6    A.   Doesn't need to be an engineer, no.

7    Q.   And so when you consider what a person of ordinary skill

8    would understand what "flexible" means, you looked at --

9             MR. TACHÉ:   If we could bring up Exhibit 111.

09:42   10   BY MR. TACHÉ:

11   Q.   The American Heritage College Dictionary.  Is that correct

12   for the word "flexible"?

13   A.   Yes.

14   Q.   Did you happen to also look up the word "hinge" in that

09:43   15   dictionary?

16   A.   No, I did not.

17            MR. TACHÉ:   Can we bring up Exhibit 258?

18   BY MR. TACHÉ:

19   Q.   Had you done so, Mr. Pribonic, this is what you would have

09:43   20   found.  I misspoke.  256.  "A jointed or flexible device that

21   allows turning or pivoting of a part."  Is that the correct

22   reading of the definition?

23   A.   Yes, "Such as a door on a stationary frame."

24   Q.   But it specifically allows for movement, does it not,

09:43   25   Mr. Pribonic?

A.   It allows for turning or pivoting.

Q.   Would you agree that turning or pivoting is movement?

A.   Yes, it is.

     MR. TACHÉ:  If we could turn to Exhibit 1, page 5, and Figure 3A as well.

BY MR. TACHÉ:

Q.   Yesterday when you were discussing the function of the invention that's claimed in the '589 patent, you used Figure A and -- to identify the fact that the entire -- what's the black portion along the top line, so this area right here.  You described that as including -- as the element -- and includes Element 190, does it not?

A.   Yes.

Q.   And you said that that entire area covered the nozzle with this piece, did you not?

A.   I believe I did, yes.

     MR. TACHÉ:  If we could, please, go to Exhibit 1, and I'm not sure the page number.  I believe it's 20 or 21.  It's column 10, lines 31 through 35.  31 through 35, please. Beginning with "Preferably."  Sorry.  There you go.

BY MR. TACHÉ:

Q.   Element 190 is identified as the decking, is it not, Mr. Pribonic, and not part of the cover?

A.   Yes.

     MR. TACHÉ:  If we could, please, turn back to Figure

1    3A of Exhibit 1.  I believe that's page 4 of 5.  Thank you.

2    BY MR. TACHÉ:

3    Q.  So, in fact, if we exclude Element 190, this is what we're

4    talking about for the cover, isn't it?

09:46    5    A.  No, I don't believe so because I believe in the

6    specification it calls out that or describes that the entire

7    area is one assembly, one unit.  I forget the exact word.

8    Q.  Is it possible, Mr. Pribonic, that that's one embodiment of

9    the invention, but not the entirety of the description and

09:46   10    specification as it relates to this issue?

11    A.  I didn't hear the question.

12    Q.  Mr. Pribonic, the specification actually calls out multiple

13    embodiments of the cover, does it not, and the one that you've

14    just spoken about is one possible embodiment but not the only

09:46   15    one that's described in the patent?

16    A.  Correct.

17    Q.  Thank you.

18        MR. TACHÉ:  You can clear that, Gary.  Thank you.

19        So if we could, please, bring up Claim 42 of the '589

09:46   20    patent.

21    BY MR. TACHÉ:

22    Q.  According to your report that you wrote in connection with

23    this case on -- on noninfringement, your defense of Independent

24    Claim 42 for the PSD's accused products is identical to the one

09:47   25    you made with respect to Claim 1 as to the issue of flexible

1    tongue, is it not?

2    A.   I don't recall that exactly, but I'll take your word for

3    it.

4    Q.   So is that a "yes"?

09:47   5    A.   Yes.

6    Q.   And is that also true with respect to Claim 17, at least as

7    to the PSD's accused products?

8    A.   Well, I would say yes, but I don't have it in front of me

9    to read it.

09:48   10   Q.   While she's looking for that, let me ask you a related

11   question.

12           MR. TACHÉ:   May I approach, Your Honor?

13           THE COURT:   Yes.

14   BY MR. TACHÉ:

09:48   15   Q.   Is that, in fact, your report on noninfringement,

16   Mr. Pribonic?

17   A.   Yes, it is.

18   Q.   So with respect to Claim 17, is your defense of Claim 17

19   identical to the one that you used with respect to Claim 1?   If

09:48   20   it helps you at all, I believe it's in paragraph 35, and

21   there's a carryover into 41.

22   A.   Yes, my opinion was that Dr. Stevick would not convince me

23   that the product on the WhiteWater device flexible tongue is

24   the same as the tongue on the Pacific Surf Designs product.

09:49   25   Q.   So you would agree with me that that's your sole defense in

1    Claim 17, is exactly the one you made with respect to Claim 1?

2    A.   Yes, it is.

3    Q.   Thank you.

4         Let's turn to Claim 37, if we could.  Can you please

09:50    5    confirm that your opinion with respect to the defense of

6    noninfringement of Claim 37 is directed to the shortened

7    horizontal transition surface claim limitation that's the last

8    four words of Claim 37?  And to help you along, it's at

9    paragraphs 53 through 56 of your report, I believe section F.

09:50   10    A.   Thank you.

11         THE COURT:  While he's looking for that, Counsel,

12    refresh my recollection.  Is there a request for an injunction

13    in this case?

14         MR. TACHÉ:  There is, Your Honor.

09:51   15         THE COURT:  I thought so.  Okay.

16    BY MR. TACHÉ:

17    Q.   Did you find that, Mr. Pribonic?

18    A.   Yes, I did.

19    Q.   And would you agree that your defense of Independent

09:51   20    Claim 37 is that the PSD's accused products do not have a

21    shortened horizontal transition surface?

22    A.   No, my opinion says that Dr. Stevick has not shown that the

23    PSD products do have a shortened transition surface.

24    Q.   Forgive me for the question then.  I don't want to play

09:52   25    semantics, but isn't the opposite of that also true then?

1    You're saying that he didn't prove to you that your rides don't

2    have one, so what you're arguing, in fact, is that -- your

3    argument is that PSD's products don't have a shortened

4    horizontal transition surface?  Is that not an accurate read of

09:52   5    what you said?

6    A.   That's right.

7    Q.   So we're in agreement then?  The defense that PSD -- the

8    defense that you have with respect -- your opinion -- pardon

9    me -- with respect to noninfringement of Claim 37 is that PSD's

09:52   10   accused products do not have a shortened horizontal transition

11   surface?

12   A.   No, I'm saying Dr. Stevick has not shown that they do.

13   Q.   Okay.  Well, I think we'll get there a different way.

14        Let's look at Exhibit 1 again, please.

09:53   15        THE COURT:  Before you do that, before you do that,

16   before you do that, I have a question.  Where's that image?

17        THE WITNESS:  Is there a rod in there?

18        THE COURT:  I have no idea.  Let's try it this way:

19   Is that a hinge?

09:53   20        THE WITNESS:  No, sir, it's not a hinge.

21        THE COURT:  Why not?

22        THE WITNESS:  A hinge is a device that contains a pin,

23   a rod, or an axis that allows the piece to move along that

24   axis.  That is a pliable material bending.

09:54   25        THE COURT:  It's a flexible material?

```
 1              THE WITNESS:  It's a flexible material bending, but
 2   not rotating.
 3              THE COURT:  It's bending?
 4              THE WITNESS:  Yes.
09:54  5        THE COURT:  Can you put your definition back up, the
 6   one that you showed him a few minutes ago?
 7              MR. TACHÉ:  I would be more than happy to, Your Honor.
 8   I believe it's 256.
 9              THE COURT:  Okay.  Is this a hinge?
09:54 10        THE WITNESS:  Yes, sir, according to that definition.
11              THE COURT:  Okay.  Is the definition on that
12   exhibit -- I mean, the hinge -- or is that device that is
13   yellow on that exhibit, is that a hinge?
14              THE WITNESS:  I'm sorry, sir, which one?
09:55 15        THE COURT:  The yellow.
16              MR. TACHÉ:  May I?  I can walk over, if you'd like.
17              THE COURT:  Sure.
18              THE WITNESS:  Yeah, the yellow piece is a hinge.
19              MR. TACHÉ:  Let the record reflect I'm moving a yellow
09:55 20  hinge.
21              THE COURT:  So looking at this definition, a hinge
22   could be a jointed definition -- or a hinge can be a jointed
23   part which would be that part?
24              THE WITNESS:  Yes.
09:55 25        THE COURT:  Or it can be this, which is a flexible
```

1   part?  Can we agree on that?

2        THE WITNESS:  I'd say it mimics a hinge, but it is not

3   a hinge.

4        THE COURT:  Okay.  This is flexible?

09:55   5        THE WITNESS:  Yes, sir.

6        THE COURT:  That is not?

7        THE WITNESS:  Correct.

8        THE COURT:  Okay.  Thank you.

9       All right.  Go ahead.

09:56   10   BY MR. TACHÉ:

11   Q.  And just to be clear, Mr. Pribonic, the definition that's

12   off Exhibit 256 is from the identical dictionary that you used

13   to look up the word "flexible," is it not?

14   A.  Okay.

09:56   15   Q.  Is that a yes?

16   A.  I agree with you, if you say that.  I don't know.

17        MR. TACHÉ:  Can we please bring up the face page of

18   Exhibit 256?

19   BY MR. TACHÉ:

09:56   20   Q.  Is that the same dictionary, Third Edition, that you used?

21   A.  Yes.

22   Q.  Thank you.

23        MR. TACHÉ:  If we could then --

24   BY MR. TACHÉ:

09:56   25   Q.  We're now on the Claim 37 where we're discussing the

1   shortened horizontal transition surface.

2         MR. TACHÉ:  If we could, please, bring up Exhibit 1,

3   Figure 1A.  It's the second or third page.  Sorry.  I believe

4   Figure 1A is the second page, so it would be page 2.  There we

09:57   5   go.  Thank you.

6   BY MR. TACHÉ:

7   Q.   Taking a look at 1A, it's identified as prior art, is it

8   not, Mr. Pribonic?

9   A.   Yes.

09:57   10   Q.   Okay.  And Element 62 is described in the specification of

11   the '589 patent as an extended horizontal transition surface.

12   Would you agree with that?  And that would be the distance from

13   here all this way?

14   A.   Yes, that's how it's defined.

09:57   15   Q.   And the purpose of that is to act as a buffer to slow a

16   rider coming down the slope and have the water going in this

17   direction, slow -- have an adequate distance to slow them down

18   to avoid having them hit the nozzle?  Is that the purpose of

19   the extended ride surface?

09:57   20   A.   Yes.

21   Q.   Thank you.

22         Do you agree that PSD's products have a nozzle flap that

23   allows riders to safely ride over from the ride surface onto

24   the nozzle cover?

09:58   25   A.   Yes.

1    Q.   And so doesn't the specification --

2            MR. TACHÉ:   If we could bring up Exhibit 482.

3    BY MR. TACHÉ:

4    Q.   Doesn't the specification specifically say that the primary

5    objective of the invention of the '589 patent is to provide a

6    nozzle assembly that includes a slide-over cover that allows

7    riders to do exactly what you just testified PSD's products do;

8    namely, to allow a rider to safely ride up onto the nozzle

9    cover?

10   A.   Yes, that's in the specification.

11   Q.   And so if we remove the buffer to allow a rider to ride up

12   and over the nozzle, by definition, doesn't that mean that

13   we've eliminated the extended horizontal transition surface and

14   that now PSD's accused products have a shortened horizontal

15   transition surface?

16   A.   No, it doesn't change the physical dimensions of the

17   surface at all.

18   Q.   So if we look at this drawing, you recall Figure 1A, the

19   distance from here to the nozzle was an extended distance.  You

20   can see this is the slope right here.  It continues on, in

21   fact.  I was trying to be conservative with my drawing.  It

22   probably stopped somewhere in the neighborhood here.  So you --

23   as a relative term, you believe that this is the same relative

24   distance as prior art, Figure 1A?

25   A.   Well, I don't know what you're trying to describe there,

1    but it's pretty vague.  Kind of a sloppy drawing.  So if you're

2    talking about dimensions --

3    Q.   Let me clear this if you would like to draw.  Go ahead.

4    A.   If you're talking about the dimensions, which you've

5    defined as extended riding surface, if you say it's from there

6    to the front edge of this flap, then that's one surface.  If

7    you take that flap away, all you have back there are the

8    nozzles.  So you can still come up over here.  This is your

9    total extended surface.  If you take the flap out of there, you

10   still have the same distance.

11   Q.   But isn't that exactly the point, Mr. Pribonic?

12   A.   I don't know what your point is.

13   Q.   The point is, there is a flap, and the point is, as a

14   result, this distance got shorter than -- from a relative

15   perspective than it was shown in Figure 1A?

16   A.   The distance from here to the front of the flap?  Or here

17   to the nozzles?  The distance from this point to the nozzles

18   always stays the same.

19   Q.   We're talking about the distance of the extended horizontal

20   transition surface on the riding surface.

21   A.   Well, that's the whole point.  What is that?  How do you

22   define it?  WhiteWater doesn't define it.  They vaguely say

23   it's different than some others.  They don't define what

24   others.  They don't call out anybody in particular.  They don't

25   give any specific dimensions.  They just use a relative term

1    that it's shorter than.

