1                UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

WHITEWATER WEST INDUSTRIES,     .
4  LTD., a Canadian corporation, .
                                .  Docket
5            Plaintiff,          .  No. 17-cv-1118-BEN-BLM
                                .
6            v.                  .  December 16, 2019
                                .  9:00 a.m.
7  PACIFIC SURF DESIGNS, INC., a .
Delaware corporation, and FLOW.
8  SERVICES, INC., a California  .
corporation,                   .
9                                .
            Defendants.         .  San Diego, California
10  . . . . . . . . . . . . . . .

11          TRANSCRIPT OF JURY TRIAL, VOLUME 7A
          BEFORE THE HONORABLE ROGER T. BENITEZ,
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13                  A-P-P-E-A-R-A-N-C-E-S

14  For the Plaintiff:     Snell & Wilmer LLP
                         600 Anton Boulevard, Suite 1400
15                         Costa Mesa, California 92626
                         By:  WILLIAM S. O'HARE, ESQ.
16                         – and –
                         BUCHALTER, A Professional Corporation
17                         18400 Von Karman Avenue, Suite 800
                         Irvine, California 92612-0514
18                         By:  ROGER L. SCOTT, ESQ.
                              J. RICK TACHÉ, ESQ.
19
For the Defendants:    Thomas, Whitelaw & Kolegraff LLP
20                         18101 Von Karman Avenue, Suite 230
                         Irvine, California 92612-7132
21                         By:  JOSEPH THOMAS, ESQ.
                              WILLIAM J. KOLEGRAFF, ESQ.
22
Court Reporter:        Chari L. Bowery, RPR, CRR
23                         USDC Clerk's Office
                         333 West Broadway, Suite 420
24                         San Diego, California 92101
                         chari_bowery@casd.uscourts.gov
25  Reported by Stenotype, Transcribed by Computer

1          SAN DIEGO, CALIFORNIA; DECEMBER 16, 2019; 9:00 A.M.

2                              -o0o-

3      (The following proceedings were held in open court out of

4   the presence of the jury:)

5          THE COURT:  Well, good morning.  Let's see.  Refresh

6   my recollection.  I think there were a couple more witnesses to

7   be called; is that right?

8          MR. O'HARE:  That's right.  We have Mr. Squier on the

9   stand still on direct.  So, cross for him, and then we have a

10  rebuttal witness, our expert, Dr. Stevick.

11         THE COURT:  All right.  Is there any reason why I

12  shouldn't bring the jury in?

13         MR. O'HARE:  No, Your Honor.

14         THE COURT:  Glen, do me a favor and go get the jury.

15         MR. O'HARE:  Can we invite Mr. Squier to go ahead and

16  resume the stand?

17         THE COURT:  Sure.  Come on up.

18     (The following proceedings were held in open court in the

19  presence of the jury:)

20         THE COURT:  Good morning.  I hope you had a great

21  weekend.

22     Mr. Thomas, you may proceed.

23                         ERIKSON SQUIER,

24         DEFENDANTS' WITNESS, PREVIOUSLY SWORN

25

                    DIRECT EXAMINATION (RESUMED)

1

2    BY MR. THOMAS:

3    Q    Mr. Squier, you are familiar with the duty of candor to

4    the Patent and Trademark Office?

5    A    Yes.

6    Q    Would you explain to the jury what the duty of candor is.

7    A    Duty of candor is a rule to, essentially, be honest and

8    not try to trick that office in any way in your communications

9    with them during a prosecution.

10   Q    Under the rules, you are obligated to be -- always be

11   truthful in filing any documents and statements with the PTO;

12   is that correct?

13   A    That's right.  During the prosecution of a patent

14   application, the code section that relates to duty of candor is

15   37 CFR 1.56, which -- you probably don't remember, but that was

16   one of the code sections we operate under, one of the

17   regulations for the patent office.  So that applies from when

18   you file the patent application, up until the patent issues.

19   You have to be honest in your disclosures with the patent

20   office.

21   Q    Are there any other CFR sections that require honesty and

22   candor when filing other matters before the PTO after the

23   issuance of a patent?

24   A    There is.  So, during prosecution -- which, again, is the

25   examination process -- 37 CFR 1.56 applies.  After that,

1   there's a different code section, which essentially says the

2   same thing; just not try to trick, not try to lie to the patent

3   office.  And that's 37 CFR 11.18.

4   Q    So you can't knowingly make a false statement to the PTO?

5   A    That's right.  You can't try to trick or lie to the patent

6   office and, essentially, be dishonest or deceitful.

7   Q    Now, we talked about the power of attorney last week, when

8   you were on the stand, and you indicated that was a filing done

9   by your firm under a best practices procedure; is that correct?

10  A    Correct.

11  Q    And even when you file under a best practices procedure,

12  you are still obligated to follow the requirements of

13  37 CFR 11.01; isn't that correct?

14  A    I assume you meant 11.18.

15       Yes.  Any time you communicate with the patent office, you

16  can't be intentionally trying to trick them for any reason.

17  Q    Let's call up, if we could, this power of attorney.  We

18  have seen parts of it, but I want to show the full extent of it

19  that was filed in March of 2015.

20       Can we have BG, page 9, on the screen.

21       This is the power of attorney that you provided to the PTO

22  in March of 2015, signed by Mr. Lochtefeld, as president of

23  Blade Loch Inc., the managing be member for Light Wave Ltd.

24       Do you see that?

25  A    Yes.  I believe this was filed March 30, I think with the

1    patent office.  Correct.

2    Q    If you look at the very top, it says, "Power of attorney

3    to prosecute applications before the U.S. PTO."  Do you see

4    that?

5    A    That's correct.

6    Q    So this would enable, under this power of attorney, for

7    someone to prosecute any application, including a petition to

8    revive the patent, correct?

9    A    Well, again, this power of attorney to prosecute

10   applications -- there's not many things at the patent office

11   that require a power of attorney.  Many applications go all the

12   way through without one ever being filed.  And this was filed a

13   month after the petition to reinstate, so it did not have

14   anything to do with it and wouldn't have authorized or

15   otherwise enabled the petition at all.

16   Q    But you agree, if you file a power of attorney and it's

17   granted, it does authorize the party who is authorized by the

18   power of attorney to prosecute applications before the PTO,

19   correct?

20   A    I am not sure I fully understand.

21        Filing the power of attorney, the effect -- I guess maybe

22   is what you are asking -- that it had in this case is -- one of

23   the things that you can do with a power of attorney is -- and

24   you can see it on this form here; it is a little hard to read

25   because the scan is kind of difficult, but near the middle, it

1    says "update the correspondence address."

2        So one of the things that you can choose to do with a

3    power of attorney is update the address where the patent office

4    will send correspondence about the application.  And that was

5    checked here.  So the effect that this had, particularly with

6    respect to the petition to reinstate, is that communications

7    with the patent office would go to the law firm of Greenberg

8    Traurig, which is the law firm associated with that 33717

9    customer number that you see there.

10   Q    Right.  And that was the firm you were then employed by,

11   correct?

12   A    That's correct, yes.

13   Q    Let's look at BG-10, if we could, which is the next page,

14   and if we could blow this up a little bit.  Okay.

15       At the very top, you will see the name -- says "Applicant,

16   patent owner, Thomas J. Lochtefeld."  Do you see that?

17   A    I see that, yes.

18   Q    And under -- maybe we could -- do you see the line where

19   it says, "Title:  Mobile Water Ride Having Sluice Slide-Over

20   Cover"; do you see that?

21   A    Yes.

22   Q    Below that it says "Light Wave Ltd., Limited Partnership."

23   Do you see that?

24   A    Yes.

25   Q    And it's hard to read, but I believe it says "name of

1    assignee," does it not?

2    A    You are saying under the line?

3         Yes, I believe so.

4    Q    So this statement to the PTO reported on the date it was

5    filed -- which I think was March 30, 2015 -- that the assignee

6    of the patent was Light Wave Ltd., correct?

7    A    That's what it states, yes.

8    Q    And if we could scroll down further.  And let's go to page

9    11, the next page, the very bottom of this.

10        We see a signature, here, by Mr. Lochtefeld, with the same

11   capacity, of Blade Loch Inc., managing member for Light Wave

12   Ltd.  Do you see that?  It's hard to read, but it is at the

13   very bottom.

14   A    Yes.

15   Q    And it was signed on March 27, 2015.

16        If we go to the top, quickly, on this screenshot, here, it

17   is -- there's a statement under 37 CFR.

18        You can probably recite this off the top of your head.

19   Just tell the jury what that statement is.

20   A    I don't have the statement memorized.  I am trying to

21   make -- sorry.  I am trying to make that out, to be honest.

22   That language, I am really struggling to read, there.

23   Q    Do you have any understanding of what Mr. Lochtefeld was

24   attesting to under this section, 37 CFR?

25   A    I don't remember.  I would want to read what that language

1    states.  I just -- I am sorry.  I don't remember.

2    Q    Do you recall that you read this before you had it filed

3    in March of 2015 with the U.S. PTO?

4    A    I don't know if I read this since, again, the filing of

5    the power of attorneys are typically administrative things.  I

6    try to review whatever gets filed using my certificate, but I

7    am not sure if I spent the time to fully review this one, given

8    that it was an administrative document.

9    Q    Well, in fact, Light Wave Ltd. was not the assignee of the

10   '589 patent in March of 2015; is that correct?

11   A    That's correct.

12   Q    You know that today?

13   A    I know that today, yes.

14   Q    What investigation, if any, did you do back in March of

15   2015 to ascertain whether or not Light Wave was in fact the

16   assignee as represented in this power of attorney?

17   A    So, I think I spoke briefly about this last week.

18        The patent office allows, if you want, to file assignments

19   with the patent office.  And the patent office doesn't review

20   those assignments for their accuracy, but they have a

21   recordation database where, if you record an assignment with

22   them, they will put it in their respository, just to have a

23   record of who the assignee is.  And on that patent office

24   database that you can go into to look at the patents, the

25   currently recorded owner per those submittals of assignments

1   will show up there.

2        So, either myself or my assistant, when they are putting

3   together one of these documents, they will check the assignment

4   record in order to know who to reach out to in order to get the

5   power of attorney information on the forms correct.

6        So Light Wave would have been listed on that patent office

7   web page.

8   Q    And did you confirm with Mr. Lochtefeld, prior to filing

9   this, that Light Wave was in fact the then-assignee of the '589

10  patent?

11  A    No.  I think I stated, but to the extent I wasn't clear, I

12  don't believe that I was involved in the preparation of these,

13  since they are typically administrative documents.  So my

14  assistant would have likely reached out in order to send these

15  documents to Mr. Lochtefeld based on the assignment record that

16  was at least currently recorded at the patent office at that

17  point in time.

18  Q    In fact, as of March of 2015, the patent was then owned by

19  Surf Park, a Singapore company?

20  A    That's correct.  Yes.

21  Q    So, the statement to the PTO about Light Wave being the

22  assignee of the patent was false and incorrect?

23  A    It is incorrect, yes.

24  Q    And you did no investigation and had no knowledge about

25  Surf Park's ownership of the patent as of March of 2015; is

1  that your testimony?

2  A    I did not know of the relationship with Surf Park at the

3  time of -- of the petition or the power of attorney at the

4  time.

5  Q    Did you have any knowledge about Whitewater's involvement

6  as a licensee or potential licensee of the patent at the time

7  this document was filed reporting Light Wave as the assignee of

8  the patent?

9  A    I knew that there was some agreement that WhiteWater was

10  in charge of the maintenance fee obligations, and that was due

11  to my discussions with Rick Taché leading up to the filing of

12  the petition.  But at the time, I had not seen the actual

13  agreements or know the full details, but I knew that WhiteWater

14  was involved in that capacity.

15  Q    Now, you had some knowledge about WhiteWater had an

16  obligation to maintain the patents, but you had no knowledge of

17  WhiteWater having either -- a license to the '589 patent; is

18  that your testimony?

19  A    I didn't know the specifics, but I knew from discussions

20  with Rick that there was some agreement or agreements that had

21  given WhiteWater the obligation and responsibility to be in

22  charge of those maintenance fees.

23  Q    Let me turn, now, to Exhibit GT, GT-1.  This is an

24  electronic acknowledgment receipt.  It is dated August 11,

25  2015.  Do you see that?

1  A    I see that, yes.

2  Q    You are the filer, Erikson Squier, in the middle?  Do you

3  see that?

4  A    Yes.

5  Q    Now, you recall filing this -- this is the renewed

6  petition to revive the patent under 37 CFR 1.378?

7  A    Correct.

8       I guess, as a reminder, the original petition that had

9  been filed got dismissed by the patent office because they

10  couldn't access our deposit account, so we had to renew that

11  original February 20th petition; and it states, "We have

12  cleaned up the deposit account issue, so now you can please

13  take your funds in order to process the petition."  And that's

14  what this August 11 renewed petition was.  Yes.

15  Q    Let's turn to GT, page 5.  This is a document -- scroll to

16  the bottom quickly.

17       Is that your signature at the bottom, Mr. Squier?

18  A    That is my signature, yes.

19  Q    Dated as of August 11, 2015.

20       Let's move up again to the top of this.  At the very top,

21  this document that you signed and prepared, shows the

22  registrant as being Thomas J. Lochtefeld.  Do you see that?

23  A    I see that.

24  Q    As it relates to this '589 patent.  Do you see that?

25  A    Yes, I see that.

1    Q    And you state, in this filing with the PTO, on

2    February 20, 2015, "Registrant petitioned for revival of the

3    above cash and patent due to its expiration from unintentional

4    nonpayment of the 11-and-a-half-year maintenance fee."

5         Do you see that?

6    A    I see that.

7    Q    Did you do any investigation of Mr. Lochtefeld or Wave

8    Light at the time of the February 20 petition to ascertain

9    whether or not the failure to pay was unintentional?

10   A    No.  Under the rules that are stated in the Code of

11   Federal Regulations and the MPEP, the party that is in charge

12   of paying the maintenance fee is the party that you have to ask

13   whether it was missed unintentionally or deliberately.  And

14   since WhiteWater was the party in charge of that maintenance

15   fee payment, they were the ones that had to be asked whether

16   they missed it deliberately or whether they had accidentally

17   missed it.

18   Q    You never asked WhiteWater, did you?

19   A    I got the information from Rick Taché, who spoke with them

20   directly.

21   Q    But you never had a conversation with anyone at WhiteWater

22   to ascertain whether or not this missed payment was intentional

23   or unintentional; isn't that correct?

24   A    Well, I guess it is true that I didn't directly speak with

25   WhiteWater.  I learned it through Mr. Taché, who was the

1    responsible relationship attorney with WhiteWater.  But again,

2    there's another Code Section, MPEP 410, that explicitly allows

3    you to rely on information that you either get directly or from

4    any other third party, just as long as you don't have any

5    information that is contrary to it.

6    Q    Were you made aware, as of the date you filed this, that

7    Light Wave was not the assignee or owner of the '589 patent?

8    A    I had not looked into the relationship of the various

9    agreements between the parties; but I knew, again, from

10   discussions with Mr. Taché prior to the filing the original

11   February 20 petition, that WhiteWater was the one with the

12   obligation to pay the missed fee.

13   Q    Okay.  I just want to be clear about this.  This is

14   important.  I know you have testified about the obligation to

15   pay the fees.

16        I am asking you specifically, as you sit here -- or as you

17   sat there in August of 2015, did you have any knowledge that

18   Light Wave was not the assignee or owner of the patent?

19   A    At the time, the only information we had about the

20   specific, I guess, legal relationship between the parties and

21   the patent was what was on record at the patent office, and

22   then obviously caveated a little bit with the information that

23   I learned from Rick Taché about who was actually in charge of

24   making the fee payments.

25   Q    Just so it's clear for the record and for the jury, what

1    was on record was Light Wave was the assignee of the patent at

2    the time you prepared this document, correct?

3    A    I believe that's correct.  If you go back -- and I don't

4    know if it's easy to go back -- the past power of attorney

5    document, there's a check box on there where you can state the

6    reel frame number, which is just basically the access number in

7    the patent office database that lists where the assignment has

8    been recorded, and it's listed in there what the assignment was

9    at the time.

10   Q    Let's scroll down a little bit on this.

11        You signed this on August 11, 2015.  Just so the record is

12   clear and the jury can hear your testimony on this, you had no

13   knowledge about Surf Park being the owner of the patent at the

14   time you signed this document, on August 11, 2015?

15   A    Correct.

16   Q    And you had no knowledge about WhiteWater being an

17   assignee or a licensee or anything like that other than it

18   generally had the obligation to pay maintenance fees; is that

19   your testimony?

20   A    That's right.  I knew there was some arrangement giving

21   WhiteWater that obligation.  But as to the specifics, whether

22   there were assignee or licensee or some other arrangement, I

23   didn't know the specifics.

24   Q    You didn't know anything about it in August 2015; isn't

25   that correct?

1    A    I am not sure what you mean by "know anything about it."

2    I knew something about it from the discussions with Mr. Taché

3    that there was some agreement, but I didn't know the specifics

4    as to whether it was a licensee arrangement, an assignee

5    arrangement or some other agreement.

6    Q    You had no idea who the owner of the patent was in August

7    of 2015; is that correct?

8    A    Just other than what was on record at the patent office,

9    and then, again, that WhiteWater was at least in charge of the

10   maintenance fee payments.

11   Q    Again, the "on record" at the patent office would have

12   been Light Wave, so that's all you knew.  And you believed that

13   WhiteWater simply had some contractual obligation to make the

14   maintenance fees; isn't that correct?

15   A    Right.  Some obligation; not sure what particular legal

16   relationship that was at the time, but just that they were in

17   charge of it.

18   Q    Let's move on then to GV-1.  This is a letter that has

19   stamp on it, I think, at the PTO, dated August 25, 2015.

