1          United States District Court

2      for the Southern District of California

3

4                                    )
5   WHITEWATER WEST INDUSTRIES,       )
    LTD., a Canadian Corporation,     )   No. 17cv1118-BEN
6                                     )
           Plaintiff,                 )   December 17, 2019
7                                     )
              v.                      )   San Diego, California
8                                     )
    PACIFIC SURF DESIGNS, INC., a     )
9   Delaware Corporation, and FLOW    )
    SERVICES, INC., a California      )
10  Corporation,

11       Defendants.

12
                          VOLUME 8
13              TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROGER T. BENITEZ
14             United States District Judge

15  APPEARANCES:

16  For the Plaintiff:      SNELL & WILLMER LLP
                               WILLIAM S. O'HARE
17
                           BUCHALTER
18                             ROGER L. SCOTT

19  For the Defendants:    THOMAS WHITELAW & KOLEGRAFF LLP
                               JOSEPH E. THOMAS
20                             WILLIAM J. KOLEGRAFF

21

22
    Court Reporter:        Dana Peabody, RDR, CRR
23                         District Court Clerk's Office
                           333 West Broadway, Suite 420
24                         San Diego, California 92101
                           DanaPeabodyCSR@gmail.com
25

| | |
|---|---|
| 1 | San Diego, California, December 17, 2019 |
| 2 | * * * |
| 3 | (Proceedings held outside the presence of the jury panel.) |
| 4 | THE COURT:  Well, good morning.  Are we ready? |
| 09:01    5 | MR. O'HARE:  Yes, sir. |
| 6 | THE COURT:  All right, Glenn.  Go get the jury, |
| 7 | please. |
| 8 | THE CLERK:  Yes, Your Honor. |
| 9 | (Proceedings held in the presence of the jury panel.) |
| 09:03   10 | THE COURT:  Well, good morning, ladies and gentlemen. |
| 11 | All right.  Well, today is the day during which the lawyers |
| 12 | get to present what is known as a closing argument.  Their |
| 13 | opening statement was essentially a road map for you to follow |
| 14 | of what they expected the evidence would show.  The closing |
| 09:03   15 | argument is now telling you where they've been, and so it's |
| 16 | showing you the map of where they've been, and they're going to |
| 17 | ask you to draw some inferences and to emphasize certain |
| 18 | evidence as has been presented to you. |
| 19 | Before they begin their closing argument, I do want to |
| 09:04   20 | remind you that the arguments of the attorneys are not |
| 21 | evidence.  You will determine what the evidence is.  If there |
| 22 | is anything that they say that is inconsistent with your |
| 23 | recollection or your notes, your recollection or your notes |
| 24 | control.  Okay.  Good. |
| 09:04   25 | Mr. O'Hare, you may proceed. |

1604

1    MR. O'HARE:  Thank you, Your Honor.  May it please the

2  Court, counsel for the defendants, and ladies and gentlemen of

3  the jury.

4    We've been together awhile, but it's actually been two

09:04    5  weeks since we've last spoken directly, and as the judge said,

6  that's the way it works in a trial.  Except for maybe an

7  occasional "good morning," here in open court is the only place

8  where I or anybody in this room can properly have a

9  conversation with you under the rules of this process.

09:05    10    And so I'm grateful that I get at least this second chance

11  to have that direct, if only a one-way, conversation with you

12  about the case.

13    When we last spoke, I told you where we thought the

14  evidence would lead; that one of the things we set out to prove

09:05    15  was that the defendants in this case made a decision to get a

16  head start on their business by taking, or knocking off,

17  Tom Lochtefeld's FlowRider rides and the '589 patent that he

18  invented.

19    And now as we conclude, it seems pretty much undisputed

09:05    20  that defendants did copy Tom Lochtefeld's FlowRiders, the

21  products that took him some decades to develop, including the

22  ride-over nozzle cover assembly that even Mr. Alleshouse

23  reluctantly admitted as much.

24    During this testimony from the trial, Mr. Alleshouse was

09:06    25  talking about what we've identified as a demonstrative here in

1   the middle, Exhibit NU, that shows three different nozzle flap

2   or nozzle cover mockups, and that this last one on the end

3   represents more or less what he had learned about at Wave Loch

4   and that PSD incorporated into their products.

09:06   5        Now, you've heard some testimony that the mockup isn't

6   precisely correct and making allowance for however this was put

7   together.

8        You've seen the nozzle flaps or tongue on the actual rides,

9   and their profile actually has this triangular shape that

09:07   10  tapers down at the end so that it's shaped more like this than

11  just the single flap, one-dimensional thing, but this at least

12  gives you the idea, a rendering of it.

13       It only makes sense that Mr. Alleshouse ended up using it

14  at PSD starting the month after he left Wave Loch, essentially

09:07   15  the same design, because what he testified was that -- that all

16  that time he spent at Wave Loch, he didn't look at what other

17  competitors did and particularly with respect to these nozzle

18  covers and nozzle flaps.  So what was happening at Wave Loch

19  was all he claimed to know.

09:08   20       Now, I'll say it's hard to believe that that testimony is

21  entirely true, meaning that the FlowRider product manager paid

22  so little attention to what the competition was doing, but

23  that's what he said.

24       Either way, PSD isn't telling us that they didn't copy the

09:08   25  FlowRider nozzle assembly.  What they're telling us is that

1  they think they're entitled to get away with knocking it off.

2     Now, the evidence showed that they're doubly wrong about

3  that.  They're wrong based on what the patent says, and we'll

4  go through some of that, and you've heard a lot of that already

09:09    5  during the trial.  And they're wrong in light of all the

6  evidence that's been presented that shows the '589 patent and

7  the products that practiced it enabled the FlowRider to achieve

8  some fundamental changes in the overall design and

9  configuration of the ride.

09:09   10     Again, all matters you've heard about extensively during

11  this case:  the smaller footprint, the -- getting rid of the

12  wall; nice, open design enabled them to put in that trampoline

13  surface because they had a much simpler ride surface without

14  the extra curves that would make it hard to stretch that

09:09   15  trampoline over it and make it work.

16     And those are the attributes that the defendants knew were

17  winning in the marketplace.  Those were the rides that were

18  selling, those were the 97 percent, and they knew that they

19  needed to offer them when they started their business and

09:10   20  couldn't do it without copying the '589 patent design and still

21  make it to that November 2012 trade show down in Orlando and be

22  able to offer a full line of products right out of the chute

23  for this brand-new business, to offer a line of products in

24  three months, what took Tom Lochtefeld years to develop.

09:10   25     So I'd like to start by going through the patent.  I'm not

1  going to go through every one of these claims.  You've been

2  through them in testimony with the witnesses, including as

3  recently as yesterday with Dr. Stevick, but I am going to touch

4  and go through a number of them to show what it actually shows

5  and discloses and how it covers the defendants' rides that they

6  sold.

7      So we're going to examine the two basic ride types that

8  they've sold.  There's the ProFlow that was first installed

9  down in Texas and then another one they sold one of; I believe

10  the Supertube ride.  That's the one that ended up going into

11  France.  And by looking at any one of them, we're really

12  looking at all of them.

13      This is some deposition testimony that was played by video

14  for Mr. Yeh that basically says this nozzle flap

15  assembly -- and this is PSD's drawing on the right -- basically

16  the design, other than maybe size changes, given the size of

17  the ride, was basically the same for all four rides.

18      And then you'll note below, anything that's an exhibit,

19  like in the lower right, it says "Ex 438-2."  That means it's

20  the second page.  And so to the extent somebody's interested in

21  thinking about, well, how do I find this exhibit once we get

22  back in to deliberate, those notes are there to try to help

23  you.

24      We also know with respect to Flow Services -- that's their

25  refurbishment subsidiary -- they go out to replace and

1    refurbish nozzle flaps and other components on existing rides.

2    Again, the shape and size may vary, but the characteristics of

3    the nozzle flaps that Flow Services installed or refurbished

4    are essentially the same.

5    And in that regard, according to Mr. Lewis -- this is the

6    defendants' damages expert -- he identified a little less than

7    $42,000 in refurbishment services or sales by Flow Services to

8    install refurbished nozzle flaps, and then on the left we have

9    a series of exhibits, some of the invoices and purchase orders

10   concerning those jobs, so in going through the patents, the

11   first thing you need to figure out is what each claim covers.

12   I think we've got it right.  We tried to replicate the

13   order in which the Court read them yesterday, and all the way

14   back in the beginning, but one sort of qualifier, it's possible

15   one of these numbers may be wrong.  So by all means feel free

16   to note the number, but you should, of course, pay attention to

17   the substance of the instructions.

18   As you've already heard, claims are important because those

19   are the words that define what the patent covers.  But there's

20   other parts to the patent.  You'll have the whole patent to

21   read or review as you wish.  The figures and text and the

22   specification, those drawings, the words provide descriptions

23   and examples and provide a context for the claims so that you

24   don't have to just read these claims in a vacuum.  And they'll

25   make reference to words like "cover," "tongue," and "ride

1    surface," and in the specification, they call out what each of

2    those things are, and then they have, you know, a number, and

3    I'll show you some of the drawings that's on the drawings that

4    takes you back to, okay, what does this number on the patent

09:14    5    drawing signify?  And so they provide a context.  But the

6    breadth of the patent's coverage is defined by the claim

7    itself, and each one of those claims is treated as a separate

8    patent.

9        So within the patent itself, it makes clear that the

09:14    10    specification, the language, and the figures are not intended

11    to limit the scope of the patent.  They're intended to provide

12    examples to teach a person who wants to learn from this patent

13    ways that they can actually implement it and practice it.  But

14    as is stated here, what they put in here in their explanations

09:15    15    are in addition to the ordinary meaning of the terms in the

16    claims.  They're not intended to limit it.

17        And then there's another passage in the specification right

18    before the claims where they're saying -- acknowledging -- this

19    is a 20-year patent.  Many changes may be made in specific

09:15    20    designs, as Dr. Stevick said.  We may come up with whole new

21    materials to make things over the course of 20 years, and so

22    the patent -- the inventor -- acknowledges and discloses that

23    there may be specific designs that practice this invention

24    without departing from the spirit and scope of it.

09:16    25        And so the invention isn't limited to the embodiments to

1  the things, the drawings that are shown in the description

2  part, but is intended to be defined by a fair reading of the

3  claims, including the full range of equivalency, meaning other

4  ways you can accomplish the same thing.

5  So turning to -- this is Claim 1.  And so, as you can see,

6  there are a number of different terms in there that are

7  contained within this.  And one of the questions that we're

8  going to ask under this patent:  Do the claims in this patent

9  just include the nozzle flap or flexible tongue?  Or do they

10  include the entire nozzle assembly of which the cover is just a

11  part and of which the flap or tongue is but a subset of that

12  part?

13  And that's important because several times in the trial the

14  defendants have disassembled this thing, taken the nozzle flap

15  or flexible tongue and treated it as if that were a separate

16  thing, that that is the scope of the invention.  And so that

17  the hinge and the burrito and everything else on this nozzle

18  cover is somehow not a part of what the claims cover.

19  Well, looking at Claim 1, it's a nozzle assembly.  So

20  that's kind of the scope of what we're dealing with.  That

21  comprises a number of different things.  There's a nozzle.

22  There's a nozzle cover, which is over the nozzle.  And that

23  nozzle cover comprises multiple things.  It's got padded

24  material that covers it, and it includes, but it doesn't just

25  consist of, a flexible tongue, you know, biased downward

1    against the water.  And then the bottom left of this slide

2    we're showing you, these are the parts of the specification

3    that give you the key or the clue to what each of those numbers

4    on that drawing on the right mean.

09:18   5    So there's the tongue-like pad.  That's 150.  It includes a

6    tongue portion -- that's 160 -- on the downstream and onto the

7    jetted water a rear, generally flat portion, 170.  It's not

8    called a burrito here, but there's that rear, generally flat

9    portion that at least some folks have called the burrito, and

09:19   10   as if that's a separate part of this invention, that it's not

11   really embraced.  And then, of course, decking, which is 190,

12   and then it tells you what the forward end of the decking is,

13   which is 190.

14   So this is a way to say that this invention as described in

09:19   15   the claims, also read against the specification, the drawings,

16   and everything, isn't just that one piece.  It's all of it put

17   together.

18   And so when we look also to see is the hinge, for example,

19   considered to be a part of all of this?  So this is one of the

09:19   20   drawings we showed you that was done by Mr. Alleshouse while he

21   was at Wave Loch.  And in that drawing, which was nozzle flap

22   construction and installation, and the hinge is shown as an

23   element of the nozzle flap construction and installation and

24   is -- all these things are a broader part of a nozzle cover.

09:20   25   Same thing at PSD.  This is a drawing that we showed you.

1    Here again, we've got this piano hinge shown as a part to the
2    nozzle flap and its assembly.

3        So put it all together with Claim 1, and this one's using
4    the Supertube product.  We've got a nozzle.  Not much contest
5    about that.  Got a ride surface.  Not much contest about that.
6    We've got a nozzle cover that has padded material substantially
7    covering the nozzle that's underneath and a flexible tongue,
8    which is a part of the cover biased downward against the flow
9    of water.  That's Claim 1 read against PSD's nozzle flap or
10   nozzle cover design.

11       Now, in here, of course, we've got our flexible tongue, and
12   we've spent a lot of time, both sides, talking about what is
13   and what isn't "flexible," so I'll pause or digress or divert
14   here to talk about that.

15       What does "flexible" mean?  Oh, and that's designed to help
16   riders ride over the nozzle flap and the nozzle assembly.  So
17   this is one of the instructions.  "And some of the terms the
18   Court has given you a definition.  And others, if he hasn't
19   given you a definition, then you apply their plain and ordinary
20   meaning in light of all the evidence that you've heard:  what
21   the specification of the patent is, what the experts have told
22   you, and all of that."

23       And so what the Court isn't telling you, they're not
24   telling you that flexible or flexibility must be achieved with
25   a hinge.  And the Court also isn't telling you that the

1   invention doesn't allow for the use of a hinge to achieve
2   flexibility in the nozzle cover or the nozzle flap.
3       So you've heard from opposing experts on this as to their
4   view of it.
5       Oh, incidentally, some of the terms that the Court defines,
6   "sluice gate," component for injecting water.  It's like a
7   nozzle.  "Contoured" just means made or shaped.  This
8   "plurality of components that are transportable" just means you
9   can transport all this stuff, take it to a site, and put it
10  together.  One other definition provided is "biased downward"
11  means caused to be oriented downward, meaning it doesn't need a
12  mechanical force to move it down.
13      So in the case of the nozzle flap, both on the model we
14  have in here and in practice, it moves down because it is
15  biased downward, and it's got weight, and so it manages to do
16  that without having some motor or spring or something else
17  attached to it.
18      So one of the things we heard about was a dictionary
19  definition.  This is actually a dictionary definition taken
20  from a dictionary that the defendants' expert, Mr. Pribonic,
21  used.  It's an older dictionary that goes back to this patent.
22  It's an American Heritage one, and it defines "hinge" to be a
23  jointed or flexible device.  So we know from a common
24  dictionary that at least flexibility is implicated and a part
25  of what it is that a hinge does.

1614

1    And so, incidentally, Mr. Pribonic had suggested that the

2    person skilled in the art, the person who would be looking at

3    this, was actually somebody less educated and experienced than

4    Dr. Stevick suggested.  He actually suggested it could even be

09:24   5    a maintenance person who worked on rides or somebody who does

6    inspections, and so not some engineer or Ph.D. necessarily, so

7    particularly, given his definition of a person of ordinary

8    skill in the art, POSITA, that, you know, to the extent people

9    are looking at dictionaries, these are the kind of dictionaries

09:25  10    you'd expect them to look at.

11    Now, dictionaries alone won't settle the issue.  If it were

12    that easy, maybe we wouldn't be here.  So the question is, we

13    need to look at these claims in the context of this patent

14    through the eyes of whatever skilled person in the art you

09:25  15    think it should be.

16    So how would a skilled person who knows about these things,

17    how to build and maintain these rides, read this patent and

18    know that a hinge could be used to achieve flexibility?

19    So here's this one part of the description in the patent

09:25  20    that we've shown both sides several times about the different

21    ways you can make the tongue or pad or nozzle flap.

22    It can be -- and so just as a note, this says the pad, 130,

23    and then you look at the drawing, and the pad is 150.  There's

24    a typo in this patent.  It got corrected, but there's a typo.

09:26  25    If you go to the end of the patent, it says the sluice cover or

1    pad, 130, should be 150.  So whenever you see "130," it really

2    means "150."  That's just a mistake they made, but caught it

3    before this prosecution of this patent was done.

4        And so right there in the specification it tells you the

09:26    5    pad material can be reinforced internally or externally.  You

6    can use different materials to get something that's soft,

7    meaning people aren't going to get hurt when they hit it.

8    "Flexible" means to move, yet rigid, and otherwise to achieve

9    the benefits of this patent, which is, you know, a safe,

09:27   10    moveable, ride-over tongue or nozzle flap that will float on

11    the flow of the water and move up and down, and you can safely

12    ride over it.

13        So how would we know that this is a nozzle flap that's

14    internally reinforced?  And this is Mr. Alleshouse when we were

09:27   15    asking him -- they keep calling it a metal nozzle flap.  It's

16    not a metal nozzle flap.  It's a padded nozzle flap that's

17    internally reinforced, in this case, with a piece of metal.  It

18    could be fiberglass.  I suppose you could stick a piece of wood

19    in there.  But so we all agree, it's a nozzle flap that's

09:27   20    internally reinforced.

21        And then this is back to this drawing that Mr. Alleshouse

22    did at Wave Loch.  He himself acknowledges in this set of

23    drawings that he did that the nozzle flap plate gives rigidity.

24    Exactly the word that was in that part of the patent that we

09:28   25    showed you; that the point of this is to give rigidity.  So

1   this is long before there was any lawsuit or fight.  This was

2   back in 2009.

3       So we all agree that this is a hinged cover that's

4   internally reinforced and rigid.

09:28   5       And then the question is, how would a skilled practitioner

6   understand how you make a reinforced, rigid nozzle cover flex?

7   Dr. Stevick explained a hinge -- not the only thing, but would

8   be a fairly evident thing -- and so did Mr. Alleshouse in his

9   trial testimony.  And then in the body of this answer basically

09:29   10  saying you can put a hinge onto something, and padding

11  something is obvious.  Putting a hinge onto something,

12  particularly something rigid and reinforced, how are you going

13  to make it move?  You put a hinge on it.  Maybe you come up

14  with something else, but a hinge is relatively obvious.

09:29   15      Now, we're not saying that Mr. Lochtefeld invented the

16  hinge or even invented the idea of flexible material.  That's

17  not what this invention is about.  Neither did that other

18  fellow, Frenzl.  He didn't invent hinges or bolts or nuts or

19  any -- or vinyl.  What Mr. Lochtefeld invented was the idea of

09:29   20  taking all these pieces and parts and putting them together in

21  a way that nobody had done before to design a nozzle cover that

22  has all the benefits of the '589 you've heard about.

23      Now, both sides have talked about a number of different

24  things that could be flexible:  doors, skis, fishing poles.

09:30   25      So here's a fishing pole.  First one on the left, it's

1    flexible.  The one on the right's flexible.  The problem is it

2    doesn't work.  Not because it isn't flexible, but because that

3    kind of flexible fishing pole, unless maybe you're ice

4    fishing -- it might work for that.  You just kind of put your

09:30    5    pole down in a hole through the ice.  So there's flexible

6    things that work and flexible things that don't work.

7        There's other things where they're flexible and they do

8    work.  You get a doggy door.  You can have a doggy door on the

9    left that's got a material that flexes and bends.  You've got a

09:30   10    doggy door on the right that's got a rigid material, but it's

11    hinged at the top.  The dog, the cat, the neighborhood skunk,

12    they can all still get through this door.

13        We saw a three-ring binder.  We got one with a piano hinge

14    on the right here and then somebody who's got a flexible

09:31   15    material that's achieving movement.  So they're all flexible,

16    but some work and some don't.

17        And so when we come to the '589 patent and these flexible

18    or moveable nozzle flaps, they achieve flexibility in different

19    ways, but both work.

09:31   20        And there are many examples in life.  I mean, when you go

21    to the doctor and he wants to get your reflexes on your leg, he

22    doesn't try to break your femur.  She'll maybe tap you on this

23    knee, which is a joint, like a hinge, and that's how they're

24    going to achieve the flexing to determine whether you've got

09:31   25    the appropriate reflexes.

1        So as the patent discloses, and Dr. Stevick also explained,

2   it's not limited to just a particular way of achieving

3   flexibility.  Because the patent acknowledges there may be

4   different ways of practicing what's being disclosed and

09:32   5   invented here, and the claims are to be read broader than the

6   specification.  The specification's specific.  Claims are

7   purposely read broader because, again, they want to have these

8   things work and last for 20 years.

9        So Claim 17, this is a claim that covers the water ride

09:32   10   sluice gate, so that's -- we're talking about the cover area

11   here.  This has some significance because that's what

12   Flow Services was doing.  They weren't building whole rides or

13   selling whole rides.  They were refurbishing or replacing just

14   these nozzle cover and nozzle flap areas, along with other

09:33   15   parts of the ride that are not a concern for us.

