JOSEPH E. THOMAS (State Bar No. 101443)
*jthomas@twtlaw.com*
WILLIAM J. KOLEGRAFF (State Bar No. 183861)
*wkolegraff@twtlaw.com*
GRANT J. THOMAS (State Bar No, 325011)
gthomas@twtlaw.com
**THOMAS WHITELAW & KOLEGRAFF LLP**
18101 Von Karman Avenue, Suite 230
Irvine, California 92612-7132
Telephone:   (949) 679-6400
Facsimile:    (949) 679-6405

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER WEST INDUSTRIES, INC,, a Canadian corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC SURF DESIGNS, INC., a Delaware corporation and FLOW SERVICES, INC., a California Corporation,<br><br>Defendants. | CASE NO. 3:17-cv-01118-BEN-BLM<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. §285; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>The Hon. Roger T. Benitez<br>Courtroom: 5A<br>Hearing Date: November 23, 2020<br>Time: 10:30 a.m. |

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 23, 2020 at 10:30 a.m., or as soon thereafter as the matter may be heard by the Honorable Roger Benitez in Courtroom 5A of the United States District Court, Southern District of California, located at 221 West Broadway, San Diego, CA 92101, Defendants Pacific Surf Design ("PSD") and Flow Services, Inc. ("Flow Services")(collectively, "Defendants") will and hereby do move the Court for an order awarding Defendants' their attorneys' fees and costs in the amount of $5,072,592, incurred in connection with litigating through trial as an "exceptional case," as defined by 35 U.S.C. § 285.

This Motion is based upon this Notice of Motion and the Memorandum of Points and Authorities in support thereof, the declarations and exhibits submitted herewith, the Complaint and other pleadings on file in this matter, the arguments of counsel, and all other material which may properly come before the Court at or before the hearing on this Motion.

Dated:  October 13, 2020          Respectfully submitted,

THOMAS WHITELAW & KOLEGRAFF LLP


By:  ___/s/ Joseph E. Thomas___
JOSEPH E. THOMAS
Attorney for Defendants

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... iii

**I.**    **INTRODUCTION** ............................................................................................................... 1

**II.**    **FACTUAL BACKGROUND** .............................................................................................. 3

    A.    Whitewater Dominates the Sheet Wave Market .................................................... 3

    B.    The '589 Patent  Should Never Have Been Granted ............................................... 4

    C.    Whitewater's Deploys Predatory Business Tactics ............................................... 5

    D.    Flowrider Filed a Litigation in 2014 and Hid the Owner of the Patents for Over 2 Years ...................................................................................................... 6

        1.    Flowrider Refiled After an Unwarranted 6 Month Delay in Which They Abandoned the '589 Patent .......................................................... 7

        2.    Whitewater Hid behind "Flowrider Surf Ltd." to Extend and Increase the Cost of Litigation .......................................................... 7

    E.    Whitewater Asserted Untenable and Unsupportable Technical and Claim Construction ...................................................................................................... 8

    F.    Whitewater Sought Ridiculous Damages To Destroy PSD ..................................... 9

    G.    A Jury Found All Asserted Claims Not Infringed and Invalid ............................. 10

    H.    This Court Has Already Found Whitewater to Have Abused the Litigation Process ............................................................................................................... 11

**III.**    **LEGAL STANDARDS** .................................................................................................... 12

    A.    Under 35 USC §285, Fees are Awarded for an Exceptional Case When a Party Unreasonably Litigates ............................................................................. 12

    B.    Whitewater's Behavior Supports Finding a Case Exceptional ............................. 14

**IV.**    **ARGUMENT** ................................................................................................................... 14

    A.    This Case is Exceptional because Lochtefeld and Whitewater Failed to Disclose Material Prior Art ................................................................................ 15

    B.    Whitewater's Baseless Infringement Arguments and Excessive Damage Demand Render This Case Exceptional Under § 285 ........................................... 16

        1.    Whitewater Took Unreasonable Positions for Unreasonable Purposes. ................................................................................................ 16

        2.    Whitewater Sought an Unreasonable $4M in Royalty on $2.5M

Actual Sales ............................................................................. 19

3.  Whitewater's Conduct in the First and Second Cases Prolonged Litigation by at Least 2 years ........................ 20

C.  PSD's Attorney Fees are Reasonable .......................................... 21

1.  PSD is Owed Fees and Costs for the Third Lawsuit .................................. 21

2.  PSD is Owed Expert fees and costs for the Third Lawsuit ........................ 22

3.  PSD is Owed Fees and Costs for the Second Lawsuit ............................... 23

4.  PSD is Owed Fees and Costs for the First Lawsuit .................................... 24

**V.   CONCLUSION** ........................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)................................................................................................17

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 379 (Fed. Cir. 1994)..........................................................................................13, 22

*Blackbird Tech LLC v. Health In Motion LLC,* 944 F.3d 910, 914 (Fed. Cir. 2019) 12

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012)...........................17

*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013)................................................................................................17

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011)................14

*FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.,* 3:15-cv-01879-BEN-BLM, 19 (S.D. Cal. May. 26, 2017).).................................................................................8

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115–16 (Fed. Cir. 2004) ......................................................................16

*Intellectual Ventures I LLC v. Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019)................................................................................................13

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989–90 (Fed.Cir.1999) .........................................................................................16

*MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012).............14

*Octane Fitness, 134 S. Ct. at 1756* ................................................................1, 11

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 550 (2014)....14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)....12

*Phillips*, 415 F.3d at 1314.................................................................................17

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, Case No.: 14-cv-02061-H-BGS (S.D. Cal. Aug. 17, 2016) ...........................................13

*Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012) ................................................................................................ 14

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ................ 17

*Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721 (1935) .......................... 16

*Synthes USA, LLC v. Spinal Kinetics, Inc.*, 734 F.3d 1332, 1345 (Fed. Cir. 2013) .. 13

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,* 549 F.3d 1381, 1391 (Fed. Cir. 2008) ................................................................................................ 14

*Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013) . 14

*Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed Cir. 2014) .......................... 17

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) .......... 17

*White v. Dunbar*, 119 U.S. 47, 52 (1886) ................................................................ 16

**Statutes**

35 U.S.C §285 ............................................................................................................ 1

## I.   **INTRODUCTION**

Pacific Surf Designs, Inc. ("PSD") seeks its attorneys' fees and costs as the prevailing party at trial, where the jury found every asserted claim of U.S. patent 6,491,589 ("the '589 patent") not infringed and invalid. The award of PSD's attorneys' fees is fully justified under 35 U.S.C §285 as this case is "exceptional" due to the egregious and deplorable litigation tactics of Plaintiff Whitewater West Industries, Ltd. ("Whitewater"). Under §285, a case is exceptional when a party either: (1) litigates in an unreasonable manner; (2) brought the case with nefarious motive; (3) the case is objectively unreasonable; or (4) there is a need to deter the losing party's future behavior. Here, all these factors apply to demonstrate Whitewater violated §285. Accordingly, this Court should send Whitewater a strong deterrent by awarding PSD the entirety of its attorneys' fees.

