JOSEPH E. THOMAS (State Bar No. 101443)
*jthomas@twtlaw.com*
WILLIAM J. KOLEGRAFF (State Bar No. 183861)
*wkolegraff@twtlaw.com*
GRANT J. THOMAS (State Bar No, 325011)
*gthomas@twtlaw.com*
**THOMAS WHITELAW & KOLEGRAFF LLP**
18101 Von Karman Avenue, Suite 230
Irvine, California 92612-7132
Telephone:   (949) 679-6400
Facsimile:    (949) 679-6405

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER WEST INDUSTRIES, INC,, a Canadian corporation,<br><br>             Plaintiff,<br><br>vs.<br><br>PACIFIC SURF DESIGNS, INC., a Delaware corporation and FLOW SERVICES, INC., a California Corporation,<br><br>             Defendants. | CASE NO. 3:17-cv-01118-BEN-BLM<br><br>**DECLARATION OF JOSEPH E. THOMAS IN SUPPORT OF DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. §285 (ECF NO. 369)**<br><br>The Hon. Roger T. Benitez<br>Courtroom: 5A<br>Hearing Date: November 23, 2020<br>Time: 10:30 a.m. |

## DECLARATION OF JOSEPH E. THOMAS

I, Joseph E. Thomas, declare:

1.      I am an attorney duly admitted to practice law in the State of California and am a partner with Thomas Whitelaw & Kolegraff LLP, attorneys of record for Pacific Surf Designs, Inc. and Flow Services, Inc. in the above-entitled action.  I am one of the attorneys responsible for the handling of the above matter.  If called as a witness, I could and would testify competently as to the facts set forth below, as I know each to be true based upon my own personal knowledge or upon my review of the files and records maintained by Thomas Whitelaw & Kolegraff LLP in the regular course of its representation of the Defendants.  I submit this declaration in support of Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Attorney's Fees Under U.S.C. §285.

2.      Attached hereto as **Exhibit A** is a true and accurate copy of the magazine photographs attached as Exhibits 8-10 to ECF 203 in the 2015 lawsuit.

3.      Attached hereto as **Exhibit B** is a true and accurate copy of an email dated April 3, 2017 from J. Barnes of Troutman Sanders to R. Tache of Greenberg Traurig regarding the Rule 11 warning.

4.      Attached hereto as **Exhibit C** is a true and accurate copy of a colorized drawing produced at trial during closing arguments of the prior art installations, Hyland Hills and Guam, that depicts that the pad, or tongue, was directly above the nozzles.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 16, 2020, at Irvine, California.


s/ Joseph E. Thomas
Joseph E. Thomas

3:17-cv-01118-BEN-BLM

**Certificate of Service**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on November 16, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any counsel of record who have not consented to electronic service through the Court's CM/ECF system will be served by electronic mail, first class mail, facsimile and/or overnight delivery.

DATED: November 16, 2020          THOMAS, WHITELAW & KOLEGRAFF LLP


                                  By:     /s/ Tierra Mendiola


3:17-cv-01118-BEN-BLM

# EXHIBIT A

**DECLARATION OF LEANNA C. COSTANTINI
ISO PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL DISCOVERY**

# EXHIBIT 8





C

**Splash**

The Exclusive Magazine of
the Waterpark Industry
©1997 American Services, Inc.
All rights reserved
**Splash** is published nine times
annually by American Services,
Inc., P.O. Box 14276, Lenexa,
Kansas 66285-4276, USA
**(913) 599-0300**
Advertising **(913) 381-8922**
e-mail **patty@waterparks.com**

Al Turr
Jess Sho
Marilyr
Jack Le
Patty M
Marci N

The annua
Splash issu
tries is $7!
Turner at
Miller at (

## Volume XVII, Number 3
## Our 123rd Issue, March 1997



F

Surf *Splash* Online at
**www.splashmagazine.com**

*Spring Management
School April 9-12
Page 6*



**Presic**
*KC was*

**Spring**
*Develop a*

**WWA**
*Preparatio*

**Colora**
*Hyland F*









the
Wav
sele
new
test-
ride
lowe
strati
Rock
style
Worl
Final
tion
the g
who
up
lines
playe
regga

In
minut
was
into
party
group
the
"Every
ing a
sun an
said or

*Continued from page 14*
numerous hours deciding on the best
in-park location for the attraction and
creative themeing. The staff finally
decided on a location close to
Thunder Bay, a 55,000 square foot

"It's just like MTV Beach
ed another excited rider.
to-be friends gathered a
advice, cheer the riders o
music and just enjoy the





*Continued from page 13*

would offer a challenge to the skills of riders combined with spectacular visual effects, attractiveness to spectators, high user capacity and the ability to attract winter sports enthusiasts—all driven by the strong beat of pop music.