2    Q.  So it's your testimony that the '589 patent doesn't

3    specifically call out that the relative term shortened is in

4    the context of the new rides that are covered by the patent

10:01    5    that have a nozzle flap that allows a rider to go up and over

6    from the riding surface onto the decking as opposed to this

7    long, extended ride surface that's there because there are no

8    nozzles, no nozzle flaps, and we want to prevent riders from

9    bumping into that?  Is that your testimony?

10:02    10   A.  No, I'll give you my testimony.  Don't give me my

11   testimony.  My testimony is that the patent discusses these

12   shortened transition areas, but they don't say based on what.

13   They say we're starting with the assumption that a normal

14   transition surface is 25 feet, and a shortened transition is

10:02    15   anything less than 20 feet.  Then we would have something to

16   understand.  We have to have a bar to measure against.  They

17   just generally say it's shorter than others, but it's also

18   longer than others, so it doesn't really help me.  And if you

19   look at the enablement clause of the patent, it says you have

10:02    20   to be specific enough to be able to tell somebody exactly how

21   to build it, how to use it, so if you can't define what your

22   baseline distance is, then it's meaningless.  It could be this,

23   it could be that.  You just throw that general term into the

24   patent.  So when you say is this shortened, relative to what?

10:03    25   If you take one device like this and say this device and this

1   pad, we can shorten it by eight inches, but the patent doesn't

2   speak to this particular ride.  If you're going to establish

3   you have to make a shorter transition distance and you have to

4   establish first the baseline so it can be applied to everyone's

10:03   5   ride.  You've chosen one, picked a pad, and said that's

6   shorter.  And now when the next ride comes along, you'll have

7   to do something different because they have a different one.

8   Q.   Okay.  Column 8 of the '589 patent specifically speaks to

9   your concern, Mr. Pribonic.  It identifies Figure 1A and said

10:04   10   61 is the transition line.  That's the extended horizontal

11   surface.  And its purpose is to slow a rider so they avoid

12   hitting nozzles at the front of the ride because no nozzle flap

13   existed in the prior art rides.  Do you agree with me so far?

14   A.   I agree that they identify what they call a transition

10:04   15   distance, transition surface.

16   Q.   So you also testified a moment ago that you agree with me

17   that the purpose of the new invention that's covered and

18   disclosed in the '589 patent is to include a covered flexible

19   nozzle cover that allows a rider to ride off of the riding

10:04   20   surface without injury onto the padded decking, and you agreed.

21   Is that correct?

22   A.   Yes.

23   Q.   Okay.  So the relative distance between a shortened and an

24   extended horizontal transition surface is made very clear in

10:05   25   the patent because the purpose of the prior art extended

1192

surface was to avoid having riders bump into and was a buffer.
Is that not what we agreed to earlier?

A.   Yes.

Q.   Okay.  So the difference now with the new invention is that
it can be shorter, and it doesn't have to be any specific
distance shorter because the purpose of the invention is to
allow riders to now ride over the nozzle flap onto the padded
decking, so the actual distance isn't important, is it,
Mr. Pribonic?

A.   It is because every ride is going to be different.  Someone
else's ride may have an Area 62 that is ten feet longer.  And
by adding this flap has not made it shorter than someone else's
ride.  It's all -- you have to have something relevant to speak
to.  You just can't say every time you put something in there,
it's shorter.  As it's defined in the patent, it's shorter, but
in reality, when you're trying to compare it to another
product, it's not.

     If the Pacific Surf Designs transition area were 35 feet
and the FlowRider were 25 feet and Pacific Surf put in a
one-foot flap, now their distance is shorter.  It's 34 feet,
but it's still much longer than the FlowRider --

Q.   Mr. Pribonic --

A.   -- so how can that infringe the patent?

Q.   -- sorry to have interrupted.  Are you done?

A.   It can't be infringing if it's no -- hasn't been made

1    shorter than the FlowRider.  It's made shorter than Pacific

2    Surf's own ride, but it's not shorter than the FlowRider.

3    Q.  Would you agree with me that the claims have to be read

4    in -- any claim limitation has to be read in the context of the

5    other limitations contained within the claim?

6    A.  I apologize, Mr. Taché, but years in the steel mills and

7    the noisy water parks, I'm having a little trouble hearing you.

8    If you could step closer to the mic.

9    Q.  My apologies.  I tend to speak softly, and hopefully you'll

10   be able to hear me.

11       So you would agree with me that the claim limitations have

12   to be read in the context of the words that are around them in

13   a claim?

14   A.  The words that are what?

15   Q.  Around them, next to, in front of, beside, behind.

16   A.  As long as they're in the claim, we'll consider them, yes.

17   Q.  Okay.  So then your defense, in general, is that -- I'll

18   leave it at that.

19       Can we please take -- let's turn to Claim 24, please,

20   Exhibit 1, page 23.  Claim 24 recites that the cover -- covers

21   and extends over the top surface of the sluice.  Is there

22   anywhere in the claims, Mr. Pribonic, that the cover says that

23   you have to cover the entire top surface of the sluice?

24   A.  Well, top surface is top surface.  It doesn't say the first

25   three inches of the top surface.  When you read that, you have

1    to take it in its entirety.  That's the top surface.  The top

2    of the table is, in fact, the entire table.

3          MR. TACHÉ:  If we could, please, go to page 20 of

4    Exhibit 1, columns -- column 10, lines 25 through 30.  And then

10:09   5    if we could put next to that the Figure 3A.  Sorry.  Do you

6    need the line numbers?  25 through 30.  Column 10, lines 25

7    through 30.  Beginning, "Preferably the sluice cover."  Yeah,

8    right there.

9    BY MR. TACHÉ:

10:10   10   Q.  So according to this part of the specification, would you

11   agree with me that what covers the nozzle, as it's described in

12   the patent, is this section right here?

13   A.  No, you're reading from specification -- what's protected

14   in the patent is only in the claims, and that's all we're

10:10   15   discussing, is the claims.  In order to determine infringement,

16   we stick with the claims.

17   Q.  Mr. Pribonic --

18   A.  You're bringing in another description that's outside the

19   claims.

10:10   20   Q.  Mr. Pribonic, I believe that you're in agreement with me

21   that the claims are broader than the specification.  Is that

22   not so?

23   A.  I don't know about broader.  Claims are more specific than

24   specifications, and claims are the only thing that govern.

10:10   25   Q.  Mr. Pribonic, if the Court were to -- sorry.  Strike that.

1     So it's your position that the claims are narrower than the

2   specification, and that's how you've interpreted the patent for

3   purposes of determining infringement.  Is that a correct

4   understanding of your testimony?

10:11   5   A.   No.  Any patent can be written with broad specifications or

6   include anything they want to say in them.  You can have

7   a patent that has very thin or narrow specifications, doesn't

8   say much about it.  The only thing that counts is what's in the

9   claims, and that's what we're here to decide, so I don't care

10:11   10   how broad -- whatever you consider broad, what the

11   specification is, the patent claims describe what's being

12   protected.  The patent claims describe what the park consists

13   of.

14   Q.   Would you agree with me, Mr. Pribonic, that claims must be

10:11   15   read in light of the specification?

16   A.   In light of, but the specifications don't govern, so if

17   there is a contradiction there, then only the claims can

18   govern.

19   Q.   I just want to make sure I'm understanding what you're

10:12   20   saying, Mr. Pribonic.  Can you please answer the question

21   whether, in your opinion, the claims of the '589 patent are

22   narrower or broader than the specification that's contained

23   within that same patent?

24   A.   I don't know.  I don't know what you mean by "broader."

10:12   25   Q.   So you've been retained by PSD as an expert to assist on

1  technical issues relating to the '589 patent claim, and you're
2  testifying that you don't understand what the term "broader"
3  means in the context of the claim?
4  A.   I understand the general claim, meaning "broader" means to
10:12  5  be far more inclusive, and in this case, as I said, the
6  specifications can be written to be as inclusive as they want,
7  but they don't offer the protection that's in the claims.
8  Q.   So is it a fair -- again, I'm genuinely trying to
9  understand what it is you're testifying to.  It appears to me
10:13  10  that you're testifying that the claims are narrower than the
11  specification and not broader.  Is that a fair understanding of
12  your testimony?
13  A.   No.
14  Q.   Then can you please explain whether or not claims are
10:13  15  broader or narrower than the claims set forth -- I'm sorry.
16  Let me try this again.  Let's just use the patent that we're
17  discussing today, the '589 patent.  Is it your testimony that
18  the claims are narrower or broader than the specification?
19  A.   Narrower.
10:13  20  Q.   Thank you.
21        MR. TACHÉ:  If we could please bring up Exhibit 419
22  next to Exhibit KZ.
23  BY MR. TACHÉ:
24  Q.   Do you recognize Exhibit 419, Mr. Pribonic?
10:14  25  A.   Yes.

1    Q.   And do you recognize the FlowRider -- I'm sorry -- the PSD

2    accused product on the left side?  I believe it's a ProFlow.

3    A.   Yes.

4    Q.   So looking at the schematic drawings on the right-hand

10:14  5    side, and using the nozzle flap, can you please identify where

6    the nozzle, the orifice of the nozzle, would be relative to the

7    nozzle flap in the Exhibit 419?

8    A.   Where --

9    Q.   I'm sorry.  In Exhibit KZ.

10:14  10   A.   Can you blow that up?

11            MR. TACHÉ:  KZ, please.  Thank you, Gary.

12            THE WITNESS:  No, blow up the drawing.

13   BY MR. TACHÉ:

14   Q.   Here's the word "Nozzle."  Do you see that?

10:15  15   A.   Yes.

16   Q.   And that's where the flap is?

17   A.   Yes.

18   Q.   So is it fair to represent that here is where -- along that

19   hinge line is where the nozzle would be relative to the flap

10:15  20   shown in Exhibit 419?  Or I'm sorry, with respect to Exhibit

21   KZ.

22   A.   Yes.

23   Q.   And with respect to Claim 24, it's your opinion that the

24   nozzle is not covered, as the claim requires, simply because

10:15  25   you're saying that it's this little piece right here -- sorry.

1         Let me clean this up.

2                   THE COURT:  Counsel, is this part of the patent?

3                   MR. TACHÉ:  It is, Your Honor.

4                   THE COURT:  This?

10:15   5                   MR. TACHÉ:  I'm sorry, the exhibit?

6                   THE COURT:  The section view.

7                   MR. TACHÉ:  It is not.  It is one produced by the

8         defendant to identify their nozzle flap.

9                   THE COURT:  If you look at the enablements in the

10:16   10        patent, you would not see this, right?  Am I correct?

11                  MR. TACHÉ:  That's correct, Your Honor.  Well, sorry.

12        Let me make sure I -- you used a term that's loaded in patent

13        law.  You said enabled.

14                  THE COURT:  Yes.

10:16   15                  MR. TACHÉ:  Is it disclosed?  The closest image that I

16        would bring to your attention in the patent would be Figure 3A.

17             Gary, if we could leave up 419 and bring up Figure 3A.  I

18        believe it's KZ.  Thank you.  There you go.  So this

19        is -- sorry.  I never did well in art.  Somewhere in that

10:16   20        general area would be the corresponding section here which is

21        corresponding to this.  That's all I'm trying to show,

22        Your Honor.

23                  THE COURT:  But they're not the same?

24                  MR. TACHÉ:  In what respect?

10:17   25                  THE COURT:  Never mind.  So that section view is

1    nowhere to be found in the patent?

2         MR. TACHÉ:   That's correct.   The patent describes the

3    general concept.

4         THE COURT:   Okay.

10:17   5         MR. TACHÉ:   If we could bring those down, please, and

6    please bring up Exhibit 58.

7    BY MR. TACHÉ:

8    Q.   You were asked a question in connection with the Hyland

9    Hills ride that's Exhibit 58.   Do you recognize this image?

10:17   10   A.   Yes.

11   Q.   You were asked a question by Mr. Kolegraff with respect to

12   the face page and the '589 patent under "Cited references," and

13   you testified, I believe, that the patent office did not

14   consider the Hyland Hills ride as part of its evaluation of

10:18   15   patentability during prosecution of the '589 patent.   Is that a

16   correct understanding of your testimony?

17   A.   Based on the referenced documents, yes.

18   Q.   And do you recall that we've -- during the context of the

19   discussion over the extended ride surface --

10:18   20        MR. TACHÉ:   Could we bring up Figure 5C of the '589

21   patent?   I'm sorry.   1C.   1A.   There you go.   1B.   There it is.

22   BY MR. TACHÉ:

23   Q.   Does Figure 1B have the same -- have the same general ride

24   contour as the image that we just saw in Exhibit 58 for Hyland

10:19   25   Hills?

1200

1    A.   Yes, I would say so.

2    Q.   Thank you.

3         MR. TACHÉ:   If we could go back to Exhibit 58, please.

4    BY MR. TACHÉ:

10:19    5    Q.   You testified earlier that you didn't visit any of the

6    accused product installations.   Is that correct?

7    A.   That's right.

8    Q.   Did you visit the Hyland Hills installation as part of your

9    analysis of invalidity?

10:19    10   A.   No, I didn't.

11   Q.   So did you take any steps to confirm that the schematics

12   and photographs that you relied upon in forming your opinion as

13   to invalidity of the '589 patent based on the Hyland Hills

14   ride -- that they were accurate?