20        Do you see that?

21   A    I do, yes.

22   Q    And it's issued to your firm, Greenberg Traurig.  You

23   received a copy of this sometime on or after August 25, 2015,

24   did you not?

25   A    That's correct.  Yes.

1    Q    This says, in the first paragraph, that a decision on the

2    petition -- and I think that's the renewed petition that you

3    filed, which was originally filed February 20 and renewed again

4    on August 11.  Do you see that?

5    A    Yes.  To be clear, though, it says it is a decision on the

6    petition, which isn't the renewed petition but the petition

7    under 37 CFR 1.378, which is the original one, filed

8    February 20, but renewed on August 11, again, because there was

9    an issue with the deposit account, so they needed to be

10   authorized to take the money.

11   Q    I don't want to parse words.

12        It says it is a decision on the petition filed

13   February 20, 2015, and the renewed August 11, 2015.

14        Do you see that?

15   A    Right.  It is a decision on the original petition, filed

16   February 20, and then that petition was renewed on August 11.

17   Yes.

18   Q    Showing the registrant in that renewed petition as

19   Mr. Lochtefeld, correct?

20   A    Well, you keep calling it the "renewed petition," but I am

21   reading the language here.

22        The petition was the one on February 20, which is what had

23   the certified statement of unintentionality.  And then that

24   petition was renewed August 11 because the patent office needed

25   to get their money from the deposit account.

1    Q    Well, we just looked at GT-5.  I am not going to go back

2    and forth with you on this.  The document you had signed -- the

3    title of that document says renewed petition to revive under

4    37 CFR 1.378.  Do you agree with that?

5    A    I don't see it, but I will take your word for it.

6    Q    All right.  And the second paragraph says there's no

7    indication that the person signing the instant petition was

8    ever given a power of attorney or authorization of agent to

9    prosecute the above-identified application.

10        Do you see that?

11   A    I do, yes.

12   Q    And it goes on to state, "In accordance with

13   37 CFR 1.34(a), the signature appearing on the petition shall

14   constitute a representation to the United States Patent and

15   Trademark Office that he/she is authorized to represent the

16   particular party in whose behalf he/she acts."  Do you see

17   that?

18   A    I do.

19   Q    So, the PTO accepted your signature that you are

20   authorized to act on behalf of Light Wave, correct?

21   A    Well, no, that says the opposite.  It says there was no

22   indication that the person signing the petition, myself, was

23   ever given a power of attorney.

24        1.34 is the code section that relates to when an attorney

25   is not of record; in other words, has not filed a power of

1    attorney and they are acting in a representative capacity.

2        So, the patent office is, again, acting on the petition

3    based on the representative capacity and explicitly not on the

4    basis of any power of attorney.

5    Q    Okay.  And you had no authorization, did you, from

6    Surf Park to file any documents or make any statements to the

7    PTO as of August 15, 2015?

8    A    That's correct.  We filed the petition on behalf of

9    WhiteWater.  And again, WhiteWater was the one who we needed to

10   ask about the unintentionally missed fee payment.

11   Q    But you are unaware of the contractual agreement that you

12   referred to?  You didn't see it; you didn't look at it; that's

13   your testimony, correct?

14   A    That's correct.  I had not seen the actual document.  I

15   was relying on what Mr. Taché had mentioned.

16   Q    Now, going now to the third paragraph, it says it is not

17   apparent whether the statement of unintentional delay was

18   signed by a person who would have been in a position of knowing

19   that the entire delay in the filing of the required reply from

20   the due date for the reply until the filing of a grantable

21   petition, pursuant to 37 CFR 1.137(a), was unintentional.

22       Do you see that?

23   A    I see that.  Yes.

24   Q    And the PTO goes on to say, "Nevertheless, in accordance

25   with 37 CFR, the statement is accepted as constituting a

1    certification of unintentional delay.  However, in the event

2    that petitioner has no knowledge that the delay was

3    unintentional, petitioner must make such an inquiry to

4    ascertain that fact that the delay was unintentional."

5         Do you see that?

6    A    I do, yes.

7    Q    It goes on to say, "If the petitioner discovers that the

8    delay was intentional, the petitioner must so notify the

9    office."

10        You understood when you received this acknowledgment from

11   the PTO that you had certain obligations, did you not?

12   A    Right.  As part of filing the petition and certifying that

13   it was unintentional, it needed to be looked into that the

14   petition or that the maintenance fee really had been missed

15   unintentionally and nobody had made a deliberate decision to

16   not pay it.

17   Q    Let me change exhibits here.  Let's go quickly to -- we

18   saw this briefly -- Exhibit 240.  Show that.  Exhibit 240, we

19   looked at last Thursday.  I don't want to spend much more time

20   on it.

21        You will see, at the bottom, it is signed July 18, 2013.

22   It is an assignment.  And you acknowledged it was an assignment

23   of a patent by Light Wave over to a company known as Surf Park

24   PTE Ltd., a Singapore company; is that correct?

25   A    I remember you showing this.  To be honest, I would like

1   to see it again.

2        But I see it is Lochtefeld to Light Wave and then Surf

3   Park.  Yes.

4   Q    Your testimony is you didn't know anything about this when

5   you made those filings in 2015 with the PTO; is that correct?

6   A    Well, again, as I stated, I didn't know the specifics of

7   the legal transfer of title or licensee arrangements, just in

8   speaking with Mr. Taché about who had obligations to pay the

9   maintenance fees.

10  Q    Okay.  Now let's go to Exhibit 218, if we could.

11       And Exhibit 218 is called a Deed of Assignment.  It's Surf

12  Park -- it's between Surf Park and WhiteWater West Industries.

13  Do you see that?

14  A    I see that, yes.

15  Q    And if we can scroll down, this was signed on -- here it

16  is -- October 31, 2017.  This is two years after you submitted

17  your statements to the PTO that we looked at in 2015, that

18  Surf Park transfers the '589 patent to WhiteWater.  Do you see

19  that?

20  A    Well, I saw the first page, indicating the parties.  I am

21  not, honestly, that familiar with the document.  But I see the

22  date there, yes.  Two years after, yes.

23  Q    Let's scroll up, if we could.

24       Do you have any doubt that Surf Park assigned ownership of

25  the '589 patent to WhiteWater in or about October of 2017?

1    A    I don't know the specific dates.  My understanding, just

2    through the course of this litigation, is that WhiteWater did

3    receive that patent from Surf Park.  But again, I am not that

4    familiar with this document or that arrangement.

5    Q    Okay.  Would you agree that ownership of the patent, the

6    '589 patent, was in the name of Surf Park between 2013 and

7    2017, the effective date of this agreement?

8    A    Again, I am not sure of the complete chain of title, but I

9    know that, at one point, Surf Park was the owner of the patent,

10   yes.

11   Q    Now, let's look at another exhibit, 241.  241.14.

12        Now, this is an email -- do you know who Barry Daniel is,

13   or Daniel Barry, I guess?

14   A    I am familiar with the name.  I believe he was an

15   associate with Snell & Wilmer for a little bit, while I was

16   there, yes.

17   Q    And you will see, on this line, at the top, Mr. Taché is

18   copied?

19   A    I see him in the cc list, yes.

20   Q    Now, if we go below that line, further, to the next email,

21   you will see this February 6, 2012, from Mr. Nutall; is that

22   right?

23   A    It looks like it is, again, from Mr. Barry to

24   Mr. Nutall -- I am sorry.  You are at the top.  Yes.

25   Q    From Mr. Nutall.  He is a lawyer, at the time, at Knobbe

1   Martins, who had original responsibility on behalf of

2   Mr. Lochtefeld for the '589 patent, correct?

3   A    I don't know the specific relationship between

4   Mr. Lochtefeld and his attorneys at Knobbe.  But I know Knobbe

5   at one point was in charge of the prosecution of the '589

6   patent.

7   Q    Okay.  Let's look a little further down here, if we could,

8   on the next email.

9        Again, Mr. Taché is cc'd on this one.  It's February 2,

10  2012, and he is thanking Mr. Nutall for sending the latest

11  communication with U.S. PTO on the AWM reexamination.

12       Were you involved in the AWM reexamination?

13  A    No.  I may have heard of it while I was there, but I was

14  not involved in that case.

15  Q    Okay.  But Mr. Taché apparently was involved; he was

16  copied on this, correct?

17  A    I see him copied, yes.

18  Q    Then, if you look down to the paragraph numbered one,

19  there, it says, "Please ensure the chain of title to Surf Park

20  PTE is properly recorded for the above patents."  Do you see

21  that?

22  A    I see that.

23  Q    So, a Knobbe lawyer is asking your firm, at the time, to

24  ensure that the Surf Park portfolio, which would have

25  included -- you can see on the bottom of 0049, there's a

1   specific reference to the '589 patent there.  Do you see that?

2   A    I see that number reference, yes.

3        But I believe that this email was from Mr. Barry asking

4   Mr. Nutall, at Knobbe, to ensure the chain of title.  And you

5   may have said that backwards.

6   Q    So at your firm -- your then firm -- Mr. Barry -- who was

7   part of your IP prosecution practice; is that correct?

8   A    I don't now Mr. Barry's full background.  I know he was

9   involved in IP while he was there, though.

10  Q    He is asking that they ensure that Surf Park is properly

11  recorded.  And you, for some reason, were not included in this

12  communication.

13  A    I don't think I was included because I wasn't involved in

14  that case.

15  Q    Okay.  All right.  Let's scroll down, if we could, a

16  little more to the bottom.

17       This revival here issue for assertion -- do you recall

18  that the -- there was -- were you involved in the litigation

19  with AWM, American Wave Machine?

20  A    No.

21  Q    Do you recall that they were concerned about that '589

22  patent for the purpose of asserting it as one of the patents

23  against AWM?

24  A    I don't believe that I was involved in the AWM reexam

25  process.  So, no, I am not that familiar with what AWM may or

1   may not have been concerned about.

2   Q    Now, we talked about these power of attorneys.  You are

3   aware that if you submit -- you have had experience, in fact,

4   have you not, with the PTO, if you submit a power of attorney

5   in the name of the wrong entity, it will be rejected by the

6   PTO?

7   A    It depends.  Typically, the patent office -- like, I

8   guess, like us, when we are preparing them, is they will use

9   the record that they have, so if they have record where it is

10  recorded to a particular party, that's how they will check and

11  see whether the power of attorney should be granted or not.

12       But they don't actually check the assignment document that

13  gets sent to them.  Again, they just record it and then store

14  it.

15  Q    If we could look at Exhibit GW, page 2 of Exhibit GW.

16       And you are familiar with this flow divider patent?

17  A    Um, I am not sure if it is a patent or not.  I see an

18  application up there, and I know that WhiteWater does have some

19  patents on the flow divider concept.  I am not particularly

20  aware of what this one is or even if it is a patent versus a

21  pending application.  But I am certainly aware of the concept

22  of the flow divider.

23  Q    Well, your name appears on this document, does it not?

24  A    Correct.  This is --

25  Q    Go ahead.

1   A    I was going to say, again, this is another one, when you

2   see the filer, my name, Erikson Squier, slash Holly Scott, who

3   was the assistant -- a lot of times these administrative

4   documents are filed by the assistants, which is why her name

5   shows up there.  She would be the filer, but she would use my

6   certificate in order to access the patent office system, in

7   order to get stuff on file.

8   Q    Let's turn to GW, page 1, if we can.

9        And what was filed in conjunction with this was -- this

10  was a power of attorney -- same language -- to prosecute

11  applications before the U.S. PTO, and it's signed at the bottom

12  by Tim Kwasnicki, vice president, risk management.

13       Do you see that?

14  A    I do, yes.

15  Q    So this was an attempt to have a power of attorney signed

16  by Mr. Kwasnicki in relation to this flow divider patent.  And

17  in fact, this was rejected by the PTO, wasn't it?

18  A    Honestly, I can't remember.  It could have been.  You

19  can't tell from this.  This was just the original document that

20  would have been submitted to the patent office.

21  Q    Let me show Exhibit OE.

22       Does this document refresh your recollection that the

23  power of attorney that was submitted by you, on September 11,

24  2014, was denied?

25  A    I am going to -- I wouldn't say that it refreshes my

1    recollection because I just don't remember.  But I can read the

2    document, sort of the same as you.  I am not completely sure

3    whether that application number up there matches.  I am

4    assuming it does.  And it is just denial of a request of some

5    power of attorney that was filed in this case.

6    Q    And if we could go to page 2 of this, OE.

7         You will see that they checked the box, "The power of

8    attorney has not been accepted because the party who is giving

9    power of attorney has not been identified.  A power of attorney

10   may only be signed by an applicant for the patent or the patent

11   owner."  Do you see that?

12   A    I see that, yes.

13   Q    And you understood that a power of attorney could only be

14   signed by either the applicant, or the patent owner, or the

15   assignee, correct?

16   A    I would want to look at that code section.  But, yes,

17   typically, the patent office will use their records that they

18   have at the time in order to make sure that the names match up.

19   Q    Okay.  Now, let's change subjects.

20        You were involved, were you not, Mr. Squier, in

21   proceedings before the German PTO as it related to the '589

22   patent?

23   A    There was some initial communication with foreign patent

24   offices with respect to other patent applications like the '589

25   patent that had their maintenance fee accidentally missed.

```
 1              MR. THOMAS:  I would like just to show to the witness

 2   and counsel and the Court Exhibit OE, and we will go to page

 3   1 -- I am sorry, page 9 of OE.

 4        I am sorry.  I have misstated.  OF.

 5              THE CLERK:  Earlier, you said OE.

 6              MR. THOMAS:  I meant OF.  My apologies.

 7              THE CLERK:  Your Honor, this is not published to the

 8   jury.

 9              MR. O'HARE:  I am sorry.  If I may inquire, the

10   exhibit on the screen, OF --

11        (Counsel confer.)

12              MR. O'HARE:  Counsel gave us OE.

13        (Counsel confer.)

14              MR. THOMAS:  I handed you three copies, and I need

15   one back.

16              THE COURT:  How about if I give you two copies back

17   because I just need one.

18              MR. THOMAS:  Here you are.  My apologies.

19        This is OF.

20   BY MR. THOMAS:

21   Q    Okay.  Now we have on the screen in front of the witness

22   page 9 of OF.

23        This first page is an email from you to an "Otto."  Do you

24   see that?

25   A    Sorry.  The screen just moved.
```

1          (Counsel confer.)

2     BY MR. THOMAS:

3     Q     Do you have that in front of you now?

4     A     Honestly, I am not sure.  I have something up, but I am

5     not sure if it's what you are asking about.

6            This is an email to me from Otto or Silvana Otto.

7     Q     And the subject matter is "WhiteWater EU IP matters."  Do

8     you see that?

9     A     Yes.

10    Q     And the date there is in German, "Freitag," Friday, 15th

11    of May, 2015.  Do you see that?

12    A     I see that.  I assume "Mai" is May.

13    Q     If you look down there, there is reference to EP-Patent.

14    Is that a reference to the '589 patent?

15    A     No.  That references a European Patent Number 1210155,

16    which is a different patent than the '589 patent, that is a

17    foreign patent.  The '589 patent is a U.S. patent.  They are

18    different.

19    Q     Understood.  But the filing date and information below the

20    EP-Patent number, those relate -- what do those relate to?

21    A     I am assuming those relate to the EP-Patent 1210155

22    patent, which is the foreign patent having, I assume, the

23    application number that is written there.

24    Q     Okay.  Scroll up a little bit on this document here.

25           At the top of this, this is an email to you from Otto, and

1    it is regarding this WhiteWater EU IP matters.  Do you see

2    that?

3    A    Subject, WhiteWater EU IP matters.  I see that.

4    Q    It is dated Tuesday, April 21, 2015?

5    A    Yes, I see that.

6    Q    And you were -- explain what you were doing here at this

7    point in time with the German law firm and the German PTO.

8    A    WhiteWater had obtained a number of patents, a big block

9    of them, from Mr. Lochtefeld, as part of the arrangement I

10   mentioned before that I discussed with Mr. Taché, including a

11   number of patents that were not U.S. patents, so not -- not

12   like the '589, but filed in other countries, Europe and other

13   places around the world and they wanted to get a status update

14   as to all of those.

15   Q    Okay.  And was there a European counterpart to the '589

16   patent filed?

17   A    Honestly, I am not sure.  There may have been.  I just

18   don't know.

19   Q    Okay.  Now, if we could look at OF, page -- page 3, OF,

20   page 3.

21        At the very top -- do you see this email?  "For further

22   detailed information" -- this is from Ms. Silvana Otto, who is

23   with a German law firm that you were communicating with; is

24   that correct?

25   A    I believe so, yes.  I am not sure if -- I am assuming that

1  that's a German law firm, yeah.

2  Q    The question is, "For further detailed information, please

3  inform us how WhiteWater is involved in these cases since all

4  patents are owned by Mr. Thomas Lochtefeld or Light Wave Ltd.,"

5  do you see that?

6  A    I see that, yes.

7  Q    And then, you went on and responded to that.

8       Let's turn, now, to OF page 5.

9       Now, this is an email you prepared, dated May 12, 2015, to

10  Silvana Otto, subject, WhiteWater EU IP matters.  Do you see

11  that?

12  A    Yes.

13  Q    And you describe -- you say, "Thank you, Ms. Otto."

14      This is your reply to Ms. Otto's inquiry about the

15  relationship with WhiteWater and these various patents,

16  correct?

17  A    I assume so.  I didn't look at the date that closely, but

18  I am clearly responding to her, so, yes.

19  Q    So, in May of 2015, you write, "WhiteWater has become

20  involved in these cases via an acquisition/licensing agreement

21  with Mr. Lochtefeld, where certain of Mr. Lochtefeld's patents

22  have been purchased outright and are now owned by

23  WhiteWater" -- do you see that?

24  A    Yes.

25  Q    -- "while others are being licensed by WhiteWater with

1    WhiteWater now being in charge of the continued prosecution."

2        Do you see that?

3    A    Yes.

4    Q    So, you were informing Ms. Otto of the fact that

5    Mr. Lochtefeld and Light Wave were no longer the owners of

6    these patents, correct?