16        And, here again, we know that the flexible tongue at the

17   downstream end of the cover is but a part of the cover.  It's

18   at the downstream end of the cover.  And that this also

19   includes a generally flat portion at the upstream end.  That's

09:33   20   170, aka, in this case, in some of the products, a burrito.

21   But the point is, there's a flat part at the end.

22        And so, likewise, when we apply the claim elements here,

23   we've got a contoured, flexible pad with a flexible tongue at

24   the down end -- at the downstream end of it, that generally

09:34   25   flat portion, and the tongue is urged downward, meaning by its

1    weight against the flow of water.

2        So Claim 24, this one's a little bit different.  It also

3    covers the entire water ride attraction.  It's got a contoured

4    ride surface.  Most of this is not particularly controversial,

09:34   5    but there's some things that are a bit different.

6        It doesn't have a requirement that the tongue or flap be

7    flexible.  That's just not in this claim.

8        Now, there's some discussion that occurred during the trial

9    where the defendants were suggesting the flap doesn't cover the

09:34   10   nozzle, but if you look at this third sentence in the claim,

11   it's not the flap which covers the nozzle.  It's the cover

12   which covers the nozzle.  And the cover, as we've seen,

13   consists of multiple components, including the flexible tongue

14   or nozzle flap and the cover on top of it as well.

09:35   15       And then here's the application of those elements to PSD

16   rides.  You've got a sluice.  You've got a cover.  And it

17   prevents riders from running into or on top of those nozzles,

18   injuring themselves, interfering with the operation of the

19   ride, and so forth.

09:35   20       So under Claim 24, the question is, does this also

21   potentially cover that welded nozzle design that we saw down in

22   Mexico and in El Paso?  As I mentioned, it doesn't include a

23   flexible tongue, and you add dependent Claim 26.  It does say

24   there's a tongue-like pad, but, again, doesn't say it's

09:36   25   flexible.  So here's the ride that we had photos from of a ride

1620

1      under construction by PSD down in Mexico that has that fixed

2      flap.  The photo on the right is sort of the underside with the

3      exposed metal pieces that, at least it's been suggested, if

4      somebody were to get an arm, a leg, a foot, or something down

09:36   5      there, something not so good might happen.

6          And so if we apply the elements of Claim 24 to that same

7      ride that's under construction, we've got a ride that's got a

8      contoured ride surface, meaning made or shaped, as the judge

9      told us.  It's got a sluice.  It's got a cover.  And,

09:37  10      obviously, that cover is designed to at least prevent riders

11      from riding into or over, although, as we've suggested, we

12      don't think it does it as well as the moveable nozzle flap

13      design.

14          And so if you put all this together from all these claims,

09:37  15      four of these five claims do include a flexible tongue.

16          So the independent claims.  So if you agree this patent

17      includes a nozzle flap or tongue that can be internally

18      reinforced so that it's rigid and that either by the dictionary

19      or other definition or based on the knowledge of the skilled

09:38  20      person a hinge would be a very evident way to achieve

21      flexibility on that rigid nozzle flap or tongue, then PSD has

22      infringed those claims.

23          And then with respect to Claim 24, you may find

24      infringement separate and apart from whether the hinge flap is

09:38  25      nozzle -- excuse me -- the hinged flap is, quote, flexible or

1621

1   not.

2       As you'll see in the Court's instructions, there's two

3   types of direct infringement, and you've heard this already:

4   literal infringement and infringement under the doctrine of

09:38   5   equivalents.

6       So far I've been talking mostly about really direct or

7   literal infringement, rather, meaning going through each of the

8   elements and showing how the evidence shows that each of those

9   elements, read fairly, are met.

09:39   10       Under the -- so to prove direct infringement, we've got to

11   show it's more likely than not that one or more of their

12   products meets all the requirements of the claim and that they

13   did it without our permission.

14       And under the doctrine of equivalents, it's a little bit

09:39   15   different.  It means even if it doesn't literally infringe, it

16   infringes if the accused product contains the elements,

17   performs the steps that correspond to each requirement of the

18   claim.  It's equivalent to, if not literally met, by each step

19   that's described in the claim.

09:39   20       So there's two ways you can find that.  One is you can find

21   that it's equivalent if a person skilled in the art in this

22   field would consider the differences to be insubstantial.  The

23   difference between achieving flexibility through a flexible

24   material versus use of a hinge to achieve flexibility, if an

09:40   25   expert in this area would view that as insubstantial, if

1622

1    they're trying to figure out how to make this thing, then

2    that's equivalent.  And then this sort of three-part analysis,

3    meaning if the thing they used that isn't literally the same as

4    what's in the patent, if it performs substantially the same

5    function, moving this thing up and down, works in substantially

6    the same way, moving it up and down to achieve substantially

7    the same result, which is, again, to have this moveable,

8    padded, ride-over nozzle flap and cover that would enable a

9    rider to safely ride over this part of the ride.

10        Now, in order for the structure to be interchangeable,

11    meaning the thing you use, the hinge, it must have been known

12    at the time of the alleged infringement to somebody skilled in

13    the art.  But we already have seen testimony from

14    Mr. Alleshouse that this was obvious to him, and Wave Loch was

15    already using a hinge while he worked there.  So, plainly, it

16    was known.

17        So going through this, our view of the evidence would be

18    most of these elements -- there's not even much of a debate

19    whether they're literally met.  There's nozzles that jet water.

20    There's a nozzle cover that's padded.  Is this a substantial

21    difference?  The hinge versus the flexible material?

22    Obviously, we would suggest no.  And is it biased against the

23    flow of water?  I don't think that there's much debate about

24    that.

25        And then there's this so-called three-part test which takes

1623

1    you through, does it do substantially the same thing, in the

2    same way, and does it achieve substantially the same result?

3         So there have been some invalidity assertions made by the

4    other side, and we told you when we began that we expected PSD

09:42    5    to argue and attempt to prove that the patent office got it all

6    wrong when they issued this patent because it's not new,

7    somebody else had already invented it and disclosed it, or that

8    the invention, you know, based on other things combined

9    together, this would have been an obvious thing to do, what

09:42   10    Tom Lochtefeld did back then.

11         And you have to look at each claim.  Even if one claim or

12    one single dependent or independent claim is invalid, you have

13    to go through every single one.

14         One very important difference is the burden of proof.  In

09:43   15    order to prove infringement and essentially all the elements of

16    the plaintiff's case, either infringement or willfulness or

17    damages, we have to go by a -- I'll go backwards -- a

18    preponderance of the evidence, which is a somewhat legalistic

19    term, but we sort of try to translate it to say it means it's

09:43   20    more probably true than not true.  Some people express it as a

21    scales of justice, although I don't know that the weighing of

22    evidence is quite as precise.  You're not just looking for

23    volume of evidence.  You're looking for what is persuasive.

24    There may be a lot of evidence you don't believe and very

09:43   25    little evidence that you strongly believe, but at the end of

1624

1    the day, the idea is however you weigh that evidence, it

2    weighs, you know, just enough to be more probably true than not

3    true.  So very different from, say, the standard of proof in a

4    criminal trial.

09:44   5    But that's the burden we have to carry to persuade you that

6    there's infringement, there's damages, and so forth.

7    For invalidity, the burden is very different.  To prove

8    that a claim of a patent, any one of them, is invalid, they

9    have to adhere to this clear-and-convincing-evidence standard,

09:44   10   meaning you're left with a clear conviction that the patent is

11   invalid or some claim of the patent is invalid in order to do

12   that.

13   And so in order to make that case, it's something short of

14   proof beyond a reasonable doubt, before we send somebody to

09:44   15   jail, but it's certainly higher than that greater weight.

16   Now, there's a reason for that.  The patent office is not

17   infallible.  The law does allow us to sort of retest some of

18   the matters here, but the fact of the matter is, the patent

19   office did spend over two years evaluating this patent before

09:45   20   they issued it.  You've heard that there was a separate

21   proceeding brought by the defendants called an IPR,

22   inter partes review, to challenge it again.  We know they

23   looked at the Frenzl patent, both when the original patent was

24   applied for and in the IPR, and as it turns out, we learned

09:45   25   yesterday that during that process, for whatever reason, the

1   patent office or the Patent Trial and Appeal Board -- that's

2   who hears these things -- wasn't presented with evidence of

3   these rides.  These are the two rides that they're bringing to

4   you here.

09:45   5       So prior art.  And anticipation.  This is the defense that

6   it's not new.  Somebody else had already invented or disclosed

7   it or possibly even Mr. Lochtefeld had previously disclosed it.

8       So to prevail on that, they need to show by clear and

9   convincing evidence that every requirement of a claim in the

09:46   10  patent are present, all of them in a single previous device or

11  something otherwise published.

12      And I'll back up a little bit.  To prove something that is

13  obvious, they need to show by clear and convincing evidence

14  that it would have been obvious to a person skilled in the art

09:46   15  at the time to combine a number of different elements from

16  different things to come up with the same invention.

17      Now, some of the components may be commonly known:

18  padding, vinyl, hinge.  The question is, is the novelty of the

19  combination, in fact, novel?

09:47   20      There's also something called secondary considerations, and

21  these are things that you heard in the instruction, and -- to

22  help evaluate whether something is obvious or not, whether the

23  '589 would have been an obvious thing for somebody to do back

24  then.  Because you can't use hindsight.  You've got to try to

09:47   25  put yourself back in time to 1999 or before to figure out what

1    would they have considered at the time to be obvious.

2        And so these secondary considerations -- and I'm just

3    highlighting a few of them -- are things that would give a clue

4    as to whether something was obvious.  Was it commercially

09:47    5    successful?  Did the sales of the product go up?  That would

6    tend to suggest, oh, yeah, this really is something new.  It

7    made a change in terms of people's acceptance of this product.

8    Again, whether it satisfied a need, a need to try to sell more

9    of these things.  Whether others copied the invention.  We

09:48    10    certainly heard evidence of copying, not just by the

11    defendants, but evidence of others, those -- the next biggest

12    competitors over in China where we don't have patent

13    protection.  They're just copying the whole thing, including

14    the trampoline.  Whether others praised.  We've certainly

09:48    15    expressed some praise.  I haven't heard anybody run down the

16    innovation of the '589.  We're just debating how broad it is

17    and whether it applies to their products.  Whether others

18    obtained rights.  We know.  We saw all those licenses.  People

19    were lining up to pay good money to license the right to use

09:48    20    this and other patents.

21        So prior art.  So what we're doing is we're comparing in

22    order to figure out invalidity, is there something before this

23    invention that either contains all the same elements or would

24    make it obvious?

09:49    25        This is the cover page of the '589 patent.  As you can see,

1   that Frenzl patent is there, so we know that was disclosed and

2   considered by the patent office.  The Frenzl patent, I mean,

3   the idea of doing a sheet wave ride, certainly Mr. Frenzl

4   contributed to that, but the Frenzl flap, actually, as you've

09:49   5   heard, it's a valve.  It's a thing that opens and closes to

6   allow water to go through pipes or other spaces.  It's all

7   metal.  It's not padded.

8       And then this Figure 8 we've looked at and we've now

9   circled where he's got a variety of different metal plates or

09:50   10  pivot valves or whatever you want to call them, and they're

11  designed to control the flow of water.  They're not covers.

12  They're not padded.  And they certainly can't be ridden over as

13  they're embedded in the plumbing of this device behind that

14  wall that he's got in here that you've heard testimony about.

09:50   15      So what about the rides?  We agree that the rides, as well

16  as the Frenzl patent, are prior art, meaning prior in the sense

17  that they came before the patent.

18      What we don't agree on is that they actually contain all

19  the elements of the '589 patent or enough stuff to make it

09:50   20  obvious to do it.

21      And so, as we've asserted during the trial, looking at

22  these rides, these old ones with the big wall, at least one

23  thing that's totally different or at least obvious, I guess, is

24  that they're totally different from the rides that emerged

09:51   25  later, the ones that actually ended up selling.

1628

1        The same for Guam.  Guam we're told is essentially the way

2   that Hyland Hills ride was built.  This is the drawing for

3   Guam, and so there's been evidence that even though the drawing

4   for Hyland Hills didn't look exactly like this, that by the

5   time they built it, they did put some additional covering near

6   the bottom of that wall.

7        Now, you may recall during Tom Lochtefeld's testimony the

8   defendants tried to get him to somehow admit that this little

9   girl in Hyland Hills could somehow ride over either the -- over

10  the wall or over even that little cover at the bottom of the

11  padding of the wall and to say that this was really a cover

12  that prevented her or other riders from riding over the

13  nozzles.  And as Tom explained, the most this little girl could

14  hope for was to maybe bump into the wall, assuming she could

15  overcome all that water current and the incline of the reverse

16  curve and all that.

17       Even Mr. McFarland, Bruce McFarland, who they called,

18  agreed it was theoretically possible, but he'd never seen it

19  happen.  And, of course, we know this is what it looks like to

20  safely ride over a nozzle assembly, and this is a FlowRider

21  product, obviously, practicing the flexible nozzle covers.

22       Now, not surprisingly, PSD wasn't able to find a photo or a

23  video of anybody riding over this wall.  This is an animation.

24  This is what they'd be trying to prove, is this little girl

25  would take off on the board and somehow, against that flow of

1   water, fly up and get it to the top of that wall.

2       And we also heard Dr. Stevick explain, at least

3   mathematically, how that wasn't possible.  There was some

4   quibbling over whether she could, you know, get on that little

09:53   5   cover at the bottom, but plainly, as he said, you couldn't ride

6   on it.  It doesn't have a horizontal surface to ride on.  Or

7   excuse me -- yeah, a horizontal surface.  It's got a little

8   tilt to it, but it's principally vertical.  You could basically

9   bump into it and bump out.

09:53   10      We also showed another video with Dr. Stevick.  This is

11  Hyland Hills.  And this one shows somebody getting over that

12  wall, but he ran over it.  He didn't ride over it.  He had to

13  get off the board, get on his feet, and run over it.  That

14  guy's pretty adventurous.  You could be assured if he could

09:54   15  have figured out how to ride over that thing, he would have

16  ridden over it instead of cheating and getting off the board

17  and getting on his feet.  So it's clearly not a ride-over.  And

18  the other thing is, he never even touched that cover at the

19  bottom of the wall.

09:54   20      So whatever we have that's theoretical, what we know in

21  practice and from what we've seen is this -- these prior art

22  rides are not either designed or, as far as we know, capable of

23  being ridden in any way close to what the '589 enables us to

24  do.

09:54   25      And that's just one element of these rides that's different

1    from what's in the patent.

2        We've also heard testimony that that little cover extension

3    at the bottom of the wall doesn't even touch the water and

4    certainly isn't biased against the flow of water, which is some

09:55    5    other claim terms we've seen.

6        So, if anything, these old rides are clear and convincing

7    evidence of how everything changed.

8        And why does it matter what happened in the market?  A

9    couple reasons.  One, this has a bearing on whether these

09:55   10    new -- the '589 was an obvious thing, and it also bears on

11    damages.

12        So here's a chart that Mr. Yeh prepared and presented to

13    show a theory that -- as to why the ride sales increased in the

14    2000s.

09:55   15        First -- and I've made a little adjustment here -- Mr. Yeh

16    was wrong on the lifespan of the patents.  He's got a good

17    start date for the '589, but it wasn't actually issued until

18    the end of 2002.

19        And the tension ride surface patent, that provisional

09:56   20    application was filed in early 2001.

21        So the point is, these two inventions, at least on a

22    timeline, overlap.

23        We also heard that there's some missing sales here

24    potentially, that there's a lag.  These are installation dates,

09:56   25    so it doesn't really tell us clearly when the sales were made.

1    And certainly Mr. Yeh would have had no idea why customers were

2    buying these products back when he was in law school, long

3    before he got into the industry.

4        Both Mr. Yeh and Mr. Alleshouse said the horizontal pumps

09:56    5    made the ride smaller, and that was the difference, but here

6    we're looking at one of the early renderings after PSD started,

7    and this was attached to that so-called knockoff email in

8    August 2012, and here he's got a compact ride with a vertical

9    pump.  So having a vertical pump versus a horizontal pump

09:57    10    didn't change the dimension of the ride.  It just changed where

11    you dug the hole.

12        Were there licenses done in the 2003 time frame with

13    Whitewater and ADG?  Yeah, but that begs the question:  Why did

14    they want to license these things?  They wanted to license

09:57    15    these things because they thought they could sell them.

16        There's also a different set of projections or historical

17    sales figures that you got from PSD.  This is Exhibit 70.  It's

18    got a list of a whole bunch of different sales in them, and you

19    look at the last page of this exhibit.  There's a whole bunch

09:57    20    of sales in the year 2000 that PSD had cataloged at that time

21    that aren't shown on those charts.

22        Now, we're going way back in time, so it may be that not

23    much of this, in terms of detail, is entirely precise and

24    accurate to try to reconstruct when things were sold and when

09:58    25    they were installed going back two decades, but we do know,

1    even from Mr. Alleshouse's testimony, that even he acknowledged

2    that the sales increased much more quickly after 2000, and, of

3    course -- or 2002, in December 2002.  That's when the '589

4    patent issued.

09:58    5    What we were fencing about is why did the sales go up?  And

6    Mr. Alleshouse gave a detailed recitation of what was going on

7    in the early 2000s, about what the customers really wanted.

8    Was it the trampoline?  Was it the nozzle flap?  You'd think he

9    was there.  But he wasn't.  He was in school up in Berkeley.

09:58   10    He didn't show up at Wave Loch until years after that.

11    So maybe Mr. Alleshouse learned about what customers were

12    buying and why in the early 2000s based on his years at

13    Wave Loch talking to customers.  Evidently not, because he

14    testified when we asked him about that, "I was never working

09:59   15    with the decision-makers who actually were the ones purchasing

16    the attractions.  I would work with the maintenance guy."

17    So if you can believe what he told us about that, how would

18    he possibly know why customers were buying products, whether it

19    was the '589 nozzle cover, open-ride design, or whether it was

09:59   20    something else.

21    So they also brought in Mr. McFarland, and they didn't even

22    try to get him to back up that story that the '589 and the

23    nozzle covers had no impact on sales.

24    Fortunately, you were able to hear directly from the people

09:59   25    who actually lived this story; people like Tom Lochtefeld and

1    Andrew Thatcher, who's here with us today in court, and others

2    in the industry, Geoff Chutter, Mr. Myrman, who had much closer

3    to firsthand knowledge as someone who actually lived it.

4        So you get to decide who to believe about what the impact

10:00   5    of this patent was:  Mr. Alleshouse, who claims knowledge of

6    things he never experienced or lived or the people who were

7    actually there.

8        Some other credibility issues came up in the case.  We had

9    the Facebook posts.  You know, kind of a juvenile thing.

10:00   10   F you, WhiteWater International, F you, Geoff Chutter.  And,

11   really, the question is, why not just admit it?  There were

12   certainly reasons to be irritated with WhiteWater with

13   everything that's going on.  And yes, I mean, this doesn't make

14   or break anything, and the only thing I can suggest is you've

10:00   15   heard this consistent narrative in the case that, you know,

16   WhiteWater's the evil empire, they're sliming and slandering

17   the competition, and these guys would never do anything like

18   that.

19       And so the best I can tell is maybe this undercuts that

10:01   20   narrative by taking jabs like this.

21       But the more important thing for you to consider is if you

22   don't buy the explanation, then you've got to ask yourself if

23   somebody's not going to be truthful about something juvenile

24   like this for fear it will hurt their case, what weight do you

10:01   25   put on the rest of their testimony?

1    Some other things thrown about loosely.  Whitewater sues

2  everybody.  We really only heard for sure, other than this one

3  and the litigation between these people, about one lawsuit

4  Mr. Chutter mentioned, and I think Mr. McFarland said he'd

10:01  5  heard about one in China.  I mean, over 40 years.  That's

6  hardly the track record of an overly aggressive company.

7    Mr. Yeh told us this 2016 investor presentation in

8  deposition, this has been provided to a couple of potential

9  investors.  He was asked by his lawyer at trial.  No, didn't

10:02  10  give it to anybody for that.

11    And, again, the purpose, these projections are being used

12  to prove damages, so presumably they're there to kind of

13  undercut that.

14    We fenced over what funds were available to them because

10:02  15  they're trying to argue, oh, we could have never afforded to

16  pay $2 million or any significant amount in a lump-sum royalty.

17  In deposition it's unlimited.  I asked at trial, "Didn't you

18  have unlimited funds available?"  "I did not say that."  Again,

19  trying to avoid liability or at least the damages amount based

10:02  20  on, hey, we can't afford it.  We don't have the money.

21    Couldn't give a straight answer, Mr. Yeh, on whether things

22  were true or not.  They were, well, true to the extent I was

23  telling it to a group of Chinese investors who had English as a

24  second language.  And I don't know the translation from

10:03  25  Mandarin to English, but I think there's probably an equivalent

1   word for "true."  You're telling somebody something that's true

2   or you're not.  Why qualify?  Again, trying to distance

3   themselves from some of their own projections.

4         And then the other thing where the defendant suggested

5   that, no, we don't badmouth anybody in the business.  We play

6   it straight up.  Yet about every third question or answer from

7   Mr. Yeh on the stand, nonresponsive to the question, included

8   some snarky comment about WhiteWater.  So you actually got to

9   witness the behavior that they were swearing that they never

10  engaged in.

11        Willfulness.  We have -- you will get a question that asks

12  you not only do you find infringement, but do you find it was

13  willful; that they either did it on purpose or at least, you

14  know, recklessly disregarded the risks?