Whitewater has harassed PSD with unreasonable litigation for years. It started with *Flowrider Surf, LTD. v. Pacific Surf Designs et al.* Case No. 14-cv-1110-GPC-BLM (the "First Lawsuit"), which they filed on May 1, 2014, and dismissed about two months later on June 30, 2014. Then Whitewater filed another suit, *Flowrider Surf, LTD. et al v. Pacific Surf Designs*, Case No. 3:15-cv-01879-BEN-BLM (the "Second Lawsuit"), which the Court dismissed on May 26, 2017. Finally, Whitewater filed this suit on June 1, 2017 (the "Third Lawsuit"), which went to trial in December 2019, where the jury found overwhelmingly in favor for PSD.

After the Court dismissed the Second Lawsuit, PSD filed a motion for attorneys' fees, citing the abhorrent and unreasonable litigation tactics and positions used by Whitewater. This Court agreed, and on February 25, 2020 found the Second Lawsuit to be exceptional under 35 U.S.C. §285. In particular, the Court held:

> *A case can be "exceptional" either "with respect to the substantive strength of [Plaintiff's] litigating position ... or the unreasonable manner in which the case was litigated." Octane Fitness, 134 S. Ct. at 1756. For the reasons discussed below,* **the Court finds that, based on the totality of circumstances, this case is "exceptional" on both grounds**.

The Court goes on to find:

> ***Plaintiff's conduct during this litigation was exceptionally unreasonable****: despite knowing facts that should have put it on notice that it had standing problems, Plaintiffs' did not adequately investigate its standing issues before filing this lawsuit, continued to pursue a determination on the merits despite mounting evidence of standing issues, and obfuscated the fact that it had standing issues.8 (Doc. No. 282 at 19.) Through this conduct, Plaintiffs' were able to drag out this action and force Defendant to incur significant additional expenses in numerous ways, including briefing on numerous motions, depositions, and additional time and effort in terms of correspondence and meet and confers to get to the bottom of Plaintiffs' falsehoods and misrepresentations regarding their document production.*

Whitewater's bad behavior from the Second Lawsuit continued into the Third Lawsuit, and even degraded, as Whitewater attacked and bombarded PSD in unending scorched earth litigation tactics and flimsy and careless legal and technical positions. Just as with the Second Lawsuit, this Court should find this Third Lawsuit exceptional under §285.

These serial lawsuits have never been about PSD infringing any of Whitewater's patents. This was Whitewater weaponizing the litigation process to destroy a competitor, and patent law was Whitewater's vehicle of choice for inflicting as much pain as possible. In the Order Setting Award of Fees and Costs (Dkt. 316),

> *"the Court found that this [Second] Litigation was at least in part motivated by [Whitewater's] desire for 'payback' for [PSD's] ongoing competition in the global water attraction market."*

PSD's superior sheet wave machine threatened Whitewater's 40% profit margins and 97% market share. But instead of playing fair and competing in the market, Whitewater attacked PSD with the full fury of its legal team. For 5 years, Whitewater engaged every unfair tactic it could to prolong the litigations and bleed resources from PSD. Whitewater used multiple lawsuits, threats to PSD's owners,

threats to potential customers, discovery abuse, scorched earth motion practice, warped basic patent law, and aimed expensive and disingenuous experts against PSD to keep them out of the market.

But when it was all over, PSD had invalidated all the patent claims that Whitewater asserted, and in the Third Lawsuit, a jury overwhelmingly confirmed that PSD did not infringe even a single asserted claim in any patent. But PSD's total vindication came at a steep price: 6 years lost and over $6M wasted in legal costs for multiple sham lawsuits. Although PSD's legal position was vindicated by the jury, Whitewater's tactics let them win in the marketplace by keeping PSD from effectively competing for over 6 years, and Whitewater still benefits from the results of their abusive litigation behavior. Whitewater delayed PSD's entry into the market, and was able to maintain its hefty profit margins through wrongful use of its market power. Meanwhile, PSD was forced to spend $6M over 6 years on multiple litigations; money that PSD should have used for marketing, engineering, sales, and maybe even occasionally paying themselves a salary. Instead, PSD now has massive debt and obligations to investors, and has sold only a half dozen machines in 5 years.

If there ever was a case that was exceptional, this is it. Under 35 U.S.C. §285**Error! Bookmark not defined.**, this Court has the equitable power to begin to level the playing field and put PSD back in a position to compete fairly by ordering Whitewater to pay PSD's legal and expert fees. The jury saw that Whitewater's case was a sham, and found overwhelmingly in PSD's favor. While this court cannot turn back the clock or put PSD in its rightful market position, it can at least get them back the $6M+ attorneys' fees it was forced to wrongly spend.

## II.   FACTUAL BACKGROUND

### A.   Whitewater Dominates the Sheet Wave Market

Whitewater and PSD both sell sheet wave machines to the surfing and waterpark industry. A sheet wave machine is a recreational device that uses

powerful pumps to forcefully inject a thin sheet of water (about 2-3 inches thick) over a cushioned ride surface. Surfers or body boarders ride on the sheet of water, which sometimes is shaped into barrels or other shapes to enhance the ride experience. These machines are sold to water parks, municipalities, cruise ships, and wealthy individuals so that a consistent and fun surfing experience can be provided almost anywhere.