After an exhaustive review of traditional and new technologies, the Hyland Hills staff contacted attorney-turned-inventor, Tom Lochtefeld, of Wave Loch, Inc., the creator of the Flow Rider ocean wave generator. A surfer himself, Tom set out in 1988 to design the perfect man-made wave. He built the first Flow Rider wave at Schlitterbahn Waterpark in New Braunfels, Texas, in 1991. Since then, he has built wave generators in Florida, California, Norway, Korea and Japan. In order to meet the requirements of a relatively small footprint and high hourly capacity, Tom created The Wave, the world's first mirror-image dual wave generator.

"The Wave is the culmination of 10 years of sacrifice, testing, research and development in stationary water technology," Tom remarked. "In addition, it's the only ride in the waterpark industry that is skill

based; in other words, you can get better the more times you try it."

The Wave, built on one acre for a cost of approximately one million dollars, operates with four pumps, each six feet high and three feet in diameter supplied by Flygt Corporation. The pumps propel water at 20 to 30 miles per hour uphill over a curved fiberglass form,



*Tom Lochtefeld, left, inventor of the Flow Rider surfing attraction technology, congratulates WWA Past President Greg Mastriona, the Executive Director of Hyland Hills Park District, which owns and operates Denver's Water World. Replacing a little used warming pool, "The Wave" is the world's first mirror image, dual wave generator.*

while the rider sits or lays on a boogie board in the water using gravity and water pressure to ride the wave.

Each wave puts out 20,000 pounds of thrust, generating 22,000 gallons of water per minute. In one second, the power of each wave could fill twelve 55 gallon drums. Chuck Neuman of Water Technology was responsible for the sump design and associated water calculations necessary to continuously recycle water through the system.

Sponsored by Ocean Spray with a multi-year agreement to help extend Ocean Spray's marketing theme "Crave the Wave", the ride became an instant hit.

"The Wave is unique because it offers fun for the novice and a real challenge for the expert" said General Manager Steve Loose. "For the novice, the excitement will simply be learning how to stay on the ride, while the experts will enjoy mastering new and better ways to ride. Additionally, The Wave will make it easier to market Water World to the thousands of snowboarders, skateboarders and in-line skaters in Colorado."

In order to enhance the total ride experience, Water World staff spent
*Continued on page 16*

**Exhibit 8**
**Page 70**

14



THE COLORADO WAVE

at Hyland Hills

Exhibit 8
Page 71

DECLARATION OF LEANNA C. COSTANTINI
ISO PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL DISCOVERY

# EXHIBIT 9



ncient history tells us Pharaoh's Lost Kingdom has been in the development stages for centuries.

But this new Pharaoh's Lost Kingdom is located next to Interstate 10, ideally positioned on the map between Los Angeles and Palm Springs, California, at the base of a resort area in the San Bernardino Mountains. Ultimately, the chosen site for the kingdom was Redlands, California, in the heart of the Inland Empire, with its five million population.

A group of local businessmen wanted to develop a family entertainment theme park which families of all ages could enjoy, all day long, all year round. With that goal in mind, Aladdin Entertainment Group was formed with Jim, John and Art Braswell as the major investors and operators.

At the early stages, the group brought in Richard Woodhouse, formerly of Raging Waters, San Dimas, California, as a partner and general manager, to develop and operate the facility. This new partnership concentrated a variety of theme park and entertainment experience into one group and helped to define an outstanding and innovative project.

Following the story line, the Egyptian motif was woven into all aspects of the park, including the main entrance. The visitor passes through the base of a 55,000 square foot "Tomb" with a glass pyramid in its center. The Pharaoh dictated that when people enter the gates of Pharaoh's Lost Kingdom, the Egyptian theme must create an instant fantasy of journeying back to ancient times.

Overseeing this mandate is an animated Egyptian character who greets all guests, welcoming them as her fellow space travelers. She tells them, "While inside the park, you should forget your worries, and enjoy all of the magical delights that the Pharaoh has designed just for you!"