10:19    15   A.   I questioned sources and asked who could confirm this

16   information, and I spoke to Mr. Alleshouse and Mr. McFarland,

17   both of whom visited, if not all the sites, many of the sites

18   to confirm that these indeed were the right ones.

19        MR. TACHÉ:   If we could bring up -- move to the left

10:20    20   of Exhibit 58, and please bring up Figure 1B -- sorry.  I'll

21   move on.   I don't need it, Gary.   If I could, please, have 58

22   stay up.

23   BY MR. TACHÉ:

24   Q.   So it's your opinion that with respect to Claim 1 of the

10:20    25   '589 patent where it requires that the riders are able to ride

1    over the nozzle, is it your testimony that being able to ride

2    over that little lip meets the requirements?

3    A.   That's the ride-over cover, my interpretation, yes, and

4    they ride over that.

10:21  5    Q.   It doesn't say, though, in Claim 1, does it --

6              MR. TACHÉ:  If we could, please, bring up Claim 1 and

7    move that to the right of this image.

8    BY MR. TACHÉ:

9    Q.   I believe you testified earlier today that the nozzles are

10:21  10   actually back here behind this front concrete wall.  Is that

11   correct?

12   A.   Yes.

13   Q.   And so the claim specifically requires that the riders ride

14   over the nozzle.  Does it not say that?

10:22  15   A.   Yes.

16   Q.   And so it's your testimony that riding on this front lip of

17   the padded bumper meets that claim requirement?

18   A.   Yes.  If you bring back the schematic that you showed me

19   earlier, we had diagrammed exactly where the nozzle projects

10:22  20   underneath that portion of that lip.

21             MR. TACHÉ:  If we could, please, bring that up.  I

22   believe that's Exhibit 448.  And if we could blow up -- there

23   you go.  Make that as large as we can.

24             THE WITNESS:  All right.  We have another exhibit that

10:22  25   shows the extension of that at Hyland Hills.  That's the one

1202

1    I'm referring to.

2            MR. TACHÉ:  Can we, please, bring up Exhibit BH?

3    Sorry.  I'm not sure which page they were using.  Page 7.

4    Thank you.

10:23   5            THE WITNESS:  No, that's not the right diagram.

6    BY MR. TACHÉ:

7    Q.   Let's use this one.  This is an image from Hyland Hills, is

8    it not?

9    A.   So to answer your question, is the lip over the nozzle such

10:23  10   that the rider can then ride over the nozzle, and the answer is

11   yes, because the as-built Hyland Hills looks like this, and

12   that's the surface over which the rider would ride, which is

13   over the nozzle.

14   Q.   Isn't this the nozzle?

10:24  15   A.   This is all the nozzle.

16   Q.   That actually says that's a nozzle aperture, does it not?

17   A.   Aperture is part of the nozzle.  Aperture is nothing more

18   than a hole in the end of the device, so without the aperture

19   there, you can't have a hole in space.  The aperture is within

10:24  20   the nozzle.

21   Q.   So you would agree that water -- if we followed the arrow

22   out, we'll follow this general ap?

23   A.   Yes.

24   Q.   And we just spoke about the nozzle aperture, and you

10:24  25   believe that's it here, correct?

1    A.  No, the aperture is right here.

2           MR. TACHÉ:  Can we blow up this section?

3    BY MR. TACHÉ:

4    Q.  What would you like to call this?

10:24    5    A.  That's the nozzle.

6           MR. TACHÉ:  If you could slide a little to the left.

7    Sorry.  You can go to the right again.  Sorry.

8    BY MR. TACHÉ:

9    Q.  That says, "Adjustable aperture," does it not?

10:25   10    A.  Yes.

11   Q.  So you would agree that in operation -- I believe

12   Mr. McFarland testified to this yesterday -- that this nozzle

13   aperture controls the direction flow of water, agreed?

14   A.  Yes.  Well, it doesn't control the direction.  It controls

10:25   15   the thickness of the water sheet.

16   Q.  Well, let's work with that for now.  And do you also agree

17   with Mr. McFarland when he says that once that's adjusted, it

18   gets locked in place and does not move?

19   A.  I didn't hear him say that, but . . .

10:25   20   Q.  I would represent to you that he did.  Would you have any

21   reason to doubt that testimony?

22   A.  Pardon?

23   Q.  Would you have any reason to doubt that testimony, that

24   once this gets put in the position that's desired and gets

10:26   25   locked, it gets tightened down and does not move?

1    A.   No, I would disagree with that.  It's going to move over

2    time.  I've never seen it -- a device on any sort of amusement

3    machinery, or almost any machinery, that doesn't come loose and

4    move.

10:26  5    Q.   Would you agree that its intended purpose, Mr. Pribonic, is

6    that once the adjustable position is -- desired position is

7    found, that its intended purpose is to be bolted or tightened

8    so --

9    A.   Yes.

10:26  10   Q.   Thank you.

11        Okay.  So if water is coming down in this direction and --

12             MR. TACHÉ:  Gary, can we slide this to the right?

13   Thank you.

14   BY MR. TACHÉ:

10:26  15   Q.   -- water's coming down in this direction.  This is in a

16   fixed position.  According to Claim 1, the requirement is that

17   the flexible tongue -- which I believe this is what you're

18   calling the flexible tongue.  Is that correct?

19   A.   Yes.

10:27  20   Q.   -- is biased downward against the flow of the water.  Do

21   you agree that's the language in Claim 1?

22   A.   Yes.

23   Q.   Okay.  So how is this going to be against the flow of water

24   if this is stopping water from traveling up and its intended

10:27  25   purpose is down?

1  A.   There's plenty of turbulence.  It's all here once that

2  water comes out, so this doesn't necessarily mean it will never

3  get wet and won't touch the water.  And also biased downward

4  against the water is -- I read that as just a description of

5  the direction in which it's to be biased.

6  Q.   So you don't believe that "against the flow of water" means

7  anything other than direction?

8  A.   No, it doesn't necessarily have to.

9  Q.   Did you look up the word "against" in the dictionary,

10  Mr. Pribonic?

11  A.   No, I didn't.

12  Q.   Do you recall -- are you aware of the fact that

13  Mr. McFarland testified -- and he's the gentleman who installed

14  this ride at Hyland Hills -- that the water doesn't touch this?

15  A.   No.

16  Q.   Would you have any reason to disagree with Mr. McFarland,

17  who is the person that built the ride?

18  A.   No, but the point is, this was never installed at

19  Hyland Hills, so why are we arguing about whether it touches

20  the water if it never existed?

21  Q.   I was using your layover drawing like this.  That doesn't

22  change anything, does it, Mr. Pribonic?

23  A.   Well, I don't know.  It depends on how far this goes down.

24  If Mr. McFarland says it never touches the water, then I'll

25  agree with him.

1  Q.   So then it can't be against the flow of water, then, can

2  it?

3  A.   No.

4  Q.   No, it can't be, or you're disagreeing with the statement

10:29   5  that it would touch the water?

6  A.   It can't be against the water.

7  Q.   Okay.  So based on the conversation that you had with

8  Mr. Kolegraff, if a claim element is missing from the prior

9  art, it doesn't invalidate that claim, does it?

10:29   10  A.   No.

11  MR. TACHÉ:   If we could turn to Claim 17, please.   If

12  we could please highlight the section that says -- I got it.

13  BY MR. TACHÉ:

14  Q.   So that same language is right here, is it not, in Claim

10:29   15  17?

16  A.   Pardon?

17  Q.   The same language we just discussed about -- and we changed

18  the word "urged downward against" instead of "biased."  You

19  would agree that it's not against the flow of water as it

10:29   20  relates to Claim 17 either, is it?

21  A.   I would agree with whatever Mr. McFarland testified to

22  yesterday.

23  Q.   Thank you.

24  MR. TACHÉ:   If we could turn to Claim 24, please.   I'm

10:30   25  sorry.   Claim 37.

1207

BY MR. TACHÉ:

Q.   And it says here, "Squeeze against the flow of water."  Do you see that language?

A.   Yes.

Q.   So you would agree, the same logic applies with respect to Claim 37 as it did with respect to Claims 1 and 17?

A.   Yes.

Q.   Thank you.

        MR. TACHÉ:   If we could please bring up Exhibit TX-63.  Sorry.  Exhibit JO.  And if we could highlight the bottom right-hand quadrant.

BY MR. TACHÉ:

Q.   And I believe just a moment ago you testified that it was your understanding that this is the nozzle flap that appeared in Hyland Hills?

A.   Yes.

Q.   Okay.  This is actually the one from Guam, is it not?

A.   Yes.

Q.   And I believe that you claimed that -- or it was your opinion that the Hyland Hills ride anticipated the '589 patent, but -- in addition to the Guam patent, it rendered it obvious.  Is that correct?

A.   Yes.

Q.   Okay.  So you just testified a moment ago with respect to Claims 1, 17, and 37 that it wasn't biased downward against the

1208

1   flow.  Is that also true now with respect to Guam?

2   A.  Yes, if they're identical.

3   Q.  Well, if it's as shown in the drawing, is that true?

4   A.  No, as it's built because we don't have drawings of

5   Hyland Hills.

6   Q.  We're talking about Guam at the moment, Mr. Pribonic.  This

7   is the image of Guam?

8   A.  Yes.  You asked me if it applied this identical to

9   Hyland Hills.

10  Q.  And I may have confused you with my question, so my

11  apologies.  Let me make sure I'm clear.  We just walked through

12  Hyland Hills as an anticipatory reference, and you agreed with

13  me that, as to the independent claims, it did not anticipate

14  because the water -- it was not biased or urged down against

15  the flow of water.

16      The second argument that was made for invalidity was that

17  adding Guam to Hyland Hills rendered it obvious.  Is that a

18  correct statement --

19  A.  Yes.

20  Q.  -- of your opinion?

21  A.  Yes.

22  Q.  Thank you.

23      We were just discussing, and I believe you confirmed, that

24  this image is -- which is Exhibit KO, is the one that you

25  believe represents the Guam ride as installed, correct?

1    A.   Yes.

2    Q.   I asked you the question with respect to the independent

3    claims, that if the water doesn't hit it when it was shown this

4    way in Hyland Hills, you would agree it doesn't hit it again in

10:33    5    Guam as shown?

6    A.   Yes.

7    Q.   Thank you.  I believe that you were asked --

8            MR. TACHÉ:  Sorry.  If we could turn to the Frenzl

9    patent.  I believe it's 360.

10:33    10    BY MR. TACHÉ:

11    Q.   Is my understanding of your testimony this morning correct

12    that you said that the Frenzl patent didn't invalidate the '589

13    patent, but that it was being used solely to establish that the

14    claims of the '589 patent can't be read so broadly to cover a

10:34    15    hinge because it was shown in the '402 patent of Frenzl?  Is

16    that an accurate understanding of your testimony and your

17    opinion?

18    A.   Yeah, I think that suffices, yes.

19    Q.   And is your argument based solely on Figure 8?

10:34    20            MR. TACHÉ:  If we could turn to that.  I believe it

21    was page 7.  It couldn't be that deep in.  Probably 3 or 4.

22    There we go.  Thank you.

23    BY MR. TACHÉ:

24    Q.   Is that what you're pointing to in support right here, in

10:34    25    support of your position?

1210

A.   Yes.

        MR. TACHÉ:   Could we please bring up next to this
image -- I think it's page 7, column 5, lines 54 through 59.
Thank you.

BY MR. TACHÉ:

Q.   Have you reviewed the -- I believe you testified you
carefully reviewed the Frenzl patent as part of preparing your
report in this case?

A.   I did review it, yes.

Q.   Are you aware that the sum total of the description of
Figure 8 is what's highlighted in front of you on the screen?

A.   No, there's other description that calls that particular
device flap or flap valve, something to that effect.

Q.   With respect to -- with respect to Figure 8?

A.   Yes.

Q.   Would you like a copy of the patent, Mr. Pribonic?   Because
I represent to you I've read it carefully again as recently as
last night.   That is the only description of Figure 8 in that
patent other than a brief description to say what it is in the
brief description section of the drawings.   I can hand you a
copy of the patent if you'd like to prove it.

A.   Sure.

Q.   Sorry.   I want to make sure I'm handing you a clean copy.

     I will represent to you that that's the only description,
but let's move on.

          1          THE COURT:  Wait, wait.

          2          MR. TACHÉ:  I'm not going to ask the question about

          3   Figure 8, Your Honor.

          4          THE COURT:  So there's no testimony on that?

10:37     5          MR. TACHÉ:  Not at the moment.  I was going to ask a

          6   different set of questions.

          7          THE COURT:  All right.

          8          MR. TACHÉ:  Can we please show figure 7?  And you can

          9   remove that.  Thank you.

10:38    10   BY MR. TACHÉ:

         11   Q.   So this is actually the flap that you're referring to in

         12   Figure 7, is it not?

         13   A.   There's one there, there's one there, and the smaller one

         14   we were just looking at, so I believe there are three.  And

10:38    15   there's another one up here.  So Frenzl describes flap valves

         16   multiple places.

         17   Q.   Does the '589 patent claim -- sorry.  Strike that.

         18        So it's your testimony that the mere fact that a flap

         19   that's hinged is disclosed in a prior art reference, that if

10:38    20   it's anywhere at all in the specification, that that would

         21   preclude a subsequent inventor from referring to the same

         22   element and covering the same element in a subsequent claim in

         23   a different context?