7    A    Well, again, I wasn't sure of the exact legal relationship

8    between all these; hence, my language up at the front, "an

9    acquisition/licensing agreement."

10       This was, again, based on my communications with

11   Mr. Taché, that there was arrangement or agreement that the

12   parties had entered into where WhiteWater was now being in

13   charge of their maintenance fees, their continued prosecution.

14           MR. THOMAS:  Your Honor, this is -- I would like to

15   publish to the jury this document.  It is being used for

16   impeachment.  It wasn't on the exhibit list.  It shows the

17   knowledge of the witness being different than what he testified

18   to at the time he did his filings with the PTO.

19           THE COURT:  Any objection?

20           MR. O'HARE:  I object to everything after, "I would

21   like to offer it," but no objection to the exhibit.

22           THE COURT:  All right.  The objection to everything

23   after he would like to offer it as an exhibit is sustained.

24       The objection to the exhibit, if any, is overruled.

25       It will be admitted and shown to the jury.

```
 1            MR. THOMAS:  Let's scroll back to the question that
 2   preceded this so the jury can see the prior email.
 3            THE COURT:  And I guess, before you do that -- I
 4   think I addressed this with Mr. O'Hare early in the trial -- I
 5   am not in favor of speaking objections, nor am I in favor of
 6   speaking offers of exhibits.
 7            MR. THOMAS:  Understood, Your Honor.
 8            THE COURT:  Great.
 9   BY MR. THOMAS:
10   Q    This is the inquiry that came to you from Ms. Silvana
11   Otto; is that correct?
12   A    Yes.  This is where she was asking how WhiteWater was
13   involved because she was seeing, apparently, on her end, that
14   this stuff had Mr. Lochtefeld or some kind of Light Wave
15   ownership.
16   Q    Okay.  And then let's go back to the email we just had
17   previously, which has the response that you wrote up.
18        Dated May 12, 2015, regarding the WhiteWater EU IP
19   matters.  This is several -- well, you filed -- we saw the
20   renewed petition in August of 2015, correct?
21   A    Right.  The petition to renew the February 20 one was
22   filed August 11, I believe was the date.
23   Q    And in fact, you knew from your investigation, which
24   allowed you to report to Ms. Otto, Silvana Otto, that, in fact,
25   Mr. Lochtefeld and Light Wave no longer owned the '589 patent
```

1    prior to your submission in August of 2015 to the U.S. PTO?

2    A    No.  I mean, I knew, essentially, what is being written

3    here, that there was some agreement with WhiteWater, some

4    patents were owned by WhiteWater, but others were being

5    licensed or some arrangement, some agreement, where WhiteWater

6    was now in charge of their continued prosecution.

7    Q    We looked at the power of attorney, and it showed the

8    assignee of the '589 patent to be Light Wave, remember?

9    A    Correct.  That is what was recorded with the patent office

10   on March 30, I think that date was, yes.

11   Q    You knew on May 12, 2015 that was not a true statement,

12   correct?

13       They were no longer the assignee?  Mr. Lochtefeld and

14   Light Wave no longer had any interest in the '589 patent; isn't

15   that correct?

16   A    No.  Again, I didn't know that because, first, this email

17   regards the foreign, European patents, not the '589.

18       But then, secondly, I knew, essentially, what is written

19   here; that WhiteWater isn't necessarily the owner of these

20   patents, but there was some agreement where WhiteWater was in

21   charge of their continued prosecution.

22   Q    Well, your firm had in its possession the licensing

23   agreements and the assignment agreements as it related to the

24   '589 patent as of this date; isn't that correct?

25   A    I mean, I don't know what the firm had.  I don't know.

1   Q    Okay.  And then the last sentence on your email says,

2   "Please, let me know whether additional details or information

3   is necessary and/or what documents you would need as we are

4   working with Mr. Lochtefeld to execute all the power of

5   attorney documents for these matters."  Do you see that?

6   A    Yes.

7   Q    You were working in May of 2015, as it relates to the

8   WhiteWater EU IP matters, to have a changed power of attorney

9   to WhiteWater for those patents; isn't that correct?

10  A    Right.  We had originally reached out -- if you can scroll

11  up, or just remember from the original email, that we had

12  reached out to get a status on this big block of foreign

13  patents that were part of this arrangement between WhiteWater

14  and Mr. Lochtefeld.

15       And since we were in communication with Lochtefeld, either

16  through his counsel or himself, we asked about the status of

17  these.  And then to the extent something else was needed for

18  these foreign IP matters, to let us know, and then we could

19  work with Mr. Lochtefeld or whatever entity was the proper one

20  per the EU records in order to get the proper documents on

21  file.

22  Q    Let's turn now to OF, page 9.  This is part of the same

23  email string between Ms. Silvana Otto, the German patent

24  lawyer, and yourself.

25       This one is dated Freitag, Friday, May 15, 2015, at the

1    top.

2         There were patents that had lapsed over in Germany; is

3    that correct?

4    A    Yes, that's my understanding.  I am not sure of the

5    particular numbers, but yes, there were some, like the '589,

6    where the maintenance fee -- it is called "annuity fee" for

7    foreign patents -- had not been paid, similarly, on time.

8    Q    So, there were a series of patents that were originally

9    part of this Light Wave/Lochtefeld group that WhiteWater then

10   had responsibility for, that had lapsed in Europe as well; is

11   that right?

12   A    That's my understanding.  Yes.

13   Q    If you look at the next page, there's a listing of fees

14   and surcharges, et cetera.  Do you see that?

15   A    I see the list, yes.

16   Q    You understood that list to be by country and how much was

17   owed or not paid; isn't that correct?

18   A    I mean, I see the columns.  It says "official fee" and

19   then the, "Fee for our annuity payment service."  That is

20   likely the law firm's fee.  And stating a due date for -- I

21   guess that's probably the -- the deadline, in the last column.

22   Q    This currency is in euros, correct?

23   A    Yes.

24   Q    Let's turn to page 11.  Okay.

25        This is an email you prepared.  "Dienstag," I am trying to

1  recall if that is Tuesday or Thursday.  I can't remember.

2  7 July 2015.  Do you recall that email?

3  A    Not particularly, but I see it is an email from me at my

4  email address at GT to, I believe -- I keep saying "Dear Otto,"

5  but that is probably the person's last name.

6  Q    Yes.  It is Silvana.

7  A    Silvana.  Yes.

8  Q    You are directing Ms. Otto to direct reestablishment of

9  rights in Germany for this case.  Do you see that?

10  A    I see that.  Yes.

11  Q    This was going on parallel with the U.S. PTO as it related

12  to the '589 patent, correct?

13  A    Yes.  We filed the petition in the U.S. case, if you

14  remember, on February 20th.  So, at this point, we were waiting

15  on the U.S. patent office to act on the petition for the '589

16  patent.  But then we were aware of other foreign patents,

17  unrelated to the '589, in foreign countries that, similarly,

18  the maintenance fee had been missed.

19  Q    And in conjunction with this, you worked on and prepared a

20  statutory declaration from Tim Kwasnicki?

21  A    No.  I am aware that Tim signed one, but I believe that

22  was prepared either by this law firm or a different law firm.

23  Q    But you would have reviewed it, would you not?

24  A    No, not necessarily.  Again, foreign rights, as a U.S.

25  firm and as a U.S. attorney, I can't act in foreign countries.

```
 1    So we rely on foreign associates, like Mr. or Ms. Otto, to
 2    handle that prosecution.
 3    Q    Let's turn to OF-13, 13.  This is at the very top.
 4         It says "Statutory Declaration."  You testified you are
 5    aware Mr. Kwasnicki submitted a declaration to the German PTO
 6    to revive patents over there, correct?
 7    A    I am aware of it, yes.  Certainly now that there was a
 8    statutory declaration that was signed and prepared for Tim
 9    Kwasnicki, though we didn't have involvement in that.  That,
10    again, is a foreign patent office reinstatement.
11    Q    Okay.  And you received a copy of this, did you not?
12    A    I am honestly not sure.  I don't remember receiving a
13    copy.  It is not necessarily expected that we would, because,
14    again, as a U.S. firm, we can't file in foreign countries, so
15    it is most likely that this would have been sent to
16    Mr. Kwasnicki for his signature at WhiteWater.
17    Q    Okay.  Well, it would -- you were dealing with
18    Mr. Kwasnicki in this same time frame; were you not?
19    A    I am not sure exactly what you mean by "dealing with
20    Mr. Kwasnicki."  I am certainly aware of who he is, and I know
21    that Mr. Taché had discussed with him, back in February, the
22    '589 patent's reinstatement.
23    Q    Let's look at paragraph three, that Mr. Kwasnicki
24    submitted.  It went to the same law firm that you were dealing
25    with in Germany, correct, for filing?
```

1   A    I am not sure -- if you could scroll up -- if it has the

2   information on there.  I am not sure.

3   Q    At the very top, top of the declaration page.  Right

4   there.

5   A    Yeah, I guess I can't tell from this which law firm was

6   responsible.  I just don't know.

7   Q    In any case, this paragraph three says, "I note that on or

8   about January 31, 2014, an agreement between the patentee of

9   record of the patent, Light Wave Ltd., and WhiteWater,

10   transferred beneficial ownership of the patent to WhiteWater."

11   Do you see that?

12   A    I see that, yes.

13   Q    And then, if we could scroll down further.

14       In paragraph five at the top, is the reference, to your

15   knowledge, anyway -- supports your knowledge of this agreement

16   where WhiteWater was supposed to maintain the maintenance fees,

17   correct?

18   A    I am sorry.  Are you talking about five?

19   Q    Yes.  Number five.

20   A    Sorry.  Let me read it.

21       Right.  Tim is signing here that WhiteWater would become

22   responsible for maintaining the intellectual property of this

23   foreign patent.

24   Q    Well, that was all done at the same time; that transfer of

25   ownership and transfer of obligation of maintenance fees was

1  all given to WhiteWater simultaneously with the domestic and

2  the foreign patents, wasn't it?

3  A    I am not totally sure.  I believe that's right.

4       Again, there, I believe, were a couple of agreements that

5  moved these patents over.  But I believe there was a large list

6  that included the '589 patent in addition to a bunch of foreign

7  applications.  And WhiteWater was taking over the maintenance

8  fee obligations on all of them.

9  Q    You recall Mr. Kwasnicki had responsibility for paying the

10 maintenance fees to the U.S. Patent and Trademark Office for

11 the '589 patent?

12 A    I am not sure if I fully understand the question.

13      Tim Kwasnicki was an employee at WhiteWater, and

14 WhiteWater was in charge of tracking and paying the maintenance

15 fees.  I doubt that Tim himself would have gone on to make the

16 payment, but it was certainly Whitewater's decision to pay a

17 maintenance fee or not.

18 Q    Going back to your renewed petition and your original

19 petition, based on the record of ownership at the U.S. PTO in

20 the statement of Light Wave Ltd., the U.S. PTO revived the

21 patent on behalf of Light Wave Ltd.  Do you agree with that?

22 A    No.  I mean, again, the 37 CFR 1.378 gives the

23 requirements for reinstating a patent that has been missed due

24 to a lack of a maintenance fee payment.  And those requirements

25 are you have to pay the missed fee, you have to pay the

1    petition fee, and you have to certify that it was

2    unintentional.

3         The patent office does not require or care -- indeed, it

4    is another code section, 1.366.  Maintenance fees can be paid

5    by anybody.  You don't need to give authorization at all to pay

6    a maintenance fee on a patent.  You don't have to be the patent

7    owner or patent holder or anything, because maintenance fees

8    are a revenue source for the patent office.  The examination

9    process for the patent has already ended, and now it is just a

10   revenue source.

11        So the patent office did not reinstate the '589 patent on

12   behalf of Light Wave or any other entity.  They simply

13   reinstated the patent because the maintenance fee had been

14   missed accidentally.

15   Q    Well, a petition to revive or reinstate a patent can only

16   be submitted on behalf of the owner or the assignee of the

17   patent; do you agree with that?

18   A    No, that's not correct.

19   Q    And the payments of maintenance fees can be made by

20   anyone, but they must be made on behalf of the owner or the

21   assignee of the patent, correct?

22   A    No.  The petition to reinstate can be on behalf of anyone,

23   as long as you are asking the proper party that they didn't

24   deliberately miss the fee payment.

25   Q    Okay.  Now, let's turn to Exhibit GR, quickly, if we

1    could.

2        This is an email dated Thursday, February 27, 2014, from a

3    Christa Perez.  Do you see this?

4    A    I do, yes.

5    Q    And Ms. Perez is informing you, "Attached are the prior

6    executed but unrecorded assignments for the Wave Loch patents."

7    Do you see that?

8    A    The first sentence?

9        Yes.

10   Q    And she is asking you to confirm these assignments are

11   acceptable for the purpose of satisfying Wave Loch's

12   obligations under the contribution agreement.  Do you see that?

13   A    Yes.

14   Q    And you in fact did that, did you not?

15   A    No.

16       Dan Donahue had originally reached out to get me

17   involved -- again, this is back February 2014, so this is a

18   year before the reinstatement efforts of the '589.

19       But no, I had gotten too busy, and Dan reassigned the

20   work.

21   Q    You were asked in 2014, a year before you submitted

22   anything to the PTO in relation to the '589 patent, to review

23   this contribution agreement, correct?

24   A    Yes.  Correct.  Christa Perez did do that.

25   Q    And it is your testimony you didn't do that?

1   A    No, did not.

2   Q    And you had no knowledge of what was in there?

3   A    No.  I did not look at them in detail.  I got tied up at

4   that time of year and Dan reassigned that work.

5   Q    Okay.  And let's turn to Exhibit 36, if we could.

6        This is a sublicense agreement between FlowRider and

7   WhiteWater West.  Do you see that?

8   A    I do.

9   Q    This was January 31 of 2014.  Do you see that?

10  A    I see that language, up at the top.

11       Just going off this, I don't know when it was actually

12  signed or effective, but I see what you are referring to up at

13  the top, yes.

14  Q    On the first "whereas" clause, it says, "Wave Loch

15  company, having its registered office in San Diego, and

16  FlowRider previously entered into that certain contribution

17  agreement, dated January 31, 2014."  Do you see that?

18  A    I do, yes.

19  Q    Those documents were prepared by your law firm; isn't that

20  correct?

21  A    I am not sure who had involvement in those.  It could have

22  been Dan Donahue at the law firm.  It could have been someone

23  else.  I am not sure.

24  Q    If we could go to sheet 19 of this exhibit.  And you will

25  see there's a reference to a number of these European patents.

1    Do you see that?

2    A    I see a number of patents here, yes.

3    Q    Those were the same patents that you were, in part,

4    dealing with the German counsel?  We looked at those exchanges

5    previously, correct?

6    A    I mean, I don't know.  There's a lot of patent numbers

7    here.  I certainly recognize some numbers, but again, I don't

8    know.  Looks like this is a 27-page agreement.  I am not really

9    sure what this relates to.  I do see some -- like I see the

10   '589 patent listed there.

11   Q    Let's scroll to page 1.  You can see that the '589 patent

12   was part of this --

13   A    I see --

14   Q    -- contribution agreement?  Foreign patents were part of

15   the contribution agreement?

16   A    I see a list of foreign patents as well.  I don't know if

17   it is the contribution agreement or not.

18   Q    Well, we can scroll up, if you would like, to the

19   beginning on this document.

20        Maybe go back up.

21        You will see there's an asterisk, "License rights to the

22   rights acquired under the contribution agreement."  Do you see

23   that?

24   A    Yes.

25   Q    Let's go up further to the top of this exhibit, page 1.

```
 1        And is it your testimony, Mr. Squier, that in August of
 2   2015, you had no knowledge of this intellectual property
 3   sublicense agreement that's in front of you right now?
 4   A    Correct.  The knowledge that I had at the time was, again,
 5   not any specific provisions or agreements.  It was from
 6   discussions with Mr. Taché that there was some agreement or set
 7   of agreements that transferred rights in a number of patents,
 8   particularly the '589, that we were working on in order to
 9   reinstate.
10   Q    All right.  Let's go back, quickly, to Exhibit GR, and I
11   want to call up page 2, if we could have that.
12        And this is an email from Dan Donahue to Christa Perez,
13   copying Mr. Taché and yourself.  Do you see that?
14   A    I do, yes.
15   Q    "Christa" -- this is from Dan.  Now, is Dan senior or
16   junior to you in the Greenberg firm at the time of this email?
17   A    I believe he was a partner at GT, which was senior to me.
18   I had just started at GT around this time.
19   Q    And Christa Perez, she was counsel for Wave Light, or
20   Lochtefeld?
21   A    I don't know exactly.
22   Q    You understood Lochtefeld had separate counsel?
23   A    I knew that we didn't represent Lochtefeld.  I knew that
24   he had counsel, David Osborn, that I was at least familiar with
25   the name, but I don't know exactly the relationship of Christa
```

1    Perez to Mr. Lochtefeld or otherwise.

2    Q    So the question was did you ever represent Mr. Lochtefeld?

3    A    Did we represent Mr. Lochtefeld?

4    Q    Yes.

5    A    No.

6    Q    Did you ever represent Wave Light?

7    A    No.

8    Q    Now, let's go back to this email.  It says, "Erik Squier,

9    one of our IP lawyers" -- that is intellectual property

10   lawyers, attorneys -- do you see that?

11   A    Yes.

12   Q    "He will be handling the review of the WI deliveries of

13   the patent assignments and domain names.  I have given him the

14   CA and asked him to look at those provisions and then reach out

15   to you to discuss.  Please look for his call."