15        And the things you can consider:  Did they intentionally

16  copy?  We've got the so-called knockoff email.  That's about as

17  blatant an evidence of copying that one might find.

18        But there's more.  That they knew there was an unreasonable

19  risk.  We know they had a heightened sense of concern, they

20  say, about possibly being sued and that they looked at the

21  patents.  And did they have a reasonable belief that they

22  didn't infringe or that the patent was invalid?  We know they

23  studied the patent.  We know we've got this email where at

24  least up front in August they're saying they're going to knock

25  them off.  That's Exhibit 204.

         1        We had testimony from Mr. Alleshouse.  You know, couldn't

         2   quite make up his mind whether the fixed design was better than

         3   the flexible one.  Finally decided the fixed one was better.

         4   But then the one he ended up using was the one that was the

10:05    5   moveable, he would say "flexible," design.

         6        And there's this letter that they sent to their very first

         7   customer, who's obviously concerned about patent infringement,

         8   to try to explain why their products don't infringe.  And when

         9   they get to the '589 patent, basically say it's irrelevant.  It

10:05   10   applies to mobile attractions.  And Mr. Alleshouse testified

        11   that when they wrote that, he knew that it applied to more than

        12   that, so why tell the customer the '589's irrelevant because it

        13   relates to mobile ride attractions?

        14        We know they say they read it.  There was an attachment to

10:06   15   this letter that makes a little more reference about flexible

        16   tongue covers and nozzles -- or nozzle covers that restrict

        17   rider motion.  I'm not sure what that refers to, but no actual

        18   analysis of why they don't think they infringe the '589.

        19        And this letter goes on and on.  From the second page,

10:06   20   bottom half, it goes page after page after page in explaining

        21   why some other patent doesn't infringe.  So they talked to six

        22   different lawyers, didn't ask any one of them to give them an

        23   actual opinion on whether they were infringing.  And the

        24   question you got to ask is, why?  Is it because they didn't

10:06   25   want to hear the answer?  Why didn't they go through that

  1   analysis of the '589 with the customer?  Because as we've

  2   heard -- and give the same arguments they've tried to make in

  3   this court?  Because I think it's a fair inference they

  4   realized it would raise more questions than answers, and they

10:07  5   didn't want to lose that sale.

  6        So inequitable conduct.  That has to do with Mr. Squier's

  7   testimony and the application to get a late fee paid in the

  8   patent office.

  9        As we said at the beginning, this was an attempt to change

10:07 10   the subject, in our view, in a very nasty way.  A low blow.

 11   They're saying that we lied to the patent office about whether

 12   this was unintentional and did it on purpose.  And instead of

 13   focusing on what the truth is, the truth being, did Whitewater

 14   intentionally not pay the fee?  We were fencing about, well,

10:07 15   this form or that form, but at the end of the day, there's no

 16   evidence that the failure to pay the fee was intentional.

 17        The only evidence we've got, obviously not just from

 18   Mr. Squier, but we've heard it directly from the client.  No,

 19   no way I would let this fee go.  And, in fact, given the fact

10:08 20   that they were contemplating litigation, all the more reason

 21   they would do it.

 22        And then there was this other sort of

 23   spaghetti-against-the-wall theory from Mr. Yeh of, well, maybe

 24   Lochtefeld did it because he was mad.  So this is a defense in

10:08 25   search of a theory, and we still haven't heard a theory that

```
        1    coincides with the evidence and certainly nothing to show that
        2    there was an intentional lie or one that would suggest that
        3    that lawyer on behalf of that client intentionally lied to the
        4    patent office to get them to do something they didn't want to
10:08   5    do.
        6        Incidentally, the burden is very high on this one because
        7    of the impact of it.  It's clear and convincing evidence.  A
        8    number of the elements of -- it has to be a false statement.
        9    They had to do it on purpose.  It has to be something that
10:09  10    would have been a game-changer for the PTO, meaning if they
       11    learned it, they wouldn't have done it.  All they wanted was
       12    their money and an affirmation that somebody didn't do this on
       13    purpose and that there's no proof that the truth is that this
       14    fee was let go on purpose.
10:09  15        And intent to deceive.  If it was negligent, if it was
       16    careless, if it was grossly negligent, that ain't enough.  This
       17    is the nuclear bomb in the patent world.  You're basically
       18    accusing somebody of being a crook.  So unless it was
       19    deliberately chosen to do, it's not intentional.
10:10  20        This talk about who did Mr. Squier get to talk to?  It's
       21    okay if they received information from a third party, including
       22    another attorney, as long as they don't have any actual
       23    knowledge that the information's false.
       24        And then you heard Mr. Squier himself recite all the
10:10  25    provisions of the Code of Federal Regulations on that.  And
```

 1   then who do you have to ask if you've got a transfer to

 2   somebody who essentially has control of the patent?  The

 3   Court's telling you here in this instruction it's Whitewater.

 4   Whitewater's the one.  And we know from seeing the contract,

 5   they're the ones that were supposed to pay the fee.

 6        So damages.  Obviously we hope you get to this question

 7   because, as you've heard, in order to get there, you need to

 8   find infringement and that one or more of the claims are valid,

 9   and we hope and expect, based on the evidence, you will.

10        So you've heard about the hypothetical negotiation.  That's

11   the basis for determining it.  Although actual evidence of

12   their profits can be considered to try to figure out what might

13   have happened back in late 2013 when the negotiation occurred,

14   the royalty can't be limited by the actual or increased by the

15   actual profits.  In other words, you don't get to make that

16   judgment with hindsight.  You have to make that judgment based

17   on what was going on in 2013.

18        And our evidence is, and you already heard it from

19   Dr. Vigil, as well as Mr. Lewis' critique, that it would have

20   been a $2 million lump sum, and that would have been to use

21   this patent at all.

22        So we're asserting it as to both Pacific Surf Designs and

23   their subsidiary, Flow Services.  If you were to make a

24   separate assessment on Flow Services, the only other figure

25   you've got in terms of their sales is that $42,000 figure you

1640

1   got from their expert, Mr. Lewis.

2       In all this, you have to assume that both parties believe

3   that they would have been infringing if they'd gone ahead

4   without it.

10:12   5   We know what they planned at PSD back in 2013.  They did a

6   forecast.  And this is the forecast that Mr. Yeh testified

7   about.  They tried to run away from it, but it was just weeks

8   from the date of this hypothetical negotiation.  We know they

9   presented it to 5,000 people.  This is trial testimony and that

10:12   10   they thought it was fair at the time.  And nothing changed

11   between October 2013 and early December 2013.

12       As you can see, their sales pipeline goes on for months and

13   months, if not years.  Mr. Yeh had testified in trial that he

14   learned sometime after that conference in October that he

10:13   15   wasn't going to be able to implement the B2C,

16   business-to-consumer, model, and that's the extent of his

17   explanation.  He doesn't say what he learned.  Did somebody

18   call and say, you can't do it?  Did somebody say, we're not

19   going to give you money?  That was it.  What happened between

10:13   20   October and December?  And we never really heard.

21       What we do know is in 2016, when they did another business

22   plan, this B2C model that they learned in 2013 they couldn't

23   do, PSD has still got in their business plan B2C.  So even

24   based on their own words, this thing didn't die.

10:13   25   So why would WhiteWater want a hefty guaranteed price for

1  this?  Well, we know -- both parties would have known.  PSD

2  looked at FlowRider, which is now WhiteWater, as their only

3  competitor.  Every sale they take, they're going to take from

4  us.

5      So we talked about a number of the other licenses through

6  the experts.  None are exactly the same, but every one of them

7  had a form of guaranteed payment.  And that's essentially what

8  a lump-sum royalty is.  We're saying a lump sum that would have

9  been paid in 2013.  Even if you were to say, well, it would

10  have been $300,000 per year.  I mean, we're now six years

11  later, so economically, essentially 2 million today, it's the

12  same as 2 million before except no interest.  $300,000 a year

13  from back in 2014 is essentially the same as well because it

14  would all have been paid by now.

15      There's some discussion of foreign sales.  Mr. Pribonic

16  addressed the wrong standard.  He talked about whether the

17  components that were shipped overseas could be used for

18  something else.

19      This is Question 3 from the verdict form.  You'll see that

20  there's nothing about whether the components could be used for

21  something else.  It's a question of whether a substantial

22  portion of the components were sent overseas to be assembled

23  into something that would be infringing.  There was some

24  suggestion that we should just have a license based on the

25  nozzle assembly.  Not a single one of these licenses that were

1   presented involved licensing the right to just build the nozzle

2   assembly and just pay a fee on that.

3        There was suggestion of a design-around, and you got an

4   instruction on that.  The mere existence of a different device,

10:15  5   meaning doing the fixed nozzle cover design means they wouldn't

6   have had to pay very much because it would have been easy to go

7   without this patent.  The question is, is it really a

8   substitute?

9        And both sides were -- actually agreed that very few rides

10:16  10   with this supposed alternative design have actually been sold.

11   Mr. Alleshouse said he knew of one.  A handful more overseas.

12   Mr. Yeh came up with that one in South Africa in 2001.  Very

13   different ride.  Only one sold.  Compared to hundreds of rides

14   sold with the '589.

10:16  15        If you're going into a new business, what are you going to

16   copy?  The design that isn't selling or the design that's

17   selling to 97 percent of the market?

18        So I'd like to go to the verdict form briefly, if I may,

19   Gary, and just give you a bit of a preview of that.

10:16  20        So this is going to be your homework after you're done with

21   us.  Can you show me the second page of the verdict form?  And

22   the third page and the fourth page.  There we go.  So keep

23   going until we get to Question 1.

24        So the first series of questions are going to deal with

10:17  25   infringement, and the first three deal with PSD and whether

they're literally infringed is the first series of questions

under 1, and then Question 2 is going to be under the doctrine

of equivalents.  If you find that they literally infringe for

any one of the claims -- and you've got to look at each

claim -- then you wouldn't have to also say they're

equivalently infringing because if they literally infringe,

then clearly they do that.

     We think the evidence would support you answering yes to

all or most of the responses to Question Number 1.  And for

anywhere you don't answer yes on 1 for literal infringement, we

would hope and expect you would find the evidence would support

finding at least infringement by the doctrine of equivalents.

And the form indicates when it says yes or no, there's a little

parenthetical to clarify what does that mean it's for.  So yes,

you know, for WhiteWater, so that means, obviously, what we're

advocating as the answer you should give.

     Question 3 is that one I just showed you that just relates

to the foreign sales.

     And then the next series of questions, Question 4, that's

the question on the question of willfulness that we've already

talked about, meaning did they not just infringe, but did they

do it willfully, and is there evidence to support that?

     The next series of questions, 5, 6, and 7, similar

questions, they all relate to Flow Services because each

defendant's entitled to be reviewed separately.

1    Question 8.  Now we get to the invalidity ones, and that

2    deals with, have they proven by clear and convincing evidence,

3    that higher standard, that any of the claims are not new?  Here

4    again, the defendants, of course, would advocate for a "yes"

10:19    5    answer, and we hope you'll conclude that a "no" answer is

6    supported.

7    Then we go to the damages questions on Question 9.  And

8    basically this combination of instructions is if you have found

9    infringement on one or more claims that are not invalid, then

10:19   10    you go to the damages question.  And so they're separate lines

11    for each.  We've suggested that both defendants are liable for

12    $2 million.  If you come up with different numbers for them,

13    you need to decide what the total award should be if it's going

14    to be allocated separately.

10:19   15    The next page there's what we'll call advisory findings.

16    That means you're answering questions to help His Honor make

17    decisions about things that he may have the final word on,

18    taking into account some factual findings that you made, and so

19    that's why they're called advisory.

10:20   20    So this whole thing on obviousness, that's one of those,

21    and so you're being asked questions about what would be a

22    POSITA, person of ordinary skill in the arts, and each side's

23    version of what that is is in there and will help inform your

24    judgment on the rest of the questions.

10:20   25    The next page you're being asked what are the differences

1    between the claimed invention and any of the prior art?  So

2    there's a series of checklist items to determine is this

3    different?  Is this different, meaning are these differences

4    from what that prior art has to what you see in the invention,

10:20    5    the '589 patent.

6        And then you're being asked about some of these other

7    factors on the next page.  Was there a commercial success?  Did

8    people want to license this?  And so forth.  That would all

9    tend to indicate, yeah, this invention wasn't obvious.  It

10:21   10    really had an impact after it came out.

11        And then last on that -- on the next page you're being

12    asked to kind of make an overall assessment.  Do you think any

13    one of these claims are obvious?

14        And then, finally, you get to make an advisory finding for

10:21   15    the Court on this inequitable conduct involving that fee that

16    was paid late, and you're going to be asked whether or not the

17    defendants have proven by clear and convincing evidence that

18    either Whitewater or somebody acting on their behalf,

19    Mr. Squier, made material misrepresentations to the patent

10:21   20    office and that they did it on purpose.

21        And so with that, we'll bring you to the end of the form.

22    So -- and it will also bring you to the end of my closing

23    remarks.

24        I'd like to thank you, as we have several times during the

10:22   25    trial, for participating in what is a -- really a critical part

1   of our democracy.  You've got a judge appointed by the

2   President, approved by the Senate.  You've got people in the

3   box who elected that President and elected that Senate

4   enforcing laws passed by our Congress.  And then they turn it

5   all back to you to help the rest of us figure out a just result

6   between these parties.  So you're playing an important role in

7   the civil justice system and our case, one that we hope

8   protects inventors like Tom Lochtefeld and people like

9   WhiteWater who pay good money to acquire their inventions and

10  did it the right way instead of just taking it and knocking

11  them off.

12      So I may have a few minutes later to respond to any other

13  comments, but with that, I'll sit down.  Thank you.

14          THE COURT:  Well, thank you, Mr. O'Hare.

15      I think now is a good time for us to take a morning break.

16      Before I do that, we're going to buy you lunch today

17  because we'd like for you to be deliberating.  In order for us

18  to do that, we're going to have to deliver -- or to give you

19  some menus that you can pick your options.  Glenn, do we

20  have --

21          THE CLERK:  Working on it.

22          THE COURT:  Maybe we'll get some burritos.  How's

23  that?  Just to sort of fit into the evidentiary portion of the

24  trial.  What do you think?

25      So I'll tell you what:  Why don't you -- I hope my voice is

1    going to hold up until the end of this trial.  Why don't you

2    take -- let's see.  Let's come back at about 25 till, and then

3    if you'll go into the jury room, we will bring you the menus.

4    You can fill those out, and once you're finished with those,

10:24   5    we'll bring you back, and now the defense will get a chance to

6    give you their closing argument.

7         Please remember my admonition.  It's still very important.

8    Please continue to have an open mind.  Okay?

9         All right.  We will see you at 25 till.  Thank you.

10:24   10    (Proceedings held outside the presence of the jury panel.)

11         THE COURT:  Counsel, the jury has left the courtroom.

12         So since you may not be familiar with my practice, since

13    this is a case that involves a complaint and a cross-complaint,

14    it's my practice usually in those cases to allow the

10:25   15    cross-complainant or defendant to have a short surrebuttal

16    following rebuttal argument by plaintiffs.  So, Mr. O'Hare,

17    after you've delivered your rebuttal argument, I will allow the

18    defense to deliver a short surrebuttal.  Your rebuttal will be

19    focused on new matters or on new matters raised by Mr. Thomas.

10:25   20         Mr. Thomas or Mr. Kolegraff, your surrebuttal will be

21    limited to new matters raised by Mr. O'Hare's rebuttal.

22    Understood?

23         MR. THOMAS:  Understood, Your Honor.

24         THE COURT:  Okay.  Great.  Have a great recess.  All

10:25   25    right.  Thank you.

1    (Recess.)

2    (Proceedings held outside the presence of the jury panel.)

3         THE COURT:  All right, Glenn.  Go get the jury.

4         THE CLERK:  Yes, Judge.

10:45   5    (Proceedings held in the presence of the jury panel.)

6         THE COURT:  All right.  Welcome back.  Mr. Thomas.

7         MR. THOMAS:  Thank you, Your Honor.

8    Good morning, ladies and gentlemen.

9         I want to first begin by thanking you for your service, and

10:46   10   I observed you all paying attention throughout, and it's not

11   easy in technical cases to do that, taking good notes, and that

12   makes me feel good because we want to make sure that we've

13   given you something that is understandable and comprehensible

14   to you.  This technical stuff isn't always the easiest kind of

10:47   15   cases for a jury to handle, but we do think this is one that's

16   not too intense on the technical side.

17        So with that, after hearing Mr. O'Hare's closing argument,

18   it occurred to me as I'm sitting there, there's either

19   confusion on his part or design, but we need to reset what is

10:47   20   the patent.

21        And the patent is, and this evidence was undisputed at

22   trial -- the patented invention was the 1999 patent that

23   Mr. Lochtefeld obtained, and we showed this demonstrative to

24   you.  The demonstrative has no hinge, has no metal flap, and

10:47   25   I'll show you on the drawings in Figure 3A.  It extends back

1    here past the nozzle flap.  It says -- I think it was

2    Figure 190, and I'll show it to you in a minute.  194, Pad 4,

3    and N.  Pad 4 and N was over here.  That was the way Whitewater

4    made their nozzle flap.  That is their invention.  They

5    abandoned that invention in 2005.  And that's -- nobody argues

6    that, and they say this is no longer valued, this is not

7    important, we're going to do it differently, and they went with

8    this two-piece system, metal flap, not flexible, separate hinge

9    part, not present in that invention, not mentioned in that

10   invention.

11       And the confusion that I was concerned about with

12   Mr. O'Hare's closing argument is he starts saying, well, they

13   copied the hinge.  We showed you drawings.  He mentioned

14   Exhibit 383-1.  And if you look at that exhibit, guess what?

15   The date's very important.  March 27, 2009.  Yes, he was

16   drawing not the patented invention.  He was drawing what they

17   were manufacturing at the time, which is not covered by the

18   patent.

19       So comparing Mr. Alleshouse's drawings in 2009 and

20   comparing the claims in the patent to this device, which is not

21   covered by the patent, is misleading.  And I'll go into this in

22   detail.

23       So with that, let's start the presentation.

24       I have no other way to say this, having sat through this

25   case.  And these are strong words.  But there's no other way to

1    describe it.  This case against Pacific Surf Designs and its

2    subsidiary, Flow Services, is a complete sham.  No other way to

3    call this.

4         Start with the competition.  PSD is competing fairly.  As

5    we heard from Mr. Alleshouse and Mr. Yong, who's an attorney,

6    Mr. Alleshouse a mechanical engineer from Berkeley.  They

7    carefully went through all these patents.  They determined they

8    were free to use a hinged metal flap.  Mr. Alleshouse knew

9    better than anybody that Wave Loch ceased using that padded

10   foam, singular padded foam, covering the sluice back in 2005.

11   Because he worked on drawings in 2009.  He's responsible for

12   putting that in.  He knew that was not covered by the 2000

13   patent.  So he knew, as an engineer, these are entirely two

14   different systems.  And we'll demonstrate that to you.

15        You hear from -- and they started this in their opening

16   statement, and Mr. O'Hare, they jump on this, oh, the knockoff

17   email and copying and all these things.

18        Well, Mr. Chutter, he testified that, that they also copy.

19        And here's a quote from his own email saying, "It improves

20   our product and means we have less differentiation."  So

21   copying is part of the business.  And, in fact, WhiteWater does

22   copy.  And he also went further than that to say they knock off

23   others.  And he directed his team to evaluate the competitors'

24   products to see if there were things of value that they were

25   using that he could add back into his product.

1       I'm not saying this so much that there was something
2  improper about what Mr. Chutter was directing his team to do,
3  but for them to get up and accuse us of doing something
4  improper by, quote, knocking off when it's conceded by the CEO
5  from Canada, Mr. Chutter, who flew down here with his awards
6  and his tuxedos and all those things, and he agrees that it's
7  okay to copy.  It's okay to knock off.  So all this idea about
8  knocking off and copying, it really is -- it's kind of a
9  distraction that has nothing to do with the case.

10      And what's more important, Mr. Myrman and Mr. Chutter in
11 emails, they internally acknowledge -- at the bottom this is
12 Exhibit NS -- just because we get knocked off, that doesn't
13 guarantee infringement.  So we have two different things going
14 on here.  To throw this word "knockoff" around is, again, a
15 distraction.  And even if there is some form of knockoff going
16 on either between my client and WhiteWater or WhiteWater taking
17 my client's product, that doesn't guarantee there's any patent
18 infringement or anything illegal about that.

19      WhiteWater's patent infringement case -- this is probably
20 the easiest way to look at this.  It's based on what I call
21 three demonstrable lies.

22      The first lie is that the '589 patent for a flexible nozzle
23 flap reduced the footprint for the wave machine.  That's what
24 they had Mr. Lochtefeld try to convince you, that this tiny
25 little thing on this big machine somehow caused the shape and

1652

1   dimension of that machine to change.

2       The second lie is that WhiteWater misrepresented -- this

3   came largely through Mr. Stevick, Dr. Stevick -- the plain and

4   ordinary meaning of the claims of the '589 patent.

10:52  5       And then, finally, the other myth in this case is that

6   somehow, someway, according to their damages expert, PSD would

7   have agreed to pay a $2 million fee for a nonexclusive right to

8   use a $3,000 part that they're selling -- we have invoices.