Whitewater has been in the sheet wave market for over 25 years, with the size of the market exploding after about 2005. In the years from 2014 through 2020, which is how long the onslaught of serial cases has continued, Whitewater and its licensees sold about 100 sheet wave machines. These machines often sell for well over $800,000 each. By way of contrast, in that same period during these litigations, PSD sold only 6 machines at an average cost of about $650,000. Whitewater dominates and controls the sheet wave market, proudly admitting it owns 97% of the market, and, with great hubris at trial, acknowledged that this illegal monopoly allows it to artificially keep its sale prices and gross profit margins extraordinarily high (Trial transcript, G. Chutter at 524:21-525:8). Whitewater has consistently acquired, often forcibly, any competition that threatens their market share.

**B.    The '589 Patent  Should Never Have Been Granted**

Thomas Lochtefeld filed for the '589 patent on August 2, 2000, while he still had control over his company, Wave Loch. Years before filing the '589 patent application, Mr. Lochtefeld installed multiple sheet wave machines, with two particularly relevant machines installed at Hyland Hills, Colorado, and in Guam. Mr. Lochtefeld installed both sheet wave machines in 1996. Despite having direct knowledge of these installations, Mr. Lochtefeld chose not to disclose these installations as material prior art to the United States Patent and Trademark Office ("USPTO"). Regardless of his failure to disclose the installations to the USPTO, the Court found these installations were material prior art to the '589 patent:

*the Court adopts the jury's finding that there is no difference between the*

*scope of invention and what was known in prior art at the time of the claimed invention. The Court adopts this finding because Mr. Lochtefeld, the inventor of the '589 Patent, was involved in the creation of the agreed-upon prior art installations. Moreover, the Court's review of the '589 Patent's elements allegedly not present in the prior art confirms that each element was actually part of the prior art. Specifically, Mr. Lochtefeld testified that both installations had a nozzle deck, nozzles, nozzle assemblies, and nozzle apertures, along with padded bumpers. In short, Mr. Lochtefeld provided sufficient testimony to support a finding that there is no difference between the '589 Patent and the prior art installations.* (Judgment, Dkt. 366, at 2)

### C.    Whitewater's Deploys Predatory Business Tactics

On January 31, 2014, Whitewater acquired a license to all sheet wave rights from Wave Loch, together with the other intellectual property rights through the parties' Contribution Agreement. As a part of this Contribution Agreement, Whitewater formed a British Columbia company known as Flowrider Surf, Ltd., which was a wholly owned subsidiary, to promote the acquisition of intellectual property from Wave Loch and Surf Park, Pte. Mr. Lochtefeld, wanting to keep an eye on the acquisition, required Whitewater to give Wave Loch, Inc. a 10 percent interest in the Flowrider Surf, Ltd. company. However, it was discovered later that Whitewater wanted to eliminate all of Wave Loch. According to Marshall Myrman's trial testimony, Whitewater poached him and 3 other key Wave Loch employees in 2013, all within days of each other, in the hopes that Wave Loch would fold and leave the industry (Trial transcript, M. Myrman at 384:17-385:22). In 2016, Whitewater amalgamated Flowrider Surf into Whitewater West Industries. This amalgamation transferred all of the assets of Flowrider Surf to Whitewater, including Mr. Lochtefeld's 10 percent interest (Trial transcript, G. Chutter at 509:6-510:16). So now that Whitewater had acquired the assets and assigned patent rights from Wave Loch, it was able to eliminate them as competition.

During this same timeframe, Whitewater recognized that PSD produced a superior sheet wave machine with a lower price that was generating substantial

market buzz (Trial Transcript, A. Thatcher at 431:7-12). Whitewater was concerned about PSD taking market share and eroding its profit margins. Internal Whitewater emails disclosed that Whitewater needed to quickly "squash" and "starve out" PSD before they could become a serious threat (Trial Exhibits CQ and 234). Emails between Whitewater and ADG, its exclusive US licensee, show them conniving to "develop a strategy to deal with" PSD (Trial Exhibit 234). Instead of fighting PSD fairly in the market, Whitewater aggressively pursued and prolonged this litigation to starve PSD of all its resources.

**D.     Flowrider Filed a Litigation in 2014 and Hid the Owner of the Patents for Over 2 Years**

On May 1, 2014, Flowrider Surf Ltd ("FSL")., a wholly owned subsidiary of Whitewater, filed the First Lawsuit against PSD, alleging infringement of the '589 patent. (Dkt. 222 at 18). But, at the time of filing the suit, FSL had no rights in the '589 patent, as it had assigned all its rights in the '589 patent to Whitewater on October 16, 2013, 7 months prior to filing the suit. (Dkt. 222, at 7). Whitewater knew that it held all the substantial rights in the '589 patent, and that FSL did not have standing to sue, but had FSL file anyway. (Dkt. 222, at 13). The only reasonable explanation of why the lawsuit was filed in the name of FSL, a single purpose entity for acquiring IP assets, rather than the obvious choice to sue in the name of Whitewater, the entity with all the patent rights, is that Whitewater knew it was undertaking the lawsuit in bad faith, and if FSL got caught in this bad act, Whitewater wanted to avoid exposing itself, the parent company, to huge financial exposures and penalties.

On June 27, 2014, Whitewater, directing the litigation through FSL entered into a six month tolling agreement with PSD. The alleged purpose of this tolling agreement was to allow a reprieve in the litigation in order for FSL (or Whitewater) and PSD to determine whether or not they could reach a reasonable settlement. Both PSD and FSL agreed to allow the dismissal of the action voluntarily without

prejudice. Based upon its tolling agreement, FSL dismissed its action against PSD on June 30, 2014. During this tolling agreement, Whitewater did not make a single attempt to contact PSD for further settlement discussions.

### 1. Flowrider Refiled After an Unwarranted 6 Month Delay in Which They Abandoned the '589 Patent

During the six-month period established by the tolling agreement, the '589 patent expired due to the failure to pay the maintenance fees. During that 6 months, no settlement communications of any sort took place. Not a phone call, not an email, not a meeting, not even a "hello" at any trade show. PSD believed that Whitewater had walked away from the '589 patent. (Trial transcript, Y. Yeh at 1034:2-6) The final day to accept late payment of maintenance fees without any repercussions came and went without any action from Whitewater on December 10, 2014.