The Pharaoh proclaimed that his guests should be free to visit his treasures and attractions. Keeping the family unit in mind, guests may choose between "Pay As You Go"

Continued on page 84

# PHARAOH'S LOST KINGDOM

## THE ULTIMATE FAMILY THEME PARK
### by Cindy Capen

*Director of Marketing and Promotions for this new family theme park, Cindy Capen was Marketing and Advertising Director for the Palm Springs International Film Festival. She worked as a television producer for the Palm Springs ABC affiliate. She has managed several special promotions, including Domino's Pizza World Record Week, PGA West, held at Mission Hills Country Club.*

Website: www.pharaohs.com

-cv-01118-BEN-BLM   Document 203-13   Filed 05/01/19   PageID.7108   Page 3 of 4



Exhibit 9
Page 73



Exhibit 9
Page 74

**DECLARATION OF LEANNA C. COSTANTINI
ISO PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL DISCOVERY**

# EXHIBIT 10







THE NEWEST FLOW RIDER SITE AT TARZA WATER PARK GUAM



WAVE LOCH

Tel (702) 786-3434  Fax (619) 454-1888

Exhibit 10
Page 75

U S Patent 4564190, 4905987, 4954014, 5171101, 5236280, 5271692, 5393170, 5401117, 5421782, 5503597. Other U.S. and foreign patents pending.



NEWEST FLOW RIDER® SITE AT TARZA WATER PARK. GUAM

Exhibit 10
Page 76

# EXHIBIT B

| | |
|---|---|
| **From:** | tacher@gtlaw.com |
| **Sent:** | Wednesday, April 5, 2017 11:50 AM |
| **To:** | Barnes, Justin |
| **Cc:** | Brahma, Charanjit; Mao, Mark C.; Shah, Anup M.; Franich, Christopher; costantinil@gtlaw.com; barrowss@gtlaw.com; squiere@gtlaw.com; SchindlerB@gtlaw.com; malinoj@gtlaw.com; BershL@gtlaw.com; AndrewsT@gtlaw.com |
| **Subject:** | RE: Correspondence in Case No. 3:15-cv-01879 |
| **Attachments:** | image002.png; image004.png; image006.jpg |

Dear Justin,

Your email of April 3, 2017 @ 10:28 pm contains material inaccuracies as to the facts and patent law and, based on that, incorrect conclusions.  If you persist with such statements, we will have no choice but to note that to the court and to seek relief (including possible sanctions) on behalf of our clients.  We trust and hope that, on reflection, you will not require us to do that.

We do not believe it will be constructive to here correct your inaccuracies or to get drawn into an email debate with you.  But, we reserve our clients' position and rights as to your email if and when a correction or other responsive steps appear needed or advisable.

We are instead concentrating on finishing the discovery within the current discovery deadline, and suggest that you do so too.  We do not agree to extend the deadline, and will oppose any application to do so.

Regards,

-Rick

P.S.  Your email is actually addressed to the merits of the case, not conduct warranting (much less justifying) its threats under Rule 11.  Of course, if you truly believe what you wrote and wish to pursue that, you can do so by motion on the merits.  If you do so move, we will oppose your motion and seek relief as to any inaccuracy in it.

J. Rick Taché
Co-Managing Shareholder - Orange County
Co-Chair, Global Patent Litigation Group Greenberg Traurig, LLP | 3161 Michelson Drive | Suite 1000 | Irvine, CA 92612
Tel: 949.732.6600
Fax: 949.732.6501
Cell: 714.944.5099
tacher@gtlaw.com | www.gtlaw.com

From: Barnes, Justin<mailto:Justin.Barnes@troutmansanders.com>
Sent: Monday, April 3, 2017 10:28 PM
To: Taché, J. Rick (Shld-OC-LT-IP-Tech)<mailto:tacher@gtlaw.com>; Costantini, Leanna (Assoc-OC-IP-Tech)<mailto:costantinil@gtlaw.com>; Squier, Erik (Assoc-OC-IP-Tech)<mailto:squiere@gtlaw.com>; Barrows, Sarah (OfCnsl-SFO-IP-Tech)<mailto:barrowss@gtlaw.com>
Cc: Barnes, Justin<mailto:Justin.Barnes@troutmansanders.com>; Brahma, Charanjit<mailto:Charanjit.Brahma@troutmansanders.com>; Mao, Mark C.<mailto:Mark.Mao@troutmansanders.com>; Shah, Anup M.<mailto:Anup.Shah@troutmansanders.com>; Franich, Christopher<mailto:Christopher.Franich@troutmansanders.com>
Subject: Correspondence in Case No. 3:15-cv-01879

Dear Counsel,

I write to explain Plaintiffs' Rule 11 basis to continue its infringement assertions in this case.  Recent documents, as well as testimony from last week's deponents, lead us to believe that, to the extent there ever was a good faith basis to bring suit, it no longer exists.  Accordingly, prior to PSD seeking relief from the Court and seeking all warranted fees, I wanted to reach out to Plaintiffs first.