         24   A.   I believe it's -- if it's disclosed, it does.

10:39    25   Q.   You're aware that the Frenzl patent was included in the

1    cited reference?

2    A.  Yes.

3    Q.  Okay.  You're also aware that once WhiteWater filed a

4    lawsuit, filed this lawsuit, that defendants petitioned the

10:39    5    patent office in an effort to review the '589 patent and have

6    it declared invalid based primarily on this specific reference.

7    Are you aware of that?

8    A.  No, I don't believe I am.

9    Q.  So you have no knowledge of the fact that an IPR

10:39    10    was -- petition for an IPR was filed?

11    A.  I don't have any recollection of discussing that with

12    anyone.

13    Q.  Well, I can represent to you, Mr. Pribonic, that the patent

14    office declined to institute an IPR specifically.

10:40    15         THE COURT:  Counsel, can you come up to sidebar for

16    just a second?

17         MR. TACHÉ:  Sure.

18       (Proceedings were heard at the bench.)

19         THE COURT:  Listen, you've done this several times now

10:40    20    during your questioning of the witness.  I let you get away

21    with it a couple of times, but if you want to testify and be

22    placed under oath, if you want to testify, I'll allow that to

23    happen.  On the other hand, if you're going to inject evidence

24    and testimony into the case while not under oath, I have a

10:40    25    problem with that, so if you will change your questions.

|   |   |
|---|---|
|  | 1 |

MR. TACHÉ:  I certainly will.  I appreciate it.

2  THE COURT:  Thank you.

3  (Proceedings held in the presence of the jury panel.)

4  BY MR. TACHÉ:

10:41  5  Q.  Do you recall being asked questions with respect to foreign

6  sales of components?

7  A.  Yes.

8  Q.  And is it your testimony -- sorry.  Did these

9  foreign -- I'm sorry.  Did these components get shipped and

10:41  10  were included in installations of PSD's accused products having

11  the nozzle flap that's at issue in this case?

12  A.  I believe they did.

13  MR. TACHÉ:  Thank you.  No further questions.

14  THE COURT:  All right.  Great time.  Good timing.

10:41  15  Let's take a morning break.  Be back at five minutes till

16  11:00, please.  Remember my admonition.  Thank you.

17  You may step down, sir.

18  THE WITNESS:  Thank you.

19  (Recess.)

10:56  20  (Proceedings held outside the presence of the jury panel.)

21  THE COURT:  All right, Glenn, go get the jury, please.

22  (Proceedings held in the presence of the jury panel.)

23  THE COURT:  Welcome back.  Please be seated.

24  Mr. Kolegraff.

10:58  25  MR. KOLEGRAFF:  Can I get Exhibit KB, please?

| | | |
|---|---|---|
| | 1 | MR. O'HARE:  Your Honor, I understand Mr. Taché is |
| | 2 | walking down the hall in our direction. |
| | 3 | THE COURT:  Can we proceed without him? |
| | 4 | MR. O'HARE:  I would suggest not because he's the |
| 10:58 | 5 | counsel who examined him. |
| | 6 | MR. KOLEGRAFF:  We'll go ahead and put KB7 up on the |
| | 7 | screen so we can proceed immediately as soon as he gets here. |
| | 8 | THE COURT:  Okay. |
| | 9 | REDIRECT EXAMINATION |
| 10:59 | 10 | BY MR. KOLEGRAFF: |
| | 11 | Q.   Mr. Pribonic, I'll represent to you that this is the '402 |
| | 12 | patent that you were discussing with Mr. Taché.  In there, he |
| | 13 | represented that there was only one place that this was |
| | 14 | discussed.  Can you look at where it talks about Figure 8 and |
| 10:59 | 15 | read that and tell us what that means to you? |
| | 16 | A.   "Figure 8 is a diagrammatic sectional view of a |
| | 17 | modification of the means feeding water into an appliance |
| | 18 | according to my invention." |
| | 19 | Q.   So as you read this, you would understand they're talking |
| 11:00 | 20 | about a wave machine? |
| | 21 | A.   Yes. |
| | 22 | Q.   And they're talking more specifically about a sheet wave |
| | 23 | machine? |
| | 24 | A.   Yes. |
| 11:00 | 25 | Q.   And they're talking about a nozzle that feeds water into a |

1   sheet wave machine?

2   A.   Yes.

3   Q.   So had he shown you Figure 8, a lot of this confusion would

4   have been corrected?

11:00   5   A.   Yes.

6            MR. KOLEGRAFF:   Let's go back to Figure 8.

7   BY MR. KOLEGRAFF:

8   Q.   So when you look at Figure 8 of the Frenzl patent, do you

9   see a nozzle for a sheet wave machine?

11:00   10   A.   Yes.

11   Q.   And is there a flap in that nozzle?

12   A.   Yes.

13   Q.   Thank you.

14        In talking about foreign sales, Mr. Taché asked you, do you

11:01   15   ship components into the foreign countries, and you said yes.

16   Now, those components are merely raw materials that have lots

17   of uses, correct?

18   A.   Yes.

19   Q.   Like, yesterday we talked about rolls of vinyl?

11:01   20   A.   Correct.

21   Q.   We talked about rolls of foam?

22   A.   Yes.

23   Q.   Those are merely off-the-shelf parts that are not patented

24   components?

11:01   25   A.   They're not patented components, no.   I used the term

1    "components" generally.

2    Q.   So, therefore --

3    A.   Parts.  They're just parts and things that are needed to

4    assemble the patent.

11:01    5    Q.   So, therefore, PSD does not infringe any asserted claim

6    because they ship raw materials into foreign countries?

7    A.   No, they don't.

8    Q.   A little earlier we talked about if WhiteWater -- whether

9    or not we used Frenzl for the sake of obviousness.  Now, this

11:01    10    morning I asked you the question if WhiteWater constructs

11    "flexible tongue" as including a metal hinge, then that would

12    render the '589 obvious in light of Frenzl.  Do you remember

13    that?

14    A.   Yes.

11:02    15    Q.   Is that still your testimony?

16    A.   Yes.

17         MR. KOLEGRAFF:  Let's turn to Claim 37, so Exhibit 1,

18    I believe, page 24.  Can you blow up 37 for me, please?

19    BY MR. KOLEGRAFF:

11:02    20    Q.   Let's refer to this section that's called -- let me see if

21    I can find it here.  "Biasing said tongue downwards."  So what

22    does it mean to seal against -- what does it mean by to seal

23    off said sluice gate?  What does that mean?

24    A.   Well, I think we discussed this yesterday and this morning,

11:03    25    but it just means to block access to.  As I said, seal off that

1   corridor.  That doesn't mean you're preventing all air from

2   coming through or anything like that.  It just means prevent

3   people from coming through or making contact with.  And the

4   term and use of this in the context of this ride, that's just

11:03   5   what it means because that padding is there to prevent somebody

6   from contacting it.

7   Q.   So even though we look at the diagrams of Guam and we look

8   at the diagrams of Hyland Hills, those tongues are not in the

9   water, correct?

11:03   10   A.   Not, they're not.

11   Q.   But when they wrote a patent claim, this patent Claim 37,

12   when they wanted that tongue to be in the water or closer to

13   the water, they knew how to articulate it, didn't they?

14   A.   Yes.

11:03   15   Q.   So in this claim as it's written, they say it needs to be

16   in the water.  Now, if riders are being injured on this ride,

17   what would you do with that pad?

18   A.   I'd just keep extending it until it got to the point where

19   it prevented the injuries.

11:04   20   Q.   And if you needed to, you'd extend it into the water?

21   A.   Yes.

22   Q.   So is the Hyland Hills -- does the Hyland Hills

23   installation invalidate Claim 37 by anticipation?

24   A.   I think it does, yes.

11:04   25   Q.   Let's go back to Claim 1.  Is there any requirement in

1       Claim 1 that the flexible tongue be in the water?

2       A.   No, it does not say it must be in the water.

3       Q.   Does Hyland Hills installation invalidate Claim 1 through

4       anticipation?

11:04   5   A.   I believe it does.  That's always been my opinion.

6            MR. KOLEGRAFF:  Move to 17, please.

7       BY MR. KOLEGRAFF:

8       Q.   Any requirement here that the tongue, flexible tongue, be

9       in the water?

11:05   10  A.   No, only to extend over the water in the downward direction

11      to the water.

12      Q.   So are all the elements of Claim 17 found in Hyland Hills?

13      A.   Yes.

14      Q.   So Claim 17 is invalidated by anticipation through

11:05   15  Hyland Hills?

16      A.   Yes, that's my opinion.

17           MR. KOLEGRAFF:  If we can go to Claim 42.

18      BY MR. KOLEGRAFF:

19      Q.   Same questions here:  Does the tongue have to be in the

11:05   20  water?

21      A.   No, it doesn't.

22      Q.   So Claim 42, does this anticipate -- excuse me.  Does

23      Hyland Hills anticipate Claim 42?

24      A.   Yes, it does.

11:06   25           MR. KOLEGRAFF:  Can you turn back to Claim 37, please?

BY MR. KOLEGRAFF:

Q.  This morning we spent a lot of time talking about the shortened horizontal transition surface.  And can you turn to page -- did you have a report up there?

11:06  A.  Pardon?

Q.  Is your noninfringement report up there?

A.  Yes, it is.

Q.  Can you read for us paragraph 35?

A.  "It is my opinion that Dr. Stevick has not shown that

11:06  plaintiff can prove by a preponderance of the evidence that the accused products meet flexible tongue limitations from Claims 1, 17, 37, 38, and 42 and related dependent claims."

Q.  So in your report, you made the claim that Claim 37 was invalidated because -- excuse me -- not infringed because it

11:07  didn't have a flexible tongue?

A.  That's right.

Q.  So this whole thing about the transition surface, that was just a second way of showing that there was no infringement?

A.  Yes, and it wasn't needed to invalidate that claim.  The

11:07  flexible tongue invalidates it.  The author of this patent, the inventor, is the same person who designed and built those other two machines, and so he was very well aware of all those parts and pieces were already in existence.  Didn't have to read this patent.

11:07  Q.  So because Claims 1, 17, 37, and 42 do not contain the PSD

1    device, does not have a flexible tongue as articulated, those

2    claims cannot infringe?

3    A.    That's correct.

4    Q.    Now, this morning there was some discussion on the type of

11:08    5    hinge that was used.  Can you see this yellow piece?

6    A.    Yes.

7    Q.    Do you recognize that as a piano hinge?

8    A.    Yes.

9    Q.    What is a piano hinge?

11:08    10    A.    It's a general description for a longer, continuous hinge

11    rather than using short, individual hinges like you would put

12    typically on a door in your house where you might have two or

13    three.  This is -- specifically has the intent of maintaining

14    the position of the moveable portion over a long distance

11:08    15    without any deviation laterally or any twisting of the position

16    in which it rotates.

17    Q.    So there's no flexibility in this hinge?

18    A.    No.

19             MR. KOLEGRAFF:  Can we go ahead and put up Exhibit KZ?

11:09    20    BY MR. KOLEGRAFF:

21    Q.    So this was displayed this morning in your

22    cross-examination.  Is that correct?

23    A.    Yes.

24             MR. KOLEGRAFF:  Can you put up Figure 3A, which is

11:09    25    Exhibit 1-5?

BY MR. KOLEGRAFF:

Q.   A few minutes ago we heard Mr. Taché say this was the closest diagram in the '589 as compared to the picture we just saw.  Is this similar at all to that picture we just saw?

11:10  A.   No, it's not at all.  Completely different devices.

         MR. KOLEGRAFF:   Can I get Exhibit 123.12-1?

BY MR. KOLEGRAFF:

Q.   Do you recognize --

A.   Recognize what?

11:11         MR. KOLEGRAFF:   Down one.  It must be dash two.  There we go.

BY MR. KOLEGRAFF:

Q.   Do you recognize this picture?

A.   Yes.

11:11  Q.   And what is that -- this is from Dr. Stevick's report, correct?

A.   I believe so.  I'm not certain.

Q.   And what is that little red thing he's got circled or squared off?

11:11  A.   Oh, at the bottom?

Q.   Yes.

         THE COURT:   Blow that up, please.

    All right.  Go ahead.