16        Let's unpack this a little bit.

17        The WI deliveries of the patent assignments, you were

18   directed by a partner that you were to be handling those?  Do

19   you see that?

20   A    Correct.  Dan did intend for me to take a look at these

21   provisions in the various contracts.  But, then again, I think

22   as I mentioned, I was busy at the time, so Dan took the work

23   and reassigned it.

24   Q    Okay.  So it is your testimony you were directed by a

25   partner to review this document, and here, on a third sentence

1    says, "I have given him the CA."  That is a reference to the

2    contribution agreement; isn't it, Mr. Squier?

3    A    This is Dan's email, so I am just kind of guessing off of

4    what he wrote.  That would be my guess, but it is not my

5    language, so I don't know --

6    Q    The partner who is supervising you is directing you to

7    review the patent assignments and the domain names, review the

8    contribution agreement, look at those provisions of the

9    contribution agreement, and then reach out to you to discuss.

10        It is your testimony you never did any of this?

11   A    That's true.  Dan had originally intended for me to help

12   them with this sort of contract review, but I was busy at the

13   time and couldn't devote the time to it that was needed, so the

14   work got assigned to someone who had more availability.

15   Q    And had you done the activities directed by the partner in

16   charge of you, Mr. Donahue, you would have learned that

17   Light Wave was not the assignee of the patent in August of

18   2015, correct?

19   A    Well, I mean, I would have looked over the CA and the

20   provisions of it.  I can't speak for sure what I would have

21   learned had I done it.  But, presumably, I would have at least

22   been more familiar with whatever provisions they are asking

23   about.

24   Q    This is February 2014.  This is almost a year before you

25   filed your original application to revive, correct?

```
 1   A    Correct.
 2   Q    And you were directed to review these specific documents
 3   about ownership and licensing, but your testimony is you didn't
 4   do that?  Is that your testimony?
 5   A    Well, I don't see "ownership and licensing."
 6        But yes.  I mean, Dan had reached out, and I was going to
 7   help look at these particular provisions for Ms. Perez, but
 8   then -- then, yes, the work was assigned to someone with more
 9   availability.
10   Q    And you say you don't know about "ownership"; but you know
11   patent assignment is a transfer of ownership, is it not?
12   A    Yes.
13   Q    So he is specifically referring you to the deliveries of
14   the patent assignments?
15   A    Correct.  It says "patent assignments."  I don't know
16   which particular patent assignments or domain names are being
17   referenced.
18   Q    And the only reason you don't know is because your
19   testimony is you never did these directly -- never undertook
20   activities directed in this email; is that your testimony?
21   A    Correct.  The work was assigned to someone with more --
22            MR. THOMAS:  I have no further questions of the
23   witness at this time, Your Honor.
24            THE COURT:  All right.
25
```

```
 1                    CROSS-EXAMINATION
 2  BY MR. O'HARE:
 3  Q    Mr. Squier, if we could leave that exhibit up, please,
 4  Exhibit GR, at page 2.
 5       Incidentally, while we are waiting for that, you and I at
 6  one time were at the same firm?
 7  A    We were.
 8  Q    You left that firm?
 9  A    I did.
10  Q    Okay.  But you never actually worked with me or for me?
11  A    No.
12  Q    And so this is actually the first time we have had what I
13  would call a professional engagement, if you want to call it
14  that, with you in the chair and me asking you questions?
15  A    Yes.
16  Q    So when Mr. Donahue asked you to look at this stuff and
17  you didn't do it, were you being insubordinate?  Were you
18  saying, "I know you want me to do it, Dan; you are a partner;
19  but I am just not going to do it"?
20  A    No.  No.  I told Dan that I had limited availability at
21  the time, and the work was just assigned to somebody else.  I
22  wasn't being insubordinate.
23  Q    Has that ever happened before, where somebody asked you to
24  do some work in one or more of your law firms; you think you
25  can do the work, and then something comes up, and then they
```

1   give it to somebody else?

2   A    Yes.

3   Q    Is there anything remarkable about this exchange in terms

4   of your life?

5   A    No.

6   Q    And to the extent there was some implication or

7   suggestion, are you lying to us about that?  Did you actually

8   really do this work but you don't want to tell us that you did

9   it?

10  A    No.  I did not do this work.

11  Q    Okay.  In terms of your practice, Mr. Squier, are you

12  generally a courtroom lawyer?

13  A    No.  Typically I do patent prosecution, which, in the

14  patent world, "prosecution" just means the examination process,

15  the filing of the application and then trying to get an issued

16  patent off of that application.

17  Q    So when you say "patent prosecution," it is not like

18  prosecuting a criminal.  It is processing, if you will, through

19  the patent office, the application and all the other things you

20  need to do to get a patent issued; is that it?

21  A    That's right.

22  Q    And you did sign and file these two petitions, the

23  original petition on February 20, 2013, [sic] and then the

24  renewed petition?

25  A    Yeah.  The first petition was February 20, 2015, and then

```
 1    the petition to renew that February 20th petition in August,
 2    yes.
 3    Q    So, do you understand that what is going on here is you
 4    are being accused by defendants of intentionally lying to the
 5    Patent and Trademark Office in order to somehow trick them into
 6    accepting your late payment on the fee?
 7    A    I understand that.
 8    Q    And back in 2015, when these events were occurring, did
 9    you have an understanding of the ethical obligations, some of
10    which you have already described in answering questions from
11    Mr. Thomas?
12    A    Yes.  In sitting for both the California bar and then
13    there's a separate bar exam you have to take in order to
14    practice before the patent office, yes, not to lie or be
15    dishonest or try to trick anybody, is just part of your
16    obligations as an attorney.
17    Q    Are you allowed to make mistakes?
18    A    Yes.
19    Q    Did you, then, have an understanding of what the potential
20    consequences could be as a matter of both the patent bar and
21    the state bar of California, if you were to have done what you
22    are accused of, which is intentionally lying to the patent
23    office in order to trick them into accepting a late fee?
24    A    Yes.  I could lose -- lose my license; lose, certainly, my
25    job, yes.
```

1   Q    Have you ever been accused of any ethical violation?

2   A    No.

3   Q    Have you ever been found to have committed any ethical

4   violation as a lawyer?

5   A    No.

6   Q    So this would be the first time?

7   A    Yes.

8   Q    I think you already told us that you first learned that

9   the '589 patent had lapsed or expired -- was it February 4,

10  2015?

11  A    Yeah.  That's when I discovered it, when I went onto the

12  patent office web page database and saw the status.

13  Q    You went on that because of what?

14  A    I had been asked to get familiar with the '589 patent, and

15  it's easiest to get information about an issued patent because

16  the patent office puts all the information in one electronic

17  place, so it's very easy to just sign on and see the patent and

18  various other information about it from there.

19  Q    Was it Mr. Taché who asked you to start to familiarize

20  yourself with the patent?

21  A    Yes.

22  Q    Generally, if you are going to file litigation against

23  somebody involving a patent, is there some degree of effort and

24  analysis that one would go through before you do that?

25  A    Yeah.  It is generally a pretty expensive task to evaluate

1    a patent, evaluate its file history, look at prior art, and

2    make a determination as to whether you have a good case or not.

3    Q    If we could show Exhibit JR, at page 19.  This is an email

4    we have seen.  It went from somebody at the Knobbe firm to

5    Mr. Taché, January 22, 2015, making reference to the expiration

6    of the '589 patent.  Do you see that?

7    A    Yes.

8    Q    And when is the first time you saw this email or even

9    heard of its existence?

10   A    Certainly well after the reinstatement of the patent.

11   This was -- came up at some point during the litigation.

12   Q    So, this is addressed, apparently, to Mr. Taché.  And on

13   this date, what exactly was Mr. Taché doing?

14   A    This was January 22.  Rick Taché was on a family leave of

15   absence.  He was a single parent, taking care of his two young

16   girls, and he was out for seven or eight months, I think.

17   Q    And was this February 4, or thereabouts, when you were

18   asked to looked at the '589 patent and familiarize yourself

19   with it, was that the first time you were involved with

20   anything having possible disputes with Pacific Surf Designs?

21   A    Yes.

22   Q    Let's look at Exhibit GZ.  What did you do in response to

23   what you learned when you went on the website?

24   A    February 4 is when I noticed, on the patent office

25   website, that there had been a missed fee, and I reached out to

1    Rick via email and noted to him that, you know, it appears that

2    this patent had missed a fee.  And Rick responded later that

3    evening and said, "Let's discuss."

4    Q    Is there a second page?  Is this the whole email?  The

5    second page, please?

6    A    You can see my original email there, the 4th.  It says,

7    "Hi, Rick," and the information there is about the noticing of

8    the lapsed patent.

9    Q    Let's enlarge that entire first email, rolling over from

10   the first page to the second page.  I think we are missing half

11   the email here.  There we go.

12        You have an email to Rick about the patent, and it

13   expired, you are not sure which service Tom and Geoff are

14   using.  And "Tom" would be referring to Tom Lochtefeld, or

15   Geoff Chutter?

16   A    Yes.

17   Q    And was your law firm monitoring the status and due dates

18   for statements of maintenance fees on this patent or any other

19   patents?

20   A    No.  Greenberg Traurig had a firm policy that they did not

21   handle tracking of maintenance fees.  We touched on this

22   briefly last week.  A lot of times law firms will not handle

23   that because it doesn't bring in a lot of money.  So no,

24   WhiteWater would handle their own maintenance fee tracking.

25   Q    And we have heard testimony from Mr. Marsh Myrman that he

1   was told what you just said, "We don't monitor fees," and

2   understood that Greenberg Traurig was not going to be

3   monitoring these fees.

4       Do you have any reason to doubt or disbelieve what

5   Mr. Chutter told us on that or what Mr. Myrman told us on that?

6   A    No.  No.  My understanding is the client knew that GT

7   didn't handle their maintenance fee tracking.

8   Q    And your comment at the bottom of your email about which

9   service Tom and Geoff was using, what do you mean, a "service"?

10  A    Right.  So typically, since Greenberg and other firms

11  don't handle maintenance fee tracking, there are other

12  companies that will track maintenance fees for you.  And

13  WhiteWater and other companies will typically use them to help

14  them keep track of when something is due.

15  Q    I believe Exhibit OF, the packet of material concerning

16  some German patents -- do you recall, at least in court, seeing

17  a portion of that signed statement or declaration by

18  Mr. Kwasnicki where he talks about WhiteWater using a firm

19  called CPA Global?

20  A    Yeah.  CPA Global is -- I am not sure if they are the

21  biggest or not, but they are certainly very well known.  They

22  are a service that handles maintenance fee tracking.

23  Q    Do you recall the portion of that exhibit, at page 14,

24  where he is saying at least that German patent was

25  unintentionally never transferred after WhiteWater took over

1   responsibility; it was never transferred to CPA to keep an eye

2   on it?

3   A    Right.  So, essentially how a service like CPA works is

4   you tell them what patents you are in charge or to be tracking.

5   And then they put it on their list, and they will track the

6   fees.

7        And my understanding from just reading that brief excerpt

8   on the Kwasnicki declaration is that it just never made it over

9   onto CPA's list, so CPA wasn't helping them with the tracking

10  on it.

11  Q    Although that, I know, involved the German patent, is that

12  consistent with the explanations you have heard about what

13  happened on the '589?

14  A    Yes.

15  Q    If we could look at the entire first page of Exhibit GQ,

16  please -- I am sorry -- GZ.

17       At the top of your email, of February 4, Mr. Taché

18  responds, "Let's discuss tomorrow."  Did you discuss what would

19  have then been tomorrow, which would be February 4?

20  A    We did.

21  Q    Was that in person or not?

22  A    No, we spoke on the phone.  Again, since Rick was out on

23  his family leave, we spoke on the phone.

24  Q    In the course of that call, did you and Mr. Taché come up

25  with some sort of plan of action as to what was going to be

1   done?

2   A    Right.  Well, we had to let WhiteWater know that the

3   patent had lapsed.  Rick was the relationship attorney for the

4   client and who had been dealing with the client for many, many

5   years.  He would be the best person to reach out and let them

6   know what the situation was and determine what they wanted to

7   do.

8   Q    So you left it that he was the one to do that?

9   A    Yeah.  He would have been in the best position to get the

10  right information.

11  Q    From the time you first discovered this patent had expired

12  or lapsed, when you discovered it on February 4, 2015, how long

13  did it take you to get a petition on file to ask for permission

14  to pay the fee late?

15  A    So, we filed the petition on February 20th, so that's 16

16  days.

17  Q    And what was happening in that 16 days?

18  A    I was out sick for about a week; but mainly it was getting

19  the information from the client, because in order to file the

20  petition, again, we had to make a statement that it was

21  unintentional, so we needed to be looking into that and for the

22  client to get back to us and tell us what really happened.

23  Q    And who was contacting the people at WhiteWater?

24  A    Mr. Taché.

25  Q    And were you informed as to who he contacted?

1    A    Yes.  I don't necessarily know the full extent, but I

2    certainly know at least who he talked to.  He talked to

3    Mr. Myrman, as the head of FlowRider.  He talked to Tim

4    Kwasnicki.  And then he talked to Mike Adam (phonetic).

5    Q    Before -- you signed both of the petitions and certified

6    the information was correct, right?

7    A    Yes.

8    Q    Before you did that, did you determine what you needed to

9    do in order to give those certifications?

10   A    Yes.

11   Q    So, let me start with -- so did you determine who it is --

12   meaning who had to be spoken to in order to figure out if this

13   failure to pay the fee was unintentional?

14   A    Yes.  I know I mentioned it a couple of times, but the

15   MPEP, which is the Manual Patent Examining Procedure, is the

16   manual for how to do various proceedings before the patent

17   office.  And there's a section, 2590, which references a number

18   of CFR sections.

19   Q    CFR -- I hate to interrupt -- is Code of Federal

20   Regulations?

21   A    Code of Federal Regulations, which is the list of codes

22   that federal agencies operate under and are published.

23        It states in the MPEP section that you reach out to the

24   party who had the obligation to pay the fee, whether that be an

25   assignee or licensee or any other arrangement.  That is the

1    party that you have to ask since it was their decision or lack

2    of decision as to whether to pay a maintenance fee or not.

3    Q    So that's something -- that is not something you just made

4    up yourself?

5    A    No.  It is written in the MPEP.

6    Q    And likewise, did you determine what would be an

7    appropriate manner for you to gain this information?

8    A    Yes.  So there's another code section, MPEP 410, which

9    states when you are doing an inquiry, how you can gather the

10   information in order to make a representation to the patent

11   office.  And I mean, essentially, what it says is you can get

12   information from the client directly; you can get information

13   from, really, any third party, and that's fine to make a

14   representation to the patent office as long as you don't have

15   knowledge of anything to the contrary.

16   Q    And so, based on that, did you make a determination at the

17   time that it was appropriate or not appropriate for you to get

18   information by having Mr. Taché talk to the client, find out

19   whatever information he could as to why they missed the

20   payment, and convey it back to you?

21   A    Yes.  It was appropriate.  Indeed, it's written right in

22   the rules.

23   Q    Is there anything in those rules that suggests you can't

24   do that or it is not proper to do that?

25   A    No.

1    Q    And, in fact, are you telling us there's actual stuff you

2    have in the rules that says, "Yeah, that's the way you do it"?

3    A    Yes.  The rules actually say that is how you do it.

4    Q    I think you said as long as you don't know it's untrue

5    from some other basis?

6    A    Right.  You can rely on information you are told, but --

7    so long as you don't know of anything to the contrary, then you

8    can represent that to the patent office.

9    Q    After Mr. Taché talked to the folks he talked to at

10   WhiteWater, did he report back to you what he had learned from

11   them?

12   A    Yes.

13   Q    And based on what he reported, were you satisfied that it

14   was appropriate for you to sign this certification?

15   A    Yes.  The missed fee was on accident.

16   Q    And then based on -- if we could show Exhibit HB.

17       Did you assist in doing an initial draft of an email?  We

18   have seen this.  You wrote it to Rick Taché.  It was a draft of

19   an email he could send to Tim at WhiteWater?

20   A    Yes.

21   Q    And in here, of course, it says, "We are not handling

22   maintenance fees."  It says you came across a problem or

23   expiration.  You say in here, in the third line, in your draft,

24   "It appears to have inadvertently expired last month."  Do you

25   see that, in the third line?

1    A    I do, yes.  "Inadvertently expired," yes.

2    Q    And what prompted you at that time, in drafting the email,

3    to indicate that it appeared to you that it inadvertently

4    expired?

5    A    Just based on my past experience working with WhiteWater,

6    I knew that the '589 patent was an important patent to them,

7    and indeed I had just been asked to get familiar with it.

8    Q    And then, if we could look at Exhibit 465, at page 2,

9    there's some emails that were between the client and Mr. Taché.

10   Here is the one -- if you could enlarge the entire email,

11   please.

12        And I take it this is the somewhat revised version of the

13   draft email that you had sent to Mr. Taché that he then sent to

14   the folks at WhiteWater?

15   A    Yeah, I believe so.  It is from Rick to Tim at WhiteWater,

16   yes.

17   Q    And then if we could go to the Exhibit 466, page 1.  If we

18   could enlarge the top.  Start at the bottom because of the way

19   this thing scrolls through.

20        So, there's an email from Mr. Myrman to Mr. Taché and, I

21   guess, Tim, finding out, "Are there other renewals that are

22   slipping?"

23   A    Correct.  Yes.

24   Q    And if we scroll to the -- we saw this German --

25   evidently, there was at least a German one that slipped, right?

1  A    Yes.

2  Q    And Mr. Kwasnicki is saying, truthfully, there may be

3  others slipping.

4       And -- now, you are not a party to these emails, but are

5  these emails consistent with what you were aware of then and

6  have since learned in terms of what was going on with their

7  renewals or payment of maintenance fees in this time frame?