9   They're selling that for $3,000.  And this, we think, is

10:53  10  nothing more than a construct.

11      Let's talk about lie number one.  The nozzle flap reduced

12  the footprint.  WhiteWater says the '589 nozzle flap reduced

13  the footprint to lower operating cost and construction costs.

14  We heard from Mr. Alleshouse and Mr. McFarland from American

10:53  15  Wave Machine.  They both testified that the reduced footprint

16  was due to the switch to horizontal pumps and the tension

17  surfaces.

18      The gen 2, which we talked about, these gen 2 sheet wave

19  machines, we had repositioned horizontal pumps, and they used a

10:53  20  different ride surface, tension ride surfaces.  The gen 1, this

21  is the Hyland Hills.  We've seen this photo many times with the

22  vertical pumps.  And gen 2.  This is a computer image of the

23  horizontal pumps, Exhibit CF-1.  The move to the gen 2 machines

24  drove this market.  Here's the graph we looked at.  We heard,

10:54  25  oh, my God, Mr. O'Hare was trying to get Mr. Alleshouse to

1    agree that somehow the '589 -- really, after that, everything

2    took off.  And the statistics and the data just don't support

3    that in any way, shape, or form.  This graph will tell you more

4    than you need to know.  The orange graph on the second

5    generation sales after 2004 goes through the roof.  They

6    continue selling -- it's important that they didn't stop

7    selling, but the number of sales of the first-generation

8    machines with the vertical pumps just lagged.  It was

9    insignificant in comparison to what happened after they adopted

10   the horizontal pumps and the tension surface.

11        This is also noted in the testimony.  And Mr. Alleshouse

12   made a very good point here.  He says, "No matter what nozzle

13   flap you had put on the ride attraction" -- and this is in

14   reference to the Hyland Hills -- "even if you switched the

15   nozzle pumps, you still had the wall."  So the nozzle pumps

16   don't change anything.  They don't drive anything.  It's the

17   positioning of the equipment that drives that.

18        Talk about lie number two.  WhiteWater misrepresents the

19   plain meaning of the claims.  You heard a lot of testimony.  We

20   had almost -- between direct examination and rebuttal

21   examination of this Dr. Stevick, he came in with all kinds of

22   ideas and opinions based on these specifications and why this

23   patent covers all these things, and it's obvious, and it will

24   be obvious to you when you read the jury instructions, if it's

25   not in the claims, it's not part of the invention.  And since

1    they understood this coming into this case, what Whitewater did

2    coming in, they hired an expert to sponsor this.  They tried to

3    import language from the specification to broaden these claims

4    because they know the claims don't cover hinges, doesn't cover

5    steel, doesn't cover all these things.  There's nothing in

6    these claims about that.  So they had to hire an expert to tell

7    you something that the jury instructions tell you you can't do,

8    is use those specifications to broaden what's in those claims.

9        As I mentioned, they want to broaden the claims because

10    they realize that they're stuck with the claims.  If you do

11    your job and just read those claims, there is no infringement.

12    There's no case for infringement here.  It's not even a close

13    case of no case.

14        And as we mentioned, the jury instructions told you this

15    cannot be done.  The Court read in part the -- read all the

16    instructions, but one of them -- I'm going to show it to you

17    here.  "The claims can never be broader than the

18    specifications."

19        So here the specification -- this is the jury instruction.

20    "The patent's protection only extends to the plain and ordinary

21    meaning of the plain language of the patent claims.  The

22    specification of a patent cannot broaden the patent's

23    protection."

24        We had a day of Dr. Stevick trying to convince you that,

25    oh, these walls are part of this patent.  This vertical wall.

1655

1    It's not part of the patent.  Oh, this hinge because it's

2    flexible.  No, the hinge is not part of the patent.

3        So we had a day of obfuscation by a hired-and-paid witness,

4    a highly paid witness, to tell you something that the jury

10:57    5    instructions told you at the very end of the case, you've got

6    to disregard that.  That's not important.  That's not how you

7    read the patent.  You read the claims, and you read the plain

8    and ordinary meaning.  If it's in there, it's protected.  If

9    it's not in there, it's not protected.

10:57   10        It's more important than this when you consider what

11   Whitewater did in getting this expert to say all these things

12   to you.  They have Lochtefeld, the inventor of this patent.  He

13   testified early in this case.  And here's his testimony:  "Do

14   you have an understanding what the claims in the patent are?"

10:58   15   "Yes, it sets forth the boundaries of your invention."  So here

16   you have the inventor of the patent who they called as a

17   witness on their side contradicting a day of testimony you

18   heard from Dr. Stevick.  And why would they do that?  And

19   that's a question we're going to get to.  Why would they hire

10:58   20   somebody to do something and say something and give you the

21   impression that you could consider things to broaden these

22   claims when you're going to be instructed you cannot do?

23        The third lie is PSD would have paid $2 million for a

24   nonexclusive right to a $3,000 part.  You heard from both

10:58   25   Mr. Alleshouse and Mr. Yeh they would never have agreed to

10:59

 1   that.  And this hypothetical negotiation assumes both parties

 2   would have agreed.  So we know from the evidence that's not

 3   reality.  We've never agreed to pay $2 million whether we had

 4   access to credit.  That's not the issue.  Would it make sense?

 5   Would you do that?  Is that reasonable?

 6       As I mentioned at the very beginning, the most important

 7   thing here is the flexible nozzle flap that's described in the

 8   '589 patent was completely abandoned by WhiteWater.  They

 9   stopped making that.  They went to a hinged, two-structure

10:59 10 piano hinge or a -- metal flap that's not flexible and this

11   burrito board, which is not even part of the nozzle flap.

12   That's the design they were making from 2005 forward.  So we

13   know they didn't value the invention after 2005 because they

14   stopped practicing it.

10:59 15     And we know that even the nozzle flap that they're using

16   sells for $3,000, so why would you pay $2 million for a license

17   to a patent, number one, that doesn't read on what you're

18   doing; and number two, even if it did, the value of that piece

19   is not significant at all to what you're doing.  You would

10:59 20 never pay a $2 million lump sum for the privilege of using a

21   $3,000 part which you could design.

22       And, finally, Dr. Vigil, you know, he went up with this

23   $2 million royalty.  Of course, he just took the sales and said

24   this is such an important little piece to the whole thing.  We

11:00 25 just look at all the sales dollars, and we came up with that

1    $2 million.

2        There is a doctrine known as the Smallest Saleable Patent

3    Practiced Unit, SSPPU.  Justin Lewis, our expert, testified at

4    length about that.  And that's typically what you do.  If you

5    have an invention, you measure the damages based on that piece.

6    Like a car.  Is it the door handle or is it the motor?  And you

7    don't get the whole sale of the car.  You get the relative

8    incremental value that that invention adds to it.

9        But the point here, Dr. Vigil just disregarded all that,

10   and he went for the jugular.  He went for the highest number he

11   could possibly throw out there, and we'll tell you why here in

12   a few minutes.

13       So these are the lies that I think form the total basis of

14   this case.  Now, I mentioned Figure 3A.  On the left, that is

15   on the screen in front of you.  And the padded nozzle flap on

16   the far left is exactly that Figure 3A, and there is no steel,

17   there is no hinges, and what's important here -- it's not

18   shown, but it was shown on Mr. O'Hare's figure because they

19   correlated the numbers.  If you see 194, where that is, that's

20   over and across.  That's the -- the definition in the patent

21   there is the pad-forward end.  So that pad continues as a

22   single piece over and on top all the way over that nozzle flap

23   to there, one single piece sitting on top, up until 2005.  They

24   stopped doing that in 2005.

25       So when you start reading these claims to understand

1658

 1   whether there's infringement, you have to understand that we're

 2   talking about what they were doing back in 2005 and what they

 3   invented in 2000.  We're not talking about -- they're free to

 4   abandon their patent at any time they want.  They can do that.

11:02   5   But they can't say that my patent covers because I modified it,

 6   somehow that patent covers what I'm doing in 2006 or 2010 or

 7   2011.  They can't do that.  That's not part of their invention.

 8        So when we start talking about covering and extending over,

 9   I just want everybody to keep this in mind.  This is the

11:02  10   original design.  Single-piece cover and extending over.

11        Following 2005, there's not a single nozzle flap made or

12   sold by WhiteWater or, frankly, my client that has a cover that

13   extends over in the fashion described in this patent.

14        So there is no infringement.  There's no infringement by

11:02  15   themselves of their own modification, and there's certainly no

16   infringement by PSD doing the same thing.

17        Let me clear this.

18        Let's talk now about infringement.  PSD does not infringe

19   any asserted claim of the '589 patent.  And we'll walk you

11:02  20   through that.

21        Flexible tongue and the piano hinge.  We talked at length

22   about these things.  "Flexible" is just a material property of

23   an object.  It's not anything more than that.  You'll

24   see -- we'll go through the patent claims.  The original -- the

11:03  25   patent that Lochtefeld filed was for a padded flexible nozzle

flap, which is the far end one, no hinges, no steel, no
nothing.

"Hinge" constrains motion.  You heard from Mr. Alleshouse.
And, finally, we got Dr. Stevick.  He argued with the judge a
little bit.  The judge was questioning him.  You're saying this
is flexible.  This is not.  Would you agree?  And he showed him
the piano hinge, and then finally Dr. Stevick said yes, this
piano hinge is not flexible.  Okay.  A piano hinge runs the
course of -- these nozzle flaps, they're 102 inches long.  The
hinge runs all the way across.  They're not like a door hinge
where you have a hinge here, the middle, and the end.  These
are all the way across the object.  So the hinge constrains
rotation and movement.  It doesn't add flexibility.

Dr. Stevick, as I said, finally agreed yesterday that the
piano hinge, yeah, I agree, in fact, that's not a flexible
device.

And what's more importantly is the hinge is a separate
piece.  When they went to 2005, they added a hinge.  It's not
in the patent, separate piece.  This is the nozzle flap.  This
is not flexible.  Nobody can make that flex.  I mean, I'm not
strong enough.  So we have two-piece construction.  And then
there's this little burrito board that sits behind.  You no
longer have a single cover across the entire nozzle or sluice
area.  You have a bunch of components that are separate that
are not covered by the patent.

1          And we bandied this about a little bit, but this definition

2     of "flexible":  "Capable of being pliable, being bent."  And I

3     showed you the demonstration of that -- the metal flap that

4     sits on a hinge.  It's not capable of doing any of those things

11:05   5     that's in the dictionary.

6          So Mr. Alleshouse testified the hinged metal flap is not

7     flexible.  His testimony is -- as we said, it's a material

8     property or an object property, and the hinged metal flap is

9     not flexible.  It's a constrained motion.

11:05   10          I believe yesterday the expert for WhiteWater also agreed

11     to this, that the piano hinge constrains motion.  That's all it

12     does.

13          The '589 patent does not disclose a hinge.  That's where we

14     get back to reading the patent in the claims and not doing what

11:05   15     you were suggesting that you could do, is you could freelance,

16     put anything in this patent, we could look.  If there's a word

17     over here, and that helps my argument, you just grab it and

18     claim it's part of the invention.  You can't do that.

19          Lochtefeld, when he testified, the inventor of the patent,

11:06   20     he admits the hinge is not disclosed anywhere in any asserted

21     claim.  There are probably eight or nine claims that are

22     asserted, but there's 57 claims in the patent, and the word

23     "hinge" is not included in any of it.  So if you read the whole

24     patent, it's not there anywhere.

11:06   25          Lochtefeld admitted it was not anywhere in the description

1    of the patent, and he admitted it was not shown in any drawing.

2    I'm sorry.  I'm having trouble with this.

3         Okay.  So we know from Lochtefeld, hinge is not part of

4    this patent.

11:06  5    And, furthermore, Lochtefeld, as I showed you previously in

6    his testimony, admits that the claims define the boundary of

7    the invention.  We know you're back to the claims, and you're

8    not looking at all this other language that was suggested you

9    should be looking at to get a result that would not be

11:07  10   appropriate in this case.

11        And what's more important is Lochtefeld, again, the

12   inventor, he described what the flexible tongue was.  And this

13   is his own testimony.  He said a nozzle cover that is padded.

14   We know that.  Padding is soft and squishy.  If someone hits

11:07  15   it, they're not going to get injured.  We call a tongue that

16   sticks out over the nozzle aperture.

17        So all these words are accurately and truthfully describing

18   what we have here on the far left of NU, which is that padded

19   cover.  It's not describing what my client is making.  And it's

11:07  20   not describing what WhiteWater's been making since 2005.

21        The flexible tongue described in the '589 is flexible.  We

22   heard that already from Mr. Lochtefeld.  And I'm going to play

23   this video.  I know you saw it briefly, but there is -- it was

24   installed -- this is the system that was being used, by

11:07  25   Mr. Lochtefeld's admission, from 1999 to 2005.  Used a heavy

1662

foam mat.  Extended over the nozzle and the outlets.  And it
had a flexible tongue.  A foam pad without structure that can
bend and twist.  And it has no piano hinge.  And here is that
video that shows you how this -- as it's designed in the
patent, how this behaves.  That's deformation on the one side
where it's being pressured up.  You can see the middle and the
far end is not moving, unlike a piano hinge where all the
movement would be aligned.  And there's nothing inside
reinforcing this flexible tongue.

PSD does not use a flexible hinge.  This is, again,
sometimes people try to win by confusion.  We're going to try
to avoid that in this case.

They brought up -- Mr. O'Hare brought up this American
Heritage dictionary definition of a "hinge," which we had to
retype to the right because that copy was hard to read.  But
you can read it easily on the right.  It says, "A jointed or
flexible."  So you have two different -- as many dictionary
definitions have more than one definition for a single word.
And this could be, "A jointed or a flexible device that allows
turning or pivoting of a part as a door on a stationary frame."
So using door as an example.

But let's talk about the real examples, and I think the
judge in this case correctly brought up, showed that binder to
the witnesses and opened it and closed it deftly on the bench
and said, "Is this a hinge?  Is this a hinge?"  And this binder

1    is a single object.  There's no hinge device in it.  It's using

2    deformation.  So whether it's the material, it's the properties

3    of the material, whether it's vinyl or plastic or whatever it

4    may be, but you can by force of motion create a hinge because

11:10    5    it's a flexible material.

6        We use a piano hinge, which Dr. Stevick agreed is not

7    flexible, and a piano hinge does not deform and is a separate

8    part.

9        So unlike this example with the binder where it's a single

11:10    10    piece, our structure -- there are piano hinges, and I think

11    Mr. O'Hare showed one to you in his closing, was a picture of

12    one with a piano hinge in it, and a piano hinge is a three-part

13    device.  You've got a pin in the middle, and you've got two

14    leaves.  We've all seen the hinge, and this is the hinge right

11:10    15    here, this yellow device.  And when you affix that to the

16    nozzle flap, it just allows a rotational movement.

17        This binder on the left doesn't have any system like that

18    at all.  It's just a flexible system that doesn't require a

19    hinge.

11:11    20        So let's go now to WhiteWater says, as I mentioned to you,

21    they really have to rely on the specifications, which we think

22    is improper, to get where they want to go in this case.

23        And as I mentioned to you, this portion of the

24    specification is not in the claims.  This is not part of the

11:11    25    invention.  There's no hinge in this anyway.  If you go through

1    this, you'll see there's no metal hinge.  There's no metal flap

2    in this discussion, to the extent you really care to even read

3    it.  And, really, what they just mentioned, the words "soft,

4    flexible material," and as we said before, that use of the word

11:11   5    "flexible" is just a property of the flexible tongue.

6        So let's talk now about why we don't infringe Claim 1.

7    Claim 1 is up in front of you now.  The very first part of

8    Claim 1 is this flexible tongue.  This shows the system that

9    PSD uses and, frankly, more or less, is being used by

11:12  10    WhiteWater after 2005.

11        We show you where the nozzles are.  You can see that this

12    hinge sits right against the nozzles, so the flat -- the metal

13    flap is actually in front of the nozzles.  It's attached to the

14    hinge.  It's a metal plate.  It's not a flexible tongue.  And

11:12  15    it goes down against the ride surface.

16        But what's missing here, and why this is not infringed, is

17    there is no flexible-tongue element as shown in Figure 3A and

18    as described in the patent.  So this does not infringe Claim 1.

19    As we said, PSD has a hinged metal plate.  Does not have a

11:12  20    nozzle cover, including a flexible tongue that is biased

21    downward.

22        PSD does not infringe on Independent Claim 17.  This

23    requires a contoured flexible pad and a flexible tongue at a

24    down-end stream.  Those are the words that are asserted as

11:13  25    being infringed by whitewater.

1       Again, over to our diagram, and we can see at the down-end

2   stream it's a rigid steel piece, and it's not a flexible

3   tongue; therefore, there is no infringement.

4       We do not have a contoured flexible pad.  Those are the

11:13   5   words in Claim 17.  And we do not have a flexible tongue.

6       PSD does not infringe on Claim 24, the operative words here

7   being, "The cover, which covers and extends over the top

8   surface of said sluice."

9       I'm going to change my battery.  And while we're doing

11:13   10   that, this is that Figure 3A.  I'll show it again.  This is

11   where the original design had a single piece that started there

12   and ended up over the top cover.  That's not used by them after

13   2005, and it's not used by us.

14       Thank you.  Okay.  So see if this works better.

11:14   15       Okay.  So we have the piano hinge.  We have the hinged

16   metal flap.  Okay.  We've got it now.  And what you have here,

17   which is important, because I can show you these pieces.  They

18   moved away from a single piece in the design of the patent, and

19   they went to a system that incorporated a hinge, not part of

11:14   20   the patent, went to this steel plate that has protection on it,

21   and what sits behind this is a third part.  They call this the

22   burrito board.  The burrito board is not connected to the

23   nozzle flap.  The burrito board is not part of the nozzle flap.

24   So when they try to conflate this claim because, really, the

11:15   25   claim's driven to the system they used up until 2005, the

1    single pad covering the sluice, they're trying to somehow

2    suggest we got you because there's a burrito board here.  And

3    you'll understand when you see these drawings that the burrito

4    board is not part of the nozzle cover.  The nozzle cover sits

5    in front of the nozzles and extends over the nozzles, but it

6    doesn't cover the top of the sluice.  And you can see the

7    arrows to the left where the nozzle sluice are depicted.

8         Claim 37.  Again, this requires a flexible tongue.  We've

9    already covered this.  A nozzle cover.  If you don't have the

10   flexible tongue, you're not infringing.  There is no flexible

11   tongue for Claim 37.

12        Claim 42 requires a flexible tongue.  And, again, there is

13   no flexible tongue, so even though there's a lot of claims to

14   look at, the evidence is pretty similar for most of these

15   independent claims.  Once you arrive at a determination, what

16   we talk about is a flexible tongue, which is a padded, soft

17   material versus a piece of steel, and you understand that that

18   is not made flexible by virtue of the hinge.  The hinge isn't

19   part of the invention.  Then you understand it's easy to work

20   through these claims and get to the right result.

21        Claim 42.  This requires a flexible tongue, again, being

22   biased downward.  Again, we're not a flexible tongue, so

23   there's no infringement.

24        As we said before, metal plate is not equivalent to a

25   flexible tongue.

1        Now, we talked about -- Mr. O'Hare talked about the

2   doctrine of equivalents.  You heard testimony about that, and

3   there are substantial differences.  For a metal plate, it's not

4   the same function.  A metal plate only protects the area in

11:17   5   front of the nozzles.  The nozzles, as was explained, are

6   underneath here, so this is protecting the area in front.  It's

7   not protecting the top of the nozzles.  It doesn't cover the

8   nozzles.  It's not done in the same way.  The metal plate has

9   no flexibility, so it can't deform.  We showed you the video

11:17   10   where you pick up one end of that flexible tongue down there,

11   and this one you pick up one end, and the entire thing moves

12   together.  So it's not allowing for the same deformation.

13        And you've got a very different safety profile because,

14   again, and I'll show you a video to demonstrate this more

11:17   15   aptly, but this nozzle flap is only protecting the front of the

16   nozzle.  It's offering no protection on top of the nozzles.

17   And we'll show this with a video of FlowRider's own product

18   that they're using today.  Not their patented product, but what

19   they're using today.  So there's no infringement under the

11:17   20   doctrine of equivalents.

21        This is the video I mentioned.  This is a FlowRider system,

22   and I'm going to play it in a second, but I want you to observe

23   the foot on -- what would be his left foot is in between the

24   burrito board and the nozzle flap.  The burrito board is not

11:18   25   part of the nozzle flap.  He's actually standing between those

1    two pieces, and, again, that's different than what was designed

2    in the patent.

3        So let's play this video.  We can see the illustration of

4    why the nozzle flap, as we're using it, does not extend over

5    and cover the top of the nozzles.

6        Okay.  This continues on, and you've seen it before, and

7    I'll just describe for you what happens next.  He slides up

8    over on top of the nozzle flap.  The burrito board is washed

9    away, and, if you recall, the judge even stopped the testimony,

10   and he said, "What is that?  Why is that piece moving?"

11   Because I'm sure he recognized -- I'm sorry.  He didn't -- none

12   of us recognized from the patent what that piece was because

13   that piece is not part of the patent.

14       So I don't know if we can get this to play or not, but, in

15   any case, what you can see from this depiction is that, number

16   one, they're not practicing the invention.  They're not using

17   that single-pad covering across.  They're using something

18   different.  And that device that they're using, and similar to

19   what we're using, does not cover.  The area of the

20   nozzle -- the nozzle sluice is this area here, back here.