### 2. Whitewater Hid behind "Flowrider Surf Ltd." to Extend and Increase the Cost of Litigation

It was not until August 24, 2015, after the final revival of the '589 patent was issued, that FSL filed the Second Lawsuit against PSD. As with the First Lawsuit, FSL knew it had no substantial rights in the '589 patent. In fact, FSL had assigned all its rights in the '589 patent to Whitewater on October 16, 2013, 10 months prior to filing the Second Lawsuit. (Dkt. 222 at 7). In this way, Whitewater knew that it held all the substantial rights in the '589 patent, and that FSL did not have standing to sue. (Dkt. 222 at 13). But Whitewater brought the case in the name of FSL even though they expressly conceded that Whitewater "held all substantial rights at the time they filed their complaint." (Dkt. 222 at 18). Unknown and undisclosed to PSD or the Court, on February 1, 2016, 6 months into the Second Lawsuit, Whitewater amalgamated FSL into Whitewater, so FSL ceased to exist and all assets and documents of FSL were then owned and controlled by Whitewater. (Dkt. 222 at 9). Whitewater did not update the Court or PSD to this amalgamation and that FSL ceased to exist, so this case continued in the name of FSL.

During the course of this two-year Second Lawsuit, Whitewater's entity shell game effectively blocked PSD's efforts to obtain document discovery. Since this case was captioned with "Flowrider Surf Ltd.," PSD reasonably made its document requests to FSL. But the Whitewater attorneys, pretending to be acting on behalf of FSL, would claim that FSL had no documents, even though the FSL documents were now under the control of Whitewater. For months, the same attorneys that filed and maintained the suit in the name of FSL asserted that FSL had no documents, and produced nothing. It was not until PSD had expended significant monies defending itself against this wrongful patent suit, that PSD finally discovered FSL no longer existed as a corporate entity and had been amalgamated into Whitewater. It is utterly shocking that the Whitewater attorneys could, at the same time, take the positions that (1) FSL existed to file and maintain a patent suit, but (2) FSL did not exist to comply with discovery requests.

Based on this information, PSD moved to dismiss the case, which this Court granted. The Court concluded: "Whitewater West should have been the named plaintiff at the time this lawsuit was filed, not FlowRider Surf Ltd." *See FlowRider Surf, Ltd. v. Pac. Surf Designs, Inc.,* 3:15-cv-01879-BEN-BLM, 19 (S.D. Cal. May. 26, 2017).* The Court then granted a motion to dismiss the case for lack of subject matter jurisdiction.

### E.    Whitewater Asserted Untenable and Unsupportable Technical and Claim Construction

Finally, on June 2, 2017, after dragging out the litigation for nearly 3 years by intentionally filing suits with the wrong entity, Whitewater, filed this Third Lawsuit against PSD in its own name, something it knew it had to do since filing the first suit in 2014. Once again, Whitewater asserted the '589 patent. *See Whitewater West Industries, LTD. v. Pacific Surf Designs, Inc. et al* Case No. 3:17-cv-01118-BEN-BLM.

The central issue in the Third Lawsuit was whether PSD's hinged metal flap

could infringe the claim limitation for a "flexible tongue." Whitewater maintained throughout the litigation that "flexible tongue" could be so broadly construed as to ensnare a hinged metal flap. But Whitewater had a big problem. None of the asserted claims had any language directed to a hinge, nor did any of the 57 claims in the '589. And there is nothing in the text of the '589 patent about a hinge, and none of the drawings show a hinge. At the Markman hearing, the Court determined that "flexible" should be given its plain and ordinary meaning. In order to force-fit a hinged metal plate to be falsely described as a "flexible tongue," Whitewater directed their technical expert, Dr. Stevick, to apply knowingly wrong claim construction law. Over and over the expert and his attorney boasted that "the patent claims are always broader than the specification." (Trial testimony, G. Stevick at 326:14-14). Armed with this bad law, Dr. Stevick opined that a couple sentences in column 11 of the '589 patent, when read into the claim, could suggest that a flexible tongue could be a hinged metal plate. However, the column 11 language had no such teaching. It was merely a description of material properties and had nothing to do with any rotation or hinge. Instead, it stated that a flexible tongue could be internally reinforced. Further, Dr. Stevick opined that such a statement was enough to a person having ordinary skill in the art would understand that a hinge was then necessary. The jury saw through this fallacy and found that the metal plate was not a flexible tongue, and that PSD infringed no asserted claim of the '589 patent.

### F.      Whitewater Sought Ridiculous Damages To Destroy PSD

Armed with Dr. Stevick's baseless opinion that the PSD's hinged metal flaps could be called a flexible tongue, Dr. Vigil, Whitewater's damage expert, reached several preposterous conclusions. Like Dr. Stevick, Dr. Vigil took standard well understood patent damages principles and warped them into an offensive tool for Whitewater. First, he believed that PSD and FS would have negotiated for an upfront lump sum payment to Whitewater for the nonexclusive use of the '589 patent. Dr. Vigil was so convinced of this, that he didn't even bother to calculate

what a reasonable running royalty would be. The reason he only considered an upfront payment is simple: If Dr. Vigil calculated a running royalty, PSD easily could have paid the royalty due on the 4 past machines, and then continued on with their business, paying as they made sales and generated revenue. Instead, Whitewater wanted the PSD competition gone. So, Dr. Vigil only presented the full upfront payment option, which would inflict the most damage to PSD.

Second, Dr. Vigil only considered the royalty base according to the whole market rule, that is, the nearly $650K for an entire sheet wave machine. With disregard for established patent damages law, Dr. Vigil refused to apply or even consider the smallest saleable patent practicing unit ("SSPPU") theory, which requires a damage expert consider the SSPPU, if one exists, as the appropriate royalty base, as opposed to the whole market rule. Here, the patent infringement issue was to the hinged metal flaps, and those flaps are separately saleable. Both PSD and Whitewater sell a set of hinged metal flaps for about $3,000. Accordingly, Dr. Vigil should have calculated the royalty base on the $3,000 SSPPU, and not the entire $650K machine. By refusing to apply the well-established SSPPU rule, Dr. Vigil was able to inflate the royalty base by 21,670%.