'016 Patent Invalidity

Presently the '016 patent is being reviewed by the PTAB in view of numerous references from Mr. Lochtefeld, the '589 patent inventor, including the '589 patent itself.  Documents that have been produced by Plaintiffs in their ESI production show that Plaintiffs and their predecessors (e.g., Wave Loch) believed that Murphy's Waves products (including the admittedly embodying product, the Stingray) infringed the '589 patent.  In light of these facts, it is PSD's position that any reasonable pre-suit diligence would have indicated that the '016 patent is not valid in view of the other patent in suit, the '589 patent.

Furthermore, Mr. Thatcher's recent deposition testimony indicates that the '016 patent is invalid for an independent basis.  Plaintiffs have accused PSD's Supertube of infringement throughout this case.  Yet Mr. Thatcher was adamant that PSD's Supertube is identical to Plaintiffs' FlowBarrel product, which predates the '016 patent's priority date by several years.  It is a well-known axiom of patent law that what infringes if later anticipates if earlier.  Accordingly, this is an independent basis for PSD to question Plaintiffs' Rule 11 basis on the '016 patent.

'589 Patent Invalidity

Plaintiffs have contended throughout this case that the FlowRider line of products embody the '589 patent.  As PSD has contended for some time, the FlowRider products that predate the '589 patent's priority date are anticipatory.  Mr. Lochtefeld's recent document production, as well as his testimony, have only bolstered PSD's belief.  The Hyland Hills schematics produced just last month (including some the day before his deposition) show all of the elements of the '589 patent, and Mr. Lochtefeld's testimony fully supported this fact.

[cid:image002.png@01D2ACC9.897ADC20]

[cid:image004.png@01D2ACC9.897ADC20]

He testified that the purpose of the padded foam depicted in Exhibits 5 and 7 (reproduced above) of his deposition was to cover the nozzle and to protect riders from injury, e.g., colliding with the nozzle assembly or getting a body part stuck.  The depicted nozzle cover is explicitly described as being a "pad," (i.e., it is "padded"), and the lower portion of the pad – the triangular portion at the bottom – squarely satisfies the claim construction advocated by Plaintiffs and adopted by the Court regarding a tongue that is biased downwards.  It is both "urged" downwards and biased by virtue of gravity, and extends from the edge of the pad.  D39 at 10:7-8.  As Plaintiffs urged in their briefing, there is no need for the "tongue" and the "pad" to be two separate pieces.  D43 at 4:18-20.  In short, in view of the claim construction advocated by Plaintiffs, as well as the clear depiction in the drawings and Mr. Lochtefeld's testimony, we do not believe there remains any good faith basis to continue asserting the '589 Patent.

Late Production of '589 Prior Art

In PSD's view, there is no legitimate basis for the late production of the prior art materials, including the Hyland Hills documents.  Separate from whatever arguments Plaintiffs may have regarding PSD's invalidity contentions, discovery requests, etc., the fact remains that Plaintiffs knew before filing suit that the FlowRider line of products embodied the '589 patent, and that there were several installations of FlowRider rides prior to the '589 patent being filed.  Accordingly, it is PSD's position that a reasonable party would have investigated these early installations as a precursor to filing suit, and certainly would have collected these documents for its own review and for production to the other side.

As PSD explained in the Joint Case Management Statement, Mr. Lochtefeld has a contractual obligation to assist Plaintiffs in this litigation.  D94, 11:10-12.  Accordingly, even if Plaintiffs themselves did not have any prior art in their possession or custody (a fact that PSD does not concede), Plaintiffs plainly had "control" over Mr. Lochtefeld and his documents.  The FlowRider website infers as much, in stating that Plaintiffs have access to every prior installation.  That Plaintiffs and Mr. Lochtefeld have a common interest agreement, and are represented by the same counsel, also bolsters PSD's belief.