BY MR. KOLEGRAFF:

11:11  Q.   Is that this piece I just took off the demonstrative NU?

```
 1   A.   Yes, that represents -- what you have represents what is
 2   shown on the photograph here.
 3           MR. KOLEGRAFF:   Can we go to Claim 24?
 4   BY MR. KOLEGRAFF:
 5   Q.   On Claim 24, that very last limitation, "To prevent riders
 6   from possibly colliding with or riding over said sluice."  Does
 7   this -- what we have right here, what's been called a burrito
 8   board, does that do that function?
 9   A.   No.
10   Q.   So there's no way that this can infringe Claim 24?
11   A.   No, it's not blocking or protecting the sluice in any way.
12           MR. KOLEGRAFF:   I have nothing further.
13           MR. TACHÉ:   Can we please bring up Exhibit 360, page
14   7, lines 5 through 20 and Figure 7 of that same patent?  360,
15   page 4, please.  If we can blow this up, please.  Just Figure
16   7.  And then page 7 as well, lines 5 through 20.
17                        RECROSS-EXAMINATION
18   BY MR. TACHÉ:
19   Q.   Mr. Pribonic, do you recognize this as the Frenzl '402
20   patent?
21   A.   Yes, I do.
22           MR. TACHÉ:   And, for the record, this is Exhibit 360.
23   BY MR. TACHÉ:
24   Q.   Can you please identify in the specification what element
25   25 is?  I'm sorry, Mr. Pribonic.  I'm actually looking for page
```

11:12  (line 5)
11:12  (line 10)
11:13  (line 15)
11:14  (line 20)
11:14  (line 25)

11:15

11:15

11:15

11:16

11:16

1   7, lines 5 through 20.  Thank you very much.  In an effort to
2   help you out.
3   A.   Thank you.  It's a pivoting flap.
4   Q.   And where in the drawing is that located relative to the
5   ride surface?
6   A.   It's upstream ride surface discharging water into the ride.
7   Q.   Is it possible for a rider to ride over the pivoting flap
8   25?
9   A.   I would not think so, no.
10  Q.   Thank you.
11       Is that also true with respect to Element 26?
12  A.   Yes.
13  Q.   And could you please identify Element 32?
14  A.   That's also a flap valve.
15  Q.   And is it possible for a rider to ride over a flap valve
16  32, as it's described in the Frenzl '402 patent?
17  A.   It doesn't appear to be.  This is not the type of drawing
18  to provide enough information, but from this sketch, it doesn't
19  appear to be possible.
20  Q.   Mr. Pribonic, did Mr. Frenzl, the inventor of the '402
21  patent, invent hinged nozzle valves?
22  A.   Not to my knowledge.
23       MR. TACHÉ:  Thank you.  No further questions.
24       THE COURT:  May the witness be excused?  Thank you,
25  sir.  You may step down.

|       | 1  | THE WITNESS:  Thank you, Judge. |
|-------|----|---------------------------------|

THE WITNESS:  Thank you, Judge.

THE COURT:  Please call your next witness.

MR. KOLEGRAFF:  May I ask one more question on this last little bit?

11:16    THE COURT:  One more question.

MR. KOLEGRAFF:  Maybe two questions.  I'm sorry.  One. Just one time.

THE COURT:  Make it quick.

MR. KOLEGRAFF:  I will.

11:16    Could I get back the Figure 8, Figure 8 and 7 of the Frenzl patent back up, Exhibit KB?

REDIRECT EXAMINATION

BY MR. KOLEGRAFF:

Q.  We've looked at Figures 7 and 8.  Do you see that

11:17 the -- looking on Figure 8, which is the one we were actually referring to, do you see that the flap and the nozzle are in the water?

A.  Yes.

Q.  Someone can bump into that, couldn't they?

11:17 A.  That one, yes.

MR. KOLEGRAFF:  No further questions.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Please call your next witness.

11:17    MR. THOMAS:  Your Honor, the defendant will call

```
 1    expert witness Justin Lewis.

 2              THE COURT:  Okay.

 3                        JUSTIN LEWIS,

 4              DEFENDANTS' WITNESS, SWORN

 5              THE CLERK:  Would you state and spell your full name

 6    for the record.

 7              THE WITNESS:  Justin Lewis, J-U-S-T-I-N, L-E-W-I-S.

 8                     DIRECT EXAMINATION

 9    BY MR. THOMAS:

10    Q.  Good morning, Mr. Lewis.

11    A.  Good morning.

12    Q.  Can you tell us where you work?

13    A.  Yes, so I work at a firm called Ocean Tomo.

14    Q.  And what is your title there?

15    A.  My title there is a managing director, and I'm in charge of

16    the San Francisco office.

17    Q.  And could you briefly tell the jury about yourself and

18    describe your educational and professional background?

19    A.  I can.  So first, I guess, Ocean Tomo, one of the things we

20    do is we specialize in the financial side of intellectual

21    property.  So virtually everything that we do relates to

22    intellectual property, whether it's in or out of litigation,

23    licensing, royalty audits, strategy, buying and selling of IP.

24         To do that, as far as the background, I'm a Certified

25    Public Accountant.  I'm also a Certified Valuation Analyst or
```

1    CVA valuation designation.  I'm also certified in financial

2    forensics, which is a designation of the American Institute of

3    Certified Public Accountants.  I have a BA in business and

4    economics from UC Santa Barbara.  I am the past chair of the

11:20   5    Valuation and Pricing Committee for the Licensing Executive

6    Society.  I'm currently the current chair of the San Francisco

7    chapter for that organization.  I'm also a member of the

8    American Institute of Certified Public Accountants, and I'm

9    also on the licensing committee of the Intellectual Property

11:20   10    Owners Association.

11              THE COURT:  And how old are you?

12              THE WITNESS:  I'll be 45 next month.

13              THE COURT:  With all that, I thought you'd be 100.

14              THE WITNESS:  I've been doing IP work for the past

11:20   15    20-plus years.

16              THE COURT:  All right.

17    BY MR. THOMAS:

18    Q.   Okay.  Mr. Lewis, have you ever testified in cases to offer

19    your expert opinion on damages related to a U.S. patent?

11:20   20    A.   Yes, I have.

21    Q.   And about how many times have you been engaged to do that?

22    A.   So I've worked on engagements involving patent damages

23    hundreds of times.  Again, even more when you consider the

24    projects that I've worked on outside litigation as well.

11:21   25    Q.   Okay.  All right.  Now, let's turn to this case.  What was

1    your assignment in this case?

2    A.   So there were two key pieces.  One was I'm what's referred

3    to typically as a rebuttal expert, so I was hired to rebut the

4    opinion of the plaintiff's expert, Dr. Vigil; and second, would

11:21    5    be to opine on what I believe to be a more appropriate measure

6    of damages if you, the jury, find that there's infringement of

7    the '589 patent.

8    Q.   Okay.  Let's move on.  We have a little PowerPoint that we

9    put together to make it easier for the jury to follow your

11:21    10   testimony.

11        Would you explain for us what your initial steps in

12   performing your assignment in this case?

13   A.   Yes.  Really, I guess, for kind of a high level, when you

14   start any damages matter, especially on the patent side, the

11:21    15   first kind of assumption that we use is that the patent will be

16   found valid and infringed.  If you don't find the patent valid

17   and infringed, then there are no damages.  So there's that

18   first assumption.

19        So then in order to determine what the appropriate amount

11:22    20   of damages would be, we'd start by looking at the evidence in

21   the case.  And so, as you can see, on this we -- I read, you

22   know, case law related to patent damages, the documents in

23   production, you know, did public research on the industry and

24   the parties, read the depositions, again, the court filings,

11:22    25   and had discussions with various individuals here.

1    And ultimately, we're trying to, again, assess what the
2    value of the use made of this technology is.
3    Q.   Okay.  And did you -- let's touch on patent damages for
4    patent infringement.  There's forms of damages such as lost
11:22  5    profits or reasonable royalty.  Would you explain what those
6    are?
7    A.   That's correct.  So damages for patent cases generally fall
8    under two categories.  One would be lost profits.  The second
9    is a reasonable royalty.  In this case, I think both Dr. Vigil
11:23 10   and I agree lost profits is not a form -- the proper form of
11   damages here.  We both agree that a reasonable royalty is the
12   appropriate measure of damages.
13   Q.   Okay.  I'm going to move on to the next slide.  And explain
14   for us this slide, the reasonable royalty framework.
11:23 15   A.   Yes.  So this is one of the odder parts, I guess, of patent
16   litigation, is that the way that you approach the determination
17   of a reasonable royalty is to envision that the parties went
18   back just prior to starting to infringe, which in this case is
19   December 2013 that they enter into a hypothetical negotiation
11:24 20   in which they assume the patent is, again, valid and infringed.
21   That they need to reach an agreement for the use that they made
22   of that technology.  And that, again, unusual, compared to,
23   like, a real-life negotiation.  The parties are assumed to know
24   all the relevant information.  So they're basically -- PSD is
11:24 25   assumed to know what's in the licenses of Whitewater, and vice

1   versa, and WhiteWater would know the condition and situation of

2   PSD.

3   Q.   Have you had a chance to review Dr. Vigil's opinions

4   regarding damages and his testimony in this matter?

11:24   5   A.   Yes, I have.

6   Q.   Okay.  Let's move on to the next slide.  Would you explain

7   what your critiques are of Dr. Vigil's opinions?

8   A.   Yes.  So I've tried to categorize them.  So I kind of start

9   with the end:  Dr. Vigil's conclusion of a $2 million lump sum

11:24   10   is not consistent with the actual sales and really is an

11   unreasonable royalty; in large part, I think, number two,

12   Dr. Vigil erred in determining that the appropriate form of the

13   royalty would have been a lump sum as opposed to a running

14   royalty; and, then, three, to reach that conclusion, he's, in

11:25   15   my opinion, improperly considered various pieces of evidence

16   that he's presented that he claims are supportive of his

17   factors that I think really fall under these subcategories,

18   which is the actual sales of PSD are really incompatible with

19   his conclusion.  He really distorts and kind of misstates what

11:25   20   pieces of the comparable licensing agreements or the license

21   agreements in this case, like, minimums, truly represent.  And

22   his assumption that PSD really could not operate in this

23   business at all without the nozzle flap patent I don't believe

24   is supported by the evidence.

11:26   25   Q.   Okay.  Now, let's elaborate on your critiques.  I'm going

1230

1   to show you another slide here.  You agree that Dr. Vigil's

2   $2 million lump sum royalty for nonexclusive license is

3   unreasonable?

4   A.   I do, yes.

11:26  5   Q.   And you understand the difference between an exclusive and

6   nonexclusive license?

7   A.   I do, yes, exactly.

8   Q.   Okay.

9   A.   So, again, exclusivity allows -- means that you're going to

11:26  10  license something and that person's the only one that can use

11   it, versus a nonexclusive license, which means they can license

12   it freely to whomever they want.  Again, Dr. Vigil's -- a lot

13   of his data points come from exclusive licenses that he seems

14   to assume would apply equally to a nonexclusive license as

11:26  15  well.

16   Q.   And just so the jury better understands this in terms of

17   licensing, the economics of the licensing for an exclusive

18   versus a nonexclusive license, typically exclusive licenses

19   fetch higher royalties or higher payments.  Is that correct?

11:27  20  A.   Well, I think yes, generally speaking, all else equal, if

21   you have exclusive rights to something, you would pay more for

22   it.  If you can exclude everyone else, you would pay a higher

23   rate than you would for a nonexclusive license because it

24   provides you less protection.

11:27  25  Q.   Yes.  In this particular case, the hypothetical license

1   being nonexclusive would allow PSD's primary competitor,

2   WhiteWater, to continue to compete against it after paying

3   $2 million, right?

4   A.   It would, right.  Again, it -- in theory, it would allow

11:27   5   them to put the patented nozzle flap on their ride, but others

6   in the industry could also continue to do that, so it wouldn't

7   give them any exclusive rights to that.

8   Q.   And WhiteWater, under that hypothetical license,

9   wouldn't [sic] be able to license other third parties as well

11:27   10   since it -- if there was a hypothetical nonexclusive license

11   provided to PSD, correct?

12   A.   You said they would be able to?

13   Q.   Yes.

14   A.   Yes, that's correct.

11:28   15   Q.   Now, let's move on and talk about your further critiques of

16   Dr. Vigil's royalty.  Would you explain what this slide

17   depicts?

18   A.   Yes.  Again, we're kind of starting at the end with the

19   conclusion here of Dr. Vigil.  You'll see the red bar is his

11:28   20   royalty conclusion, a lump sum of $2 million.  And when you

21   compare that to Pacific Surf Designs' actual revenue from

22   rides, it amounts to 83 percent of their revenue from selling

23   all four of the accused rides.

24   Q.   Okay.  And let's move on, then.  If you've covered

11:28   25   everything on this, we'll move on to the next slide.  Explain

1       what this is showing.

2   A.   So in addition to kind of assuming that 80 percent of all

3       the money they receive from customers would go to WhiteWater

4       for just a nonexclusive license to the nozzle flaps, his actual

11:29   5   conclusion also results in over 200 percent of Pacific Surf

6       Designs' profits over the last, almost, six years.  And so

7       their profits on all of their sales to date have been 962,000,

8       and, again, these are -- they're gross profits, and his -- so

9       ultimately, even though they've been in business now, and

11:29   10   they've sold these four machines, under Dr. Vigil's conclusion,

11       they would still owe another million dollars, potentially all

12       of the profits for their next four machines, to WhiteWater for

13       access to only, like I said, nonexclusive access to just this

14       '589 patent.

11:29   15   Q.   Okay.  Let's move on then to the next slide.  Would you

16       explain what this slide is?

17   A.   So there are a number of licenses in which WhiteWater or

18       the prior owner, Wave Loch, had licensed the -- an entire

19       portfolio of patents related to the wave machines to ADG or to

11:30   20   WhiteWater, and ultimately, then, WhiteWater to ADG.

21           But what you'll see in the blue charts are the actual

22       royalty rates for often exclusive rights to the entire

23       portfolio of patents that range anywhere from 5 to 15 percent,

24       and Dr. Vigil's conclusion amounts to 83 percent.

11:30   25           And so, again, when you just think about what two rational

1233

1    parties sitting at a table together in 2013 ever agree on --

2    that this outcome would be a reasonable conclusion to that

3    negotiation, it seems impossible to me.