8  A    Yes.  My discussions with Rick and subsequently seeing

9  these in litigation and heard from talking with Rick leading up

10 to the petition, yeah.  The missed fees had slipped.  They were

11 accidentally missed.

12 Q    If we could look at Exhibit GQ, I think that's the

13 petition you filed, the initial one, and if we could go to the

14 next page of it, and the next page.  Let's enlarge this.

15      Is this the first time you had filed one of these

16 petitions?

17 A    It is, yes.

18 Q    Is part of what you were doing in the 16 days figuring out

19 how to do this?

20 A    Right.  Before we could put this petition or payment

21 information together, I had to look up the various code

22 sections and figure out what we had to do, what was needed to

23 order to potentially reinstate.

24 Q    Now, on this form, at the bottom, you are identifying

25 yourself, "I certify in accordance with 37 CFR 1.4(d)(4) that I

1  am an attorney or agent registered to practice."

2      Now, nowhere in that form does it say on whose behalf you

3  are actually submitting this.  Am I missing something?

4  A    No, that's correct.  This is the form that the patent

5  office -- this is a form created by the patent office for the

6  purposes of petitioning to have these late maintenance fees

7  paid.  And again, it is not one of the requirements, not one of

8  the concerns that the patent office has in reinstating a patent

9  for lack of the fee payment, again, because the maintenance fee

10 can be paid by anyone.

11 Q    Who can file one of these petitions?  Do you have to be

12 the owner of the patent, assignee of the patent, power of

13 attorney of the patentee?

14 A    No, you don't need to be anything in particular as long as

15 you select the right box at the bottom so there is no mismatch.

16 Anyone can file one as long as you are asking the proper party

17 whether it was intentional or not.

18 Q    Theoretically, if anybody in this room asked a lawyer

19 registered before the patent board to file this thing, would

20 that have been proper?

21 A    Yes.

22 Q    But, I take it, based on your understanding at the time,

23 and I guess now, if they were to do that, who would they have

24 to talk to to find out why the fee was missed?

25 A    They would have to talk to WhiteWater, because WhiteWater

1   had the obligation or responsibility to pay the fee.  So,

2   again, it is their unintentional miss that is important to

3   ascertain so that you can properly certify.

4   Q    If we could go to Exhibit 47, the bottom of page 9, top of

5   page 10, section 4.4.

6        This is from the, I believe the -- one of the license

7   agreements that was assigned at the same time as the

8   contribution agreement, when Tom Lochtefeld's companies were

9   licensing and selling various patents and other property to

10  WhiteWater.

11       Are you generally aware how that transaction occurred?

12  A    Yes.  As part of the litigation, I have seen in more

13  detail some of the other agreements that Mr. Taché had referred

14  me to on the phone, giving WhiteWater the responsibility to pay

15  the maintenance fees and to track them.

16       And I have seen this provision subsequently now, and it is

17  in line with those original communications.

18  Q    So, I believe you testified that, back in early 2015, you

19  were told that there was some arrangement under which

20  WhiteWater was responsible for paying maintenance fees?

21  A    Correct.

22  Q    And then now looking at this section, 4.4, you looked at

23  this after you had filed those petitions?

24  A    Correct.  I saw that in particular during the litigation.

25  Q    So, based on what you have since seen, is the information

1    that Mr. Taché gave you at the time consistent with what you

2    have learned by actually looking at the contract?

3    A    Yes.

4    Q    If we could go to Exhibit HA.  Let's enlarge the entire

5    string of emails, please.

6         This is your February 19 email to your assistant, Holly,

7    asking what is the status on the '589 petition, correct, to get

8    the fee paid?

9    A    Yes.

10   Q    And then, evidently, Holly is saying there's some power of

11   attorney that she is waiting on.  And just so we are clear, is

12   the power of attorney that she sent to David Osborn, one of

13   Lochtefeld's lawyers, on February 17, did that have anything to

14   do with the '589 patent?

15   A    No, it did not.

16        You may or may not remember, the power of attorney form

17   that we have been discussing kind of at length with this trial

18   was, I believe, sent to Tom or David sometime in mid to late

19   March.  So, no, this was some other patent matter that Holly

20   was referring to.

21   Q    If we could look at Exhibit BG, and if we could go --

22   scroll down to the signature line.

23        That's the wrong one.  My apologies.  Let me find my

24   notes.  I am trying to find the power of attorney form.  Try BG

25   again but page 9.  There it is.  Okay.

1      You filed the petition to get the late payment fee on

2 February 20, 2015?

3 A    Yes.

4 Q    And I recall there were multiple times you were being

5 asked, "Did you need to file this power of attorney form for

6 Light Wave in order to renew the petition to get the late

7 payment fee," and the answer to that question clearly is what?

8 A    No.  The petition was filed on February 20th, not on the

9 basis of any power of attorney.  We didn't need one.  This was,

10 again, all done a month later as part of the best practices and

11 had the effect of updating the correspondence address, but was

12 not related to the petition.

13 Q    What was the effect of filing this form?

14 A    On the POA form, you can check a box that updates the

15 correspondence address for the patent office where they will

16 send to the correspondence address any information about the

17 patent application.

18      So the effect this had was it updated where the

19 correspondence would be sent.

20 Q    As of this date on the PTO's website, was Light Wave shown

21 as the owner?

22 A    Yes.

23 Q    At the time this was filed, were you aware that there had

24 been some additional assignments?

25 A    No.

```
 1   Q    At the time you filed this, were you trying to trick the
 2   patent office into thinking there had not been any other
 3   assignments?
 4   A    No.
 5   Q    Can you think of any reason why filing this power of
 6   attorney would have had any bearing at all on what the patent
 7   office was going to do about accepting a late fee?
 8   A    No.  That wouldn't have any impact.
 9        I believe we have talked about it a little bit earlier,
10   when we saw the grant of the petition, the patent office stated
11   that power of attorney doesn't have anything to do with it.
12   Q    Let's go to Exhibit GU, page 2.
13            THE COURT:  Mr. O'Hare, how much longer do you have?
14            MR. O'HARE:  I am going to say about 15 minutes.
15            THE COURT:  Let's take a break, then.
16        Ladies and gentlemen, come back at five minutes after
17   11:00.  Please remember my admonition.
18        Sir, you may step down.  Thank you.
19        (Recess taken from 10:51 a.m. to 11:08 a.m.)
20            THE COURT:  Mr. Squier, you are on the witness stand,
21   again.
22        Please get the jury.
23            MR. O'HARE:  Your Honor, before we bring the jury in,
24   it's been brought to my intention at least one of the
25   defendants has engaged in conversation with one or more jurors.
```

1    I am not talking "hello" and "good morning," but actual

2    conversation.  I don't know the subject.

3        And so what I would invite the Court to do -- and I know

4    the Court has mentioned this in its preinstructions -- is to

5    remind both the jury and the parties that there should be no

6    communication between the jurors, the parties, counsel, or

7    witnesses beyond the courtesy of a "good morning" or a "good

8    afternoon."

9              THE COURT:  All right.  I will do that.

10             MR. O'HARE:  Thank you.

11             THE COURT:  If you don't mind, I will do it when we

12   break for lunch.  If I forget, remind me.

13             MR. O'HARE:  Okay.  Thank you, Your Honor.

14             THE COURT:  All right.  Go get the jury, please.

15        (The following proceedings were held in open court in the

16   presence of the jury:)

17             THE COURT:  Welcome back.

18             MR. O'HARE:  Your Honor, if I may, there actually are

19   two exhibits that are on the exhibit list that both sides have

20   referenced in the examination of the witness but did not make

21   their way on the separate list we already submitted of admitted

22   exhibits.

23        And so, with that, I would like to move the admission of

24   Exhibit GQ, and Exhibit GU.

25             THE COURT:  All right.

1          MR. THOMAS:  No objection, Your Honor.

2      And I think, just to correct something in the record for

3  us, we -- I mentioned previously Exhibit OE and OF both, and we

4  move they formally be admitted.

5          THE COURT:  All right.  They will all be admitted.

6  Thank you.

7          MR. O'HARE:  May I, Your Honor?

8          THE COURT:  Sure.

9          MR. O'HARE:  Thank you.

10 BY MR. O'HARE:

11 Q    If we could now show Exhibit GU, which I just got

12 admitted, and go to page 2, I believe this is the -- what you

13 described as the dismissal of the petition.  And the first line

14 of it -- well, let's get the date straight, August 2, 2000.  So

15 this is the response you got from the patent office to the

16 petition you filed in -- on February 20, 2015?

17 A    So, just to be clear, the August 2, 2000 -- that's the

18 filing date of the patent.

19 Q    Sorry.

20 A    I believe this dismissal to the February 20 petition was

21 August 5th, I think, of 2015.

22 Q    Let's take a look at -- see if there's a date on this

23 document, Gary.

24      It's sent -- okay.  On the first page, notification date

25 is August 5, 2015, so you got that right.

1    Go back to page 2 and get rid of my artwork.

2    Then it says it is a decision on the renewed petition --

3    and actually, this was not a decision on the renewed petition,

4    was it?

5    A    Correct.  The renewed petition of August 11 had not been

6    filed yet.  This was in response, as it says, to the petition

7    filed on February 20.

8    Q    That's just a mistake?

9    A    Yeah.  The patent office just made a mistake.  It should

10   say "petition," not "renewed petition."

11   Q    In the body of it, the -- this paragraph here, they

12   basically say the petition to accept the delayed payment has to

13   be accompanied with the statement the delay was unintentional

14   and then these payments.

15    And then, in the next paragraph, they are telling us -- I

16   will do my own artwork here -- you didn't have authority to

17   charge the fees on your law firm's account, so the patent

18   office didn't get the money.

19   A    Correct.  So if you look at the paragraph there that has

20   some of the highlighting, it lists three things.  Two and three

21   are the fees.  And the last sentence says this petition lacks

22   items and two and three above, so the maintenance fee and the

23   petition fee.  And this circled paragraph, the last sentence is

24   really what the issue was.  It says, "Mr. Squier does not have

25   authority to have the fees charged to the deposit account on

1  file."

2      Just as a reminder, the deposit account is like a checking

3  account.  You have to be an authorized user for it.  Otherwise

4  the patent office won't act on it telling them to take the

5  money, so I had to get my name associated with the deposit

6  account.

7  Q    If we could scroll down some more.

8      It says, "It is not apparent whether the statement was

9  signed by a person who was in a position to know the entire

10  delay was unintentional."

11     And I take it, again, when you filed the petition, you

12  didn't identify on whose behalf you were filing it?

13  A    Correct.  So this paragraph here is the same one that we

14  saw later on in the grant.  It is just stating the next

15  sentence here, the statement of unintentionality is accepted;

16  but then it gives, "However, in the event that petitioner has

17  no knowledge that was unintentional, or if the petitioner

18  discovers that the delay was actually intentional or

19  deliberate," then I would have had to let the patent office

20  know.

21  Q    So, I take it from this, is it evident that the patent

22  office, looking at that petition where you checked the box

23  saying, "I am filing as a lawyer or somebody licensed to

24  practice before the patent bar," that they didn't know who you

25  were filing it on behalf of?

1    A     That's correct.

2    Q     And they didn't have a problem with that?

3    A     No.  No.  It is not something the patent office is

4    concerned with.  Indeed, that February 20 petition is the form

5    provided by the patent office for petitioning for the late

6    payment, and there's nothing on there where you have to

7    indicate who you are filing on behalf of because it doesn't

8    matter.

9    Q     Okay.  And they go on to say that form is accepted as a

10   certification of unintentional delay, but if you don't have any

11   knowledge, you have to make an inquiry; and if you discover the

12   delay was intentional, you have to inform the patent office?

13   A     Correct.

14   Q     What, if anything, did you do in response to this language

15   in this denial or dismissal?

16   A     There was nothing -- I didn't do anything additional in

17   response to that language.

18   Q     Why not?

19   A     Because I had already done an investigation before filing

20   the initial petition, and it was unintentional.

21   Q     And to this day, have you discovered any facts to suggest

22   that it was intentional?

23   A     No.

24   Q     So, after you got this notice or this dismissal, what did

25   you do to try to fix the problem?

 1   A    Yeah, I called the patent office.  You can call the office

 2   of petitions.  And I asked what -- what is the issue, and how

 3   do you proceed to rectify it?

 4            MR. O'HARE:  And so if we could display Exhibit GT,

 5   at page 5.

 6       And I believe this has also been displayed, but we

 7   neglected to move it into evidence, so we would move admission

 8   of Exhibit GT.

 9            MR. THOMAS:  No objection, Your Honor.

10            THE COURT:  All right.  It will be admitted.

11   BY MR. O'HARE:

12   Q    This is page 5 of the renewed petition that you signed on

13   August 11, I guess, less than a week after you got the

14   dismissal --

15   A    Correct.

16   Q    -- to get the fee paid --

17   A    Correct.

18   Q    -- and correct the mistake from the first one?

19   A    Correct.

20   Q    And at the top, it says registrant, Thomas Lochtefeld.

21   And was that a mistake?

22   A    Yes.  "Registrant" is not a term that is associated with

23   patents.  That's actually a trademark term, which -- trademarks

24   are like slogans or logos.  Patents use the term "inventor," so

25   you invent an invention.  "Inventor, Tom Lochtefeld."

1    Trademarks, you don't invent a trademark; you register it with

2    the patent office.  So "registrant" is a term for the patent

3    side.

4    Q    So, evidently, you or your assistant started off with a

5    form that's used to be filed with the trademark people?

6    A    Right.  Greenberg Traurig, the law firm, has a respository

7    of forms that you can sort of use as templates, and a trademark

8    form was pulled for kind of the official fill-out of

9    information, and I just didn't catch it.

10   Q    And then the first line says, "On February 20, 2015,

11   registrant," this trademark term, "applied or petitioned for

12   revival."  Is that literally correct?

13   A    No.  That's not correct, again.  That was sort of holdover

14   language from the trademark form.  "Registrant" should not have

15   been used.  And WhiteWater had petitioned.

16   Q    In fact, when we looked at the original petition that was

17   filed, was there anything on that petition that said that you

18   were filing it for a registrant named Thomas Lochtefeld?

19   A    No.

20   Q    Using this "registrant" trademark term, were you trying

21   put one over on the patent office?

22   A    No.  Again, who the petition is filed on behalf of does

23   not matter for the purposes of granting the petition.  I just

24   missed it when I was reviewing the form.

25   Q    And I take it this is somewhat inconsistent with that

1    power of attorney that was signed that would get you or your

2    law firm notices that would otherwise be directed to

3    Light Wave, correct?

4    A    Correct.

5    Q    So if you were trying to trick the patent office to who

6    you were applying on this for, would it make any sense to file

7    two inconsistent documents, one a power of attorney for

8    Light Wave and another one for registrant Thomas Lochtefeld?

9    A    No.  Again, the point of this August 11 petition was just

10   to renew the original February 20 petition, with the corrected

11   fee information, and I just missed the use of the trademark

12   language in there.

13   Q    If we could go to Exhibit GV, which is in evidence, and

14   this is the decision granting it.

15        And then in the second paragraph, it says there's no

16   indication that the person signing the instrument, this

17   petition, was ever given a power of attorney.

18        So we have seen that power of attorney that was filed in

19   March for Light Wave, correct?

20   A    Correct.

21   Q    Evidently, whoever in the patent office was doing the

22   decision on the petition to let you make the late payment

23   wasn't even aware that you had ever gotten the power of

24   attorney to prosecute the '589?

25             MR. THOMAS:  Object.  Calls for speculation.

1          THE COURT:  Sustained.

2    BY MR. O'HARE:

3    Q    So, in any event, this is what they told you when they

4    granted it, that there was no indication that the person

5    signing the petition -- that is you -- was ever given a power

6    of attorney?

7    A    Correct.

8    Q    If we could go to the rest of the text here in that same

9    document.  And then there's similar language about the

10   statement of unintentional delay, if we could enlarge the third

11   paragraph.

12       Here, again, they are telling you they can't tell from

13   what you have submitted whether it was signed by somebody who

14   was in a position to know whether the delay was unintentional?

15   A    Yeah, the patent office is stating -- this is form

16   language that they were in accordance with some of the Code of

17   Federal Regulations, the statement is accepted.  But, if no

18   investigation had been done, or if it was actually intentional,

19   then you just have to let the patent office know.

20   Q    Okay.  We can take that down, Gary.

21       So we have just gone through a couple of mistakes.  With

22   respect to this renewed petition, and when did you first

23   realize that those mistakes -- meaning using the word

24   "registrant," and other language along those lines -- had been

25   made?

1    A    During litigation.

2    Q    And when was that, approximately, that you first learned

3    about that?

4    A    I believe it was sometime in 2016 or 2017.  Certainly at

5    least a year after the petition had been filed.

6    Q    And when you learned about that and that it was being

7    raised in connection with this case, what was your reaction?

8    A    I mean, I guess embarrassment, initially.  I -- the fact

9    was this really was a missed fee, on accident, and I felt

10   terrible that I had done -- or any mistakes that I made in the

11   petition could be used to hurt WhiteWater or make it seem like

12   they had actually made a deliberate decision to not pay this,

13   because it just was not true.

14   Q    How much time have you spent reflecting on this since you

15   first learned of it?

16   A    I probably think of it every week or so.  It is -- it's

17   difficult.

18   Q    And do you still stand by your certification that the

19   delay was unintentional?

20   A    Yes.

21   Q    And if somebody was trying to, in connection with these

22   petitions that you filed, you signed, was trying to trick the

23   patent office, are you satisfied that you were situated that if

24   there was some scheme like that, you would have known about it?

25   A    Yes.  There was no scheme.  I would have known if I was,

1   you know, being tricked or something like that.