21   There's no padding.  There's nothing covering that, as required

22   by the patent to find infringement.

23       We'll try it again.  If it doesn't, I'll move on.  Well,

24   we're not going to get there on this one, but I'm sure you

25   remember it anyway, so we'll move on.

           1       Again, I'm back to Figure 3A, and I mentioned this to you
           2   again.  This is directly out of the patent, and you can
           3   correlate this "194" here.  And that is described to be the
           4   pad-forward end.  This is the downstream end, and that's the
 11:20     5   flexible tongue.  And that's the forward end.  This is a
           6   single-piece covering.  That's not present in our design.  It's
           7   not present in their current design.  So there's no way that
           8   they can assert this infringement claim under Claim 17.
           9       Let me clear that for you.  Okay.
 11:20    10       Now, we talked about this shipping parts to other
          11   countries.  This is a pretty simple analysis, as far as I'm
          12   concerned.  We ship off-the-shelf raw materials to other sites.
          13   Yes, we do.  They make them -- the nozzle flaps on-site.
          14   Whether it's France or Mexico or other countries.  And the most
 11:21    15   important thing is, when it's all assembled, it's exactly what
          16   we have here.  You've got a hinge, you've got a metal plate,
          17   and you've got maybe a burrito board, but you don't have what
          18   is described in the patent.  So we are not infringing.
          19       So a hinged metal flap, no matter where we make it, we make
 11:21    20   it in the U.S. or we make it in Canada or we make it in Mexico
          21   or whatever country it may be, does not infringe the '589.
          22       There's no willfulness here.  We talked about the due
          23   diligence done by Mr. Alleshouse and Mr. Yeh.  They talked to
          24   each other.  They talked to -- he reviewed drawings.  He
 11:21    25   certainly is qualified as skilled in the art under any

definition.  Under Mr. Pribonic's definition, clearly
Mr. Alleshouse is a person skilled in the art.  He analyzed all
the patent claims.  He understands what they mean.  He
certainly worked on the devices that were then being used back
in 2009 and 2008 by WhiteWater and understood the patent and
understood the patent didn't cover these.  Talked to half a
dozen attorneys.  They got advice.  They reviewed all the
patents on the WhiteWater's website.  And they avoided.  It's
interesting.  They didn't use -- the trampoline patent had some
value.  It's been licensed.  It's been used.  It was a new
system for ride surfaces, but he didn't use that.  He's never
been accused of violating that, so we do know he was careful in
what he did.

     Let's talk about invalidity.  The '589 patents, claims,
they are invalid.  And how do we know that?  Well, 1996, we
heard testimony from Mr. Lochtefeld, and he agreed that the
Hyland Hills and Guam, they already had flexible tongues.  This
is a picture.  We've seen it a lot.  I don't need to spend a
bunch of time on it, but this is the rider, and, you know, we
heard a lot from Dr. Stevick.  Oh, she can't get up and over,
all this stuff.  The nozzle flap here is doing exactly what our
nozzle flap does, which is protecting the front end of the
rider from going into the nozzle, and it is capably ridden
over.  I think all the experts finally agreed, yes, they could
ride over that lower part, and that would have afforded the

1    protection.  This discussion about jumping on top of this deck

2    is just irrelevant.  This comes from Mr. Stevick's attempt to

3    capture things out of the specifications or inferences even,

4    not even directly stated, inferences.  Oh, there's a vertical

11:23    5    wall associated with this.  There's no vertical wall in the

6    patent, and it doesn't require anything like that.  The simple

7    claims speak to a riding over of the nozzles.  It doesn't have

8    to go on top of that deck.  So we know that that feature was

9    afforded in both Hyland Hills and Guam.  Here's the drawing

11:24    10    that Mr. O'Hare showed as well.  The nozzle in the yellow.

11    This flexible tongue hanging down.  The water coming underneath

12    that.  Basically doing the same thing, Exhibit CJ-4, that is

13    shown in the Lochtefeld patent, the '589 patent.

14         So you'll -- in terms of this anticipation, we had a lot of

11:24    15    testimony, and, again, I think it all comes down to some very

16    core points that run through all of these claims.  And I don't

17    want to repeat all that.  I think you guys are smart, and you

18    understand that, but if you don't have -- if you have the

19    flexible tongue on anticipation, if you had the protection and

11:25    20    the ride-over feature for the nozzle flaps, you have

21    anticipation.  And both of these -- both of these facilities

22    are important because they were facilities done by Wave Loch

23    and Mr. Lochtefeld himself.  So he knew about those when he

24    filed his patent.  He never disclosed those.  He never

11:25    25    explained why he didn't disclose those, but he knew that.  And

1    that's why he came up with this.  He was using those and

2    practicing those, and he put it into his patent that he filed

3    in the '589.

4        So all these independent claims are all -- and Dependent

5    Claims 3, 13, and 15 are all anticipated by both Hyland Hills

6    and Guam.  And those are all set forth -- I'm not going to walk

7    you through those right now.

8        Independent Claim 17, 37, and 42 and Dependent Claim 43 are

9    also anticipated.  And if you go back and just read the

10   language, what they all basically talk about is padded flap,

11   extending over the water, protecting the nozzles, adding a

12   ride-over feature.

13       Independent Claim 24, Dependent 25, 27, and 30, again, all

14   of these are anticipated by Hyland Hills and Guam.  And, as I

15   mentioned to you, this was facilities that were installed by

16   Wave Loch, practiced, tried and true, and for whatever reason,

17   Mr. Lochtefeld decided to incorporate that into his '589 patent

18   after using them for several years.

19       But when he's done that, he's created a situation where at

20   least the patent can be invalidated.

21       As I mentioned to you, Mr. Lochtefeld certainly knew of it

22   because he installed those systems.  He never disclosed this to

23   the PTO.  What was disclosed was the Frenzl patent.  We've

24   talked about that.  That's this '402 patent.

25       And the importance of the Frenzl patent is, really, kind of

 1    responding to some ways Dr. Stevick's claim that somehow this

 2    claim can read over a hinged metal flap.

 3        We'll show you that the hinged metal flap, there's a lot of

 4    back and forth, but this is clear.  This is the ride surface in

 5    Figure 8.  There's a hinge and a flap there, and there's a

 6    nozzle assembly.  So all of that was in prior art at the time

 7    that Mr. Lochtefeld submitted or filed his '589 patent.

 8        Had he tried to claim and insert into those claims -- we

 9    know this word "hinge" and "metal flap" don't exist inside the

10    claims.  But had he tried to do that, Frenzl would have said

11    that's prior art.  You couldn't do it.  So he was bound by

12    that, and that's one reason he couldn't do it.  He never did

13    it.  But now we get into litigation, we come up with experts,

14    and we're trying to find ways to reach those claims into things

15    that were never covered by the patent and could not have been

16    covered by the patent because of Frenzl.

17        You know, there's this confusion about the Figure 8 and

18    Figure 7.  Figure 7 -- I don't want to spend much time on this,

19    but this does show a hinged check valve in the back of the

20    system over here.  But Figure 8 is in a different location.

21    And Figure 8 is, as I showed you before, in front of the ride

22    surface area.  So this disclosure of a hinged metal flap in

23    putting -- obviously foam padding on that would be obvious or

24    lowering that to prevent injury is also obvious, we heard from

25    Mr. Pribonic, and even, to some extent, from Dr. Stevick

1    himself on that.  Those would be obvious to anybody.

2        Okay.  So when we talk about obviousness, the difference,

3    as the Court jury instructions will tell you, it's a

4    combination of art.  We think the doctrine of anticipation

5    works based on Hyland Hills and Guam alone.

6        If you think you need to look at other art, we think we can

7    combine all three of these:  the Hyland Hills, the Guam, and

8    the Frenzl patent to show that the claims they're asserting

9    about a nozzle, flexible tongue, over water, were not new.

10   There's nothing new about this.  This was being practiced and

11   being done in 1996, and it was being done by the so-called

12   inventor.  So he knew that this was not new.

13       There was mention of this PTR [sic], the inter partes

14   review.  We do know the PTR review, inter partes review, did

15   not include this prior art.  You people get to decide this.

16   You get to decide, is this invention new?  Just because you get

17   a patent, until it's tested in court, it's not -- a lot of

18   people say it's not worth the paper it's written on until you

19   have some judge or jury confirm that that patent is not

20   anticipated, it's not obvious, or it's not invalidated by

21   inequitable conduct.  That is part of your role to decide, is

22   this something really new?  Is this something, some unique

23   invention, that never existed or wasn't obvious to one skilled

24   in the art prior to the submission of that patent in 1999?  And

25   I think that is very obvious, for the obviousness question,

1    that Mr. Lochtefeld knew.  And it was -- and he's skilled in

2    the art, and he certainly knew by combining all three things

3    that this was not anything brand new, it had been done before

4    by himself on two different locations.

11:30    5    This is another aspect of the case that I think drives

6    what's going on here.  We know that WhiteWater hates fair

7    competition.  That's a strong word, but I'm going to show you

8    the evidence.  They've been angry.  They've been angry with my

9    client from the beginning of time, the beginning of the

11:30   10    start-up of their company in 2012 and 2013.

11    And we have evidence that they were willing to do anything

12    to squash a competitor.

13    This is testimony that Mr. Thatcher gave.  I examined him,

14    cross-examined him, and we asked him about this:  He was angry.

11:30   15    He admitted he was angry.  "Were you being honest when you say

16    you wanted to squash him?"  This is in 2012, 2013.  The answer,

17    "Yes."  He freely admitted we want to go after these guys.  We

18    want to take them out of business.  We want to get rid of our

19    competitor.

11:31   20    So they had power.  They're a large company based in

21    Canada.  They have the power to influence or squash any

22    competitor.  And Mr. Chutter, as I mentioned, he flew down here

23    with his awards and his tuxedos and everything else.  And he

24    controls -- he admits they control 95 percent of the sheet wave

11:31   25    market.  He admits they get excessive charges.  They're the

1    most expensive in the industry.  He's proud of that.  They get

2    a 40 percent profit margin.  And Mr. Chutter, who you can judge

3    for yourself, I mean, he came in, he was open, he didn't like

4    Californians, he didn't like lawyers, he didn't like surfers.

11:31   5    Very open about that.

6        When we go back and look at the evidence of what was going

7    on at the time, and here are emails that go right through the

8    top executives, senior executives in the company:  Mr. Myrman,

9    Mr. Chutter, Mr. Lochtefeld, Mr. Vicente.  This is

11:32   10   June 19, 2013.  And you'll see this highlighted portion of this

11   email, they're talking about what a big threat Pacific Surf

12   Design is.  He has no cash.  He's struggling.  Now is the time

13   to squash him.  Now, this is important timewise.  Why is this

14   important timingwise?  This anger, this desire to squash my

11:32   15   client's company, wasn't driven by a patent-infringement

16   analysis.  It wasn't driven by anything other than they're out

17   there, and they were putting in the market good products.

18       So where this anger starts has nothing to do -- you heard

19   Mr. Chutter come up with this thing that, oh, this is like

11:32   20   somebody breaking into my house and stealing my painting.  No,

21   this was not about breaking into anybody's house and stealing a

22   painting.  This is what Mr. Chutter likes to do to all

23   competitors.  He likes to control the market, and he wants to

24   squash them, and this had nothing to do with the

11:33   25   patent-infringement analysis.

1        And what's important is this pattern of conduct.  We had

2   evidence in the case he did the same thing to Lochtefeld and

3   Wave Loch.

4        You recall when we had Mr. Lochtefeld on the stand, he

5   testified that they wanted to acquire him, and we had

6   Mr. Chutter and Mr. Myrman testify, and Mr. Myrman gave this

7   testimony because he was in the middle of all this.  They

8   signed this memorandum of understanding, which was only good

9   for 30 days, in November of 2012.  Things didn't happen.  In

10  early '13 Chutter became frustrated, according to Mr. Myrman's

11  testimony, over the stalled negotiations.  He used the phrase

12  "oil and water" between Lochtefeld and Myrman.

13       In April '13 what did Mr. Chutter do?  He poached the four

14  key employees from Wave Loch to pressure Lochtefeld.  He hired

15  Mr. Myrman, and he hired three other people.

16       And guess what?  By January 31, '14, WhiteWater acquired

17  all the assets from Wave Loch.  So we see the pattern of what

18  they do here.  Anybody that gets in the way, he finds a way to

19  squash them.

20       This was the testimony I mentioned to you a moment ago.

21  This was Mr. Myrman's testimony.  And you'll see the upper

22  part, "I was kind of like the cheese between the sandwich, Tom

23  and Geoff; in other words, I was kind of like stuck in the

24  middle."  And I said, "They weren't getting along, were they?

25  They were like oil and water."

             1    And the result of that oil-and-water discussion was that
             2    Mr. Myrman resigns, and you heard him testify how he was hurt
             3    or shocked that when Mr. Alleshouse resigned, but here he is
             4    eight months later, he's leaving and taking the three key
    11:34     5    employees and going to WhiteWater, a company that was trying to
             6    negotiate unsuccessfully with Wave Loch and Mr. Lochtefeld.  He
             7    abandoned ship on Mr. Lochtefeld with three other employees and
             8    does exactly the same thing that he's feeling hurt and upset
             9    about with Mr. Alleshouse.  But you can understand what impact
    11:35    10    on a small businessman like Mr. Lochtefeld at the time.
            11        More importantly, WhiteWater did the same thing to
            12    Mr. McFarland.  Mr. McFarland, you heard he's a key designer.
            13    He was the one that drew the drawings, the CAD drawings and so
            14    forth on the '589 patent.  He left Wave Loch to start American
    11:35    15    Wave Machines.  That's a competitor, a direct competitor.  Wave
            16    Loch sued him on three patents.  You heard that testimony.
            17            MR. O'HARE:  I think there's a motion in limine on
            18    this.
            19            THE COURT:  There certainly was testimony to that
    11:35    20    effect.  The objection is overruled.
            21            MR. THOMAS:  All this came into evidence.
            22        He sued him on those three patents.  All those patents were
            23    found invalid.  And then following that, they tried to
            24    negotiate a license with WhiteWater in 2019 [sic].
    11:36    25    Mr. McFarland talked about that.  Those negotiations stalled.

1    And what happened?  According to Mr. McFarland, he said

2    WhiteWater told him that we're not going to enter a license.

3    Instead, we're going to knock off American Wave Machines'

4    designs and copy us in countries where we don't have patent

11:36    5    protection.

6        And then after that, true to form, they go out and they

7    hire his key engineer.  This is what happens to competitors of

8    WhiteWater.  This is their plan.  This is what they do.  So

9    this anger I mentioned to you before is not about somebody

11:36   10    stealing something they own.  This anger is driven against

11    anybody entering that marketplace they perceive as a threat.

12        Wave Loch admitted it was a mistake to -- this is

13    Mr. Lochtefeld's testimony.  So they went ahead and brought

14    this lawsuit.  And this is his answer, in that context, an

11:36   15    infringement, you know, I was wrong.  He admitted they were

16    wrong.

17        What's going on here, we believe the evidence will show,

18    has shown, that WhiteWater's improperly using the '589 patent

19    to try to destroy PSD.

11:37   20        I showed you the anger, the motivation.  And how do we know

21    that?  Well, we know that WhiteWater knows that the '589 is

22    valueless.  It was stopped being practiced in 2001.  They moved

23    away from that single-pad design that's on the far left to the

24    rigid metal flap.  They know the claims don't cover this.

11:37   25    Anybody can read those claims.  They know that those claims

1    don't include a hinge or a metal flap that's not flexible.

2        And, more importantly, WhiteWater admits that PSD is making

3    a better wave machine.  This goes to not only the fact that

4    we're a competitor.  They're very concerned about a competitor

11:37    5    that's making a better product.

6        How do we know that?  Well, Mr. Thatcher, again, back in

7    2013, before there was any discussion, hint, or suggestion of

8    any patent infringement, he's saying, "Richard, Pacific Surf

9    Designs, is a big threat from a product standpoint.  He has

11:38    10    made improvements."  All capital letters.  "He has no sales

11    force, but his product is good.  If we do nothing, this will be

12    a problem."  Again, this is not about patent infringement.

13    This is we must go quash the competitor.  We must get these

14    guys out of business.

11:38    15        We had testimony also -- this is from Mr. Thatcher -- that

16    PSD made a better wave machine.  We talked about them knocking

17    off PSD.  And this is Mr. Thatcher's testimony about the

18    improvements that were made by Mr. Alleshouse.  He reduced the

19    water volume, according to Mr. Thatcher's own testimony, had

11:38    20    good consequences.  He made the pump more accessible for oil

21    changes, and there were other things like that.  And he

22    admitted they went back, and they were with that gen 2

23    FlowRider.  They went back and incorporated our changes.

24        And the point of this, really, is they know we make a good

11:38    25    product.  They know we sell a product for less than they are.

1    They know that customers are moving to our product, which is

2    threatening them.  So this is the impetus for this lawsuit.

3         Not only that, did they discuss this internally, putting us

4    out of business, they discussed it externally.  This is an

11:39   5    email between Mr. Myrman and Mr. Keim.  It's Exhibit 234,

6    March 2, 2015.  And at the bottom of the highlighted section,

7    "Clearly, we don't want Richard to get another installation,

8    which would continue to provide funding to Pacific.  I believe

9    we should discuss what, if anything, we can do to starve them

11:39   10   out of business."

11        So now this idea of putting us out of business is taken to

12   a new level.  They're bringing in their licensee, another

13   competitor of ours, ADG, and are working with them to come up

14   with ways to put us out of business.

11:39   15        Same thing on this email, March 3, 2015.  This is, again,

16   from Mr. Keim to Mr. Myrman.  The reference to the Trinidad

17   FlowRider, that's a sale that we had recently completed.  It

18   says, "We need to strategize how to quash Richard or he's going

19   to destroy the market.  He's not impacting new ride sales, but

11:40   20   service sales as well."

21        These discussions aren't about patent infringement.  These

22   discussions are about finding ways to put a business, a small

23   business in San Diego, out of business so that they own the

24   market.

11:40   25        And that's what's driving this case, and that's what's

 1   driving the experts to give this outlandish testimony on

 2   damages, to give this outlandish testimony on the scope of

 3   these claims when they know the claims are limited by law to

 4   what the claims say.

 5   So now switch to another topic, and I know Mr. O'Hare has

 6   brought up, oh, we have this really high bar.  It's clear and

 7   convincing.  And I believe we have clear and convincing

 8   evidence.

 9   And on that point, on this inequitable conduct, there are

10   two elements that we have to show, and I believe we have shown

11   them and will show them to you now.

12   A material misrepresentation of the patent office is one

13   element with the intent to deceive being the second element.

14   And part of the jury instructions, if you read them, I'm

15   not going to put -- we don't have time to go through our jury

16   instruction, but there was a jury instruction on the intent to

17   deceive and inequitable conduct.  And you will read that, and

18   you will find in that jury instruction that could be proven by

19   direct and indirect evidence.

20   And that's typically how these things get proven.  When

21   somebody commits a fraud, seldom do people get up in court and

22   say, yes, I defrauded them.  I agree.  I did that.  You have to

23   prove it based on what they did.  You have to prove it testing

24   their credibility.  You have to prove it on there's other

25   conduct besides their denial, which is what we've done in this

1683

1   case.

2        Plenty of people in jail committed murder that never

3   admitted that they committed murder, but they were convicted

4   because there was plenty of evidence, whether it was DNA,

11:41   5   fingerprints, whatever.  There's other things other than direct

6   testimony, and we have all that for you here.

7        Mr. Squier made a material misrepresentation to the USPTO

8   when he revived the patent.  What were they?  Well, Exhibit BG

9   was a power of attorney he signed.  And in that power of

11:42   10   attorney, you know, he had that signed, as you know, by

11   Litewave, and Litewave no longer had any interest in this

12   patent.  It was a stranger to the patent.  It had divested its

13   interest, sold its interest off, and was not a licensee.

14        He also misrepresented in Exhibit GT -- this is the second

11:42   15   renewed petition submitted by Mr. Squier to the PTO, and he's

16   called Mr. Lochtefeld a registrant.  Well, we know

17   Mr. Lochtefeld was no longer the owner or assignee of the

18   patent.  He was a stranger to the patent.

19        And then he misrepresented he'd done an actual

11:42   20   investigation, and we'll talk about that in a minute.

21        And then, finally, what's also important to all of this is,

22   as I mentioned at the very beginning of my comments, if

23   Whitewater hadn't abandoned this Figure 3A design in 2005 and

24   intentionally allowed this patent to lapse -- and we'll talk

11:43   25   more about that.  Why would we let this thing go?  Why would we

1    do that?  Well, we had Mr. Chutter testify in part.  He

2    acknowledged, we buy lots of IP, and if it's not being used,

3    some of it we let lapse.  It's expensive to pay these patents

4    because they're paying not only in the United States, we have

5    evidence, particularly as it relates to the '589, it was

6    being -- there was an issue of maintenance in Germany, there

7    was an issue of maintenance fees in the UK.