Third, Dr. Vigil opined that PSD would pay an upfront $2M royalty for the '589 patent. This, despite PSD only having over its 5 years in business, had total sales of only about $2.5M with a profit of under $260K. It is incomprehensible that anyone, let alone a Ph.D economic expert, would consider an 83% upfront royalty "reasonable." Third, Dr. Vigil opined that FS, a wholly owned subsidiary of PSD, would also pay an upfront $2M royalty for the '589 patent. Dr. Vigil made this claim despite FS only having total sales of $41K with negligible profit. It is astounding, but Dr. Vigil found that a royalty payment of 4,878% was "reasonable."

### G.    A Jury Found All Asserted Claims Not Infringed and Invalid

After being able to perform full discovery, PSD was finally provided the documents that would allow PSD to successfully defend the suit against it. On

December 19th, 2019, the jury returned a verdict that found no infringement of any asserted claim of the '589 patent and found every asserted claim invalid as being anticipated by two prior art installations. On September 29, 2020, the Court entered Judgment finding no claim infringed, and that all asserted claims were invalid. (Dkt. 265 and 266).

### H.    This Court Has Already Found Whitewater to Have Abused the Litigation Process

On February 25, 2020, this Court issued an Order awarding PSD attorney's fees under 35 USC §285 in the Second Lawsuit. In its ruling, the Court stated:

> *A case can be "exceptional" either "with respect to the substantive strength of [Plaintiff's] litigating position ... or the unreasonable manner in which the case was litigated." Octane Fitness, 134 S. Ct. at 1756. For the reasons discussed below, the Court finds that, based on the totality of circumstances, this case is "exceptional" on both grounds.*

First, the Court found that Whitewater's subsidiaries should have known they had an exceptionally weak case. Here, the subsidiaries knew that the '016 patent they were asserting was likely to be invalid in light of the '589 patent, which had not been disclosed to the USPTO during prosecution of the '016 patent. Indeed, when PSD challenged the '016 at the USPTO, and finally showed the 'prior art '589 patent to the examiners, the USPTO invalidated the '016 patent. Further, the only way the subsidiaries could maintain its suit against PSD was to take ridiculously overbroad claim constructions.

> *The Court agrees with the Defendant [PSD] and finds this case exceptional because Plaintiffs knew or should have known that the '016 Patent was objectively unreasonable and frivolous. This is especially true considering it was previously invalidated as described supra. (Doc. No. 282 at 15.) Moreover, the Plaintiffs' awareness of the invalidating prior art (at least as to the '589 Patent), raised overbroad infringement theories....*

Second, the Court found that Whitewater's subsidiaries litigated unreasonably. The Court notes that the interactions between the parties and counsel

in this suit have been contentious. Despite this, the Court still finds Plaintiffs' litigation conduct taken, unreasonable. *See Lyda v. CBS Interactive, Inc.,* Case No. 16-cv-06592-JSW, Dkt. No. 35 at 7 (N.D. Cal. Jan. 24, 2018) (granting fees; because one factor under Octane Fitness is "the need to advance considerations of compensation and deterrence, ... the Court also takes into consideration the fact that Plaintiff has sued other entities on similar claims without success.")

Accordingly, in the prior case to this one, the Court found that Whitewater, through its subsidiaries, had acted so egregiously with regard to the '016 patent that the Court found the case to be exceptional under 35 U.S.C. §285. As described in detail herein, Whitewater committed this same pattern of litigation abuse with the '589 patent, if not more egregious, and therefore the case as it relates to the '589 patent is similarly exceptional under §285.

### III.   LEGAL STANDARDS

#### A.   Under 35 USC §285, Fees are Awarded for an Exceptional Case When a Party Unreasonably Litigates

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. §285 "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Blackbird Tech LLC v. Health In Motion LLC,* 944 F.3d 910, 914 (Fed. Cir. 2019) *citing Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness*, 134 S.Ct. at 1756. The totality of the circumstances extends past initial infringement allegations such that if at any point it becomes clear that continued pursuit of litigation is vexatious, a case may be considered extraordinary and fees may be warranted even if the initial complaint was arguably justified. *Synthes USA, LLC v.*

*Spinal Kinetics, Inc.*, 734 F.3d 1332, 1345 (Fed. Cir. 2013). "There is no precise rule or formula for determining whether to award attorney's fees, but instead equitable discretion should be exercised . . ." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, Case No.: 14-cv-02061-H-BGS (S.D. Cal. Aug. 17, 2016) (*citing Octane Fitness*, 134 S.Ct. at 1756). To help guide a court's discretion, the Supreme Court compiled a non-exclusive list of factors that includes: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 134 S.Ct. at 1756.

There is no precise rule or formula for finding a case to be exceptional under § 285. However, "a district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act." *Intellectual Ventures I LLC v. Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019). In *Intellectual Ventures I LLC*, the district court awarded fees based upon a singular isolated act of an attorney misrepresenting that an expert changed his opinion. *Id.* at 1382. The Federal Circuit found that the district court did not appear to find the case as a whole to stand out as exceptional, instead the district court found only one discrete part stood out. *Id.* at 1383. The appellate court overruled the finding of fees after concluding the district court did not apply the correct standard in finding that the case was exceptional. *Id.* at 1384. In order for the case to meet the exceptional case standard, the case overall is exceptional. *Id.* In this case, that standard is easily met. Here, there are a multitude of actions Whitewater's attorneys undertook, all of which individually could be cause for awarding fees under § 285. These actions so tainted the case that an award of all attorneys' fees is warranted.

In addition to attorney fees and costs, the court may also award expert witness fees if the Court finds there is "fraud on the court or an abuse of the judicial process." *Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 379 (Fed. Cir. 1994). Further, the Court may award expert witness fees as a sanction under the

Court's inherent powers. *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,* 549 F.3d 1381, 1391 (Fed. Cir. 2008). But the circumstances outlined in *Amsted* must be present to award such sanctions.