What is especially troubling is that Mr. Lochtefeld's recent production contradicts Plaintiffs prior representations regarding the completeness of their production, and Mr. Lochtefeld's testimony also contradicts Plaintiffs prior representations that they had been in contact with the inventors for some time.  On May 22, 2016, Plaintiffs' counsel agreed to produce documents sufficient to identify the design of FlowRider installations prior to January 3, 2012.  After the parties' joint statement regarding the case management order – where Plaintiffs represented to the Court that they had "produced all documents in its possession responsive to PSD's requests" – Plaintiffs confirmed on October 14, 2016 that it had reached out to both inventors and produced all responsive documents.  Four days later, on October 18, 2016, Plaintiffs once again confirmed that they had reached out to Mr. Lochtefeld, and would do so once again: "As I stated in my previous email, we believe all relevant and responsive documents in Plaintiffs' care,

EXHIBIT U
Page 624

custody, and control have been produced; however, in an abundance of caution, we will check with our client to determine whether any additional responsive documents exist. To the extent documents relating to non-practicing FlowRider devices are held by Mr. Lochtefeld, as I previously stated, we will contact Mr. Lochtefeld again."

Yet Mr. Lochtefeld stated at his deposition that he was not contacted regarding this case until he received a subpoena, which did not occur until November 18, a month later.  His production did not begin until January 2017, and between then and the day before his deposition, he produced dribs and drabs of information regarding the prior art installations, but certainly more than had been received from Plaintiffs themselves when they informed the Court that their production was "complete."  Moreover, Mr. Lochtefeld stated that he instructed his assistant to provide "everything" requested by counsel, so the dearth of production does not appear to lie with Mr. Lochtefeld himself.  In short, either through negligence or purposeful action, Plaintiffs avoided providing PSD key prior art for 18 months of this suit.

That Plaintiffs in the past two weeks backtracked from their earlier representations, and attempted to withhold production of additional schematics and drawings, gives PSD reason to believe that Plaintiffs' actions were deliberate.  In other words, it is PSD's belief that once Plaintiffs realized the strength of these documents as prior art, they attempted to prevent any further disclosure.  Only once PSD threatened to move to compel did Plaintiffs provide more information (beginning last Friday), and this additional information, such as the drawings from the Guam installation (reproduced below), show that more than one prior art installation anticipates the '589 patent. [cid:image006.jpg@01D2ACC9.897ADC20]

Request for Immediate Meet & Confer, Extension of Discovery Deadline At this juncture, based on the above facts, PSD believes it would be more than justified to file a Rule 11 motion with the Court and seek terminating sanctions and attorney fees.  That being said, PSD appreciates the severity of such a request, and would like to meet-and-confer with Plaintiff to discuss less drastic remedies, such as a possible "walk away" that would spare the parties more costly briefing, not to mention the additional work that would need to be done during the period the Rule 11 motion is pending.  Separately, we would like to discuss an extension of the fact discovery deadline until May 26, in order for PSD to have sufficient time to review and analyze Mr. Lochtefeld's most recent productions, and conduct the necessary follow-up discovery based on this new production.

If Plaintiffs are unwilling to drop their assertions, PSD intends to 1) serve a formalized Rule 11 motion and trigger the 21 day safe-harbor provision, and 2) seek an extension to the fact discovery deadline and associated sanctions.

As we will both be in Vancouver this week, I would be happy to meet in person and discuss any and all of the above issues.  Please let me know your availability at your earliest convenience.

Best Regards,


Justin


Justin Barnes
Direct: 858.509.6063
justin.barnes@troutmansanders.com
─────────────────
TROUTMAN SANDERS
11682 El Camino Real, Suite 400
San Diego, CA 92130
troutmansanders.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.troutmansanders.com&d=DwMF3g&c=2s2mvbfY0UoSKkl6_Ol9wg&r=-PFK2rBKNPR-RiO6BukYbg&m=1wBVNCR_Oan-eQWpM016gc28w7XhTeAkgCMJRjXFMOo&s=zbSu79gVpRpZok1jqY86LVaaSFnsfZAsL7yT9u_RVhE&e=>
  Sent from Troutman Sanders


─────────────────────────

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

------------------------------------------------------------------------
If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information.

# EXHIBIT C

# All Asserted Claims are Obvious in view of the Prior Art



Ex. BI

Hyland Hills



Nozzle
Flexible
Tongue
Water

Guam

Frenzl

Ex. KB-5

Ex. CJ-4

46