4    Q.   Are you -- you may not be aware, but I'll let you know that

11:30    5    the CEO of WhiteWater, Geoffrey Chutter, testified here, and

6    when asked what a reasonable royalty is, he said it was between

7    5 and 10 percent.

8    A.   Again, that would be consistent with what they've charged

9    historically for, again, their entire portfolio.  So when he

11:31    10   says 5 or 10 percent for just the one patent, again, I have a

11   conclusion, but, again, a potentially different royalty base

12   for it, but 5 to 10 percent has been what they have granted

13   rights to these patents and others for exclusive rights over

14   time, as you can see by these blue bars.

11:31    15   Q.   Okay.  So let's move on, then, to your -- to Slide 11.

16   This indicates, "Lump sum license is unsupported."  Probably go

17   to Slide 12, and you can explain why you believe that's

18   unsupported.

19   A.   Well, again, to stop at lump sum versus a running royalty,

11:31    20   just from a high level, lump sums essentially are, as you see

21   here in this chart, a single, one-time, fixed payment on kind

22   of day one.  Right?  And running royalties are, essentially,

23   you determine what portion of each sale is made that should go

24   to or be attributed to that technology, and you pay that as you

11:32    25   go, right?

1234

1      And so what you see on that last slide is that every
2   license in this case has been on a running royalty basis.  So
3   the only person that has ever even suggested that these parties
4   would enter into a lump sum is Dr. Vigil, right?  There's not a
11:32   5   shred of evidence that WhiteWater would ever require or has
6   ever required a lump sum license.  And so, again, I think this
7   is a very key factor because once he has tried to, like, push
8   all the payment to day one, that has essentially allowed him to
9   ignore everything that happened afterwards, right?  And so to
11:32   10   the extent that the parties at that table in 2013 would have
11   said hey, let's pay as we go, let's pay on a running royalty
12   basis, then they don't have to try to guess at what that value
13   is going to be over time.  They will pay as they use it, which,
14   again, is far more consistent with the history here in this
11:32   15   case.
16   Q.   Okay.  Let's move on to Slide 13.  Would you explain what
17   you have on this slide?
18   A.   Yes.  I seem to have jumped the gun a little bit.  Every
19   license in this case that WhiteWater, again, the licensor in
11:33   20   our hypothetical negotiation, has been on a running royalty
21   basis.  None of them are lump sums.
22   Q.   Okay.  Let's go on to Slide 14.  And this is a discussion
23   about why PSD would prefer a running royalty.  Would you
24   explain this slide?
11:33   25   A.   Yes.  So Dr. Vigil has said oh, well, PSD would want a lump

1    sum.  Again, that's also incorrect.  The evidence indicates

2    that PSD was a start-up company.  They had two people that

3    worked there.  They had absolutely no sales history.  Right?

4    So they had no real sales history to know what the license

5    should be for.  They had no profits.  Right?  So paying huge

6    amounts of money up front when they've got not yet any money

7    coming in, again, wouldn't be a very rational business

8    decision.  They had very minimal funding by that time, and by

9    the time in December, they knew they had missed their

10   projections already, so they were already behind what they even

11   had thought they might make.  And so, you know, what

12   is interesting here is that I think Dr. Vigil said something

13   along the lines of well, Mr. Alleshouse didn't want to show his

14   sales to them, and, therefore, he would have just paid all this

15   money up front.  And, again, I think that what I've seen done

16   in those situations is you license for a particular rate on a

17   running royalty basis, but then you can -- you don't have to

18   necessarily tell them all your sales amount.  They might be

19   able to back into it, but if you sell two or three machines,

20   they don't know the pricing on each one, and so you can enter

21   into running royalty licenses in which you don't have to tell

22   the licensor exactly what your sales are, and, therefore, you

23   can get around any of that issue.

24   Q.   Okay.  So based on this, you have concluded the proper form

25   of royalty is a running royalty.  Is that correct?

A.   That's correct.  And, again, this one is, I think, really
key to my overall opinion, and, really, my response to
Dr. Vigil is I have seen no evidence in this case that actually
supports that the parties, one, would require or even want a
lump sum agreement, that there's not been any lump sum
licensing done, at least not between the parties that would
have been at this negotiating table.

Q.   Let's move on to your next critique of Dr. Vigil's
opinions.  This Slide 15 you say improperly considers evidence.
I'll move ahead then to Slide 16.  Explain what you've grafted
here.

A.   So this next series is how Dr. Vigil presented evidence
supporting what he called these four factors.  I'm really
addressing the first three.  His first factor related to PSD's
expectations of sales at the time of the negotiation.  And so
what I wanted to point out here is there were two documents
that existed where PSD put together any projections, one in
2013 and one in '16.  So this one -- this slide here is
addressing the one in '13.  What the projection actually said
was in these blue columns or the blue part, so the 2013
projection had a low projection of 13 million.  When Dr. Vigil
used it, he added an extra year, and he added -- he'd assumed
that all the different years were additive as opposed to
individual years, and he turned that 13 million into 27 million
at the low end.  And on the high end, he took that projection,

1  and he said, you know, the high end was really 28 million when

2  you add them up appropriately, and, again, Dr. Vigil presented

3  to you that they thought they would make 53 million over this

4  six-year period instead of kind of the five-year period that

11:36  5  they had really projected numbers for.

6  And, again, I think, you know, almost more importantly,

7  there is consideration of actual sales.  And so here we see

8  that the 2.4 million of their total sales from '13 through now

9  that are at issue in this case, again, were significantly

11:37  10  smaller than and should have been considered by the parties

11  certainly to test the reasonableness of the conclusion.

12  Q.   Okay.  And as you can see, in the blue or the actual

13  projections -- the red, the higher bar, are what Dr. Vigil

14  did -- is it looks like he took them up over 100 percent, from

11:37  15  13 to 27 and 28 to -- well, almost double, 53, correct?

16  A.   Correct.  And the low end, he did more than double, and on

17  the high end, he almost doubled.  And, you know, it's also

18  interesting.  Dr. Vigil presented this 2013 one as if it had a

19  projection of profits, and it did not.  So this is early in the

11:37  20  company.  They hadn't made any sales yet.  They did not project

21  what their profit margin would be at all.  They just for this

22  contest had put this projection together of revenues.  Again,

23  no profits were projected at all.

24  Q.   Okay.  Let's move on to your next slide.  Would you explain

11:38  25  what this is?

A.   So this is what's actually on the 2016 projection.   So one
thing to note here is that, clearly, Dr. Vigil, by relying on
this slide, is acknowledging that the parties would look out
past the hypothetical negotiation.   So this document was
created in 2016, years after the negotiation.   And what
Dr. Vigil pulled out of this is just what you see on the blue
and red lines, which is that they had a sales projection for
2016 and '17, which was $11 million.   Dr. Vigil turned that
into a projection from '16, '17, and he added 2018 to it, and
came up with $23 million.

On the profit side, the document for 2016 and '17 shows
about 3 million projected profits for both of those years.   And
he turned that into $7 million of profit based on his revenue
projections.

And then what Dr. Vigil left off from that document are
those first two columns, which is by 2016, they actually
reported in this document what their actual sales had been.
And so from 2013 to '15, their actual sales were 1.9 million.
And guess what?   Their profits were only $37,000 by that time.

And so, again, considering all this, somehow Dr. Vigil is
still saying 2 million bucks makes sense, and I'm saying that,
you know, even though he's inflated these numbers, it still
doesn't.

Q.   Okay.   Let's move on to your next slide.   This says,
"Distorts comparable licenses."   Let's move ahead and explain

1239

1    what you've done here.

2    A.   So this first piece is, as you saw, there's a number of

3    licenses that the parties have entered into, including this

4    patent.  Dr. Vigil has primarily focused on the minimum, right,

11:40   5    and so while there was a series of licenses that had different

6    minimums throughout time, Dr. Vigil would like you to believe

7    that the minimums would never change, no matter the size of the

8    parties or anything else.  Right?  And that even though these

9    minimums were for a portfolio of, really, exclusive rights to

11:40  10    the patent, that they would still -- they would still be the

11    same minimums for PSD for nonexclusive rights to one patent.

12         And so what you can see here is that ADG, the licensee,

13    their sales were, on average, about $6 million, right, per

14    year, and they're paying 300,000, according to Dr. Vigil, in

11:40  15    minimums.  That's about 5 percent.  Right?  To assume that PSD,

16    on the other side here, with $400,000 of average annual

17    revenue, would pay the same $300,000 minimum or, again, only

18    one patent, again, just doesn't make sense.  You would assume

19    that you would adjust those -- that -- those proportions.

11:40  20    Q.   And did you find Dr. Vigil also to distort the running

21    royalty rate by implying that the minimum royalties are

22    basically for the same breadth of technology?

23    A.   I did.  I mean, as I mentioned, this -- so these

24    licenses -- and, again, maybe we should take a step back.  The

11:41  25    licenses themselves, they actually have two components, right?

1240

       1    There was patented technology, a portfolio -- it started at 23

       2    patents, but there's also nonpatented technology included in

       3    these licenses.

       4        So what was really going on here was that they were

11:41  5    licensing the entire wave ride, meaning it had the trademarks

       6    for the FlowRider, it had, like, the operations manuals, they

       7    had the engineering stuff, they had, you know, the patents.  It

       8    was basically a license that was -- here's a whole ride.  Go

       9    out and sell it.

11:42  10       And so the minimums -- so Dr. Vigil was trying to take out

       11   half of that for the nonpatent piece, but, again, the rest of

       12   it was for the -- was related for an entire portfolio of

       13   patents, and so, again, he made no adjustment for, one, the

       14   nonexclusive nature and, again, the fact it's one instead of

11:42  15   the whole portfolio.

       16   Q.  Okay.  Now, you mentioned the size of the companies was a

       17   factor, too, that you didn't think Dr. Vigil appropriately

       18   considered, given PSD is a small start-up.  Could you explain

       19   how that influences this?

11:42  20   A.  Again, I mean, just as you could see on this chart, you

       21   know, his conclusion for ADG is about 5 percent of their sales,

       22   and with respect to Pacific Surf Designs, those minimums are 75

       23   percent of their sales.

       24       I would also say with respect to the misapplication of

11:42  25   minimums, minimums often apply with exclusivity as opposed to

1  nonexclusive licenses.  And you can see why in the sense that

2  if you were going to grant exclusive rights to an entire

3  portfolio or entire product, if that company decides not to use

4  it, then the technology is dead, right?  Meaning you have no

5  other option to go out and make money on it.  So if they just

6  decided to take the license and sign it and then say hey, the

7  world doesn't need surf machines, we'll just sit it in a

8  corner, then basically they've ruined that technology, right?

9  So with exclusive licenses, you often see a minimum so that you

10  make sure that the party actually does something.  So hey, if

11  you had to pay 300,000 or 600,000 or 100,000 a year, you're at

12  least going to go out and sell and utilize that technology in

13  the marketplace, right?  A nonexclusive license doesn't have

14  that same kind of tie to the technology.  If that licensee

15  decides not to use it, you can license it to others, and you

16  can find other ways to make money.

17  Q.   Okay.  Let's then move on to the next slide, 20.  Would you

18  explain what you are depicting here?

19  A.   Yes.  So Dr. Vigil stated that every license -- and this is

20  really Dr. Vigil's slide, but with my addition at the bottom.

21  So he said every license contained minimums or a minimum

22  royalty clause.  I think one thing that's particularly

23  noticeable here is that those minimums were 120,000 and

24  125,000, even to ADG, a much larger company.  Only after

25  WhiteWater acquired the patents and the product did it raise

1    that minimum up.  And so what you also will see is that by

2    January 14, so one month after this negotiation, they removed

3    the minimums.

4        Now, one thing you will also note is that as time went on,

11:45   5    and after WhiteWater acquired the technology, guess what else

6    generally went away?  The exclusivity.  Right?  And so as the

7    minimums went away, generally the exclusivity was going away as

8    well.

9    Q.   Okay.  All right.  Now, what is the next error you believe

11:45  10    Dr. Vigil made with respect to comparable licenses?

11   A.   Now, I jumped ahead a little bit, but we've already kind of

12   touched on this, so I'll go through it quickly.  You can see

13   here that over time, there were basically three types of

14   licenses:  Wave Loch, the original inventor, to ADG; Wave Loch,

11:45  15   again, the original inventor, to WhiteWater; and then

16   eventually WhiteWater acquired the Wave Loch assets and

17   licensed it to ADG.  And so what you'll see here is that, over

18   time, the basket of technologies, they really cut and pasted

19   into each of the different agreements.

11:45  20       For the most part, the rates all ranged between, you know,

21   5 and 15 percent with respect to what was attributed to

22   patents, but it's -- what you'll find a little bit odd, and I

23   do as well, is in 2009 they changed it, right?  In 2009 they

24   broke out all of the royalty, the running royalty rates, to two

11:46  25   patents, right?  One being the '280 patent, where they assigned

1   10 percent of the royalty, and then another 5 percent for the

2   '530 patent, which if you actually think about it, left zero

3   royalties for any of the other patents in the portfolio, one of

4   which was the '589 patent.