2   Q    Now, it's been suggested that what was really going on

3   was, in the February 2015 time frame, WhiteWater was thinking

4   about filing a lawsuit on the '589, and so the reason they held

5   off on paying the $7,400 fee was to figure out if they were

6   going to file a lawsuit before they paid the $7,400.

7        Have you heard that suggestion?

8   A    I have heard that theory.

9   Q    Does that make any sense?

10  A    No.

11  Q    Why not?

12  A    It is orders of magnitude more expensive to do a patent

13  analysis for infringement.  7400 -- it is much cheaper to pay

14  the fee.  The first thing you would do if you were thinking of

15  suing on a patent is making sure that the patent is in force.

16  So the fee would have been paid first thing, and then you do

17  the analysis afterwards.  It's much more expensive.

18  Q    If I had a long first list of patents that had maintenance

19  fees, and I had one patent that I was thinking about filing a

20  lawsuit on, would it make any sense not to pay the fee on the

21  patent I was thinking about suing on?

22  A    Not to me.

23  Q    And why not?

24  A    Because the patent has to be in force.  You run a risk of

25  deliberately letting something go.  If you are thinking of

```
 1   suing on it, the first thing you would do is pay the fee.

 2   Q    Would it make any sense to you to hold off on paying a

 3   $7,400 fee -- excuse me.

 4        Would the time and expense of having your lawyers evaluate

 5   whether to file suit be more or less than $7400?

 6   A    It would be substantially more.

 7   Q    So, would it make any sense to spend tens of thousands of

 8   dollars evaluating whether to sue and then not pay the $7,400

 9   fee?

10   A    No.  It's -- that would be backwards.

11             MR. O'HARE:  Okay.  Thank you.

12                        REDIRECT EXAMINATION

13   BY MR. THOMAS:

14   Q    Mr. Squire, you were deposed in this case?

15   A    I was.

16   Q    And at the time of your deposition, you were asked about

17   the communications that Mr. Taché had relayed to you, what he

18   had learned from his meetings with WhiteWater, and you had

19   counsel present, and he instructed you not to answer based on

20   the attorney-client communication?

21   A    Yes.  The details of that would be privileged.

22   Q    In fact, you didn't give any information in response to

23   the questions at your deposition as to what Mr. Taché allegedly

24   learned and told you; isn't that correct?

25   A    Correct.  It was just that it had been looked into and --
```

1  Q    As far as you went was just, "We looked into it and

2  Mr. Taché," not you, "talked to WhiteWater," and Mr. Taché

3  relayed to you some information, but you refused to disclose it

4  in your deposition, correct?

5  A    Correct.  That information was privileged.  The only

6  information that was disclosed is what I certified to, which

7  was it was unintentional.

8  Q    We know what you certified to because it is in the

9  document.

10  A    Correct.

11  Q    You are not waiving attorney-client privilege here in

12  trial, are you?

13  A    No.

14  Q    So you are still standing on it, so we don't know, because

15  of assertion of the privilege, exactly what Mr. Taché learned

16  and exactly what Mr. Taché may have told you; isn't that

17  correct?

18  A    Correct.

19  Q    And your job is to certify not only that it was an

20  unintentional act and not -- in not making the maintenance fee

21  payment, you certified for the entire period of which the

22  payment was missed, it was unintentional.  You see that as

23  well?

24  A    Correct.

25  Q    And you can't tell us today, because of the assertion of

1   the attorney-client privilege, what it was that you learned

2   about the facts regarding it being an unintentional missed

3   payment; isn't that correct?

4   A    Well, I can't go into the details on it.  But I can state,

5   based on what I learned, I certify that it was unintentional.

6   I believe that other witnesses have testified previously here

7   who worked at WhiteWater and at FlowRider who potentially could

8   have spoken to those things.  For me, I can't go into the

9   attorney-client details.

10  Q    We understand.  You are standing firm on the

11  attorney-client.  You are not telling us in court, you didn't

12  tell us in the deposition, you haven't told anybody what was

13  learned in this investigation that Mr. Taché did and reported

14  to you, correct?

15  A    Well --

16  Q    It is yes or no.

17  A    Let me finish.  I don't have any issue telling you.  If

18  the judge is willing to instruct me to do so, I can answer the

19  question.

20  Q    No, you have asserted the privilege consistently.  You

21  deprived my client of getting the truth and the answers during

22  deposition.  You have asserted it again during trial, and you

23  are entitled to do that.

24       So, my question to you is -- you are an experienced patent

25  and trademark practitioner, correct?

1          MR. O'HARE:  Objection, Your Honor, to the preface as

2    argumentative; invades the province of the Court to rule on

3    expertise.

4    BY MR. THOMAS:

5    Q    I will restate the question.

6         You are an experienced petition and trademark counsel,

7    Mr. Squier, are you not?

8    A    Yes.  I have been involved in patent actions for a few

9    years now.

10   Q    When you act as a prosecutor, based on your knowledge and

11   experience and knowledge of the law, when you make

12   communications with the Patent and Trademark Office in

13   connection with a prosecution, your communications to that

14   office are not privileged?

15   A    To be honest, I would have to look that up.

16   Q    You don't know?

17   A    I don't know.

18   Q    In fact, you are acting as an agent in communicating on

19   behalf of your client when you are dealing with the PTO; isn't

20   that correct?

21   A    Again, I am not completely sure.

22        I know when we interact with the patent office in

23   prosecuting an application -- at least in my experience -- I am

24   typically not giving the patent office privileged information.

25   It is based on what is in the application, what the prior art

1   speaks about with reference to those claims.

2   Q    But when you start speaking about factual matters, when

3   you report to the Patent and Trademark Office those

4   communications about prior art, about anything that's important

5   to the patent office, you are subject to the duty of candor,

6   and they are not privileged?

7   A    I mean, I guess -- I am not sure exactly what you are

8   asking.

9        Personally, I have never disclosed privileged

10  communications to the patent office.

11       They are facts about what the prior art discloses, what

12  the patent is trying to claim, but not details about privileged

13  matters that are had between the client about litigation or

14  something of that sort.

15  Q    If you provide -- for example, if you provide information

16  to the patent office about prior art, and there's a question

17  that comes back from an examiner on that, you can't say,

18  "That's privileged"; you must answer that question, correct?

19  A    I guess it depends on the question.  I have never had an

20  examiner ask me a privileged client communication.  Typically,

21  when an examiner responds back in an office action, they are

22  clarifying what does the prior art teach.  There is some

23  document you are looking at, and the argument you respond with

24  would be either to amend the claims in some fashion, or to

25  argue to the examiner that the prior art actually teaches

1    something different.

2    Q    Well, if you are aware of prior art, and an examiner asked

3    you about it, you would have to disclose it to him, would you

4    not?

5    A    I mean, under what -- if you are aware of prior art that

6    is material to the prosecution and would impact patentability,

7    then, under the duty of candor, you should disclose it.

8         I am not sure if that's what you are referring to.

9    Q    You actually have a duty to disclose it, correct?

10   A    The duty of candor is to not -- it goes along with the

11   whole "tricking."  You are not supposed to know of prior art

12   that you know would impact whether the patent could issue and

13   then choose not to disclose it.  You are not allowed to do

14   that.

15   Q    Understood.

16        And you couldn't -- let me back up.  Let me go back.

17        Mr. O'Hare, at the beginning of his direct examination of

18   you, questioned you about whether you are a courtroom lawyer,

19   litigator or patent prosecutor.  And I think you indicated you

20   are essentially more of a patent prosecutor?

21   A    Yeah, more of a patent prosecutor.  I have helped out with

22   litigation support, which really just means looking at patents,

23   helping evaluate stuff.  But I am not -- I have never been in

24   court, standing up, speaking, anything of that nature.

25   Q    But, in fact, you are on this team?  You are part of this

1    team?  You are on the emails, because I see the emails come

2    from your firm, and you are currently on it.  So you are

3    treated as member of the trial team, are you not?

4    A    Yes.  Yes.  I am part of the trial team.

5    Q    And you have been part of the trial team since this case

6    was filed; isn't that correct?

7    A    Yeah.  I know this case has been filed and restarted a few

8    times.  I was not on it in the very beginning.  But yes, I have

9    been on it now for quite a few years.

10   Q    And you understand that one of the objectives of this

11   trial team is to convince the jury that there was nothing

12   improper at the Patent and Trademark Office concerning the

13   power of attorney or the representations of the assignee in

14   connection with this renewed petition?

15   A    I understand that the argument your side is presenting is

16   that, as part of my petition to reinstate the patent, that I

17   deliberately tried to trick the patent office.  I understand

18   that that is the allegation.

19   Q    Okay.  And this -- you talk about "copyright."  Do you do

20   copyright work?

21   A    I spoke about trademark, which I think is what you are

22   referring to.  I have done some trademark work.  I have done

23   some copyright work, too.  My focus is patent, but I have done

24   a little bit of that as well.  Yeah.

25   Q    So you filed petitions to reinstate patents before, prior

1    to this; is that correct?

2    A    No.

3    Q    This is first time you have ever done that?

4    A    Yes.

5    Q    Did you have any partner review your work before you

6    submitted it to the Patent and Trademark Office?

7    A    I honestly can't remember if Rick reviewed it or not.

8    Q    Would that have been your practice, to have the partner in

9    charge -- in this case, Mr. Taché -- review it before you filed

10   it with the Patent and Trademark Office?

11   A    I guess it depends on the document itself.

12        But, typically, in a law firm situation, as an associate,

13   there's typically someone who is in charge of reviewing work

14   before it goes out the door, for younger associates.

15   Q    And in this case, now focused on 2015, when you filed the

16   original petition and you filed the renewed petition, and you

17   filed the power of attorney, the responsible partner would have

18   been Mr. Taché, correct?

19   A    It would have been, yes.

20   Q    So presumptively, you would have asked Mr. Taché to review

21   what you prepared and submitted to the Patent and Trademark

22   Office before it was filed; isn't that correct?

23   A    Well, Mr. Taché wouldn't have necessarily reviewed the

24   exact document.  I know we had a number of discussions leading

25   up to the filing between that February 4 date and the

1    February 20th date, where we were discussing what the client

2    had found out, and then, also, what needed to be done in order

3    to petition to reinstate.  So there were, I don't know, a

4    number of conversations along those lines, where I discussed

5    the three things that we needed and what we had to do in order

6    to properly petition.

7    Q    Your practice would have been, at the time, as an

8    associate, is have a partner review the document for accuracy

9    before submitting it to the PTO; isn't that correct?

10   A    Again, I don't know if it would have necessarily been to

11   review the actual document.  As long as I was satisfied that it

12   was being filled out in the proper way, based on discussions,

13   then that would have satisfied the review as well, at least in

14   my experience.

15   Q    Did you have discussions with Mr. Taché about this use of

16   the word "registrant" in connection with your renewed

17   application?

18   A    No.  I mean, again, the discussions with Mr. Taché were

19   back originally before the original petition was filed, and in

20   terms of the "registrant" term in the petition that renewed

21   that original February 20 petition, I wasn't aware that

22   registrant was there until years later in litigation, where it

23   was pointed out.

24   Q    And you will recall from the power of attorney, there was

25   a statement in the power of attorney that the Light Wave entity

1  was the assignee of the '589 patent.  You recall that?

2  A    Yes.

3  Q    Did Mr. Taché, in the ordinary course, did he review that

4  document prior to you submitting that to the Patent and

5  Trademark Office?

6  A    I am not totally sure what Rick would have typically

7  reviewed.  But again, I think I stated that power of attorneys

8  typically are administrative documents, so I am not sure if

9  there was a standard review practice for things of that sort.

10  I don't know whether that was reviewed by Mr. Taché or not.

11  Q    So you just don't know as you sit here today whether

12  Mr. Taché reviewed the power of attorney before you submitted

13  it, and you don't know as you sit here today whether Mr. Taché

14  reviewed the renewed application to revive the patent?

15  A    I don't believe that Mr. Taché reviewed, in particular,

16  the power of attorney because, again, that was something that

17  my assistant would have prepared and likely filed.  And while I

18  typically try to do review of that type of stuff anyway, I

19  don't know whether Mr. Taché would have reviewed it as well or

20  not.

21          MR. THOMAS:  I have nothing further.

22          MR. O'HARE:  Nothing further from us, Your Honor.

23          THE COURT:  Thank you, sir.  You may step down.

24      (Witness excused.)

25          THE COURT:  Mr. Thomas, please call your next

```
 1   witness.
 2             MR. THOMAS:  Your Honor, we are resting our defense
 3   with this witness subject to the -- I can't -- we can deal with
 4   this without the presence of the jury.  There may be exhibits
 5   that failed to be moved in.  I think we got them all, but I
 6   want to check my notes for that.
 7        But from a testimony standpoint, yes, we are resting.
 8             THE COURT:  All right.  In that case, are there any
 9   witnesses on rebuttal?
10             MR. TACHÉ:  There are, Your Honor.
11             THE COURT:  Okay.
12             MR. TACHÉ:  Good morning.  At this time, plaintiff
13   calls Dr. Glen Stevick to the stand.
14                       GLEN STEVICK, Ph.D.,
15              PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
16             THE COURT:  Sir, you are still under oath.
17             THE WITNESS:  Thank you, Your Honor.
18                       DIRECT EXAMINATION
19   BY MR. TACHÉ:
20   Q    Good morning, Dr. Stevick.  Welcome back.
21   A    Thank you.  Good morning.
22   Q    Since it's been almost two weeks since you were first
23   here, can you please remind the jury of your educational
24   background.
25   A    Sure.  I have a bachelor's, master's, and Ph.D. in
```

1    mechanical engineering.

2    Q    And approximately how many times have you testified as a

3    technical expert in connection with patent cases?

4    A    More than 50.

5    Q    Did your engagement with WhiteWater in connection with

6    this lawsuit cover more an the issue of infringement?

7    A    Yes.

8    Q    What else was included in the engagement on behalf of

9    WhiteWater in connection with this case?

10   A    Validity of the '589 patent itself and non-infringing

11   substitutes.

12   Q    Did you review the materials, reports, and testimonies

13   presented in connection with this case regarding the validity

14   of the '589 patent and potential non-infringing substitutes?

15   A    Yes, I did.

16   Q    Earlier in this case, do you recall that Judge Benitez

17   asked you what a POSITA is?

18   A    Yes, I do.

19   Q    And based upon your review of the '589 patent and your

20   understanding of the relevant technology, have you determined

21   the level of a person of ordinary skill in the art of the '589

22   patent?

23   A    Yes.

24   Q    Did you include this information in your report in

25   connection with this case?  I believe your report is dated

1   September 7, 2018.

2   A    Yes.

3   Q    And would it help refresh your recollection as to what you

4   stated or determined what a POSITA is in connection with this

5   case if you had a copy of that report?

6   A    I have it in front of me.

7   Q    Could you tell the jury what you determine to be a person

8   of ordinary skill in the art in connection with this case.

9   A    Sure.  What I wrote -- and I still believe this to be

10  true -- the '589 patent involves structures involving

11  high-velocity fluid flow to form desired flow patterns for wave

12  shapes.

13       Due to the nature of this patent, such concepts would not

14  be understood by an individual without at least a Ph.D. in

15  mechanical engineering or at least five years of experience on

16  the job.  You could do it either way.

17  Q    So, if I understand you correctly, are you suggesting that

18  one could obtain the requisite qualifications either by

19  educational or work experience?

20  A    Yes.

21  Q    Or some combination thereof?

22  A    Yes.  Which is more typical, yes.

23  Q    And why do you believe that's the appropriate level of

24  skill for a person of art in the area?

25  A    Well, you have a structure, that's like a small building,

```
 1   and it has forces applied to it by water that's moving at
 2   30 miles an hour.  So it has a high potential for hurting
 3   someone.  So it really requires some due diligence and
 4   engineering understanding to design it properly.
 5   Q    What is required to become a named inventor in a U.S.
 6   patent?
 7   A    To become a named inventor, you have to be the person who
 8   game up with the concept, the working or the operable idea or
 9   invention.
10   Q    What exactly does that mean?
11   A    Well, what it means is it has to be an idea or invention
12   that works, it has to be operable, and the methodology to make
13   that work.
14   Q    Is that the same as the -- sorry.
15        Is that the same as the idea of a conception?
16   A    Yes.
17   Q    Are you familiar with the term "production to practice"?
18   A    Yes.
19   Q    What is that?
20   A    "Production to practice" is taking that workable idea and
21   doing the nuts-and-bolts details of making a prototype or
22   making a patent, so POSITAs can build the device.
23   Q    So if someone does the engineering analysis using modeling
24   tools to model or simulate an invention based on an idea
25   conceived of by another person, is the person doing the
```

1   modeling considered a coinventor?

2   A    No.  That's just taking the workable concept and reducing

3   it to practice.

4   Q    Is that also true of a person who would prepare drawings

5   based on someone else's conceived idea?  Would the person doing

6   the drawings be considered a coinventor?

7   A    No, they would not.

8   Q    Why is that?

9   A    They are, again, just reducing the idea to practice.

10  Q    When a patent office issues a patent, how long is the

11  owner allowed to protect that invention from having others

12  make, use, sell, offer for sale, or import the invention that

13  is the subject of the patent?

14  A    You are allowed to own that idea or concept for 20 years.

15  Q    Given that the patent is intended to protect an idea for

16  20 years into the future, are patents typically written

17  differently than other documents that would describe something

18  that we would own?

19  A    Very much so.

20  Q    How are patents written differently?

21  A    Well, they are written differently in that they -- in

22  exchange for the 20 years, you have to write what you think is

23  the best embodiment.  And then you have to -- because it is a

24  living document that's to last for 20 years, you have to

25  anticipate the alternate embodiments and variations that can

1    occur for 20 years that are still covered by this working idea,

2    this concept, this invention.