8        Specific intent.  Let's talk about that.  Mr. Squier had

9    the specific intent to deceive the United States Patent and

10   Trademark Office.

11       Well, we know he revived the patent based solely on

12   instructions from the trial counsel here, Mr. Taché.  It's

13   interesting.  They asked Mr. Squier, who was a younger

14   associate, to inform the PTO that there was an investigation

15   done when we do know from all the testimony that whatever

16   investigation was done was by Mr. Taché, who neither testified

17   in this court proceeding nor submitted the revival petition to

18   the PTO saying, I did the investigation.  I know it's

19   unintentional.  So it's interesting how they buffered

20   Mr. Taché.  They had Mr. Taché call and then somehow whisper in

21   the ear of Mr. Squier, and Mr. Squier said, I can rely on that.

22   There's all these rules that say I can rely on third parties.

23   But I think we have to test the credibility.  Why wasn't

24   Mr. Taché, who's an able lawyer -- why didn't he submit this?

25   He did the investigation.  He should have been reporting to the

1    PTO.  He didn't do it.

2        And how do we know that these were misrepresentations?  I

3    think the evidence on this is very compelling.  I know

4    Mr. Squier got up, and he feels bad, and he feels horrible and

11:44    5    all these things about mistakes and so forth, but what we do

6    know, from the actual evidence, is that he wasn't being

7    forthcoming to you or us about his answers.  We do know that --

8    I showed him this.  This is Exhibit GR-2.  This is

9    February 2014.  He gets an email from his partner, senior

11:45    10    partner, instructing him that he's going to be handling the

11    review of the WhiteWater deliveries of the patent assignments.

12    That would include the chain of title on the '586 patent and

13    the domain names.  He says, "I've given him the CA," which is

14    the contribution agreement.  And the contribution agreement is

11:45    15    really what put all these technologies in the hands of

16    WhiteWater.  It started with Wave Loch, and it went over to

17    Surf Park, and then it was licensed to FlowRider, and then the

18    contribution agreement comes in, and FlowRider in January of

19    2014 becomes part of WhiteWater.  So their story is WhiteWater

11:45    20    had the responsibility to maintain the patent.  And that may be

21    true from a contractual standpoint.

22        But what they never explain, and they can't explain, if

23    this patent was so important, why did they stop paying

24    maintenance fees, not only in the United States, but the UK and

11:45    25    Germany?  And I will tell you why.  Because they weren't

1    practicing this patent.  They stopped practicing that patent in
2    2005.  They didn't want to pay the maintenance fees.

3        And it wasn't until we saw those hateful emails in late '13
4    and '14 when they decided, aha.  Maybe there is a use for that
5    patent.  Let's go back and get the patent.  Let's revive the
6    patent because we're going to take that patent and go after
7    this hated competitor of ours.  Back when they abandoned it,
8    they weren't thinking that way.  They didn't care.
9    Mr. Alleshouse worked for them.  It was no issue.  But only
10   after they decided, from a business standpoint, that they
11   didn't need it.  How do we know that they intentionally
12   abandoned?  No one's said that.  You're right.  Mr. O'Hare said
13   nobody's said that.  Of course, they never said that.  They
14   would never say that.

15       But we have ample evidence to tell you that they did do
16   that.  Because we know they weren't practicing the invention.
17   We know they didn't record the patent assignments.  You know,
18   this patent was transferred to Surf Park, the Singapore
19   company.  We know that the Singapore company licensed
20   FlowRider.  We know that this amalgamation agreement occurred
21   in 2014.  None of those recordings were ever done at the PTO.

22       And the reason they weren't done is because they weren't
23   concerned about using this stuff.  They weren't maintaining the
24   maintenance fees.  They weren't updating the PTO on who
25   actually owned the patent or who licensed the patent.  They

1687

```
        1    just were -- they didn't pay attention at all to it on purpose,

        2    though.  It was failure to pay attention because it wasn't

        3    something they were actively using and had any value to them.

        4        It only became valuable to them after this swirl of

11:47   5    activity when Mr. Alleshouse was discovered to be a very viable

        6    and threatening competitor, and that's when in -- after 2014,

        7    in 2015, there's this rush, this haste, by Mr. Squier to go

        8    revive that patent.  He was so hasteful, he just went off and

        9    revived it because he knew the PTO chain of title showed

11:47   10   Litewave was the last assignee.  So rather than take time to

        11   record all these updates, we'll just go to the patent office

        12   and just pretend Litewave is asking to revive the patent.  And

        13   they did that on purpose.  Time was important.  They wanted to

        14   get a lawsuit filed in 2015 against my client, so they skipped

11:48   15   steps.  They shortcut things.  Because at one point, they had

        16   abandoned this.  It was unimportant.  They weren't using it.

        17   And suddenly they had a use for the patent, and they had to

        18   revive it to use -- the only use of that patent they were going

        19   to use it for was for litigation.  In order to institute

11:48   20   litigation, they had to revive it, and it became a race to

        21   revive it so they can get their complaint on file.

        22       And here we know about -- he's in a difficult spot, and I

        23   almost feel sorry -- almost.  But he signs this Exhibit GT on

        24   the left, and he shows, oh, Mr. Lochtefeld's the registrant.

11:48   25   And he knows that Mr. Lochtefeld's not the registrant of that
```

patent.  He knew that the patent, according to the documents,

was in the hands of WhiteWater by virtue of the 2014

amalgamation agreement.  They possessed -- they had a license,

and they acquired all the intellectual property.  And we know

that, even though he denies -- even though he was instructed in

2014 to review the consolidation agreement, to look at all the

patent transfers, he was told by a partner to do that.  He says

he didn't do it.  It was too busy.  No email saying, I'm too

busy.  No response email at all on that.  Does that make sense

to you?  An associate would just not respond to a partner and

not do what he's told to do?  Not in any big law firm that I'm

familiar with.

    And then, and more importantly, we have Exhibit OF.

Exhibit OF, while he's dealing with the U.S. Patent Office,

he's also dealing with the German patent office and the counsel

in Germany over the WhiteWater EU IP matters.  And this

paragraph that he writes, I submit to you, can only be written

had he reviewed all the things he was told to review back in

2014 by the partner.

    And if you believe that he did review, and he knew all

these things, he made an intentional misrepresentation to the

patent office with the intent to deceive, and they were doing

this revival thing.  They didn't want to come clean and say, we

let this thing go.  We were no longer using it.  They never

informed the patent office, by the way, we're not even

1689

1    practicing this invention since 2005.  They wanted to suggest

2    that this is important to them, so they went about it in a

3    hasty way.  They went about it -- they cut corners, but it was

4    the haste to get this lawsuit using this expired patent, lapsed

11:50    5    patent revived to be used as a club in this case.

6        I believe that this amalgamation of evidence -- and you can

7    measure the credibility, if you will, of Mr. Squier yourself.

8    You can measure the fact that Mr. Taché didn't testify, never

9    gave an answer about his investigations, and didn't do the

11:50    10    certification of the patent office himself about, I talked to

11    Whitewater, and this was unintentional.

12        Let's talk about damages.  Whitewater has no claim for

13    damages.  It's that simple.  There's no infringement.  There's

14    no damages.  There's no -- the patent's invalidated by

11:51    15    anticipation or it's invalidated by inequitable conduct.

16    There's no damages.

17        This claims of $2 million of damages is, frankly, invented.

18    It's outrageous.  It doesn't -- it's not correlated.  They want

19    to have you believe we can ignore the actual sales.  Well,

11:51    20    Justin Lewis, our expert, said no.  What you have to do is go

21    back and look.  These hypothetical negotiations, you have to

22    test it.  It has to be a reasonable royalty.  It can't just be

23    a royalty.  It can't be the biggest number that you want.  You

24    have to look at all the data.  You have to look at the actual

11:51    25    data to measure if your hypothetical negotiation you come out

1    is up here, and the actual data is over here, you can't do it.

2    And he -- Dr. Vigil knew there was plenty of ways to measure

3    royalties here.  You could have done a lump sum, which he chose

4    to do, which is the highest amount, and inflict the most damage

11:51   5    on my client.  He could have done a running royalty.  No rule

6    of damage law in patents to prevent it.  In fact, that was an

7    available option.  He just skipped over that.  He went right to

8    the heart of what he was instructed to do, which I believe he

9    was instructed to do, find a way, we're going to put these guys

11:52   10   out of business.  He came up with the biggest number, paid

11   immediately, is the biggest threat to our business.  And that's

12   what he did.  He ignored a reasonable royalty.  He ignored the

13   actual sales data of my client and didn't correlate.  There's

14   no way that that $2 million ever correlates to the actual data.

11:52   15   And Mr. Lewis, who's a highly credentialed IP damage guy, said

16   you have to do that.  You have to make sure it's reasonable.

17   We have to look at the data, and if it's disproportionate, you

18   can't use it.  He should have rejected this lump sum,

19   $2 million royalty, immediately when he looked at the data

11:52   20   saying, this doesn't correlate to anything that really

21   happened.

22       So we know they claim we should pay $2 million for the

23   right to use a part that sells for $3,000 for a $650,000

24   machine.

11:52   25       I ask you again:  You are the triers of fact.  who would

1    ever do that?  What kind of hypothetical negotiation?  Who

2    would ever agree to that?

3         The cost of the design-around, which is another fact that

4    Dr. Vigil ignored, is only $500.  That's another factor in

5    arriving at the value of a license.

6         And we do know Dr. Vigil was paid.  He's been paid on two

7    different matters.  According to his own testimony, he gave me

8    the hours and his rate, and it comes out to $150,000, to

9    inflate his damages.

10        Is WhiteWater being reasonable?  They never filed a patent

11   application on the hinged metal flap.  They were doing it after

12   2008.  They could have tried to patent it.  I don't think it

13   would have passed muster at the PTO, but they don't have one.

14   They ignored the law and the boundaries of the '589 claims.

15   They assert that a hinged metal flap can be a flexible tongue.

16   We know a hinged metal flap is not a flexible tongue.

17        They're seeking an 80 percent-plus royalty on a patent

18   that's expiring in eight months.  And by all admission, this

19   covers a very minor component of a very large wave machine.

20   And as I mentioned before, this was allowed to lapse, and we

21   made two intervening sales on that '589 patent when it did

22   lapse.

23        This is a slide you saw before, but this is this

24   ridiculousness of this $2 million royalty.  This is his failure

25   to reconcile to the data.  His hypothetical royalty rate is 83

1    percent.  All of the other licenses range from 5 and 10

2    percent.  Maybe one at 15 percent.  It well exceeds by orders

3    of magnitude anything that was ever done in the licensing.  And

4    what's more important is all these licenses at the bottom in

5    the blue are not just for the '589.  They're for the portfolios

6    of patents.  So the relative value of the '589 in any of these

7    10, 10, 15, 5 is de minimis.

8        Royalty base and a royalty rate.  Let's talk about that for

9    a minute.  As I mentioned to you, this yellow area is the

10   nozzle flap.  This is a description of the -- it's a small part

11   of the entire wave machine.  The royalty rate indicators --

12   this is from Mr. Lewis' presentation -- zero percent.  We had

13   one license that had no value assigned to this to 5 percent at

14   the highest rate ever for a single patent, which is a '280

15   patent, would be 10 percent.  Mr. Lewis does not agree that

16   this is a 10 percent patent if you find infringement for any

17   reason.

18       As we mentioned, here's the invoice we put into evidence.

19   They're selling their nozzle flap for $3,000.  And this is a

20   breakout of the PSD and Flow Services sales.  We sold a total

21   of 19 nozzle flaps that come out to, according to Mr. Lewis'

22   calculations, about $112,000, and we sold four machines.  So

23   you can look at the royalty base being the flap.  If you think

24   the technology is all about the flap, that's the cost of the

25   flap.  If you want to associate it to the larger machine,

1    Mr. Lewis says it's an incremental part of the larger machine,

2    as we discussed earlier.

3        In any case, at the bottom here, looking at the price per

4    nozzle flap, the revenue attributed to nozzle flaps is about

5    $112,000 and 5 percent royalty.  It's $5,629.

6        Now, obviously, WhiteWater is -- objective would not serve

7    by coming up with any damage calculation that looks like this

8    because nobody would sue for -- on a case of this magnitude.

9    But this case is not really about the damages.  This case is

10   about putting a competitor out of business.

11       The nozzle flap, according to Mr. Lewis, is about 1 percent

12   of the total wave machine.  So if you consider the total sales,

13   the four sales that Dr. Vigil considered, and you applied the

14   1 percent royalty, you'd only get 24,000.  So if you look at

15   the nozzle flap at 5 percent, which is Dr. -- or Mr. Lewis'

16   opinion of a reasonable royalty on the flap itself, $5,600.  If

17   you look at 1 percent of the total wave machines sales, it's

18   24,469.

19       Dr. Vigil's royalty, as we mentioned, is more than double

20   PSD profits, but I'm going to just kind of graph out

21   Dr. -- Mr. Lewis' -- his opinion, as we mentioned, is the

22   5 percent on the nozzle flap.  If you're going to give a

23   royalty, that's more than reasonable because it's more than any

24   value that was ascribed to the '589 patent previously.  If you

25   look at the royalty base being the entire machine, 1 percent,

11:57

11:58

11:58

11:58

11:59

1   you're at 24,000.  And he said the maximum, this would be a 10

2   percent number; in other words, looking at historical licensing

3   that was done, there was only a single patent, a different

4   patent than the '589, that went for 10 percent.  That's the

5   highest that this could possibly go.  244,000.

6       PSD's profits are 962,000 to date.  And Dr. Vigil's royalty

7   is more than double that.  So you can determine yourself

8   whether you think that is a reasonable outcome from a

9   hypothetical negotiation.

10      We're currently using a fixed metal flap.  There's

11  challenge by WhiteWater that this is an inferior, it's less

12  safe, or it's not an acceptable substitute in the marketplace.

13      You heard testimony from Mr. Alleshouse that we've already

14  installed one of these in Mexico.  And it's a Triple Barrel

15  meaning they put lots of riders through it.  And I'm going to

16  show you a brief video here.  This is actually Mr. Alleshouse

17  riding the wave machine with a fixed metal flap.  My apologies.

18  He actually rides it very skillfully.  But it's safe to ride.

19  People are riding.  And I think Mr. Alleshouse testified that

20  there's about a thousand rides a day on the Triple Barrel, and

21  this has been in place for over six months.  There's hundreds

22  of thousands of rides.  There's not one reported injury on

23  this.  And maybe we're okay.

24      Let's move on, then.  Talk about the verdict form.  I know

25  Mr. O'Hare did this too.  Verdict form is long.  It's got lots

1   of questions, but I think once you understand the evidence and

2   how you're going to approach the case, getting to the answers

3   of those questions is fairly simple.

4       For convenience, we've designated the boxes with the titles

11:59   5   "PSD" for my client, "FS," also the service part of our client,

6   and the other side for "WhiteWater."

7       So as we go through it, just to familiarize yourself,

8   you'll have a series of questions.  The first one is about

9   Claim 1.  Left side of the column for WhiteWater.  Right side

12:00   10   for PSD.  We, obviously, believe, based on the evidence we've

11   provided to you, they're not practicing and have not practiced

12   that '589 since 2005, and you understand that the scope of

13   those claims are limited to what's in the claims.  There's no

14   way there's any infringement, literal infringement of '589.

12:00   15       Doctrine of equivalents, the same answer.  You go through

16   it.  What we're doing is achieved under a different system.  It

17   covers different things.  It protects different things.  It

18   doesn't protect the top of the nozzle sluice.  PSD does not

19   infringe by shipping parts because it's the same analysis.  If

12:00   20   we're not infringing when we build it in the United States, we

21   can't be infringing by sending those parts to another country

22   and shipping those to another country.

23       No willful infringement.  We covered all the reasons for

24   that.

12:00   25       This is the same question directed to Flow Services, the

1   service arm, which has about $42,000 worth of revenue that I

2   think I heard Mr. O'Hare suggest we should give a 2 million

3   royalty against a $42,000 business.  It's just incredible to

4   hear that.

12:01   5   And, interestingly enough, I don't even think Dr. Vigil

6   said that.  He just put up $2 million.  He never mentioned

7   Flow Services.

8   But, in any case, they don't infringe.  They don't infringe

9   under the doctrine of equivalents for the same reasons because

12:01   10   when you repair and reassemble -- refurbish those hinged nozzle

11   flaps, there's no infringement.  And there was nothing willful

12   done by Flow Services.

13   The '589 is invalid as being not new and anticipated.  We

14   spent a lot of time in this trial on that, on Hyland Hills and

12:01   15   the Guam installation done by Mr. Lochtefeld two or three years

16   before he filed this patent application.  Every one of these

17   claims that he put in there have been anticipated because he

18   used those in his attractions or water -- sheet wave machines,

19   and he was deployed in '96.

12:02   20   There should be no damages if you find no infringement.  If

21   you find invalidity, there are no damages.

22   If we do get to damages, we don't believe that there should

23   be, but if you do, you've got to look at the royalty base.  I

24   mentioned Flow Services, $41,000 revenue.  Mr. O'Hare thinks

12:02   25   you should put in 2 million here, which is just an outrageous

1    statement, in my opinion.

2         The royalty base for the sales of the flaps is 112,000.  If

3    you use a 5 percent royalty, it's 5,600.  If you went to a

4    10 percent royalty, you just double those numbers.  They're

12:02    5    nothing.  They're incremental.  The 1 percent royalty base if

6    you choose to go to the whole base and allocate back the value

7    of the nozzle flap system to the entire wave machine, that

8    1 percent is about 122,000 of sales.

9         Okay.  So obviousness.  We believe that the testimony of

12:02    10   Mr. Alleshouse is correct; that anyone with the skill in

11   designing or manufacturing or refurbishing a water ride

12   attraction is able to -- this is not high-tech technology.

13   These are simple parts that are well known and combined

14   together.

12:03    15        Factual findings regarding obviousness.  We think this is

16   real easy.  When you look at that prior art, and we showed it

17   to you, and you can study yourself, there was absolutely no

18   difference between the scope of what is claimed in this '589

19   patent and what was deployed by Mr. Lochtefeld and Wave Loch

12:03    20   1996 in Guam and Hyland Park.

21        These are the obviousness questions.  And this is when you

22   combine more than one piece, and, again, we have you look at

23   all the art that predated the patent, which would include

24   Frenzl and Hyland Hills and Guam.  And we think the answer for

12:03    25   all these questions, for the obvious reasons, are no.

1    And this is the question as it relates to obviousness in

2   the view of Hyland Hills, Guam, and Frenzl in the '402.  And we

3   think you should answer all of those "Yes."

4    And the question about inequitable conduct, and I know

12:04  5   Mr. O'Hare will come back and talk about that again, that this

6   is clear and convincing, this is insurmountable proof, and

7   we've heard nothing in the room because nobody admitted it.

8   Somehow they're going to win because nobody admitted that they

9   did anything wrong.  We don't expect -- in few trials do people

12:04  10   come in and admit anything.  We think the evidence is there,

11   both direct evidence of a conscious decision to stop using that

12   in 2005.  Direct evidence of not paying maintenance fees when

13   they're not using the technology.  Direct evidence that they

14   didn't update the PTO with the transfers of the patent,

12:04  15   transfers of the licenses.  Direct evidence that they had

16   basically a desire to put us out of business and that triggered

17   this need to revive because that's the only reason they needed

18   the patent.

19    So we think the answer to that one is "Yes" by clear and

12:04  20   convincing evidence.

21    Specific intent to deceive the United States trademark?

22   Yes, because they didn't tell them they abandoned this use.

23   There's no notification to the PTO that they stopped using that

24   design in 2005.  There's no notification to the PTO where the

12:05  25   chain of title was prior to them going to revive the patent.

1  They submit a -- they submit an application on behalf of an

2  entity that doesn't license or own the patent to revive the

3  patent.  And, in fact, in the -- if you look at the letter

4  reviving the patent, the PTO was deceived because they revived

12:05  5  it in the name of somebody that didn't own or license the

6  patent.

7      Now, Mr. Squier said anybody can revive a patent.  Well,

8  the PTO, there's a duty of candor.  You can't go in and say,

9  revive the patent for my client or this entity if this entity

12:05  10  has no basis to do it.  And he admitted, more importantly, as

11  it relates to either Mr. Lochtefeld or Wavelite, never

12  represented them, and, in fact, he said he never talked to

13  them, but that's who he revived the patent for.  So, yes,

14  there's clear and convincing evidence of this.

12:06  15      Why are we here?  I mean, this is kind of the sum-up of the

16  sum-up.  We know that they threaten.  They use litigation to

17  squash competition.  We know from plain reading of the '589

18  patent it doesn't cover a hinged metal flap.  We think they

19  know that.  We think that their expert knew that and had to

12:06  20  come up with some ploy to make those claims different than what

21  they are.  So he came up with all this testimony about these

22  specifications, which we know from the jury instruction you

23  cannot broaden those claims.

24      They abandoned using the flexible tongue in 2005, and they

12:06  25  know it had no value.  It had no commercial value.  They

1    weren't practicing it after 2005.  They never tried to put a

2    patent on the design that they were using after 2005.  We don't

3    think they would have gotten one, but they never even tried.

4    They intentionally allowed the '589 patent to lapse because

12:06   5    they weren't using it.  They were paying lots of fees.  There

6    was no business sense to it.  And they went to the PTO under a

7    pretextual basis, using the wrong entity to revive the patent,

8    with no investigation, legitimate investigation, behind that,

9    and the purpose of that revival was, really, to initiate this

12:07   10   baseless lawsuit.