## B. Whitewater's Behavior Supports Finding a Case Exceptional

Even before Octane lowered the standard for inequitable conduct, Courts have found exceptional cases when "there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or like infractions." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 550 (2014). Courts have also found for attorneys' fees "[w]hen patentees have sought unreasonable claim constructions divorced from the written description." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013); *see also MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011). "Claim construction is a matter of law, so that an attorney's proposed claim construction is subject to Rule 11(b)(2)'s requirement that all legal arguments be nonfrivolous." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012). "Rule 11 sanctions only apply '[w]here it is clear that a case lacks any credible infringement theory and has been brought only to coerce a nuisance value settlement.'" Id.

In this case, Whitewater maliciously pursued litigation with the intention of eliminating the only threat to their market dominance, thus protecting Whitewater's uncompetitive 40% profit margin. Whitewater must be deterred from attempting this approach towards other competitors.

## IV.   ARGUMENT

In this case, the Jury found that all of the claims asserted against Whitewater asserted against PSD were anticipated by non-disclosed prior art. (Verdict Form, Dkt 356 at 12). Whitewater continued to assert patent claims which were neither

supported by the claim language nor the description of the patent. (Trial transcript, G. Stevick at 311:12-312:22). Whitewater pursued a damage figure which was not correlated with the alleged infringement. (Trial testimony, R. Vigil at 650:10-651:21).

### A.     This Case is Exceptional because Lochtefeld and Whitewater Failed to Disclose Material Prior Art

The '589 patent should never have been issued, and the USPTO would not have issued the patent had Mr. Lochtefeld followed the patent rules and disclosed the Hyland Hills and Guam installations to the patent examiner. Mr. Lochtefeld of course knew about Hyland Hills and Guam - he had done the installations. Both installations were on public display and were sold into the public market. Mr. Lochtefeld was the inventor of the '589 patent application, and made the conscious decision not to disclose the installations to the patent office. The installations are material to the question of whether or not the '589 patent should have ever issued. In this case, after the jury saw how identical the '589 patent claims were to the installations, the jury found all asserted claims to be invalid as being anticipated and rendered obvious by both Hyland Hills and Guam.

Further, despite having full knowledge of these two installations, Whitewater failed to disclose them to the USPTO after PSD filed for *inter parties* review ("IPR") of the '589 patent. Without having the full benefit of these pieces of prior art, the USPTO denied PSD's IPR petition, to Whitewater's benefit. Had Whitewater disclosed these material prior art installations during the IPR petition process, the '589 patent would have been declared invalid by the USPTO and this litigation would have ended years ago.

Had Mr. Lochtefeld and his attorneys done the right thing, and disclosed the installations as required, this case never would have happened because the '589 patent asserted claims never would have been issued. This entire sham of a case was predicated on a patent that issued only because the inventor did not inform the

USPTO of material prior art. Whitewater's enforcing of the '589 patent against PSD was objectively unreasonable, and falls within the exceptional case guidelines set by the Supreme Court. *See Octane Fitness*, 134 S.Ct. at 1756.

## B.   Whitewater's Baseless Infringement Arguments and Excessive Damage Demand Render This Case Exceptional Under § 285

### 1.   *Whitewater Took Unreasonable Positions for Unreasonable Purposes.*

#### (a)   Whitewater Intentionally Misrepresented Patent Law to Pursue Claims against PSD.

Patent protection is defined by its claims. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115–16 (Fed. Cir. 2004) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") *Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721 (1935) ("[T]he claims of the patent, not its specifications, measure the invention."). Unless the Court specifically defines the construction for a patent term, every term is constructed according to its plain and ordinary meaning. *White v. Dunbar*, 119 U.S. 47, 52 (1886) ("The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public ... to construe it in a manner different from the plain import of its terms.") The patent specification can help aid the public in understanding what the patent claims are intended to cover. However, since only the patent claims are used to inform the public of what is protected by the patent, the patent specification cannot broaden the scope of the patent claims. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989–90 (Fed.Cir.1999). (Attending this principle, a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to "particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.")

In determining the proper construction of a claim, a court should first look to the language of the claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The context in which a disputed term is used in the asserted claim and other claims may provide guidance as to the meaning of the term. *See Phillips*, 415 F.3d at 1314. Additionally, a disputed term should be construed "consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (internal citations omitted). Moreover, "'[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.'" *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed Cir. 2014) (internal citation omitted). A court must also read claims "in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (internal citation omitted). "Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term." *Vederi*, 744 F.3d at 1382 (internal citation omitted). For example, "a claim construction that excludes [a] preferred embodiment [described in the specification] 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (internal citation omitted). But a claim construction must not import limitations from the specification into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012). During briefing for the Markman claim construction hearing, Whitewater proposed that the word "flexible" be given its plain and ordinary meaning such that the Court need not specifically construe it. (Dkt. 39 at 12:23-28). The Court agreed, and therefore "flexible" is to be given its plain and ordinary meaning.

But instead of allowing plain and ordinary meaning to control, Whitewater maintained throughout the litigation that "flexible tongue" could be interpreted so

broadly construed as to ensnare PSD's hinged metal flap. However, none of the asserted claims had any language directed to a hinge, nor did any of the 57 claims in the '589 patent. And there is nothing in the text of the '589 patent about a hinge, and none of the drawings show a hinge. In order to force-fit a hinged metal plate to be a flexible tongue, Whitewater's attorney, Rick Tache, directed his technical expert, Dr. Stevick, to apply knowingly wrong claim construction law. On direct, cross, and redirect, Dr. Stevick confidently but wrongly asserted that "the patent claims are always broader than the specification." He used this bad law to import a portion of the specification into the claims. Specifically, Dr. Stevick used two sentences in column 11 of the '589 patent to assert that a flexible tongue could include a hinged metal plate. But even the column 11 language had no such teaching. It was merely a description of material properties, and had nothing to do with any rotation or hinge. Instead, it just said that a flexible tongue could be internally reinforced, and Dr. Stevick opined that such a statement was enough to a person having ordinary skill in the art would understand that a hinge was then necessary.

(b)     Whitewater Took These Unreasonable Positions for to Extending the Litigation to Put PSD out of Business.