11:46   5       Now, again, then, in 2011, they took that out.  Again, I

6   think at least one of the two -- I'm going fast.  The '280

7   patent had expired by then, and so they moved the royalties to

8   be attributed to the remainder of the patents by that time.

9   Q.   But you're indicating that in this -- I guess this 2009

11:46   10  licensing agreement, there was no value assigned to the '589

11  patent?

12  A.   What I will say is that up until this 2009 agreement, they

13  had never broken out the patent value amongst the patents.  In

14  2009, they did.  And they determined that the '280 patent and

11:47   15  the '530 patent were the only two that generated 100 percent of

16  the patent royalties, and that left zero for all of the

17  remaining.  So you could imply that they didn't value the '589

18  patent very highly because they didn't assign any value to it,

19  at least in this 2009 agreement.

11:47   20  Q.   Okay.  Now, let's move on to your next slide, 22.  Would

21  you explain what you've done here?

22  A.   Yes.  So this is kind of a deeper look into rates paid for

23  individual technologies.  So, again, the '280 patent, if you

24  look at it, it relates to the wave flow itself, so the highest

11:48   25  royalty they ever assigned to a single patent was the '280

1     patent at 10 percent.  And, again, it related to the actual

2     wave itself, right?  Meaning the water and how it flowed over

3     the surface.

4         The second one was the '530 patent, and it related to the

11:48   5     ride surface, meaning that blue material, the tension material

6     that, you know, when the riders -- if they fall down and the

7     water goes over, it will provide safety for them.  They assign

8     5 percent to that one.

9         And, really, what that left for all the other patents was

11:48  10     nothing, again, which included that '589 patent.

11     Q.  Doesn't Dr. Vigil claim that each patent would be worth at

12     least the full royalty specified in these licenses?

13     A.  He does.  He has this, again, basic assumption that because

14     as patents expired, the rates didn't always change, that,

11:48  15     therefore, that meant that every patent must be worth the

16     entire value of the whole portfolio.  And that really doesn't

17     work.

18     Q.  You don't believe that's true, do you?

19     A.  I don't, and I think the next slide is a small example of

11:49  20     that.  It would be, like, going to your cable provider and

21     you're saying I want the premium bundle of every channel, HBO,

22     Showtime, all the sports packages, everything, and that will

23     cost you $100.  And then the next guy says well, I just want

24     one channel, and according to Vigil, you'd have to pay the same

11:49  25     $100, and that's just not what people pay.  If people were

1    going to get all the channels, they would pay the $100.   For

2    one, they would certainly pay far less than the total amount.

3    Q.   Okay.   Thank you for that.

4         Now, let's move on to the next slide.   This says, "PSD did

11:49   5    not need the '589 patent to compete."   Slide 24.   You

6    understand that there is the ability to sell sheet wave

7    machines without nozzle flaps, and, in fact, that's being done

8    by competitors?

9    A.   Correct.   So there's two -- there's two pieces to this one.

11:50   10   Excuse me.   I'll give the court reporter a minute to catch her

11   breath as well.

12        In order for Dr. Vigil to say that WhiteWater would have

13   considered its losses as the entire sale of these machines, you

14   have to believe that, without the '589 patent, they couldn't

11:50   15   sell a machine at all, meaning they would be out of the market,

16   and, therefore, WhiteWater would have made all their sales.

17        And there are at least two pieces here that would indicate

18   you could still sell a wave machine without the technology.

19   One is what we referred to as noninfringing alternatives, so

11:50   20   you could design around it, meaning you could replace the

21   nozzle flap with something else that wasn't infringing, and

22   then you could still make your sale.

23        The other -- and, again, I think the next slide --

24   Q.   I'll move on to the next slide, Slide 25.

11:51   25   A.   And this is what I was just describing, which is in order

1246

         1    for Vigil to go through this step, this four-step process, you

         2    have to assume PSD couldn't sell a wave machine without the

         3    '589 patent.  And so then the next slide, again, the nozzle

         4    flap was a relatively small part of the overall ride.  So if

11:51    5    you just look at the other pieces, the recovery area, the ride

         6    surface, the nozzle deck, the trench drains, you know, all of

         7    these other parts are not what's included in the '589.  So if

         8    you picture selling this wave machine without the nozzle flap,

         9    you can see it would still potentially work as a wave machine,

11:51   10    right?  And so, again, you could, one, take the nozzle flap

        11    off; two, you could design a different nozzle flap and still

        12    make the sale.

        13    Q.   Okay.  All right.  Now, let's move on to the next slide.

        14    This is discussing PSD's noninfringing alternative.  You

11:52   15    reviewed the deposition testimony of Mr. Alleshouse.  Is that

        16    right?

        17    A.   Yes, and I've had a conversation with him.  One of the

        18    proposed design-arounds would be to make the nozzle flap not

        19    move.  So you would just weld the hinge.  It wouldn't move

11:52   20    anymore.  And as I understand it, they've done just that; that

        21    there's been an installation in Mexico, and, in fact, on that

        22    same property in Mexico, there were other FlowRider machines

        23    that had the patented nozzle flap potentially, and that no one

        24    has noticed.  No one mentioned hey, this one doesn't move up

11:52   25    and down.  No one mentioned anything about having increased

1    safety issues; that it basically has been accepted, at least by

2    that customer, without any problem.

3    Q.   And are you aware that Mr. Alleshouse testified that the

4    cost of -- the process is simply welding the hinge to put it in

11:53    5    a fixed position, and it's a de minimis cost to do that, about

6    $500?

7    A.   That's correct.

8    Q.   And that would be a factor that you would consider too?

9    A.   It would.  And to go back to this hypothetical negotiation,

11:53   10    if someone says to you on day one, hey, pay me, you know, 10

11    percent of your ride for access to the nozzle flap, and you say

12    well, hey, I could spend $500 a unit and just weld it shut, you

13    certainly wouldn't pay any more than that $500.  So the

14    design-around or the noninfringing alternatives are things that

11:53   15    would come into play there and would influence how much someone

16    would be willing to pay for a particular technology.

17    Q.   And forgive me if you covered this, but I don't think you

18    did.  You said this is a two-part thing.  The first part being

19    the noninfringing alternative and the cost of that, which I

11:53   20    know we covered for certain; and the second one would be the

21    ability to just sell a wave machine without the nozzle flap.

22    A.   Correct, and I think the next slide relates to at least one

23    manufacturer of wave machines, Murphy's Waves, which, again,

24    interestingly, is owned by WhiteWater, doesn't have what is

11:54   25    alleged to be the accused nozzle flap.  The water essentially

1   just shoots right out at the beginning of the ride, and it

2   doesn't have a flap.

3   Q.   Okay.  Let's move on to your next slide.  This is titled,

4   "Vigil Royalty Falls Apart."  Explain what you're doing here.

11:54   5   A.   So, if you recall, this slide was, again, Dr. Vigil's; that

6   he could have walked through these different factors.  So in

7   the first factor, he claimed that their expectations were

8   27 million to 50 million.  We showed that wasn't right.  Didn't

9   project anywhere close to 7.8 to 15 million in profits.  But I

11:54   10   think what's really important here is that there was really a

11   total of less than a million dollars of total profits.

12   Q.   Okay.  And --

13   A.   On the second piece here, what you see is, as we just

14   discussed, in order for WhiteWater's expected losses to come

11:55   15   into play at the negotiation, you would have to assume they

16   could not sell the ride without the '589 patent.  And so we've

17   shown that rides are sold without nozzle flaps.  The nozzle

18   flap could also be designed around, and, therefore, this

19   consideration really isn't correct.  You know, the right thing

11:55   20   would have been to look at the cost of the noninfringing

21   alternatives or to look at, really focused on the value of just

22   the nozzle flap, not that -- not the entire loss of a sale as

23   if PSD couldn't have sold it without this technology.

24   Q.   Okay.  And then let's look at this -- I'm sorry.  Here we

11:56   25   are.  The comparable license agreements.  I know you covered

1249

1    this, so we don't need to repeat it.

2    A.   Well, and, again, he focuses very heavily on these

3    minimums.   He takes this 300,000, which was the minimum for the

4    whole basket, on an exclusive basis, multiplies it times 6 to

11:56   5    get to 1.8 million.

6        The actual licenses were running royalty licenses.   They

7    ranged anywhere from 5 to 15 percent.   And, again, minimums are

8    not lump sums.   So while Dr. Vigil has attempted to correlate

9    them or call them, like, a hybrid agreement, they're actually

11:56   10   not.   There is a hybrid lump-sum-running-royalty-type agreement

11   where you pay an amount up front and then a running royalty.

12   This does not have that.   This is a running royalty agreement,

13   but if the royalties don't add up to a certain amount, then you

14   would pay the difference.   It's different than a lump sum.

11:56   15   Q.   Okay.   So, finally, as it relates to the slide, your

16   opinion is that $2 million is unreasonable?   Highly

17   unreasonable?

18   A.   It is.   I think that there's no way that PSD and Whitewater

19   sitting in a room in December of 2013 could have ever come to a

11:57   20   conclusion that, for the use that they've made of this

21   technology, that they would have paid $2 million up front for

22   access to a single patent on a nonexclusive basis.

23   Q.   Okay.   Now, let's turn to how you approached -- how you

24   think the proper approach would be to determining damages.   You

11:57   25   used this term previously, and I should have stopped you, but

1    we can do it now.  Explain to the jury what a royalty base is.

2    A.    So once you agree that the proper form of the royalty is a

3    running royalty, then you have two pieces to solve.  One is the

4    royalty base, and one is the royalty rate.  And so the first

11:57    5    one I'll talk about here is what is the royalty base.

6    Q.    Okay.  And the base being what you are applying the royalty

7    percentage to in terms of sales, correct?

8    A.    That's correct.

9    Q.    Okay.  So let's move on to the next slide.  Slide 36 here.

11:58    10    And how do you -- let's discuss how you determine the proper

11    royalty base in this case.

12    A.    So I'll try to go slow because this is, sadly, an odd

13    concept at one level.  So there is -- in order to determine the

14    right royalty base, you are supposed to look at -- the courts

11:58    15    have said you should look at what's called the smallest salable

16    patent-practicing unit.  We call that sometimes the SSPPU.  And

17    so you are supposed to identify what you believe to be the

18    SSPPU, and that should represent the royalty base.

19    Q.    Okay.

11:58    20    A.    So we see in this one that the nozzle flap itself, if you,

21    the jury, decide that the patented invention is in the nozzle

22    flap as opposed to the whole ride, then you see it should be

23    limited to the small piece here.  Right?

24    Q.    Okay.

11:59    25    A.    And I think on the next slide you'll see WhiteWater's ride

1     as well.  This is the nozzle flap.  So then you kind of get

2     into well, is this a salable unit?  Do they make sales of

3     nozzle flaps?  And, again, the answer there is yes.  And I

4     think on the next slide --

11:59   5     Q.   Okay.

6     A.   -- there's at least four providers that do sell nozzle

7     flaps.  And the -- I had evidence from Pacific Surf's sale of

8     nozzle flaps that the average sale of -- sale price of a nozzle

9     flap was $5,925.  That was the high -- I'm sorry.  I said that

11:59   10    was the average.  It was actually the highest price they ever

11    sold a nozzle flap for.  I think you've seen earlier in the

12    case that WhiteWater and others have charged as low as $3,000

13    for a nozzle flap.

14    Q.   Yeah, and on that point, Mr. Alleshouse, when he testified,

12:00   15    he said he reviewed all of their sales, and he said he averaged

16    it out to just shy of $3,000.  It might have been 2980 or

17    something close to that.  So the average is lower than actually

18    the number that you have here, which is closer to $6,000,

19    almost twice as much?

12:00   20    A.   That's correct.

21    Q.   Okay.  Now, let's move forward.  I understand you looked at

22    that, and being a CPA and conservative, you just took the

23    higher end of the sales for purposes of this illustration.  Is

24    that correct?

12:00   25    A.   Again, I think that for the royalty base, that is, nozzle

1    flap value, yes, I took the highest possible value that I had

2    seen charged for a nozzle flap, which was, again, about $6,000.

3    Q.   Okay.  So let's move on then to the next slide, 39.

4    Explain what you're doing here.

12:01   5    A.   So this really addresses, you know, are you ever allowed to

6    charge a royalty rate on the whole ride?  And, again, this is

7    something that you, the jury, will have to decide if the

8    inventive portion of the '589 patent is the nozzle flap, and

9    you believe that the royalty base should be the flap, then it

12:01   10   would be this $5900 worth of the ride.  If you believe that the

11   invention covers the whole ride, which, again, I think that's

12   what Dr. Vigil has proposed, the only -- there's only, really,

13   two ways you can do that under -- as I understand it.  One

14   would be to say that the whole ride is the SSPPU, that in order

12:01   15   to practice the patent, you need the whole ride.  The other

16   would be what we call the entire market value rule.  In order

17   to apply royalty rate to a large, multicomponent product, you,

18   then, must establish that the patented feature, the '589

19   patent, drives the demand for the entire wave machine.  And I

12:02   20   think that we've shown here that there are many things that

21   drive demand:  the wave, the shape, the safety of the ride

22   surface, the tank in the back where people typically fall -- go

23   when they fall.  So I don't think that they could meet that

24   requirement, which would be that the '589 patent somehow drove

12:02   25   demand for the entire wave machine.