3    Q    Gary, if we could bring up Exhibit 1, page 20, column ten,

4    lines 62 through column 11, line 5.  The very bottom paragraph

5    of column ten, and the top paragraph of column 11.

6         Is this language in the specification of the '589 patent

7    an example to support your opinion that that '589 patent is a

8    living document?

9    A    Yes.  First it discusses how and what the invention is,

10   and then it gives examples, embodiments, to help explain that.

11   And then, thirdly, it talks about alternate manners, as

12   required or desired, giving due consideration to the goals of

13   providing a suitable, resilient, and strong nozzle cover,

14   and/or achieving one or more of the benefits and advantages as

15   taught herein.

16        Materials will change, which materials or parts are

17   cheaper at a given time, so different embodiments will occur

18   over 20 years, but do they use this workable invention?

19   Q    Thank you.

20        Is there similar language in the '589 patent related to

21   the flexible tongue?

22   A    Yes.

23   Q    Page 21, column 11, lines five to 17 of the same exhibit.

24        In your opinion, Dr. Stevick, does this -- what does this

25   language mean in terms of ways to make a rigid nozzle flap

1  that's covered by the '589 patent?

2  A     Sure.  It still covers the same three parts, how and what

3  we are doing, and then it gives the preferred embodiment at the

4  time the patent is written.  "The sluice cover or pad, 130, is

5  preferably made out of any suitable, soft, flexible material

6  that will avoid injury upon impact yet rigid enough to hold its

7  shape under prolonged use."  Suitable pad materials include two

8  pounds per foot cube, so they are giving an exact amount, and

9  talk about polyurethane foam.

10      And then it talks about the pad or pad material can be

11  reinforced internally or externally, because you can certainly

12  imagine that reinforcing it might make a less expensive, just

13  as effective, embodiment of this concept and idea of a

14  ride-overable, without injury, pad and tongue.

15  Q     Does the '589 patent say how much needs to be reinforced

16  in order to still stay within the scope of the '589 patent?

17  A     No.

18  Q     So, can only a portion of the patent be reinforced?

19  A     Sure.

20  Q     Can all of it be reinforced and still be within the claims

21  of the patent?

22  A     Yes.

23  Q     So, if that's the case, how can a component that is

24  completely rigid be flexible according to the '589 patent?

25  A     Reducing something to a practice that accomplishes the

```
 1   benefit here means making it flexible.  And an engineer who is
 2   reducing it to practice, one of the tools in his toolbox is a
 3   hinge, a plastic hinge or pin and barrel, like you might see on
 4   a door.  These are all hinge examples.
 5        This is a plastic hinge here.  You make a thinner area.
 6             THE COURT:  You must have heard about me talking to
 7   the defendants' expert witness, didn't you?
 8             THE WITNESS:  I did.  I did.  Yes, Your Honor.
 9             THE COURT:  Because that was my idea.
10        Can I patent it, by the way?
11             THE WITNESS:  Yes, you can.
12             THE COURT:  Can I see that?  Can I --
13             THE WITNESS:  I will have to help you reduce that to
14   practice.
15             THE COURT:  You would agree this is a flexible hinge
16   (indicating)?
17             THE WITNESS:  Yes, I would.
18             THE COURT:  You agree with that?
19             THE WITNESS:  Yes.
20             THE COURT:  Okay.  Good.  Since you are there, I want
21   to show you another hinge.  That's not a flexible hinge, is it?
22             THE WITNESS:  Well, it makes the part flex.
23             THE COURT:  That wasn't my question.  That's not a
24   flexible hinge, is it?
25             THE WITNESS:  It is a pin and barrel hinge.  It
```

```
 1   provides flexibility to the component.
 2           THE COURT:  Why don't you answer my question?  Is the
 3   hinge flexible?
 4           THE WITNESS:  A hinge is flexible.
 5           THE COURT:  Okay.  Never mind.  Thank you.
 6   BY MR. TACHÉ:
 7   Q    During the course of this litigation, there's been
 8   substantial -- sorry.
 9        Does the '589 patent state anywhere that a hinge cannot be
10   used to make a rigid nozzle flap flexible?
11   A    No.
12   Q    Other than the language you referenced a moment ago in
13   column 11, is there any other language in the '589 patent that
14   supports your opinion that a tongue or nozzle flap can be
15   ridged or can move?
16   A    You mean cannot?
17   Q    I am sorry.  Let me rephrase the question.  I did not mean
18   to confuse you.
19        Is there any language in the specification of the '589
20   patent that supports your position that a rigid nozzle flap or
21   tongue can be made flexible by use of a hinge?
22   A    Yes.  If your definition of "flexible" is to move down and
23   urge into the water, that's what "flexible" is being used for
24   in that context.
25   Q    Is there any language in the patent specification to
```

1    support that?

2    A    Yes.  We just read it.  You can internally or externally

3    reinforce it and make it rigid.  The way it accomplishes the

4    movement is a local flexibility at a hinge.

5    Q    Is there any other language in the patent that supports

6    that?

7    A    Sure.  If you go to the bottom of column 16.

8    Q    If you could please bring up page 21, column 16, 41

9    through 51.  Thank you.  It is the paragraph right before the

10   claims.

11   A    Yes.

12   Q    Right there.  Thank you.

13        Is this the language you were referring to, Dr. Stevick?

14   A    Yes.

15   Q    There are two sentences in this paragraph.  What does the

16   first sentence about "changes in specific designs,

17   constructions, and methodology without departing from the

18   spirit and scope of the disclosure" mean?

19        If you could please highlight that first sentence.

20        Thank you.  Please explain to the jury what that sentence

21   means.

22   A    Well, what they are trying to explain is that the whole

23   patent is describing what the intent, the actual workable

24   concept or invention is, and that's the flap moving down, the

25   tongue moving down, and pressing into the water.  There is

1   other designs, other configurations taken with the fact that

2   you can make it rigid, we still have common tools in our

3   toolbox to render an embodiment to accomplish that.  And there

4   will be more that we haven't thought of yet.

5        But the concept is pressing down into the water so that

6   you can ride over safely all the way to the deck.

7   Q    Thank you.

8        And can you please explain what the last sentence in this

9   paragraph means; specifically, "The invention is defined to be

10  defined only by a fair reading of the appended claims,

11  including the full range of equivalency to which each element

12  thereof is entitled."  If you could please explain that to the

13  jury.

14  A    Sure.

15       The embodiments given in the patent are examples.  The

16  claims form the boundary of the idea or the concept.  And they

17  are always much wider than what is in the specification.  The

18  specification is a finite or limited number of examples to show

19  what the invention is.

20  Q    So, in your opinion, Dr. Stevick, are the claims or the

21  specification broader?

22  A    Well, the claims are always broader.

23  Q    And why is that, exactly?

24  A    Because that's the -- you are describing in words the

25  boundary of the idea or the workable concept, not the

```
 1   nuts-and-bolts rendering of it into a particular device.
 2   Q    If something is not specifically defined in the claims,
 3   how is one to determine whether or not it is, in fact, covered
 4   by the claims?
 5   A    Well, you can look at the specification and look at
 6   the examples, and then decide -- there are several tests to see
 7   if there is any significant difference in how it functions, the
 8   way it functions, and the result.
 9   Q    So, in your opinion, Dr. Stevick, do the claims of the
10   '589 patent cover the use of a hinge to allow a rigid tongue or
11   nozzle flap to be flexible or moved?
12   A    Yes.
13   Q    And why is that?
14   A    Because the flexibility, as it's used in this patent, is
15   to allow the tongue to squeeze against the water, displace or
16   flex downward.  We use hinges to make devices flex or move.
17   Robot hands, all kinds of things.  It is still flexing in that
18   context.
19        Does the individual part flex?  No.  Those are rigid parts
20   that are allowed to rotate relative to each other to make the
21   overall piece move.
22   Q    Thank you.
23        Are you familiar with the term "doctrine of equivalents"?
24   A    Yes.
25   Q    What is that?
```

1    A    It is a way of looking at whether something is

2    insubstantially different from what is shown in the patent.

3    Q    Is that in connection with infringement of a patent?

4    A    Yes.

5    Q    How does one determine whether or not there's an

6    insubstantial difference from the accused product to the claims

7    being asserted?

8    A    Well, there's -- one example is a function, way, and

9    result test.

10   Q    In applying that test, would the function of a hinge in a

11   rigid nozzle flap be the same function as a flexible tongue

12   using materials that bend?

13   A    Yes.

14   Q    And does the -- does PSD's hinged, rigid nozzle flap

15   operate in substantially the same way as a nozzle flap that

16   uses bendable material?

17   A    Yes, it does.

18   Q    And does PSD's hinged, rigid nozzle flap achieve

19   substantially the same result as a nozzle flap using bendable

20   material?

21   A    Yes.  It squeezes against the water so you can ride over

22   it safely onto the deck.

23   Q    Once a patent has been issued by the patent office, is

24   there a presumption that the patent is valid?

25   A    Yes.

1    Q    And what exactly does that presumption mean?

2    A    Well, it means it has been reviewed by the patent office,

3    and you start with the presumption that, yes, it is valid.

4    It's already been validated and there's mechanisms for

5    evaluating after that.

6    Q    As you understand the term, Dr. Stevick, what does "prior

7    art" mean?

8    A    Prior art is the state of affairs before the particular

9    patent in question.

10   Q    And what does it mean that a piece of prior art

11   anticipates a claim of the '589 patent?

12   A    To anticipate, prior art would have to have every element,

13   every limitation of a particular claim in that device or in

14   that patent.

15   Q    What does it mean that one or more pieces of prior art can

16   render a claim obvious?

17   A    It means if you combine various devices or patents in the

18   past, viewed in light of each other, then it makes obvious what

19   is in the patent, and that's another way to invalidate a

20   patent.

21   Q    Can we please bring up Exhibit 58.

22        Do you recognize this photograph of the Hyland Hills ride?

23   A    Yes.

24   Q    Can you also bring up Exhibit 63 -- I am sorry -- page 4

25   of this exhibit.  Thank you.  Sorry.  Next one down, please.

1    Page 4.  Can we please enlarge this part.  Can we make that

2    larger.  Thank you.

3         Do you recognize this Exhibit 63, page 4, as a schematic

4    drawing of the Guam ride?

5    A    Yes, I do.

6    Q    And is this schematic drawing, Exhibit 63, page 4,

7    representative of the ride installed at Hyland Hills?

8    A    Yes, it is.

9    Q    So, is the schematic, 63, page 4, actually the proper one

10   to discuss to use -- use to discuss the Hyland Hills ride and

11   the Guam ride?

12   A    Yes.

13   Q    Are you aware of any material differences between the

14   Hyland Hills ride and the Guam ride, based on your review?

15   A    No.

16   Q    According to Exhibit 63, page 4, what part does PSD

17   consider to be the nozzle cover?

18   A    The vertical wall section, here.

19   Q    I am glad you saved me from drawing.

20        Is what you have drawn -- I am going to call it a "bumper

21   pad."  Is that okay?

22   A    Yes.

23   Q    Is this bumper pad, as shown in Exhibit 63, capable of

24   moving?

25   A    No.

1  Q    And why is that?

2  A    Well, it is substantially rigid and attached to the wall.

3  Q    If we could please bring up -- leave this on the left-hand

4  side, if possible, Gary, and bring up Exhibit 1, page 20,

5  column 10, lines 38 through 41.

6       Are you familiar with this portion of the specification as

7  it relates to the description of the tongue-like pad being

8  preferably urged downward to squeeze against the flow, 138, and

9  so seal and to cover the nozzle area off from possible

10 injurious contact with a rider?

11 A    Yes.

12 Q    Does this language, that the flexible tongue is required

13 to be urged downward or biased downward against the flow of

14 water, appear in the independent claims in all but claim 24 of

15 the '589 patent?

16 A    It does.

17 Q    And if we could even take the highlighting off this part.

18 Just collapse this, please.  If we can enlarge Exhibit 63

19 again.

20      If the bumper pad can't move, is it possible for this

21 bumper pad to be biased downward or urged against the flow of

22 water as required to invalidate Claims 1, 17 or 42 of the '589

23 patent?

24 A    No.  It's too rigid for that.  Its only flexibility is

25 through the thickness, to prevent impact injury.

1  Q    So, it is not biased or urged downward against the flow of

2  water?

3  A    It is not.

4        MR. TACHÉ:  It is my understanding, Your Honor, that

5  Exhibit 63 was not admitted into evidence, and I would like to

6  do so at this point.

7        THE COURT:  Any objection?

8        MR. KOLEGRAFF:  None.

9        THE COURT:  All right.  It will come in.

10       MR. TACHÉ:  Thank you.

11 BY MR. TACHÉ:

12 Q    So, is it your opinion, Dr. Stevick, based on the fact

13 that a bumper pad can't move, that any of Claims 1, 17, 37, or

14 42 of the '589 patent are either anticipated or rendered

15 obvious by either the Hyland Hills ride, whether alone, or here

16 in combination with the Guam ride?

17 A    They are not.

18 Q    If we could please turn to page 24 of Exhibit 1,

19 specifically Claim 17.

20      Does Claim 17 contain a limitation requiring a flexible

21 tongue at a downstream end of the cover and a generally flat

22 portion at an upstream end of the cover?

23 A    Yes.

24 Q    If we could, please, move that to the side and collapse it

25 and bring up Exhibit 63, page 4, again.  If we could enlarge

1    that section again, Gary -- thank you.  And if you could

2    also -- sorry.  Collapse the left-hand side and please bring up

3    Figure 3A of that patent.  I believe it is on page 4.

4         As shown in Figure 3A of the '589 patent on the right-hand

5    side of your screen is the tongue, which is I believe where the

6    nozzle cover part meets.  What is highlighted here as 150, is

7    that oriented horizontally, generally parallel to the water?

8    A    Yes.  Generally parallel to the water, yes.

9    Q    And is the tongue portion, 160, located at a downstream

10   end?

11   A    Yes.

12   Q    Is the generally flat portion, 170, located at an upstream

13   end?

14   A    Yes.

15   Q    Turning back to exhibited 63, page 4, the image of both

16   Hyland Hills and Guam, is the bumper pad that's been identified

17   by defendants as the corresponding element to a nozzle cover

18   oriented horizontally or vertically?

19   A    Vertically.

20   Q    Is a vertical orientation on the nozzle cover described

21   anywhere in the '589 patent?

22   A    No.

23   Q    Is it even, ever, contemplated anywhere in the '589

24   patent?

25   A    No.  Because you have to be able to ride, launch, exit,

```
 1    beach, all the way to the deck.  You can't do that with a

 2    vertical wall.

 3    Q    Is it your opinion -- is your opinion, either at Hyland

 4    Hills alone or in combination with Guam -- contains a flexible

 5    tongue at a downstream end of the cover and a generally flat

 6    portion at an upstream end of the cover, as set forth in Claim

 7    17 of the '589 patent?

 8    A    No.

 9    Q    In your opinion, based on that testimony, do either the

10    Hyland Hills or Guam rides anticipate or render obvious

11    Claim 17 of the '589 patent?

12    A    No.

13    Q    If you could please keep up Figure 3A and bring up

14    Claim 24, which is on page 24 of Figure 1 -- I am sorry -- page

15    24 of Exhibit 1.

16         Do you see the third claim limitation that says, "A cover

17    which covers and extends over the top surface of said sluice to

18    prevent riders from colliding with or riding over said sluice

19    or interfering with the ride operation"?

20    A    Yes.

21    Q    If would could please leave up the right-hand side of the

22    screen and bring up Exhibit 63-4 again.  Thank you.

23         Based on comparing Figure 3A of the '589 patent and

24    Exhibit 63-4, representative of the Hyland Hills and Guam ride,

25    do either of these rides have a cover that extends over the top
```

1  surface of the sluice?

2  A    No.

3  Q    Why is that?

4  A    Well, it's above, but it does not allow you to ride over

5  it.  It is not over, in the context of the patent itself.

6  Q    So, in your opinion, does it extend over the top surface

7  of the sluice?

8  A    No.

9        THE COURT:  Just a second, Counsel.  Let me make sure

10  I understood what was just said.

11      So your question was whether the Hyland Hills or Guam

12  ride, either of the rides have a cover that extends over the

13  top surface of the sluice?

14      Now, I understood the top surface of the sluice -- and I

15  am not able to draw on my monitor, but the top surface of the

16  sluice would be somewhere up there where it says -- I can't

17  read it.  It's really blurry.  Towards the left side --

18        MR. TACHÉ:  Forgive me for interrupting.  Would it

19  help if we blew up Exhibit 63?

20      Make that larger.

21        THE COURT:  Sure.  There you go.

22      I still can't tell what it -- trying to make me dizzy.

23  That's not going to help.

24        MR. TACHÉ:  Go back to the way it was a minute ago.

25        THE COURT:  That's good.

1          MR. TACHÉ:  Make it a full screen.  Thank you.

2          THE COURT:  This very, very top, top --

3          MR. TACHÉ:  Are you referring to this, Your Honor?

4          THE COURT:  Yes.

5      Isn't that extending over the top of the sluice, or did I

6  misunderstand?

7          THE WITNESS:  No, that part is.

8          THE COURT:  Okay.  So the answer is it does extend

9  over the top of the sluice, right?

10          THE WITNESS:  If you include that, yes.

11          THE COURT:  It won't allow a rider to ride over it?

12          THE WITNESS:  That's correct.

13          THE COURT:  Okay.  Now I understand.  Thank you.

14  BY MR. TACHÉ:

15  Q    For clarification, Dr. Stevick, is this portion part of

16  the bumper pad as it appears in Hyland Hills or Guam?

17  A    No.  It is more like the deck.

18  Q    Thank you.

19      So it is actually a deck, not part of the bumper pad,

20  correct?

21  A    Correct.  But it does extend over, but it is not part of

22  the bumper pad but it is part of the deck.