11        And, finally, as we showed, WhiteWater -- under any

12   scenario, if they went to the reasonable royalty that they

13   should have, the running royalty, there are no real damages in

14   this case.  This case is not about damages.  This case is about

12:07   15   using a revived patent under false pretenses to go after a

16   competitor.  That's what this case is about.  They win by just

17   getting this case to trial.  They win -- the more time and

18   money my client spends on this, they're winning.  So this is

19   just part of what they do.

12:07   20        And I have to end on this note.  The jury system is a

21   wonderful system.  It's an important part, a constitutional

22   part, of our democracy.  And you are the conscience of our

23   community, and you are the people that have the power to say

24   what is right and what is wrong.

12:08   25        And I'm going to ask you, when you go back to deliberate,

1  was what WhiteWater doing here, was that right or was that

2  wrong?  If that was wrong, I think you need to send a message,

3  you need to send that message all the way up to Vancouver,

4  Canada, to Mr. Chutter when he's holding all of his awards and

12:08  5  all of his medals to say, putting people out of business is bad

6  business.  Squashing competitors is bad business.  Reviving

7  patents to use as a tool in litigation to put a competitor --

8  is bad business.

9      And I think you ought to send that message and let them

12:08  10  know that people in San Diego, people of America, we don't do

11  business that way, and we're not going to let him do business

12  that way.

13      So with that, I will have a chance to give a surrebuttal.

14  I don't know if I'll need to, but if I don't, thank you very

12:08  15  much, and if I do, it will be very brief, I assure you.  Thank

16  you for your attention.

17          THE COURT:  All right.  Thank you.

18      Mr. O'Hare.

19          MR. O'HARE:  One of the instructions you heard was not

12:09  20  to decide this case out of sympathy or prejudice, and you

21  should not be appealed to based on nationality.  That's what

22  you just heard.  Anyway, I know you won't decide this case

23  based on where these people live and where they reside or

24  whether somebody's in Canada or San Diego.  And, actually,

12:09  25  we've got people on my side in both locations because

1    FlowRider, the company that's competing to sell the sheet wave

2    rides that we're arguing about over the past couple of weeks,

3    is and always has been located in San Diego, but we don't

4    expect any extra points because our office is down by Lindbergh

5    Field or that the ethics of San Diegans are any better or worse

6    than the ethics of something in Vancouver.

7        You got to hear these people face-to-face, and part of

8    what's different about our system of justice is we are all

9    equal in the eyes of the law.

10       One thing we agree on, if we can show Slide 6, please,

11   Gary, is that -- and if you can highlight -- there we go.  You

12   know, the claims define what the patent covers.  The figures

13   and text provide context and help understand it, but the claims

14   define the breadth.  We agree on that principle, but once we

15   get past there, the defendants have been running away from

16   these claims as fast as they can.  How many times in explaining

17   why either we're not practicing the '589 patent or they're not

18   infringing it did they go to the words of Claim 1 or any other

19   claim?  How many times did they point to this?  You won't find

20   this in Claim 1.

21       How many times did they point to Figure 3A?  If we could

22   display that please, Gary.  Figure 3A, it's a figure we've both

23   shown.  It is a specification.  It is an example of the patent.

24   It is not the limit of the patent.  In fact, one time defendant

25   slipped up and called this the 3A design as if that was the

1    entirety of the patent.  I think this was a misspeak.  They had

2    two slides in a row that contradicted each other.  One slide

3    said the specification limits the claim, which, as you will see

4    from the instruction, has it exactly backwards.  The

12:12   5    specification does not limit the claim.  It specifies the

6    number of examples that fall within the scope of it.  And then

7    they -- actually, I think they put up another slide that said

8    no, no, the claim controls over the specification, and we all

9    agree with that.

12:12   10       So let's go to Claim 1.  Let's try Slide 12.  I think

11    that's got Claim 1 in there.  And maybe just take out all the

12    background noise.  So let's just -- okay.  The nozzle cover

13    assembly.  And it doesn't define the nozzle cover as this piece

14    or this piece.  It doesn't limit itself to a number of

12:13   15    competitors.  Part of the specification gives an example or

16    embodiment, but, remember, the patentee, Mr. Lochtefeld, with

17    the help of his lawyers, he's trying to describe this concept

18    as broadly as he can and still legitimately have it approved by

19    the patent office.  So he didn't patent a nozzle flap or a

12:13   20    flexible tongue that covers the nozzles.  It's a cover that

21    covers the nozzle.

22       And I already went through this before and including -- the

23    specifications were to back up what's stated plainly here in

24    the claim, which it's a nozzle cover, which includes a number

12:14   25    of things:  padded material substantially covering the nozzle,

1    just using this mockup here and including a flexible tongue.

2    This claim doesn't say they all got to be connected like this.

3    So, again, the defense starts with the idea.  It's the same one

4    we have, and we all have to accept it because His Honor

12:14    5    properly instructed you.  The claims define the scope of the

6    patent; that I suggest to you almost as soon as they stated

7    that, they treated the claims as radioactive.  Because the

8    invention that supposedly Mr. Lochtefeld and, I guess,

9    WhiteWater abandoned wasn't the invention of, by way of

12:14    10    example, this claim.  It was the invention on a mockup that was

11    created for purposes of this trial.  That's not the scope and

12    limit of the invention nor is the specification.  The

13    specification gives examples.  Does this say it's a hinge?  No,

14    it's not limited to a hinge.  It doesn't limit the manner in

12:15    15    which the tongue can be made flexible, which brings us back to

16    all that we've both talked about back and forth.

17        I might add, the dictionary definition didn't come from us.

18    It came from their expert.  And you've heard all the evidence

19    that we've talked about about if the objective is to achieve

12:15    20    flexibility of a tongue or flap that can be made rigid and

21    reinforced, it doesn't take rocket science to figure out that

22    you may want to use a hinge.

23        The sales driver.  What's been proposed is that the sales

24    increase, and we've shown you multiple versions of sales.

12:16    25    We've got the slide that was just shown again where Mr. Yeh

kind of messed up which started when -- that those aren't sales

dates, they're installation dates.  We've shown you Exhibit 70,

which is a bunch of other sales that aren't shown on this

chart, and -- but, more importantly, we've got the narration of

12:16    people who were there in terms of what was driving sales and

the impact of this invention, and then we have the argument of

people who were not there and are trying to go back and

reconstruct it.

So what drove sales?  The postulation is it's the

12:16    horizontal pump and the trampoline surface.  Mr. McFarland, who

was called by the defense, said no, it was not the horizontal

pump.  You know, laying it down flat, that enabled us to

shorten the ride surface.  The reason we got a horizontal pump

was -- had to do with this was something we were going to ship

12:17    all over the world and tours.  It was the only way we could fit

it into the shipping container.  So if we show up Slide 52,

which I briefly have shown you earlier, this is

Mr. Alleshouse's design in April or sketching in -- excuse

me -- August 2012 right after he left WhiteWater.  It's

12:17    attached the to the email where he said he was going to knock

off FlowRider products.  Sometimes people do admit what they're

doing and come right out and say it.  It's got a vertical pump

in it.  And it's also got a short ride surface.  So just by

that, that's clearly not the explanation.

12:18    The trampoline?  We've already got testimony that you

1    couldn't have done the trampoline without the '589 patent

2    because you needed to get rid of that curve.

3        If we could go to Slide 47.  This Sharpie line that was

4    added, I mean it's been done before.  You take something like

12:18  5    the path of a hurricane, and you add a Sharpie to it and say,

6    oh, that's where it actually went.  Now, there's a debate over

7    who did that, whether it was some overeager staffer or whether

8    it was the president, but that's basically what they've done

9    here.  They can't actually show anything that gets the little

12:18  10   girl doing that, so somebody came along with a Sharpie just to

11   help it along.

12       But the point is, even if somebody could bump into it, we

13   know from looking at this, we can't ride on that thing.  And

14   it's certainly not designed for that, but we'll leave that all

12:19  15   to you to sort that out with all we've already told you.

16       That Frenzl patent, it's already been examined a couple

17   times, and we can show Slide 44.  And the next slide.  I mean,

18   we've got the testimony.  And this has got to be clear and

19   convincing evidence that this thing either is -- actually

12:19  20   anticipates or somehow makes obvious our invention, and the

21   evidence we've had on what it is is that this Figure 8 is just

22   different kind of plumbing to go into the innards of this

23   invention and that that's a solid metal flap that nobody's ever

24   going to ride over, it's just used to turn water on and off.

12:20  25       If we could go to Slide 10 on inequitable conduct.

1707

1        Slide 70.  The 7 looked like a 1.  So yeah, you can show intent

2        to lie to the patent office with indirect evidence, but start

3        with the words "However," Gary.  You can only -- at the bottom.

4        I'm sorry.  Okay.  "However, an intent to deceive may only be

12:20   5        inferred where as the single most reasonable inference."  In

6        other words, if it could be reasonable to conclude that

7        somebody made a mistake, you can't conclude that.

8            If we could go to Slide 69.  "Material" means it would have

9        to make a difference.  There is no evidence in this case, and

12:21   10       not a word in the instructions from the Court, that's going to

11       tell you that it mattered who that request to reinstate was

12       made by.  It's not in there.  And, in fact, the only evidence

13       we heard on it was from the practitioner who was filling this

14       out, and if you look at the form, they don't even ask for a

12:21   15       name.  They just want the money, and they want somebody to

16       certify, who's in a position to certify, that the payment was

17       missed accidentally.

18           That this theory keeps shifting.  Oh, they shouldn't have

19       talked to WhiteWater.  You got an instruction in your packet.

12:21   20       The Court has settled that issue.  WhiteWater is exactly who

21       they needed to talk to because that's the party that had the

22       control over whether to pay the maintenance fee.

23           And then they said, well, no, he shouldn't have talked to

24       Mr. Taché.  Well, let's look at Slide 72.  The second

12:22   25       paragraph.  Perfectly fine to receive information from a third

1    party as long as you don't know it's not true.  We didn't call

2    Mr. Squier and not call Mr. Taché.  So now they're complaining

3    about their own choice of witnesses.  They called Mr. Squier.

4    They didn't call Mr. Taché.  And, of course, properly, because

12:22    5    Mr. Squier signed the certification.  If you're going to go

6    down this rabbit hole, I guess that's the guy you should talk

7    to.

8        But right here, you don't need to decide this.  You are

9    being instructed under the law.  And you heard it from

12:22    10    Mr. Squier as well.  It was perfectly appropriate for him to do

11    it.  And there's no evidence it's not true.  We've now got

12    three theories, if I haven't lost count, as to why they didn't

13    do this.  But one theory was Tom Lochtefeld did it because he

14    was mad at WhiteWater.  Then the other theory was they were

12:23    15    trying to decide whether to sue PSD, and so they held off on

16    paying until they could make up their mind.  And now the theory

17    is, well, no, they really didn't care at all, and then after

18    these bad emails, then they decided to do it and changed their

19    mind.

12:23    20        Well, these emails go back to 2013 and early 2014 when

21    they're saying, you know, they're hurting us.  We don't like

22    them, whatever.  They missed the payment in December 2014.  If

23    they were so bound and determined in 2013 and from the start,

24    you know, they were obviously unhappy when one of their own

12:24    25    left, shows up at a trade show with products that kind of look

1    like theirs.  Why did it take them, you know, the end of '14 to

2    say, okay, we're kind of over it.  Don't bother with that

3    payment.  You know, Richard's not such a bad guy after all.  It

4    just doesn't make any sense at all.

12:24    5        And that was actually the point where they said WhiteWater

6    had already abandoned the 3A design.

7        Now, they weren't even talking about the claims of the

8    patent anymore.  That was an example of sort of, well, the

9    claim's covered, but let's look over here.  Let's look at that

12:24    10   figure.  And we want you to look at all these things, but they

11   aren't limited.  They're examples of how to do various things

12   and not the only thing you could do.

13       On damages, we could look at Slide 74.  Look at the last

14   sentence and highlight it.  The instructions from the Court are

12:25    15   you could look at what they actually made, but it

16   doesn't -- it's not a cause to limit it, and it's not a cause

17   to increase it.  If things had gone better than expected, I

18   mean, it cuts both ways.  And yet the analysis that Mr. Lewis

19   did, the expert for the defense, all he looked at were actual

12:25    20   sales.  He basically treated those forecasts that PSD did as if

21   they didn't exist.  He does no analysis of it.  He even says he

22   didn't come up with his own analysis of, well, what would have

23   been a more accurate forecast in terms of what the parties

24   would have done in December '13?  I mean, we at least tried to

12:26    25   do it, and we did it with the only forecast that's available,

1    and that's the one that came from the defendants themselves.

2        All right.  Sure, the percentage doesn't work out very good

3    in the sense that it's a very high percentage, but we'd ask

4    Mr. Lewis the same question.

12:26   5        In December 2013, what would these -- this lump-sum royalty

6    look like as a percentage of what they then knew?  What they

7    then knew or thought they knew or expected were what was in

8    those forecasts?  And, of course, then, obviously, the

9    percentages flip, and I'll come to the question.  So whose

12:26  10    fault is it that the forecast didn't come to pass?

11        All right.  Would we base a license back in 2013 on, okay,

12    we'll just sell you the nozzle flap cover or let you build up

13    and take a percentage of that?  We've got the licenses we've

14    got, but we've got a number of things that are extremely

12:27  15    consistent.  We have no evidence of WhiteWater, Lochtefeld,

16    anybody agreeing to that, of saying you can take either this

17    component or a license to build this patented component and

18    stick it on your million-dollar ride, and from that, we suggest

19    that only supports a broader point, that we've provided

12:27  20    testimony from the people who were there, which is because that

21    thing really does enable a lot more than just putting on a

22    better flap.  And, in fact, all the licenses that were

23    submitted from whatever combination of patents, what the

24    license fee is based on were entire rides, not components of

12:28  25    rides, so nobody's brought you anything different from that.

1    The fixed design, I guess it's working in Mexico, but we're

2  still left with the question of if it's so good, why isn't

3  anybody buying?

4    Motive.  Considerable part of the defense case from the

12:28    5  beginning was based on WhiteWater's intention, motive.  Today,

6  their nationality.  And we'll address that.  But you'll notice

7  that it's one thing that's missing from your instructions is

8  any instruction on WhiteWater's intent.  You will get one of

9  those as it relates to -- except on the inequitable conduct

12:28   10  part, you know, filling out the form, but in terms of

11  doing -- bringing a claim for infringement, one of the elements

12  of the claim is not you're doing it for a good reason or you're

13  not doing it to hurt to a competitor or whatever.  There is

14  going to be a question like that relating to whether the

12:29   15  defense, you know, willfully, recklessly infringed the patent.

16  So in a direct sense, it's not really germane.  I suppose it

17  has an element of the atmospherics, but what we do know from

18  Mr. Chutter, there's this notion of people suing after suing.

19  Mr. Chutter's testified this is lawsuit number one against a

12:29   20  competitor, although Mr. McFarland did mention another one down

21  in China, so maybe two.  Not exactly that remarkable.

22    The lawsuit against Mr. McFarland, the slide said

23  WhiteWater's some sort of strategy.  This was a lawsuit brought

24  by Wave Loch and Tom Lochtefeld before WhiteWater even owned

12:30   25  it.  Yes, one lawsuit doesn't sound like enough or one plus one

1      in China, so they threw Mr. Lochtefeld's lawsuit in our pile.

2      Are these people competitors?  Absolutely.  How about what's

3      going on between Lochtefeld and WhiteWater?  They were engaged

4      in a negotiation for a transaction that would ultimately result

12:30   5      in the acquisition of the sheet wave business by our client,

6      WhiteWater.  So when these people quit, got poached, you heard

7      the testimony, because they were already starting to function

8      together.  Remember that agreement was backdated to the

9      beginning of their negotiations, the one between WhiteWater and

12:30   10     Mr. Lochtefeld.  So they moved, you know, some -- I don't even

11     know if they moved.  They were in the same physical office

12     space as Wave Loch working side by side.  Hardly sounds like

13     the acrimonious -- not that any of that should have a whole lot

14     to do with what we have to decide in our case, not to mention

12:31   15     Mr. Lochtefeld was right here in court and didn't provide any

16     testimony that I could recall suggesting that he had felt

17     strong-armed or bullied into doing anything.

18         Which I think kind of brings us back to where I started.

19     Throughout the trial, the defendants have tried to play what we

12:31   20     would describe as a sympathy card, that they're just this small

21     start-up company being bullied by big bad WhiteWater.  Well,

22     WhiteWater was once a start-up company, nearly 40 years ago,

23     when Geoff Chutter, the accountant, sort of like

24     Tom Lochtefeld, the lawyer, decided, hey, maybe I can do

12:32   25     something in a much more fun business than the one that most of

1713

 1    the people in suits over here are involved with.  We just get

 2    to talk about water rides.  They get to ride on them and make

 3    them.

 4        And then but he built that business.  It didn't happen

 5    overnight, and it took years to do, and he based it on some new

 6    ideas, and he based it on some other people's ideas that he

 7    paid for, like Tom Lochtefeld's.  And so does that track record

 8    of success and hard work -- and we're not talking about Apple

 9    or Google here.  This is still a successful, decently sized,

10    but still privately owned business.  This isn't some behemoth

11    rolling over the planet.  But given that success, are they any

12    less entitled to a fair shake?  Of course not.  Or does that

13    give defendants a pass if the evidence shows that they

14    infringed on a patent?  Not just copied something, but copied

15    something that was patented?

16        And when you evaluate that, consider this:  Mr. Yeh and

17    Mr. Alleshouse had the benefit of the finest education that our

18    state and our nation has to offer people.  Mr. Alleshouse spent

19    five years working at Wave Loch learning from the master and

20    the people he'd assembled around him, Tom Lochtefeld, who

21    invented this entire industry.  The same time he was able to

22    earn his MBA at UC San Diego and was presumably taught how to

23    compete fairly, effectively, and honestly.

24        Mr. Yeh, he's a lawyer, so he's got the same clear ethical

25    standards that Mr. Squier and a bunch of people in this

1    courtroom have, and as members of a profession, you know, we're

2    supposed to know what those standards are.  He was privileged

3    to work with some of the finest law firms in this country,

4    Mr. Yeh was, and he had the upbringing and the backing of a

5    family that was prepared to provide him with whatever support

6    he needed; in his words, unlimited funds upon request.  All he

7    had to do was ask.  These were not two naive, well-intentioned,

8    uninformed men who stumbled into a problem.  They had a lot of

9    advantages of their own in this start-up, both financial and in

10   terms of education, training, and experience.  It would be hard

11   to find two men who were better prepared or educated on how to

12   start a business and do it fairly.

13       So I suppose while we're postulating, one thing to

14   postulate is, why would they do this?  One thing we postulate

15   is they had to.  They could skip the trampoline thing and still

16   have all the other elements of the ride, but they couldn't

17   skip -- I mean, it couldn't go back to the big wall.  I mean,

18   that -- and so what did they pick?  They picked what was

19   selling.  And they picked what Mr. Alleshouse knew from working

20   at Wave Loch that also happened to represent 97 percent of the

21   sales.  And at the same time, they knew that Tom Lochtefeld was

22   mired down in that lawsuit that he ended up losing with

23   Mr. McFarland, the one where we saw the testimony where he

24   said, yeah, I guess I kind of messed up.  He'd been bled by

25   that lawsuit.  And, remember, at the time they started PSD,

1    Wave Loch didn't own it yet.  Didn't own this business yet.

2    And so it was a calculated risk and maybe a good one at the

3    time:  Tom Lochtefeld's had enough.  He ain't going to sue

4    anybody anytime soon.  So no, don't be a pig about it, don't

12:36  5    infringe what you don't have to, but we need the design that we

6    ended up adopting.

7        Now, what they didn't count on was that Tom Lochtefeld was

8    going to end up selling his business, this piece of his

9    business, to WhiteWater, who, yes, they did have the means, and

12:36  10   they hadn't lost some big ugly patent lawsuit, like

11   Tom Lochtefeld did, to enforce their rights.  Not out of spite.

12   Yes, there was competition here, but we've seen enough -- I

13   mean, PSD's whole business plan is to take sales from

14   WhiteWater.  So they're competing, and that competition runs

12:36  15   both ways.  And WhiteWater's been competing with lots of people

16   for a long time, but they're not suing everybody.  It doesn't

17   make this right just because we sued.  That's what you all are

18   going to have to judge.  But not we just go around suing

19   because we feel like it because the evidence doesn't show that

12:37  20   they've gone around suing because they feel like it.  They've

21   gone and filed this lawsuit, and you're going to have to judge

22   it based on whether there's infringement.

23       So from WhiteWater's point of view, their motive is they

24   had just paid millions to Tom Lochtefeld to buy some

12:37  25   intellectual property, including the '589 patent, and that they

1   came to a court and jury to convince you that they should be

2   compensated under the law based on what PSD would have had to

3   pay in a hypothetical negotiation, a negotiation that didn't

4   happen because they took that shortcut.

12:37   5        Now, no doubt PSD has fallen short of their optimistic

6   forecasts for their business, but that's on them.  That's not

7   on WhiteWater or anybody else.  It's on them for knocking off

8   other people's ideas, if you conclude that they are, indeed,

9   patented ideas.  On them for spending those unlimited funds.