Whitewater intentionally and unreasonably extended the litigation for purposes that are nefarious, frivolous, and objectively unreasonable.

Early on in the litigation, PSD put Whitewater on notice that PSD was not infringing upon any claims asserted by Whitewater. Whitewater ignored this notice. At the claim construction hearing, the Court refused to find the definition of "flexible". Instead, the court found that "flexible" should be consistent with its plain and ordinary meaning. Despite this knowledge that the singular term which provided Whitewater with a claim of infringement was not found in their favor, Whitewater continued this suit in order to harass PSD, drain their resources, and eliminate them as competition. Whitewater extended this definition of "flexible" significantly beyond its plain and ordinary meaning to further their objectively unreasonable

motivation in continuing the suit. At trial, Whitewater's CEO Geoffery Chutter admitted in Court that the purpose of the suit was to maintain Whitewater's 40% profit margin and 97% market share. (Trial transcript, G. Chutter at 555:8-16; 557:13-558:5; 563:6-564:7). Thus, Whitewater's outrageous litigation tactics fall squarely within the exceptional case guidelines set by the Supreme Court: frivolousness, nefarious motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *See Octane Fitness*, 134 S.Ct. at 1756.

In conclusion, this court should find that this case is exceptional (1) because Whitewater took unreasonable litigation positions contrary to law, and (2) because Whitewater did this in order to harass, drain resources, and exclude PSD from the market place.

### 2. Whitewater Sought an Unreasonable $4M in Royalty on $2.5M Actual Sales

Dr. Vigil had one clear objective: financially cripple PSD and squash them as competitors, just like Andrew Thatcher and Marshall Myrman wanted. We know this because Dr. Vigil did not even consider applying a running royalty to PSD sales, an option that would have allowed PSD to pay a royalty on actual sales and continue to exist as a business. Instead, Dr. Vigil opined that this 2-person start up, with a $90k total investment, would have negotiated a fully paid up lump sum payment to Whitewater in December 2015, a time when PSD had no revenue. This form of royalty is objectively unreasonable, but his opinion becomes ludicrous when Dr. Vigil declared that both PSD and FS would have made a separate $2M lump sum payment.

PSD had actual sales of $2.5M with a profit of under $260,000, which is an 83% royalty. As to FS, they had total sales of $41,000, with a negligible profit, which is 4,878% royalty. Put another way, on PSD and FS combined sales, Dr. Vigil

thought a $4M lump sum royalty was reasonable, even though the royalty was $1,600% of actual sales.

### 3. Whitewater's Conduct in the First and Second Cases Prolonged Litigation by at Least 2 years

Whitewater first filed its patent suit against PSD on May 1, 2014, but did so using the name "Flowrider Surf Ltd," which Whitewater knew had no substantial rights in the asserted patents. Whitewater fully knew that only Whitewater had the right to bring suit. (Dkt. 22 at 18). Of course Whitewater knew that FSL did not have sufficient rights in the asserted patent, so presumably filed using the FSL name in an attempt to shield the substantial assets of Whitewater in case the lawsuit went badly.

Whitewater had second thoughts about the merits of their case, so they let the '589 patent expire and dismissed the case on June 30, 2014. Whitewater did enter into a 6 month tolling agreement with PSD under the pretext of wanting to settle the matter, but Whitewater did nothing in that 6 months toward settlement: no calls, no meetings, no emails... nothing. So with the '589 patent dead, and no communications from Whitewater, PSD assumed the saga was over.

However, on August 24, 2015, Whitewater refiled the patent suit against PSD. Again, as with the first case, FSL had no substantial rights in the '589 patent. In fact, FSL had assigned all its rights in the '589 patent to Whitewater on October 16, 2013, 10 months prior to filing the suit. (Dkt. 222 at 7). In this way, Whitewater knew that it held all the substantial rights in the '589 patent, and that FSL did not have standing to sue. (Dkt. 222 at 13). But Whitewater brought the case in the name of FSL, even though they expressly conceded that Whitewater "held all substantial rights at the time they filed their complaint." (Dkt. 222 at 18).

Unknown and undisclosed to PSD, on February 1, 2016, six months into this litigation, Whitewater amalgamated Flowrider into Whitewater, so Flowrider ceased to exist and all assets and documents of Flowrider were then owned by Whitewater.

(Dkt. 222 at 9). Whitewater did not update the Court, or PSD to this amalgamation and that Flowrider no longer existed, so this case inevitably continued in the name of FSL.

Since this case was captioned with "Flowrider Surf Ltd.," PSD made its document requests to FSL But the Whitewater attorneys, pretending to be acting on behalf of FSL, would claim that FSL had no documents, even though the FSL documents were now under the control of Whitewater. For months, the same attorneys that filed and maintained the suit in the name of FSL asserted that FSL had no documents, and produced nothing. It was not until PSD had expended significant monies defending itself against this wrongful patent suit, that PSD finally discovered FSL no longer existed as a corporate entity and had been amalgamated into Whitewater. It is utterly shocking that the Whitewater attorneys could, at the same time, take that positions that (1) FSL existed to file and maintain a patent suit, but (2) FSL did not exist to comply with discovery requests. The Court realized that Whitewater had the knowledge that Whitewater was the true owner of the patent all along, and that Whitewater owned and controlled the documents of FSL.

Whitewater knew it was wrong to file this suit in the name of FSL. They admit that. And equally bad, when FSL ceased to exist, they never updated the Court or PSD, so PSD continued propounding discovery requests to the non-existent FSL. It is almost unbelievable that Whitewater then used the fact that FSL no longer existed as a justification to not produce the documents that were then owned and controlled by Whitewater. This Second Lawsuit was frivolous, filed to harass, and objectively unreasonable, and the express threat to "bury PSD in litigation" shows it was all done in bad faith. Therefore, the entire Second Lawsuit falls within the exceptional case guidelines set by the Supreme Court. *See Octane Fitness*, 134 S.Ct. at 1756.