1    Q.   In fact, in this case, there's been testimony that price

2    for the wave machine is the single biggest driver of sales.

3    A.   Correct.  And I think as this slide shows, you know,

4    typically customers don't even know what a nozzle flap is, as

12:02   5    seen by some of these installations.  There's very little

6    evidence of somebody going well, wait, why does this nozzle

7    flap look this way?

8    Q.   So if the jury were to conclude that the nozzle flaps were

9    not driving demand, they should be using the royalty base of

12:03  10   the nozzle flap itself, not the entire machine?

11   A.   That's correct.  And the only exception would be if they

12   believe that the ride, in its totality, is the smallest salable

13   patent-practicing unit.

14   Q.   Okay.  Let's move on to the next slide.  Explain what

12:03  15   you've done here.

16   A.   So, again, because this question is really as to you, as to

17   what is the appropriate base, I've calculated both.  So I've

18   taken the 19 nozzle flaps that PSD has sold.  I multiplied that

19   times the $5,625 that was the per-nozzle-flap value for a

12:03  20   royalty base of $112,575.

21       In the alternative, if you were to include all of their

22   sales of the entire ride, they've sold four accused rides, and

23   there's, I think, a few services that they have in there as

24   well, which would make the royalty base $2,446,850.

12:04  25   Q.   Okay.  That seems simple enough.  Let's move on to the next

1   slide, which is royalty rate, which is the other component that

2   you need to address to arrive at a reasonable royalty.  Explain

3   what you did to arrive at the -- a reasonable royalty.

4   A.   So as we've been talking about, and I went back to the

12:04   5   agreements that -- where rights to the '589 patent had been

6   granted in the past, and I tried to determine what a

7   nonexclusive right to just the '589 patent would be worth, and

8   so the only real place that I saw in the agreements that any

9   individual patents were given a royalty rate at all was this

12:05   10   2009 agreement.  So I generally focused on that.

11   Q.   Okay.  And how did you evaluate the comparable licenses?

12   A.   Again, so once I got to the 2009 agreement that had

13   individual rights for -- or individual rates for these two

14   patents, I then looked at those technologies.  So the

12:05   15   next -- slide.  I think, hopefully, you remember I mentioned

16   the '280 patent, which had 10 percent.  It was for the flow of

17   the water.  And so, again, I didn't find that as comparable a

18   technology as I did the '530 patent, which was for the -- this

19   tension soft ride surface.  And so what you see is that the

12:05   20   '530 patent was something that was heavily promoted by

21   WhiteWater as a big safety feature of their ride; that, again,

22   it provided this impact-safe surface for the entire ride.  And

23   as you would think about that, the -- that larger blue surface

24   covers the whole ride.  And so what I did was when you look at

12:06   25   the '589 patent covering maybe the safety feature of the nozzle

1   flap, I thought okay.  The 5 percent royalty rate might be a

2   reasonable rate when applied to the nozzle flap value, which

3   is, again, what it provides.

4   Q.   Okay.  Let's move on to your next slide entitled "Royalty

12:06   5   Rate Indicators."  Would you explain what this is?

6   A.   Yes, so I try in each case to develop what I'll call

7   quantitative indicators, kind of the numbers, and then we use

8   these things called Georgia Pacific factors to go up or down

9   within the range.

12:06   10   So what we've talked about today with respect to these

11   licenses is that when they assigned patent value to any patent,

12   zero was assigned to the '589.  In the other agreements where

13   there was the entire portfolio being licensed, it was anywhere

14   from 5 to 10 percent for the whole portfolio.  But, again, I

12:07   15   focused on the fact that the '530 patent was a safety patent,

16   which, again, it would be a similar benefit to the '589, but

17   that the '589 was narrower than the whole ride.  And at the

18   highest end, you saw the '280 patent, which is this flow patent

19   or the rates paid for exclusive rights for the whole portfolio,

12:07   20   and so that would be the high end.

21   Q.   Let's move on to your next slide, 45.  You mentioned the

22   Georgia Pacific factors.  Explain that to the jury, if you

23   could.

24   A.   So the courts had established a set of 15 factors that you

12:07   25   would -- that they believe parties should consider in

1  determining their reasonable royalty.  So we've got these rates

2  from zero to 10 percent from the data.  Most of the factors I

3  believed had a neutral impact, but there were a few that

4  actually pointed down or up.  The scope of the license being

12:08   5  nonexclusive compared to exclusive, where those rates came

6  from, I thought would push the rate toward the lower end, but

7  then the relationship of these parties being competitors would

8  push it to the higher end.  Right?  And then when you think

9  about the noninfringing alternatives, which are the advantages

12:08   10  of the patent as a safety feature, and then the 9 and 10 also

11  would typically include the availability of noninfringing

12  alternatives, and you include the expert opinions of the

13  technical witnesses that generally tend to think that the '589

14  patent is a more limited technology to the nozzle flap, so

12:08   15  those would generally point you to the lower end.

16  Q.   So based on where the red arrows are pointing, those

17  Georgia Pacific factors you've identified would indicate it

18  should move -- push the rate down.  You did find one that would

19  suggest a little upward movement?

12:09   20  A.   Correct.

21  Q.   And what was -- just explain what that one was.

22  A.   Again, this relates to the competitive nature.  If you were

23  licensing to a noncompetitor, and you were not worried about

24  them impacting your customers when there is competition, again,

12:09   25  you would potentially want to have a higher rate if you're

1257

1       charging your competitors.

2       Q.   You see three above that, the scope.  This scope of license

3       is the nonexclusive nature, so that's weighing against the

4       royalty?  The fact that they're competitors?  Would you say

12:09   5       they cancel each other out or --

6       A.   I think that to some degree, and, again, it depends on

7       which of the rates we're talking about.  If we're talking about

8       the ones that are, like, 10 percent for the whole portfolio, I

9       think, generally, for the '589 patent, more limited scope, just

12:09   10      being the one patent, you would still move down from that rate

11      because it's got so much more in it.  But if we're talking

12      about the '530 patent applied to the whole ride, because it

13      covers the whole ride, versus the '589 patent covering the

14      nozzle flap, they would basically be pretty close.

12:10   15      Q.   Okay.  All right.  Let's move on, then, to the next slide.

16      This is your -- explain what you did here.

17      A.   So I have three conclusions, and, again, this really goes

18      to you, the jury, what you think the right rate and base are.

19      My first, and what I believe is probably the most appropriate

12:10   20      conclusion, is that the nozzle flap is the smallest -- the

21      SSPPU that -- its average price was -- it's highest price was

22      $5,925.  They sold 19 of them.  That's how much they used the

23      technology, which would give you the royalty base of $112,575.

24      The royalty rate conclusion was 5 percent applied to that

12:11   25      nozzle base, that nozzle flap base, which I derived primarily

1  from the '530 rate at 5 percent because it was a safety

2  feature, like the '589, and when you multiply those together,

3  you come to damages for the 19 nozzle flaps of $5,629.

4  Q.   Okay.  And just so I understood your testimony, you believe

12:11   5  this is the most appropriate way if the jury were indeed to

6  find validity and infringement -- this is the most appropriate

7  way to -- measure of reasonable royalty?

8  A.   I believe that if you find that the smallest salable

9  patent-practicing unit is the nozzle flap, then the 5 percent

12:11   10  rate would be the right rate to apply to that, and I -- from

11  what I understand of the technical opinions, that the inventive

12  portion of this -- the inventive footprint of the '589 patent

13  is the nozzle flap.  So if you agree that that's the

14  limitation, it's the nozzle flap itself, then I believe this is

12:12   15  the right one.

16  Q.   Okay.  Totaling $5,629, correct?

17  A.   Correct.

18  Q.   Okay.  Now, let's move on to you did an alternative

19  calculation with a different royalty base using the entire wave

12:12   20  machine.  Is that correct?

21  A.   That's correct.

22  Q.   Okay.  And just explain your calculation here.

23  A.   So you'll see that the sale of the four accused machines

24  was 2.4 million, $2,405,000.  Then they had some repair and

12:12   25  refurbishment revenue that included some of those nozzle flap

1    sales.  That was $41,850.  That brings the total revenue

2    of -- for all of their sales at $2,446,850.  So that's

3    the -- their entire sales over the period.

4        So then because this is -- these are the sales that include

12:13   5    the rest of the ride parts, you know, the pumps and the tanks

6    and the surfaces, everything, I then thought the rate must be

7    adjusted properly to reflect this much larger base.  So now I'm

8    applying this rate to everything, and, therefore, I need to

9    adjust the rate down to account for the nonpatented elements of

12:13   10    the ride.

11        So to do that, I looked at -- there was 23 patents when

12    originally they started licensing them that typically went for

13    10 percent.  I was informed that there were nine patent

14    families that were in there, so there was -- if there were nine

12:13   15    inventions.  I gave consideration that two of those inventions

16    were the '280 patent, which was deemed the most valuable by

17    them.  The '530, which was deemed kind of the second most

18    valuable.  But if I assumed that the '589 patent was of equal

19    value to all the others, I gave it as 1 percent, kind of

12:14   20    one-tenth of the overall royalty rate, and so that was the

21    1 percent conclusion.

22    Q.  Okay.  Now, let's move on to your next slide.  This is

23    entitled "Damages Wave Machine Royalty Base."  And you have a

24    low and a high.  Explain what you did here.

12:14   25    A.  Again, as you'll see, it also says right above the table

1    "Royalty rate ceiling."  So this would be my alternative in

2    which you found that WhiteWater's -- WhiteWater has claimed the

3    benefits of this invention are with respect to the entire wave

4    machine, meaning that it made the machine smaller.  It made it,

12:15   5    you know, more -- it made all the significant improvements.  If

6    you believe that, and that it applies to the entire machine,

7    these rates would be the highest rates ever applied to any

8    patent and really typically applied to the entire exclusive

9    rights of the entire portfolio.

12:15   10       So, again, if you find that this is as important as they

11   describe, you know, at 5 percent of their total sales, the

12   damages would be $122,343, and on the high end, the highest,

13   you know, 10 percent of all of their sales is just under

14   245,000.

12:15   15   Q.   Just so we're clear -- and this is an alternative

16   calculation for the jury's benefit -- this is not your opinion

17   of what the royalty should be in this case.  Is that correct?

18   A.   That is correct.  I believe that the evidence supports the

19   more limited view of the benefits of the technology.

12:16   20   Q.   Okay.  Now, you've given us quite a bit of information,

21   Mr. Lewis, and I want to thank you for that.

22       I'd like to go back and conclude one last time for the

23   jury.  What is your overall opinion regarding Dr. Vigil's

24   $2 million lump sum?

12:16   25   A.   So the next slide I put kind of these two final slides and

1261

1   bring it all back together.  Dr. Vigil assumes this lump sum up

2   front of 2 million.  That's more than double of all their

3   profits.  Again, you really cannot, knowing what their sales

4   are, ever conclude that that would be something they would

5   agree to.  And my conclusions are on the right.  My ceiling

6   would the 10 percent at 240, but I believe the more appropriate

7   one would be is the 5,629, which relates to 5 percent of the

8   value of the nozzle flap itself.

9   Q.   Okay.  Now, let's move on to the next slide, Slide 50.

10  Just show us again what you're depicting here.

11  A.   Again, these are what Dr. Vigil's rate represents as a

12  percentage of sales, over 80 percent of their sales, and then

13  the blue is all the actual agreements, like I say, typically

14  for exclusive rights to the whole portfolio, and then on the

15  right would be my opinions with respect to the appropriate

16  royalty rates.

17  Q.   Okay.

18       MR. THOMAS:   I have no further questions of this

19  witness at this time.

20       THE COURT:   Well, it's a good time for us to take a

21  lunch break.  So let's be back at 10 minutes to 1:00.  Please

22  remember my admonition.  Thank you.

23       Sir, you may step down.

24       Counsel, if you'll remain for just a second.

25       (Proceedings held outside the presence of the jury panel.)

12:16

12:17

12:17

12:17

12:17

1    THE COURT:  I'm just kind of -- you can go.  I'm just

2  trying to make sure that I've got this thing sort of figured

3  out.

4    So as I understand it, there are basically three possible

12:18  5  outcomes in this case:  One, the defendant wins everything, the

6  patents are declared invalid; number two, the patent is

7  declared valid, but there's no infringement; or three, the

8  plaintiff wins everything, and the patents are declared valid,

9  infringement, and royalties.  Do I have that -- is that about

12:18  10  right?

11    MR. THOMAS:  Yes, with the permutations on how much

12  the royalties might be.

13    THE COURT:  Right.

14    MR. O'HARE:  We're not in complete agreement on that.

12:19  15    MR. THOMAS:  Oh, okay.  I'm sorry.

16    MR. O'HARE:  We're not in complete agreement on the

17  amount of royalty.

18    MR. THOMAS:  Oh, that's one of a few things.

19    THE COURT:  Okay.  It strikes me that there's a

12:19  20  win-win and a lose-lose proposition in this case.  I think you

21  folks ought to go talk settlement.  See you at 10 minutes till.

22    MR. THOMAS:  Thank you, Your Honor.

23    (Luncheon recess.)

24    ---000---

25

1263

1        C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated December 11, 2019, at San Diego, California.

7

8

                            /s/ Dana Peabody_____
9                           Dana Peabody,
                            Registered Diplomate Reporter
10                          Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25