23          THE COURT:  Why?  What is the difference?

24          THE WITNESS:  When you use the ride, it's really

25  quite interesting.  That area, in this type of a ride, people

1  will sit there, with their chairs, and watch, and it is not

2  part of the actual ride activity area; whereas, if we go back

3  to the other drawing --

4          MR. TACHÉ:  Could we also bring up Exhibit 58?  That

5  might help.

6          THE WITNESS:  So, on the left you can see people

7  actually use that area for sitting.  They don't use it for the

8  activity; whereas, what you will find, when you go to a ride

9  with the '589 tongue and cover, is that they will ride over it,

10 and that becomes part of the ride, usable area.

11         THE COURT:  Go ahead.

12 BY MR. TACHÉ:

13 Q    Thank you, Your Honor.

14      If we could bring up Exhibit 1, page 24, column 18.  It's

15 Claim 37 I am looking for.  Thank you.

16      What does Claim 37's requirement that "the tongue is

17 biased downward to squeeze said sluice gate outlet" mean?

18 A    Yes.

19 Q    And it's biasing down the tongue?

20 A    Yes.

21 Q    Based on your review of the Hyland Hills and Guam rides as

22 well as the corresponding schematic that is Exhibit 63, page 4,

23 do either of the rides, Hyland Hills or Guam, have a tongue

24 that is biased downward to seal off the sluice gate outlet?

25 A    No.

1  Q     Correspondingly, is it your opinion that either the Hyland

2  Hills ride or the Guam ride render Claim 37 anticipated or

3  obvious as a result?

4  A     No.

5  Q     If we could please bring up Claim 1, which I believe is --

6  thank you.

7        Claim 1 recites that the nozzle cover prevents injury to

8  riders riding over said nozzle.  That's the last line of the

9  '589 patent.  Do you see that?

10 A     Yes.

11 Q     Do either the Hyland Hills or Guam rides have a nozzle

12 cover that prevents injury to riders that ride over the nozzle?

13 A     No, not in the context of the patent itself, which means

14 you can ride over -- you can beach onto the deck, you can exit,

15 launch.  It uses all those words throughout the specification

16 to explain what they are talking about, "riding over."

17 Q     And if we could bring up Exhibit 58, please.

18       Assuming that a rider could make contact with this

19 vertical wall, would it be possible for a rider to ride over

20 this vertical wall from the ride surface, over the sluice, and

21 onto this deck?

22 A     Not on a surfboard, no.

23 Q     Did you do any calculations to support your determination

24 that that is the case?

25 A     Yes.

1  Q    And based upon your math, is it possible for a rider to go

2  from the ride surface using the bumper pad to ride over the

3  nozzle and onto the deck while riding on a board?

4  A    No.  It is not possible.  Even using the world-record

5  vertical jump of 63-and-change inches, it is not possible.

6  Q    I am going to show you a video and ask you -- a very short

7  video and ask you a couple of questions.

8       If we could please play Exhibit 505.  (Videotape played.)

9       Do you recognize that as a rider of the Hyland Hills ride?

10 A    Yes.  It appears to be Hyland.

11 Q    And have you seen this video before?

12 A    Yes.

13 Q    While I can see the person in the video is a fairly

14 talented individual --

15 A    Yes.

16 Q    -- did the rider in the video ride his board over the

17 bumper pad to ride over the nozzle and onto the decking as is

18 required by the claims of the '589 patent?

19 A    No.

20 Q    Did the rider, in fact, even touch the bumper pad on his

21 way to the decking in the video?

22 A    Didn't appear to, no.

23 Q    Based upon your review of this video, does it in any way

24 impact your opinion as to whether or not the Hyland Hills or

25 Guam rides invalidate any of the claims of the '589 patent?

1    A    No.  A talented individual could run fast enough and jump

2    over that height because your feet are going through the water

3    and pushing onto the actual ride surface itself.  So, yeah,

4    that's possible.

5         But you couldn't do that on a board because the lack of

6    friction will have the board scoot out on you and you simply

7    can't obtain that kind of distance.

8    Q    Thank you.

9         If we could bring up Exhibit 360.

10        Do you recognize Exhibit 360, Dr. Stevick?

11   A    Yes.

12   Q    Can you please tell the jury what Exhibit 360 is.

13   A    It is a piece of prior art that was considered by the

14   patent office in the '589 patent.

15   Q    Is this the Frenzl 402 patent?

16   A    It is.

17   Q    If we could please bring up page 4 of Exhibit 360 and,

18   next to it, include columns -- page 6, column four, lines 74

19   and 75, last two lines of the page, please.  If it's possible,

20   can we make the image on the left-hand side a little larger.

21        Looking at Figure 7, Dr. Stevick, what does reference

22   number 25 in the Frenzl 402 patent refer to?

23   A    It is a pivoting flap.

24   Q    Is the pivoting flap part of the nozzle itself, which is

25   identified as item 2?

1  A    Yes.  It is to control the water flow rate and turn it

2  off, even.

3  Q    Sorry.  For purposes of clarification, is it the nozzle,

4  item 2, that's controlling the flow rate, or is it the pivoting

5  flap, 25, that does that?

6  A    Well, 25 closes down, and it does that by the control

7  system, the hydraulic control system above.

8  Q    Is that how the nozzle cover of the '589 patent operates?

9  A    No.  There's not a hydraulic force on top.  And it is not

10  meant to control the water at all.  It is meant to actually not

11  inhibit the water but ride and squeeze against the top surface.

12  So it is a different function.

13  Q    Does the Frenzl patent disclose the pivoting flap, 25, as

14  having a cover of any kind?

15  A    No.

16  Q    And as shown in Figure 7, would a rider be able to ride

17  over the pivoting flap, 25?

18  A    No, not in the context of the '589 patent.  You just can't

19  do that.  You have a vertical wall, right there.

20  Q    Is this the vertical wall that you are referencing?

21  A    Yes.

22  Q    So this vertical wall, is it separating the rider from

23  flap 25?

24  A    Yes.

25  Q    Is there anywhere a description inside the 402 Frenzl

1    patent that describes the pivoting flap as being padded?

2    A    No, there's not.

3    Q    Let's look next at the element Number 26 in Figure 7.

4         Do you see that?

5    A    Yes.

6    Q    What is reference Number 27 [sic]?

7         And if you could please bring up page 7, column five,

8    line 13.

9    A    You mean 26?

10   Q    Yeah.  I am sorry.

11        Can you please identify what element 26 is in the Frenzl

12   patent?

13   A    It is another flap valve using a pivoting flap.

14   Q    What exactly is a flap valve and what does it do?

15   A    It's used to control the flow rate of the water and even

16   shut off the water.  It is not meant for protecting a rider or

17   increasing the area of the ride.

18   Q    And as it is shown and disclosed in Figure 7 of the Frenzl

19   402 patent, is a rider able to ride over flap valve 26?

20   A    No.

21   Q    Why is that?

22   A    Well, it is -- you are prevented by the vertical wall from

23   getting near it.

24   Q    Thank you.

25        Could you please take a look at reference numeral 382

1    shown in Figure 7 of the 402 patent.

2         Do you recognize what that is?

3    A    Yes.  I see it.

4         It is a flat valve that is used to hydraulically control

5    valve 25.  It lets water in or out of the top area above 25,

6    causing it to open or close.  So it is part of a hydraulic

7    control system.

8    Q    Is that flat valve, 32, padded in any way?

9    A    No.  That would inhibit its function, really.

10   Q    Is it intended to be ridden over, as disclosed in the

11   Frenzl 402 patent?

12   A    No.  It is inside piping so you don't ride over it.

13   Q    If we could please collapse the right-hand side and the

14   bottom, and let's focus on just the figure, for a second.

15   Could you please highlight and enlarge Figure 8 of the Frenzl

16   402 patent.  Thank you.

17        Do you recognize the item that I have circled in Figure 8?

18   A    Yes.

19   Q    What is exactly -- I am sorry.

20        What is Figure 8 relative to Figure 7 in the Frenzl 402

21   patent?

22   A    Figure 8 is a section replacing Items 9 to 13, putting a

23   different style pump and replacing the bottom section of

24   Figure 7.  You can't really look at Figure 7 without looking at

25   Figure 8, for context.

1  Q    We would be replacing this piece, right here, with

2  Figure 7?  Is that an approximately accurate drawing of what

3  you just said?

4  A    Yes.

5  Q    And so, going back to my original question, what is it

6  exactly that I circled?  What is that element there in

7  Figure 8?

8  A    Well, it is a flat valve that controls the water flow.

9  Q    Is that comparable to one of the flat valves that appeared

10 in Figure 7?

11 A    Yes.

12 Q    And specifically which one?

13 A    Well, 26.  Arguably, 25.

14 Q    Is the function of the item in Figure 8 the same as it was

15 in Figure 7?

16 A    Yes.

17 Q    And I asked you this question in the context of Figure 7,

18 but I would like to ask it again in the context of Figure 8.

19      Is this flap something a rider would be able to ride over?

20 A    No, because you would have a vertical wall above it.  You

21 are just replacing the bottom section of Figure 7.

22 Q    Is this the vertical wall that you are referring to?

23 A    Yes.

24 Q    Is the flat valve identified in Figure 8 padded in any

25 way?

1  A     No.

2  Q     In the Frenzl patent, there are one, two, three, four --

3  approximately four pivoting flaps or flaps identified in the

4  patent, agreed?

5  A     Sure.  Or three.  Depending how you count them, I guess.

6  Q     Okay.  Does the fact that Mr. Frenzl in the '402 patent

7  disclose the flaps that he did, does that in any way suggest,

8  based on your review of the '402 patent, that he invented the

9  use of flaps in connection with a water ride attraction?

10 A     No.  He is using them for a bigger concept, a bigger idea.

11 Q     How do you know he didn't invent them?

12 A     Flaps and pivoting hinges have been around decades, if not

13 centuries, and they are a component used in a bigger device.

14 Q     Does the disclosure of the pivoting flaps and flat valve

15 in the Frenzl '402 patent in any way prevent the claims of the

16 '589 patent from covering a hinge as part of its nozzle cover?

17 A     No.  It is not part of the claims patent.

18 Q     And does the Frenzl '402 patent in any way limit the scope

19 of the '589 patent as it relates to the nozzle cover at issue

20 in this case?

21 A     No.

22 Q     Does the Frenzl '402 patent anticipate or render obvious

23 any claims of the '589 patent?

24 A     No.

25 Q     If we could turn to page 1 of Exhibit 1, please.  Focus on

1    the cited references, please.

2         What are cited references in a patent on the face page of

3    '589?

4    A    Those are prior art references that the patent office has

5    examined in detail.

6    Q    And when you say "examined in detail," is that part of an

7    examiner's job during prosecution of an application to

8    determine whether or not it is patentable?

9    A    It is.

10   Q    Is the Frenzl '402 patent one of the patents that the

11   patent office considered in its analysis of the '589 patent?

12   A    Yes.

13   Q    Is that the one there, located third down?

14   A    Yes.  It is.

15   Q    Based on your review of the '589 patent and its file

16   history, to your knowledge, did the patent examiner reject any

17   of the claims of the '589 patent based on the Frenzl '402

18   patent?

19   A    No, it didn't, initially or in a second review.

20   Q    You mentioned a second review.  Is that -- let me rephrase

21   the question.

22        What is an inter-parties review, Dr. Stevick?

23   A    An inter-parties review is where an outside party requests

24   the patent office to re-review a particular patent for reasons

25   they are processing.

```
 1   Q     And how does one begin an IPR?

 2         And "IPR" is an abbreviation for an inter-parties review,

 3   is it not?

 4   A     It is.

 5         You file a petition with the patent office, and they

 6   review that petition.

 7   Q     Did PSD petition the patent office to begin an IPR to

 8   review the '589 patent based, in large part, on the Frenzl '402

 9   patent?

10   A     They didn't.

11   Q     Did the patent office grant PSD's request to review the

12   '589 patent in an IPR?

13   A     No.  They felt it had no merit and no likelihood of

14   overturning the patent, the '589 patent.

15   Q     Is that consistent with your own -- with whether or not

16   the Frenzl patent anticipates or renders obvious the '589

17   patent?

18   A     Yes.  I agree with the probation office on both occasions.

19   Q     Based on your review of the '589 patent, is it your

20   opinion that the patent contains an adequate written

21   description of the invention claimed?

22   A     Yes.

23   Q     And why is that your opinion?

24   A     It gives numerous examples of how you can implement the

25   invention, and it then talks about ways you can modify it,
```

```
 1   making the flaps rigid, talks about the future.  It does

 2   everything a patent is expected to do.

 3   Q    Based on your review of the '589 patent, is it also your

 4   opinion that the written description is sufficiently clear and

 5   complete in order to enable a POSITA to make and use the

 6   claimed invention?

 7   A    Yes.  There's enough detail for someone to design a water

 8   ride based on this patent.

 9   Q    Why is that the case?

10   A    It gives sufficient details about the invention, the

11   concept, the idea, so you can implement it.

12   Q    Are you familiar with the phrase or term "best mode" in

13   the context of a patent?

14   A    Yes.

15   Q    What is the best mode used for?

16   A    Well, in exchange for your 20-year ownership of that idea

17   and that invention, you are supposed to give the patent office

18   your best embodiment of how to accomplish an idea and concept.

19   Q    Does "best mode" have anything to do at all with

20   invalidating a patent once it's been issued?

21   A    No.

22   Q    Nothing whatsoever?

23   A    No.

24   Q    What is a non-infringing substitute, Dr. Stevick?

25   A    It is a substitute way of accomplishing a task described
```

1    in the patent that doesn't infringe.

2    Q    In order to be a non-infringing substitute, must it meet

3    the same benefits and advantages of the invention that is

4    claimed?

5    A    Yes.

6    Q    If we could bring up Exhibit NH.  (Videotape played.)

7         Have you seen this ride before?

8    A    Yes.

9    Q    Can you identify what ride it is?

10   A    It looks like a Stingray.

11   Q    Does this ride have a nozzle cover?

12   A    It does.

13   Q    Do you consider this to be a substitute for the ride-over

14   nozzle cover that is claimed in the '589 patent?

15   A    No.

16   Q    Why is that?

17   A    It appears fixed, and it has a very large opening and does

18   not provide you to safely ride over.

19   Q    If we could bring up Exhibit MC, please, as in Michael

20   Charlie.

21        Have you seen this photo before?

22   A    Yes.

23   Q    Does that ride have a nozzle cover?

24   A    This appears to be a vertical wall.

25   Q    Do you consider this to be a substitute for the ride-over

1  nozzle cover of the '589 patent?

2  A    No.

3  Q    Why is that?

4  A    You can't ride over that wall.  It curves up as you

5  approach it, and you simply couldn't, on a surfboard, get over

6  that wall.

7  Q    Is this a similar configuration to the Hyland Hills or

8  Guam rides?

9  A    It appears to be.

10  Q    So, for the same reasons that you wouldn't find the Hyland

11  Hills or the Guam rides to be non-infringing substitutes, would

12  that be your opinion with respect to this ride?

13  A    Yes.

14  Q    If we could, please, bring up Exhibit LJ.

15       Have you seen this photo before, Dr. Stevick?

16  A    Yes.

17  Q    Does this ride have a nozzle cover?

18  A    Not in the manner of the '589, no.  It has a vertical

19  wall.

20  Q    As a result, do you consider this to be a non-infringing

21  substitute for the ride-over cover of the '589 patent?

22  A    No.

23  Q    Is that for the same reasons of the other rides that you

24  have seen just a moment ago?

25  A    Yes.

```
 1              THE COURT:  How much do you have, Counsel?
 2              MR. TACHÉ:  Probably another 10 or 15 minutes.
 3              THE COURT:  Well, we are going to take a break.
 4         Ladies and gentlemen of the jury, I apologize.  I have a
 5    judges meeting this afternoon that I have to go to.  I will not
 6    be back until probably two o'clock.  Okay.
 7         So, please remember my admonition.  Also, please remember
 8    not to talk among yourselves or with anyone.  It's okay to say,
 9    "Hello; good morning; how are you?"  Don't engage in
10    conversations with the attorneys, or the parties, or my staff,
11    or any of the witnesses.  Don't allow anyone to engage you in
12    conversations as well.  Okay?  See you at two o'clock.  Thank
13    you.
14         Sir, you may step down.
15         (The following proceedings were held in open court out of
16    the presence of the jury:)
17              THE COURT:  Counsel, we are going to give you a copy
18    of what I propose to use as jury instructions so you can review
19    it.
20              MR. SCOTT:  I apologize, Your Honor.  I couldn't hear
21    you.
22              THE COURT:  I am going to give you copies of the
23    proposed jury instructions that I intend to give so you can be
24    reviewing them.  My law clerk will bring them out in just a few
25    minutes.
```

1    I do have to tell you I have a pretty heavy calendar

2 tomorrow, so we have to try and get this case to the jury this

3 afternoon, just to let you know.

4         MR. O'HARE:  Your Honor is coming back at what time?

5         THE COURT:  Two o'clock.  I might be able to go until

6 5:00 if we need to.  Okay.  All right.  Thank you.

7         MR. TACHÉ:  Thank you, Your Honor.

8    (End of morning proceedings at 12:39 p.m.)

9                        -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with rules and requirements of the United States Judicial Conference.

DATED:  December 16, 2019, at San Diego, California.

/s/  Chari L. Bowery

_____
Chari L. Bowery
CSR No. 9944, RPR, CRR

I N D E X

CHRONOLOGICAL INDEX OF WITNESSES:                    PAGE    VOL.

**ERIKSON SQUIER — DEFENDANTS' WITNESS**
    CROSS BY MR. O'HARE ..........................1438        7
    REDIRECT BY MR. THOMAS .......................1468        7

**GLEN STEVICK, Ph.D. — PLAINTIFF'S WITNESS**
    DIRECT BY MR. TACHÉ ..........................1478        7