12:38   10   Doubling down on trying to keep that, to keep what they took

11   instead of paying for the use of somebody else's invention or

12   investing time and money to come up with something better and

13   to compete fairly.

14        So thank you again for your time and patience.  Somebody

12:38   15   has to have the last word.  I suspect it's not going to be me

16   because counsel will have a chance to respond, and so I know

17   you'll keep an open mind till the end, and as you consider

18   whatever else you hear, at least in the back of your mind, ask

19   yourself, well, what might the plaintiff say in response to

12:38   20   that?  It doesn't mean we're right, but at least think about

21   what we might say in response to whatever else you hear, and

22   put that into the equation as you judge what you think is right

23   to do.  So thank you.

24             THE COURT:  Mr. Thomas.

12:39   25             MR. THOMAS:  Thank you, Your Honor.

1        I do, by law, get the last word.  I'll try to make it

2    brief.  I will address a few of the comments that were raised

3    specifically by Mr. O'Hare in his rebuttal.

4        I have a slide I want to show you, and the point I want to

12:39  5    start with is the point he started with:  that we're running

6    away from the claims.  Nothing could be further from the truth.

7    We have been arguing about what's in the claims and what's not

8    in the claims from opening statement through every witness.

9    And they've been avoiding the claims.  They've been hiring

12:39 10   experts to try to go beyond the claims, to try to broaden the

11   claims, and talk about all these other things.

12       And the first, what I think, misrepresentation, if you

13   will, or attempt to obscure the truth, is this notion that

14   we're running away from the claims.  And let me explain what I

12:39 15   meant here by that.

16       Okay.  Yes, I did use Figure 3A, but I also showed you the

17   claims.  I showed you the claims in opening statement.  I

18   showed you the claim in closing statement.  And this is Claim 1

19   juxtaposed to Figure 3A.  So we're not running away from the

12:40 20   claim.  When I say they stopped practicing this invention in

21   2005, what was the invention claimed in 2000 -- in the 1999

22   patent?  And the relevant language here is, "A nozzle cover" --

23   a nozzle cover, a single cover -- "comprising a padded material

24   substantially covering said nozzle, including a flexible

12:40 25   tongue, which is biased downward against the flow of the

1    water."

2        So let's just take those words, and let's take Figure A.

3    Figure A depicts exactly what that claim says.  This is, "A

4    nozzle cover comprising a padded material substantially

12:40   5    covering said nozzle."  So this is "substantially covering said

6    nozzle."  It's a single piece.  That's the words in the claim.

7    That's the drawing.  They're one and the same.  They put a

8    drawing to describe what was in the claim and the

9    specification.  They didn't broaden that with this.  They

12:41   10   actually associated those words to what they were doing at the

11   time.  They stopped doing this.  They didn't continue to do

12   this single pad across the top of the nozzle after 2005.  They

13   put the nozzle flap in front of the nozzle, and there was

14   nothing on top except this little burrito board, which is a

12:41   15   separate cover, and this language here, and you're constrained

16   to the language, it's a -- it's a cover, so you can't get to

17   this result without looking at what really is in the claim.

18       So this is a single-pad device.  It's all foam.  It's all

19   padded.  It doesn't include steel.  It doesn't include a hinge.

12:42   20   Not in the claim.  They abandoned that in 2005, and that's

21   what's 3A shows, and that's what the plain meaning of the

22   language shows.

23       Let me move on to, if I can clear that quickly, another

24   point that Mr. O'Hare tried to make.

12:42   25       Now, this, again, was a document that came from

1   Mr. Alleshouse early on when he started his company.  He's a

2   bright guy.  I don't think they would argue that.  I think they

3   valued him as an employee.  They were angry he left.  He was

4   smart.  He was innovative.  So he did very early -- he did a

12:42   5   sketch of what Mr. O'Hare would like you to believe, oh, this

6   shows all this testimony about the horizontal pumps isn't

7   really meaningful, doesn't mean what it says.  Well, this is a

8   conceptual drawing he did.  Smart enough to figure maybe

9   there's a way to create a vertical pump.  This drawing, on its

12:42   10   face, Exhibit 204, is 10 feet -- a little over 10 feet.  He

11   also testified that wasn't feasible to be built in many

12   locations, close to the beach where the water table is too

13   high.  He also talked about the cost and expense of doing it.

14   And he also said that this design was never built.  It's not

12:43   15   feasible to be used.  The fact that he created a simple drawing

16   of an idea doesn't undermine the market reality that all of the

17   sales driven by the change to the horizontal pumps actually

18   happened.  His little conceptual design has nothing to do with

19   that.  It's an effort to confuse and obscure, really, what's

12:43   20   going on here.

21       A word about Mr. Alleshouse.  I've heard at least three

22   times, I think, from Mr. O'Hare, well, both Mr. Alleshouse and

23   Mr. Yeh, well, they weren't alive.  They were in high school.

24   They were in college when all these things happened.  Well,

12:43   25   let's bring our common sense in the room.  These people are

 1   professionals.  They're in industry.  Their job is to know

 2   their industry and the history of their industry.

 3       So and I'll give you an example.  I know December 7, 1941,

 4   Pearl Harbor was bombed.  I wasn't there.  I wasn't alive.  But

12:44  5   I know.  How do I know that?  I was educated.  I read books.  I

 6   went to school.  And that's the same thing as it relates to

 7   Mr. Yeh and Mr. Alleshouse's knowledge about things that

 8   happened before they came into the industry.  They're required

 9   to learn things.  They're required to know things.  So trying

12:44  10   to undermine this knowledge, if you will, on the fact that they

 11   may have been 17 or 14 when all these things happened doesn't

 12   mean it didn't happen.  It happened.  Just as Pearl Harbor

 13   happened before I was born.  It happened, and I know it

 14   happened.  So I'm just a little confused by why we keep making

12:44  15   that argument because I don't think it makes any sense to me

 16   anyway, and I ask you to check that one at your front door as

 17   well.

 18       You know, Mr. O'Hare did make the point that -- it's

 19   probably important.  He says motive is not important.  Intent

12:44  20   is not relevant.  It's highly relevant to this inequitable

 21   conduct.  There's a jury instruction you must prove intent.

 22   But Mr. O'Hare, he's a trial lawyer.  He knows.  Our job in

 23   summation is to put all these little pieces of the case

 24   together into a bigger mosaic and string them together.  Why do

12:45  25   people say what they say?  Why do they take actions or fail to

1    take actions?  There has to be a reason, and there is a reason,

2    in my opinion.  This motive thing ties this whole story

3    together.  It changed from that design that was in the patent

4    in 2005.  They abandoned it.  They made an intentional decision

12:45   5    not to continue to maintain the patent.  It wasn't until this

6    threat of a competitor, these two gentlemen, who Mr. O'Hare

7    just admirably described as smart, well-educated, talented

8    people.  They were formidable competitors.  This small

9    two-person company is a formidable competitor.  We've got smart

12:45  10    people over here.  They're innovative.  They're so innovative

11    they're copying our designs.  So that's a big business threat.

12    So this idea of quashing them, that's not my -- I'm not making

13    that up.  That's in the emails.  That's their testimony.

14    That's their words.  That's their desire.  It had nothing to do

12:46  15    with patent infringement.  And that race to retrieve that

16    patent was done solely to be used as a club against my client,

17    and, again, that is the business practice that I think -- it's

18    the reality of what happened in this case.  However you look at

19    it, they had every opportunity to make the maintenance fees,

12:46  20    not only in the U.S. and Germany and the UK.  They chose not to

21    do that.  They had every opportunity to record the patent

22    assignments.  I showed you a 2012 email from the old law firm,

23    Knobbe, over to Snell & Willmer saying, go ahead and record all

24    these patent assignments.  They didn't do that because they

12:46  25    weren't practicing the invention in 2012.  They didn't update

1   the PTO.  And then when it came time to revive the patent, they

2   were in such a hurry to get the lawsuit on file, they just

3   skipped all the regular regularities, and they went right ahead

4   and revived the patent using the registration of an entity that

12:46   5   had nothing to do with this patent.

6       And I'm not going to repeat what we said before, but I

7   think the evidence shows intent.  It shows intent to let the

8   patent lapse.  It shows intent to abandon the invention.  It

9   shows intent to revive to be used in a vengeful motive way

12:47   10   against my client.

11      So with that, I want to thank you again for patiently

12   listening to lawyers talk for the better part of three hours,

13   and we are confident you'll do the right thing.  Thank you.

14          THE COURT:  All right.  Ladies and gentlemen, I want

12:47   15   to say a couple things:  First of all, you're going to get the

16   jury instructions.  Please do not pay any attention to any

17   strikeouts.  Do not pay any attention whatever to the fact that

18   the fonts in some may be different than others.  Please do not

19   pay any attention to the numbering because I have two sets.

12:47   20   The first set was a set I gave you at the beginning of the

21   trial, and then there's a second set and both begin with a

22   Number 1.  My error.  It just happened that way.  So don't pay

23   any attention to any of that.  Okay?  It has nothing to do with

24   the evidence in the case and what you're supposed to be doing.

12:48   25          Now, before you begin your deliberations, you should elect

1    one member of the jury as your presiding juror.  The presiding

2    juror will preside over the deliberations and serve as the

3    spokesperson for the jury in court.

4        You shall diligently strive to reach agreement with all of

12:48    5    the other jurors, if you can do so.

6        Your verdict must be unanimous.

7        Each of you must decide the case for yourself, but you

8    should do so only after you have considered all the evidence,

9    discussed it fully with the other jurors, and listened to their

12:48    10    views.

11        It is important that you attempt to reach a unanimous

12    verdict, but, of course, only if each of you can do so after

13    having made your own conscientious decision.

14        Do not be unwilling to change your opinion if the

12:48    15    discussion persuades you that you should.  But do not come to a

16    decision simply because other jurors think it is right or

17    change an honest belief about the weight and effect of the

18    evidence simply to reach a verdict.

19        If at any time it becomes necessary during your

12:49    20    deliberations to communicate with me, you may send a note

21    through the bailiff sent by any one or more of you.

22        No member of the jury should ever attempt to communicate

23    with me except by signed writing.  I will not communicate with

24    any member of the jury on anything concerning the case except

12:49    25    in writing or here in open court.

1    If you send out a question -- and I'm not inviting

2  questions -- I will consult with the lawyers before answering

3  it, and that may take some time.  You may continue your

4  deliberations while waiting for the answer to any questions.

12:49   5    Remember that you're not to tell anyone, including the

6  Court, how the jury stands, whether in terms of vote count or

7  otherwise, until after you have reached a unanimous verdict or

8  have been discharged.

9    The verdict form has been prepared for you.  I'm not going

12:50  10  to go over it again.  Both counsel have gone over the verdict

11  form with you.  They did a great job explaining it to you.

12  It's pretty self-explanatory.

13    After you've reached a unanimous agreement on a verdict,

14  your presiding juror should complete the verdict form according

12:50  15  to your deliberations, sign and date it, and advise the bailiff

16  that you're ready to return to the courtroom.

17    Now, a couple things I want you to know.  I don't want to

18  keep you too much longer because I don't want your lunch to get

19  cold.  A couple things.  If you have a question or you reach a

12:50  20  verdict, my bailiffs will show you, there's a button in there

21  that you push.  Just push it very briefly, please.  It makes a

22  really obnoxious noise.  It's right behind my ear.  I don't

23  want to have to listen to it very long, so just push it.  Just

24  push it.  We will have heard you.  At least three people will

12:50  25  have heard you.  I promise.

1    Now, it may take it some time to get to you.  It doesn't

2    mean we have not heard you.  Okay?

3        Secondly, do not discuss the case at any time unless all

4    eight of you are present and no one else.  Okay?  If any one of

12:51   5    you needs to use the facilities or is not present, don't talk

6    about the case.  If anyone else is in there, for example, they

7    bring you the food, don't talk about the case.  Okay?  Simple.

8        All right.  With that, Glenn, if you'd do me a favor and

9    swear in my bailiffs, please.

12:51   10       (The bailiffs were sworn.)

11           THE COURT:  All right.  If you would do me a favor and

12   please take your notes with you and follow my bailiffs into the

13   jury room.

14       Counsel, if you will please remain for a few minutes.

12:51   15       (Proceedings held outside the presence of the jury panel.)

16           THE COURT:  Okay.  The jury has left the courtroom.

17       A couple of things I want to talk about we talked about

18   yesterday.  If you go back to your offices or go have lunch or

19   whatever, just make sure you remain available so that you're

12:52   20   here, hopefully, within ten minutes in the event that we have a

21   question or a verdict.

22       Secondly, it is usually my practice if they have not

23   reached a verdict by 4:00 this afternoon, I will simply send

24   them home, remind them of the admonition, and ask them to come

12:52   25   back tomorrow morning, and to promptly file into the jury room.

1       Glenn, do I have a calendar tomorrow?

2              THE CLERK:  No.

3              THE COURT:  Just simply come in and go into the jury

4       room.

12:53   5       Now, do either one of you want to be present when I send

6       them home tonight?  You don't have to be.  If you want to be,

7       then I'd rather you both be present.

8              MR. O'HARE:  I probably plan on being back here, at

9       least one of us, back here at 4:00.

12:53   10             THE COURT:  Fine.

11             MR. THOMAS:  I'll be here at 4:00.

12             THE COURT:  Okay.  Great.

13       What about in the morning?  Do you want to be here tomorrow

14       morning?

12:53   15             MR. THOMAS:  Is it 9:00?

16             THE COURT:  Yes.

17             MR. O'HARE:  We'll be here.

18             MR. THOMAS:  Well be here.

19             THE COURT:  Okay.  Great.  That takes care of that.

12:53   20       Usually I don't require that, and very often lawyers say, oh,

21       we don't care, you know, as long --

22             THE CLERK:  But we're not on the record?

23             THE COURT:  No, absolutely not.

24       The last thing I want to talk about is I don't know if I

12:53   25       gave this instruction at the beginning of the trial, and I

1    don't know if I should send it to them or not.  The instruction

2    says, "The parties have agreed to certain facts.  Those will be

3    stated to you later by the attorneys."  Does anyone know?  Did

4    I give that instruction?

12:54    5         MR. THOMAS:  You didn't give it, and I don't think it

6    should be given.  I don't think there was any real stipulation.

7         MR. SCOTT:  Actually, the way you read it earlier was

8    basically the attorneys are going to give it to you later, and

9    the intent of that instruction has been, we were going to

12:54   10    submit an exhibit, which is Exhibit 422, that has the

11    stipulated facts the parties agreed to as part of the pretrial

12    filings.  That is also an exhibit that's on the list of

13    exhibits to be admitted for the jury to be able to view.  It

14    wasn't spoken about in court, but it's on the exhibit list, and

12:54   15    that was the intent of the instruction.

16         THE COURT:  What was the exhibit?

17         MR. SCOTT:  I believe it's 422.

18         THE COURT:  422.  Then I ought to tell the jury about

19    it.

12:54   20    Okay.  And the other one was, "The Court has decided to

21    accept as proved certain facts, which will also be explained to

22    you later at the final conclusion of the case."

23         MR. SCOTT:  That one, we don't need.

24         MR. THOMAS:  It's not needed.  Agreed.

12:54   25         THE COURT:  Okay.  I'll remove that, then.

1     Okay.  So, Glenn, do me a favor, would you alert Susie

2  and/or George to bring the jury in.

3     (Proceedings held in the presence of the jury panel.)

4     THE COURT:  Welcome back.  And you were just getting

12:56  5  really ready to dig into that lunch, weren't you?  Aren't I

6  mean?  I'm terrible.  Not really.

7     Hey, listen, I forgot to give you an instruction that I

8  should because it's important.

9     So you have heard evidence in the trial, you've heard the

12:56  10  witnesses, you've seen exhibits, you've heard deposition

11  testimony, et cetera.  I want you to know the parties on both

12  sides, they've agreed to certain facts, and those facts are

13  essentially contained in an exhibit.  The exhibit is

14  Exhibit Number 422.  You're to treat those facts as if, in

12:56  15  fact, they had been proven just as if a witness had taken the

16  witness stand and testified to them.  Okay?

17     So with that, go have lunch.  Thank you.

18     (Proceedings held outside the presence of the jury panel.)

19     THE COURT:  All right.  Thank you, counsel.  I think

12:57  20  that takes care of the jury instructions, and we have the

21  verdict form, I assume.  Would you folks object if I removed

22  the front pages?

23     MR. THOMAS:  No.

24     MR. O'HARE:  That was contemplated because I think we

12:57  25  have a separate caption plate page after the page that says

1    "Exhibit A."

2            THE COURT:  Well, I don't have that.  Yes, I do.

3    Verdict form.  I've got it.

4            MR. THOMAS:  It's just the verdict form.

12:57    5            THE COURT:  Okay.  Great.  Got it.  Good.  Okay.

6        And, Glenn, I think we have two copies of the jury

7    instructions, of the closing jury instructions, if I'm not

8    mistaken.

9            THE CLERK:  I think George would have those.

12:58    10            THE COURT:  When George gets back, make sure that

11    those get back to the jury.

12            MR. SCOTT:  My colleague pointed out at the end of

13    that verdict form is a certificate of service that goes with

14    the ECF filing that also does not need to go back.  So the very

12:58    15    last page should be a certificate of service.

16            THE COURT:  What about the one that says, we, the

17    jury, find that the judge wins?  All right.  There you go.  Go

18    have lunch.

19            MR. O'HARE:  Thank you, Your Honor.

12:58    20            MR. THOMAS:  Thank you, Your Honor.

21        And, Your Honor, one question:  Do you want us to keep this

22    in the courtroom until the verdict comes back?

23            THE COURT:  Yes.

24            MR. THOMAS:  We'll just wheel it out of the way over

12:58    25    there.

1         THE COURT:  Yes, just put it over there, please.

2         MR. THOMAS:  Okay.

3         THE COURT:  Thank you.  All right.  We're in recess.

4     (Jury deliberations.)

04:01  5     (Proceedings held outside the presence of the jury panel.)

6         THE COURT:  George, do me a favor.  Go get the jury,

7  please.

8         LAW CLERK:  All right.

9     (Proceedings held in the presence of the jury panel.)

04:01  10        THE COURT:  Well, good afternoon.  How was lunch?

11        PANEL MEMBER:  Tremendous.  Thank you very much.

12        THE COURT:  Tomorrow you're on your own.

13     Okay.  Listen, I want to thank you for giving us your time

14  today.  I'm going to ask that you go home tonight, come back

04:02  15  tomorrow morning at 9:00.  You don't have to wait for me.  You

16  don't have to wait for anyone.  Just come straight in, go into

17  the jury deliberation room.  When all eight of you are

18  present -- seven.  I keep saying eight.  I forgot.  When all

19  seven of you are there, I will then let you start deliberating

04:02  20  about the case again.  Okay?  But don't deliberate until all

21  seven of you are present.

22     Please remember my admonition.  Okay?  Anybody want to

23  volunteer?  No, never mind.  Seriously, it's important.  It's

24  really important, particularly at this stage of the game.

04:02  25  Okay?  So please do not discuss the case among yourselves or

| | |
|---|---|
| 1 | with anyone.  Do not allow anyone to discuss it with you.  When |
| 2 | I say "discuss it," I mean orally or in writing or |
| 3 | electronically.  Do not read, watch, or listen to any news |
| 4 | accounts of the case, if any.  Do not do any independent |
| 04:03  5 | research, look at dictionaries, get on the Internet, look at |
| 6 | Google or Chrome or any of those things, and please continue to |
| 7 | have an open mind until you've all settled on a verdict.  Okay? |
| 8 | See you tomorrow morning at 9:00 a.m.  You may leave your |
| 9 | notebooks there.  Nobody will touch them.  And see you promptly |
| 04:03  10 | tomorrow morning at 9:00 a.m.  Okay.  Don't wait for me.  Just |
| 11 | go in there.  All right.  Thank you. |
| 12 | (Proceedings held outside the presence of the jury panel.) |
| 13 | THE COURT:  Counsel. |
| 14 | MR. O'HARE:  Good evening. |
| 04:03  15 | MR. THOMAS:  Good evening. |
| 16 | THE COURT:  Do you want to be here at 9:00?  If not, |
| 17 | you don't have to be.  Why don't you go have breakfast.  If |
| 18 | they reach a verdict or they have a question, I'll call you and |
| 19 | let you know.  You don't have to be here. |
| 04:03  20 | MR. O'HARE:  We'll hang out. |
| 21 | THE COURT:  I'll see if I can find one of my law |
| 22 | clerks to give you something to do. |
| 23 | MR. O'HARE:  A little research project. |
| 24 | THE COURT:  All right.  I won't be here.  I'm going to |
| 04:04  25 | be in my chambers, and that's all there is to it. |

1     MR. THOMAS:  I may or may not be here.  I'm thinking

2  that one over as we speak.

3          THE COURT:  Okay.  See you tomorrow.

4          MR. THOMAS:  Thank you.

04:04   5          THE COURT:  Bye.  We're in recess for the night.

6  Thank you.

7                    ---000---

8

9                C-E-R-T-I-F-I-C-A-T-I-O-N

10

11     I certify that the foregoing is a correct transcript from

12  the record of proceedings in the above-entitled matter.

13

14     Dated December 17, 2019, at San Diego, California.

15

16
                         /s/ Dana Peabody_____
17                       Dana Peabody,
                         Registered Diplomate Reporter
18                       Certified Realtime Reporter

19

20

21

22

23

24

25