### C.   PSD's Attorney Fees are Reasonable

#### 1.   *PSD is Owed Fees and Costs for the Third Lawsuit*

This is an exceptional case under 35 U.S.C. §285, and as such the Court should award all the fees and expert expenses paid by PSD. The Declaration of Charanjit Brahma and Exhibit A-1 detail the fees and costs through Oct 31, 2019, the time period when Troutman Sanders was lead counsel. The Declaration of Joseph Thomas and Exhibit B-1 detail the fees and costs for the time period after October 1, 2019 when Thomas Whitelaw & Kolegraff was lead counsel. Attorney fees and costs are summarized below:

Here is a summary of the fees and costs for the Third Lawsuit:

| | | |
|---|---|---|
| Troutman Sanders Attorney Fees: | $2,002,328 | (Brahma Decl. p.2) |
| Troutman Sanders e-merge Fees: | $ 16,659 | (Brahma Decl. p.3) |
| Troutman Sanders Costs: | $ 180,982 | (Brahma Decl. p.4 |
| Thomas Whitelaw Attorney Fees: | $ 820,069 | (Thomas Decl. p.4) |
| Thomas Whitelaw Costs: | $ 43,281 | (Thomas Decl. p.4) |

TOTAL ATTORNEY FEES AND COSTS: **$3,063,319**

### 2.   *PSD is Owed Expert fees and costs for the Third Lawsuit*

The conduct of Whitewater's attorneys and Whitewater's experts, Dr. Vigil and Dr. Stevick, as directed by their attorneys, constitute an abuse of the judicial process. Whitewater and its wholly owned subsidiaries weaponized the legal system for 6 years to put PSD out of business. In the Third Lawsuit, Dr. Stevick wrote reports and told the jury that a hinged metal plate could be a "flexible tongue." He told the jury that claims are always broader than what is in the patent specification. Dr. Vigil then used Dr. Stevick's opinions to absurdly conclude that PSD and FS together would have made an upfront lump sum royalty payment of $4M. This outrageous royalty is not supported by law, but was an attempt to bankrupt PSD. This court should award expert witness fees to PSD due to Whitewater's "abuse of the judicial process". *See*, *Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 379 (Fed. Cir. 1994). The expert witness fees are summarized below:

Mr. Lewis

| | |
|---|---|
| Fees Prior to Oct. 31, 2019.: | $277,537 (Brahma Decl. p.7) |
| Fees After Oct. 31, 2019 | $ 60,954 (Thomas Decl. p.8) |
| Costs After Oct. 31, 2019 | $ 2,055 (Thomas Decl p.9) |

Mr. Pribonic

| | |
|---|---|
| Fees Prior to Oct. 31, 2019: | $ 22,225 (Brahma Decl. p.8) |
| Fees After Oct. 31, 2019 | $ 18,900 (Thomas Decl. p.7) |
| Costs After Oct. 31, 2019 | $ 2,036 (Thomas Decl. p.7) |

Mr. Carmichael

| | |
|---|---|
| Fees Prior to Oct. 31, 2019: | $ 79,659 (Brahma Decl. p.6) |

Amica Law

| | |
|---|---|
| Fees Prior to Oct. 31, 2019: | $ 8,500 (Brahma Decl. p.5) |
| Costs Prior to Oct. 31, 2019: | $ 1,070 (Brahma Decl. p.5) |

TOTAL EXPERT WITNESS FEES:   **$472,936**

### 3.   *PSD is Owed Fees and Costs for the Second Lawsuit*

On February 25, 2020, this Court awarded PSD its attorney fees with regard to Whitewater's egregious litigation conduct with regard to their '016 patent assertion in the Second Lawsuit. (*See Case no. 3:15-cv-01879-BEN-BLM*, Dkt. 308). In its Order Setting Award of Fees and Costs, the Court only awarded fees for items directly attributable to the '016 patent, finding that PSD was the prevailing party only for the '016 patent. For entries where the Court could not identify if the work was directed to the '016 patent or the '589 patent ("Mixed Fees"), the court declined to award any fees. Although the Court awarded PSD $525,762 in '016 patent fees, PSD spent an additional $1,532,057 of Mixed Fees and costs, where every entry was directed to work on both the '016 patent and '589 patent. With a finding that this Third Lawsuit is exceptional as to the '589 patent, and with the prior finding that the Second Lawsuit was exceptional as to the '016 patent, all Mixed Fee items are each directed to an exceptional case. The attached Thomas Decl. (p.17) and Exhibit B-6 sets out the detail for the Mixed Fee request.

**TOTAL FOR THE SECOND LAWSUIT:** $1,532,057

**4.     *PSD is Owed Fees and Costs for the First Lawsuit***

The First Lawsuit was brought by Flowrider Surf Ltd. when Whitewater knew it did not have the right to file the suit. PSD engaged Kaufman Dolowich to defend the First Lawsuit. Now that PSD is the prevailing party in the Third Lawsuit, PSD is owed its attorney fees for the First Lawsuit as well. Exhibit B-7 shows Kaufman Dolowich's invoice for work on '589 patent in the First Lawsuit.

**TOTAL FOR THE FIRST LAWSUIT:**   $ 4,280

**V.     CONCLUSION**

This is an exceptional case under 35 U.S.C. §285, and as such the Court should award PSD its attorney fees and costs. Further Whitewater's egregious conduct is an abuse of the judicial process and exceptional under *Amstedm,* so PSD is also owed its expert witness fees. The total fees are summarized below:

| | |
|---|---|
| Third Lawsuit fees and costs (see § IV(C) (1)) | $3,063,319 |
| Third Lawsuit Expert fees and costs (see § IV(C) (2)) | $  472,936 |
| Second Lawsuit Mixed fees (see § IV(C) (3)) | $1,532,057 |
| First Lawsuit fees and costs (see § IV(C) (4)) | $     4,280 |

**TOTAL AWARD        $5,072,592**

Accordingly, PSD requests that the Court order Whitewater to pay all PSD's fees and costs of $5,072,592.

DATED: October 13, 2020          THOMAS, WHITELAW & KOLEGRAFF LLP

By:      /s/ Joseph E. Thomas
JOSEPH E. THOMAS
Attorney for Defendants

**Certificate of Service**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on October 13, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

DATED: October 13, 2020          THOMAS, WHITELAW & KOLEGRAFF LLP

By:   /s/ Joseph E. Thomas
      JOSEPH E. THOMAS
      Attorney for Defendants